# Dr. Richard Drogin Rebuttal
# to Declaration of Dr. Ali Saad

# Ellis v. Costco

## Richard Drogin, Ph. D.

August 10, 2006

*Richard Drogin*

---

Richard Drogin, Ph. D.

August 10, 2006
(510) 540-5071

## A. INTRODUCTION

1. I have been retained by Plaintiffs' counsel to analyze statistical questions raised in the Ellis v. Costco litigation.  The purpose of my study was to obtain descriptive summaries of computer data, and prepare various statistical analyses relevant to the issues in the case. I have previously submitted a report in this litigation, dated May 15, 2006.  Subsequently, defendant's expert Dr. Ali Saad submitted a report June 2006 giving his opinion and results regarding his review of my May 15 report.   During the subsequent 2-3 week period he provided backup materials for his report. On June 29, 2006 Dr. Saad was deposed.  I have reviewed a copy of the deposition transcript. The report below gives my rebuttal to Dr. Saad's report and deposition testimony.

2. Dr. Saad's report covers several issues regarding plaintiffs' expert reports.  My rebuttal will address those areas where he has presented his opinions regarding issues covered in my May 15 report.  In this report I will explain the flaws in his conclusions regarding promotion into AGM, his interpretation of job posting data he compiled, and his analysis of time spent in Senior Staff jobs prior to promotion.

### B. SUMMARY OF FINDINGS

3. The findings reported below are that Dr. Saad:

a) Confirms accuracy of the analyses I presented in my May 15 report;

b) Uses a tainted variable to explain adverse impact against women in promotion to AGM;

c) Improperly uses haphazard, grossly incomplete and unrepresentative job posting data for some management and non-management vacancies to draw inferences about differential job interest by gender among Senior Staff employees;

d) Fails to report that women promoted to AGM have a statistically significantly greater amount of time spent in Senior Staff jobs than men who are promoted, during the period 1999-2003;

e) Fails to report that the percent of women promoted to AGM who held three or more Senior Staff jobs prior to promotion is a statistically significantly greater percent than corresponding percent for men.

**Dr. Saad Confirms Accuracy of Drogin Analysis**

4. In my May 15 report I showed that there is a statistically significant shortfall of women promoted into the AGM position.[1] The model I used assumes the availability pool for promotion into AGM consists of all women Senior Staff employees, and does not distinguish the job held within the set of Senior Staff jobs. Dr. Saad replicated the main results I presented in my May 15, report, and agrees with the accuracy of the calculation according to the assumptions of the model described in my report.[2]

**Dr. Saad's Criticism of Drogin Analysis are Meritless**

5. Dr. Saad mischaracterizes my analysis of promotions into AGM. He states in reference to my analysis, "Since incumbent staff managers may be at different stages in their rotation it makes little sense to look only at the current staff job."[3] However, my analysis did not look 'only at the current staff job', but rather looked at the group of all staff managers as a whole, in order to account for managers being in different stages of their rotation.

6. Dr. Saad states "Dr. Drogin's statistical analysis of promotion to AGM is not reliable, because he fails to take into account staff manager job experience …".[4] In order to examine the effects of differences in total years of staff manager experience on the likelihood of promotion, I have performed an alternative promotion analysis taking into account the total time in staff manager jobs as a

---

[1] Drogin report, May 15, Table 8, page 10.
[2] Saad report, page 30, paragraph 41.
[3] Saad report, p.31:25-27
[4] Saad report, p.3:20-22.

control variable.  In this analysis I considered each promotion into AGM, and looked at the total time in Senior Staff positions spent by the person promoted, prior to the promotion.  Then, I constructed the availability pool to include only Senior Staff employees with the same or more Senior Staff experience as the promotee.  The results of this analysis, using Dr. Saad's data, are shown in the following table.

Table 1

**Analysis of Promotions into AGM**

Controlling for number of years of Sr. Staff experience

Pool = Senior Staff Employees

| Year[5] | Promotions | | | Average % Women in Pool | Loss | Cumulative | |
|---|---|---|---|---|---|---|---|
| | Total | Women | | | | Loss | Z-Value |
| 1999 | 65 | 10 | 15.4 | 29.0 | -8.8 | -8.8 | -2.42 |
| 2000 | 127 | 22 | 17.3 | 28.3 | -13.9 | -22.8 | -3.64 |
| 2001 | 128 | 18 | 14.1 | 28.2 | -18.2 | -40.9 | -5.08 |
| 2002 | 98 | 23 | 23.5 | 27.2 | -3.6 | -44.6 | -4.85 |
| 2003 | 80 | 15 | 18.8 | 27.7 | -7.1 | -51.7 | -5.16 |
| 2004a | 55 | 14 | 25.5 | 26.7 | -0.7 | -52.4 | -4.97 |
| Pre-8/2004 | 553 | 102 | 18.4 | 27.9 | | | |
| | | | | | | | |
| 2004b | 56 | 17 | 30.4 | 27.1 | 1.8 | 1.8 | 0.54 |
| 2005 | 42 | 17 | 40.5 | 27.5 | 5.5 | 7.3 | 1.65 |
| Post-8/2004 | 98 | 34 | 34.7 | 27.3 | | | |
| | | | | | | | |
| Total | 651 | 136 | 20.9 | 27.8 | | -45.1 | -3.95 |

This analysis supports the same conclusion as the one found in my May 15 report.  Namely, there is a statistically significant shortfall of female promotions into AGM, having a Z-value of -3.95, and the pattern is more pronounced prior to the filing of this lawsuit.

7. Dr. Saad suggests that a control for region should be added to a promotion analysis for moves into AGM.[6]  I refined the analysis described in the previous paragraph further, by adding a control for the region where the

---

[5] 2004a includes promotions during January through July 2004.
 2004b includes promotions during August through December 2004.
[6] Saad report, pps.35:25-36:5.

3

promoted person worked, and found that this additional factor has no effect on the result. That is, when restricting the availability pool for each promotion to the set of employees with at least as many years of Senior Staff experience as the person promoted, and working in the same region, the shortfall of female promotions has a statistically significant Z-value of –3.94. The following table shows the results for this analysis.

Table 2

**Analysis of Promotions into AGM**

Controlling for number of years of Sr. Staff experience and Region

Pool = Senior Staff Employees

| Year | Promotions | | | Average % Women in Pool | Loss | Cumulative | |
|------|------|------|------|------|------|------|------|
|  | Total | Women |  |  |  | Loss | Z-Value |
| 1999 | 65 | 10 | 15.4 | 29.2 | –9.0 | –9.0 | –2.54 |
| 2000 | 127 | 22 | 17.3 | 27.2 | –12.6 | –21.6 | –3.56 |
| 2001 | 128 | 18 | 14.1 | 28.8 | –18.9 | –40.5 | –5.14 |
| 2002 | 98 | 23 | 23.5 | 26.4 | –2.9 | –43.4 | –4.83 |
| 2003 | 80 | 15 | 18.8 | 27.2 | –6.8 | –50.2 | –5.12 |
| 2004a | 55 | 14 | 25.5 | 25.5 | 0.0 | –50.2 | –4.88 |
| Pre-8/2004 | 553 | 102 | 18.4 | 27.5 |  |  |  |
| 2004b | 56 | 17 | 30.4 | 28.6 | 1.0 | 1.0 | 0.29 |
| 2005 | 42 | 17 | 40.5 | 28.2 | 5.1 | 6.1 | 1.39 |
| Post-8/2004 | 98 | 34 | 34.7 | 28.5 |  |  |  |
| Total | 651 | 136 | 20.9 | 27.7 |  | –44.1 | –3.94 |

**Dr. Saad's Promotion Model is Based on A Tainted Variable, not Costco Policy**

8. Dr. Saad constructs two alternative analyses of promotions into AGM. One analysis separates all Senior Staff into sixteen subgroups, depending on the combination of the four Senior Staff jobs they have held. A second analysis separates Senior Staff into two groups, those with Merchandising Manager experience and those without Merchandising Manager experience.[7] Dr. Saad's statistical models are defective, because he introduces a tainted variable to explain the shortfall of women promoted, that is, prior Merchandise Manager

---

[7] Saad report, p.31:6-15.

4

experience.  A tainted variable is one for which the values of the variable itself may be influenced by discrimination.

9. As I explained in my May 15 report, most Senior Staff positions are filled by rotation, not by promotion.  Among those Senior Staff positions filled by promotion, Front End Manager is the most common initial position entered.[8] For rotation assignments, Costco makes the decision as to where to rotate an employee.[9]  Women are less likely to be rotated into Merchandise Manager jobs from other Senior Staff jobs than is expected from their representation in these jobs.[10]  Since women in Senior Staff jobs are less likely to be rotated into Merchandising Manager positions, and "staff managers with merchandising experience have a better chance of getting promoted than those without such experience"[11], women are less likely to be promoted to AGM.

10. Company policy is to treat all Senior Staff jobs as a group, and to rotate employees among the four Senior Staff positions in order that each employee gain experience in each of these jobs.[12]   However, there is empirical evidence that shows that Costco does not follow this policy, and women in Senior Staff are not always rotated through the same jobs as men.[13]  By controlling for 'Senior Staff experience', Dr. Saad is factoring in Costco's failure to follow its policy as justification for their failure to promote Senior Staff women into AGM positions. In other words, Dr. Saad is constructing his statistical model based on Costco practices rather than Costco policy.  Moreover, these practices themselves have adverse impact on women, thus limiting promotional opportunities.

---

[8] Drogin May 15 report, page 4-5.
[9] Drogin May 15 report, page 9.
[10] I presented a discussion and analysis of this pattern in my May 15 report, on page 8, paragraph 17.
[11] Saad report, p.33:25-27.
[12] The elements of this policy are outlined in detail in my May 15 declaration, on pages 8 and 9, paragraph 18.
[13] Drogin May 15 report, paragraph 13 on page 7, and paragraph 17 on page 8.

**Dr. Saad's Study of Job Posting Data is Defective**

11. Costco has no job posting system for filling vacancies in GM or AGM. Moreover, employees rotated between Senior Staff positions are moved at the discretion of the GM, and there is no formal process for Senior Staff employees to indicate interest in a particular rotation.  Nevertheless, Dr. Saad relies on a study of existing job posting data for vacancies in Senior Staff positions and lower level management jobs to draw inferences about the differences in job preferences between men and women.[14]  His study is defective, and his inferences drawn from the study are not reliable, because

a) the data he used is grossly incomplete and unrepresentative;

b) he does not know whether most of the vacancies for which he has no data were posted or not;

c) his methodology for coding  and compiling his database is haphazard, misleading and arbitrary;

d) he uses his study of job posting applicants for promotion to Senior Staff jobs to draw inferences about differences in job interest among men and women holding Senior Staff jobs for promotion into AGM positions and for rotation among Senior Staff jobs.

Each of these defects in Dr. Saad's analysis is discussed in the following paragraphs.

12. Under questioning at his deposition, Dr. Saad admitted that he did study the completeness of the job posting data, and that his study includes information for  "...between 15 and 20 percent of the moves that are similar to those jobs that were posted."[15]  This means information for 80-85% of all vacancies in management and non-management jobs where posting might occur are not included in his study.  There were about 125 warehouses that could not provide any posting data.  Moreover, he also admitted that the data he did study cannot be considered as a random sample[16], and thus he has no way of knowing whether the data he studied is representative of all vacancies.

---

[14] Saad report, pps.40:27-41:2.
[15] Saad deposition, page 28.
[16] Saad deposition, page 28.

6

13. Dr. Saad could not explain whether the large number of positions for which there was no posting data was a result of the fact that the data was not retained, or whether the jobs were never actually posted.[17] This is an important threshold question that should be answered before any meaningful analysis of posting data can be undertaken. If most, or possibly nearly all, openings in Senior Staff positions are not even posted, then the existing posting data for the remaining openings cannot be considered as an unbiased measure of interest in promotion. Dr. Saad never discusses in his report why there are such a large number of openings for which there is no posting data.

14. As mentioned above, Dr. Saad's job posting data includes some postings for Senior Staff openings and also for lower level management openings. I have studied the file restricted to postings for openings in Senior Staff positions. I then compared Dr. Saad's job posting data for Senior Staff openings with the full set of openings in Senior Staff filled by promotion and by rotation, as determined from the electronic history database. Openings included in Dr. Saad's posting data amounted to only about 10% of the approximately 2500 vacancies actually filled by promotion into Senior Staff. In other words, Dr. Saad's job posting data has no information for 90% of Senior Staff openings filled by promotion. Moreover, Dr. Saad's posting data includes less than 2% of the approximately 3200 vacancies in Senior Staff filled by rotation. Accordingly, only about 5% of all vacancies filled in Senior Staff positions are included in Dr. Saad's posting data.

15. The paper files provided to Dr. Saad for his job posting study were of very low quality. "These records were in a variety of formats, and in a variety of states of organization and completeness."[18]  The files had to be collected directly from the warehouses. In the process of converting the paper files into an electronic database, Dr. Saad set up various rules and procedures for handling anomalous and ambiguous cases. For example,

---

[17] Saad deposition, p.31:1-9.
[18] Saad report, p.41:12-14.

a) Dr. Saad failed to distinguish postings for a generic[19] Senior Staff openings compared to an opening for a specific Senior Staff position. He coded the generic Senior Staff postings according to the specific job the successful applicant entered.[20] By coding the postings for generic Senior Staff openings as the specific job that was filled, Dr. Saad distorts his measure of interest in all Senior Staff jobs.  For example, suppose a woman applies for a generic posting, and was then selected and assigned to Front End Manager.  Dr. Saad's methodology would count this women's application, as well as those of all other applicants for this posting, as showing interest in Front End, and not Merchandise or any other Senior Staff job.  A study of the paper record documents Dr. Saad relied upon in compiling his database of posting data shows that there were at least 50 examples where the posting indicated a generic opening in Senior Staff.  Thus, Dr. Saad's measure of interest in various Senior Staff jobs does not accurately reflect the actual interest shown in the limited application data he studied.

b) some of the paper files were simply unusable and had to be excluded;[21]

c) in some cases Dr. Saad created an "implied posting" from paper resumes;[22]

d) some of the paper files were excluded if there were applicants who were not in the human resource electronic files;[23]

e) postings showing only one applicant were excluded;[24]

f) in some cases the posting corresponded to a promotion found in the electronic personnel data, but the person promoted was not an applicant, so Dr. Saad added this person to the set of applicants;

g) Dr. Saad counted a promotion found in the electronic data as having matching posting data even if the actual promotion occurred up to two months prior to the job posting date.[25]

---

[19] Generic openings are those postings that do not designate a specific Senior Staff job opening among the four Senior Staff jobs
[20] Saad deposition, pps.72:24-73:16.
[21] Saad deposition, p.64:17-25.
[22] Saad deposition, p.57:5-20 and p.59:12-24.
[23] Saad report, p.41:25-28.
[24] Saad report, p.41:24-25;
[25] Saad deposition, p.66:13-25.

16. In addition to the reasons described above, Dr. Saad's inferences about "differential job interest by gender" based on his job posting study are flawed, because the population he studied, primarily employees below Senior Staff, is different from the population for whom he is making his inference, Senior Staff employees. Dr. Saad uses his study of applicants for posted openings into Senior Staff jobs and below to make inferences about Senior Staff employees who want to be AGMs or who may seek to be rotated into Merchandise Manager positions.[26] He fails to recognize that the set of people he is studying in his posting data are not the same group as the set of people he is making inferences about.

17. Rotation of Senior Staff employees is at the discretion of the GM, and because there is no posting or application process involved, there is no formal mechanism in place for taking differential job interest into account. Indeed, Costco Management assumes all Senior Staff employees are interested in AGM and GM positions.[27] Employees who have achieved Senior Staff level positions may well have different interest in advancement than lower level employees. Moreover, rotation of Senior Staff employees among the four Senior Staff jobs is part of company policy. Accordingly, it is reasonable to assume that Senior Staff employees expect to be rotated among the four Senior Staff jobs.

**Women Promoted to AGM Spend More Time in Senior Staff than Men**

18. Dr. Saad criticized the study of time until promotion into AGM I presented in my May 15 report. I found that men take less time since date of hire to reach AGM than women who reach AGM, on the average. Dr. Saad stated that this analysis fails to "account for several relevant factors", such as "differences between promotees early in their careers."[28]

---

[26] See Saad report, pages 40-41, paragraph 63.
[27] Zook deposition, pps.129:1-130:23
[28] Saad report, pps.37:28- 38:4

9

19. Dr. Saad suggests a more appropriate analysis would restrict the comparison to time spent in Senior Staff jobs prior to promotion to AGM.[29] He reports that the average number of years spent in Senior Staff before promotion is greater for women than men, by about six months, on the average, for promotions into AGM during April 1, 1999 through July 31, 2004.[30] He also reports that this difference is not statistically significant. However, he does not report excluding promotions in 2004, women spend 4.29 years in Senior Staff compared to 3.58 years for men, a difference of about eight months. This disparity is statistically significant, with a Z-value = 2.43.

**Women Promoted to AGM have Held More Senior Staff Jobs than Men**

20. In my May 15 report I presented results showing that women promoted to AGM held more Senior Staff positions than men prior to promotion to AGM.[31] That study was limited to persons who moved into AGM during the period April 1999 forward, and for whom the available computerized job history data was likely to be complete. I have repeated the same study using Dr. Saad's database, which includes both the electronic and paper record data he compiled, and gives complete histories for those promoted to AGM from April 1999 forward. The following table summarizes the distribution for number of different Senior Staff jobs held prior to promotion, by persons promoted into AGM.

---

[29] Saad report, p.38:10-20.
[30] Saad report, p.38:18-20.
[31] Drogin May 15 report, page 6 paragraph 11. The conclusion stated in that paragraph is correct, but there is a typo in the cited percentage of men who held three or more Senior Staff jobs. The second to last sentence in that paragraph should read, "Women tend to hold more Senior Staff jobs than men prior to promotion into AGM, with 42.3% of women holding three or more Senior Staff jobs compared to 27.6% of men."

Table 3

**Senior Staff Jobs Held Prior to**

**Promotion Into Assistant General Manager**

Based on Saad histandbio Database

| Number Sr. Staff Jobs Held | Total | | Men | | Women | |
|---|---|---|---|---|---|---|
| Held 1 job | 103 | 15.8% | 85 | 16.5% | 18 | 13.2% |
| Held 2 jobs | 196 | 30.1 | 166 | 32.2 | 30 | 22.1 |
| Held 3 jobs | 206 | 31.6 | 150 | 29.1 | 56 | 41.2 |
| Held 4 jobs | 146 | 22.4 | 114 | 22.1 | 32 | 23.5 |
| Total | 651 | | 515 | | 136 | |

The result obtained using the entire group of those promoted into AGM is consistent with, if not more pronounced than, the results described in my May 15 report. Namely, women who are promoted on average held more Senior Staff jobs than men. Thus, 64.7% of the women promoted into AGM held three or more Senior Staff jobs prior to their promotion, but only 51.2% of the men did. The disparity between these two percentages is statistically significant, with a Z-value of 2.80.

## EXPERT REPORT OF BARBARA F. RESKIN, Ph.D.[*]

### *Shirley "Rae" Ellis et al. v. Costco Wholesale Corp.*

### QUALIFICATIONS, ASSIGNMENT, AND MATERIALS REVIEWED

I have been retained by Brad Seligman and Jocelyn Larkin of The Impact Fund and by Bill Lann Lee from the law firm of Lieff Cabraser Heimann & Bernstein, counsel for the plaintiffs in *Shirley "Rae" Ellis et al. v. Costco Wholesale Corp.* I was asked to review materials pertaining to personnel policies and practices of Costco and to address whether Costco has a common culture and common policies, practices or procedures that are uniform across the U.S. retail divisions regarding advancement into assistant warehouse manager and warehouse manager positions, and, if so, the implications of this common culture and practices on women's qualifications for and access to positions as warehouse manager or assistant manager. Finally, I was asked to offer an opinion as to the effectiveness of Costco's personnel practices (including its diversity programs) for identifying, monitoring, and eliminating potential discriminatory barriers to women's promotion to posts as assistant warehouse manager and warehouse manager.

*Qualifications.* I received my Ph.D. in Sociology from the University of Washington in 1973 where I was a National Science Foundation fellow. I have been a Professor of Sociology at the Universities of Michigan, Illinois, Ohio State (where I was department chair and a distinguished professor), and Harvard University. I am currently the S. Frank Miyamoto Professor of Sociology at the University of Washington.

I have served as an expert in several workplace discrimination lawsuits (see Appendix). I have served as a consultant to the U.S. Bureau of Labor Statistics, have been on several National Research Council Committees, and was study director for the NRC's Committee on Women's Employment and Related Social Issues which was supported by the Department of Labor's Employment Training Division. I collaborated with the Employment Policy Institute to study the impact of nonstandard jobs on workers and on work-family issues, projects supported by the Sloan and Ford Foundations.

I have been recognized by my profession and the American scholarly community in several ways. I have been elected a Fellow of the National Academy of Sciences and the American Academy of Arts and Sciences. I have been elected both President and Vice President of the American Sociological Association, and I have received the Association's Distinguished

Scholarship Award for research on sex and gender. I have been a Fellow at the Center for Advanced Studies in the Behavioral Sciences at Stanford University.

I teach graduate and undergraduate courses on statistics, the sociology of work and labor markets, social stratification, and gender and race in work organizations. My specialties include quantitative and qualitative research on gender, race, and ethnic inequality in work organizations and labor markets, and I do research in these areas. Over the past twenty years, much of my research has focused on issues of workplace discrimination and on organizational policies and practices that can mitigate conscious and unconscious stereotyping, automatic and conscious ingroup favoritism, and sex bias. My research has been supported by grants from the National Institute of Mental Health and the National Science Foundation. I have also published several dozen scholarly articles and chapters—several of the former in my discipline's and other disciplines' top journals, and almost entirely in peer reviewed journals. I have published several scholarly monographs and books about gender and work. A copy of my *curriculum vitae* is attached to this report.

I have given invited lectures about my research at the Harvard Business School, the Kennedy School of Government at Harvard, MIT's Sloan School, the Yale Law School, Princeton University, UCLA, Stanford University Law School, the University of Chicago, Northwestern University, the University of Michigan, Indiana University, the University of Manchester (England), among others, and have taught short courses at the University of Notre Dame, Stockholm University and the University of Trondheim, Norway.

*Materials reviewed.* To prepare this report I have read the depositions and accompanying exhibits of Costco's executives, as well as some Divisional, Regional, and Warehouse Managers who are responsible for creating and implementing the company's personnel policies regarding compensation, hiring, promotion, job assignment, and related personnel matters. I also read the depositions of the named plaintiffs (Shirley Rae Ellis, Leah Horstman, and Elaine Sasaki) as well as some class members. These documents include organizational charts, committee minutes, correspondence, memos, reports, and presentations relating to personnel policy and practice, and documents describing the culture and history of Costco. I have examined statistical data prepared by Dr. Richard Drogin.

I have studied these materials in the context of a large body of social scientific research on sex stereotyping and ingroup bias as well as personnel practices. This body of research appears in peer reviewed journals or edited volumes of the highest scholarly caliber. In arriving at the conclusions I express in this report, I treat the depositions and the exhibits as data. Based on these data, I first examine whether Costco establishments across the U.S. show uniform features,

a collective culture, and consistent personnel policies across stores. I then examine whether Costco's personnel practices create barriers to women's opportunity to advance to managerial positions within Costco's warehouses based on social scientific knowledge about the kinds of practices that reduce some groups' access to high-level jobs. Finally, I assess the extent to which the data in the depositions and exhibits show personnel practices that have been shown in the scientific research to eliminate or circumvent barriers to women's advancement.[1]

## SUMMARY OF FINDINGS

Centralized control, reinforced by a strong organizational culture, creates and sustains uniformity in the personnel policies and practices throughout Costco's operational units. This common culture is characterized by unwritten rules and informal, undocumented personnel practices featuring discretion by decision makers. Such subjective personnel policies are likely to be tarnished by biases that operate against women. In contrast, the formalized promotion practices that Costco eschews check the biasing effects of conscious or automatic gender stereotypes and the biasing and exclusionary effects on women of ingroup favoritism in a predominantly male-run organization. Although Costco executive and managerial staff identified several Costco policies and practices that contribute to women's underrepresentation in warehouse management and assistant management and suggested policies for eliminating or curtailing these barriers to equal employment opportunity, Costco has not implemented most of these or other personnel practices that can mitigate the sex biases that have excluded women from management.

Below I provide the bases for my conclusions. First, I address the issue of the uniformity of Costco's culture across the United States and the effect of its culture on Costco's personnel policies and practices and indirectly on women's access to jobs as warehouse (i.e., general) managers (GMs) and assistant warehouse managers (AGMs). Deposition testimony indicates both a centralized control of operations and a common Costco culture. I then review the scholarly evidence regarding employment practices that can check sex biases which stem from Costco's culture of managerial discretion, ingroup favoritism, and stereotyping, and compare that scholarship to Costco's employment practices as described in deponents' testimony and exhibits. Finally, after comparing Costco's employment practices with policies and practices that sustain or

---

* This is an initial report; additional discovery may lead me to alter my conclusions.

[1] In litigation, this method of analysis is known as "social framework analysis" (see J. Monahan and L. Walker, *Social Science in Law: Cases and Materials,* Fourth Edition, Foundation Press, 1998, Chapter Five, "Social Science Used to Provide Context."

4

reduce barriers to women's career success, I conclude that Costco has not implemented policies and practices that have been shown to eliminate barriers to women's representation in jobs customarily performed by men.

## UNIFORMITY IN COSTCO'S ORGANIZATIONAL CULTURE AND GENERAL PERSONNEL PRACTICES

Costco's several hundred warehouses in the U.S. are unified by the organization's common culture and personnel practices. An organizational culture comprises shared assumptions, beliefs, norms and values about how things are done and ought to be done in the organization that differentiate it from other organizations.[2] Organizations that rely heavily on culture to structure their personnel decisions deliberately teach their culture to new employees and evaluate employees partly in terms of their conformity to cultural precepts. A strong, widely-shared organizational culture promotes uniformity, in part by weeding out those employees who appear not to fit in the culture.

Costco has consciously retained its distinct, unifying culture through orientation for all new employees, publications, national meetings, workshops, and oral teaching on Costco's code of ethics in the day-to-day work assignments (Matthews dep., pp. 70, 107). Every employee receives and signs an "Employee Agreement"—"a part of [Costco's] culture since 1983" (Matthews dep., p. 23)—that includes Costco's core tenets, including its code of ethics. This Employee Agreement is posted in every warehouse and office. Periodically, all employees are invited to participate in revising this document, thereby making the culture their own.

Costco further disseminates its cultural values and practices to its employees in all its warehouses through *Costco Today*, a newsletter (Matthews dep., p. 70), internet and intranet sites, courses at Costco University (e.g., Costco Leadership 101) (Zook dep., pp. 14-16), and the "Costco Perspective," meetings for Costco employees during which senior Costco staff tell the story of the company (Davis dep., pp. 17-19; Webb dep., p. 22).

Costco culture with respect to personnel decisions is distinctive in the corporate world in its paternalistic stance toward its employees. Paternalism, in general, resembles a father-child

---

[2] See T. E. Deal and A. A. Kennedy, *Corporate Cultures.* Addison-Wesley, 1982; E. H. Schein, *Organizational Culture and Leadership*, Second Edition, Jossey-Bass, 1992; and J. Kerr and J. W. Slocum, "Managing Corporate Culture Through Reward Systems," *Academy of Management Executive*, Vol. 1, 1987, p. 99-108.

relationship in which subordinate "family" members exchange obedience for care-taking.[3] Costco's version of paternalism involves an implicit contract in which employees exchange obedience and loyalty for a well paying job, benefits, and promotion opportunities. I characterize Costco's personnel practices as paternalistic because superordinates have almost total control over subordinates' advancement. In contrast to modern bureaucratic personnel systems, subordinates are not entitled to be considered for promotion and have no specific guidelines on how the promotion process works or where they stand in it.[4] Instead, promotions depend on employees' developing personal relationships with decision makers in which they must display loyalty and conformity to the Costco culture, while at the same time making themselves visible.

Costco's description of its culture also reflects its paternalism. Its primary tenets are that Costco is an "open company" in which communication flows freely (Matthews dep., pp. 18, 21, 73-74), and relationships are based on trust and respect and oriented toward teaching and developing its "people" whom it expects to show initiative and reward by promoting from within (Matthews dep., pp. 90, 95; Gaherty dep., p. 131). As Personnel Director Judy Vadney testified, "[w]e don't have a whole lot of things that are written down" (Vadney dep., pp. 107-08). Indeed, in lieu of guidelines, Costco advises new employees as to how to develop in the company through a cultural production: "stories" about successful Costco employees who might serve as role models, as early as in their initial orientation and then in *Costco Today* (Vadney dep., pp. 106-07) and in workshops (Davis dep., p. 31). Requirements for promotion have been passed down through Costco's culture (Hoover dep., p. 87; Zook dep., p. 164; Matthews dep., p. 94).

In keeping with its paternalistic promotions system, Costco gives its decision makers almost total discretion in their personnel decisions, eschewing written policies, criteria, and justifications that imply subordinates are entitled to information or mobility. Organizations maintain their cultures in part by winnowing out employees who do not believe in or conform to it. Costco managers Davis (dep., p. 146) and Gaherty (dep., p. 227) attributed Costco's decision not to promote Ms. Ellis in part to her failure to "get" the culture. More generally, Costco's paternalistic stance across its disparate regions in giving managers and executives discretion in

---

[3] Kerfoot, Deborah and David Knights. 1993. "Management, Masculinity and Manipulation." *Journal of Management Studies* 30, p. 665; Alson, Lee and Joseph Ferrie. 1993. "Paternalism in Agricultural Labor Contracts in the U.S. South." *American Economic Review* 83:853-76.

[4] Edwards, Richard C. 1980. *Contested Terrain.* N.Y.: Basic Books. Kerfoot, Deborah and David Knights. 1993. "Management, Masculinity and Manipulation." *Journal of Management Studies* 30, p. 665: "Under paternalism, management is seen as the fount of all corporate wisdom and is believed to exercise its power within the constraint of protecting and improving the lives of its employees." It also helps legitimate managerial prerogatives in the eyes of those who are protected from making decisions and those of the decision makers.

choosing whom to promote adversely affects the advancement opportunities of all of its female employees by inviting the use of ingroup favoritism and sex stereotypes in promotion decisions.

**Common business and personnel practices.** Although the administrative hierarchy of Costco's operations is organized geographically into divisions and regions, the executives responsible for each division and its regions interact regularly, sometimes transferring across regions, and work closely as a team in implementing personnel and other business decisions (Portera dep., pp. 110-11). Costco's avoidance of formalized, written promotion procedures does not hold when it comes to Costco's core function—sales. GM Davis, who had just testified that it was unnecessary to post positions for GMs, testified that there are benchmarks for every other aspect of the store (Davis dep., p. 229).

Costco's corporate staff is concentrated in Issaquah, Washington which its divisional and regional executives visit monthly for meetings. Its human resources office is also located at its Issaquah headquarters (Zook dep., p. 38) where it electronically generates paychecks for warehouse employees all over the country (Jelinek dep., p. 49). The Vice President for Human Resources testified that he "can look to every warehouse manager at every location . . . as an extension of the HR Department in fulfilling our goal to support our employees in a fair and equitable way" (Matthews dep., pp. 24-25). Corporate HR provides rudimentary job descriptions (Hoover dep., pp. 71-72; Zook ex. 8, CRE 0002450)[5] and sets company-wide salary guidelines (Webb dep., p. 78). The job responsibilities for salaried jobs are standardized across different regions (see, e.g., Hoover dep., pp. 66-69). All senior vice presidents, vice presidents in operations, GMs and AGMs have a common set of duties (Portera dep., pp. 49, 51, 52, 55): managers and vice presidents are charged with implementing Costco's policies (Vachris dep., p. 123). The four warehouse staff positions are also consistent across Costco's warehouses (Schutt dep., p. 60), except in Alaska (Olson dep., p. 122). The decision makers involved in promotion decisions for GMs and AGMs hold the same positions, regardless of region. The process associated with transfers is also common across regions (Hoover dep., pp. 106-07). Costco maintains its uniformity through an audit system in which Divisional and Regional Vice Presidents visit warehouses at least annually, and by rotating employees across warehouses, regions, and even divisions.[6]

---

[5] Matthews (dep., p. 58) testified that Costco has never used professional industrial psychologists in preparing job analyses, job descriptions or performance evaluations.

[6] Deal and Kennedy, *op cit.*; Schein, *op cit.*, W. Ouchi, "Markets, Bureaucracies, and Clans," *Administrative Science Quarterly*, Vol. 25, 1980, p. 129-141; C. D. Hansen and W. M. Kahnweiler, "Storytelling: An Instrument for Understanding the Dynamics of Corporate Relationships," *Human*

In sum, Costco maintains a distinctive culture through system-wide efforts to socialize new employees to its core values. Although decisions involving individual employees are made at the warehouse, regional, or divisional level, Costco maintains a common HR system that handles payroll, and is governed by decisions made at corporate headquarters in Executive Committee, Board, and operations meetings that draw executives from across the country. Costco's common culture—with its license for executives to use discretion in personnel decisions—leads to ingroup favoritism and sex stereotyping, both of which create system-wide disadvantages for Costco's female employees.

### MANAGERIAL DISCRETION IN PROMOTION DECISIONS

Promotions to AGM and GM are consequential. AGM is the pathway onto the managerial career ladder. GMs can earn more than $100K annually and make up the pool for future promotions with their attendant salary increases and bonuses. Few jobs in the U.S. that require only a high school degree offer these opportunities for upward mobility.

Men have a virtual monopoly on operations jobs above the warehouse level, although 44 percent of Costco's employees are female. Costco's executive committee has been all male (Matthews dep., p. 154) until a month ago when Costco added two women (Sinegal dep., p. 182). All its Executive Vice Presidents are male, and all but one of the Senior Vice Presidents are male (Portera dep., pp. 92-93). Men's monopoly of these top positions over the past five to six years is not a temporary aberration. With one exception, men have held all the executive positions during Costco's 25-year history. This fact both stems from and helps to preserve Costco's exclusionary and paternalistic personnel practices.

I characterize these practices as exclusionary because in 2005, just one in six Costco GMs was female, an average 1.2 percentage point increase in women's share of jobs as GMs over the last five years. Women's share of AGM positions has remained almost stable during the same period, growing six one-hundredths of one percent per year (CRE 0142204; Omoss ex. 140, CRE 0142454). James Sinegal, Costco's founder and CEO explained the problem as follows: "While we have been committed to diversity at Costco from the beginning, in our rush to grow, our

*Relations*, Vol. 46, 1993, pp. 1391-1409; J. Martin, M. S. Feldman, M. J. Hatch, and S. B. Sitkin, "The Uniqueness Paradox in Organizational Stories," *Administrative Science Quarterly*, Vol. 28, 1983, pp. 438-453; T. Peters, "Symbols, Patterns, and Settings," *Organizational Dynamics*, Vol. 7, 1978, pp. 3-23; J. Pfeffer, "Management as Symbolic Action: The Creation and Maintenance of Organizational Paradigms," pp. 1-52 in *Research in Organizational Behavior*, Vol. 3, edited by L. L. Cummings and B. M. Staw, Jai Press, 1982; M .E. Boyce, "Organizational Story and Storytelling: A Critical Review," *Journal of Organizational Change Management*, Vol. 9 (No. 5), p. 5-26; W. Swap, D. Leonard, M. Shields, and L. Abrams, "Using Mentoring and Storytelling to Transfer Knowledge in the Workplace", *Journal of Management Information Systems*, Vol. 18 (Summer), 2001, p. 95-114.

attempts to create a healthy climate for diversity have not been as successful as we had hoped they would" (Matthews ex. 98, CRE 0142021). As is true in other large organizations, organizational inertia impedes change in Costco's policies and practices, particularly with respect to promotion.[7]

Paternalistic control systems lack written rules that constrain the decisions of the powerful. Thus, decision makers operate with considerable discretion. They select people for advancement early on, and thus can fulfill their prophecy by socializing the chosen for leadership status through special mentoring and opportunities not open to others. Evidence for the importance of discretion in the selection of AGMs and GMs exists in the absence of written guidelines or standardized decision making procedures. Although Costco employs almost 400 GMs in the U.S. and more than twice that number of AGMs, there are almost no written documents describing these jobs, documenting the qualifications necessary for holding them, describing how applicants are assessed in terms of specified criteria, or otherwise detailing the promotion process. As a result, staff with the authority to select AGMs (i.e., the regional managers in consultation with the GMs) and those with authority to select GMs (i.e., regional and divisional vice presidents) have almost complete discretion in deciding whom to promote. Managers and executives testify to relying on their own or their subordinates' discretion in making promotion decisions (Jelinek dep., pp. 67-68, 71-72; Vachris dep., pp. 78, 133).

GMs must have a high school diploma or GED and Costco AGM experience or its equivalent (Zook ex. 8, CRE 0002450). AGMs must also have completed high school or obtained a GED and must have management experience, preferably as a merchandising manager (Zook ex. 9, CRE 0002454). Job analyses further specify that a GM "[o]versees operation of a membership warehouse with direct responsibility for complete operation and profitability," and "[i]mplements Costco mission statement, policies, and procedures" (Zook ex. 8, CRE 0002450), and an AGM "[d]irects, plans, and coordinates programs necessary for successful warehouse operations," and "[a]ddresses personnel issues and oversees administrative tasks as performed by departmental managers and workers" (Zook ex. 9, CRE 0002454).[8]

---

[7] Stinchchombe, Arthur. 1965. "Social Structure and the Founding of Organizations," Chapter 4 in James March (ed.), *Handbook of Organizations*, p. 155. Baron.

[8] Clear, detailed job descriptions are not relevant only for hiring. They also can affect outsiders' ability to perform their jobs in ways that produce positive evaluations. For example, class member Kathleen Olson (dep., pp. 75, 78-79, 147-49) testified that her manager restricted her ability to do her job by disciplining her subordinates, indicating then he would handle the problem (Olson dep., p. 153), and then gave her a negative evaluation for not "tak[ing] ownership" of her job (Olson dep., p. 246).

Rather than making these descriptions more specific or linking them to observable indicators, promotion decision makers use idiosyncratic and nonstandard criteria in deciding whom to promote. For example, Sinegal (dep., pp. 28-29) testified that he has made absolutely clear to operations people what he wants in GMs: experience at Costco, strengths in merchandising, people skills, and financial acumen. The Employee Agreement puts this more succinctly, but without any real guidance to employees seeking promotion: "Individuals will be selected for promotion based on skill and ability. Where skill and ability are equal, then length of continuous employment will be the determining factor."[9] The vice presidents to whom Personnel Director Vadney talked said that a GM "should take initiative, see the big picture, be able to identify areas of concern that need to be acted upon, and do that without being told" (Vadney dep., p. 264). Cardoso (dep., p. 105) attributed his promotion of Dan Iaquinta to GM to his annual progress in payroll percent and productivity and "the number of success stories that he is able to put together. . . ."

Managers and their superiors testified that before promotion to assistant manager, candidates should have rotated through at least three of four warehouse staff-level positions (Davis dep., p. 274; DiCerchio dep., pp. 79-85; Omoss dep., pp. 220-21).[10] Drogin's analysis indicates that only 7.6 percent of the male managers and 9.6 percent of the female managers had held all four senior staff jobs before being promoted to AGM.[11]

Costco does not use: (1) detailed job descriptions for assistant managers and warehouse managers, (2) measurable performance criteria, (3) valid measures of stated criteria, (4) job postings to alert potential candidates, or (5) guidelines on what employees must do to become managers. Costco does not use any of these standard personnel practices in deciding whom to promote. AGMs and GMs are selected through a process Costco refers to as "walking the warehouse" (Omoss dep., pp. 84-90).

According to senior executives' and GMs' testimony, senior executives pick whom to promote to warehouse management based on their impressions of the (small number of) employees with whom they have contact when they make periodic walks of the warehouse (see, e.g., Omoss dep., pp. 92-94). Walking the stores is an integral part of Costco's culture, according

---

[9] Costco Employee Agreement, p. 13.

[10] Whether staff are rotated through all four positions is up to their regional manager. Omoss (dep., p. 221) rotates them depending on their ability and the availability of an opening. Rotations are a collective decision with the person immediately above the promotion candidate and sometimes Omoss's immediate superior (Omoss dep., p. 222).

[11] Drogin, op. cit., Table 5.

to Sinegal (dep., pp. 14-19). The walk has multiple functions, including auditing a store's appearance and merchandising, assessing its manager's performance, and teaching the staff, as well as appraising junior managerial staff, often in one hour (Vachris dep., pp. 71, 74-75, 190, 195; Gaherty dep., pp. 45-54; Webb dep., pp. 61-68, 114; Vadney dep., pp. 264-65; Zook dep., pp. 89, 91-92; Omoss dep., pp. 84-90). Importantly for the walk's function as an appraisal device, senior executives are typically accompanied by the warehouse manager, its AGMs, and the merchandising manager (Webb dep., pp. 66-69; Omoss dep., pp. 84-90; Gaherty dep., pp. 48-49) who, according to Vadney (dep., p. 265), actively participate in conversations about merchandising, the competition, products, and people. Omoss (dep., pp. 92-93) said he always includes the GM and maybe the merchandise manager on the whole walk, but sometimes asks other staff to remain in their area until the group gets there. Several VPs testified that they get to know the AGMs well enough from their walk so that they can assess their promotability (Zook dep., pp. 99-100). From walking the warehouse "you *get a feeling* for that assistant manager in an *objective way* how that warehouse is merchandised" (Zook dep., p. 89; italics added).

Every manager who testified on behalf of Costco testified that the executives and managers who make the promotion decisions have a sufficient working knowledge of the abilities of the AGMs in those buildings to determine who is probably qualified for promotion to warehouse manager (Omoss dep., p. 124). As one vice president testified, walking the floor permits them to evaluate people "based on their ability to merchandise, their understanding of the six rights, their ability to put merchandise in the right place, ... [their ability] to understand that the competition has a price, ... [and whether they are] capable of directing the work force" (Hoover dep., p. 88). Hoover (dep., p. 21; italics added) testified that by the time an employee becomes an assistant manager, "you've been working with those people on a *daily* basis for as long as ten years sometimes, so we know those people really well, and we know what their goals are. We know what they want to do." Importantly, the VPs' and GMs' assessments of the AGMs and area managers during the walks are largely unwritten. None testified to making written notes about employees during the walk (Gaherty dep., pp. 52-53; Omoss dep., pp. 90-91, 94-95).

Moreover, Costco's culture of teaching and mentoring (at least some employees) encourages decision makers to identify promising candidates for promotion to AGM or store manager early. Being identified as someone with the potential to run a warehouse brings with it sponsorship that makes early identification a self-fulfilling prophecy. Those identified as promotable are mentored during subsequent walks which help them to acquire necessary skills. Some AGMs are invited to Costco conferences for GMs (Hoover dep., pp. 54, 56-57), which enhances their visibility, which in turn fosters promotion in a large organization (Zook dep., pp. 18, 23-24;

Portera dep., pp. 137-39). Once they are known to their regional or divisional executives, their opportunity structure may extend beyond their own region (Gaherty dep., p. 90).

　　Promotable lists. In order to identify persons that were ready or almost ready for a promotion, Costco VPs sometimes made "promotable" lists based on their observations from walks and input from the GMs. Sinegal (dep., pp. 60-64) testified that at some point he asked operators to identify five assistant managers in each region who were in line for promotion. However, no stated or objective criteria exist for deciding which staff managers and AGMs are capable of running a warehouse, nor does Costco provide instructions on how to identify promising AGMs (Hoover dep., pp. 56-57) and there is no guidance or consensus as to how many persons should be on a promotable list (Hoover dep., pp. 32-33, 126-29; Sinegal dep., pp. 65, 71).[12] GMs and their immediate superiors in the managerial hierarchy use their own judgment in identifying AGMs. For the last five years Costco has been telling regional managers to prepare lists of five to ten people that they deemed promotable to GM and making them familiar with managers meetings and posting their pictures and bios in an actual and then a virtual (i.e., web based) "Green Room" that Sinegal installed to display Costco's rising stars (Sinegal dep., pp. 67-72). As noted, Sinegal has also encouraged executive vice presidents to maintain a list of "promotable" AGMs based on the VPs' assessments and those of their immediate subordinates (Sinegal dep., pp. 60-64). Thus, Costco has been making its informal, subjective practices more permanent and hence more resistant to reform in order to designate early in their careers the employees it will make the next generation of GMs. This process of institutionalizing subjective practices that are vulnerable to cognitive biases, automatic ingroup favoritism, and sex stereotyping will preserve the sex composition of the ranks of managers and executives.[13]

　　Lack of formal standards and procedures for filling openings for AGMs. Promotion decisions for AGMs depend on the opinions of the regional VPs and GM. No formal application procedure exists (Webb dep., p. 133), and there are no application forms (Zook dep., p. 128). Although several deponents testified that they assume that all staff-level managers want to be promoted, workers also list their career goals on their annual evaluations. In addition, in some regions employees who want to be considered for a promotion must tell their manager or the senior vice president of the area (Gaherty dep., p. 62). Thus, promotion decision makers believe they know from working with possible candidates on a daily or weekly basis whom their next

---

[12] Someone could not be promoted to GM in Gaherty's region unless they were on the promotable list for his or another region (Gaherty dep., p. 79).

[13] For example, all five warehouse managers that Vachris included in his "Talent Pool" and characterized as having "greater" potential from San Diego district 2 are male (Zook ex. 12, CRE 0020000).

12

AGM should be (Schutt dep., pp. 95-96; see also Hoover dep., pp. 21, 156).  Promotions to AGM
do not require approval above the senior VP level.  Senior VP Gaherty (dep., pp. 56-57) testified
that he gave final approval of a promotion from staff-level to AGM in his region in response to an
oral recommendation from a regional manager.  He does not need to see the bios of potential
candidates or their evaluations because he "know[s] most of those people pretty well from [his]
visits to the building" (Gaherty dep., p. 57; see also pp. 58, 72).  Thus, a regional manager has
authority to promote someone to AGM who has not applied (Schutt dep., p. 90) and does not
usually interview candidates who come from within his/her region (Webb dep., p. 118).
Moreover, once Webb (dep., p. 128) has decided whom to appoint to an AGM position, he does
not document why he picked that candidate.  Neither DiCerchio nor Sinegal approve promotions
to AGM (Omoss dep., p. 113).

    **Lack of formal standards and procedures for filling openings for warehouse manager.**
Senior Vice President for Human Resources John Matthews described how Costco executives
decide who is next in line for warehouse manager:  "It's done through a conversation with the
corresponding warehouse managers in a region, with their district managers, vice presidents, the
senior vice president over that region, and the process . . . is really a byproduct of day-to-day
interaction with assistant warehouse managers, walking through the buildings, viewing their
performance, understanding that all of these people grew up within Costco, have been doing this
and working with these people for years in a variety of positions. . . " (Matthews dep., pp. 84-85).
Others shared Matthews's confidence that they knew who was next in line.  In fact, Webb (dep., p.
127) testified that he did not review performance evaluations in selecting AGM candidates.

    Although AGMs who want to manage a new warehouse have the prerogative of contacting
its regional vice president to indicate their interest, "we do have the people that we've selected
already in mind" (Hoover dep., p. 34).  Thus, GMs and higher-level employees pre-select the pool
of future managers based on subjective impressions formed while walking the store.  Senior VP
Hoover (dep., p. 125) testified that they did not interview management candidates because
"[w]e've been interviewing for 10, 12 years."

**CATEGORIZATION, INGROUP FAVORTISM, STEREOTYPING
AND SEX BIAS IN PROMOTIONS**

**Categorization into Ingroups and Outgroups**

As Greenwald and Krieger (2006) point out, many mental processes function *implicitly*, outside our conscious awareness.[14] As with other stimuli, we instantly and automatically classify the people we encounter. The primary classification humans make is whether another person is in our "ingroup" ("we") or our outgroup ("they").[15] As Allport (1954) wrote, "The human mind must think with the aid of categories . . . . We cannot avoid this process."[16] Contemporary social psychologists have experimentally confirmed Allport's insight: categorization is automatic and adaptive because it conserves mental resources.[17] We understand our social world in terms of categorical distinctions,[18] and we readily categorize others into in- and outgroups, even on the basis of arbitrary and trivial characteristics.[19] Sex is one of two primary dimensions on which we assign people to ingroup or outgroup status.[20] Given its cultural salience, sex is habitually used in assigning others to in- or outgroup membership.[21]

In simplifying information, categorization also introduces cognitive errors. The cognitive process of automatic categorization affects how we encode and recall information about others, distorting our perceptions and shaping our preferences in ways unbeknownst to us. For example, we tend to assume that outgroup members are relatively homogeneous, while we recognize the heterogeneity in members of our ingroup.

---

[14] The science of implicit cognition suggests that actors do not always have conscious control over their social perception, impression formation, and the judgments that motivate their actions (Greenwald, Anthony and Linda Krieger. "Implicit Bias: Scientific Foundations." Forthcoming in *California Law Review*, 2006).

[15] Rothbart, M. and S. Lewis. 1994. "Cognitive Processes and Intergroup Relations: A Historical Perspective." Pp 347-379 in P.G. Devine, D.L. Hamilton & T.M. Ostrom (eds.), *Social Cognition: Impact of Social Psychology*; Brewer, M. and R. Brown. 1998. "Intergroup Relations." Pp. 554-94 in *Handbook of Social Psychology*, edited by DT Gilbert, ST Fiske, and G Lindzey.

[16] Allport, Gordon. 1954. *The Nature of Prejudice*. Cambridge, MA: Addison-Wesley.

[17] Fiske, ST. 1998. "Stereotyping, Prejudice, and Discrimination" in *Handbook of Social Psychology*, edited by DT Gilbert, ST Fiske, and G Lindzey.

[18] Brewer, M. 1997. "The Social Psychology of Intergroup Relations: Can Research Inform Practice?" *Journal of Social Issues* 53(1): 197-211.

[19] Tajfel, H. 1970. "Experiments in Intergroup Discrimination." Scientific American 223:96-102; Brewer and Browne, op cit, 566.

[20] Brewer, MB and LN Lui. 1989. "The Primacy of Age and Sex in the Structure of Person Categories." Social Cognition 7:262-274.

[21] Brewer and Brown, op. cit.

14

**Preference for members of one's ingroup.**  We automatically prefer ingroup members to outgroup members, are more comfortable with them, trust them, feel more obligated and loyal to them; impute to them positive attributes and remember their positive traits while forgetting their negative ones, are predisposed to cooperate with them; and favor them when distributing rewards.[22]  This ingroup bias may be conscious or implicit (i.e., outside our awareness).  Either form can prompt us to defer to members of our ingroup over outgroup members.  This means that we may automatically defer to the implicit or conscious biases of a member of our ingroup over a member of an outgroup.

Unequal treatment of in- and outgroup members results primarily through automatic ingroup favoritism rather than outgroup antipathy, although a positive attitude toward one's ingroup necessarily implies a relatively negative view of members of the outgroup.[23]  We are automatically inclined to distrust and depersonalize outgroup members and see them as competitors,[24] but we do not automatically harm outgroup members when allocating negative outcomes.[25]  Ingroup preference helps to maintain dominant groups' privileged status. Importantly, members of high-status ingroups show more ingroup favoritism than do members of low-status ingroups.[26]  The practical implication of this is that people tend to mentor others like themselves.[27]  Because in- and outgroup membership are often based on sex and men predominant at the top of the workplace hierarchy, ingroup favoritism—if not checked—can foster sex discrimination.

Harvard Business School professor and management specialist Rosabeth Kanter authored a classic discussion of how ingroup favoritism operates in the workplace based on a case study of a large U.S. corporation.  When performance is consequential and hard to predict, people tend to

---

[22] Perdue et al. 1990. "Us and Them: Social Categorization and the Process of Intergroup Bias." *Journal of Personality and Social Psychology* 59:475-486; Baron, JN. and J. Pfeffer. 1994. "The Social Psychology of Organizations and Inequality." *Social Psychology Quarterly* 57:190-209; Rothbart, M and S. Lewis. 1994. "Cognitive Processes and Intergroup Relations: A Historical Perspective." Pp 347-379 in P.G. Devine, D.L. Hamilton & T.M. Ostrom (Eds.), Social Cognition: Impact of Social Psychology. Brown 1995; Brewer op. cit.; Brewer and Brown, op cit. 567; Fiske. 1998.  Op. cit.

[23] Greenwald and Krieger.  Op. cit.

[24] Brewer. 1997.  Op. cit.

[25] Brewer and Brown 1998, op cit., 599.

[26] Brewer and Brown. 1998, op cit, 570

[27] McGuire, GM.  1996.  "Race, Sex, and Informal Work Ties: Understanding The Social Embeddedness of Mentor Relationships."  In Faye Crosby, Robin Ely, and Audrey Murrell (eds.), *Multicultural Mentoring*.

select others most similar to them to fill important roles because they assume others similar to them will behave in similar ways.[28]  At the executive level, Costco is a predominantly male organization, and all the people who decide who are going to manage Costco warehouses in the U.S. are men.  Moreover, a substantial majority of the people involved in selecting AGMs are male; 86 percent were male in Fall 1999, and 84 percent were male in June 2004 (calculated from CRE 0142435).  When women participate in these decisions they are likely to be the only female participant.  Such skewed sex ratios of decision makers tend to make women "tokens" who are both overly visible and hence subject to close scrutiny[29] and simultaneously marginal in the decision making process.[30]

Apparent instances of ingroup favoritism are described in several depositions.  The testimony of class member Sandra Barnwell illustrates how the adverse effects of ingroup favoritism can dog an employee's entire career (entire deposition).  After she used the open-door system for help from the regional when she was sexually harassed by her GM, both the regional who was close friends with her GM and her GM belittled and ostracized her, leading her to transfer to a different region.  The transfer meant moving to a lower position, and for the rest of her career at Costco she has been repeatedly blocked in her efforts to advance, as the regional she initially approached advanced in the company and became well connected with the managers in the warehouses where she worked.  Although Costco has grown, the executives and managers who "man" the open-door policy tend to know each other through Costco's practice of relocating managers every three to seven years and through an annual conference for managers.  Apart from any direct personal ties, women who try to use the open-door policy above the GM level will almost certainly have to go to a man for whom automatic ingroup favoritism works against women.  Importantly, personnel director Vadney (dep., p. 51) refers most of the complaints back to the warehouse managers.

Consistent with automatic ingroup favoritism fostering differential treatment for people whose superordinates are the same sex as opposed to those whose superordinates are the other sex, when Omoss (dep., p. 190) learned that a man on his promotable list had used the company's email list for an inappropriate activity, Omoss lowered him on the promotable list, but he remains

---

[28] Kanter, RM. 1979. *Men and Women in the Corporation.* Basic.

[29] Kanter, op. cit.

[30] Reskin, BF., DB. McBrier, and JA. Kmec. 1999. "The Determinants and Consequences of Workplace Sex and Race Composition." *Annual Review of Sociology* 25:335-61.

on the most recent list.  In contrast, Olson testified that she was fired for asking a subordinate to go out for sandwiches for the managers (Olson dep., pp. 275-76).

Other deponents describe what many social scientists would characterize as ingroup favoritism.  For example, Omoss (dep., p. 281) indicated that the kind of person he would want to promote to management was "somebody that you feel comfortable taking home for dinner with your family."  Male senior executives testified to the lengths they went to accommodate *male* managers or AGMs who were single parents or dealing with a divorce (see, e.g., Gaherty dep., pp. 175-77; Omoss dep., pp. 203-04, 268),[31] although no attempt was made to accommodate outgroup members Leah Horstman or Kathleen Olson when they faced similar problems.[32]

Costco has long known that its employees perceive favoritism to be a problem.  When Sinegal began the BOLD initiative in 1999, focus groups comprising high level managers mentioned instances of unconscious exclusion as a possible barrier to women's advancement (DiCerchio dep., p. 149).  Examples of the barriers that focus group participants mentioned include: "who are we senior managers most comfortable with when deciding on new promotions and new hires" and "'[g]ood old boy' network" (Matthews ex. 98, CRE 0142018); "I hire in my own likeness" (Matthews ex. 98, CRE 0142047); "depends on who you know" (Matthews ex. 98, CRE 0142045); and "[p]romote based on comfort level instead of qualifications" (Matthews ex. 98, CRE 0142029).  Every task force summary indicated that some managerial and executive level employees believed that ingroup favoritism was a problem (see Matthews ex. 98, CRE 0142015, 0142017-18, 0142029, 0142031, 0142035, 0142037-39).  A 2001 report which summarized barriers stemming from ingroup favoritism listed: (1) relying on word of mouth to evaluate talent, (2) hiring within our comfort zone, (3) promoting people as special favors or based on relationships, and (4) a reward system seen as based on favoritism (Matthews ex. 98, CRE 0142024, 0142026).  Despite the fact that executives had identified this problem five years earlier, a slide on diversity shown to the Board of Directors at its April 2006 meeting labelled "Unconscious Exclusion" listed under "Potential Barriers":  "We sometimes tend to promote people like us" (CRE 0135100).  Thus, we see in the perceptions of Costco's executives and

---

31 "[W]e make a lot of decisions based [on] people's personal life" (Omoss dep., p. 223).

32 As a result, Leah Horstman was not able to complete the merchandising manager rotation that she needed for promotion despite the fact that she appears on Cardoso's 2001 "talent pool" as being one year from promotion to assistant manager (Cardoso ex. 74, CRE 0125199).  During her employment at Costco, Olson, who had two pre-school children, worked from 3 p.m. to midnight while front-end assistant manager, and from 5 a.m. to 2 p.m. when she was receiving manager (Olson dep., pp. 110, 130-31).  She testified that she said she was willing to work all night if it would help her be promoted to manager. Instead she was terminated.

managers exactly what social scientific research predicts when promotion practices are discretionary.

Few organizations can eliminate the taint of automatic ingroup favoritism from every evaluation or promotion/transfer decision, but certain personnel practices permit and even encourage such practices, while others limit them. Failing to post warehouse management jobs invites the use of automatic ingroup favoritism which is a well established phenomenon and one that can prevent outgroup members from learning about opportunities. Posting counteracts the exclusionary effects of this expression of ingroup favoritism. Costco's discretion-based promotion and transfer practices and its reliance on an open-door policy as the primary remedy for complaints also permit ingroup favoritism. Most organizations locate both these key functions in human resources, a highly bureaucratized part of most organizations that is run by trained professionals.

In sum, the automatic sorting of people into categories can lead to automatic biases in our assessments of and treatment of others. These biases can have discriminatory effects.[33] People's automatic preferences for others like themselves can lead to biased assessments and differential treatment of the sexes.[34]

**Sex Stereotyping**

The process of stereotyping attributes to individuals characteristics that society associates with the category to which individuals belong. In other words, stereotypes are generalized beliefs about all the members of a group, and the process of stereotyping applies these generalizations to individual members of a group.[35] While people often consciously draw on stereotypes, everyone has *implicit stereotypes* that distort how we regard others outside our awareness. Stereotyping results from automatic categorization through a process that has been termed "illusory correlation" in which people infer a correlation between belonging to a particular group and having certain attributes, despite the fact that no correlation exists. Illusory correlation leads us to systematically underestimate the differences on a wide range of characteristics among members of outgroups (i.e., "all {fill in the blank} are alike") and to exaggerate the differences on a variety

[33] Fiske. 1998, op. cit.

[34] Brewer and Browne 1998, op. cit.

[35] Brewer, MB, V Dull, and LN Lui. 1981. "Perceptions of the Elderly: Stereotypes as Prototypes." *Journal of Personality and Social Psychology*, 41, 656-670; Schmidt, DF and SM Boland. 1986. "Structure of Perceptions of Older Adults: Evidence for Multiple Stereotypes." *Psychology and Aging, 1*, 255-260. See also Bargh, J. A., M. Chen, M., and L. Burrows. 1996. "Automaticity of Social Behavior: Direct Effects of Trait Construct and Stereotype Activation on Action." *Journal of Personality and Social Psychology* 71, 230-244.

of traits between our ingroup and outgroups (Brown 1995:78).[36]  Thus, stereotyping involves cognitive distortion.

Automatic stereotyping biases our impressions of individual members of stereotyped groups to fit societal stereotypes.  Because the general process of stereotyping is functional in helping us cope in a complex world, automatic stereotypes are accompanied by cognitive processes that tend to perpetuate them.  We tend to forget information about people that contradicts our stereotypes or treat people who behave inconsistently with our stereotypes as exceptions, while we treat information that is consistent with our stereotypes as confirmatory.  We sometimes misremember events to make the behavior of actors consistent with our stereotypes.

Fiske distinguishes between descriptive and proscriptive stereotypes.[37]  The former include beliefs about how members of a group are (e.g., sentimental), while the latter indicate how society believes members of that group ought to be (e.g., nurturant).  We depend on descriptive stereotypes about a group to fill in missing information about an individual or interpret her/his behavior, while we draw on proscriptive stereotypes in making judgments about people.

Given the importance of sex as a basis of categorization, most people believe that the sexes differ and should differ in fundamental ways on a wide variety of characteristics.  Regardless of our sex, Americans learn (or "overlearn") the content of pervasive stereotypes about each sex and automatically invoke them in predicting or explaining the behavior of others.  Because we overlearn sex stereotypes and because stereotyping is cognitively efficient, encountering members of a stereotyped group can *automatically* trigger our sex stereotypes.[38]

Sex stereotypes tend to characterize men and women as polar opposites (e.g., men are assertive, women are passive).  As a result, behavior that would be acceptable and even desirable in one sex often violates proscriptive sex stereotypes when it is enacted by the other sex.  This puts women in customarily male jobs in a double bind:  when they behave in the same ways as their male colleagues, they conform to occupational norms that have developed on the assumption that workers are male, but violate the female sex stereotype.  For example, the June 2001 performance review for class member Kathleen Olson criticized her tone and manner—a presentational style that is consistent with the sex stereotype for men as well as the prescribed

---

[36] Although we tend to exaggerate differences between in and outgroups on dimensions that favor ingroup members, we are less likely to do so on traits that do not (Brewer and Brown 1998:570).

[37] Fiske 1998, op. cit.

[38] Gilbert, D.T. and J.G. Hixon.  1991. "The Trouble of Thinking:  Activation and Application of Stereotypic Beliefs." *Journal of Personality and Social Psychology, 60*, 509-517.

behavior for managers (Olson dep., pp. 212-13).  Thus, Olson was criticized for behavior that would be acceptable in a man and certainly not criticized by a male assistant manager.

Given the descriptive and proscriptive sex stereotypes that women are and should be feminine, deferent, and nurturant and that men should be and are manly, assertive and aggressive, many people may not distinguish appropriately assertive behavior by a woman superior from inappropriately assertive behavior.  Recent research suggests that adherents of proscriptive sex stereotypes may generalize, assuming that people who do not conform to one aspect of a proscribed gender stereotype are sex-role deviants more generally, and thus fail to differentiate between women who are straightforward and directive at work from women who would use profanity at work.[39]  This kind of cognitive error could account for the allegations that Ms. Olson and Ms. Ellis, both apparently direct individuals, used profanity at work.  (According to this reasoning, observers would be less likely to believe and testify that men who were assertive at work were profane.)

Decision makers in predominantly male organizations are more likely to engage in sex stereotyping than those in more balanced groups.[40]  When they are a numerical minority, women tend to stand out and are subject to greater scrutiny and greater sex stereotyping.[41]

Americans tend to automatically stereotype women as more family oriented than career oriented, a core sex stereotype.[42] For example, a member of a task force of senior managers and VPs held in 2000 said, "Women—inability to make the hours sacrifices to be accepted by the male establishment" (Matthews ex. 98, CRE 0142029).  CEO Sinegal (dep., pp. 140-45) testified that Costco loses more senior women than men and that women are leaving for family reasons. His observation, "Our experience is that women have a tendency to be the caretakers" (Sinegal dep., p. 141), reflects the stereotype that women are more oriented to their families than men are. Although he believes women move into areas of the company that have more stable hours and are more family-friendly (Sinegal dep., pp. 133, 139-42), he views this as a "societal issue, not

---

[39] Renfrow, D. 2005. *Sexuality as Status*.  Unpublished doctoral dissertation, University of Washington.

[40] Konrad, Alison et al. 1992. "Diversity in Work Group Sex Composition. *Research in Sociology of Organization* 10, p. 131.

[41] Kanter, op. cit.

[42] Wang, C.S. and M. Banaji. 1999. "Implicit Gender Stereotypes about Work and Family." Unpublished; Nosek, B., M. Banaji, and A. Greenwald. 2002.  "Harvesting Implicit Attitudes and Beliefs from a Demonstration Web Site." *Group Dynamics* 6:101-15.

necessarily a Costco issue" (Sinegal dep., p. 145).  In supporting his point of view, Sinegal referred to an article he read in the *New York Times* about women lawyers (Sinegal dep., p. 145).

Because Costco has not gathered any data comparing the percentages of women and men who have left the organization and their reasons for doing so, his impressions are based on a few instances that are consistent with his sex stereotypes and the stereotypes of the senior—and male—people with whom he talks.  Importantly, Sinegal ignores the evidence of the women in this case, women who sought unsuccessfully to advance at Costco, consistent with the cognitive tendency to neglect negative instances that do not conform to sex stereotypes.  A growing body of research indicates that women give up or leave when their opportunities to advance are blocked.[43]  But there is also a well known cognitive phenomenon that may explain Sinegal's perceptions:  the neglect of negative instances.  People tend to remember behaviors that are consistent with their stereotypes and forget those that are inconsistent.  For example, male research subjects evaluated female and male performance equally immediately after they observed the task, but a week later, they evaluated the males as having performed better, although their general recollections about the female and male they observed were equally accurate.[44] These automatic cognitive errors serve to perpetuate stereotypes which can then act as barriers to women's advancement.

According to Sinegal, "since the beginning of time women have had a tendency to come into our businesses in positions that were more associated with the administrative aspect of the company, the front end [of the warehouse], the marketing end" (Sinegal dep., pp. 146-47). Sinegal (dep., pp. 150-51) also testified that he believes that women are offered the opportunity to move into merchandise manager jobs at the same rate as men, but turn down these positions because of early and inconsistent starting times.  Because Costco has never done a survey on whether this is true, this belief apparently stems from a stereotype.[45]

At the executive task force meetings in late 2000 and early 2001, participants expressed several other sex stereotypes (e.g., "[w]omen executives [are] not skilled in dealing with

[43] Kanter, op. cit., Ogasawara, Y. 2001. *Office Ladies and Salaried Men*; Cassirer, NR and BF Reskin, "High Hopes:  Organizational Location, Employment Experiences, and Women's and Men's Promotion Aspirations." *Work and Occupations* 27:438-63; Sturm, S. 2001. "Second Generation Employment Discrimination: A Structural Approach." *Columbia Law Review* 101:458-568.

[44] Martell, R. 1996.  "What Mediates Gender Bias in Work Behavior Ratings?" *Sex Roles* 35:153-66.

[45] According to national data, men are only .8 of a percentage point more likely than women to work night shifts and the sexes are equally likely to work evening shifts (Presser, Harriet. 2003.  "Race-Ethnic and Gender Differences in Nonstandardized Shifts." *Work and Occupations* 30:412-39).  Indeed, in dual-earning couple, one partner often works an unconventional shift to facilitate childcare (Presser, H. 2005. *Working in a 24-7 Economy.*  Russell Sage).

employees of color") (Matthews ex. 98, CRE 0142015, 0142018, 0142033, 0142039, 0142046). Importantly, GMs expressed many of the same stereotypes in the August 2005 focus groups (Matthews ex. 104, CRE 0142526-27, 0142535; Schutt ex. 37, CRE 0142505; Portera ex. 63, CRE 0142479-80).

Sinegal (dep., pp. 178-79) also testified that "when you had a tendency as a manager to look at the people who were qualified who knew the most about the merchandise, they happened to be the people who were driving the forklifts . . . . [M]ost of the people who were accepting those jobs of driving forklifts were male." This testimony makes three assumptions for which no evidence was provided in the materials I was given to examine. It assumes that the ability to drive a forklift was a formal job requirement for merchandising, when in fact people could be certified as being able to drive a forklift after a promotion. Second, it assumes the existence of data broken down by sex on who accepts jobs that involve driving a forklift. Such data were not provided to me. Third, it reflects a sex stereotype that men are better than women at driving forklifts or have a greater preference for doing so. Using sex as an indicator of the ability to perform a job is a special kind of stereotyping which economists and sociologists call "statistical discrimination" because it applies a statistical generalization about a group to individual members of that group, thus denying all group members the opportunity for certain jobs.[46] Although more men than women probably have driven a forklift at Costco, it is likely not because female Costco employees cannot learn to or do not want to drive forklifts.[47]

In the focus groups on barriers, Costco managers frequently cited sex stereotypes, deponents often assumed that managers are male (e.g., using the pronouns "he" and "his" generically to refer to GMs and sometimes AGMs and merchandising managers) (Zook dep., pp. 53, 56; Webb dep., pp. 65, 104), and reference materials for "Your Work Plan 2002" are illustrated by a male figure (Portera ex. 64, CRE 0142158). Stereotyping is most like to occur when people are under time pressure. Thus the perceived need to fill managerial jobs quickly ("panic hiring"; Omoss dep., p. 280), cited as one reason why these jobs aren't posted, increases the likelihood that the decision process will be distorted by sex stereotyping.

---

[46] Phelps, ES. 1972. "The Statistical Theory of Racism and Sexism." *American Economic Review* 62:659-61.

[47] Padavic, I. and BF Reskin. 1990. "Men's Behavior and Women's Interest in Blue-Collar Jobs." *Social Problems* 37:613-28.

Both explicit and implicit biases are particularly likely to reduce promotion chances for women when decision makers are predominantly male.[48]

## BARRIERS TO WOMEN'S REPRESENTATION AMONG WAREHOUSE AGMS AND GMS AND THE USE OF PERSONNEL PRACTICES THAT CAN REDUCE THEIR EXCLUSIONARY EFFECTS

### Sex Make-up of the Promotion Pool

A fundamental barrier to women's advancement into managerial jobs at Costco warehouses is the demographic effect of long-standing exclusionary practices. GMs must have had experience as AGMs or equivalent experience, and according to the testimony of Costco senior managers, AGMs must have merchandising experience. Thus the pools from which AGMs and GMs are selected are almost as male-dominated as the current GMs and AGMs. In 2005, for example, women were just 18.6 percent of assistant warehouse mangers and just 19.3 percent of merchandising managers.[49] As Drogin shows, among senior staff, men were twice as likely to have been promoted to merchandise manager (28.9 percent compared to 14.3 percent); while women were more than twice as likely as men to have been promoted to administration manager.[50] Among persons who made lateral transfers into merchandise manager, four fifths were male, although women comprised almost one-third of the pool.[51] Executive Vice President Zook (dep., p. 69) testified that an assistant front-end manager would have a very difficult time moving into a job as merchandising manager, and class member Barnwell (dep., p. 167) testified that she could not apply to be front end, admin., merchandising or receiving manager because they are rarely posted, consistent with Drogin's report.

Women's lower likelihood of having begun the senior staff rotation in merchandising management compared to men[52] and their lower likelihood of having been promoted to AGM

---

[48] Reskin, BF. 2000. "The Proximate Causes of Employment Discrimination." *Contemporary Sociology* 29:319-29.

[49] Omoss ex. 140, CRE 0142454. See also Drogin, Richard. "Statistical Analysis of Job Movement in Management at Costco." May 15, 2006, pp. 3-4.

[50] Ibid., Table 4, p. 5.

[51] Ibid., Table 7.

[52] Ibid., Table 4.

before they held at least three senior staff jobs[53] contribute to their significantly longer time to promotion prior to the filing of *Ellis v. Costco*. If Costco continues to follow its practices of underemploying women as merchandising manager, requiring merchandising management experience for promotion to AGM and requiring AGM experience for promotion to manager, women will remain substantially underrepresented in the latter two positions, even if all other sources of sex bias in the promotion process are eliminated.

**Costco's solutions.** Several Costco managers referred to the need to maintain the pipeline. As I have shown, this alone will not suffice. Given this situation, mandating goals for women's representation as merchandising managers and enforcing compliance in meeting those goals is an affirmative step through which Costco would be able to increase women's representation at a faster pace than it has increased since the lawsuit was filed.

The October 1999 Executive Committee meeting notes show that Sinegal announced that Costco will either identify two candidates for promotion to the senior officer level by February 2000 or he will actively recruit outside candidates to be hired by the end of the fiscal year (Schutt ex. 35, CRE 0135005). The following year Sinegal wrote to several senior managers saying that "our attempts to create a healthy climate for diversity have not been as successful as we had hoped" and that "[i]t is time to take action" (Matthews ex. 98, CRE 0142021). The letter indicated that Dick DiCerchio would provide executive leadership on Costco's assessment of "ways [Costco] can strengthen the climate for inclusiveness throughout [the] company" (Matthews ex. 98, CRE 0142021). Sinegal invited a cross section of managers, including senior managers, to participate in focus groups to strengthen the climate of inclusiveness at Costco. Sinegal hoped that a report synthesizing the findings of these focus groups would identify the areas in the greatest need of attention (Matthews ex. 98, CRE 0142021).

The existence of organizational goals is associated with progress toward a more balanced workforce.[54] Between October 2004 and mid-February 2005, goals appeared on several of the minutes of the Operations Committee, beginning with "[e]veryone should outline goals that reflect the population in the market area" (Portera ex. 61, CRE 0130053), "[e]veryone should plan and outline goals" (Portera ex. 61, CRE 0130054), "[e]stablish goals and come up with a plan of where we want to be in a year" (Portera ex. 61, CRE 0130057), and "we need regional plans and goals. The current bench limit of eight may have to be expanded in order to include potential diverse employees" (Portera ex. 61, CRE 0130058). I could find no evidence that

---

[53] Ibid, computed from Table 5.

[54] Reskin, BF. 2000. *The Realities of Affirmative Action*. Washington, D.C.: American Sociological Assn.

corporate monitored whether VPs acted on any of these goals. However, Costco has not sent a clear signal to those involved in the promotion process that they must have goals and that they must act to meet those goals. At a weekly operations meeting, DiCerchio asked operations managers in each region to select "your top woman, black, Hispanic, and Asian, et cetera, no matter where they are in the pecking order, and outline a plan to get them ready for promotion. Submit to Dick" (Portera ex. 61, CRE 0130061). He added, "I never got a written plan in from them." Instead, when they recommend a promotion, managers must be "prepared to tell me where each one of these groups are in that order" (DiCerchio dep., pp. 177-79).

There was talk about managers setting hiring goals and having their performance rating and bonus depend in part on their achieving those goals, but this did not happen. Presently, goals are discretionary. For example, Schutt's senior VPs either have a specific goal or a general goal to promote diversity within their region. "They submit to me what they feel. I may ask them to change it" (Schutt dep., p. 175).

Matthews (dep., pp. 176-78) testified that the Executive Committee adopted goals for women's representation among GMs and higher. He was not aware of the size of these goals but testified that they are division specific (Matthews dep., p. 177). Minutes from a 2004 Operations meeting report that everyone should outline goals that reflect the population of the market area (which they periodically assess using BLS statistics) (Matthews dep., p. 190), although testimony and documents available to me did not indicate that this was implemented. Another 2004 Operations meeting refers to diversity, plans, outline goals, schedule meeting to review and discuss early 2005 (Matthews dep., p. 191).

Although Sinegal (dep., pp. 92-93) testified that diversity cannot be mandated, he set goals in October 2004 for women's representation on the Board of Directors, the Executive Committee, the Vice Presidents for Operations and for GMs. Recently he made appointments that met the first three goals (Sinegal dep., pp. 192-93). In 2004, he also set a goal for a two-percentage point increase in women's representation among GMs (from 13 percent to 15 percent) that Costco achieved, but women remained substantially underrepresented among GMs.

Executive and senior VPs in operations testified to different procedures (Portera dep., pp. 14-17). Gaherty (dep., pp. 124-26) listed as a goal in early 2005 one female manager or senior manager in all the 39 locations in his region, but did not achieve it. That has been his goal for several years and remains his goal for 2006. Gaherty (dep., p. 130) testified that he is taking affirmative steps to meet the goal by trying "to identify candidates from the outside that we can bring into our organization to fill the pipeline." His subordinate, regional VP Webb (dep., p. 194) described their affirmative steps as setting personal goals of having a female manager or AGM in

every warehouse in the Midwest.  Executive VP Schutt (dep., p. 51) set a goal that women would comprise 30% of new managers in his region without consulting the previous year's goal because he "thought one third [sic] was a good goal."

Goals are most likely to be effective when there is accountability.[55]  Accountability reduces subjectivity, discretion, ingroup favoritism, and stereotyping by making their consequences unacceptable.  Employers can reduce these barriers to women's access to warehouse management by using specific, objective, measurable criteria to evaluate job performance or consider candidates for promotion,[56] Costco has not effectively implemented any of these practices.

Costco does not collect or distribute to company executives a variety of data on how women are faring relative to men, especially in their opportunity to work as merchandise management. For example, Senior Vice President Hoover (dep., p. 117) was unable to estimate women's share of AGM jobs.  By keeping executives generally in the dark about women's representation in this key port-of-entry job into warehouse management, Costco executives are not able to explain—or address—women's underrepresentation as AGMs and GMs—except to cite the stereotype that women do not want certain jobs because of their commitment to their families.

Costco expects its managers to be geographically mobile.  Willingness to relocate can make people more promotable to AGM by increasing the openings for which they qualify (Hoover dep., p. 149).  Lack of knowledge of women's interest in promotions or their willingness to move to be promoted, stereotype-based inferences of women's immobility, and paternalistic attitudes that assume women are immobile or should not have long commutes create barriers to women's advancement (Hoover dep., p. 121).

**Hours and Relocation Policies**

**Hours.**  Although the biggest barriers to women's advancement on equal terms as men are managerial discretion and the lack of standardized procedures, Costco's hours for managers constitute barriers.  Managers' hours are irregular, depending on the extent of seasonal changes in merchandise, and start very early so that they can have their store completely ready for a 10 a.m. opening.  As several executives acknowledged, irregular hours put a burden on single parents who must arrange regular childcare (see, e.g., DiCerchio dep., pp. 86-87; Portera dep., p. 203), a group that is disproportionately female.  As an organization, Costco has taken no steps to adjust the hours of managers or permit a later starting time.

---

55 Reskin, ibid.

56 Bielby, WT.  2000. "How to Minimize Workplace Gender and Racial Bias." *Contemporary Sociology* *29*: 120-29.

26

**Relocation.** Rotating GMs and sometimes AGMs every three and seven years is part of Costco's philosophy (Matthews dep., p. 88; Zook dep., p. 141).[57] It is not possible to determine how much this policy contributes to women's underrepresentation as AGMs and GMs because Costco does not maintain records regarding workers' geographical constraints or their relocation preferences. However, decision makers' perception that women are less willing to move than men does matter. Relocatability is a criterion some decision makers invoke in making promotion recommendations (Vachris dep., p. 185; Webb dep., p. 116). Workers whom Vachris believes to be immobile get a lower score in his evaluation of who is promotable. This practice is consistent with Costco's paternalism (see, e.g., Webb dep., pp. 144-45). Some testified that the general managers and VPs know whether an AGM is willing to relocate or how far they can commute (Hoover dep., p. 27), while others view the walk as an opportunity to learn or update an employee's preferences (Webb dep., pp. 174-75). In the absence of recent, systematic, and reliable information on the interests and availability of individual men and women, stereotypes about women's and men's family commitments and constraints will lead decision-makers to overlook or discount the availability of qualified women who want to advance into the salaried ranks. The less specific information the decision maker has about all possible candidates, the more likely stereotypes will bias their decisions against women. Costco has not taken any formal steps to address this problem by implementing better record keeping or rethinking the need for periodic relocation, according to the materials available to me.

**The No-Problem Problem**

Importantly, some decision makers are not convinced that women's underrepresentation in top jobs stems from Costco's policies and practices. Sinegal opined that job assignments reflect workers' preferences rather than managerial decisions. DiCerchio (dep., p. 149) clarified that "perceived barriers" may not be real, and Portera (dep., p. 207) testified that he didn't believe that women faced special barriers. A robust research finding is that commitment at the top is necessary for the elimination of subtle barriers to advancement faced by women and minorities.[58]

**The Effectiveness of Costco's Efforts to Address Women's Underrepresentation in Key Warehouse Positions**

As Matthews (dep., p. 171) testified, prior to the BOLD Initiative and the October 2005 efforts, there was no corporate effort to focus on women and minorities. Instead, Matthews

---

[57] In other words, it is not part of a written policy (Portera dep., p. 118).

[58] Reskin, BR and H Hartmann. 1986. *Men's Work, Women's Work: Sex Segregation on the Job.* National Academy of Sciences Press.

testified that Costco's strategy of trying to develop *all* employees would necessarily develop female and minority employees. In 1999, Costco took its first step toward addressing its lack of demographic diversity as part of the BOLD Initiative which convened focus groups of high-level staff. Key findings from the BOLD Initiative regarding barriers were summarized in a February 7, 2001 document (Matthews ex. 98, CRE 0142045-49): women are underrepresented at senior levels, pipeline is weak, there aren't positions open to move into, problems with work-life balance, decision makers' preferences for others who are similar to them, people are hired through networks, and people's performance isn't being reviewed (Matthews ex. 98, CRE 0142047). Focus group participants recommended that Costco should increase exposure and broaden experience of women and minorities, recognize existing talent, recruit to expand talent, and make diversity hiring part of the review and bonus program (Matthews ex. 98, CRE 0142048).

From the initial focus groups, an on-going steering committee was appointed. It recommended that the decision making process should include three questions: (1) who is included in the pool of candidates, (2) who are females/minorities in the pool, and (3) if females or minorities were not selected, why not and what can be done to help them develop so that they are ready for the next promotional opportunity (Matthews ex. 98, CRE 0142013). They also noted that direction should begin at the top, noting that there are only two female senior vice presidents and no minority senior vice presidents (Matthews ex. 98, CRE 0142014). Sinegal made DiCerchio Costco's Chief Diversity Officer in 2004 to send a clear message that Costco took diversity seriously and because DiCerchio had strong feelings about this (Sinegal dep., pp. 87-96, 200-02). However, he gave DiCerchio no staff for this initiative, required no goals, and disdained the use of consultants. DiCerchio's testimony showed no particularly strong feelings about diversity. DiCerchio testified that before he was assigned to be Chief Diversity Officer, he had not paid any attention to statistical data about women's representation in various warehouse jobs (DiCerchio dep., p. 111), he did not use diversity as a criterion in calculating bonuses (DiCerchio dep., p. 26), he did not set diversity goals for warehouse management (DiCerchio dep., pp. 28, 53), he did not require regional vice presidents to give him a goal (DiCerchio dep., p. 56), he had never disapproved of any of their goals (DiCerchio dep., p. 64), he was not knowledgeable about regional vice presidents' diversity plans (DiCerchio dep., p. 29), he did not know if operations vice presidents (his immediate subordinates) have been trained regarding creating a more diverse workforce (DiCerchio dep., p. 36), and he believed that diversity is the total responsibility of the operators (DiCerchio dep., p. 37). Nonetheless, he did testify that he has a goal of twenty warehouse managers who are female or underrepresented minorities

(DiCerchio dep., p. 59). When he was appointed diversity officer, he did not start a diversity committee (DiCerchio dep., p. 126).

During 2001 the BOLD Initiative led to the Rothman Workplan which required that jobs *below* assistant manager be posted and called for annual performance reviews of all employees. The performance evaluation form enabled workers to express their interest in promotional opportunities, but the decisions as to whether to use that information remained entirely in the hands of the immediate supervisor and his/her supervisor (Matthews dep., p. 148). After merchandising positions were posted, there was a small but discernible increase in women's representation in those positions.[59]

Costco continued to hold periodic diversity workshops and training for all managers, the most recent in 2005. However, it conceptualized diversity as the variety of differences that exist within the workforce (Matthews dep., p. 108-09), and those groups continued to list the same barriers to women's advancement noted by the first focus groups, five years earlier, along with some recommendations for addressing them.

**Standardization of Promotion Procedures as a Check on the Biasing Effects of Discretion**

Almost all large corporations have bureaucratized their personnel practices.[60] Modern bureaucratic systems rationally coordinate the duties and responsibilities of officials and employees, these duties and responsibilities being delineated by formal rules in order to constrain private, idiosyncratic, and personal interests of individuals.[61] Among the hallmarks of bureaucracy are official records in the form of written documents, specialization of roles, and accountability.[62] Costco has bureaucratized its sales and financial functions and its personnel department provides orientation and on-going training to all Costco's employees. But in an important departure from the norm, HR does not oversee the promotion system or promotion decisions. The bureaucratic practices of written records, rules, and penalties and the uniform application of those rules contrast with paternalism which gives complete discretion to the persons who distribute rewards and punishments and acknowledges few if any rights for their subordinates, and which thus lack standardized procedures, written guidelines and records, and genuine oversight.

---

[59] Drogin, op. cit., Table 2a.

[60] Kalleberg, Arne, David Knoke, Peter Marsden, and Joe Spaeth. 1996. *Organizations in* America. Sage.

[61] March, James and H. Simon. 1958. *Organizations.* N.Y.: Wiley.

[62] Nikinovich. 2000. "Bureaucracy." In the *Encyclopedia of Sociology* edited by E. Borgatta and R. Montgomery.

The independence of Costco's promotion system from HR or the personnel department means that there is no common source of information from which employees can obtain guidance regarding career advancement or go to for recourse for unfair discipline, outside their Divisional and Regional Warehouse hierarchy.[63] An employee who is summarily disciplined or terminated has no recourse but through the "open-door" policy. I saw no evidence that people whose door was supposed to be open were governed by any rules or formal obligations. So the open-door policy is simply another part of Costco in which discretion and its concomitants, ingroup favoritism and stereotyping, are given free rein.

With respect to hiring, transfer, and promotion, Costco does not have a staff function that develops and disseminates specific criteria for promotion to AGM or GM. Cardoso (dep., p. 145) testified that he does not have any guidelines from Costco as to what geographical regions he should post in and that he has not received any guidelines on when he can refuse a transfer request (dep., p. 180). No written guidelines describe how the promotion process works for a candidate for AGM or GM (Zook dep., p. 128; Vachris dep., pp. 96-97). Indeed, Vachris (dep., p. 98) testified that Costco gives senior executives little direct instruction on how to promote. No one tells employees whether they are on a promotable list or even that a list exists and how they might get on it.

**Absence of written documents.** As personnel director Judy Vadney (dep., p. 107) testified, "Our culture is very oral, and we don't have a whole lot of things that are written down" (see also Omoss dep., p. 27). Although DiCerchio (dep., p. 96) and Sinegal (dep., p. 30) testified that all operations executives use the same general standards, the only written qualifications for AGM and GM are a high school diploma/GED and specified experience that is specific to each job. Portera (dep., pp. 106-07) testified that there are no written minimum qualification standards for the job of GM. Moreover, deponents testified that Costco lacked detailed written job descriptions, written criteria for holding AGM and GM positions, written guidelines as to how to operationalize the criteria that Costco managers named, written guidelines regarding how the promotion system works, written guidelines describing how applicants are assessed, written reports indicating why certain candidates were selected, written procedures with respect to the obligations of superordinates whose doors were open to grievances, and a written policy calling for mentoring. Thus, Gaherty's (dep., p. 226) negative assessment of plaintiff Ellis was not in writing. He testified that he did not counsel Ellis because he assumed that her GM would

---

[63] Director of Personnel, Judy Vadney, has no formal training in personnel practices or human resources (Vadney dep., pp. 37-38).

(Gaherty dep., pp. 227-28). Gaherty (dep., p. 232) did not know how he could find out what steps were taken to improve Ellis's people skills. Class member Kathleen Olson (dep., pp. 132-33, 135, 164) testified that she did not know that merchandising experience was required for promotion to assistant manager and that her four GMs gave her inconsistent information regarding the experience she needed be promoted. Cardoso (dep., p. 199) testified that he never received any written guidelines on creating a promotable list.

Many employees do not know what they need to do to be promoted in general and do not realize the importance of merchandise management experience. In the BOLD initiative focus groups made up of top managers and officers, twenty-eight participants said that the criteria for promotion were not clear and should be clarified (DiCerchio dep., p. 154). Five years later, participants in the 2005 focus groups raised the same concern (DiCerchio ex. 132, CRE 0130147-50).

In addition, information about opportunities for AGM and GM positions is not posted. It is available only by word of mouth (see, e.g., Vadney dep., p. 24), and in a predominantly male organization, ingroup favoritism makes word-of-mouth information more available to males because social networks tend to be sex-based and because of ingroup favoritism. Hence, women often do not learn about a position before it is filled. Although Costco increasingly uses promotable lists from which regional executives select GMs, this fact is not generally known (Gaherty dep., pp. 76-77), even to workers who are on such a list (Webb dep., p. 179).

**Failure to retain written records.** Costco fails to retain previous lists of promotables that would allow accountability and mentoring. For example, Gaherty (dep., p. 111) did not save promotable lists so it not possible to compare women's and men's promotion, once they are declared promotable or to further mentor women who for some reason fall off the list. Some operations executives do not retain records of past promotions. HR has not audited operations records on who is participating in mentoring at the AGM level to see if there is an adverse impact against women (Matthews dep., p. 87). Costco does not retain records indicating whether women are more likely to turn down promotions than men.

**Failure to collect information.** In general, Costco failed to collect data that would reveal the nature of and reasons for women's underrepresentation, despite investing time into focus groups of executives and managers seeking their *opinions* about diversity. Thus, Sinegal (dep., p. 144) has no information on whether some of women's turnover might be due to women believing that they have no opportunity to advance. He testified that he hopes managers are not making assumptions about the availability of women to move through the managerial staff positions

31

below that of AGM (Sinegal dep., p. 155), but he provided no evidence that Costco has systematically surveyed managers about whether they make such assumptions.

**Failure to provide available information to Costco personnel.** VPs don't share their promotable lists with people from other regions (Omoss dep., pp. 208-09). Hoover (dep., pp. 59-60) testified that he has not received any written communication from another person outside his region saying here are some "potential people".