SECOND REPORT OF BARBARA F. RESKIN, Ph.D.
*Shirley "Rae" Ellis et al. v. Costco Wholesale Corp.*

### Assignment and Materials Reviewed

I have been retained by Brad Seligman and Jocelyn Larkin of the Impact Fund and by Bill Lann Lee from the law firm of Lieff Cabraser Heimann & Bernstein, counsel for plaintiffs in *Shirley "Rae" Ellis et al. v. Costco Wholesale Corp.* I have been asked to assess the validity of the opinions Drs. Landy, Stockdale, and Mulligan (June 22, 2006) express in their expert reports on behalf of Costco Wholesale Corp. ("Costco"). In addition to the materials I reviewed for my report, I read Costco's experts' responses, any appendices, and the depositions of Drs. Saad and Stockdale. I have read some of the published material that Drs. Landy and Stockdale cited, as well as additional material on sex stereotyping and on motherhood and women's occupational preferences. I read Dr. Bendick's second report, and I analyzed performance review data that Costco produced for Dr. Saad, as well as certain data from the 2000 census Integrated Public-Use Micro Sample (IPUMS).

### Summary of Opinion

I. Drs. Stockdale and Landy misstate well-established scholarship on cognitive bias and sex stereotyping, understating the likelihood and adverse effects of sex stereotyping.

II. Drs. Landy and Stockdale ignore the fact that only certain kinds of individuating information can reduce the effects of sex stereotyping on women's career outcomes. They also ignore evidence that employers' personnel practices can mitigate the effects of sex stereotyping and ingroup favoritism.

III. Defendant's experts exaggerate the importance of family roles for women's career preferences, relying on dated, poorly designed and irrelevant research findings. They ignore the fact that workers' job preferences change over time, partly in response to opportunities open to them. They overstate the role of workers' preferences on women's presence in customarily-male management jobs.

IV. Dr. Landy incorrectly claims that my report does not meet the standards of social framework analysis.

## I. Drs. Stockdale and Landy Misstate Scientific Research
## on Sex Stereotyping and Cognitive Bias

1. Drs. Stockdale and Landy ignore or substantially misstate well-established scholarship about sex stereotyping and the impact of stereotyping on women's underrepresentation in high-level jobs. Dr. Stockdale's coauthored book on sex stereotyping and women's and men's careers (Cleveland, Stockdale and Murphy 2000; hereafter, "Cleveland et al.") *contradicts* most of her and Dr. Landy's opinions about sex stereotyping and *supports* my opinions on sex stereotyping and its adverse effects on women's careers (Cleveland et al.:83-86).

2. As Dr. Stockdale's book states, sex stereotypes play an important role in sex discrimination (Cleveland et al.:56-57). They do so in part by operating as implicit knowledge that decision-makers draw on and that "influence [people's] perceptions of individual men and women" (Cleveland et al.:43). As Borgida and his colleagues concluded, there is "substantial agreement that these gender stereotypes have small but consistent effects on the judgments of women and men (including evaluations, attributions, and employment decisions), particularly when women and men act in stereotype-inconsistent ways" (Hunt, Borgida, Kelley and Burgess 2002:616-17).

3. Sex stereotyping contributes to jobs being defined (or "labeled") as "male" or "female". This sex typing perpetuates job segregation and the devaluation of women's work, as Dr. Stockdale's book indicates (Cleveland et al.:313; see also Kilbourne et al. 1994; Nelson and Bridges 1999). Both jobs' sex composition and their "labels" as "women's work" or "men's work" affect women's access to them.

4. As Stockdale and her coauthors point out, stereotypes are especially likely to influence gatekeepers' perceptions of workers whose sex differs from the sex of most persons in that job. Drawing on Kanter's (1977) case study of a major organization, Stockdale's book explains that sex-atypical workers (workers in jobs that mostly employ members of the other sex) are treated as "tokens". This increases their visibility and subjects their behavior to close scrutiny. It also leads others to focus on and exaggerate the differences between themselves and members of the minority group and to ignore their similarities (Cleveland et al.:165). Importantly, a token's personal characteristics do not fit those that have come to be associated with typical job holders. This "lack of fit" exacerbates sex stereotyping (Cleveland et al.:165-66).

5. Managerial jobs have been stereotyped as male and have become associated with stereotypically male attributes and, as a result, male attributes became associated with succeeding in those jobs (Kanter 1977; Cleveland et al.:303; Hunt et al. 2002:598). As Cleveland and her

3

coauthors wrote, although women and men do not differ in managerial ability or motivation, women are perceived to have fewer of the attributes associated with managerial effectiveness than men. The fact that the male sex stereotype is consistent with the occupational stereotype of a manager, while the stereotype of a woman is not, "spells trouble for women attempting to enter and succeed in the managerial ranks" (Cleveland et al. 2000:163).

6. Dr. Landy claims that I misrepresent the scientific view of automatic cognitive processing (Landy report:94-98). He is wrong. Research on conscious and implicit stereotyping is generally accepted in the social scientific community, published in top peer-reviewed journals, and has been the subject of special issues of several major journals (Fazio and Olson 2003:307-10).

7. Dr. Landy opines that my report said that "human information processing is universally flawed in the way gender influences personnel decision" (p. 48). I made no such assertion. I cite a body of research that establishes that people's cognitive need to simplify the multitude of stimuli barraging our senses necessitates our taking "cognitive shortcuts" such as categorization, ingroup favoritism, and stereotyping (Reskin report:13-18). As I discuss below, employers can prevent these shortcuts from harming either sex.

8. Dr. Landy criticizes the Implicit Association Test (IAT) research method, asserting that "the notion of automatic cognitive processing as an explanation for gender discrimination is little more than 'pop' psychology" (pp. 94-97). Dr. Landy misconstrues the "basic paradigm" of Greenwald and his colleagues and understates its acceptance in social psychology. As Hunt and her colleagues (2002:585) conclude, "given the firm grounding of the methodologies in cognitive psychology as well as the consistency of response patterns found across numerous studies, there is no serious question within the psychological community about whether response latency methodologies [which include the IAT] are a useful means of studying stereotyping."

9. I do not claim, as Dr. Landy asserts, that Greenwald and his colleagues say that only "men carry implicit negative associations about women" (p. 49). Both sexes associate positive images with women more readily than with men, and sex stereotypes are not necessarily pejorative (Hunt et al. 2002:509). The stereotypes that are particularly relevant in this case are that women are more oriented to their families than to their jobs and that women's orientation to their children and families leads them to avoid certain jobs because of their irregular or long hours. Evidence for the existence of these stereotypes comes from research showing that both sexes more readily associate women with family and men with career (Fazio and Olson 2003:308).

10. Because Dr. Landy mistakenly equates "ingroup membership" with membership in an organization's elite, his criticisms of my discussion of categorization and ingroup favoritism are not relevant (p. 99). A half century of research has demonstrated that people automatically

categorize others into ingroups and outgroups based on the similarity of their personal characteristics, such as sex and age. Importantly, we automatically favor and trust members of our ingroup over outgroup members (Brewer and Brown 1998; Hunt et al. 2002:606). For example, experimental research that created artificial groups based on inconsequential attributes shows ingroup favoritism (Fazio and Olson 2003:307). Kanter showed that ingroup favoritism is particularly likely when corporate managers are filling positions that involve uncertainty, presumably because they believe that others who resemble them will make the same kinds of decisions they would make (Kanter 1977:48, 63). In organizations in which most decision-makers are male, automatic ingroup favoritism will disproportionately exclude women from top jobs unless companies implement personnel structures that check the biasing effects of automatic ingroup favoritism and stereotyping (discussed in more detail below).

11. I agree with Dr. Landy that the generalizability of laboratory experiments is limited if subjects behave differently from the general population or if the experimental manipulation does not correspond to real-world situations. These limitations of laboratory experiments do not hold for basic studies of how human cognition operates, however.

**II. Employers' Practices Can Check Stereotyping or Reduce its Biasing Effects**

12. As Dr. Landy acknowledges, individuating information can reduce the adverse effect of sex stereotyping on women (pp. 84-89). It does so, however, only under specific conditions (Cleveland et al.:59; Hunt et al. 2002:603). While early research suggested that *any* individuating information reduced the effect of sex stereotypes on judgments about individuals, more recent research shows that the role of individuating information is much more complicated (Hunt et al. 2002:603). Because perceivers tend to selectively process information, preferring information that is consistent with their stereotypes, while inhibiting inconsistent information, only unambiguous individuating information can override stereotypes. Perceivers may ignore individuating information if they lack the incentive or the cognitive resources to form an individualized impression of the person. "The mere process of trying to suppress a stereotype consumes cognitive resources, making it harder to process individuating information" (Hunt et al. 2002:603). Individuating information is most effective in suppressing stereotyping when it is relevant to the decision being made. However, as Hunt et al. note, gender may be considered relevant for some decisions, such as filling a customarily-male job (p. 604). Indeed, irrelevant information can increase the impact of sex stereotyping if it makes the person seem more like a "typical man" or "typical woman" (Hunt et al. 2002:604). Hour-long warehouse walks every month or two by the regional executives responsible for selecting AGMs or GMs are extremely

unlikely to provide current, accurate individuating information for the hundreds of workers that district or regional vice presidents supervise. The fact that workers' circumstances and preferences change renders it almost impossible for regional or district executives to have up-to-date knowledge about all workers' preferred working hours across the several warehouses for which they are responsible.

13. Whether and how much automatic ingroup favoritism and sex stereotypes harm women depend on an employer's personnel practices. Because people's stereotypes replace missing information, processes that ensure that decision-makers have relevant information on all decision criteria for every promotion candidate reduce the *incidence* of stereotyping. When decision-makers are busy, under time pressure, or their cognitive resources are otherwise taxed, they are less able to attend to many details and hence are more likely to base decisions on stereotypes (Bodenhausen et al. 1998:319; Fiske 1998:389; Goodwin et al. 1998:694; Hunt et al. 2002:613). According to Hunt and her colleagues, sex stereotypes are activated when participants have high cognitive demands and little incentive not to stereotype, are less likely to be activated when participants have high cognitive demands but are motivated not to stereotype, and are eliminated when participants are motivated to avoid stereotyping and have light cognitive loads (pp. 84-89). "This research suggests that controlling the use of gender stereotypes in a busy workplace . . . may be very difficult" (p. 613).

14. Dr. Landy (p. 49) ignores the most important element of my argument: Personnel structures can mitigate the likely adverse effects of ingroup favoritism and stereotyping. Economists Goldin and Rouse illustrated how personnel practices can diminish or eliminate the adverse effects of sex stereotyping (see below; see also Sturm 2001). Until the last 20 years, women were virtually absent from major U.S. symphony orchestras. Individual-level explanations for their absence included sex differences in talent or aspirations, or time conflicts with practice or performances. However, Goldin and Rouse (2000) found that U.S. symphony orchestras increased their representation of female musicians after they changed their audition practices. Auditioners were more likely to select female candidates for major symphony orchestras when candidates auditioned behind a screen that ensured that auditioners' conscious or unconscious stereotypes could not influence their decisions. This real-world experiment illustrates how personnel structures can override individuals' biases or cognitive errors in evaluation.

15. Employers' personnel policies and practices can reduce the biasing effects of stereotyping by making decision-makers accountable for their decisions. When decision-makers know that they will be held accountable for making fair decisions, their stereotypes are less likely

to affect their decisions (Hunt et al. 2002:609; Tetlock 1985, 1992). As I noted in my report, Costco's top executives only nominally review decisions regarding promotions to AGM and GM (p. 25). Those persons who decide whom to promote to AGM and GM are not accountable for how they reach their decision or what that decision is, for whether they have goals or whether they reach those goals. Thus, Costco has not implemented any accountability structures that effectively reduce the effects of conscious or automatic sex stereotyping or ingroup favoritism.

16. Personnel structures can reduce bias only to the extent that organizations systematically use them when making personnel decisions. Standardizing performance evaluations, for example, will not increase women's access to top managerial positions unless decision-makers systematically consult those evaluations for all promotion candidates before making promotion decisions (Edelman 1992).

17. Dr. Landy suggests that the warehouse walk is a "best practice" which I "trivialize" by portraying it as an infrequent event conducted by senior executives (p. 61). As he points out, *warehouse managers* walk their warehouses daily. However, the decision-makers who select AGMs and GMs are not warehouse managers, but district and regional executives who typically spend only an hour or two walking each warehouse every month or two (Landy report:64-65; Reskin report:9-12, 26). Regional and district members choose which senior staff will join them on the walk, and apparently assess their promotability during these walks. Both their choice of whom to accompany them and their assessments of promotability are subject to cognitive biases. Their brief periodic exposure to a few warehouse senior staff cannot possibly permit decision-makers to acquire individuating, job-relevant information for *all* staff qualified for promotion. Contrary to Dr. Landy's contention, this policy and practice of identifying prospective AGMs and GMs well in advance is exclusionary and vulnerable to bias stemming from cognitive distortions (Landy report:68-72). Costco's practice of subsequently providing special opportunities to superstars singled out as prospective GMs creates a self-fulfilling prophecy of success for a few, while limiting the opportunities of others.

18. Dr. Landy criticizes my characterization of Costco's system of identifying senior staff for promotion to AGM and GM as paternalistic, and disagrees that bureaucratized promotion systems are less subject to bias (pp. 58-61). Indeed, Dr. Landy asserts that the bureaucratic model is outdated and that standardization would "strangle" human resources (p. 59). Bureaucracies refer to organizational systems that rely on written rules and records, standardized practices, hierarchical lines of authority (including accountability), and the separation of a position from its incumbent. Written procedures and records and emphasis on standardized practices are necessary to reduce the likelihood of capricious or unequal treatment. According to the National

Organizations Survey, 70 percent of a representative survey of almost 600 U.S. work organizations had a bureaucratic structure (Kalleberg et al. 1996:109). (The exceptions were small companies.) A strong majority of the organizations in the survey had formalized personnel structures (Kalleberg et al.:chapter 4). The researchers concluded that "modern organizations are dominated by the use of bureaucratic systems of control" (p. 217).

19. Dr. Landy opines that I used the wrong level of analysis because I cite scholarship that acknowledges the importance of both individual-level factors such as stereotyping and structural variables such as the sex make-up of jobs, personnel practices, and accountability structures that can mitigate or exacerbate the effects of stereotyping (Landy report:17).[1] The sex composition of a job and whether it is viewed as "men's" or "women's work"—both structural-level variables— affect a variety of job-related outcomes (for a review, see Reskin et al. 1999). The proportion of women employed in a job is positively associated with the likelihood that a woman will be hired or promoted into that job (Cohen et al. 1998). As Stockdale's book asserts, "Jobs that are mainly held by men tend to have male stereotypes, whereas jobs that are mainly held by women tend to have female stereotypes, almost independent of the content of the job" (p. 164; also see Hunt et al. 2002:598). Reliance on individual-level explanations precludes the discovery of structural or contextual explanations that identify ways that structures mediate the effect of individual-level factors (Cleveland et al.:65).

20. In keeping with their "supply-side" approach, neither Dr. Saad nor Dr. Mulligan acknowledge that Costco's decision-makers play any role in the sexes' segregation into different warehouse management jobs (except to conclude that they treat the sexes equally[2]). They attribute women's underrepresentation in management to women's choices. However, Dr. Saad's report shows that Costco substantially overselected female applicants to be membership and marketing managers: Women were 42 percent of the applicants, but 72 percent of those hired. Decision-makers also overselected female applicants to be assistant front-end managers: women were 34 percent of the applicants, but 45 percent of those hired (Saad report:exh. 28). There was no shortage of male applicants; over 1000 men applied to postings for one or the other of these

---

[1] By analogy, individual-level factors such as age, sex, and alcohol abuse are related to the likelihood of a serious auto accident. Mandatory seatbelts—physical as well as legal structures—reduce the likelihood that these individual-level factors lead to serious injury or death.

[2] Costco's experts inferred that Costco did not discriminate against women based on the significantly higher performance evaluations of female over male Costco managerial employees (Landy report:79; Mulligan report, Saad dep.:53-54). Evidence that women have systematically better evaluations than men at the same organizational level is not evidence of equal treatment. To the contrary, it suggests

8

two positions (exh. 28). In disproportionately selecting women for positions that are feeder jobs for front-end and administrative manager, Costco decision-makers perpetuate sex segregation, while signaling to its workers that women are better suited for some jobs than for others.

**III. Defendant's Experts Make Erroneous Inferences about Women's Preferences**

21. Dr. Stockdale exaggerates the importance of family roles for the career preferences of women employed at Costco, relying on outdated, poorly designed and irrelevant research findings. For example, among the evidence she cites with dubious generalizability to Costco employees are a 1977 survey sample of adults who work as little as 20 hours a week, a study using 1988 data limited to white women, a 1988 study of dual-earner couples, a convenience sample of 336 parents whose children were at daycare centers, and 252 working parents employed in a Canadian firm (pp. 18-25). These studies purport to show that women continue to do more domestic work and childcare than men do, but none show that a woman's share of childcare is related to her willingness to accept a managerial job.

22. Dr. Stockdale opines that women are less likely than men to accept management positions requiring relocation based on two sources, neither of which warrants generalization (p. 42). One of the two sources for her opinion used 1977 data for 359 members of dual-career families in which respondents were asked hypothetically if they would move if their spouse received a higher-paying job in another city (p. 33). The sexes' relative positions in the labor force in 1977—their relative labor force participation, earnings, representation in managerial occupations, among others—differed so dramatically from their relative positions today that we cannot extrapolate from 1977 work-related preferences. The other study was based on a "convenience sample" in which MBA students were given extra credit for distributing their professor's questionnaire to up to ten employees at their company and asking them to provide the name of someone of the other sex as a "control". This publication does not meet scientific standards with respect to research methods; its results cannot be generalized to any known population. Dr. Mulligan relies primarily on a study published in 1978 that reported that wives had less say in migration decisions than their husbands (p. 12). As noted, pervasive changes since the late 1970s in the sexes' positions in the labor force means that research from the 1970s is not likely to apply to contemporary women's preferences.

23. Dr. Saad's report shows that men who were staff managers in 1999 had transferred more frequently than women, although the transfer rate for both sexes was low (Saad report:exh. 41).

---

that women have to be better than men to reach the same level or deserve to be promoted to a higher level.

However, when he takes into account whether sample members had been promoted to AGM, the sex difference is no longer statistically significant (Saad dep.:162). Importantly, both women and men who had been promoted to AGM were about twice as likely to have moved as were those who had not been promoted (Saad report:exh. 42). One interpretation for these results, which Dr. Saad does not discuss, is that a promotion to AGM acts as an incentive to both men and women to move and that Costco offered more men than women promotions to AGM. Other research raises the same possibility. Female managers employed at twenty Fortune 500 firms had relocated slightly less often than their male counterparts, but the researchers point out that one cannot know how much of this difference is due to being offered an opportunity that involves moving and how much is due to whether one accepts such an offer. The women managers in this study were as willing to accept an international assignment as men, however, and the spouses of both the women and men were equally willing to relocate (Brett and Stroh 1999:396). The possibility that opportunity affects people's preferences is consistent with a large body of sociological research.

24. Dr. Stockdale attributes presumed sex differences in preference for warehouse management to gender role socialization (p. 23), as does Dr. Mulligan when he suggests that "a woman may have learned from her parents that women 'ought to' limit their work hours in order to have time to care for children and housework" (p. 10). These speculations ignore the consensus among experts that socialization is a life-long process to which adults are subject and in which *on-going* social rewards and punishments, from a variety of sources, can reinforce or alter attitudes and behavior (Epstein 1988; Reskin and Hartmann 1986; Reskin et al. 1999).

25. As Dr. Stockdale admits, "barriers to women's employment opportunities . . . are the sources of differences in job attribute preferences . . . if they cause women to re-evaluate (i.e., lower) their career aspirations" (pp. 27, 29). I agree. People's occupational preferences depend to a considerable degree on the opportunities and constraints that they encounter. Just as barriers can lead workers to lower their preferences, opportunities can cause them to raise their preferences (Kanter 1977; Cassirer and Reskin 2000).

26. Costco's experts claim that women are underrepresented among AGMs and GMs because women choose not to pursue these jobs. Dr. Saad's and Dr. Mulligan's basis for this claim is theoretical (for a general discussion, see Bendick's second report:section V).[3] Two implicit and erroneous assumptions about women's preferences and the female labor supply

---

[3] To be completely accurate, I should mention that Dr. Saad also relied on the experience of a single female Costco employee whom he testified chose to defer promotion for family reasons (p. 13).

underlie Drs. Saad's and Mulligan's argument.  The first is that raising children deters women
from accepting high-level managerial jobs, and the second is that this preference substantially
reduces the supply of promotable female employees at Costco.  My analyses of two data sets—
the IPUMS data for the over 4 million women employed full-time in retail sales and Dr. Saad's
sample of the performance evaluations of 281 Costco managers—cast doubt on both assumptions
(Saad report:52, exh. 37).

27.  Over sixty percent of women employed in retail sales in the IPUMS data from the 2000
census had no children under age 18.  Among these women, I selected the two occupational
groups that Dr. Saad identified as corresponding in responsibilities to general managers and
senior staff managers.[4]  Of the almost quarter million women employed full time in retail sales as
general managers, 63 percent had no children under age 18.  Among the almost one million
women employed full time as first-line supervisors of sales workers in the retail sales industry, 60
percent had no children under age 18.  Unless Costco's female workforce is extremely atypical, a
large proportion of female managers at Costco have no children under age 18.

28.  The presence of children—even pre-school children—does not deter American women
from pursuing careers as managers.  According to my analyses of the IPUMS data, more than
83,000 mothers of children under 18 worked full time as general managers in retail sales, as did
more than 33,000 mothers of children under six.  Among women employed full time as first-line
supervisors of sales workers, almost 362,000 had children under 18, and more than 134,000 had
children under six.

29.  My results from analyzing the performance evaluations of 281 Costco managers are
consistent with these national data.  As part of the performance-evaluation process, Costco
employees have an opportunity to discuss their career goals and any constraints.[5]  Dr. Saad
claimed that these data included many examples of women indicating that they wanted to
postpone promotion because of family considerations (Saad report:13; Saad dep.:186).  In fact,
the performance evaluations of only nine male and nine female managers mentioned family
constraints.  Similarly, all of Costco's experts assume that women prioritize family over
advancement at work and identified early starting or erratic schedules as deterrents for mothers

---

[4] I restricted the sample to women between the ages of 22 and 64.  Like Dr. Saad, I selected women
who worked more than 35 hours a week and who had some earnings, but I did not further restrict the
sample according to earnings for the reasons Dr. Bendick outlined in his second report.

[5] Analyzing these data was complicated by the fact that many sample members had multiple
performance evaluations over the four years for which Dr. Saad had data.

with children at home. According to my analysis, however, just four men and one woman mentioned time or scheduling constraints in this sample of performance evaluations.[6]

30. The performance evaluation data sometimes included workers' career aspirations. According to my tabulation, virtually identical proportions of male and female AGMs aspired to be GMs, as did very similar proportions of merchandise managers and administrative managers. A higher proportion of male than female front-end managers aspired to become GMs, but the reverse is true for receiving managers.

31. As case studies and surveys have shown, workers' job preferences as well as whether they work in customarily-male, sex-integrated, or customarily-female jobs fluctuate over time and in response to opportunities (Jacobs 1989; Rosenfeld 1992; Padavic and Reskin 2002). As customarily-male jobs have become open to women, women have flocked to them (Reskin and Roos 1989).

### IV. Social Framework Analysis

32. Dr. Landy asserts that my report does not meet the standards of social framework analysis because the scholarly works I cite do not conform to standards delineated by Monahan and Walker (1991; Landy report:27). I disagree. Social framework analysis uses general scientific knowledge to construct a frame of reference or background context for the factual issues crucial to the resolution of a specific case (Walker and Monahan 1987:559). I reviewed testimony, documents, and other quantitative and qualitative information about the case in order to draw conclusions about how *extant* social science theory and research applies to the specific circumstances of the organizational setting in which discrimination is alleged to have occurred, which I evaluated in the context of social science scholarship on factors that create, sustain, and minimize bias. I relied on the findings of a large body of interdisciplinary, peer-reviewed social science research on factors that create and sustain bias and those that minimize it, and compared it with Costco's policies and practices and the stated beliefs of the executives who decided whom to promote to AGM and GM. Dr. Landy supports his claim by mischaracterizing the scientific literature that I cite as essays or theories rather than empirical research (Landy report:Table 2).

---

[6] Men's comments included "I must stay on the morning shift so that I am able to pick up [my children] from school" (center manager); "I can't work many hours over 45. I play a great part in my children's lives" (hardlines manager); "I would like someone to . . . say that I have been a successful merchant so that I may move on to more normalized hours" (merchandise manager); and "regular days off like Fri., Sat.—Sat., Sun.—Sun, Mon.—so I can see my family" (merchandise manager). The woman who mentioned schedules (an administrative manager) sought "earlier shifts, weekend day(s)" (tabulated from Landy report, Appendix G).

12

For example, Kanter's empirical field study of men and women in a Fortune 500 corporation (which has received thousands of citations) showed that gender differences in workers' behavior stemmed from such structural factors as the demography of their work group, workers' promotion opportunities, and access to resources and power.  Dr. Landy did not classify as "empirical" articles or books that critically review a body of empirical research (e.g., Baron and Pfeffer 1994; Reskin and Hartmann 1985, Reskin 1998; Reskin et al. 1999; Padavic and Reskin 2002—all highly cited publications published by selective peer-reviewed journals or presses).

Received   01-08-2006   08:57        From-20664943516        To-The Impact Fund        Page 002

13

## V. Conclusions

33. Costco's experts disregard a large body of high-quality research conducted with a variety of recognized methods by members of multiple scholarly disciplines that establishes that cognitive distortions—automatic ingroup favoritism and conscious and implicit sex stereotypes—contribute to women's underrepresentation in management jobs, and that employers can check these cognitive biases. Costco's experts' emphasis on "the supply side" (i.e., women's choices or preferences) precludes their acknowledging Costco's role in promoting workers to management jobs. It is my opinion that decision-makers' cognitive distortions or Costco's failure to implement structures to mitigate those distortions contribute to the disparities in the sexes' representation among Costco's AGMs and GMs.

Signed this 31st day of July at Seattle, Washington.

Barbara F. Reskin

14

# REFERENCES

Baron, J.N. and J. Pfeffer. 1994. "The Social Psychology of Organizations and Inequality." *Social Psychology Quarterly* 57:190-209.

Bem, S.L. and D.J. Bem. 1973. "Does Sex-Biased Job Advertising 'Aid and Abet' Sex Discrimination?" *Journal of Applied Social Psychology* 3:6-18.

Bodenhausen, G.V., C.N. Macrae, and J. Garst. 1998. "Stereotypes in Thought and Deed: Social Cognitive Origins of Intergroup Discrimination." Pp. 311-36 in C. Sedikides, J. Schopler, and C. A. Insko (eds.), *Intergroup Cognition and Intergroup Behaviors.* Mahway, N.J.: Erlbaum.

Brett, J.M. and L.K. Stroh. 1999. "Women in Management: How Far Have We Come and What Needs to Be Done." *Journal of Management Inquiry* 8:392-98.

Brewer, M.B. and R.J. Brown. 1998. "Interpersonal Relations. Pp. 554-94 in D.T. Gilbert, S.T. Fiske, and G. Lindzey (eds.), *Handbook of Social Psychology.* NY: McGraw-Hill.

Cassirer, N.R. and B.F. 2000. High Hopes: Organizational Location, Employment Experiences, and Women's and Men's Promotion Aspirations. *Work and Occupation* 27:438-63.

Cleveland, J.N., M. Stockdale, and K.R. Murphy. 2000. *Women and Men in Organizations.* Mahwah, NJ: Erlbaum.

Cohen, L.E., J.P. Broschak, and H.A. Haveman. 1998. "And Then There Were More: The Effects of Organizational Sex Composition on Hiring and Promotion. *American Sociological Review* 63:711-27.

Edelman, L.B. 1992. "Legal Ambiguity and Symbolic Structures: Organizational Mediation of Civil Rights Law." *American Journal of Sociology* 97:1531-76.

Epstein, C.F. 1988. *Deceptive Distinctions.* New Haven: Yale.

Fazio, R.H. and M.A. Olson. 2003. "Implicit Measures in Social Cognition Research." *Annual Review of Psychology* 54:297-327.

Fiske, S.T. 1998. "Stereotyping, Prejudice and Discrimination." In D.T. Gilbert, S.T. Fiske, and G. Lindzey (eds.), *Handbook of Social Psychology.* NY: McGraw-Hill.

Fiske, S.T. and S.E. Taylor. 1991. *Social Cognition.* NY: McGraw-Hill.

Goldin, C. and C. Rouse. 2000 "Orchestrating Impartiality: The Impact of "Blind" Auditions on Female Musicians." *American Economic Review* 90:715-41.

Goodwin, S.A., D. Operario, and S.T. Fiske. 1998. "Situational Power and Interpersonal Dominance Facilitate Bias and Inequality." *Journal of Social Issues* 54:677-98.

Jacobs, J.A. 1989. *Revolving Doors.* Stanford: Stanford University Press.

Kilbourne, B., P. England, and K. Beron. 1994. "Effects of Individual, Occupational, and Industrial Characteristics on Earnings: Intersections of Race and Gender." *Social Forces* 72:1149-76.

Hunt, J.S., E. Borgida, K. M. Kelley, and D. Burgess. 2002. "Gender Stereotyping: Scientific Status," pp. 580-620 in *Modern Scientific Evidence: The Law and Science of Expert Testimony,* edited by D. Faigman, D. H. Kaye, M. J. Sacks, and J. Sanders, West.

Kalleberg, A.L., D. Knoke, P.V. Marsden, and J.L. Spaeth. 1996. *Organizations in America.* Sage.

Kanter, Rosabeth. 1977. *Men and Women of the Corporation.* NY: Basic.

Martell, R.F. 1991. "Sex Bias at Work: The Effects of Attentional and Memory Demands on Performance of Ratings of Men and Women." *Journal of Applied Social Psychology* 21:1939-60.

Marini, M.M., P-L. Fan, E. Finley, A.M. Beutel. 1996. "Gender and Job Values." *Sociology of Education* 69:49-65.

Miner, J.B. 2002. *Organizational Behavior: Foundations, Theories, and Analyses.* NY: Oxford.

Monahan, J. and L. Walker. 1991. "Judicial Use of Social Science Research. *Law and Human Behavior* 15:571-84.

Nelson, R.L. and W.P. Bridges. 1999. *Legalizing Gender Inequality.* NY: Cambridge.

Ogasawara, Y. 1998. *Office Ladies and Salaried Men.* Berkeley: California.

Padavic, I. and B.F. Reskin. 2002. *Women and Men at Work.* Thousand Oaks, CA: Sage.

Presser, H.B. 2003. "Race-Ethnic and Gender Differences in Nonstandard Work Shifts. *Work and Occupations* 30:412-39.

Reskin, B.F. 1998. *The Realities of Affirmative Action.* Washington, D.C.: American Sociological Association.

Reskin, B.F. and H.I. Hartmann. 1986. *Women's Work, Men's Work: Sex Segregation on the Job.* Washington, D.C.: National Academy Press.

Reskin, B.F. and D.B. McBrier. 2000. "Why Not Ascription? Organizations' Employment of Male and Female Managers. *American Sociological Review* 65: 210-33.

Reskin, B.F., D.B. McBrier, and J. Kmec. 1999. "The Determinants and Consequences of Workplace Sex and Race Composition." *Annual Review of Sociology* 25:335-61.

Reskin, B.F. and P.A. Roos. 1999. *Job Queues, Gender Queues: Explaining Women's Inroads into Customarily Male Occupations.* Philadelphia: Temple.

16

Rosenfeld, R.A.  1992.  "Job Mobility and Career Processes."  *Annual Review of Sociology*
18:39-61.

Stockdale, M.S.  2006.  Expert report in *Browning v. Southwest Institute*.

Sturm, S.  2001. "Second Generation Employment Discrimination: A Structural Approach."
*Columbia Law Review* 101:458-568.

Tetlock, P.E.  1985.  "Accountability: The Neglected Social Context of Judgment and
Choice."  *Research in Organizational Behavior* 7:297-332

Tetlock, P.E.  1992.  "The Impact of Accountability on Judgment and Choice: Toward a
Social Contingency Model."  *Advances in Experimental Social Psychology* 25:331-76.

Walker, L. and J. Monahan.  1987.  "Social Frameworks:  A New Use of Social Science in
Law."  *Virginia Law Review* 76:877-96.