UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

(SAN FRANCISCO DIVISION)

SHIRLEY "RAE" ELLIS, etc., et al., )
                                    )
                      Plaintiffs,  )
                                    )
            v.                      )  No. C04 3341 MHP
                                    )
COSTCO WHOLESALE CORPORATION,       )
                                    )
                      Defendant.    )
_____)

VOLUME II

DEPOSITION OF LEAH HORSTMAN

April 10, 2006

SHURI GRAY
CSR No. 3786
JOB#117262



700 South Flower Street, Suite 1050
Los Angeles, CA 90017
800-722-1235

1      A.   3105 Alpine Boulevard.                              9:18AM

2      Q.   Alpine?

3      A.   Alpine.

4      Q.   And what's the zip code?

5      A.   91903.                                              9:18AM

6      Q.   And why did you move?

7      A.   Because the ranch I lived at on Alpine

8   Boulevard sold.

9      Q.   Okay.  And where are you currently employed?

10     A.   For a company called Professionals Choice.         9:18AM

11     Q.   And what's your current salary there?

12     A.   About 75,000.

13     Q.   And has it been that way since you started

14   working there?

15     A.   I have had one pay increase since I started        9:19AM

16   working there.

17     Q.   How much was it when you started working there?

18     A.   It was a base salary of 58,000, but I get a

19   monthly bonus, and so that 75 includes the monthly

20   bonus.  My base salary right now I believe is 62, but     9:19AM

21   with the monthly bonus, that's about what I am

22   averaging.

23     Q.   Okay.  So you have received a $4,000 raise on

24   your base salary?

25     A.   Correct.                                            9:19AM

1      Q.    Has there been any change to the monthly bonus    9:19AM

2   you get?

3      A.    Yes.  It went up a hundred dollars a month.   It

4   was 750, and now it's 850 a month.

5      Q.    And that's an automatic bonus?    9:19AM

6      A.    If I make my goals.

7      Q.    Have you ever not made your goals?

8      A.    Only once.

9      Q.    And what kind of benefits do you have?

10     A.    Medical, dental, 401(k).    9:20AM

11     Q.    Would you say those are better, the same or

12   worse than what you had at Costco?

13          MS. LAWRENCE:   Objection.  Vague, ambiguous,

14   calls for speculation.

15   BY MS. SHELBY:    9:20AM

16     Q.    You can answer.

17          Is the benefits package roughly the same?  Is

18   it better?

19     A.    It's about the same.

20     Q.    Is it different in any way that you can    9:20AM

21   identify?

22     A.    No, it's actually -- right when I left Costco,

23   they had just changed the medical package.  This is more

24   like the package we had before they changed it, so I'd

25   have to say maybe it's a little better.  I don't have    9:20AM

1      Q.   And how far is that from your current address      9:21AM

2   on Viejas Grade Road?

3      A.   About 35 minutes.

4      Q.   And how far was it from your prior address on

5   Alpine?                                                     9:21AM

6      A.   About 25 minutes.

7      Q.   And what is your position at Professionals

8   Choice?

9      A.   Warehouse manager.

10     Q.   And how many employees are at the warehouse?       9:22AM

11     A.   I have nine employees in shipping that I am

12  responsible for.

13     Q.   So you supervise nine people?

14     A.   Correct.

15     Q.   And these nine employees, they are not at a        9:22AM

16  management level?

17     A.   Correct.

18     Q.   How many employees total work at the warehouse?

19     A.   In shipping and receiving I have got nine

20  employees.   Then in production there's probably another   9:22AM

21  15 to 18 employees.

22     Q.   Are there any other managers besides yourself?

23     A.   No, not in the warehouse, no.

24     Q.   Okay.  So at the warehouse that you are at

25  there's approximately 25 to 30 employees?                  9:22AM

1      A.    Correct.                                               9:23AM

2      Q.    And who do you report to?

3      A.    To a man by the name of David Forester.

4      Q.    And what's his job title?

5      A.    He's the CEO of the company.                          9:23AM

6      Q.    And where is he located?

7      A.    At the same location.

8      Q.    Other than Mr. Forester, is there anybody else

9   that you report to?

10     A.    No.                                                   9:23AM

11     Q.    Have you had any performance reviews since you

12  have been working there?

13     A.    One.

14     Q.    How were you rated?

15     A.    Excellent.                                            9:23AM

16     Q.    And how did you hear about the position at

17  Professionals Choice?

18     A.    I approached them.

19     Q.    How had you heard -- had you heard about an

20  opening?                                                       9:23AM

21     A.    No.

22     Q.    How did you even hear about Professionals

23  Choice?

24     A.    How did I hear about the company?

25     Q.    Yes.                                                  9:23AM

1      A.    I have known of the company for 20 years.        9:23AM

2      Q.    And how do you know about them?

3      A.    Because I use their products on my horses.

4      Q.    So you would go there to purchase products?

5      A.    I had never been there before, no.              9:24AM

6      Q.    Did they ship you products?

7      A.    No.

8      Q.    How did you get the products that you used on

9 your horses?

10     A.    I bought them at feed stores.                   9:24AM

11     Q.    Okay.  When's the first time you ever discussed

12 potentially working for Professionals Choice?

13     A.    I sent them an e-mail, and it was -- it was in

14 February or March of, it would be two years ago, so

15 2004.                                                      9:24AM

16     Q.    Prior to that had you had any talks with

17 anybody, informally or formally, at Professionals Choice

18 before working there?

19     A.    No.

20     Q.    Had you known anybody that worked at            9:25AM

21 Professional Choice?

22     A.    No.

23     Q.    How did you come up with the idea about maybe

24 applying for work there?

25     A.    I sent them an e-mail.                           9:25AM

1        Q.    Did you see an ad in the paper?                    9:25AM

2        A.    No.

3        Q.    Had anybody told you there was an opening?

4        A.    No.   I didn't know there was an opening.   I

5   sent them an e-mail with my qualifications, asking them    9:25AM

6   if they had a need for anyone with my skills.

7        Q.    Why were you interested in working there?

8        A.    Because I wanted to leave Costco.

9        Q.    Why were you interested in Professionals

10  Choice?                                                     9:25AM

11       A.    Because it was a local company that I knew of

12  that I was interested in working for.

13       Q.    What about it was interesting to you?

14       A.    Because they deal in horse products which is

15  right up my alley.                                          9:25AM

16       Q.    Do you own horses?

17       A.    Uh-huh.

18       Q.    How many horses do you own?

19       A.    Currently three.

20       Q.    And are those horses stabled at your residence? 9:25AM

21       A.    Yes.

22       Q.    And they have been moved with you, I take it?

23       A.    Yes.

24       Q.    So where did you send the e-mail from?   Was it

25  your home computer or --                                    9:26AM

1    A.   Yes.                                              9:26AM

2    Q.   Do you still have that e-mail?

3    A.   Yes, I believe I do.

4    Q.   Have you looked for it?

5    A.   No.                                               9:26AM

6    Q.   Did you look for any documents in response to

7    the deposition notice that asked you to bring documents

8    today?

9    A.   Yes, I did.

10   Q.   And did you bring any documents?                  9:26AM

11   A.   I --

12        MS. LAWRENCE:  We have an earning statement

13   which is responsive to the document request and the

14   deposition notice.  I didn't have an opportunity to make

15   any copies of it yet.                                  9:26AM

16        MS. SHELBY:  I think the hotel can do it.

17        MS. LAWRENCE:  Okay.

18   BY MS. SHELBY:

19   Q.   The document request asks for all documents,

20   any job search documents, which clearly would entail    9:26AM

21   this e-mail.  So you didn't even look to see if you have

22   it?

23   A.   You know what, when I moved, I have a lot of

24   stuff in storage, and because I just moved, I don't -- I

25   looked for a resume that it asked for specifically which 9:27AM

1     Q.    And what was the incident?                    9:31AM

2     A.    I had worked for him twice over the years.   The

3  first time I worked for him was at a warehouse,

4  Southeast San Diego, when I was first getting into

5  management.   And I was a hard lines center merchant when 9:31AM

6  he came into the building, and I was a hard line center

7  merchant when he left the building.

8          Fidel, in my opinion, was the type of manager

9  that if you are doing a really good job where you are

10  at, he likes to keep you there.   And very shortly after  9:32AM

11  he left, I was promoted by a gentleman by the name of

12  Doyle Duvall to my first senior management position

13  which was merchandising manager.

14     Q.    Were you pleased about that?

15     A.    Oh, very.   It was what I wanted.             9:32AM

16     Q.    Okay.   So what's the incident?   Is there an

17  incident you are referring to?

18     A.    Yeah, there is.

19     Q.    Okay.

20     A.    When Fidel came to La Mesa, which is the second 9:32AM

21  time I worked for him, I was receiving manager.   And we

22  had had several conversations about my moving up in the

23  company.

24          Fidel made it very clear that he liked me,

25  physically; made it very clear that he wanted to take me 9:33AM

1       A.    Nina Borgner and a gentleman whose name is          9:37AM

2  escaping me.

3       Q.    Okay.  All right.  So --

4       A.    Mike McLetter.  That was his name.

5       Q.    I'm sorry.  What?                                    9:38AM

6       A.    Mike McLetter.

7       Q.    Okay.  Okay.  So at that point you had been

8  with the company, 20, 21 years, correct?

9       A.    Twenty-three.

10      Q.    Well, at the time this incident happened, I          9:38AM

11 guess it was 22 years --

12      A.    Twenty-two and a half years.

13      Q.    -- by the time this happened.

14            Had anything like this ever happened to you

15 before at Costco?                                               9:38AM

16      A.    Not quite that extreme.  There was an incident

17 where I worked at the corporate office when I was five

18 or six months' pregnant with my daughter, where I was in

19 the Human Resource Department.  A gentleman by the name

20 of Rusty Wells, he was a -- he worked in the optical          9:39AM

21 department at various warehouses as an optical manager,

22 and they decided to bring him to the corporate office to

23 run the optical department on a corporate level.

24            And I knew him from the Santee location, and

25 they put his office right across from mine.  So his           9:39AM

1    first day there I walked over and said hello, told him          9:39AM

2    I'd show him around the corporate office, where the

3    kitchen was, if he needed any help.

4          And a couple of days later he came in my

5    office, and he walked up behind me, began rubbing my            9:39AM

6    shoulders, told me he thought I was so attractive,

7    wanted to know if I would go out with him, and again he

8    was married, and I was five months' pregnant.  And I

9    told him I was -- he needed to back away from me.  I was

10   a little offended by this.  And I went and told my             9:39AM

11   supervisor what had happened and asked them to please

12   move his office away from mine.

13        Q.   Good for you.  What did the supervisor say?

14        A.   He was gone the next day, so I assumed they

15   took care of it.                                                9:40AM

16        Q.   Excellent.  Who was the supervisor you told?

17        A.   Judy Lemm.

18        Q.   So when you say "he was gone the next day," was

19   his office moved or he was --

20        A.   Just his office was moved.  He still worked for 9:40AM

21   the company.

22        Q.   Did you have any troubles with him again?

23        A.   No.

24        Q.   Okay.  So regardless of the dates, you recall

25   that this incident with Mr. Castro --                          9:40AM

1   there wasn't, but those are the two that I am aware of. 10:10AM

2       Q.   Okay.  So knowing the full experience that

3   Susan had then and then Julie's, which appeared to be

4   fine, that still caused you not to tell anybody about

5   what Mr. Cardozo had allegedly done to you; is that       10:10AM

6   correct?

7       A.   Correct.

8       Q.   Any other reason you chose not to tell anybody?

9       A.   That was the No. 1 reason.

10      Q.   I am just asking if there was another reason.  10:11AM

11      A.   No.

12      Q.   Okay.  So did you decide to leave Costco at

13  that time?

14      A.   No.

15      Q.   Why not?                                          10:11AM

16      A.   After that happened, it was pretty shortly

17  after that happened they moved Fidel out of the

18  warehouse.  And at that point I still had the dream of

19  moving up in that company.  I was very disillusioned.  I

20  was very -- just couldn't believe that that had happened10:11AM

21  and couldn't believe that that was where all those years

22  of hard work had -- it was just a horrible, horrible

23  feeling, but I still stuck it out, and Fidel left and

24  Tim came in.

25      Q.   How did you get along with Tim?                   10:12AM

1      A.    You know, he never spoke with me, a very          10:12AM

2   different management style.  Right around the time

3   before Fidel left, they had had a walk on the floor.  I

4   was receiving manager.  And Ron Vachris came in, walked

5   the building, and the floor, I guess in his opinion --   10:12AM

6   and I didn't hear this from Ron -- was in terrible

7   shape.

8           So apparently Ron made a comment to Fidel and

9   Nina that they -- the comment that was repeated to me by

10  Nina was that they needed to get Leah back on the floor 10:12AM

11  and get Leah back in merchandising, get that floor

12  fixed.  I had a ton of years of experience in

13  merchandising.  Ron knew that.  I was very respected as

14  a merchant.

15          And so Nina came back to receiving and said,    10:12AM

16  "Hey, what do you think about going back into

17  merchandising?"  And I said, "Bring it on.  I would love

18  to."  I loved merchandising.  It was my favorite job in

19  the company.

20          She said, "Well, Ron walked.  He's real unhappy10:13AM

21  with the condition of the floor and told us we need to

22  get you back out here."  I said, "Great."

23          So at the time Darron was merchandising

24  manager, and they talked about putting me back out

25  there.  And very shortly after that Fidel left and Tim  10:13AM

1    response?                                          10:56AM

2         A.    That he felt I needed to rotate through that

3    position before he could recommend me for the assistant

4    manager position.

5         Q.    But did he, nevertheless, let you for the time 10:56AM

6    stay in the receiving manager position?

7         A.    Yes, he did.

8         Q.    He accommodated that request?

9         A.    Yes, he did.

10        Q.    And up until the time you left Costco, did your 10:57AM

11   need to be home with the children during certain hours

12   change?

13        A.    No.  It was pretty much that way up until I

14   left.

15        Q.    And so you had this conversation shortly after 10:57AM

16   Fidel started; is that correct?

17        A.    Yes.

18        Q.    Was that the last conversation you had with

19   anybody, a manager about trying to move you into a front

20   end manager position?                               10:57AM

21        A.    The last time I discussed that was with Fidel

22   at La Mesa, yes.

23        Q.    Right after he started?

24        A.    We discussed it a few times with him being

25   there.                                             10:57AM

1    Q.   Well, was there a particular opening that you   11:03AM

2    were interested in at the time?

3    A.   I wanted to be an assistant warehouse manager.

4    You know, those positions open up few and far between in

5    the San Diego region, and when they do, I wanted to be   11:03AM

6    eligible for one of them.

7    Q.   Well, at the time that you went back to talk to

8    Fidel about it, was there a particular opening you were

9    aware of?

10   A.   No.                                               11:04AM

11   Q.   So Fidel didn't come back to you and say, "Hey,

12   have you changed your mind?"  It's you went to him to

13   revisit whether you really had to do that.  Is that what

14   you are saying?

15   A.   Yes.                                              11:04AM

16   Q.   So is it fair to say that Fidel never

17   subsequently tried to get you into that front end

18   manager position after that initial conversation?

19   A.   He never actively pursued getting me into the

20   position, no.                                          11:04AM

21   Q.   Is there anybody else that did?

22   A.   No.

23   Q.   And I take it the only type of positions that

24   you could take within Costco had to be in the San Diego

25   area, correct?                                         11:04AM

1    A.   No, we never did that.                          1:56PM

2    Q.   You never had to drop them off at his house

3    before you went to your Saturday shift?

4    A.   No.  We always exchanged on Fridays after

5    school.                                              1:56PM

6    Q.   Okay.  Were the hours you worked and how that

7    would impact the kids, was that an issue in the divorce

8    proceedings?

9    A.   No.

10    Q.   That didn't come up?                           1:57PM

11    MS. LAWRENCE:  Objection.  Asked and answered.

12   BY MS. SHELBY:

13    Q.   That didn't come up in the divorce

14   negotiations?

15    A.   No.                                            1:57PM

16    Q.   Okay.  Okay.  So you are the receiving manager

17   in Southeast San Diego.  How long does that position

18   last?

19    A.   I was receiving manager at Southeast San Diego

20   until I moved to Santee again.  Transferred -- that   1:57PM

21   would have been -- transferred to Santee -- September of

22   '98.

23    Q.   So it's a very short time that you are this

24   receiving manager?

25    A.   That is correct.  Seven -- six, seven months.   1:57PM

```
 1      Q.    Had you worked with Dan Bridge before?        2:45PM

 2      A.    A long time ago at Santee the first time

 3   around.

 4      Q.    So he was a long-term employee too?

 5      A.    Yes.                                           2:45PM

 6      Q.    But you liked working with Rick, correct?

 7      A.    I considered them the dream team.  All three of

 8   them were wonderful.

 9      Q.    So you were pleased with this transfer?

10      A.    Oh, absolutely.                                2:45PM

11      Q.    And what was the volume of the La Mesa store?

12      A.    Higher than Santee.

13      Q.    So that was a positive thing.  You moved to an

14   even higher-volume store?

15      A.    Yes.                                           2:45PM

16      Q.    And how many people were you managing?

17      A.    Probably about 10.

18      Q.    And it's your recollection this transfer

19   happens about February of 2002?

20      A.    Yes.                                           2:46PM

21           MS. SHELBY:  Okay.  Why don't we take a break

22   so he can change the tape.

23           THE VIDEOGRAPHER:  We are going off the record

24   at 2:46 p.m, and this will be the end of tape two of

25   today's deposition.                                     2:46PM
```

1    comments and then -- and you have some comments on the    3:02PM

2    front page too.

3          Do you see under "accomplishments" you wrote --

4    I think you wrote this.  Tell me if you didn't.

5          "I had the ability to teach seven new merchants    3:02PM

6    in the three years I spent on the floor.  Helping these

7    individuals learn and grow into self-sufficient

8    merchants is one of my proudest accomplishments."

9       A.    Yes.

10      Q.    Did you write that?                             3:03PM

11      A.    Yes, I did.

12      Q.    And then under "VI, Career Comments," it says

13   "Employee comments:  Short term I would like to continue

14   to balance my family and career until such time that I

15   am available to assume my long-term goal of assistant    3:03PM

16   manager/warehouse manager."

17         Did you write that?

18      A.    Yes, I did.

19      Q.    And is that accurate on you how you felt at the

20   time?                                                    3:03PM

21      A.    I wrote that because, as you can see, this was

22   done the day that I left Santee, and this is when Joe

23   was telling me I had to be a front end manager or go

24   work at McDonald's, and so that's why I wrote that.

25      Q.    Right.  So short-term, was staying in the role  3:03PM

1    could have done whatever.  And that's what Rick said he    3:12PM

2    wanted me working.

3        Q.    And you didn't have any restrictions as a

4    result of your divorce proceedings on hours?

5            MS. LAWRENCE:  Objection.  Asked and answered.    3:12PM

6    BY MS. SHELBY:

7        Q.    Well, at this time did you have any?

8        A.    There was never anything in my divorce

9    proceeding about what I couldn't or couldn't work.  I'm

10   not sure where you got that from.                          3:12PM

11       Q.    Wasn't there any negotiated hours arrangement

12   with the ex-husband?

13           MS. LAWRENCE:  Objection.  That specific

14   question has been asked and answered.

15   BY MS. SHELBY:                                             3:12PM

16       Q.    How about at this time?

17       A.    It never changed.

18       Q.    So you were free to work whenever you wanted?

19       A.    I had no restrictions on -- you know, I am not

20   understanding your question.  There was no restrictions   3:12PM

21   in my divorce about what I could and couldn't work.

22       Q.    Okay.  So how long are you in this position as

23   the receiving manager at La Mesa?

24       A.    For the duration of my time with the company.

25       Q.    Okay.  And while you are the receiving manager  3:13PM

1      Q.   Okay.  And then I think you said that since      3:14PM
2   this was even a bigger warehouse, you continued to learn
3   some things while you were the receiving manager?
4      A.   Yeah, it was a lot -- this was a huge volume
5   building compared to what I had been in.                 3:14PM
6      Q.   Even compared to Santee?
7      A.   Oh, yeah.
8      Q.   Okay.  So after that initial positive
9   conversation with Rick, was there any subsequent
10  conversation with anybody about whether you could become 3:14PM
11  an assistant warehouse manager or something else?
12     A.   Well, Rick Garrett was the assistant manager
13  there, who is the guy that had taught me all of the
14  budgeting back years before at Southeast San Diego.  And
15  so I got with Rick about wanting to get back into that,  3:15PM
16  because it had been a long time since I had done that,
17  and he said, absolutely, he'd loved to get back into
18  teaching me that.
19          Dan Bridge was the other assistant who is
20  another great teacher.  I mean, I absolutely felt like I 3:15PM
21  had died and gone to heaven.  I was working with a
22  strong staff, all wanting to get me promoted, all very
23  positive people, willing to teach me anything I wanted
24  to learn.
25     Q.   So I take it at some point something changed?    3:15PM

```
1        A.   Yes.                                           3:25PM

2        Q.   Okay.  If you could turn to the next page under

3    "career comments."  Under the "employee section," it

4    says:  "What are your short and long-term goals?"

5             It says, "My short-term goals are to remain in  3:25PM

6    departments that allow me to balance both work and the

7    raising of my two daughters for the next four to five

8    years.  After that I would like to continue growing in

9    the company."

10            Did you write that?                             3:25PM

11       A.   Yes, I did.

12       Q.   And does it mean what it says there?

13       A.   Does it mean it?  Yes, it does.

14       Q.   And by that you meant you wanted to work in

15   departments that let you work the hours you could work,  3:26PM

16   for instance, not the front end manager?

17       A.   It would have been anything but the front end,

18   including an assistant manager position.

19       Q.   And why did you say you wanted to remain in the

20   departments for the next four to five years?  Why was    3:26PM

21   that timing in there?

22       A.   Because that's where I felt my girls would be

23   old enough to be on their own a little bit.

24       Q.   Okay.  And then it says after four or five

25   years, then you could continue growing in the company?   3:26PM
```

1       A.   Yes.                                              3:26PM

2       Q.   And you wrote that on your own, correct?

3       A.   Yes.

4       Q.   Let's look at the "Manager comments."  It says,

5  "Leah should continue to contribute as a senior manager     3:26PM

6  to all areas of the warehouse by sharing her knowledge

7  and skills with all key managers.  She should be viewed

8  as the go-to manager for newer managers and as the

9  knowledgeable senior manager in the front end,

10 administration, and merchandising departments."            3:26PM

11      Did you agree with that?

12      A.   Yes.

13      Q.   So he's kind of saying you are the senior of

14 the senior managers; is that correct?

15      A.   Yes.                                              3:27PM

16      Q.   And he says, "Leah has the potential to develop

17 into a strong assistant manager when the time is right

18 for her."

19      Did you agree with that?

20      A.   I felt the time was right for me right then,     3:27PM

21 and I told him that.

22      Q.   Well, isn't it true you told him that you

23 wanted to wait to be an assistant manager until your

24 children were old enough?

25      A.   I told him that I could be an assistant manager  3:27PM

1      A.    That is true.                                    3:30PM

2      Q.    Okay.  Did you ask Fidel if you could attach a

3  comment on here after he sat down and worked through

4  this?

5      A.    No, I didn't.                                    3:30PM

6            MS. SHELBY:  We'll mark as Exhibit 2023, it's a

7  performance review dated February 2004, and it's Bates

8  stamped 709 through 712.

9            (Exhibit No. 2023 was marked for

10           identification.)                                 3:31PM

11 BY MS. SHELBY:

12     Q.    Do you recognize this document?

13     A.    Yep.

14     Q.    And is this -- there is no signature on the

15 back here.  Do you know if you ever signed a version of  3:31PM

16 this?

17     A.    It was never issued to me.

18     Q.    Okay.  You have never seen this one?

19     A.    Oh, I have seen it.

20     Q.    What do you mean it was never issued to you?    3:31PM

21     A.    When Fidel -- Fidel had left at this point.  He

22 had moved on to Rancho -- no, where did he go?  I don't

23 even know where he went.  He left the warehouse at this

24 point and hadn't given me a review.  I remember going to

25 Nina, and I don't even -- there is not even a date on    3:32PM

1    here, is there?  Oh, February.                                    3:32PM

2        Q.   Yes.

3        A.   February 20th.  This is after Fidel had already

4    left La Mesa.  And I hadn't gotten a raise in quite a

5    while, since for a year.  So I was due for a salary         3:32PM

6    increase.  And you only get salary increases when you

7    get reviews, and I had been passed over.

8             So I went to Nina, and I said, "Hey, you know,

9    Fidel left.  He didn't give me a review.  I haven't

10   gotten a salary increase.  Is there something that we      3:32PM

11   can do about this?"

12            So Fidel did this from his new building.  I

13   thought that Tim was going to give me a review, the new

14   warehouse manager, but Tim didn't know me and didn't --

15   I guess didn't want to give me the review.  So what he     3:33PM

16   did is he had Fidel do this from his other warehouse.

17   And I filled out my section, Fidel filled out his, and

18   then it was never issued to me, so --

19       Q.   So you typed in your parts of this; is that

20   correct?                                                    3:33PM

21       A.   Yes, I did.

22       Q.   And then did you see at least the form of it

23   after Fidel filled out his parts of it?

24       A.   You know, I don't think that I did.  I filled

25   out my part, and I sent it over.  It was never issued to   3:33PM

1   me.                                                    3:33PM

2       Q.   But you filled out this, your part of it after

3   you knew Fidel had gone; is that correct?

4       A.   Correct.  I filled out my part.  Then there was

5   this -- they weren't sure who was going to give it to    3:33PM

6   me, if it was going to be Tim, or if it was going to be

7   Fidel, and I guess Tim told me didn't want to do it

8   because he didn't know me, so they sent it to Fidel.

9            I remember Nina telling me, yeah, Fidel faxed

10  over your review, but like I said, it was never issued    3:33PM

11  to me.

12      Q.   Did you ask Nina if you could see it?

13      A.   At this point is when I had already started

14  looking for another job, so I didn't care.

15      Q.   So you didn't ask her.                          3:34PM

16           If you could look to the "employee's comments"

17  on the top of Page 3, it says, "I would like to improve

18  on the facility expectations for this upcoming year.

19  Creating organized schedules and project lists for the

20  department, as well as setting specific expectations for  3:34PM

21  Ken, will hope to better organize the department."

22           Who is Ken?

23      A.   Page 3?

24           MS. LAWRENCE:  Yes, I am not seeing that on

25  Page 3 either.                                           3:34PM

1   meeting, never got anything.                              3:39PM

2       Q.   What position were you in at the time at

3   Santee?

4       A.   This was when I was merch manager at Santee.

5       Q.   So this is after September 1998 --             3:39PM

6       A.   I guess.

7       Q.   -- if I am looking at our chronology.

8       A.   You know, I -- I had been through every

9   channel, every manager, every VP, executive VPs, 23

10  years, and I gave up.  I gave up.                        3:39PM

11      Q.   So you are saying that when you were merch

12  manager at Santee, you applied to transfer to Texas?

13      A.   I responded to an e-mail that asked if you are

14  interested in interviewing for potential Texas

15  positions, that they were coming out to do interviews at 3:39PM

16  the different regions.

17      Q.   Were you serious about your expression of

18  interest?

19      A.   Yes, of course I was.  I wouldn't have

20  responded if I wasn't.                                   3:40PM

21      Q.   Would you have moved to Texas?

22      A.   Yes, I would have.

23      Q.   Isn't it true that at that time you could not

24  have moved to Texas?

25      A.   You know, I was open to discussion for it, and 3:40PM

1   the witness.  She has answered that question.  Can you          3:41PM

2   move on, please.

3             MS. SHELBY:  Actually it's not an argumentative

4   question to say, "Isn't that true?"  And she didn't

5   answer.                                                          3:41PM

6   BY MS. SHELBY:

7       Q.   Are you saying that the custodial arrangements

8   with your ex-husband would have permitted you to move

9   out of state with the kids?

10      A.   No, it wouldn't have.                                   3:41PM

11      Q.   That's all I wanted to ask.

12           Were you willing to move to Texas without your

13  children?

14      A.   I would have considered the option if we could

15  have arranged something between the two of us where           3:41PM

16  maybe we could have shared them.  You know, I was open

17  to consider the possibilities, but I was never even

18  granted an interview, so we'll never know, will we?

19      Q.   Did you have that sort of amicable relationship

20  with your husband that you could have discussed that?        3:41PM

21      A.   It was off and on.

22      Q.   Were there times that it was an amicable

23  situation?

24           MS. LAWRENCE:  Objection.  She just answered

25  that question.  You are arguing with her.  You are            3:41PM

1    warehouse manager so that you don't have to beat your          5:05PM

2    head against the perpetual wall, so you don't have to do

3    positions over and over because they move someone in and

4    move someone else, and it shouldn't have to be that way.

5         Q.   So you are hoping that the process is changed?      5:05PM

6         A.   Yes.

7         Q.   Okay.  Any other reason that you are pursuing

8    this lawsuit?

9         A.   You know what, I have two daughters, and God

10   willing they won't ever have to go through the crap that  5:06PM

11   I had to go through.  My oldest daughter starts college

12   in a year, and God willing that college education is

13   going to get her something a little better than what I

14   had.

15        Q.   So when you look back at your employment at       5:06PM

16   Costco, you mostly think of it as crap?

17             MS. LAWRENCE:  Objection.  You don't need to

18   answer that.

19             MS. SHELBY:  That's her word.

20             MS. LAWRENCE:  You don't need to answer that.    5:06PM

21   Ask your next question.

22   BY MS. SHELBY:

23        Q.   I am serious.  When you look at your 23 years

24   at your employment with Costco, as you have testified,

25   it's mostly a negative experience?                         5:06PM

1      A.   Not the first 19 years.  You know, I had a lot    5:06PM

2  of good in there.  Did I move up as fast as I wanted to?

3  Absolutely, no, and we have been over that a million

4  times today --

5      Q.   But the last four years?                          5:06PM

6      A.   -- but I learned a lot.  Those last years,

7  yeah, those last years were crap.

8           MS. SHELBY:  Okay.  I have no further

9  questions.

10           THE VIDEOGRAPHER:  Off the record everyone?       5:06PM

11           MS. SHELBY:  Yes.

12           MS. LAWRENCE:  Yes.

13           THE VIDEOGRAPHER:  We are off the record at

14  5:07 p.m., and this will conclude today's deposition.

15                (TIME NOTED:  5:07 p.m.)                     5:07PM

16

17

18

19

20

21

22

23

24

25

1   STATE OF CALIFORNIA        ) ss:

2   COUNTY OF SAN DIEGO        )

3

4       I do hereby certify:

5       That the foregoing deposition was taken before me

6   at the time and place therein set forth, at which time

7   the witness was put under oath by me;

8       That the testimony of the witness and all

9   objections made at the time of the examination were

10  recorded stenographically by me, were thereafter

11  transcribed under my direction and supervision and that

12  the foregoing is a true record of same.

13      I further certify that I am neither counsel for nor

14  related to any party to said action, nor in anywise

15  interested in the outcome thereof.

16      IN WITNESS WHEREOF, I have subscribed my name

17  this 17 day of April, 2006.

18

19

20

21

22  _____

23        Shuri Gray, C.S.R. NO. 3786

24

25