ORIGINAL

FILED

JUL 3 2003

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

1  BRAD SELIGMAN (SBN 083838)
   JOCELYN D. LARKIN (SBN 110817)
2  THE IMPACT FUND
   125 University Avenue
3  Berkeley, CA 94710
   Telephone:   (510) 845-3473
4  Facsimile:   (510) 845-3654

5

6

7  IRMA D. HERRERA (SBN 98658)
   DEBRA A. SMITH (SBN 147863)
8  EQUAL RIGHTS ADVOCATES
   1663 Mission Street, Suite 250
9  San Francisco, CA 94103
   Telephone:   (415) 621-0672
10 Facsimile:   (415) 621-6744

11 SHEILA Y. THOMAS (SBN 161403)
   EQUAL RIGHTS ADVOCATES
12 5260 Proctor Avenue
   Oakland, CA 94618
13 Telephone:   (510) 339-3739
   Facsimile:   (510) 339-3723

14

15 STEVE STEMERMAN (SBN 067690)
   ELIZABETH LAWRENCE (SBN 111781)
16 DAVIS, COWELL & BOWE
   100 Van Ness Avenue, 20th Floor
   San Francisco, CA 94102
17 Telephone:   (415) 626-1880
   Facsimile:   (415) 626-2860

18 Attorneys for Plaintiffs

JOSEPH SELLERS
CHRISTINE WEBBER
CHARLES TOMPKINS
JULIE GOLDSMITH
COHEN, MILSTEIN, HAUSFELD & TOLL
West Tower – Suite 500
1100 New York Avenue
Washington, D.C. 20005-3964
Telephone:   (202) 408-4600
Facsimile:   (202) 408-4699

STEPHEN TINKLER
MERIT BENNETT
TINKLER & BENNETT
309 Johnson Street
Santa Fe, New Mexico 87501
Telephone:   (505) 986-0269
Facsimile:   (505) 982-6698

DEBRA GARDNER
PUBLIC JUSTICE CENTER
500 East Lexington Street
Baltimore, MD 21202
Telephone:   (410) 625-9409
Facsimile:   (410) 625-9423

SHAUNA MARSHALL (SBN 90641)
HASTINGS COLLEGE OF THE LAW
200 McAllister Street
San Francisco, CA 94102
Telephone:   (415) 565-4685
Facsimile:   (415) 565-4854



19                UNITED STATES DISTRICT COURT

20              NORTHERN DISTRICT OF CALIFORNIA

21 BETTY DUKES, PATRICIA SURGESON,
   CLEO PAGE, CHRISTINE KWAPNOSKI,
22 DEBORAH GUNTER, KAREN WILLIAMSON
   AND EDITH ARANA, on behalf of themselves
23 and all others similarly situated,

24        Plaintiff,

25    vs.

26 WAL-MART STORES, INC.,

27        Defendant

28

Case No. C-01-2252 MJJ

REBUTTAL DECLARATION OF MARC
BENDICK, JR., Ph.D.

Date: July 25, 2003
Time: 10:00 am
Courtroom: 11

566

## Table of Contents

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . para. 1 - 4
Why Do a Comparators-Based Benchmarking Analysis? . . . . . . . . . para. . 5 - 9
Who Are Appropriate Comparators to Wal-Mart? . . . . . . . . . . . para. 10 - 16
Basing Comparators on Wal-Mart Product Lines . . . . . . . . . . . . para. 17– 26
Comparing Wal-Mart to Target . . . . . . . . . . . . . . . . . . . . para. 27 - 32
Summary and Conclusions . . . . . . . . . . . . . . . . . . . . . . . para. 33 - 34
Attachments A–D . . . . . . . . . . . . . . . . . . . . . . . . . . . page 18

I, Marc Bendick Jr., declare

1.    I am a labor economist who previously presented a declaration with respect to the above-referenced case entitled *Declaration of Marc Bendick, Jr., Ph.D., in Support of Motion for Class Certification* (hereinafter, "Bendick Declaration of April 21, 2003").

2.    Subsequent to my preparation of that declaration, I read a report by defendant's expert Dr. Joan Gustafson Haworth entitled *Amended Report of Analysis and Opinions Regarding Dukes et al. v. Wal-Mart Stores, Inc., Class Certification Issues and Response to Selected Plaintiffs Experts' Analyses and Conclusions* (hereinafter referred to as "Haworth Report of April 18, 2003").[1] In the present declaration, I supplement my previous declaration with responses to Dr. Haworth's report.

3.    The present declaration does not address every aspect of Dr. Haworth's report with which I disagree, but instead focuses on the sections of her report directly related to my previous report (especially her Section VI) and points within that section that appear to be of greatest importance.   If at a later time other points prove important, I may wish to prepare additional analyses and opinions in response to Dr. Haworth.

4.    As background to this present declaration, I note that Dr. Haworth's staff successfully replicated my numerical computations and concluded that "his [Bendick's] calculations accurately

---

[1]Throughout this report, page numbers are based on the "redlined" version of this report presented by Dr. Haworth in conjunction with her deposition of April 21, 2003.

 

1  reflect his explanations of how he selected and analyzed each store in his benchmark analysis." The
2  memorandum in which Dr. Haworth's staff reports this conclusion is provided as Attachment A to
3  this declaration.

4

5      5.    The focus of my earlier declaration is comparisons, in terms of employment of
6  women in store management, between Wal-Mart and other large, nation-wide retail chains such as
7  Target, K-Mart, Costco, Sears, and JC Penny.   Dr. Haworth's most fundamental criticism of my
8  analysis is that it uses this comparators-based "benchmarking" approach *rather than* estimating the
9  expected representation of women among Wal-Mart in-store managers from the representation of
10  women among the "...actual qualified and interested candidates..." for hiring or promotion at Wal-
11  Mart itself.[2]   In terminology often used in employment discrimination litigation, Dr. Haworth is
12  advocating an analysis based on "applicant flow."

13      6.    Applicant flow analysis is a well-established technique in employment discrimination
14  litigation. It is sometimes appropriate and sometimes not, depending on such considerations as what
15  applicant records are available, their completeness, and circumstances (such as a firm's reputation
16  for discrimination) potentially influencing the likelihood that members of various demographic
17  groups apply for hiring or promotions. Among plaintiffs' experts in the present case, Dr. Drogin has
18  been principally responsible for considering whether applicant flow analysis is feasible, and the
19  extent to which it would be useful and appropriate.  To date, I have not examined these issues in
20  depth.

21      7.    Whether or not applicant flow analysis is appropriate in the present case, my
22  comparators benchmarking analysis remains relevant and important.  The two types of analysis are
23  not primarily substitutes for each other, as Dr. Haworth implies, but instead are *different* ways to
24  analyze *related* issues that provide *complementary* insights.  For example, an applicant flow analysis
25  might be particularly useful in pinpointing the stages in a company's promotional processes where
26  disproportionate numbers of women applicants are screened out.  In contrast, a comparators analysis

27

28  [2]Haworth Report of April 18, 2002, VI A, p. 73.



1   might be particularly useful in identifying the fundamental causes of an apparent under-

2   representation of women among current employees.  As I stated in my earlier declaration:[3]

> In examining issues such as the demographic characteristics of a firm's workforce,
> benchmarking using comparator firms addresses the important issue of "labor supply" --
> the availability of persons in the demographic group being examined (here, women) who
> are interested in and qualified to hold the positions in question (here, Wal-Mart in-store
> management).  The logic in benchmarking is that, if retail chains comparable to Wal-
> Mart are successfully employing women at some rate, then women are presumably
> available, interested, and qualified to hold comparable positions at Wal-Mart at a similar
> rate.  Therefore, if the representation of women among store managers at Wal-Mart is
> substantially lower than at the comparator large retail chains, the cause of the "shortfall"
> is to be found in how Wal-Mart hires, trains, selects, assigns, treats, promotes, or retains
> women employees rather than lack of available, interested, qualified women job
> candidates.

10      8.      As my earlier report also noted,[4] the practice of benchmarking a company's

12   performance against those of similar firms in the same industry is a standard management technique

13   widely applied in the private sector not only to employment issues but also to a variety of financial

14   and operational issues.  It pervades analyses of publicly-traded corporations, as is readily apparent

15   from well-respected business publications such as *Fortune* and *The Wall Street Journal*.  It is central

16   to the training MBA students receive to prepare themselves for careers in corporate management.

17      9.      In these circumstances, it is no surprise that comparator-based benchmarking is

18   commonly applied to Wal-Mart not only by outside analysts but by Wal-Mart itself.   In particular,

19   my earlier declaration provided several examples of benchmarking studies of employment practices

20   by Mr. Coleman Peterson, Wal-Mart's Executive Vice President – People, in which he compared his

21   firm against competitors such as Target, Costco, K-Mart, Sears, and JC Penny in terms of salary

23   levels, profit per employee, and the representation of women among managers.[5]   In rejecting the

---

[3]Bendick Declaration of April 21, 2003, paragraph 16.

[4]Bendick Declaration of April 21, 2003, paragraph 13.

[5]Bendick Declaration of April 21, 2003, paragraphs 14-15.

Rebuttal Declaration of Marc Bendick, Jr., Ph.D.                              4

                                                        Case No. C-01-2252 MJJ

value of comparator-based benchmarking studies, Dr. Haworth is out of step with standard analytical practices, including those commonly practiced by Wal-Mart itself.

10.    The first and most crucial step in benchmarking is selection of the firms to be included as comparable to each other.   In the comparisons of employment of women in store management presented in my earlier declaration, I compared Wal-Mart to approximately 20[6] large, multi-state retail chains, such as Target, K-Mart, Costco, Sears, and JC Penny.

11.    In her report, Dr. Haworth criticized my reliance on these firms as comparators to Wal-Mart on at least four grounds:  (1) that they constitute a "very small sample";[7]  (2) that they exclude 96% of persons employed in retail sales management in the U.S.;[8]  (3) that they do not include all firms that deal in all of Wal-Mart's product lines;[9] and (4) that I have not named each firm.[10]

12.    The first of these criticisms is incorrect on the face of it.  In paragraph 22 of my previous report, I listed the 20 firms I used as comparators to Wal-Mart in 1999 as follows:

| Firm | Total Employees | Establishments Nationwide |
|------|-----------------|---------------------------|
| A | 279,255 | 1,168 |
| B | 271,171 | 2,111 |
| C | 264,581 | 1,254 |
| D | 190,063 | 1,030 |
| E | 150,942 | 415 |
| F | 133,906 | 434 |
| G | 85,421 | 356 |
| H | 63,285 | 340 |

[6]Over the years I examined between 1975 since 1999, the number of comparator firms varies between 18 and 23.  In 1999 -- the year on which my analysis focuses -- it is 20.

[7]Haworth Report of April 18, 2003, VI B (ii), p. 74.

[8]Haworth Report of April 18, 2003, VI B (iv) p. 75.

[9]Haworth Report of April 18, 2003, VI C, p. 84.

[10]Haworth Report of April 18, 2003, VI B (iv), p. 76.

 

| | | |
|---|---|---|
| I | 58,228 | 214 |
| J | 54,845 | 247 |
| K | 54,171 | 336 |
| L | 37,152 | 244 |
| M | 37,039 | 297 |
| N | 34,600 | 391 |
| O | 18,837 | 167 |
| P | 15,895 | 198 |
| Q | 15,693 | 187 |
| R | 14,512 | 109 |
| S | 12,943 | 102 |
| T | 10,547 | 105 |
| TOTAL | 1,803,086 | 9,705 |

As the bottom row of this table reports, the 20 firms together employ more than *1.8 million workers* and operate nearly *10,000 establishments* nationwide.    To label such a data set a "very small sample" is an absurd mischaracterization.

13.    Dr. Haworth's second criticism is that that my set of comparators fails to include 96% of persons employed in retail sales management.    Dr. Haworth apparently derives this figure by comparing my comparators' total number of managers to the approximately 4.9 million persons employed in 1999 in "Sales Occupations, Supervisors and Proprietors," as reported by the U.S. Bureau of the Census.[11]    However, the vast majority of these 4.9 million persons are employed in positions very different from Wal-Mart store managers.[12]   About 2 million of the 4.9 million are owner-operators of retail activities so small that they are run by the owner (and possibly other family members) without any other paid employees.[13]   Firms in this category include, for example, neighborhood candy shops run by family members (sometimes called "mom and pop" stores) and

---

[11] Haworth Report of April 18, 2003, VI  B (iv), p. 75.

[12] Unless otherwise noted, throughout this declaration, I use phrases such as "store managers" and "store management" to refer to all in-store employees holding titles such as store manager, co-manager, and assistant manager, not just the one person within each store holding the title "store manager." The phrase is not intended to include hourly personnel such as the hourly sales employees Wal-Mart labels "department managers."

[13] According to the U. S. Bureau of the Census, in 1999, there were 1.76 million retail establishments in the U.S. that have no paid employees (U.S. Bureau of the Census, *Statistical Abstract of the United States, 2002*, Table 1008, page 644, at www.census.gov). I base the 2 million figure on an assumption that each of these establishments has at least one proprietor, and some have more than one (often family members).

Rebuttal Declaration of Marc Bendick, Jr., Ph.D.                                    Case No. C-01-2252 MJJ

1   street corner news stands.   It also includes part-time businesses selling Tupperware through sales

2   "parties" in customers' homes.

3        14.   The rest of the persons Dr. Haworth includes in her 96% computation are employed by

4   retail firms large enough to have at least one paid employee other than the owner(s), but the vast

5   majority of these firms are still very small.   Wal-Mart has 2,909 stores in the U.S. in 1999, an

6   average of 290 employees per store, and stores reporting themselves as department stores, variety

7   
8   stores, or general merchandise stores.[14]   Clearly, it is a *large chain of large stores selling a large*

9   *range of goods*.   In selecting firms against which to compare Wal-Mart's employment of store

10  managers, it is appropriate to focus on firms in which store manager positions are most like those in

11  Wal-Mart.   It is therefore *not* appropriate to include firms that consist of a single retail store rather

12  than a chain of stores, to include chains in which individual stores are very small (for example, half a

13  dozen employees), or to include stores that sell only a narrow range of specialized products (such as

14  bakeries).   This is precisely why I restricted my search for comparators to firms filing EEO-1

15  reports, which are generally filed only for establishments with at least 100 employees (*large stores*),

16  
17  and, within that EEO-1 data, to firms with at least 100 separately-reporting establishments (*large*

18  *chains*) reporting themselves in the General Merchandise Store industry (SIC 53) (*large range of*

19  *goods*).[15]

20       15.   As I discussed in my earlier declaration, in conducting its own benchmarking of

21  employment patterns, Wal-Mart itself focused on comparison firms such as Target, K-Mart, Costco,

22  Sears, JC Penny, and Dayton-Hudson[16]-- *large chains of large stores selling a large range of goods*.

23  

24  _____

25  [14]Bendick Declaration of April 21, 2003, paragraph 24 and footnote 15.

26  [15]Bendick Declaration of April 21, 2003, paragraph 21.

27  [16]Bendick Declaration of April 21, 2003, paragraph 15.

28  Rebuttal Declaration of Marc Bendick, Jr., Ph.D.                          7

                                                          Case No. C-01-2252 MJJ




When major public sources of business data, such as Fortune and Forbes, analyze Wal-Mart, they also focus on its competitor *large chains of large stores selling a large range of goods.*[17]

16.     The fact that restricting the comparators to large chains of large stores selling a large range of goods excludes 96% of the persons working in retail management is not a problem, as Dr. Haworth implies.     Instead, it is a natural consequence of deliberately narrowing the set of comparator firms to those most directly comparable to Wal-Mart, rather than mixing irrelevant firms with relevant ones.   In terms of *relevant* data, the 20 comparators firms accounted for 91.4% of all retail managerial employees in general merchandise stores in 1999 EEO-1 data.

17.     Dr. Haworth's bases her third criticism on the lines of merchandise sold in Wal-Mart stores.   She argues that, since Wal-Mart stores sell a broad range of products, comparison firms should include *all* firms selling *any* of these products.   Guided by this concept, her report lists 10 industries "...representing Wal-Mart Product Lines..." and 6 industries "...most analogous to Sam's Clubs...."  She then cites EEO-1 data on the percent female among managers in these separate industries, computes their *unweighted* average, and proposes the resultant figures -- 36.4% for Wal-Mart, 31.7% for the Sam's Clubs -- as benchmarks against which to compare Wal-Mart representation of women in management, in place of the 56.5% figure she quotes from my report.[18]

18.     I do not believe that Dr. Haworth's approach produces accurate and relevant benchmarks for the representation of women among Wal-Mart in-store managers.  As I discussed in paragraph 14 above, the basis for such benchmarks should be store management positions that are most like store management positions in Wal-Mart itself – those in *large chains of large stores carrying a large range of goods*.  Nevertheless, for purposes of exploring Dr. Haworth's approach, I

[17]Bendick Declaration of April 23, 2003, paragraph 23.

1   have calculated the benchmark figure that results from carrying out her concepts.  These calculations

2   are presented in Attachment B.

3        19.      According to the bottom row of Attachment B, the resulting expected representation

4   of women among Wal-Mart store managers is 48.3%.  It is *not* the 31.7% to 36.4% figures reported

5   by Dr. Haworth, which are distorted by four important flaws.

6        20.      The first flaw is that Dr. Haworth's list of industries corresponding to Wal-Mart

7   product lines is not restricted to firms that, like Wal-Mart, are *retailers*.  Instead, it includes

8   industries in which firms are engaged in activities not even remotely comparable to those of Wal-

9   Mart stores.   For example, the lists on pages 80 and 84 of Dr. Haworth's report include as

10  comparators to Wal-Mart stores and/or Sam's clubs:[19]

| Non-Retail Industries in Dr. Haworth's Lists | which includes irrelevant firms such as |
|---|---|
| Communications (SIC 48) | television broadcast stations (SIC 4833) missile tracking stations (SIC 4899) |
| Auto Repair Services and Parking (SIC 75) | tow-in car parking lots (SIC 7521) antique car restoration (SIC 7532) |
| Business Services (SIC 73) | court reporting services (SIC 7338) termite control services (SIC7342) leasing of airplanes (SIC 7359) development of computer software (SIC 7372) news correspondents (7383) |
| Wholesale Trade – Durable Goods (SIC 50) | dealers in coal and metal ores (SIC 5052) installers of industrial boilers (SIC 5074) sellers of rough iron castings (SIC5051) sellers of railroad equipment (SIC 5088) |
| Wholesale Trade – Nondurable Goods (SIC 51) | livestock auctioneers (SIC 5154) dealers in bovine semen (SIC 5159) operators of petroleum terminals (SIC 5171) sellers of sawdust (SIC 5199) |

[18]Haworth Report of April 18, 2003, VI C, pp. 86 – 88.

[19]"SIC" refers to the U.S. government's Standard Industrial Code; see *Standard Industrial Classification Manual 1987* (Washington, DC: Office of Management and Budget, no date).



To correct this flaw, Attachment B includes only firms that, like Wal-Mart, are retailers.

21.    The second flaw in Dr. Haworth's analysis is to perform her calculations at an unnecessarily imprecise level (industries defined in terms of "2 digit" SIC codes) when she could have done so at a more accurate level (industries defined in terms of "3 digit" SIC codes). In fact, Dr. Haworth did perform calculations at the "3 digit" level, producing an estimated female representation among Wal-Mart store managers of 37.1%.[20]  However, her criticism of my report largely ignores this figure and focuses instead on the figures resulting from her calculations at the 2 digit level, 31.7% to 36.4%.   To correct this flaw, Appendix B consistently use "3 digit" industry data. Thus, for example, rather than using data for SIC 54 (Food Stores), Attachment B relies on more precise data for SIC 541 (Grocery Stores), SIC 545 (Dairy Product Stores) and SIC 546 (Retail Bakeries).

22.    The third flaw in Dr. Haworth's analysis is to give each Wal-Mart product line equal weight. For example, in the table on page 84 of her report, she gives equal weight to SIC 566 (shoe stores) and SIC 565 (family clothing stores).  But, as Attachment B reports, whereas shoes account for only 1% of sales in Wal-Mart stores, the "soft goods product lines" (such as clothing) account for 18% -- nearly *20 times* as much.

23.    In her deposition, Dr. Haworth stated that she "...was not able..." to do anything but weight all the product lines equally and that she "...had no idea..." what proportion of Wal-Mart sales is accounted for by each product line.[21]  Had Dr. Haworth desired information on sales by product line, she obviously could have requested it from Wal-Mart. Even without the cooperation from Wal-Mart which Dr. Haworth presumably enjoys, I readily found such information from an on-

---

[20]Haworth Report of April 18, 2002, page 90.

[21]Deposition of Joan G. Haworth, Ph.D., April 21, 2003, p. 300, line 2-6; p. 301, lines 2-3; p. 301, lines 14-17.

line financial information source, www.hoovers.com.[22]  To correct the third flaw in Dr. Haworth's calculation, column (b) of Attachment B uses these data to weight each Wal-Mart product line by its proportion of total Wal-Mart sales.

24.    The fourth flaw in Dr. Haworth's calculation is to treat all types of retailers the same whether they compete against Wal-Mart in a single product line (e.g., bakeries) or a broad range of product lines (e.g., SIC 531, department stores).  Attachment B corrects this flaw by listing all the categories of retailers selling each of Wal-Mart's product line and weighting each category's importance within that product line by its proportion of retail managers within that product line (see columns (c) - (e) of Attachment B).

25.    The consequence of these 4 corrections[23] is to transform Dr. Haworth's inaccurate 31.7% - 36.4% figures into the more accurate figure of 48.3%.

26.    The 48.3% figure is very different from the 34.5% figure that I compute for Wal-Mart's actual employment of women among store managers in 1999.[24]  Like 56.5%, which is the benchmark I derive from my 20 comparators firms in that year,[25] the 48.3% figure corresponds to an estimated shortfall of women among Wal-Mart in-store managers of several thousand women and a probability that such a large shortfall could have arisen by chance alone of less than one in many billions.

---

[22]The table on which I relied, downloaded from http://www.hoovers.com/premium/profile/0/0,2417,11600,00.html, is provided as Attachment C.

[23]I also inserted "Percent Female Among Officials & Managers" figures for 3 industries for which Dr. Haworth could not obtain such figures from the EEOC source she used for other industries:  SIC 543 (Fruit and Vegetable Markets) – 46.9%; SIC 564(Children and Infant's Wear Stores) – 83.5%; and SIC 569 (Miscellaneous Apparel and Accessory Stores) – 60.7%.

[24]Bendick declaration of April 21, 2003, Attachment F, row (2), column (i).

[25]Bendick declaration of April 21, 2003, Attachment F, row (2), column (j).

27.     Dr. Haworth fourth criticism of my analysis focuses on the fact that my 20 comparator firms are unnamed.  As I explained in my earlier declaration, this anonymity is a consequence of the EEOC's removing identifying information from the EEO-1 data set they released to me.[26]   In her report, Dr. Haworth *speculates* that, since we cannot identify my unnamed comparator firms, they *may* differ from Wal-Mart in a variety of ways, such as managers' job titles, duties, and work schedules, and the types of products their stores sell.[27]

28.     I do not believe that my inability to identify individual firms reduces the accuracy or relevance of my analysis because the selection criteria I applied to EEO-1 data ensure that the comparators are firms widely recognized as directly comparable to Wal-Mart, such as Target, K-Mart., Sears, and JC Penny.  Contrary to Dr. Haworth's speculations, the jobs of retail managers at such firms are reasonably comparable to those in Wal-Mart.

29.     However, to further address Dr. Haworth's concerns, I am able to identify one of the 20 comparators, Target Corporation.  Target voluntarily provided to plaintiffs' counsel data from their EEO-1 report for 2000.[28]  Matching these data to that in my EEO-1 data file,[29] I deduce with a high degree of certainty that Target is the company I refer to as "Firm C" in Paragraph 22 of my earlier declaration.

---

[26] Bendick Declaration of April 21, 2003, paragraph 23.

[27] Haworth report of April 18, 2003, VI B, (i) – (vii), pp. 76-80.

[28] Target's letter providing these data is presented in Attachment D.

[29] The matching was accomplished in two steps applied to EEO-1 data for 2000: (1) Target's letter reports the firm's percentage representation of women and minorities among managers, professionals, sales workers, and all employees. I compared these 8 percentage figures against those for the 19 firms that I had identified as comparators in 1999 that remained in my EEO-1 file in 2000. One firm provided an exact match on all 8 percentages, whereas the other 18 firms only matched on between 0 and 2 percentages.  (2) Target's letter states that (as of some unspecified date that may differ from the EEO-1 reporting date) the firm operates in 46 states, had its headquarters in Minneapolis, and had 258,400 total employees.  To confirm the match, I noted that the firm identified in the previous step had EEO-1 records for establishments in 45 states, its headquarters record was for an establishment in the Minneapolis-St. Paul Metropolitan Area (FIPS code 5120), and reported 243,499 total employees.




30. Target happens to be the firm which Wal-Mart itself often considers its most direct competitor. For example, Coleman Peterson, Wal-Mart's Executive Vice President–People, paid particular attention to Target in his own benchmarking of Wal-Mart's employment of women in management.[30] Target also happens to be one of the two firms that closely match Wal-Mart in both managers-per-store and managers per-100-employees in the analysis presented in Attachment G of my earlier declaration. For example, Target's 9.1 managers per store closely matches Wal-Mart's 10.1.

31. In 1999, the proportion of women among managers at Target Corporation was 51%.[31] If Dr. Haworth believes that the expected representation of women among Wal-Mart's should be based only on firms that can be identified by name as appropriate comparators, then 51% is the best estimate I can provide.

32. The 51% figure is very different from the 34.5% figure that I compute for Wal-Mart actual employment of women among store managers in 1999.[32] Like 56.5%, which is the benchmark I derive from my 20 comparator firms in that year,[33] the 51% figure corresponds to an estimated shortfall of women among Wal-Mart in-store managers of several thousand women and a chance that such a large shortfall could have arisen by chance alone of less than one in many billions.

33. Paragraph 67 of my earlier Declaration stated 13 conclusions to which my analysis led me. For reasons presented in paragraphs 5 through 32 above, nothing in Dr. Haworth's report

---

[30] Bendick Declaration of April 21, 2003, paragraph 15.

[31] See Attachment D.

[32] Bendick declaration of April 21, 2003, Attachment F, row (7), column (i).

[33] Bendick declaration of April 21, 2003, Attachment F, row (7), column (j).



causes me to modify any of these 13 conclusions.   In fact, I am led to hold these conclusions even more firmly by the general consistency between the benchmarks I developed in my previous declaration (such as 56.5%) and two figures I calculated in the present report – 48.3% based on Wal-Mart product lines and 51% based on Target alone.[34]

34.   My conclusions, stated *unchanged* from their presentation in paragraph 67 of my earlier declaration, continue to be as follows:

- Conclusion One:  The representation of women among in-store managers in Wal-Mart is substantially smaller than would be expected based on the availability of qualified, interested women in the local labor markets in which Wal-Mart operates stores, as measured by the utilization of women in in-store management in those labor markets by large retail chains widely recognized as comparable to Wal-Mart.

- Conclusion Two:  In 1999 – the year for which I have the most recent complete data -- a conservative estimate of the extent of this shortfall is 4,004 female in-store managers.

- Conclusion Three:  Reasonable alternative estimates of this shortfall in 1999 include: 6,445 female in-store managers (based on the same method as the conservative estimate but excluding Wal-Mart itself in setting the benchmark), 4,911 female in-store managers (based on benchmarking Wal-Mart's managerial/non-managerial employee ratios), and 4,328 (based on comparing Wal-Mart to the two comparator chains most closely matching it in terms of managers per store).

- Conclusion Four:   When conservatively updated to 2002, the conservatively-estimated shortfall of 4,004 women in-store managers increases to 5,465.

---

[34]See paragraphs 26 and 32 above.  In this sentence, I am citing these two figures *only* to confirm what I believe to be correct benchmarks.  I do not intend to endorse either 48.3% or 51% as a correct benchmark in its own right.

- Conclusion Five:  Because the rate at which comparator firms employ women in-store managers takes account of the rate at which women are available, interested, and qualified to hold in-store management positions comparable to those at Wal-Mart, the causes of Wal-Mart's shortfall are likely to be found in how Wal-Mart hires, trains, selects, assigns, treats, promotes, or retains women employees, not lack of interested, qualified women candidates.

- Conclusion Six:  Wal-Mart's shortfalls are not simply artifacts of differences between Wal-Mart and its comparators in how they classify and report in-store managerial employees.  To the extent these differences exist, they are not sufficiently widespread to invalidate the benchmarking I have performed or to justify an alternative benchmarking procedure in which Wal-Mart would broaden its counts of in-store managers.

- Conclusion Seven:   The estimated shortfalls are "statistically significant" and cannot reasonably be attributed to chance alone.   The conservative estimated shortfall of 4,004 corresponds to 47.0 standard deviations, representing a probability that a figure this large could have been estimated by chance of less than one chance in many billions.

- Conclusion Eight:  Shortfalls of women among Wal-Mart's in-store managers are pervasive among Wal-Mart retail establishments, appearing in approximately four out of five of the firm's stores.

- Conclusion Nine:   Shortfalls of women in Wal-Mart's in-store management occur nationwide.  They are found in virtually every state in the nation, in every region, and in both urban and non-urban areas.

- Conclusion Ten:   Women are also substantially under-represented among managers throughout Wal-Mart's *non-retail* establishments, including corporate headquarters, "white collar" facilities, and "blue collar" facilities such as distribution centers.



ATTACHMENT A

1   •  <u>Conclusion Eleven</u>:   Substantial shortfalls of women among Wal-Mart's in-store managers

2      were present in every year between 1975 and 1999, and they are likely to have persisted from

3      1999 through 2002.

4   •  <u>Conclusion Twelve</u>:   Throughout its history, Wal-Mart has maintained a degree of

5      centralization of it managerial staff at corporate headquarters that is strikingly higher than its

6      comparator firms.

7

8   •  <u>Conclusion Thirteen</u>:   The scale, pervasiveness, persistence, and consistency of under-

9      representation of women among Wal-Mart's managers suggests that such under-

10      representation is deeply rooted in the organization's corporate culture and the company-wide

11      employment attitudes, policies and practices that reflect and maintain that culture.

12

13

14      I declare under penalty of perjury of the laws of the United States and of the District of

15 Columbia, that the foregoing is true and correct.   This Declaration was signed by me on July 1,

16 2003, in Washington, DC.

17

18

19                             Marc Bendick, Jr., Ph.D.

20

21

22

23

24

25

26

27

28

Rebuttal Declaration of Marc Bendick, Jr., Ph.D.

Laurie Miller

From:      DAVIS, JOHN
Sent:      Thursday, February 06, 2003 6:10 PM
To:        WHITE, PAUL
Cc:        HAWORTH, JOAN
Subject:   WALGEN

Paul,

I have been able to replicate Bendick's analysis of stores found in his February 2003, Attachment F, (2) Stores, for 1999, using the data set he provided with his June 2001 report. His calculations accurately reflect his explanations of how he selected and analyzed each store in his benchmark analysis. He is using the binomial to analyze the representation of women in management in each store relative to their representation in stores in the same MSA, and aggregates using the Mantel-Hanzel technique.

I will let you know if I find any calculations for other analyses that do not correspond to his descriptions.

John

John B. Davis, Ph.D.
ERS Group
255 California St., 12th floor
San Francisco, CA 94111
(415) 288-4500 (127)
(415) 288-4505 (fax)
email: jdavis@ersgroup.com

FOR OFFICIAL USE ONLY
Privileged Document -- Limited Dissemination
Attorney-Client and Attorney-Work-Product Privileged
Exempt From Disclosure Pursuant to Subpoena or Discovery Request,
or Under the F.O.I. and Privacy Acts

1

ATTACHMENT B

ATTACHMENT B

EXPECTED FEMALE REPRESENTATION AMONG WAL-MART'S IN-STORE MANAGERS
CORRECTING DR. HAWORTH'S APPROACH OF ANALYZING COMPARATORS
FROM INDIVIDUAL WAL-MART PRODUCT LINES

| (a) Wal-Mart Stores Sales in 2003 According to Hoovers.com | (b) | (c) Types of Retailers Selling this Product Line | | (d) Managers in this Industry (1999 EEO-1 Data) | (e) | (f) |
|---|---|---|---|---|---|---|
| Product Line | % of Wal-Mart Sales | SIC | Industry | Number | % | Female % of Managers (1999 EEO-1 Data) |
| Grocery, Candy, and Tobacco | 24% | 531 | Department Stores | 127,114 | 36.2% | 55.9% |
| | | 539 | Misc General Merchandise Stores | 14,957 | 4.3% | 34.6% |
| | | 541 | Grocery Stores | 183,157 | 52.2% | 35.1% |
| | | 542 | Meat and Fish Markets | 306 | 0.1% | 24.2% |
| | | 543 | Fruit and Vegetable Markets | 32 | 0.0% | 46.9% |
| | | 544 | Candy nut and confectionery stores | 1,239 | 0.4% | 67.6% |
| | | 545 | Dairy Products stores | 216 | 0.1% | 28.2% |
| | | 546 | Retail Bakeries | 1,307 | 0.4% | 26.9% |
| | | 592 | Liquor Stores | 15 | 0.0% | 20.6% |
| | | 596 | Non Store Retailers | 15,468 | 4.4% | 48.8% |
| | | 599 | Retail Stores NEC | 7,245 | 2.1% | 47.0% |
| | | | TOTAL | 351,056 | 100.0% | 43.5% |
| Hardgoods (hardware, housewares, auto supplies, small appliances) | 20% | 523 | Paint, Glass and Wallpaper stores | 1,778 | 0.8% | 13.1% |
| | | 525 | Hardware Stores | 1,679 | 0.8% | 18.7% |
| | | 526 | Retail Nurseries and Garden Stores | 1,297 | 0.6% | 29.1% |
| | | 531 | Department Stores | 127,114 | 57.2% | 55.9% |
| | | 539 | Misc General Merchandise Stores | 14,957 | 6.7% | 34.6% |
| | | 553 | Auto and Home Supply Stores | 4,641 | 2.1% | 21.5% |
| | | 571 | Furniture and Home Furnishing Stores | 8,620 | 3.9% | 42.2% |
| | | 572 | Household Appliance Stores | 925 | 0.4% | 23.0% |
| | | 573 | Radio, television and Computer Stores | 16,043 | 7.2% | 42.0% |
| | | 594 | Miscellaneous Shopping Goods Stores | 22,514 | 10.1% | 27.4% |
| | | 596 | Non Store Retailers | 15,468 | 7.0% | 48.8% |
| | | 599 | Retail Stores NEC | 7,245 | 3.3% | 47.0% |
| | | | TOTAL | 222,281 | 100.0% | 48.1% |
| Softgoods/ Domestics | 18% | 531 | Department Stores | 127,114 | 68.3% | 55.9% |
| | | 539 | Misc General Merchandise Stores | 14,957 | 8.0% | 34.6% |
| | | 561 | Men and Boys Clothing Stores | 1,314 | 0.7% | 42.8% |
| | | 562 | Women's Clothing Stores | 3,912 | 2.1% | 71.3% |
| | | 564 | Children and Infant's Wear Stores | 1,078 | 0.6% | 83.5% |
| | | 565 | Family Clothing Stores | 6,722 | 3.6% | 63.0% |
| | | 566 | Shoe Stores | 3,008 | 1.6% | 36.6% |
| | | 569 | Miscellaneous Apparel and Accessory Stores | 12,420 | 6.7% | 60.7% |
| | | 596 | Non Store Retailers | 15,468 | 8.3% | 48.8% |
| | | | TOTAL | 185,993 | 100.0% | 54.3% |
| Electronics | 9% | 525 | Hardware Stores | 1,679 | 0.8% | 18.7% |
| | | 531 | Department Stores | 127,114 | 61.3% | 55.9% |
| | | 539 | Misc General Merchandise Stores | 14,957 | 7.2% | 34.6% |
| | | 571 | Furniture and Home Furnishing Stores | 8,620 | 4.2% | 42.2% |
| | | 572 | Household Appliance Stores | 925 | 0.4% | 23.0% |
| | | 573 | Radio, television and Computer Stores | 16,043 | 7.7% | 27.4% |
| | | 594 | Miscellaneous Shopping Goods Stores | 22,514 | 10.9% | 42.0% |
| | | 596 | Non Store Retailers | 15,468 | 7.5% | 48.8% |
| | | | TOTAL | 207,320 | 100.0% | 49.1% |
| Pharmaceuticals | 9% | 591 | Drug Stores and Proprietary Stores | 10,091 | 39.5% | 32.5% |
| | | 596 | Non Store Retailers | 15,468 | 60.5% | 48.8% |
| | | | TOTAL | 25,559 | 100.0% | 42.4% |

| Product Line | % | SIC | | Count | % | % Female |
|---|---|---|---|---|---|---|
| Health and Beauty Aids | 7% | 531 | Department Stores | 127,114 | 36.2% | 55.9% |
| | | 539 | Miscellaneous General Merchandise Stores | 14,957 | 4.3% | 34.6% |
| | | 541 | Grocery Stores | 183,157 | 52.2% | 35.1% |
| | | 591 | Drug Stores and Proprietary Stores | 10,091 | 2.9% | 32.5% |
| | | 596 | Non Store Retailers | 15,468 | 4.4% | 48.8% |
| | | | TOTAL | 350,787 | 100.0% | 43.1% |
| Sporting Goods and Toys | 6% | 531 | Department Stores | 127,114 | 67.9% | 55.9% |
| | | 539 | Miscellaneous General Merchandise Stores | 14,957 | 8.0% | 34.6% |
| | | 594 | Miscellaneous Shopping Goods Stores | 22,514 | 12.0% | 42.0% |
| | | 596 | Non Store Retailers | 15,468 | 8.3% | 48.8% |
| | | 599 | Retail Stores NEC | 7,245 | 3.9% | 47.0% |
| | | | TOTAL | 187,298 | 100.0% | 51.6% |
| Stationery | 3% | 531 | Department Stores | 127,114 | 67.9% | 55.9% |
| | | 539 | Miscellaneous General Merchandise Stores | 14,957 | 8.0% | 34.6% |
| | | 594 | Miscellaneous Shopping Goods Stores | 22,514 | 12.0% | 42.0% |
| | | 596 | Non Store Retailers | 15,468 | 8.3% | 48.8% |
| | | 599 | Retail Stores NEC | 7,245 | 3.9% | 47.0% |
| | | | TOTAL | 187,298 | 100.0% | 51.6% |
| One-Hour Photo | 2% | 531 | Department Stores | 127,114 | 72.6% | 55.9% |
| | | 591 | Drug Stores and Proprietary Stores | 10,091 | 5.8% | 32.5% |
| | | 594 | Misc Shopping Goods Stores | 22,514 | 12.9% | 42.0% |
| | | 596 | Non Store Retailers | 15,468 | 8.8% | 48.8% |
| | | | TOTAL | 175,187 | 100.0% | 52.1% |
| Jewelry | 1% | 531 | Department Stores | 127,114 | 62.6% | 55.9% |
| | | 539 | Miscellaneous General Merchandise Stores | 14,957 | 7.4% | 34.6% |
| | | 562 | Women's Clothing Stores | 3,912 | 1.9% | 71.3% |
| | | 565 | Family Clothing Stores | 6,722 | 3.3% | 63.0% |
| | | 569 | Miscellaneous Apparel and Accessory Stores | 12,420 | 6.1% | 60.7% |
| | | 594 | Misc Shopping Goods Stores | 22,514 | 11.1% | 42.0% |
| | | 596 | Non Store Retailers | 15,468 | 7.6% | 48.8% |
| | | | TOTAL | 203,107 | 100.0% | 53.1% |
| Shoes | 1% | 531 | Department Stores | 127,114 | 74.5% | 55.9% |
| | | 539 | Miscellaneous General Merchandise Stores | 14,957 | 8.8% | 34.6% |
| | | 561 | Men and Boys Clothing Stores | 1,314 | 0.8% | 42.8% |
| | | 562 | Women's Clothing Stores | 3,912 | 2.3% | 71.3% |
| | | 564 | Children and Infant's Wear Stores | 1,078 | 0.6% | 83.5% |
| | | 565 | Family Clothing Stores | 6,722 | 3.9% | 63.0% |
| | | 566 | Shoe Stores | 3,008 | 1.8% | 36.6% |
| | | 569 | Miscellaneous Apparel and Accessory Stores | 12,420 | 7.3% | 60.7% |
| | | | TOTAL | 170,525 | 100.0% | 54.7% |
| WEIGHTED AVERAGE OF PRODUCT LINES* | 100% | -- | | -- | -- | 48.3% |

*% females among managers in column (f), weighted by product line % of sales in column (b)
and % of managers by SIC within each product lines in column (e).

ATTACHMENT C

| | 2003 Sales % of total |
|---|---|
| Grocery, candy & tobacco | 24 |
| Hardgoods (hardware, housewares, auto supplies, small appliances) | 20 |
| Softgoods/domestics | 18 |
| Electronics | 9 |
| Pharmaceuticals | 9 |
| Health & beauty aids | 7 |
| Sporting goods & toys | 6 |
| Stationery | 3 |
| One-hour photo | 2 |
| Jewelry | 1 |
| Shoes | 1 |
| | |
| Total | 100 |

ATTACHMENT D

 04-10-2002  02:01pm  From-The Impact Fund        5108453654         T-439  P.024/027  F-678

## TARGET CORPORATION

612/370-6646
612/370-6909 (fax)
jim.hale@target.com

James T. Hale
Executive Vice President
General Counsel and Corporate Secretary

December 10, 2001

Mr. Brad Seligman
The Impact Fund
125 University Avenue
Berkeley, California 94710

Dear Brad:

At long last, I am enclosing a copy of our statement of our commitment to diversity, including statistical information that we make publicly available.

Very truly yours,

James T. Hale,
Executive Vice President and
General Counsel

*Enclosure*

TGT: 125022

777 Nicollet Mall, Minneapolis, MN 55402-2055
Target • Marshall Field's • Mervyn's • AMC
target.direct • DCI • Target Financial Services



**Target Corporation and Diversity**
**Page 2**

### Our Commitment to Equal Opportunity

Discrimination based upon race, color, religion, sex, age, national origin, disability, sexual orientation or other characteristics protected by law is not tolerated in our work place.  In addition to prohibiting such discrimination, we attempt to create an environment that recognizes the value of diversity and enhances the opportunity for success of all team members, regardless of their differences.  Management is required to report annually to the company's board of directors on its progress in achieving greater diversity of our workforce.

Target Corporation is a participant in Project Equality, a national program committed to the achievement of diversity and equal opportunity.  As a participant, we provide equal employment information and have made a commitment to maintain employment policies and practices that affirmatively promote equal employment opportunities for people of color, women and persons with disabilities.

While each of our individual operating companies has developed its own initiatives, the following are examples of programs intended to promote diversity:

- **Diversity Training.**  We provide training that is intended to enhance awareness of diversity in the work place and to build skills necessary to promote that diversity and the benefits it offers.

- **Minority Recruitment.**  Employees of diverse backgrounds are sought by attending minority job fairs, placing ads in minority media, posting positions at schools and other public places with high minority populations, attending national meetings of minority organizations, and publishing and distributing recruitment literature emphasizing our commitment to diversity.

- **Employee Networks.**  Our operating companies sponsor a variety of employee groups that create a network for people of similar backgrounds to share information of common interest, facilitate mentoring relationships, address work place issues, and resolve common concerns.  Networks have been established for people of color, people of Asian descent, and gay and lesbian employees.

- **Diversity Council.**  In February 1998 Mervyn's launched a diversity council to explore opportunities in the workplace and recommend ideas for creating a work environment that builds on the strengths of its diverse team and better meets the needs of a diverse guest population.

-more-



Contact:        Carolyn Brookter,  Director, Corporate Communications, 612/304-6557

## Target Corporation and Diversity

Our team members are a key factor in our performance as a company. Our ability to recruit and hire people from diverse backgrounds to create a team with a rich variety of strengths, perspectives and lifestyles is essential to our business. Our ability to "know our guest" is greatly dependent upon a group of employees that reflects the diversity of the communities that we serve. We are committed to equal employment opportunity because it is the right thing to do and because it provides us a competitive advantage.

### Our Diverse Work Force

Target Corporation employs 259,400 people in 46 states. Our long-standing commitment to equal opportunity has increased the diversity of our work force as reflected in our Equal Employment Opportunity (EEO) Report for 2000 (the most relevant portions of which follow). For purposes of comparison, 2000 company data regarding the employment of women and minorities in specific EEOC job categories is cited below, along with similar U.S. and retail industry data from the EEOC report entitled "Job Patterns for Minorities and Women in Private Industry -- 1998." (most recent report available):

Female employees as a percentage of all employees in the following job categories:

|                         | Target Corp. | U.S. | Retail Industry |
|-------------------------|--------------|------|-----------------|
| Officials and managers: | 51%          | 32%  | 29%             |
| Professionals:          | 59%          | 51%  | 51%             |
| Sales workers:          | 72%          | 57%  | 63%             |
| All employees.          | 67%          | 47%  | 56%             |

Minority employees as a percentage of all employees in the following job categories:

|                         | Target Corp. | U.S. | Retail Industry |
|-------------------------|--------------|------|-----------------|
| Officials and managers: | 21%          | 13%  | 12%             |
| Professionals:          | 14%          | 17%  | 16%             |
| Sales workers:          | 37%          | 25%  | 16%             |
| All employees.          | 35%          | 27%  | 16%             |

With regard to senior management, 30 percent of vice presidents and higher at Target Corporation are female, and 7 percent are minorities. Of middle management at the company, 52 percent are women, and 14 percent are minorities. (Note these are not EEOC categories but are frequently-asked-about job categories).

-more-

04-10-2002  02:02pm  From-The Impact Fund                5108453654                T-430  P 027/027  F-679

**Target Corporation and Diversity**
Page 3

- **Parenting Programs.** We have received national recognition for our family-friendly benefits that include pretax set-asides for dependent care expenses, generous pregnancy leaves, child care resources, flexible work schedules and time off to care for family members.

- **Community Partnering.** In addition to our internal programs and initiatives, we also partner with other groups to promote diversity throughout the broader community. Target is a national leader in providing job opportunities for people with disabilities. Target participates in community-based training by seeking out agencies, school programs and government incentive programs in an effort to hire people with disabilities. Target was the first retailer to use models with disabilities in its print advertising. All of our stores are accessible to people with disabilities.

**Moving Forward**
We are pleased with our success in attracting and retaining a diverse population of team members. That diversity has been one of the strengths of our company and will continue to be an important part of our business strategy as we expand into new and different markets. We will continue to promote the ideal of diversity as we position our businesses for success in the 21st century.

###

May 2001