1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3            (SAN FRANCISCO DIVISION)

4

5     -----------------------------

6     SHIRLEY "RAE" ELLIS, on        )

7     behalf of herself and all      )

8     others similarly situated,     )

9                   Plaintiffs,      )      **Certified Copy**

10         vs.                       )  No. C04 3341 MHP

11    COSTCO WHOLESALE               )  VOLUME I

12    CORPORATION,                   )

13                  Defendant.       )

14    -----------------------------

15

16

17         Deposition of RICHARD DROGIN, Ph.D.,

18         at 125 University Avenue, Berkeley,

19         California, commencing at 9:37 a.m.,

20         Wednesday, August 9, 2006 before

21         Sandra Lehane, RPR, CSR No. 7372.

22

23

24

25    PAGES 1 - 138

1

1      A.   Well, he assisted in the sense that I did

2   talk to him several times, and he provided documents

3   such as deposition transcripts and answers to

4   questions about the data that I had asked and that --

5   things of that nature.

6      Q.   Aside from assisting you in gathering data,

7   answering questions that you posed to -- you posed,

8   did Mr. Seligman assist you in framing any hypothesis

9   or deciding on how data should be presented?

10     A.   Well, I wrote the report.  And during that

11  period when I was writing the report, I may have had

12  some discussion with him and talked about what my

13  opinions were, but as far as actual specific

14  formulation in deciding what to put and not put in the

15  report, that was totally based on my decisions.

16     Q.   Did Mr. Seligman, because he's quite

17  experienced in these matters, suggest to you that you

18  look at certain time frames or you present the

19  information in a certain way?

20     A.   Well, there were considerations about what

21  the time frame should be based on the legal issues in

22  the case, and what -- who was in the purported class

23  and what the class period would be.  And those are

24  things that generally have to be decided upon in doing

25  any statistical analysis.  But those essentially are

16

1          Q.   Dr. Drogin, you've been engaged as an expert

2     in lawsuits by The Impact Fund before, have you not?

3          A.   Yes.

4          Q.   How many times have you been an expert on

5     behalf of The Impact Fund?

6          A.   Let me think.  Probably three or four.  And I

7     believe in each of those cases, there were other

8     co-counsel.

9          Q.   When was the first time?

10         A.   I believe it was in Dukes v. Wal-Mart.

11         Q.   That was the first time you were engaged by

12    The Impact Fund?

13         A.   That's my recollection at this time.

14         Q.   Okay.  Well, what's been your relationship

15    with Mr. Seligman, the executive director, over the

16    years?

17         A.   I have been involved in other litigation

18    prior to the time that he was involved with The Impact

19    Fund.

20         Q.   You might help me out here and just tell me

21    what Mr. Seligman was doing before he was involved

22    with The Impact Fund, if you know.

23         A.   Well, that's kind of a general question.

24         Q.   Immediately prior, in a professional sense.

25         A.   Okay.  Thank you for the clarification.

                                                            19

1      Q.   We'll talk about his extracurricular

2  activities later.

3           MR. SELIGMAN:  No, you won't.

4           THE WITNESS:  I mean, he's been a lawyer for

5  a long time.  I guess since about 1980, I think.  I

6  don't know the exact date.

7  BY MR. ROSS:

8      Q.   Has he engaged you before as an expert?

9      A.   Yes, he has.

10     Q.   Before he joined The Impact Fund?

11     A.   Yes.

12     Q.   Okay.  And how many times was that?

13     A.   I don't know.  Several.  I don't know the

14 exact number.

15     Q.   A dozen?

16     A.   It's possible.

17     Q.   Okay.

18     A.   It might be a dozen.

19     Q.   Have you ever represented him personally?

20     A.   Personally?  What do you mean?

21     Q.   As a client, not in his capacity as a lawyer.

22     A.   Have I represented him?

23     Q.   Yes.  That's my question.

24     A.   Not that I know of.

25     Q.   Have you ever -- have you been a financial

20

1  been largely on the plaintiff's side of discrimination

2  cases?

3       A.  In discrimination cases that I've worked on,

4  that would be correct.

5       Q.  Did you continue to do work on this matter

6  after submitting your second report?

7       A.  I did some review.  I did some work, yes.

8       Q.  Is that work currently in progress?

9       A.  Yes.

10       Q.  And can you tell me what you're doing?

11       A.  I -- I looked at -- I did some calculations

12  on Dr. Saad's -- some of his exhibits, recently in the

13  last few days, and also -- well, that's what I did.

14       Q.  And what exhibits are those?

15       A.  Exhibit 7 and 14.  And I also looked at one

16  other issue involving the regions.

17       Q.  What are you looking at in that respect?

18       A.  I performed my promotion analyses that I --

19  using the model that I describe in my reply report by

20  region.

21       Q.  Okay.  And do you anticipate any further work

22  in connection with possible testimony or other written

23  reports in this case?

24       A.  Not at this time.  But, of course, I may --

25  something may come up, but I don't have any plans

24

1    there is not a statistically significant impact or

2    disparity in the promotions of women to AGM?

3         A.   That is correct.  There is one -- well, there

4    are -- that is correct.  It's not statistically

5    significant in each region, but there is a pattern

6    nevertheless.

7         Q.   Before I get to that, would you tell us what

8    regions -- what are the regions in which you did not

9    find a statistically significant disparity in the

10   promotion of women to AGM using your model?

11        A.   Well, I know that Texas was one.  But Texas

12   has a rather diminimous number of promotion.  I think

13   there is 13 or something of that nature during the

14   whole time period.  So that leaves seven other

15   regions; and out of those seven, there is three that

16   show a statistically significant disparity.  And so --

17   and then out of all seven of those, there is a

18   negative disparity through the year 2003.

19            In other words, if you look at the cumulative

20   disparity during 1999 through 2003, then in all seven

21   of the regions -- other than Texas, then you find a

22   negative disparity.  In other words, women are

23   promoted fewer times than would be expected from the

24   model.  And Texas is the only region where that is

25   true.

26

1        Q.  You only found one region, Texas, in which

2    there was -- you did not find a statistical

3    significant disparity?

4        A.  That's incorrect.  That's not what I said.

5        Q.  Would you please correct me.

6        A.  What I said is -- I made a few points.  One

7    is, first of all, there is eight regions that I

8    considered, and one of those is Texas.  But Texas has

9    only 13 promotions during the entire 7-year time

10   period.  The others have more, but still not a very

11   large number.  But in any case, the other seven

12   regions all show a negative disparity for promotion of

13   women into assistant general manager during the years

14   1999 to 2003.  In other words, the 5-year period in

15   the first part of the time period that's been studied.

16        My next point is that in those seven regions,

17   three of those regions show a statistically

18   significant shortfall of promotion to women into AGM

19   during the entire period.

20       Q.  Okay.  Let me see if I can break this down so

21   I understand.

22        Of the seven, I understand that you found

23   three which show a statistically significant disparity

24   in promotions to AGM during the entire time period,

25   and that is on the basis of a cumulative Z-score for

27

1   the entire time period?

2       A.  That's correct, using the same methodology I

3   reported.

4       Q.  Right.  And in the case of -- I guess that

5   leaves us in the case of four regions, excluding Texas

6   and excluding these three, you found a negative -- a

7   negative Z-score in the cumulative Z-score for the

8   5-year period '99 to 2003?

9       A.  That's correct.

10      Q.  And did you conclude that that was -- that

11  that negative score was statistically significant?

12      A.  Well, not individually, no.  It was not.

13      Q.  Okay.

14      A.  So it was statistically significant -- well,

15  actually, I don't know what it was for '99 to 2003.

16  The three had to -- the three statistically

17  significant regions, the number I'm referring to here

18  in my discussion, is during the whole time period.

19      Q.  Okay.  But even with respect to the remaining

20  four -- we have Texas out here, that's aside.  We have

21  three that you found a Z-score that was statistically

22  significant on a cumulative basis for the entire

23  period for three regions.

24      A.  That's correct.

25      Q.  So we have four regions left.  Of those four

28

1   regions, you found a negative cumulative Z-score for

2   the 5-year period '99 to 2003?

3        A.   That's correct.

4        Q.   But that wasn't necessarily a statistically

5   significant negative score?

6        A.   That's correct.

7        Q.   Okay.  And for the period of time between

8   2004 to the present, I take it you did not find a

9   statistically significant Z-score for those four

10  regions you talked about?

11       A.   That's correct, yes.

12       Q.   And how about the cumulative Z-score for

13  those four regions from '99 to the present?

14       A.   I believe some of those were positive.  I

15  think they all might have been positive for those

16  four, for the whole entire time period, and that's

17  because of the change in the promotion rate of women

18  in the last few years.

19       Q.   Did you -- do you recall which were the three

20  regions that had a cumulative negative Z-score that

21  was statistically significant for the --

22       A.   I'm sorry, I don't remember the number.

23       Q.   You don't remember which ones?

24       A.   No, I don't remember the numbers.  I can find

25  that number out; but as I sit here, I cannot recall

29

1    exactly which ones.  I just remember the Texas one had

2    a very small number, and I sort of considered that as

3    diminimous, whereas the other ones had maybe 50 to

4    slightly over 100 promotions.

5        Q.  So there really were, out of eight regions --

6        A.  Texas, I believe --

7        Q.  Counting Texas?

8        A.  Out of eight regions.

9        Q.  Out of all the eight regions, you only found

10   three that showed a statistically significant

11   disparity based on cumulative Z-scores for the entire

12   period?

13       A.  Well, I don't know if the word "only" is

14   appropriate here.

15       Q.  Well, you found three --

16       A.  That is what I testified to, that there are

17   three out of the eight individually.

18       Q.  "Only" was my characterization.

19       A.  Yeah.  And then -- yes, correct.

20       Q.  You found three out of eight?

21       A.  That's correct.

22       Q.  Okay.  Well, aside from the investigations

23   you've just told us about, which you've done recently,

24   going back to the beginning of your engagement, did

25   you conduct any other investigations or analysis in

30

1   that to mean that you controlled for which employee in

2   that pool held which of those four jobs?

3            MR. SELIGMAN:  Objection.  Asked and

4   answered.

5            THE WITNESS:  I believe that's correct.

6            MR. ROSS:  Okay.

7            THE WITNESS:  Based on the data that was

8   available at that time, which as I previously

9   testified was one of the earlier versions of the data,

10  which was subsequently replaced.

11  BY MR. ROSS:

12     Q.  So aside from that one investigation, you --

13  the model you used in your final report was the same

14  basic model that you had begun at the start -- you

15  used at the start.  You never really changed that

16  throughout; you just improved the data and refined the

17  data?

18     A.  Well, I believe that's generally correct.

19  But I think the data that I had initially was not very

20  refined.  And I'm not sure -- I didn't really have

21  enough sufficient information to know exactly what was

22  and was not included in that -- in that data that I

23  looked at.  And also at that time, the purpose, as I

24  stated, was to just evaluate the preliminary data.

25     Q.  The long and short of it is you started with

34

1    a basic model, did significant tests on promotions

2    from the four senior staff positions to AGM.  And that

3    was the model you stuck with, in essence, for the

4    entire time?

5        A.  That's -- generally speaking, the issue that

6    I understood in the beginning was was there or was

7    there not a shortfall in promotion of women from

8    senior staff into AGM.  And that's pretty much been

9    the issue since that time, and so my analyses has been

10   pretty much the same for that issue.

11       Q.  From the very first phone call?

12       A.  The model is similar, yeah.  That's correct.

13       Q.  You provided us a disk which, upon

14   inspection, I think will reveal has some of your

15   preliminary findings.  Have we been provided with all

16   of those, your early preliminary findings?

17       A.  As far as I know, yes.

18       Q.  Did you have any other notes that you might

19   have taken that were not provided to us?

20       A.  Not that I retained.

21       Q.  Okay.  Of course your notes are -- your

22   findings are based solely on the facts -- data that, I

23   should say, was provided to you; isn't that right?

24       A.  Yes.

25       Q.  You didn't do any independent fact gathering

1    yourself, did you?

2         A.   No, I did not.

3         Q.   And the facts that were submitted to you were

4    facts submitted to you from either Mr. Seligman or

5    other plaintiffs' counsel in this case, which they may

6    or may not have obtained from Costco of course?

7         A.   That's correct.  I don't know if I've gotten

8    anything that wasn't from Costco.  I believe

9    everything I've received is from -- ultimately from

10   Costco, although I did not get it directly from

11   Costco.

12        Q.   By the way, are you a member of Costco

13   Wholesale?

14        A.   My partner is.

15        Q.   Your partner is, but you aren't?

16        A.   No, I don't think -- no, I'm not.

17        Q.   Have you never shopped there?

18        A.   Not that I can recall.

19        Q.   Have you ever even --

20        A.   I think I was there once.

21        Q.   Once.

22             So you haven't been at a Costco warehouse

23   except maybe once?

24        A.   Maybe twice.

25        Q.   When was the last time?

36

1    anything additional when you wrote your first report.

2    Were you -- were you frustrated and planned to expand

3    your original model because you didn't have the

4    earlier data?

5              MR. SELIGMAN:  I'm going to object as

6    misstates his earlier testimony.

7              THE WITNESS:  No.

8              MR. ROSS:  Okay.

9        Q.  You didn't have any plans to expand the model

10   prior to reading Dr. Saad's report; isn't that right?

11       A.  That's correct.

12       Q.  Well, I think we can agree as a general

13   matter, I hope, that the determination of whether

14   there is an adverse impact depends on the proper

15   specification of control factors in your analysis?

16       A.  In a statistical sense, yes.

17       Q.  And the inclusion or exclusion of certain

18   factors, control factors, may affect whether there is

19   a statistically significant disparity?

20       A.  That's correct.

21       Q.  All right.  Just to turn to some other

22   points, you concluded on Paragraph 3 of Page 3 that

23   when not filled, bilateral transfers, vacancies at

24   each level are almost always filled through promotions

25   from a lower level.

                                                        60

1      Q.   And if there were such factors in this case,

2   your significance test does not account for them?

3      A.   It accounts for only the factors that I've

4   identified in the description of the model.

5      Q.   And the only one factor that you've accounted

6   for in the promotion from the pool is gender?

7      A.   Gender and, of course, the job they held.

8   The job -- the -- that they were in senior staff.

9      Q.   Basically from the promotion pool you defined

10  from the start, you have only one variable in your

11  process that you tested for, and that was for gender?

12     A.   That's correct.   In this particular analysis.

13     Q.   Now, I've already asked you what other tests

14  you've performed.   And I think you've answered that.

15  But did you perform any type of regression analysis in

16  your investigations?

17     A.   No.

18     Q.   Now, your report indicated -- and again, I'll

19  be -- see if I got this right -- Page 10.   I'm sorry

20  Paragraph 10, Page 6.   You said right there that the

21  available job history data indicates that most

22  employees who were promoted to assistant general

23  manager are rotated through at least two different

24  senior staff jobs prior to their promotion.

25     A.   Mm-hmm.

                                                        69

1    people in senior staff positions.

2        Q.  Did you not understand that rotation through

3    more than one general -- senior staff position was

4    important for their promotion to AGM?

5        A.  I think that's the way the practice at Costco

6    has worked.

7        Q.  That would make sense, wouldn't it?

8        A.  That the more -- that they did want to have

9    people who held more than, as you say, one job --

10       Q.  Okay.

11       A.  -- in senior staff to be promoted.

12       Q.  Just some simple mathematics here,

13   arithmetic.  There were four different senior staff

14   positions.  So in principle, any senior staff member

15   could have served in 16 different combinations of

16   these four senior staff jobs?

17       A.  Well, that's actually incorrect.

18       Q.  15?

19       A.  Yeah, 15.

20       Q.  We'll eliminate the null set.

21       A.  Yeah, there you go.

22       Q.  Thank you.

23           Did you attempt to see whether having two or

24   more senior staff jobs explained any of the shortfall

25   in the promotion from women to senior -- from senior

75

1    made?

2         A.   Yeah, that's correct.

3         Q.   Okay.  And at the time you made that

4    calculation, you did not have data on prior job

5    experience earlier than '99?

6         A.   That's correct.

7         Q.   Okay.  You were obviously aware that if you

8    had that data, you could -- that could affect your

9    conclusion as to whether it was 85 percent, 85 percent

10   of the AGMs had prior merchandising manager

11   experience?

12        A.   That's -- it could be recalculated, yes.

13        Q.   In fact, it could only increase it actually?

14        A.   That's correct.

15        Q.   You have not received the biographical data

16   prior to '99.  Did you make any calculation to see if

17   that 80 percent increased -- 85 percent increased?

18        A.   I think I may have looked at that at one

19   point.  I don't recall.

20        Q.   Okay.

21        A.   I mean, the data was there, I agree.

22        Q.   Our information that the percentage of those

23   promoted into AGM positions with prior experience as

24   merchandising manager, if you include the earlier data

25   before '99, goes up to over 90 percent.  Would that --

                                                          77

1    that would not surprise you?

2        A.  No.

3        Q.  Going back to something else we mentioned,

4    you are aware from time to time that existing senior

5    staff managers are assigned to assistant merchandise

6    manager but at the same senior staff pay level?

7        A.  I believe that does occur.

8        Q.  Okay.  And is it your understanding that

9    that's in order to give them merchandising manager

10   experience even if there is no vacancy in the

11   merchandise manager position?

12       A.  I'm sure it is in some cases.  I don't know

13   about every case.

14       Q.  Well, in cases in which that occurred, that

15   is, when a senior staff person at the same level of

16   pay was assigned to become an assistant merchandise

17   manager, would you have considered that a lateral

18   rotation as you calculated your rotation data?

19       A.  Not in the model that I used in my report,

20   no.

21       Q.  Okay.  Similarly, if an individual had been

22   moved into the assistant -- I'm sorry.  A person

23   who -- a senior staff manager had been moved at the

24   same pay grade to become an assistant merchandise

25   manager and then promoted directly to an AGM, you

78

1   position -- percentage was 97 percent.  That would not

2   surprise you?

3        A.  I mean 90 to 97, it's possible.  I don't

4   know.  I would have to look at the data.  I think it's

5   certainly plausible.

6        Q.  Did you look at any of the job analysis

7   documents that were -- that were in this case, like

8   the job analysis for describing the AGM position?

9        A.  I may have at some point.  I don't recall

10  though.  I primarily looked at depositions.

11       Q.  Let me get it out and show you.  Just let me

12  take a second to find it in my briefcase.

13            (Counsel examines document.)

14            Okay.  I found what I was looking for.  Let

15  me just show you this first and see if you saw this

16  job analysis.

17            (Witness examines document.)

18            It's a CRE No. 245.  00245.  And it's

19  entitled "Job Analysis, Job Title Assistant Warehouse

20  Manager."

21       A.  Assistant warehouse manager.  I don't recall.

22  I may have seen this, but...

23            (Witness examines document.)

24       Q.  You may have seen it?

25       A.  Yeah, I may have seen this.

80

1          Q.   I'm going to mark it as an exhibit, please.

2               By the way, when we were off the record, we

3     marked Exhibit 4, let the record reflect this.  And I

4     would like you to mark this as Exhibit 5.

5               (Defendant's Exhibit 5 marked for

6     identification.)

7               Dr. Drogin, let me direct your attention to

8     the qualification standards that are listed on that

9     job analysis toward the bottom third of the page.

10         A.   Mm-hmm.

11         Q.   And in particular, the qualification of

12    experience.  You see where it says "merchandise

13    manager experience preferred"?

14         A.   That's correct, yes.

15         Q.   So you might have noticed that in connection

16    with your review of documents?

17         A.   Yes.

18         Q.   Okay.  Dr. Reskin describes the merchandise

19    manager position, and I quote, as a "key port of entry

20    job" into higher management positions.

21              Would you agree with that?

22         A.   Yeah.  Empirically it is.  I would agree.

23         Q.   So based on the empirical evidence, if

24    90 percent or more of the AGMs have that experience,

25    it's on the fact that the job analysis specifically

                                                        81

1    says that merchandise manager preferred, you would

2    concur with that statement of hers?

3         A.   Yes.

4         Q.   Okay.

5         A.   That's -- its empirically required in the

6    sense that almost everybody who is promoted would have

7    such experience.

8         Q.   Are you aware that employees who rotate

9    through senior staff positions are expected to spend a

10   much longer time in the merchandise manager position

11   than the stints they performed in other senior staff

12   manager jobs?

13        A.   Not specifically, but I wouldn't be surprised

14   if that was the case.

15        Q.   Okay.  You did not, however, attempt to see

16   whether having experience in the merchandising manager

17   job explains some or all of the shortfall of promotion

18   of women from the senior staff manager pool; isn't

19   that right?

20        A.   No -- yes, I did.  I did look at that.

21        Q.   Okay.  In connection with your first report,

22   did you look at that?

23        A.   I know that -- that women are less likely to

24   be rotated into senior staff.  I think I described

25   that in Table 7 on Page 8 of my first report.  I show

82

```
 1    that there is a statistically significant shortfall in
 2    women being rotated into merchandise manager positions
 3    among those rotated in senior staff jobs.
 4         Q.   That wasn't the question I asked, however.
 5    To go back to your earlier testimony, you did indicate
 6    that you didn't expand your model to look at other
 7    variables like qualifications prior to reading
 8    Dr. Saad's report.  So I'm just following up on that
 9    question.  You did not -- prior to reading Dr. Saad's
10    report, you did not attempt control for merchandising
11    manager experience in your model?
12         A.   No.  And there is good reason for that.
13         Q.   I understand that you stated that.  And I'll
14    give you an opportunity to talk about that.  Okay.
15              Notwithstanding I understand that you believe
16    there is a good reason for it, you would not disagree
17    with the conclusion of Dr. Saad, would you, that there
18    is no statistically significant difference between the
19    overall rate that female senior staff members who have
20    had merchandise manager experience are promoted
21    compared to men who also have had merchandise manager
22    experience?
23         A.   I did look at that at one point, and then I
24    agree with that.  It's not a statistically significant
25    disparity in that model.
```

83

1      Q.  Did you look at that prior to reading

2  Dr. Saad's report?

3      A.  Well, I didn't have the appropriate data to

4  really do a complete study of that.  So I didn't.  I

5  was aware of women, obviously, are not moving in at

6  the same rate in their rotation as men in the lateral

7  moves, you know.  And I described that in my report.

8  But I didn't -- I don't think I actually did the

9  promotion analysis.  I may have at some point.  But

10  the problem was, again, I didn't have the complete

11  data prior to 1999 of all the history, so I couldn't

12  tell exactly what jobs people held.

13      Q.  Okay.  Again, I understand that you believe

14  you have good reasons not to control for this

15  variable.  But wouldn't you agree with the converse,

16  that there is no statistically significant difference

17  between the overall rate at which male senior staff

18  members who have not had merchandising manager

19  experience are promoted compared to women who,

20  likewise, do not have merchandising manager

21  experience?

22      A.  I'd say there is no difference.  But I would

23  also add that that's a trivial result because you just

24  got through suggesting that the study of Dr. Saad's,

25  as he informed you, that 97 percent of those promoted

84

1    those promoted, which again, as you've suggested, are

2    primarily those with management experience.  So they

3    would, of course, find in pool, one as you defined it

4    in your hypothetical, that those women took longer in

5    senior staff to get promoted and they held more jobs

6    than men.

7         Q.  Okay.

8         A.  So there is a difference.  The rate at which

9    they are promoted is not statistically significant,

10   different than men, but these other two components

11   are.

12        Q.  Again, you have not read Dr. Reskin's report.

13   But are you aware of her opinion that the promotion

14   from -- of women to AGM is adversely affected by

15   cognitive bias and gender stereotyping?  Is that

16   something you're familiar with?

17        A.  I've heard those terms before, but I'm not

18   considered an expert in interpreting those in this

19   context.  So I don't really have an opinion.

20        Q.  Then I won't go there.  That's next week.

21        MR. SELIGMAN:  You've saved us probably two

22   or three hours of time.  I appreciate it.

23   BY MR. ROSS:

24        Q.  Weren't you interested, at least, to

25   investigate whether or not women with merchandise

87

1    manager experience were promoted at the same rate as

2    men?

3         A.  This is not an exercise in curiosity.  This

4    is an exercise in determining what is the result of an

5    appropriate model that would measure a fair and bias

6    process, and that's what I've tried to.

7         Q.  And it's -- your investigation, of course, is

8    an objective process.  So you would investigate

9    anything that it seemed pertinent to investigate?

10        A.  Well, as I -- I looked at these factors that

11   you're talking about.  I think -- my goal was to

12   construct a model that I felt was appropriate for

13   measuring -- measuring the disparity, if any, in the

14   promotion rates based on a nondiscriminatory model.

15        Q.  Well, in any event, we agree that you did not

16   control for merchandise manager experience.  And one

17   of the reasons you stated in your report was that it's

18   a tainted variable, "it may be influenced by

19   discrimination."  And that was the reason you didn't

20   test for it, I believe.

21        A.  That's what I stated in my second report.

22   That's correct.

23        Q.  Did you have any other view -- did you have

24   that opinion when you wrote your first report?

25        A.  Yes, I did.

88

1          Q.   Okay.

2          A.   And as I pointed out, if you just look at

3     Table 7 on Page 8, and also on Paragraph 17, it's well

4     documented.

5          Q.   Are you basing your assertion that it may be

6     influenced by discrimination solely on your -- on the

7     statistics that you refer to or on the conclusion of

8     any other expert in this case?

9          A.   First of all, I don't have an opinion about

10    discrimination.  My opinion is based -- is a

11    statistical opinion.  And secondly, the -- I have

12    shown there is adverse impact in the lateral moves by

13    gender against women.  But also -- so I have observed

14    that as a statistical fact that I reported, as I just

15    mentioned, in Paragraph 17 in my first report.  But

16    also, I think there is an abundance of deposition

17    testimony from higher-up people in Costco that I've

18    cited in numerous footnotes in both reports that

19    support the idea that Costco chooses who they are

20    going to move within the lateral moves.  This is not

21    something that's based on an expression of interest of

22    the employees.  And that they expect to rotate people,

23    all people.  And that, therefore -- that, to me, is a

24    justification for the model that I used.  That's the

25    basis for why I chose the model I did, because of

                                                          89

1    concluded that there may be discrimination?

2         MR. SELIGMAN:  Objection.  Mischaracterizes

3    testimony.

4         THE WITNESS:  No, that's not what -- I

5    decided from these that the -- what the fair model

6    would be based on their policies -- based on the

7    policy.

8    BY MR. ROSS:

9         Q.  By "fair model," you mean you undertook to

10   eliminate what you thought was a tainted variable?

11        A.  Based on their policy, they would -- women

12   and men would tend to get the same jobs and be rotated

13   equally and have the same interest at being promoted

14   to AGM, and that's how I -- that's how I used that

15   fact that I gleaned from the depositions in order to

16   formulate the model that I thought would represent a

17   fair exercise of their policy.  They don't say we --

18   we consider merchandise manager and we tend to move

19   men into merchandise manager more.  There is -- that's

20   not part of their policy.  That's a practice.  They

21   don't say that they take -- women should spend more

22   time in senior staff than men in order to be promoted,

23   or women should have more different jobs than men in

24   order to be promoted.  Those are not part of their

25   policy.

96

1    1999 through July 31, 2004, in the amount of time

2    spent as senior staff of those who are promoted to

3    AGM.  And that result is consistent with my Table 9 in

4    my earlier report, which is Exhibit 2 to this

5    deposition.  And that -- so that's the first point I

6    wanted to make.

7            And secondly, that although -- I wanted to

8    show the stronger pattern occurred in the earlier

9    years, and that's why I did the Z-value for that

10   portion of the time period.

11       Q.  Also in your report, you make a point that

12   the rate of promotions you observed appeared to change

13   after the litigation was filed than compared to the

14   period of time before litigation was filed.  You make

15   that point, do you not?

16       A.  Yes.

17       Q.  Okay.  That being the case, in calculating

18   the significance test of the additional time women

19   spend in the senior staff position compared to men,

20   would there be any logical basis for not including the

21   entire period up to the time the lawsuit was filed?

22       A.  Well, the basis would simply be if you wanted

23   to look at that period, and that's information that I

24   wanted to provide, to show the change -- I was

25   basically showing that the change in this particular

                                                            120

1    STATE OF CALIFORNIA                ) ss.

2

3

4          I hereby certify that the witness in the

5    foregoing deposition was duly sworn to testify to the

6    truth, the whole truth and nothing but the truth, in

7    the within-entitled cause; that said deposition was

8    taken at the time and place herein named; that the

9    deposition is a true record of the witness's testimony

10   as reported by me, a duly certified shorthand reporter

11   and a disinterested person, and was thereafter

12   transcribed into typewriting by computer.

13         I further certify that I am not interested in

14   the outcome of the said action, nor connected with,

15   nor related to any of the parties in said action, nor

16   to their respective counsel.

17         IN WITNESS WHEREOF, I have hereunto set my

18   hand August 11, 2006.

19

20

21

22         *Sandra Lehane*

23         SANDRA LEHANE, CSR No. 7372

24

25

                                                     137