IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

JUL - 7 2004

CLERK, U.S. DISTRICT COURT
By _____
Deputy

| | |
|---|---|
| LINDA D. WEBB and ERICA SANDERS, individually and on behalf of others similarly situated, § § § § | |
| Plaintiffs, § | |
| vs. § | CA No. 3:02-CV-2716-R |
| § | |
| BARNES GROUP, INC., § § | |
| Defendant. § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW: CLASS CERTIFICATION

1. This case comes before the Court for a ruling on plaintiffs' motion for class certification of a claim for gender-based salary discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. Named plaintiffs Linda Webb and Erica Sanders seek to represent a class of "[a]ll female salaried employees of Barnes Group, Inc. ("Barnes") employed between April 1, 1999 and the present, and who were compensated on a salary basis." (12/03/03 Revised First Amended Cplt. ¶ 5.02 (Doc. No. 84)).

2. On December 2, 19, 22, and 29, 2003, the Court held evidentiary hearings on plaintiffs' motion for class certification. During the hearings, the Court heard live testimony from the purported class representatives Linda Webb and Erica Sanders, Jeff Hummel, Barnes Distribution's Vice President of Human Resources, Angela Savage, Barnes Distribution's Manager of Compensation and Benefits, Dr. John R. Michael, plaintiffs' expert, and Dr. Dwight Steward, defendant's expert. The Court also received into evidence numerous exhibits from both plaintiffs and defendant. Subject to objections, the deposition transcripts of Linda Webb, Angela Savage, Sandra Dixon, Idelle Wolf, Martin Van Walsum, Paul Terrell, Tamara Kay Wagoner, Diane Woolley, and Zaya Oshana were also submitted, as were videotaped excerpts of various depositions from both plaintiffs and defendant.

3. Having heard the evidence presented at the hearing, and having considered the written submissions of the parties, the Court rules that plaintiffs' motion for class certification is **DENIED WITH PREJUDICE**.

4. Plaintiffs fail to satisfy the requirements of Rule 23(a), as the unique circumstances surrounding plaintiffs' own claims and their personal salary treatment foreclose any finding of commonality or typicality with the claims of other putative class members. The evidence established that the salary treatment of each member of the putative class is unique because each is made in a

different operating or functional group, in a different geographic area, on the basis of highly individualized factors attendant to different jobs, based on different performance expectations, by different decisionmakers. *See* Fed. R. Civ. P. 23(a)(2)-(a)(3).

5. Moreover, neither Webb nor Sanders is an adequate class representative. *See* Fed. R. Civ. P. 23(a)(4).

6. Consistent with the foregoing, the Court now makes the following additional findings of fact and conclusions of law:

## FINDINGS OF FACT

1. Barnes Group is headquartered in Bristol, Connecticut, and is comprised of three unincorporated operating groups: (1) Barnes Aerospace; (2) Associated Spring; and (3) Barnes Distribution. These three groups are engaged in different businesses and industries. (12/19/03 Tr. p. 214 (Doc. No. 108)). Each maintains places of business in numerous states within this country, as well as internationally. (12/22/03 Tr. p. 200 (Doc. No. 107); Barnes Group Inc.'s Annual Report on Form 10-K for Fiscal Year Ending December 31, 2002, Ex. 1-A to Defendant's Appendix to its Brief in Opposition to Plaintiff's Motion for Class Certification, filed 04/27/03 (Doc. No. 14)).

2. Barnes Aerospace is headquartered in Windsor, Connecticut, and manufactures precision machined and fabricated components and assemblies for the aerospace industry. (Barnes Group Inc.'s Annual Report on Form 10-K for Fiscal Year Ending December 31, 2002, Ex. 1-A to Defendant's Appendix to its Brief in Opposition to Plaintiff's Motion for Class Certification, filed 04/27/03 (Doc. No. 14)). Associated Spring is headquartered in Farmington, Connecticut, and manufactures springs, stamping, components, and assemblies. (12/02/03 Tr. p. 65; 12/19/03 Tr. p. 214 (Doc. No. 108)); Barnes Group Inc.'s Annual Report on Form 10-K for Fiscal Year Ending December 31, 2002, Ex. 1-A to Defendant's Appendix to its Brief in Opposition to Plaintiff's Motion for Class Certification, filed 04/27/03 (Doc. No. 14)). Barnes Distribution, the only business unit in which plaintiffs Webb and Sanders worked, is headquartered in Cleveland, Ohio, and does not manufacture anything. (12/19/03 Tr. p. 214 (Doc. No. 108)); Barnes Group Inc.'s Annual Report on Form 10-K for Fiscal Year Ending December 31, 2002, Ex. 1-A to Defendant's Appendix to its Brief in Opposition to Plaintiff's Motion for Class Certification, filed 04/27/03 (Doc. No. 14)). Rather, Barnes Distribution distributes industrial maintenance supplies such as cleaners, fasteners, nuts, and bolts. (12/02/03 Tr. p. 14).

3. Each of the three operating groups has its own discrete management team and separate human resources departments. (12/19/03 Tr. p. 215 (Doc. No. 108)). Barnes Distributions' human resources department is headed by Jeff Hummel, the Vice-President of Human Resources. (*Id.*). Hummel has counterparts in each of the other two businesses. (*Id.*).

4. Immediately following the merger that formed Barnes Distribution in 2000, Barnes Distribution operated distribution centers in the following ten locations in the United States:

Arlington (Dallas), Texas; Edison, New Jersey; Elizabethtown, Kentucky; Atlanta, Georgia; Rockford, Illinois; Seattle, Washington; Bakersfield, California; Las Vegas, Nevada; Shelbyville, Kentucky; and Sparks, Nevada. (12/02/03 Tr. p. 96). In 2001, Barnes Distribution consolidated all its distribution operations in four distribution centers: Edison, New Jersey; Elizabethtown, Kentucky; Sparks, Nevada; and Arlington, Texas (12/02/03 Tr. p. 97; 12/22/03 Tr. pp. 16, 59 (Doc. No. 107); Declaration of Angela Savage, Ex. 3 to Defendant's Appendix to its Brief in Opposition to Plaintiff's Motion for Class Certification, filed 04/27/03 (Doc. No. 14)).

5. Barnes Distribution has employed salaried employees (male and female) at all of its distribution centers (both before and after the 2001 consolidation). (12/22/03 Tr. p. 198 (Doc. No. 107)). In addition, at its headquarters in Cleveland, Ohio, Barnes Distribution employs salaried workers (male and female) in the following departments: Information Technology/Systems, Human Resources, Operations, Purchasing, Finance, and Marketing. (*Id.*). Barnes Distribution also currently has salaried employees (male and female) working in an Industrial Supply Division in California, and as Field HR Managers in Texas and California. (*Id.*).

6. Linda Webb began working for Barnes Distribution's predecessor, Bowman Distribution, in 1973. (12/02/03 Tr. pp. 12, 14). During her entire career, Webb worked only for Barnes Distribution or its predecessor, and she never worked for Barnes Aerospace or Associated Spring. (12/02/03 Tr. p. 65). Also, during her tenure, Webb worked in a warehouse in Arlington, Texas (often referred to as the "Dallas facility"). (12/02/03 Tr. p. 14). Webb resigned her employment with Barnes Distribution on October 24, 2001, began working for a competitor, and signed an agreement that she would not return to Barnes Distribution. (12/02/03 Tr. pp. 61-63; DX 26).

7. Erica Sanders began working for Barnes Distribution in February 2000, at its Cleveland, Ohio, headquarters. (12/02/03 Tr. at p. 166; DX 3). Sanders worked at the Barnes Distribution headquarters in Cleveland during her tenure with the Company. (12/19/03 Tr. at pp. 13-14, 52 (Doc. No. 108)). Like Webb, Sanders never worked for Barnes Aerospace or Associated Spring. (*Id.*). Sanders resigned her employment with Barnes Distribution on July 16, 2003, to become a full-time student. (12/19/03 Tr. p. 27 (Doc. No. 108); DX 24).

8. As Angela Savage explained, From January 1, 1999, through the present, Barnes Distribution has employed salaried female workers in a large variety of jobs. (12/22/03 Tr. p. 199 (Doc. No. 107)). For example, as of April 2003, Barnes Distribution employed salaried female employees in 84 different job codes. (DX 28; 12/22/03 Tr. p. 199 (Doc. No. 107)). The 84 different jobs include both exempt and non-exempt positions under the Fair Labor Standards Act ("FLSA"), as well as supervisory and non-supervisory positions. (12/22/03 Tr. pp. 33-34 (Doc. No. 107)). Each job code is correlated to a distinct position. (12/19/03 Tr. p. 39 (Doc. No. 108)). Each position, in turn, entails substantively different job duties and responsibilities. (12/19/03 Tr. pp. 39-41, 201-03 (Doc. No. 108)).

9. Jobs at Barnes Group are assigned salary grade levels. Jeff Hummel, Barnes Distribution's Vice President of Human Resources, testified that Barnes Distribution assigns jobs to salary grades based on the scope and scale of the job responsibilities, which are determined based upon factors

Findings of Fact and Conclusions of Law: Class Certification 3

such as: (a) the effect of the position on profit and loss in the business; (b) the number of direct reports; and (c) the reporting relationship of the position (i.e., whether it is a position reporting directly to a functional head, or to the office of the presidency). (12/22/03 Tr. p. 31-33 (Doc. No. 107)). Gender is not a factor in assigning salary grades to positions. ( *Id.*). Hummel and other Human Resources managers at Barnes Distribution frequently assign jobs to salary grades before candidates for the positions have even been identified. (12/22/03 Tr. p. 32 (Doc. No. 107)).

10. Jobs in salary grades 10 and below are typically non-exempt under the FLSA, while jobs in salary grades 11 and above are typically exempt under the FLSA. (12/22/03 Tr. p. 33 (Doc. No. 107)). Similarly, jobs in salary grades 13 and below are typically non-managerial jobs that do not involve supervision of subordinates, while jobs in salary grades 14 and above are typically managerial jobs that do involve supervision of subordinates. (*Id.*).

11. Actual job duties for jobs within a particular salary grade differ significantly from job to job. (12/22/03 Tr. p. 37-38 (Doc. No. 107)). For example, Webb's position as the Dallas facility Distribution Center Manager was a salary grade 15 position. Other positions assigned to salary grade 15 include such disparate jobs as "Lead Programmer/Analyst," "Senior Sales Associate," and the Manager of the Accounts Receivables Department in Barnes Distribution's headquarters. (DX 28). Thus, as Hummel testified, an analysis of the performance of employees holding different jobs within the same salary grade would be very different: "you have numerous different managers with different business objectives in their respective areas assessing the performance of people that are performing widely varying job responsibilities. So it would be a very disparate analysis in terms of performance." (12/22/03 Tr. p. 41 (Doc. No. 107)). Angela Savage also testified that each of the many jobs have different duties and responsibilities. (12/22/03 Tr. p. 199 (Doc. No. 107)).

12. From 1999 to present, salary grades at Barnes Group ranged from 1 to 37. Within Barnes Distribution specifically, salary grades range from 1 to 25. (PX 1-5). The evidence at the hearings also demonstrated that Barnes Distribution's female employees are not clustered in a handful of salary grades, but are distributed throughout the salary grades, from grade 5 to grade 21 in a wide range of exempt and non-exempt and managerial and non-managerial jobs in numerous different geographic locations. (12/22/03 Tr. pp. 199-200 (Doc. No. 107); DX 28).

13. The evidence also established that each grade level within Barnes Group is assigned a range of salaries which are applied to the jobs in that particular grade. (PX 1-5). Salaries assigned to salary grades overlap from grade to grade, to allow for flexibility in assigning salaries to employees as they progress from one salary grade to another. (12/22/03 Tr. p. 34 (Doc. No. 107); PX 1-5). Therefore, it is possible for an employee in salary grade 10 to have a higher salary than an employee in grade 11. (*Id.*). In addition, within salary grades, individual employees' salaries differ based on factors such as performance, educational level, time-in-job, geography/cost of living, market factors, business conditions and a person's prior pay at the job they had before working at Barnes Distribution. (12/22/03 Tr. pp. 34-36 (Doc. No. 107)).

14. Every year, Barnes Group's corporate office issues U.S. Salary Tables to each of its operating groups (Barnes Distribution, Barnes Aerospace, and Associated Spring) (12/22/03 Tr. pp. 42-56;

Findings of Fact and Conclusions of Law: Class Certification 4

84-85 (Doc. No. 107); DX 29). The Tables contain salary ranges for each grade level. *Id.*). In 1999 and 2000, the ranges were identified at minimum, midpoint and maximum points. (PX 1-2). Beginning in 2001 and continuing through to the present, the ranges have been identified only at the midpoint and maximum points – that is, salary minimums were eliminated. (12/02/03 Tr. pp. 43, 51; 12/22/03 Tr. p. 64 (Doc. No. 107); PX 3-5).

15. When Barnes Group's corporate office issues the U.S. Salary Tables to each operating group each year, it also provides the operating group with salary planning instructions. (12/22/03 Tr. pp. 42-43 (Doc. No. 107); DX 29). The instructions contain aggregate percentage-based guidelines regarding the merit component of annual raises, as well as other general guidance concerning salary planning implementation. (12/22/03 Tr. pp. 42-43 (Doc. No. 107); DX 29). As Hummel testified, the guidelines are "very general in terms of process and procedure." (*Id.*). None of the guidelines make any reference to gender. (DX 29).

16. The specific guidelines may vary according to operating group based upon external market factors particular to the group's industry (*e.g.*, spring manufacturing) and/or internal factors relating to the group's performance. The salary planning functions of each operating group do not overlap or commingle with those of other operating groups. (12/22/03 Tr. p. 53-54 (Doc. No. 107)). In addition, operating groups may diverge downward from the guidelines issued to them and operating group line management applies its own discretion to salary treatment. (12/22/03 Tr. p. 86 (Doc. No. 107)). For example, at Barnes Distribution, it is undisputed that the salary ranges were only one factor among many others considered in making salary decisions. The overriding factor in setting salary was performance (12/22/03 Tr. pp. 45-49 (Doc. No. 107)). Further, other factors such as educational level, time-in-job, geography/cost of living, market conditions for types of jobs, and a person's prior pay at the job they had before working at Barnes Distribution all could affect an employee's salary. (12/22/03 Tr. p. 34-36, 65 (Doc. No. 107)).

17. For Barnes Distribution employees at salary grade levels 16 and below, the salary planning process takes place on a local level and on a de-centralized basis. (12/22/03 Tr. pp. 52-53 (Doc. No. 107)). The process begins when Hummel and Angela Savage, Barnes Distribution's Manager of Compensation and Benefits, receive the U.S. Salary Table and corresponding planning instructions from Barnes Group's corporate office. (12/22/03 Tr. pp. 42-43 (Doc. No. 107); DX 29). From that point, Hummel and Savage determine Barnes Distribution's general guidelines for salary planning and disseminate the relevant information to Barnes Distribution's department heads. (12/22/03 Tr. p. 45 (Doc. No. 107); DX 30). The department heads, in turn, typically request that line managers beneath them provide recommended salaries for their direct reports. (12/22/03 Tr. pp. 45-47, 204 (Doc. No. 107); DX 30-31). For example, when Webb was a manager she received such a request from her supervisor at the time, Tom Ostrander. (DX 31).

18. Approximately 75 different Vice Presidents, Directors, or Managers within Barnes Distribution determine the salaries of their direct reports based upon each individuals' performance in their particular jobs. (12/22/03 Tr. p. 205 (Doc. No. 107)). Within the operations department alone, at least fifteen managers make salary recommendations. (12/22/03 Tr. p. 46 (Doc. No. 107)). The performance component is based on the individual employees' most recent performance

evaluations. (12/22/03 Tr. p. 42 (Doc. No. 107)). Barnes Distribution's philosophy is to strive for a clear linkage between the individual employee's performance and the amount of their merit raise. (12/22/03 Tr. pp. 44-45 (Doc. No. 107)). Barnes Distribution refers to this as "sharp differentiation," meaning that employees will receive distinctly different merit raises based upon the quality of their performance, rather than simply spreading a roughly equal percentage raise among the workforce. (12/22/03 Tr. pp. 44-45 (Doc. No. 107)). Thus, employees with "partially meets" ratings (a particularly low performance rating) typically do not receive a merit raise. (12/19/03 Tr. p. 236 (Doc. No. 108)).

19. Barnes Distribution's managers forward their individual salary recommendations to Hummel and Savage, who, in turn, review them with Barnes Distribution's Office of the President, comprised of Keith Drewett, Barnes Distribution's President, and Idelle Wolf, Barnes Distribution's Chief Operating Officer. (12/22/03 Tr. pp. 49-50 (Doc. No. 107)). Hummel, Savage, and the Office of the President also schedule meetings with the department heads to sit down and go through the salary recommendations, focusing on the performance of individuals. (12/22/03 Tr. p. 50 (Doc. No. 107)).

20. The salary decisions of Barnes Distribution's Office of the President are then submitted to Barnes Group's corporate office. (12/22/03 Tr. p. 51-52 (Doc. No. 107)). Barnes Group's Chief Executive Officer, Senior Vice President of Human Resources, and Global Director of Compensation and Benefits meet with Hummel and the Office of the President to review Barnes Distribution's salary decisions. (*Id.*). Hummel described those meetings as a "one-hour conversation." (12/22/03 Tr. p. 121 (Doc. No. 107)). Given that Barnes Distribution has approximately 3,300 employees, of which all but a couple hundred are in grade levels 16 and below, very little of the review is focused on grade levels 16 and below. (*Id.*). Instead, corporate review focuses on the employees in grade levels 17 and above, who are considered to be senior management. (12/22/03 Tr. p. 52-53, 121 (Doc. No. 107)).

21. Once the salary planning process is complete, the merit-based raises take effect prospectively. (12/22/03 Tr. p. 123 (Doc. No. 107)). Raises are not paid retroactively. (*Id.*). Prior to 2001, the merit-based raises were implemented at different times throughout the year. (12/22/03 Tr. p. 56 (Doc. No. 107); Declaration of Angela Savage, Ex. 3 to Defendant's Appendix to it Brief in Opposition to Plaintiff's Motion for Class Certification at ¶13 (Doc. No. 14)).

22. Beginning in 2001, the Company moved to a "focal point" date for merit increases, meaning that the increases were all implemented on a particular date. (12/22/03 Tr. p. 56 (Doc. No. 107)). In 2001 the merit-based raises were implemented prospectively on April 1, 2001. (*Id.*). In 2002, the merit-based raises were implemented prospectively on July 1, 2002, because of deteriorating business conditions. (*Id.*). In 2003, the merit based raises were implemented prospectively on April 1, 2003. (*Id.*).

23. Individual factors other than the annual merit-based salary process affect the pay of Barnes Distribution employees. For example, an employee who is promoted from one salary grade to another typically receives a raise. A promotional raise for a Barnes Distribution employee in salary grade 16 or below is not reviewed at all by Barnes Group's corporate office. (12/22/03 Tr. p. 29, 73

**Findings of Fact and Conclusions of Law: Class Certification 6**

(Doc. No. 107)). Rather, the decision is made entirely within Barnes Distribution. *Id.*). Thus, for example, when Webb was promoted from salary grade 10 to grade 15 in August 1998, the decision to give her a 20% promotional raise was made entirely within Barnes Distribution, and was not reviewed by Barnes Group's corporate office. (12/22/03 Tr. p. 29 (Doc. No. 107); DX 32).

24. An employee's pay may also be affected by internal, external, or special adjustments. For salary grades 16 or below, decisions to make such adjustments for Barnes Distribution employees are made entirely within Barnes Distribution and are not reviewed at all by Barnes Group's corporate office. (*Id.*). Thus, for example, the decisions to give Webb an 11% special adjustment raise in April 1999 and a 5% internal equity raise (to go along with a 4% merit increase) in April 2000, were made entirely within Barnes Distribution and were not reviewed by Barnes Group's corporate office. (12/22/03 Tr. p. 29 (Doc. No. 107); DX 33, 35-36).

25. In 1973, Webb began working as an Order Filler for Barnes Distribution's predecessor, Bowman Distribution (12/02/03 Tr. pp. 12, 14). When Jack Anderson, the long-time Distribution Center Manager of the Dallas facility, retired on December 31, 1996, Webb took over as the acting Distribution Center Manager of the Dallas facility. (12/02/03 Tr. pp. 15, 48).

26. In February 1998, Webb was given a 10% "special adjustment" raise, from $35,016.00 per year to $38,520.00 per year (Webb Deposition pp. 35-37 (Doc. No. 87)). On August 1, 1998, Webb was formally promoted to the position of Distribution Center Manager of the Dallas facility. (12/02/03 Tr. pp. 9, 49-51, 67). Webb was selected for that promotion over a male coworker in Dallas named Don Williams, who had worked for the Company longer than Webb and had been a supervisor longer than Webb. (Webb Deposition p. 19 (Doc. No. 87)).

27. With her promotion, Webb jumped from a level 10 salary grade position to a level 15 salary grade position. (12/02/03 Tr. pp. 48, 68). This was an unusually large promotion. The overwhelming majority of promotions are increases of only one to three salary grade levels. (12/02/03 Tr. p. 68; 12/22/03 Tr. p. 29 (Doc. No. 107)).

28. At the time of her promotion, Barnes Group provided guidelines for "minimum," "mid-point," and "maximum" salaries for each salary grade. (PX 14). Barnes Group's written Salary Administration policy also provided guidance on salary increases for promotions. It stated

> A promotional increase not to exceed 20% may be granted to bring the salary of a newly promoted employee to the salary range minimum. If such promotional increase does not bring the employee's salary to the new salary range minimum, adjustments at six-month intervals, not to exceed 6% in each increment, may be granted until the employees salary is at the new salary range minimum. (PX 14).

29. In accordance with the Salary Administration Policy guidelines, when Webb was promoted to the grade 15 position, she received a 20% salary increase, from $38,520.00 to $46,224.00. (DX 37; 12/02/03 Tr. p. 94; 12/22/03 Tr. pp. 28-29 (Doc. No. 107)).

Findings of Fact and Conclusions of Law: Class Certification    7

30. As Hummel testified, promotional raises typically range anywhere from 8% to 15%. (12/22/03 Tr. p. 57 (Doc. No. 107)). According to Hummel, a 20% promotional raise is the maximum allowed except in "extraordinary" circumstances. (12/22/03 Tr. p. 58 (Doc. No. 107)). Webb also testified that "as a rule" promotional raises do not exceed 20%. (12/02/03 Tr. pp. 94-95). Barnes Distribution's records reflect that, of more than 100 promotions within Barnes Distribution between October 1, 1999, and December 31, 2002, only three employees received promotional pay increases of more than 20%. (DX 33-34; 12/22/03 Tr. p. 72 (Doc. No. 107)). Of those three employees, two are female (Patricia Sours and Lynn Lonn) and one is male (John Wierda). (*Id.*).

31. On April 1, 1999, Webb received an 11% "special adjustment" pay increase, from $46,224.00 to $51,312.00. (DX 35; 12/02/03 Tr. pp. 90, 94; 12/22/03 Tr. pp. 29-30 (Doc. No. 107)). On April 1, 2000, Webb received an additional 9% pay increase, from $51,312.00 to $55,932.00. (DX 36; (12/02/03 Tr. p. 93; 12/22/03 Tr. p. 30 (Doc. No. 107)). In short, in the twenty-month period between August 1, 1998, and April 1, 2000, Webb's salary increased a total of 40%. (12/22/03 Tr. p. 30 (Doc. No. 107)). Hummel testified that this sort of salary increase was "extraordinary." *Id.*). The record evidence in fact reflects that a 40% increase in pay within a twenty-month period at Barnes Distribution is, in fact, extraordinarily large.

32. In February 2000, Erica Sanders began working for Barnes Distribution at its Cleveland, Ohio, headquarters. (12/02/03 Tr. at pp. 166, 173; PX 20; DX 3). Sanders worked in Cleveland throughout her entire tenure with the Company, never in Dallas. (12/19/03 Tr. at pp. 13-14, 52 (Doc. No. 108)). Sanders began working for Barnes Distribution in the position of Administrative Assistant in the Information Systems Department. (12/02/03 Tr. pp. 166-67; PX 20). As an Administrative Assistant, Sanders was assigned to salary grade 8. (12/02/03 Tr. p. 169, 182; 12/19/03 Tr. p. 218 (Doc. No. 108)). Although this position was salaried, it was non-exempt under the FLSA. (12/19/03 Tr. p. 3 (Doc. No. 108)). Her starting annualized salary was $34,080.00. (12/02/03 Tr. 182; PX 20; DX 14). In July 2001, Sanders received a raise to $35,198.00. (DX 14).

33. On October 23, 2001, Sanders filed a charge of discrimination with the EEOC in Cleveland, Ohio, alleging that she had been denied promotions to the positions of Group HR Manager and Senior Accountant because of her race, African-American. (DX 3; 12/19/03 Tr. pp. 8-9 (Doc. No. 108)). Both positions were filled by females: Sandi Burnett was awarded the position of Group HR Manager and Susan Johnson was awarded the position of Senior Accountant. (12/19/03 Tr. p. 20, 56, 216 (Doc. No. 108)).

34. Sanders also claimed in her charge that Barnes Distribution discriminated against African-Americans as a class. (DX 3; 12/19/03 Tr. p. 20 (Doc. No. 108)). Sanders did not make any complaints regarding pay or sex discrimination. (DX 3; 12/19/03 Tr. p. 18-19 (Doc. No. 108)).

35. On May 3, 2002, the EEOC dismissed Sanders' charge of discrimination with the finding that, "[b]ased on its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes." (DX 6). The EEOC issued Sanders a right-to-sue letter with its dismissal, giving

Findings of Fact and Conclusions of Law: Class Certification  8

Sanders 90 days to file a lawsuit (until August 1, 2002) under Title VII. (DX 6; 12/19/03 Tr. p. 22 (Doc. No. 108)). Sanders, however, did not file any lawsuit. (12/19/03 Tr. p. 22 (Doc. No. 108)).

36. On July 1, 2002, Sanders was given another raise, which increased her annualized salary to $35,902.00. (DX 14). Shortly thereafter, Sanders (then a grade 8) applied for a posted opening for the position of Accounts Receivable ("A/R") Analyst in the Accounts Receivable Department (which is part of the Finance Department). (12/02/03 Tr. pp. 185-86; 12/19/03 Tr. p. 221 (Doc. No. 108)). The opening resulted from the promotion of a male employee, Bradley Clifford, from the Accounts Receivable Department to another department in Barnes Distribution. (12/19/03 Tr. p. 224 (Doc. No. 108)). Clifford was a salary grade 12 at the time. (12/19/03 Tr. pp. 223-24 (Doc. No. 108)).

37. Initially, the posting contemplated that Clifford's replacement would also be assigned a salary grade 12. (12/19/03 Tr. pp. 224-25 (Doc. No. 108); PX 45). However, Barnes Distribution subsequently decided to break Clifford's former workload into two A/R analyst positions, rather than have one person handle all of the responsibilities for the business. (12/19/03 Tr. pp. 224-25 (Doc. No. 108); 12/22/03 Tr. p. 95 (Doc. No. 107)). Each new position was then assigned to salary grade 11, to reflect the reduced scope of the job responsibilities. (12/19/03 Tr. p. 224-227 (Doc. No. 108)).[1]

38. On September 9, 2002, Barnes Distribution promoted Sanders to one of the newly created A/R Analyst positions. (PX 24; DX 8). As a result of her promotion, Sanders' salary grade moved from grade 8 to grade 11, and she was given a 15% raise in pay (in the amount of $5,398) to $41,300.00 per year. (DX 8-9; 12/19/03 Tr. p. 24, 227 (Doc. No. 108)). Hummel and Idelle Wolf, Barnes Distribution's female Chief Operating Officer, approved the decision to give Sanders the 15% promotional raise. (DX 9; 12/19/03 Tr. p. 75, 227 (Doc. No. 108)). Hummel testified that Sanders' 15% raise was a "very healthy increase," given the history of promotional raises at Barnes Distribution. (12/19/03 Tr. p. 233 (Doc. No. 108)). Barnes Distribution's records confirm Hummel's testimony on this point. (DX 33). Sanders testified that she was happy about the promotion and was looking forward to the opportunity. (12/19/03 Tr. p. 24 (Doc. No. 108)).

39. Also on September 9, 2002, Barnes Distribution promoted another female, Heather Morrison, into the other newly created A/R Analyst position. (12/19/03 Tr. p. 225 (Doc. No. 108); DX 10). Morrison was given a 15.2% raise, to $35,700.00 per year, and also assigned to salary grade 11. (DX 10). Idelle Wolf also approved the decision to give Morrison a 15.2% promotional raise. (12/19/03 Tr. p. 227 (Doc. No. 108); DX 10).

---

[1] The postings for the new positions originally were for salary grade 12, rather than 11. (12/19/03 Tr. p. 224 (Doc. No. 108)). Hummel credibly testified that this was because the position had been posted prior to the decision to split Clifford's original position (which was salary grade 12) in two salary grade 11 positions, and because the hiring manager was cognizant of the fact that he was more likely to get budgeting approval by replacing one existing position rather than adding two new positions. (12/19/03 Tr. p. 224, 226-27 (Doc. No. 108)). Both replacements for Clifford (Sanders and Heather Morrison) were, in fact, slotted into salary grade 11. (DX 9-12; 12/19/03 Tr. pp. 226 (Doc. No. 108)).

Findings of Fact and Conclusions of Law: Class Certification   9

40. Although Sanders contends that her pay was too low and discriminatory, the facts do not support her claim. After Sanders' promotion and pay increase in September 2002, she was the 15th highest paid employee out of the 61 salary grade 11 employees within Barnes Distribution at the time. (DX 13; 12/19/03 Tr. p. 230-31 (Doc. No. 108)). Sanders' salary was higher than 21 male salary grade 11 employees. (*Id.*).

41. On March 28, 2003, Marilyn Jacobs gave Sanders her annual review for 2002, and rated her as "partially meets" expectations, a low rating. (12/02/03 Tr. p. 196; PX 25; DX 15). Hummel testified that the "partially meets" rating is neither typical nor common; only approximately 10% of Barnes Distribution employees receive "partially meets" ratings. (12/19/03 Tr. p. 236 (Doc. No. 108)). As described previously, employees who receive "partially meets" ratings normally do not receive any annual merit raise. (12/02/03 Tr. p. 196). Thus, Sanders received no merit raise in 2003. (12/02/03 Tr. p. 196). Sanders testified that she understood that the performance evaluation would preclude her from getting a raise in 2003. (12/02/03 Tr. p. 196; 12/19/03 Tr. p. 43 (Doc. No. 108)).

42. Sanders and Webb worked in different states, different departments, had different jobs, and different supervisors. (12/19/03 Tr. p. 52 (Doc. No. 108)). Webb worked for the Company approximately 28 years, whereas Sanders only worked for the Company three and one-half years. (12/19/03 Tr. p. 53 (Doc. No. 108)). Webb received a 5 grade promotion, and Sanders never did. Webb never received a "partially meets" rating, whereas Sanders did receive such a rating (from her female supervisor, Marilyn Jacobs), which precluded her from obtaining a merit raise in 2003. In addition, Webb was a supervisor, whereas Sanders never supervised any employees. (12/02/03 Tr. p. 208; 12/19/03 Tr. p. 13 (Doc. No. 108)). Moreover, Webb participated in making pay decisions regarding salaried workers (both males and females), whereas Sanders never did. (12/02/03 Tr. p. 208; 12/19/03 Tr. pp. 13, 53 (Doc. No. 108)).

43. This Court also finds that the statistical evidence provided by parties refutes any claim of class-wide pay discrimination. According to plaintiffs' expert's (Dr. Michaels') final analysis (PX 70; 12/29/03 Tr. p. 50, 56-57), there is no credible statistical evidence of pay or salary discrimination at Barnes Distribution during the relevant Title VII statute of limitations time period, September 29, 2001 to 2003.

44. The statistical reports of the experts and their accompanying testimony evolved during the course of this case and over the month of December 2003, during which evidentiary hearings were held. Both sides prepared running, revised analyses in response to criticisms by the other. Throughout the proceedings, defendant's expert Dr. Steward consistently and credibly maintained that there was no basis from a statistical perspective to conclude that Barnes discriminated on the basis of sex in salary determinations.[2] While plaintiffs' expert (Dr. Michaels) initially concluded that

---

[2] Dr. Steward ran regression analyses controlling for job code number, gender, location, months with company and months in job. He ran these regressions both on the data set 0168D1.XLS, and also on a more accurate subset of that data set that adjusted for employees exiting the Barnes Distribution workforce. This corrected for the problem that employees who had left the workforce in 1999, for example, continued to appear in the data in succeeding years as if they were still employed and receiving the same salary. (12/22/03 Tr. pp. 227-29

Findings of Fact and Conclusions of Law: Class Certification  10

there were statistically significant disparities in pay for male and female Barnes Distribution employees,[3] on the final day of the class hearing (December 29, 2003), based on his refined and best analysis of the data, he reversed his earlier conclusions and determined that there were not statistically significant disparities between the salaries paid to males and females in 2002 and 2003, and that the disparity he found in 2001 was only -2.39 standard deviations.

45. There was considerable controversy over plaintiffs' expert's treatment of the independent variable "job title" in the regression analyses he reported in his December 1, 2003, revised report. Dr. Michaels "standardized" job titles, by aggregating job titles that, to him, sounded as if they entailed substantially the same duties and responsibilities. (12/22/03 Tr. pp. 143-46, 151-53, 170 (Doc. No. 107); DX 39-40). The Court finds that Dr. Michaels' "standardization" of job titles was

---

(Doc. No. 107)). The results of Dr. Steward's regression analyses using the more precise job code variable on the more accurate data set, were as follows:

| 1999 | -2.68 |
| 2000 | -1.72 |
| 2001 | -1.85 |
| 2002 | -1.80 |
| 2003 | -1.95 |

(DX-46C, Model III).

[3] The statistical effect of Dr. Michaels' mis-aggregation of job titles can be seen in comparing his regression results with those of Dr. Steward, which were run on the same data set, controlling for the same variables. In his December 1, 2003 report, Dr. Michaels, using data set 0168D1.XLS, ran a regression using the dependent variable log of salary, and controlling for independent variables "female, job title, location, months in job" using his aggregated job titles. The results, shown in units of standard deviation, were:

| 1999 | -2.77 |
| 2000 | -2.01 |
| 2001 | -2.49 |
| 2002 | -2.55 |
| 2003 | -2.96 |

(PX 48). Dr. Steward's results, based on the same data set and controlling for the same variables, but without aggregating job titles, rendered different, lower results:

| 1999 | -1.96 |
| 2000 | -1.53 |
| 2001 | -2.00 |
| 2002 | -1.88 |
| 2003 | -1.81 |

(DX-46C). In other words, Dr. Michaels' mis-aggregation of the data suggested a statistical disparity to improperly suggest, in turn, a possible inference of discrimination where there is none.

Findings of Fact and Conclusions of Law: Class Certification 11

improper. Dr. Michaels' sole basis for his "standardization" was his subjective belief that job titles in different salary grades were, in reality, essentially the same. (12/22/03 Tr. pp. 133, 143-46, 151-53, 170 (Doc. No. 107)). This belief, however, is without factual support. Dr. Michaels himself conceded under cross-examination that he had no evidence that job titles he aggregated as part of his "standardization" effort are, in fact, the same or similar. (Id.). Rather, he decided to aggregate certain job titles based purely on whether the job titles sounded similar. (Id.). As he admitted:

> Q: I understood that you looked at the words here [in the job titles], and by looking at the words, because of your conclusion that they were similar, that's how you aggregated those jobs to be the same.
>
> A. Yes. (12/22/03 Tr. pp. 152-53 (Doc. No. 107)).
>
> * * * *
>
> Q: Because you haven't actually looked at the jobs. You haven't looked –
>
> A: No. We have been over that. I haven't. (12/22/03 Tr. p. 170 (Doc. No. 107)).

Contrary to Dr. Michaels' aggregation approach, the evidence presented at the hearing showed that salaried jobs at Barnes Distribution are assigned unique job code numbers (12/22/03 Tr. pp. 39-41, 193, 199-203 (Doc. No. 107)). As Jeff Hummel testified, the assignment of jobs to salary grades is actually based upon a careful analysis of the scope and scale of the job responsibilities, which are determined based upon a host of factors. Angela Savage testified that the very job titles Dr. Michaels aggregated are, in fact, very different in terms of the scope and scale of their responsibilities. (12/22/03 Tr. pp. 200-03 (Doc. No. 107)). Accordingly, the Court finds that Dr. Michaels' subjective "standardization" of job titles was erroneous, and that it resulted in unreliable findings.

46. If any of the foregoing Findings of Fact may be more properly deemed a Conclusion of Law, it is hereby incorporated by reference into the Conclusions of Law.

## CONCLUSIONS OF LAW

1. For the reasons set forth below, the Court concludes that this case is not suitable for class action treatment and hereby determines that plaintiffs' motion for class certification should be, and hereby is, denied. Specifically, Plaintiffs have failed to meet the requirements of Fed. R. Civ. P. 23(a) of commonality, typicality, and adequacy.

2. District courts "must conduct a 'rigorous analysis of the Rule 23 prerequisites' before certifying a class." *O'Sullivan v. Countrywide Home Loans, Inc.*, 319 F.3d 732, 738 (5th Cir. 2003) (internal citation omitted); *Stirman v. Exxon Corp.*, 280 F.3d 554, 561 (5th Cir. 2002). Because "disparate treatment claims are by their nature individual, class certification . . . requires close scrutiny." *Swanson v. Perry*, No. 4:01-CV-0258-A, 2002 U.S. Dist. LEXIS 3346, at *7 (N.D. Tex.), *aff'd* 69 Fed. Appx. 658 (5th Cir. 2003) (citing *Abrams*, 178 F.R.D. at 129).

3. In ruling on the plaintiffs' motion for class certification, the Court is not bound by the

allegations of the complaint. *See Humphrey v. International Paper*, No. 02 C 4147, 2003 WL 22111093, at *3 (N.D. Ill. Sept. 11, 2003) (quoting *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 675 (7th Cir.), *cert. denied*, 534 U.S. 951 (2001)). "Going beyond the pleadings is *necessary*, as a court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues." *Castano v. American Tobacco Co.*, 84 F.3d 734, 744 (5th Cir. 1996) (emphasis added). *See also Amchem Prods. v. Windsor*, 521 U.S. 591, 615 (1997) (the court must "close[ly] look" at the plaintiff's evidence).

4.  "In order to certify a class, plaintiffs must establish that the proposed class meets the requirements of F.R.C.P. 23(a) and the requirements of at least one of the subsections of F.R.C.P. 23(b)." *Abrams v. Kelsey-Seybold Med. Group, Inc.*, 178 F.R.D. 116, 127 (S.D. Tex. 1997) (citing *Castano v. American Tobacco Co.*, 84 F.3d at 750). The party seeking certification bears the burden of proof." *Castano*, 84 F.3d at 740 (citations omitted). "Failure to establish any one requirement will completely defeat a motion for class certification." *Wright v. Circuit City Stores, Inc.*, 201 F.R.D. 526, 536 (N.D. Ala. 2001); *see also Berger v. Compaq Computer Corp.*, 257 F.3d 475, 479-481, 484 (5th Cir. 2001) (reversing, vacating, and remanding district court's class certification; district court improperly inverted the requirement that the party seeking certification bears the burden of proving all elements of Rule 23(a)); *Abrams v. Kelsey-Seybold Med. Group, Inc.*, 178 F.R.D. 116, 128 (S.D. Tex. 1997) (citing *Castano*, 84 F.3d at 740); *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 596 (7th Cir. 1993); *Horton v. Goose Creek Indep. Sch. Dist.*, 690 F.2d 470, 483 (5th Cir. 1982)); *Walker v. Jim Dandy Co.*, 747 F.2d 1360, 1363 (11th Cir. 1984).

5.  Rule 23(a) sets forth four prerequisites to maintaining a class action. All four requirements must be met. *Zachery v. Texaco Exploration and Production, Inc.*, 185 F.R.D. 230, 237 (W.D. Tex. 1999). These four requirements are: (1) the class must be so numerous as to make joinder impracticable (numerosity); (2) questions of law or fact common to the class must exist (commonality); (3) the claims of the representatives must be typical of those of the class members (typicality); and, (4) the representatives must fairly and adequately represent the class (adequacy of representation). Fed. R. Civ. P. 23(a).

6.  The Court's role in determining whether or not to certify a class action is distinct from a determination on the merits. *See Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177-78 (1974). Accordingly, the Court views the parties' statistical experts' testimony and conclusions through the prism of whether such evidence tends to support or defeat class certification in this case. As described herein, the Court finds that it clearly militates against class certification.

7.  Because the commonality and typicality requirements fundamentally address the same issue, they are often addressed jointly by the courts. *See Zachery*, 185 F.R.D. at 240 ("The commonality and typicality requirements for a class have a tendency to merge."); *General Tel. Co. of the S.W. v. Falcon*, 457 U.S. 147, 157 n.13 (1982). The fundamental inquiry is whether resolution of the named plaintiffs' claims will also resolve—one way or the other—the claims of absent class members. To satisfy the typicality requirement, representatives must have the same interests and have suffered the same injuries as members of the proposed class. *East Texas Motor Freight System, Inc. v.*

Findings of Fact and Conclusions of Law: Class Certification  13

*Rodriguez*, 431 U.S. 395, 403 (1977).

8. To meet the commonality requirement, the court must find issues of law or fact common to the class. *See Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 625 (5th Cir. 1999). To meet the typicality requirement, the claims of Webb and Sanders must be typical of the claims of the class members. Fed. R. Civ. P. 23(a)(3).

9. Neither Webb nor Sanders can fulfill the commonality and typicality requirements. The unusual circumstances surrounding Webb's compensation precludes a finding of commonality or typicality. As set forth above, after approximately 27 years as an employee at Barnes Distribution (and its predecessor), Webb was promoted in August 1998 and jumped five grade levels – from Grade 10 to Grade 15. She received a 20% raise, which was followed by an 11% special adjustment raise nine months later, and another 9% raise the following year. A five-grade promotion and concomitant 20% raise is almost unheard of at Barnes Distribution.[4] In addition, receiving a 40% increase in pay over a twenty month period, as Webb did between August 1998 and April 2000, was, according to Vice-President of Human Resources Hummel, "extraordinary." These atypical facts regarding Webb's pay demonstrate that a ruling on discrimination can only bind Webb, but no one else. Webb's is the antithesis of a common or typical claim.

10. Compounding Webb's atypicality problem is the fact that there were only two other female Distribution Center Managers within Barnes Distribution, and there is no evidence that either has issues remotely akin to Webb's. (Declaration of Angela Savage, Ex. 3 to Defendant's Appendix to its Brief in Opposition to Plaintiff's Motion for Class Certification, filed 04/27/03 at ¶ 23 (Doc. No. 14)).

11. Sanders' claims are also not common or typical. The Court credits Jeff Hummel's testimony that Sanders did not complain about her 15% promotional pay increase (12/19/03 Tr. p. 229-32 (Doc. No. 108)). Indeed, as of September 9, 2002, Sanders' salary was in the top quartile for all salary grade 11 employees within Barnes Distribution, and was higher than 21 male employees who were employed in salary grade 11 at the time. (DX 13). Sanders' high pay among salary grade 11 employees undercuts the typicality of her claim and militates against class certification.

12. Moreover, the circumstances surrounding Sanders' pay claim are highly individualized. Sanders testified that her pay discrimination claim is based upon the fact that she did not receive a raise as part of the 2003 merit-based annual salary planning and implementation process. The evidence shows, however, that Sanders did not receive a merit raise in 2003 because she received a "partially meets" rating on her performance evaluation given her by a female employee, Marilyn Jacobs. (12/02/03 Tr. p. 196; 12/19/03 Tr. p. 43(Doc. No. 108)).

---

[4] Barnes Distribution's records reflect that out of more than 100 promotions within Barnes Distribution or its predecessor between October 1, 1999, and December 31, 2002, only three employees received promotional pay increases of more than 20%. Of those three employees, two are female (Patricia Sours and Lynn Lonn) and one is male (John Wierda). (DX 34; 12/22/03 Tr. p. 72 (Doc. No. 107)).

**Findings of Fact and Conclusions of Law: Class Certification 14**

13.     Thus, proof of Sanders' claim will center around highly individualized inquiries relating to her job performance. Where "individualized proof is necessary, a class action is not an economical or efficient way of processing the complaints of the proposed class." *Riley v. Compucom Sys., Inc.*, No. 3:98-CV-1876-L, 2000 U.S. Dist. LEXIS 4096, at *8 (N.D. Tex. Apr. 3, 2000) (internal quotations and citation omitted). *See also Trevino v. Holly Sugar Corp.*, 811 F.2d 896, 905 (5th Cir. 1987) (affirming denial of certification of proposed promotions class because employer's promotion criteria included consideration of employees' accrued seniority and job skills, which factors required "individualized proof"); *Pinkard v. Pullman-Standard*, 678 F.2d 1211, 1215 (5th Cir. 1982) ("it is well settled that where a case requires detailed investigations of the circumstances surrounding the claims of individual class members, the case does not lend itself to treatment as a class action").

14.     Glossing over their unique situations, plaintiffs contend that the requisite commonality and typicality are nonetheless present because Barnes Group's corporate office disseminates the U.S. Salary Table and salary planning guidelines to its organizational entities. (*See* Plaintiff's Reply Brief to Defendant's Response to Plaintiff's Motion for Certification (Doc. No. 42); 12/29/03 Tr. p. 60-62 (Doc No. 111)). But the evidence was clear that the guidelines are just that, guidelines, and do not prescribe mandatory salary treatment. The undisputed testimony of Barnes Distribution managers Jeff Hummel and Angela Savage leaves no doubt that decisions regarding salary planning for employees grades 16 and below are made by at least 75 supervisors and managers within Barnes Distribution alone – not by Barnes Group's corporate officials. (12/22/03 Tr. pp. 41-56, 205 (Doc. No. 107)).[5] The undisputed record evidence in this case – including Webb's own testimony – establishes that, contrary to plaintiffs' arguments, the salary planning and implementation system at Barnes Distribution is highly decentralized. Hummel and Savage both credibly testified that the primary driver of all salary decisions during the annual merit raise process is each supervisor's evaluations of their subordinate's job performance. (12/22/03 Tr. pp. 41-56, 205 (Doc. No. 107)). Plaintiffs' and defendant's exhibits also demonstrate that this is the case. (PX 6-9, 25; DX 29-31).

15.     In addition, Barnes Distribution's 75+ managers-decisionmakers are located in different operating and functional groups, in different geographic areas. (12/22/03 Tr. p. 205 (Doc. No. 107)). They make their salary planning decisions based on highly-individualized factors attendant to different jobs, and based on different performance expectations.

16.     One recent decision noted:

> Several other courts have found that the commonality requirement is not satisfied where geographic diversity or an absence of centralized decision-making exists, or where different decision-makers made the challenged decisions. *Stastny v. S. Bell Tel. & Tel. Co.*, 628 F.2d 267, 278-80 (4th Cir. 1980); *Donaldson v.*

---

[5]   There also can be no typicality between the claims of Webb and Sanders and those of individuals grade levels 17 and above, whose salary recommendations were closely reviewed at the highest levels of Barnes Group's corporate hierarchy. (12/19/03 Tr. pp. 52-53 (Doc. No. 108)).

**Findings of Fact and Conclusions of Law: Class Certification   15**

*Microsoft Corp.*, 205 F.R.D. 558, 567 (W.D. Wash. 2001); *Beck v. Boeing Co.*, 203 F.R.D. 459, 463-64 (W.D. Wash. 2001); *Cooper v. Southern Co.*, 205 F.R.D. 596, 611 (N.D. Ga. 2001); *Abram v. United Parcel Serv. of Am., Inc.*, 200 F.R.D. 424, 432-33 (E.D. Wis. 2001); *Wright v. Circuit City Stores, Inc.*, 201 F.R.D. 526, 540-42 (N.D. Ala. 2001); *Bacon v. Honda of Am. Mfg., Inc.*, 205 F.R.D. 466, 478-79 (S.D. Ohio), *aff'd* 2004 U.S. App. LEXIS 10437 (6th Cir. May 27, 2004); *Lott v. Westinghouse Savannah River Co.*, 200 F.R.D. 539, 555-56 (D.S.C. 2000); *Troupe v. Randall's Food & Drugs, Inc.*, Civil Action No. 3:98-CV-2462-P, 1999 WL 552727, at *5 (N.D. Tex. July 28, 1999); *Betts v. Sundstrand Corp.*, No. 97 C 50188, 1999 WL 436579, at *6 (N.D. Ill. June 21, 1999); *Zachery v. Texaco Exploration & Prod., Inc.*, 185 F.R.D. 230, 238-40 (W.D. Tex. 1999); *Bostron v. Apfel*, 182 F.R.D. 188, 195-96 (D. Md. 1998); *Reyes v. Walt Disney World Co.*, 176 F.R.D. 654, 658 (M.D. Fla. 1998); *Boykin v. Viacom, Inc.*, No. 96 CIV. 8559 (DLC), 1997 WL 706323, at *4 (S.D.N.Y. Nov.12, 1997); *Abrams v. Kelsey-Seybold Med. Group, Inc*, 178 F.R.D. 116, 130-31 (S.D. Tex. 1997); *Appleton v. Deloitte & Touche LLP*, 168 F.R.D. 221, 231-32 (M.D. Tenn. 1996); *Lumpkin v. E.I. Du Pont de Nemours & Co.*, 161 F.R.D. 480, 482 (M.D. Ga. 1995).

> Instead, the circumstances of each proposed class representative's case will depend on how a specific manager treated that proposed class representative at his or her store. Defendant can assert specific, non-discriminatory reasons for its manager's actions. Each purported class member's claim thus will depend on an individualized factual inquiry. Under these circumstances, Plaintiffs cannot satisfy Rule 23(a)'s commonality requirement.

*Rhodes v. Cracker Barrel Old Country Store, Inc.*, 213 F.R.D. 616, 676 (N.D. Ga. 2003). *See also Bradford v. Sears, Roebuck and Co.*, 673 F.2d 792, 795-96 (5th Cir. 1982) (commonality not shown where personnel administration differed from facility to facility; personnel decisions were made by the different staffs who supervised the different facilities); *Abrams*, 178 F.R.D. at 129 (citations omitted) ("A class may not be based on discrimination occurring in different departments, involving different decision makers"); *Swanson v. Perry*, No. 4:01-CV-0258-A, 2002 U.S. Dist. LEXIS 3346, at *6-10 (N.D. Tex.), *aff'd* 69 Fed. Appx. 658 (5th Cir. 2003) (finding no commonality or typicality in disparate treatment case where prospective class members performed different jobs, were employed by different organizations, worked in different states, and were supervised by different individuals (or were supervisors themselves)).

17.  The adequacy requirement of Rule 23(a) "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Products*, 521 U.S. at 625. There are a host of conflicts between Webb and Sanders on one hand, and the putative class on the other.

18.  Neither Webb nor Sanders is an adequate representative because each voluntarily resigned from Barnes Distribution. *See, e.g., Bradley v. Southern Pacific Co.*, 51 F.R.D. 14, 15 (S.D. Tex. 1970) (fact that plaintiff was no longer employed by defendant cast "serious doubt" on whether he

Findings of Fact and Conclusions of Law: Class Certification   16

was proper party who would fairly and adequately protect class interests), *aff'd*, 486 F.2d 516 (5th Cir. 1973).

19. Furthermore, the potential conflicts are particularly acute in this case, where plaintiffs have disavowed any interest in pursuing compensatory and punitive damages on behalf of the purported class. This leaves plaintiffs only with injunctive relief as a potential class remedy. As former employees, however, plaintiffs cannot benefit from any injunctive relief and therefore have no incentive to adequately represent the interests of absent class members. Indeed, Webb demonstrates that she has no interest in returning to Barnes Distribution by virtue of a non-compete agreement she executed with her current employer. (12/02/03 Tr. p. 63). Webb and Sanders, therefore, will not serve as adequate representatives for the proposed class.

20. Webb and Sanders are also not adequate because their interests conflict with members of the class they seek to represent. This class necessarily would include females in grade levels 14 and below, whom Webb reviewed and for whom Webb performed salary planning. As to those potential class members for whom she performed salary planning, Webb herself may be the very instrument of alleged sex discrimination: "Supervisory employees are often inappropriate representatives of nonsupervisory employees because the structure of the workplace tends to cultivate distinctly different interests between the two groups." *Wagner v. Taylor*, 836 F.2d 578, 595 (D.C. Cir. 1987); *Wells v. Ramsay, Scarlett & Co., Inc.*, 506 F.2d 436, 437-38 (5th Cir. 1975) (supervisory personnel could not adequately represent bargaining unit members because there was no "nexus" between the two groups).

21. Plaintiffs have failed to carry their burden of proof on any of the requirements of typicality, commonality, and adequacy under Rule 23(a). Accordingly, this court will not address Plaintiff's motion for class certification as it pertains to Rule 23(b) requirements.

22. If any of the foregoing Conclusions of Law may be more properly deemed a Finding of Fact, it is hereby incorporated by reference into the Findings of Fact.

## CONCLUSION

Plaintiffs have failed to satisfy the requirements of Fed. R. Civ. P. Rule 23(a). Therefore, their motion for class certification is **DENIED WITH PREJUDICE**.

ENTERED: July __6__, 2004.

*/s/ Jerry Buchmeyer*
JERRY BUCHMEYER
SENIOR U.S. DISTRICT JUDGE
NORTHERN DISTRICT OF TEXAS

Findings of Fact and Conclusions of Law: Class Certification   17