## INTRODUCTION

Of all the women allegedly denied GM or AGM promotions at Costco since 2001, just three have sued. Their claims should be tried individually because they cannot show any nationwide practice with an adverse impact on women. Here are the basic facts:

1.      Costco promotes from within its GMs and AGMs. (A rare exception is Plaintiff Ellis, who induced Costco to hire her as an AGM by misrepresenting her background.)

2.      Since Costco launched its major diversity initiatives in 2001, before any class period, there has been **no** significant nationwide gender disparity in promotion.

3.      To argue for a gender disparity in promotion to AGM, Plaintiffs aggregate data back to 1999—three years before the diversity initiative. Moreover, even with those stale data, there is no significant disparity in GM promotions, and no such disparity in AGM promotions if one controls properly for the objective factor of prior job experience.

4.      Costco women fare as well as men with respect to pay, performance review scores, and, since 2002, the time that a Senior Staff manager takes to get promoted to AGM. Moreover, the turnover rate for women senior managers is **lower** than it is for men.

5.      Managers regionally decide whom to promote to AGM or GM. There is no significant gender disparity in **any** region during the class period. Further, within Plaintiffs' broader aggregated period, only **two** of the **eight** regions show a significant gender disparity.

6.      Plaintiffs Ellis and Horstman are former employees. Plaintiff Sasaki has been an AGM since 1996, and there is no gender disparity in promoting AGMs to GM. Each Plaintiff thus lacks standing to seek injunctive relief, and is more interested in the fund than in the impact.

Plaintiffs, therefore, cannot plausibly assert a nationwide class claim for denial of promotion to GM and AGM. Moreover, they are not entitled to seek punitive and compensatory damages through their overly ambitious certification request. The Court should deny it.

## PROCEDURAL BACKGROUND

On 10/24/02, Shirley Ellis filed a charge for denial of promotion to GM, a charge that the EEOC dismissed, for lack of merit, in May 2003. In August 2004, she sued. Three months later, she quit Costco. A first amended complaint added Plaintiff Horstman, who had quit Costco in

COSTCO'S OPPOSITION TO CLASS CERT
Case No. C04 3341 MHP

July 2004.  Her 10/4/04 charge alleges denial of promotion to AGM.  A second amended complaint added Plaintiff Sasaki, an AGM seeking promotion to GM.

In May 2005 the Court denied Costco's motion to transfer venue to Colorado or the Southern District of California.  It remains the case that no Plaintiff lives in this District.

Plaintiffs seek certification of a class of women who, since 12/28/01, have been denied promotion to GM or AGM or denied Senior Staff jobs important to AGM promotion.  No denial of Senior Staff jobs is alleged in any Plaintiff's charge or complaint.

## SUMMARY OF ARGUMENT

Plaintiffs' Motion must be denied.  First, the absence of significant gender disparity in GM or AGM promotions within the liability periods (post-12/28/01 and post-12/10/03, respectively) defeats Rule 23(a) commonality.  Plaintiffs make a superficial statistical case only by arbitrarily including pre-limitations data and excluding limitations-period data.  Their only other statistical prop—a "benchmark" of external labor markets—is so flawed that it falls of its own weight.  Also precluding commonality are Plaintiffs' unscientific, factually mistaken assertions, which fail to link Costco practices to actual gender disparities.

Further, Plaintiffs are not typical of and adequate for the class.  Promotion rates do not significantly differ by gender for managers with experience as Merchandise Manager.  Yet no Plaintiff was denied that experience, for each did not need it or already had it.  Instead, each Plaintiff has unique, weak claims, subject to special defenses not representative of the class.

Plaintiffs also face huge Rule 23(b) problems.  Their monetary claims predominate, making (b)(2) certification inappropriate, as they seek punitive **and** compensatory damages, while lacking standing for injunctive relief.  And the monetary claims are unmanageable for want of objective evidence on the issue of job interest.  The novel trial plan they propose to solve this problem offends Rule 23, Title VII, the Constitution, and the Rules Enabling Act.

## RELEVANT FACTS

### A.    Costco's History and Operational Structure

CEO Jim Sinegal and others founded Costco in 1983, with one warehouse in Seattle.  In 1993 Costco merged with San Diego-based Price Club.  As Costco has grown to more than 350

warehouses in 39 states, its operations have de-centralized into eight geographical regions,[1] with each region run by a Senior Vice President ("SVP")[2] within that region.[3]  Each region (except Texas) has multiple districts.  A district, covering 15-20 warehouses, is overseen by a Regional Operations Manager ("ROM"), who typically becomes a District Vice President ("DVP").

**B.  Costco's Strong, Inclusive Culture**

Through its Employee Agreement, Costco enunciates various policies.  Its Code of Ethics is to obey the law and take care of employees.  It forbids discrimination and makes promotions turn on skill and ability, without favoritism, with length of service controlling where skill and ability are equal.  Its Open Door policy permits employees to complain to any manager.  It promises job security to all non-probationary employees, and requires high-level management approval to dismiss employees with more than two years of service.  It provides extensive human resources training to managers, including annual courses at each warehouse, during "HR month," in which local warehouse managers provide training with curriculum and teaching tools provided by the corporate HR department.  Vadney Decl. ¶¶ 3-8; see Kadue Decl. ¶ 53, Ex. EE (EEOC position statement, attaching Costco Employee Agreement).

**C.  Women in Senior Management Throughout Costco**

Women serve on Costco's Board of Directors and Executive Committee.  Over 25 Costco VPs are women.  The highest volume operation—e-commerce online sales—is run by Executive Committee member and SVP Ginnie Roeglin.  Women constitute more than one-half of corporate merchandising managers, who purchase tens of billions of dollars of items.  In U.S. warehouse operations, female managers in recent years have included three ROMs (Shirley Murguia, Darby Greek, Julie Cruz), 68 GMs, and 189 AGMs.  Matthews Decl. ¶¶ 10-11, 13-15.

Costco operates in foreign countries.  Louise Wendling, Executive Committee member and SVP, heads Canadian operations and merchandising, overseeing 68 warehouses.  In Asia and in Mexico, where senior women managers are rare, Costco has selected 14 women as warehouse

---

[1]  Northwest, Midwest, Northeast, Southeast, Bay Area, Los Angeles, Southwest, and Texas.

[2]  Texas, with only 16 warehouses, is overseen by a Vice President.  Omoss Decl. ¶¶ 1-2.

[3]  *Cf. Dukes v. Wal-Mart*, 222 F.R.D. 137, 152 & n.17 (N.D. Cal. 2004) (citing, to support nationwide class, concentration of operations executives in defendant's headquarters).

GMs.  Matthews ¶¶ 10, 13.

### D. Costco's Retail Warehouse Business

Plaintiffs omit important details regarding Costco's business model.  Costco is a Fortune 29 company, with nearly $60 billion of annual revenue.  A single warehouse is a large, complex business.  Even its physical dimensions are immense:  140,000 to 160,000 square feet—three football fields under one roof.  An average warehouse employs 240 people, with annual sales of **$130 million** to 98,200 members.  A Costco warehouse sells not only general merchandise but groceries and various goods and services sold by numerous ancillary businesses, which often include a gasoline station, a tire shop, a food court, a deli, a bakery, and departments for meat, photo, pharmacy, optical, and hearing aids.  Nelson Decl. ¶¶ 3-5; Vachris Decl. ¶ 8.

### E. The Senior Warehouse Manager Jobs

Costco invests heavily in its human capital.  Its senior managers undergo many years of intensive training in jobs of increasing difficulty.  The GM and AGM, in particular, are high-level executives, within the very upper echelons of retail managers generally.  They are not comparable to department store managers, small retail managers, lower-level managers, first-line supervisors, or other holders of far less responsible jobs.

#### 1. The General Manager

The GM controls merchandising and operations of a $100 million-plus business.  She recruits, hires, evaluates, and promotes the 200 + employees in her warehouse, and maintains a daily $10 million inventory, including 4,000 items over a wide range of categories.  GMs earn an average salary of over $116,000 (and as much as $176,000), and 2,000 restricted stock units (RSUs), plus annual bonuses of up to $40,000.  Nelson Decl. ¶¶ 5-6.  GMs typically have more than a dozen years of prior Costco experience, much of it as an AGM and Senior Staff manager.

#### 2. The Assistant Manager

AGMs are potential GMs (though few can be selected, as Costco annually promotes only 33 GMs, from over 900 AGMs, Matthews Decl. ¶ 15).  The AGM acts in the GM's absence.  AGMs receive 350 RSUs and earn an average salary of over $73,000 (and as much as $110,000), plus annual bonuses of up to $5,000.  Nelson Decl. ¶ 5.

### 3.      The Senior Staff managers
#### a.      The four positions:  FM, AM, RM, MM

The Senior Staff has a Front End Manager ("FM"), Administration Manager ("AM"), Receiving Manager ("RM"), and Merchandise Manager ("MM").  A warehouse with three AGMs might have as few as three Senior Staff, with an AGM also acting as AM.  While Senior Staff share the same pay grade, respective duties and working conditions can vary widely. Matthews Decl. ¶¶ 16-21; see Kadue Decl. ¶¶ 3-4, 6-7 (summarizing employee declarations). **FMs** manage cashiers, membership personnel, and other front-end employees.  FMs interact often with members, supervise many employees, and usually need not work early morning hours.

**AMs** manage administrative functions such as processing payroll and human resources forms.  AM schedules do not link tightly to member or merchandising hours; AMs work fewer weekends than other Senior Staff, and typically work normal business hours.

**RMs** oversee the stocking of items that typically arrive on pallets at the receiving dock. RMs have fairly regular schedules that typically begin between 4:00 a.m. and 6:00 a.m.

**MMs** decide how to display items in the right place at the right time and in the right quantity and condition at the right price, to maximize sales.  Costco's sophisticated merchandising, which far transcends mere "stocking" (cf. Motion 7:19), sets it apart.  Costco views this activity as a critically important matter of acquired professional expertise, which cannot be learned outside the Costco system.  Consequently, Costco, operating at very small mark-ups, manages to outsell competitors (per square foot of floor space) by a factor of two or three to one.  Nelson Decl. ¶ 3; Matthews Decl. ¶ 21; Zook Dec. ¶¶ 9-11; see Kadue Decl. ¶¶ 3-4 (summarizing employee declarations).

The MM oversees "Area Merchants," i.e., the junior-level Center, Hardlines, Foods, and Non-Foods Managers.  Daily shopping spans 10:00 a.m. to 8:30 p.m. (weekdays) and 6:00 p.m. (weekends).  To make the floor "showtime ready" at 10:00 a.m., by displaying the items that have arrived overnight, merchandise managers must start work as early as 4:00 a.m., or even earlier for special events and seasonal changes.  Mulligan Decl. ¶ 30; see Kadue Decl. ¶¶ 4, 6 (summarizing employee declarations).

Experience as an MM and FM is a crucial objective criterion for promotion to AGM.[4]

#### b.    Gender distribution in the Senior Staff

GMs rotate Senior Staff members, but a rigid rotation schedule is not required.  Schutt ¶5; Cardoso Decl. ¶ 3; see Kadue Decl. ¶¶ 3, 6, 7 (summarizing employee declarations). Someone comfortable as RM, for example, can stay there for years, impeding rotation by others. Consider Horstman: an RM for three consecutive years, she resisted efforts to rotate her.  See *infra* at 12:6-10.  The gender composition of the four Senior Staff managers varies.  During 2002-2005, women were 29%-44% of FMs and AMs, while only 15%-28% of RMs and MMs. Drogin Decl., Table 2a.  Business records and sociological studies show that this uneven distribution reflects gender-differentiated preferences.  The data suggest that women at Costco, as women generally, are less interested than men in the early-morning, irregular hours associated with the MM job.  See also Kadue Decl. ¶ 6 (summarizing employee declarations).

**Business records**.  Since 10/01, Costco has posted salaried job openings, through Senior Staff.[5]  Analysis of posting records, validated for representativeness, show gender-differentiated interests for the FM, AM, RM, and MM jobs, and also in the MM-related Area Merchant jobs. Saad First Decl. ¶¶ 63-77; Saad Second Decl. ¶¶ 55-77.  Thus, while women are 29%-37% of available FM and AM aspirants, they are only 20%-26% of RM and MM aspirants.  Saad First Decl. ¶ 65, Ex. 20.  Similarly, they are only 17-23% of those aspiring to Area Merchant jobs, which have working conditions and early-morning schedules resembling those of the MM.  Saad First Decl. ¶ 66, Ex. 21.

**Census and other data**.  Consistent with what happens at Costco, women generally

---

[4]  Plaintiffs claim that MM experience is not "require[d]" (Motion 10:25), but realistically it is: MM and FM experience are expected of any AGM aspirant. Zook Dep. 110:3-19, Ex. I.  The statistics confirm this.  Saad Second Decl. ¶ 35.  Drs. Reskin and Drogin acknowledge as much. Reskin Decl. ¶ 71 at 35:10, 12 ("merchandise management" is "key port-of-entry job into warehouse management"); Drogin Dep. 82, Ex. X.  Exhibits indicated by letter are attached to the Kadue Declaration.

[5]  Plaintiffs claim that posting records exist for "only 10% of all Senior Staff promotions **since 1999**," Motion 7:27 n.6, but Costco did not initiate posting for those jobs until **late 2001.** Plaintiffs also claim, citing testimony of Patricia Glenn, that Staff Manager positions are not always posted, Motion 7:27-28 n.6, but she admittedly was mistaken and finally agreed that Staff Manager positions in her warehouse were, in fact, posted. Glenn Dep. 127-28, Ex. AA.

1   work fewer early-morning shifts (such as those worked by MMs and Area Merchants).

2   Stockdale First Decl. at 27-33; Stockdale Second Decl.at 18-24, Tables 1-3; Mulligan Decl. ¶¶

3   63-68, 71.  This sociological fact, sometimes confused with a "stereotype" (*compare* Motion

4   12:19-13:13 *with* Stockdale Decl. at 12:4-13:10), applies at Costco just as it applies in America

5   generally.  Mulligan ¶¶ 63-68.  Dr. Peggy Stockdale reports that because merchandise manager

6   jobs have "attributes … shown in the literature to be affected by gender role ideology, especially

7   with regard to non-work and family responsibilities, *gender differences in preferences for these*

8   *positions are likely to exist*."  Stockdale First Decl. at 35:12-15.[6]  Plaintiffs' expert Dr. Reskin,

9   while noting changing "sex-type preferences among much younger people," concedes that

10  gender disparities in Costco jobs are not "entirely a product of … Costco's practices."  Reskin

11  Dep. 238-39, Ex. Y.  Thus, she and Dr. Stockdale differ only as to the degree that women's

12  preferences determine the uneven gender distribution.[7]

13          F.      **Costco's Human Resources Practices**
                    1.      **Promotion Statistics**

14          The proposed class period (post-12/28/01) follows the onset of Costco diversity

15  initiatives.  Within that period, there has been no significant gender disparity in promotions to

16  AGM, evident by a maximum Z-score of -1.73, even if one ignores MM experience.  Saad

17  Second Decl. ¶¶ 6, 45.[8]  Dr. Drogin chose not to report the results of any significance tests for

18  promotion data within the liability period alone, so Dr. Saad's results stand unrebutted.

19          Further, even if one confines Drogin data to the class period, as Dr. Saad has (Saad

20

21  ─────────────────────

22  [6] (Emphasis added.)  As to the MM job itself, Dr. Stockdale opines:  "Abundant, current research confirms that managerial and professional women continue to have different job
23  attribute preferences from their male counterparts on various dimensions that may affect their desire for jobs like [MM] that require difficult working hours and potential relocations" and that
24  "family structure variables affect some but not all of these preferences for women more than men."  Stockdale Second Decl. at  22:22-26.

25  [7] Dr. Reskin also would **not** conclude that "child-rearing responsibilities" "traditionally assigned to women have completely disappeared," Reskin Dep. 167, Ex.Y, and does "not discount[ ] the
    fact that [gender-based] preference may play a role" (*id.* 238).

26  [8] Dr. Saad obtains a Z-score = -1.73 using Dr. Drogin's model without his so-called "regional
27  controls."  Saad Second Decl., Ex. R32.  Alternatively, using Dr. Drogin's model with "regional controls" for the same period, the Z-score = -1.60.  *Id.*, Ex. R1.  Either way, there is clearly no
28  statistically significant disparity.

Second Decl., Ex. R39), the data would still fail to exclude employees on leave of absence, who thus were unavailable for promotion. *Even without considering leaves*, Dr. Saad shows that the Drogin model would yield a cumulative Z-score for the liability period of only -2.20, less than the test for significance used by this Court.[9] Indeed, viewed on an annual basis, there would be no significant disparity in AGM promotions in either 2002 or 2004, and only a -2.01 Z-score in 2003.[10]

## 2. Diversity Initiatives

Since 1999, Jim Sinegal has helped lead the Seattle chapter of the BOLD Initiative (Business Opportunities for Leadership Diversity), a national organization whose goal is to help corporate America diversify its leadership to gain competitive advantage by encouraging best practices to foster opportunities for women and people of color. In 2000-2001, Costco convened employee groups in Issaquah to discuss how to improve diversity. There was no survey taken; rather, certain employees speculated about opportunities and suggested corporate changes; there was never a formal corporate finding. As a result, within the corporate office, experiments began, including a mentoring program.

Personnel practices changed fundamentally in 2001 with what now is called "Rothman Workplan," which grew out of the BOLD process. Omoss Decl. ¶¶ 16-19; Matthews Decl. ¶¶ 6-9. Costco began formal diversity initiatives and encouraged more formal succession planning by asking regional executives to prepare promotable lists. The diversity initiatives[11] also included:

- Posting warehouse management job vacancies through the Senior Staff level.
- Annual two-way employee performance reviews, listing goals and requiring structured Career Development dialogues between manager and subordinate.

---

[9] *Stender v. Lucky Stores*, 803 F. Supp. 259, 323, 333 (N.D. Cal. 1992) (Patel, J.) (determining that Dr. Drogin's Z-score of -2.58 did not reflect statistically significant disparity in promotions. "Dr. Drogin did not find statistically significant disparities for the liability period in promotions of women to Third Person (Z-value of -2.58), Assistant Store Manager or Store Manager.").

[10] Moreover, these scores lack practical significance for, as Dr. Drogin admits (Drogin Dep. 104-112, Ex. X), these scores are highly sensitive to slight change: if just two male promotions resulted from non-discriminatory reasons, the cumulative Z-score of -2.20 would fall below -1.96, and if only one male promotion resulted from non-discriminatory reasons in 2003, the Z-score for this year, viewed separately, would fall below -1.96. Saad Second Decl. ¶ 7, Exs. R39-R41.

[11] Schutt ¶ 3; Matthews Decl. ¶¶ 6-9; Omoss Decl. ¶¶ 16-19.

- Review of manager-evaluatees for their steps to "promote a more diverse organization."
- Explicit adoption of "diversity" as a corporate goal.
- Adoption of numerical diversity promotion goals for senior-level operations executives.

During 2001-2002, Costco publicized its diversity objectives in employee publications and by postings on warehouse bulletin boards. Treating 1999-2001 data on the same continuum as post-2001 data ignores the impact of Costco's diversity initiative.

### 3.   Time-in-Grade Statistics

Plaintiffs claim that women usually take longer than men to reach AGM (Motion 19:1-11), but do not assert a statistically significant difference.[12] Moreover, any such figure is of dubious value as it ignores the reality that women, on average, take more and longer leaves of absence, reflecting the gender-differentiated lifestyle choices that delay promotional progress. Saad Decl. ¶¶ 78-85 ("Leaves of Absence"). A less misleading figure would be the time a Senior Staff member takes to reach AGM. By that figure, there is **no** significant gender disparity. Saad First Decl. ¶¶ 56-59, Ex. 18. Plaintiffs claim such a disparity only by arbitrarily ignoring seven months of data (1/1/04 to 7/31/04).[13] Drogin Decl. ¶ 22:15-18; Saad Second Decl. ¶ 44.

### G.   Costco's Regional Promotional Systems

Plaintiffs claim that Costco lacks "written promotion criteria" or "any system for identifying and evaluating candidates for promotion to AGM and GM," and that ROMs and SVPs purport to "fully assess the skills and preferences of the dozens or hundreds of candidates within their regions in the course of monthly or quarterly warehouse visits." Motion 12:6-7, 9-11. This is gross nonsense. Costco's different regions use well-developed systems to evaluate promotional candidates through written criteria on the basis of information supplied through

---

[12]  Plaintiffs cite Patricia Glenn's testimony for this claim (Motion 19:4-6). But while she did assert that four male colleagues spent less time as Senior Staff to reach AGM than she did, she admittedly was uncertain how long each spent in various jobs, she did not know how their performance was evaluated, and knew that two of them had 17-18 years of Costco experience. She also admits ignorance as to how much time the male Senior Staff managers had spent in those positions before promotion to AGM. Glenn Dep. 56:14-67:4, Ex. AA.

[13]  Dr. Drogin does not dispute Dr. Saad's finding of no statistical significance in the time taken to reach AGM within the liability period (Drogin Dep. 16, Ex. X), but purports to show a significant disparity here by arbitrarily excluding data from 1/1/04 through 7/31/04, which is unquestionably relevant data preceding this lawsuit. He admits his reason for doing so is that excluding all the data shows "the stronger pattern." *Id.* at 120.

COSTCO'S OPPOSITION TO CLASS CERT
Case No. C04 3341 MHP

various sources, over many years. Landy First Decl. at 69-73, 75-83. Promotions are **not** made by ROMs or SVPs solely or even primarily on the basis of infrequent walks. See Kadue Decl. ¶¶ 5, 7 (summarizing employee declarations).

### 1. Promotion From Within

Plaintiffs do not challenge Costco's practice of promoting GMs and AGMs from within.

### 2. Objective Promotion Criteria

Costco expects AGM aspirants to have substantial FM and MM experience, as well as other objectively determined factors such as job performance and relocation flexibility. Zook Decl. ¶¶ 13-21; Portera Decl. ¶¶ 5-8; Schutt Decl. ¶¶ 9, 11; Hoover ¶¶ 3-14; Gaherty ¶¶ 5-7; Omoss Decl. ¶¶ 4-12; Vachris ¶¶ 5-7, 9; Cardoso ¶¶ 4-6, 10; see Kadue Decl. ¶ 7 (summarizing employee declarations).

Controlling for FM and MM experience, there is no cumulative gender disparity in promotion to AGM. Saad First Decl. ¶¶ 3, 47-49, Exs. 7, 8. In many Costco regions the ROMs use promotable profiles that describe criteria closely tracking the same written criteria used to evaluate employees in annual written performance reviews. See Landy First Decl. at 69-73, 75-83; Kadue Decl. ¶¶ 4-5 (summarizing employee declarations).

### 3. Team-Based Decisionmaking

No single manager makes anyone an AGM or GM. An AGM promotion, for example, involves several mutually accountable decisionmakers. The primary decisionmaker is the GM, using input from her AGMs and consulting with her ROM and SVP. Zook Decl. ¶¶ 7, 15, 19(a). Regional differences exist with respect to the promotion process.[14]   Other regional managers (e.g., a regional deli manager) may also be involved if they know the candidate well. The decisionmakers share a stake in selecting the best candidate, because each is judged on the operational results that the GMs and AGMs generate. Schutt ¶ 10; Booth Decl. ¶ 7; Landy First Decl. at 90.

### 4. Formal Succession Planning

---

[14] *See generally* Portera Decl. ¶3; *see, e.g.*, Webb Decl. ¶ 6(a), (c) (ROM as primary decisionmaker on AGM promotions), 6(c) (de-emphasis on annual written reviews), 6(d) (using mental, not written, talent pool).

Another aspect of Costco's promotional systems, subject to regional variations, is the use of written promotable lists and ratings for candidates for GM and AGM (as well as other management positions).  Omoss Decl. ¶¶ 14-15 (talent pools); Cardoso Decl. ¶¶ 16-17; Hoover Decl. ¶ 11; Omoss Decl. ¶¶ 5(e), 7(d); Schutt Decl. ¶ 8.

### 5.     Abundant Individuating Information

The managers evaluating GM and AGM candidates do so on the basis of regular, often daily interactions, spanning several years.  See Kadue Decl. ¶¶ 5, 7 (summarizing employee declarations).  Costco exemplifies "management by walking around":  GMs and AGMs walk their warehouses *daily*.  See Kadue Decl. ¶¶ 4-5 (summarizing employee declarations).  They acquire vast evaluative data, which they formally memorialize no less often than once a year in written performance reviews.  First Landy Decl. at 84-89, Table 13; Second Landy Decl. at 13-15.

### 6.     Employee Awareness of Promotion Process

Costco employees (with no material exception) know what it takes to be promoted to AGM.  Cardoso ¶ 12-15; Gaherty Decl. ¶ 3; Schutt Decl. ¶ 4; see Kadue Decl. ¶¶ 3-4, 7 (summarizing employee declarations).  Warehouse employees receive detailed information on that subject from various sources, including the Costco Employment Agreement, the Rothman Workplan, the *Costco Today* employee orientation issue, and monthly promotional announcements that outline the background of Costco employees being promoted to senior management positions.  Vadney Decl. ¶¶ 5-8 & Kadue Decl., Exs. J, K.[15]

### H.     The Plaintiffs:  Three Atypical Employees With Unique Stories
#### 1.     Leah Horstman, Former Senior Staff Manager

Horstman swears she would take an AGM job anywhere (Horstman Decl. ¶¶ 17, 26 & Ex. 7, her EEOC charge), yet contradicts herself in performance reviews, divorce proceedings,

---

[15] Ironically, Plaintiffs' declarant Elaina Wales is a Costco success story, becoming AGM within six years of joining Costco after repeated rotations and promotions.  She knows of no woman who has suffered discrimination and supports this suit because, to her, greater bureaucratic structure would benefit *everyone*, men and women alike.  Wales Dep. 242:22-243:20; 250:9-22, Ex. DD.

and her deposition.[16]  The fact is that she received virtually every job she desired.  Hired in 1987, she  advanced through many jobs until, in 1996, she was promoted to AM, her first Senior Staff manager job.  Within two years she rotated to MM and then to RM.  In September 1998, she transferred to a higher-volume warehouse as MM.  Three years later, in September 2001, she rotated back into RM.  Horstman Decl. ¶¶ 5, 8, 10, 15, 16, 17, 19, 25.

A few months later, she rejected a rotation to MM; then rejected a rotation to FM, the Senior Staff role she had yet to fill (hours and childcare responsibilities made FM unacceptable). In September 2002, to help her stay an RM, Dennis Zook, a senior Costco executive, transferred her to an RM job at the La Mesa warehouse, where she remained throughout her employment. *Id.* ¶¶ 27-29.

In 2004, Horstman, an equestrian enthusiast, landed a horse industry job that pays as much as she made at Costco.  Horstman Dep. 84:9-85:19, 87:7-14, 89:1-3, Ex. T.

### a.    Promotion Delayed For Personal  Reasons

In performance reviews, Horstman thanks Costco for the chances it gave her; she admits that, until recently, she got every promotion she wanted (*id.* 360:23-361:7).  Indeed, her last three annual reviews admit that her family priorities trump her career ambitions:

- **2002 review:**  "Short term I would like to balance my family and career until … I am available to pursue my long term goal of [AGM/GM]." *Id.,* Ex. T-2021.[17]
- **2003 review:**  "My short term goals are to remain in departments that allow me to balance both work and the raising of my two daughters for the next 4-5 years.  After that, I would like to continue growing in the Company." *Id.* 294:2-13; Ex. T-2022.
- **2004 review:**  "My short term goals are to remain in departments that allow me to balance both work and the raising of my two daughters for the next 3 years.  After that, I would like to continue growing in the Company." *Id.* 299:6-19; 300:19-301:8; Ex. T-2023.

Even after quitting and suing Costco, Horstman confirmed that personal priorities trumped career ambitions:  "Costco was trying to move me into the job of Front End Manager for a period of almost a year.  … I could not work in that job, as it required working nights (1

---

[16]  Plaintiffs cite Horstman to argue that women, to be promoted, must "in the good graces of Costco's all-male decision-makers," which make the women "uniquely vulnerable to sexual harassment" (Motion 22:8-12).  The truth is that Horstman's DVP, until 2000, was a woman, Shirley Murguia. Vachris Decl. ¶ 1.  Further, Horstman was in the good graces of EVP Dennis Zook and exploited that fact to avoid rotation and get choice transfers.

[17]  "Ex. T-2021" is Exhibit 2021 of the Horstman Dep., Ex. T to the Kadue Declaration..

pm–11 pm).  After 23 years with this company, I left because there is no way that I could raise my children while working those types of hours." See RJN re Horstman divorce records.

### b.    Horstman Legally Could Not Move

A 1998 divorce document expressly forbids Horstman to remove her children from San Diego County without a court order or her ex-husband's written consent.  A post-marital agreement includes Horstman's pledge to "find a home within 15 miles of the area of Crest" (the residence of the ex-husband).  RJN, Marjorie Ospeck April 6, 1999 Report.  Thus, a declared interest in Texas notwithstanding (see Horstman Decl. ¶ 26), custodial arrangements kept her in Southern California.  Horstman Dep. 308:7-308:11, Ex. T.

### c.    Horstman Now Claims Sexual Harassment

Horstman claims that once in 2003 her GM—in an unlocked office that he shared with others—encircled her neck while kissing her on the mouth, unzipping his pants, and pushing down her head.  Horstman Dep. 130:2-11; 96:16-130:14, Ex. T.; Horstman Decl. ¶¶ 36-37.[18] There is no similar classwide allegation.

### 2.    Shirley Ellis, Former AGM

Ellis differs markedly from the typical GM candidate in that she did not rise through the ranks; rather, she joined Costco, in July 1998, as a lateral hire in the rapidly expanding Midwest Region (Ellis Decl. ¶¶ 2, 4).  Lacking the experience of her AGM counterparts, who had years of Costco experience in jobs of progressively more responsibility, Ellis developed slowly.  Her 1999 review by GM Wendy Davis notes that Ellis needed "more of an operational focus, learning the intricacies of Costco, why we do things the way we do, and how to achieve consistent results within that framework."  Ellis Decl. ¶ 12, Ex. 1 at 3.  Some employee declarants believe Ellis never excelled as a manager.  E.g., Padgett Decl. ¶ 27 (Ellis not performing to standard of AGM); Hurbace Decl. ¶¶ 41-42 (Ellis lacked professional focus); Vachris Decl. ¶¶ 12-23, 28 (reporting numerous incidents of Ellis misbehavior).

In August 2000, Ellis retarded her promotional prospects when, to tend her ailing mother,

---

[18]  She did not allege this incident while employed, even though her earlier report against another alleged offender had led to his removal from the workplace (Horstman Dep. 100:14-101:23).

1   she transferred to the static Denver market. Ellis's abrasive style[19] then resurfaced in March

2   2004, when many employees complained about her brusque, demoralizing manner. Costco gave

3   Ellis a written warning, transferred her to another warehouse, required sensitivity training, and

4   deemed her not promotable until she rehabilitated herself.[20] She quit shortly thereafter. Her

5   male GM was demoted and transferred to another warehouse, for allowing Ellis to misbehave on

6   his watch. Vachris Decl. ¶¶ 18-19.

7          Ellis further claims that Costco's failure to promote her quickly breached a pre-hire

8   promise made by SVP John Gaherty. She claims, still further, that the March 2004 discipline

9   was retaliation for her 2002 EEOC charge. She also presents serious credibility issues in that she

10  misrepresented her credentials to SVP Gaherty, failing to tell him she had been removed from

11  her Sam's Club warehouse manager position with no option to return. Ellis Dep. 205:21-206:11,

12  208:6-209:22. Had Gaherty known the truth, he would not have hired her; and had he discovered

13  the truth while she was working for him, he would have fired her. Gaherty Decl. ¶ 8.

### 3.   Elaine Sasaki, Current AGM

15         After joining Costco in 1985 as a cashier, Sasaki progressed though several jobs before

16  being promoted in 1990 to the Senior Staff, as an FM in Clovis, California. In 1996, after

17  serving a year as Bay Area Regional Admin Assistant, she became an AGM in Chico. In 2000

18  she transferred back to Clovis, and then to Fresno, as an AGM. From March 2001 to June 2002

19  she was an AGM in Willowbrook, Texas, before she transferred back to California, where she

20  has worked ever since as an AGM in Visalia. Sasaki Decl. ¶¶ 2, 14, 16, 21, 23, 24-26.

### a.   Sasaki Has Not Yet Excelled As A GM Candidate

22         Sasaki was never rated high on a GM promotable list (see Booth Decl. ¶ 5, Vadney ¶ 11),

23  though back in 2000 she appeared on a list for the Midwest Region as someone with

24  management potential. Her annual reviews indicate numerous relevant weaknesses. Her 2003

25  review (Ex. U-1041) notes she failed to ensure her warehouse is "showtime-ready," lacked a

26  ---
[19]  The 1999 review cites Ellis's lack of "finesse" when coaching employees of average or below
27  average performance. She was instructed to establish "an approachable style, with an awareness
    of potential frustration." Ellis Decl., Ex. 1, at 2.

28  [20]  Ellis Decl. ¶¶ 19-20.

1    sense of urgency at work, and was unable to meet deadlines.  Her self-evaluation agrees that she

2    did not meet expectations  (*id.*).  Her 2004 review (Ex. U-1042) reflects her needs to ensure that

3    the warehouse is "showtime ready," demand better performance from underperformers, display a

4    sense of urgency on the job, meet deadlines, demonstrate follow-through, set achievable goals,

5    and provide timely feedback to employees.  Sasaki concedes she needed improvement in nearly

6    all of these areas.   Sasaki Dep. 56:10-18, 81:6-15, Ex. U; Ex. U-1042, 2004 review.  In August

7    2005, Sasaki's DVP, John Booth, wrote her a letter (Booth Decl. ¶ 6, Ex. U-1045), stating that

8    she needed to improve in these areas to ready herself for GM..

9         There is no gender disparity in promotions to GM in Sasaki's region, the Bay Area.

10   Indeed, when an SVP once allegedly told her a GM promotion was between her and another

11   AGM, the other AGM was a woman, Melissa McCurdy.  Sasaki Dep. 89:19-90:15, Ex. U.

12                    **b.    Sasaki's Unique Personal Claim**

13        Sasaki thinks her SVP has blocked her promotional path, for personal reasons (Sasaki

14   Decl. ¶¶ 30-33; Vadney Decl. ¶¶ 10-11).  She claims he made advances to her during a

15   managers' van tour in 2002, which culminated in his entering a hotel elevator with her.  She

16   exited the elevator on her floor feeling, somehow, that she "had doomed [her] chances at

17   promotion."  *Id.* ¶¶ 30-31; Sasaki Dep. 169-73, 180:13-182:5, 184:11-16, Ex. U.

18                              **ARGUMENT**

     **I.    "RIGOROUS ANALYSIS" IS REQUIRED**

19        Courts apply Rule 23 with "rigorous analysis" to Title VII class actions;[21] "actual, not

20   presumed, conformance with Rule 23(a) [is] … indispensable."[22]  As class determination

21   "generally involves considerations that are 'enmeshed in the factual and legal issues comprising

22   the plaintiff's cause of action,'"[23] it is appropriate to "consider the merits of the case to the

23   degree necessary to determine whether the requirements of Rule 23 will be satisfied."[24]  Courts

24   ――――――――――――――――――――――――――――――

25   [21]  *General Tel. Co. v. Falcon*, 457 U.S. 147, 161 (1982).

     [22]  *Id.* at 160-61.

26   [23]  *Coopers & Lybrand v. Livestay*, 437 U.S. 463, 469 (1978).

27   [24]  *Heffner v. Blue Cross*, 443 F.3d 1330, 1337 (11th Cir. 2006).  *See also Bowe v. PlyMedica Corp.*, 432 F.3d 1, 5-6 (1st Cir. 2005) (courts should  "make whatever legal and factual inquiries

28   necessary to an informed determination of the certification issues"); *Blades v. Monsanto Co.*, 400

                                        COSTCO'S OPPOSITION TO CLASS CERT
                                        Case No. C04 3341 MHP

1    thus "take a "close look" at the record to make Rule 23 "findings,"[25] "even if they overlap with

2    issues on the merits."[26]

3        Costco moves to strike Plaintiffs' expert declarations, which teem with lay assertions and

4    unscientific manipulation of data. A rigorous, not superficial, evaluation of these flawed

5    opinions is required, lest a class action proceed on the basis of nothing more than mere assertion,

6    conjecture, and junk science.

7    **II.    ONLY LIABILITY-PERIOD DATA SHOULD COUNT**

8        Plaintiffs expand their analysis beyond the liability periods for GM (post-12/28/01) and

9    AGM (post-11/03), in two ways. First, they use data from 1999-2001, although even those stale

10   data do not show gender disparity in GM promotions. Second, to attack Costco's gender-neutral

11   GM promotion rate, Plaintiffs argue that the AGM feeder pool has been artificially depressed by

12   historical discrimination, thereby justifying them to propose what the AGM feeder pool

13   hypothetically should be, absent the posited discrimination. Neither of Plaintiffs' proposed

14   expansions is appropriate here.

15       **A.    Pre-Limitations Statistics Have Limited Relevance**

16       In *Amtrak v. Morgan*,[27] the Supreme Court held that Title VII plaintiffs cannot recover

17   for discrete acts of discrimination that occurred before the liability period, even if they allege a

18   "continuing violation."[28] Among the discrete acts that *Morgan* covers are failures to promote.[29]

19   F.3d 562, 566-67 (8th Cir. 2005) ("limited preliminary inquiry" needed to see if "common
     evidence…could make out a prima facie case for the class"); *Szabo v. Bridgeport Machines,* 249
20   F.3d 672, 675-76 (7th Cir. 2001) (rejecting Rule 12(b) standard in Rule 23 proceeding; "judge
     should make whatever factual and legal inquiries are necessary under Rule 23," even if "a
21   preliminary inquiry into the merits"); *Hanon v. Dataproducts*, 976 F.2d 497, 509 (9th Cir. 1992)
     (courts "consider evidence which goes to the requirements of Rule 23 even though the evidence
22   may also relate to the underlying merits").

23   [25] *Gariety v. Grant Thornton,* 368 F.3d 356, 365 (4th Cir. 2004) (quoting *Amchem Prods. v.
     Windsor*, 521 U.S. 591, 615 (1997)).

24   [26] *Id.* at 366.

     [27] 536 U.S. 101, 115 (2002).
25
     [28] *Id.* at 113. *See Hildebrandt v. Department of Nat'l Resources*, 347 F.3d 1014, 1027 (7th Cir.
26   2003) (*Morgan* bars use of "continuing violation doctrine to incorporate untimely claims for
     discrete discriminatory actions even though they may be related to a timely claim"); *Elmenayer
27   v. ABF Freight Sys.*, 318 F.3d 130, 135 (2d Cir. 2003) ("continued effect [of pre-limitations
     conduct] is similar to that continued effect of being denied a promotion or denied a transfer,
28   denials that *Morgan* offered as examples of a discrete act").

COSTCO'S OPPOSITION TO CLASS CERT
Case No. C04 3341 MHP

1   There is no exception for adverse impact claims,[30] and *Morgan* has also been held to cover

2   pattern or practice claims.[31]

3          Appropriate statistics are confined to the relevant period.[32]  While pre-limitations acts can

4   be "background evidence" for a timely claim, they cannot themselves support liability.[33]  "A

5   discriminatory act which is not made the basis for a timely charge is the legal equivalent of a

6   discriminatory act which occurred before the statute was passed."[34]  Plaintiffs therefore cannot

7   use pre-limitations statistics even as "background information."[35]

8          The *Paige* decision[36] does not justify Plaintiffs' use of stale data.  Dictum in *Paige*, re-

9   issued 38 days after *Morgan* but failing to note *Morgan*, endorses use of pre-liability period data

---

[29]   536 U.S. at 114 ("failure to promote" is discrete act).

[30]   *Morgan*'s only reservation is as to "pattern or practice" claims.  *Id.* at 115 n.9.

[31]   *E.g.*, *Beck v. Boeing*, 2004 U.S. Dist. LEXIS 27622, at *23-24 (W.D. Wash. April 9, 2004); (*Morgan* covers pattern or practice claim; pre-limitations acts are only background evidence).

[32]   *Morgan v. UPS*, 380 F.3d 459, 470 (8th Cir. 2003) (rejecting use of stale statistics because no disparity existed during class period); *Smith v. Western Elec. Co.*, 770 F.2d 520, 528 n.8 (5th Cir. 1985) (affirming rejection of statistics "outside the liability period"); *Ste. Marie v. Eastern R.R. Ass'n*, 650 F.2d 395, 401-02 (2d Cir. 1981) (reversing district court's reliance on statistical analysis in class action that reflected significant gender disparities preceding liability period; "since [then] significant progress has been made in eradicating discrimination"); *Patterson v. American Tobacco Co.*, 34 F.2d 744, 752 (4th Cir. 1980) (rejecting pre-Title VII data, "including statistical data," as "irrelevant to prima facie case"); *Jones v. GPU*, 234 F.R.D. 82 (E.D. Pa. 2005) (denying class certification given absence of statistics regarding promotions during "relevant time period"); *Moore v. Boeing*, No. 4:02CV80 CDP, 2004 U.S. Dist. LEXIS 5959, at *36 (E.D. Mo. Mar. 31, 2004) (rejecting reliance on data from "periods outside the limitations period," which "aggregates data inappropriately"); *Carpenter v. Boeing*, No. 02-1019-WEB, 2004 U.S. Dist. LEXIS 24296, at *20 n.5 (D. Kan. Feb. 24, 2004) (decertifying class) (large pre-liability impacts "do not transform the data from within the limitation period into evidence of commonality and typicality"), *aff'd*, 456 F.3d (10th Cir. 2006).

[33]   *Morgan,* 536 U.S. at 113.

[34]   *United Airlines v. Evans*, 431 U.S. 553, 558 (1977); *see also Lyons v. England*, 307 F.3d 1092, 1109-10 (9th Cir. 2002) (interpreting *Evans* as excluding time-barred evidence from bolstering later acts unless later acts are "independently discriminatory and charges addressing those acts are themselves timely filed").

[35]   *See Lamumba Corp. v. City of Oakland*, 2006 U.S. Dist. LEXIS 40522, at *22 (N.D. Cal. Jun. 30, 2006) (Patel, J.) (applying *Morgan* to reject continuing violation theory for race discrimination claim; untimely conduct could not provide even "background information," because plaintiffs failed to cite acts during limitations period); *Berg v. California Horse Racing Bd.*, 419 F. Supp. 2d 1219, 1227 (E.D. Cal. 2006) (reliance on pre-limitations events improper if no discrimination shown during limitations period).

[36]   *Paige v. State of California*, 291 F.3d 1141 (9th Cir. 2002).

COSTCO'S OPPOSITION TO CLASS CERT
Case No. C04 3341 MHP

- 17 -

1    "*if promotional practices remain similar over a long period of time*, as they have in this case."[37]

2    But these are not the facts here, where Costco launched major diversity initiatives in late 2001.

3    Accordingly, the pre-2002 data are inadmissible.

4        **B.**     **The "Hypothetical Feeder Pool" Theory Lacks Merit**

5            The AGM feeder pool to analyze is the actual number of incumbents, not a larger,

6    hypothetical number.  Using a hypothetical feeder pool would be wrong because there has been

7    no relevant denial of an AGM job that would affect GM promotions.  Any such denial would

8    have no observable effect for several years, because a newly promoted AGM typically needs that

9    much experience to qualify for promotion to GM.[38]  Because any actionable denial of an AGM

10    job would have occurred only after 12/6/03 (onset of AGM liability period), any hypothetical

11    effect on GM promotions would not have occurred until several years later, and, thus, as a

12    practical matter, has yet to occur.  Even with Plaintiffs' proposed class date of 12/28/01, the

13    number of arguably unlawful denials of AGM promotions is close to zero.  Accordingly, under

14    *Morgan*, the relevant number of promotion-available female AGMs must still be the ***actual***

15    numbers of female AGMs, not some inflated hypothetical number.

16        **C.**     **Prior Discrimination Did Not Taint The AGM Feeder Pool**

          The "hypothetical feeder pool" argument further fails because there is no proof of any

17    relevant discrimination.  No significant gender disparity in AGM promotions has occurred since

18    12/6/03, or even since 12/28/01 (Plaintiffs' preferred date).  In *Paige v. State of California*,[39]

19    non-white CHP officers challenged promotions under Title VII.  At issue was which feeder pool

20    to analyze.  While CHP argued for an "internal pool" of actual promotional applicants, plaintiffs

21    argued for a hypothetical pool—an external pool of similarly skilled peace officers—on the

22

23    [37]   *Id.* at 1149 (emphasis added).  The discussion of pre-limitations data was dictum in that the court reversed a partial summary judgment for plaintiffs and then addressed additional issues not

24    necessary for that result.  *Id.* at 1147-48.  Further, the *Paige* dictum cites such pre-*Morgan* authorities as *Eldredge v. Carpenters*, 833 F.2d 1334, 1339 n.7 (9th Cir. 1994), and 28 C.F.R. §

25    501.4, which justify pre-limitations data when data within the liability period is "too small to be reliable."  *Paige*, 291 F.3d at 1149.  Here, though, the ample data within the liability period

26    obviate any reliance on stale data.

27    [38]   Zook Dep. 78:5-79:8, Ex. I (corporate designee on promotion process personally opining that, depending on the person, AGM needs two to six years of experience for promotion to GM).

28    [39]   291 F.3d 1141 (9th Cir. 2002).

1   ground that discrimination in hiring had artificially reduced non-white representation in the

2   internal pool.[40]   The Ninth Circuit, reasoning that adverse impact should be measured against the

3   actual pool of eligible employees absent some special circumstance,[41] determined that an internal

4   pool of applicants was the only appropriate comparative group.[42]   Analogously here, only

5   employees eligible for promotion to GM (i.e., the actual AGMs) are the appropriate feeder

6   pool.[43]

7   **III.   PLAINTIFFS SEEK TOO BROAD A CLASS**

8   Plaintiffs seek to represent AGMs denied GM jobs  ("GM class"), Senior Staff managers

9   denied AGM jobs ("AGM class"), and employees denied MM jobs ("MM class"), since

10   12/28/01.  But Plaintiffs cannot represent (A) any MM class or (B) any AGM class as to

11   promotions before December 9, 2003 (300 days before the Horstman charge).

12   **A.   An MM Class Exceeds The Scope Of Any Charge**

13   Because "the EEOC should have the opportunity to consider and resolve a dispute before

14   it is filed in federal court,"[44] a complaint under Title VII is limited by the scope of the EEOC's

15   "*actual* investigation" and the investigation that could "*reasonably be expected* to grow out of

16   the charge of discrimination."[45]   The charges here allege denial of promotion to GM and AGM.

17   They do not, and could not, allege a denial of selection to MM, for each Plaintiff was already

18   either above the MM level or had MM experience.  Nor did Plaintiffs ever allege denial of access

19   to MM jobs in their complaint.

    **B.   The AGM Class Period Cannot Precede December 2003**

---

[40]  *Id.* at 1145. Plaintiffs did not challenge CHP's promotion-from-within practice, as they all
benefited from it.

[41]  *Id* at 1145-47.

[42]  *Id.* at 1147.

[43]  *See also Morgan v. UPS,* 380 F.3d 459, 469-70 (8th Cir. 2004) (faulting plaintiffs' statistician
for excluding past pay in regression analysis on the ground that past pay reflected earlier race
discrimination: "[p]ast pay can only be omitted if it is somehow linked to race. … [Plaintiffs]
have no evidence, statistical or otherwise, that past pay disparities were racially discriminatory.
This sort of bootstrapping cannot create an inference of discrimination.").

[44]  *Rodgers v. Henderson*, Case No. C 99-3012, 2000 U.S. Dist. LEXIS 3162, at *6-7 (N.D. Cal.
March 10, 2000) (Illston, J.) (dismissing ADA complaint).

[45]  *EEOC v. Farmer Bros Co.*, 31 F.3d 891, 899 (9th Cir. 1994) (quoting *Sosa v. Hiraoka*, 920
F.2d 1451, 1456 (9th Cir. 1990).

1   While EEOC charges are construed "liberally,"[46] investigation of the Ellis fact-specific

2   charge of a promise to give her a "quick promotion" to GM would not reasonably extend to class

3   allegations regarding promotions to AGM, for Ellis *already* was an AGM.  Because Ellis

4   logically could not allege denial of an AGM job, the EEOC could not reasonably have been

5   expected to investigate that subject.  Confirming this point, the actual EEOC  investigation did

6   not reach nationwide AGM promotions, as Plaintiffs do now through the later-filed Horstman

7   charge; rather, the EEOC looked only at **GM** promotions, in **California,** before dismissing the

8   charge for lack of merit (Kadue Decl. ¶¶ 53-55 & Exs. EE-GG; Ellis Decl. ¶, Ex. 5).[47]  Nor did

9   Ellis somehow cover AGM aspirants by mentioning women "similarly situated."  Those women

10  would be other **AGM**s, seeking **GM** jobs, not Senior Staff managers seeking AGM jobs.  The

11  first Plaintiff to raise that issue was Horstman, whose 10/4/04 charge triggered a Title VII

12  liability period beginning 12/6/03, not 12/28/01.

13      In an analogous case, *EEOC v. Jillians*,[48] the court dismissed a nationwide pattern or

14  practice suit for exceeding the scope of a charge that alleged gender discrimination at a single

15  facility, where the EEOC investigation focused.  In that context, "similarly situated" in an EEOC

16  document was read to apply to individuals at that facility,[49] just as "similarly situated" here

17  should cover only AGMs who sought promotion to GM.

## IV.   PLAINTIFFS' EXPERTS FAIL TO SHOW COMMONALITY

### A.   Plaintiffs Ignore Job Experience And Relevant Times

19      Dr. Drogin purports to find significant gender-related disparities in (i) promotion to AGM

20  and (ii) the time Senior Staff managers take to reach AGM, but only by gerrymandering the time

---

[46] *Sosa*, 920 F.2d at 1456.

[47] *See, e.g., Devereaux v. East Bay Conservation Corp.*, Case No. C 97-3065, 1998 U.S. Dist. LEXIS 20435, at *7-8 (N.D. Cal. Dec. 29, 1998) (Illston, J.) (plaintiff precluded from suing for race and sex discrimination when charge was limited to age; EEOC "did not investigate possible race or sex discrimination; EEOC requested age-related data but not data "regarding the sex or race of any applicant, recent hire, or administrator responsible for hiring").

[48] 279 F. Supp. 2d 974 (S.D. Ind. 2003).

[49] *Id.* at 979-83. *See also Freeman v. Oakland Unified School Dist.*, Case No. C 99-3029, 2001 U.S. Dist. LEXIS 485, at *11 (N.D. Cal. 2001) (Illston, J.) (where charge alleged discrimination at single school and ensuing suit alleged actions by different parties affecting many schools, suit was not "like or reasonably related to" charge because reasonable EEOC investigation would not have focused beyond plaintiff's situation at his school).

frame to avoid an analysis of promotions within the liability period.  His analysis is rife with errors that invalidate his declaration.  As stated more fully in the motion to strike, he fails to control for obvious, acknowledged objective job qualifications (especially MM experience); he manipulates the time frame by including stale data from 1999-2001 and by excluding post-2003 relevant data; and he fails to report the non-discriminatory result of Costco's regional promotional patterns, instead presenting a national aggregation that is improper based on the undisputed evidence as to how Costco actually promotes.  The Drogin declaration is so infected with serious mistakes that it is inadmissible as a matter of law, and certainly is so weak as to fail to satisfy Plaintiffs' duty, under a rigorous analysis, to establish commonality.

**B.      "External Benchmarks" Do Not Show Commonality**

While Dr. Drogin argues for gender discrimination with Costco's internal promotion records, Dr. Bendick so argues with external labor "benchmarks."  As detailed in the motion to strike his declaration, his "benchmarks"—ostensibly designed to measure expected representation of women in management positions at Costco—are so badly flawed as to be inadmissible as a matter of law, and in any event fail to show commonality under the required rigorous analysis.

The Bendick "benchmarks" are particularly defective for ignoring the critical variable of job earnings.  This failure causes Dr. Bendick to compare Costco's GM and AGMs with department store managers, small retail managers, and others whose skills and responsibilities are such that they earn only a small fraction of the salary (to say nothing of the bonus and RSUs) of a Costco GM or AGM.  Saad First Decl. ¶¶ 100-101; Saad Second Decl. ¶¶ 13-21.  He might as well compare a beginning single-engine Piper Cub pilot with the highly trained captain of a Boeing 777.  The jobs are not the same.

Bendick also relies inappropriately on the industrial category of "General Merchandise Stores" as a comparator for Costco, fails adequately to control for factors such as employer or establishment size, uses the wrong occupational code as a comparator for Senior Staff managers, relies on the EEO-1 omnibus category of "Officials and Managers" as a comparator for the high-level positions of GM and AGM, and wrongly treats gender-differentiated interest in the MM job

COSTCO'S OPPOSITION TO CLASS CERT
Case No. C04 3341 MHP

- 21 -

1   as a demand factor rather than a supply factor.

2   **C.     The Stereotyping Theory Does Not Show Commonality Here**

3          Adverse-impact plaintiffs must link the challenged neutral employment practice to a

4   significant classwide impact.[50]  Plaintiffs seek to supply that link between practice and impact by

5   advancing a sociological conjecture that a uniformly subjective promotional process exposes

6   Costco's promotion decisions to gender stereotypes that harm women.

7          As stated in the motion to strike Dr. Reskin's declaration, that theory, in this case, fails to

8   support a finding of commonality.  First, the wide gap between the real world of Costco's

9   regional promotional systems and laboratory-based experiments render Dr. Reskin's opinions

10  unreliable.   Second, she falsely assumes that AGM promotions are made above the warehouse

11  level, and mistakenly concludes that decisionmakers rely upon personal impressions gleaned in

12  episodic encounters rather than on rich sources of individuating data systematically gathered

13  over many years.  Third, Dr. Reskin is unqualified to opine on Costco's corporate culture,

14  promotion processes, performance appraisals, and other personnel documentation.  Finally, her

15  theorizing fails to account for relevant gender-neutrality phenomena at Costco with respect to

16  turnover rates, pay, promotion to GM, promotion to AGM of those with prior job experience,

17  and performance review ratings.

18  **V.     INTER-REGIONAL DISPARITIES DESTROY COMMONALITY**

19         Further defeating a nationwide class is Dr. Saad's unrebutted report shows that Z-scores

20  for the eight Costco regions, based on post-12/28/01 promotion data and excluding leaves of

21  absence, range from +0.97 to -1.65.[51]

22         Because Plaintiffs must link the alleged policy of subjective decisionmaking to an

23  adverse impact,[52] under any rigorous analysis the decisionmakers' identity is relevant.  The

---

[50]  *Paige v. California*, 291, F.3d 1141, 1144 (9th Cir. 2002).

[51]  Dr. Drogin submitted in discovery the regional findings he fails to put in his declaration.
Inexplicably, Dr. Drogin used the time frame 1999-2005.  Dr. Saad replicated Dr. Drogin's
analysis by region, using a time frame that includes the 1999-2001 stale data but that excludes
employees on leaves of absence.  Dr. Saad reports a statistically significant disparity in only **two**
regions.  Saad Second Decl. ¶¶ 39-43, Exs. R2-R9.  The exclusion of employees on leaves of
absence explains why Dr. Saad, unlike Dr. Drogin, found no significant disparity in the
Southeast Region within this expanded time period.  *Id.*

[52]  See *Paige,* note 50 *supra.*

COSTCO'S OPPOSITION TO CLASS CERT
Case No. C04 3341 MHP

1    Plaintiffs' expert so admits.  Confronting the absence of gender disparity in promotions to AGM

2    in at least five regions, Dr. Reskin offered the explanation that "I know that it's the case that ....

3    regional managers operate differently in terms of their responsiveness to goals."  Reskin Dep.

4    214, Ex.Y.  If regionally disparate decisionmakers have differential impacts, then it makes no

5    sense to focus, as Dr. Drogin does, on a nationally aggregated mass of numbers.

6    "[D]iscrimination in some districts and not in others tends to defeat the argument that

7    discrimination was [the employer's] nationwide standard operating procedure."[53]

8         Because GM and AGM promotions occur regionally, Plaintiffs lack a coherent rationale

9    for nationwide aggregation.[54]  A nationwide class was feasible in *Dukes v. Wal-Mart* only

10   because, with some evidence of regional control, Dr. Drogin could report significant wage

11   disparities in each of 41 Wal-Mart regions[55] and significant promotion disparities in a "sizable

12   number of regions."[56]  Dr. Drogin here, however, is silent on the regional front, for here, even by

13   his model, there is no significant regional disparity in promotion to AGM in six of eight Costco

14   regions.

15   [53] *Morgan v. UPS*, 380 F.3d 459, 464 (8th Cir. 2004).  *Cf. Stastny v. Southern Bell T&T,* 628
     F.2d 267, 278, 280 n.20 (4th Cir. 1980) (systemwide certification might be appropriate if
16   comparable disparities in treatment ... at a sufficient number of the separate facilities ... justify
     the inference [of] a system-wide policy or practice," but inferring systemwide discrimination
17   from locally centered discrimination would have "forbidden effect of using the procedural device
     of Rule 23 to abridge the defending party's substantive rights").  *See generally* Daniel S. Klein,
18   *Bridging the Falcon Gap: Do Claims of Subjective Decisionmaking in Employment
     Discrimination Class Actions Satisfy the Rule 23(A) Commonality and Typicality Requirements?*,
19   25 Rev. Litig. 131, 170 (2006) (arguing impropriety of using aggregated statistics in class
     certification determinations at level higher than the decisionmaking level, and noting *Caridad*
20   court considered disaggregated data in making certification decision).

21   [54] *EEOC v. Sears*, 839 F.2d at 350 (affirming district court's rejection of national aggregation of
     data where wage decisions were made locally, and disparities differed by territory); *Dukes*, 222
22   F.R.D. at 158 (acknowledging possibility that "aggregated data at the nation-wide level is highly
     suspect"); *Rhodes v. Cracker Barrel Old Country Store*, 213 F.R.D. 616, 676 (N.D. Ga. 2003)
23   (collecting many cases) (geographic diversity in absence of centralized decisionmaking defeats
     commonality); *Abram v. UPS*, 200 F.R.D. 424, 431 (E.D. Wis. 2001) (denying class certification
24   where only  statistically significant racial disparities were on national level); *Moore*, 2004 WL
     3202777, at *12 (improper aggregation of data could not support class certification).   Even in
25   *Caridad*, the court recognized limits to national aggregation:  plaintiffs' expert provided
     disaggregated data regarding discipline and the Second Circuit found commonality only as to
26   "the 48 positions in which African-Americans are more likely to be disciplined."  191 F.3d at
     289, 292.

27   [55] 222 F.R.D. 137, 156 (N.D. Cal. 2004).

28   [56] *Id.* at 161.

COSTCO'S OPPOSITION TO CLASS CERT
Case No. C04 3341 MHP

1    Dr. Saad's unrebutted report, showing regional Z-scores regions ranging from +0.92 to -

2  1.65, defeat any notion of nationwide commonality, as "[s]*ignificant* proof that an employer

3  operated under a general policy of discrimination *conceivably* could justify a class … *if* the

4  discrimination *manifests itself* in hiring and promotion decisions *in the same general fashion*,

5  such as through entirely subjective decisionmaking processes."[57] Here, at the nationwide level,

6  there is no such general manifestation.

7  **VI.    PLAINTIFFS ARE NOT TYPICAL REPRESENTATIVES**

8    The test for 23(a)(3) typicality is whether plaintiffs share the injury of the putative class,

9  whether the action challenged is not unique to them, and whether the putative class has been

10  injured by the same course of conduct.[58]  That is not the case here.  Plaintiffs lack standing—and

11  have atypical claims—for the class theories they seek to champion. [59]  The only women under-

12  promoted to AGM vis-à-vis female Senior Staff representation are those lacking MM experience.

13  Yet no Plaintiff belongs to any meaningful group of promotionally retarded women:  Ellis and

14  Sasaki were AGMs at all relevant times, and Horstman had ample MM experience.[60]

15    Further, each Plaintiff has unique claims:  Ellis thinks she is a victim of retaliation and

16  contract breach; Sasaki thinks she was denied promotion because of sexual harassment;

17  Horstman has her own sexual harassment story.  They have no claims typical of the class.[61]  Still

18  ───────────

[57] *Falcon*, 457 U.S. at 159 n.15 (emphases added).

19  [58] *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (mere membership in
protected class fails to show typicality); *Doninger v. Pacific Nw. Bell*, 564 F.2d 1304, 1312 (9th
20  Cir. 1977) (mere invocation of Rule 23 standards is no "mystical legal talisman guaranteeing
class treatment").

21  [59] *See General Telephone Co. v. Falcon*, 457 U.S. 147, 157 (1982) (gap between individual class
promotion claims).
22
[60]  Plaintiffs' declarants Jessica Harrell and Kathleen Olson—both short-term Senior Staff
23  managers—likewise fail to identify typical claims, Harrell having been fired for stealing (Harrell
Dep. 325:12-327:3, Ex. BB) and Olson  having been fired for having a subordinate run a
24  personal errand for her on company time (Olson Dep. 275:4-21, 276:18-19, 279:13-18, Ex. CC).
Moreover, both women were fired years before their own written target dates for promotion.
25  Olson Dep. 297:18-22, Ex. CC;  Harrell Dep. 180:2-181:23, Ex. BB.

26  [61]  *See, e.g., Amchem Prods. v. Windsor*, 521 U.S. 591, 625-26 (1997) (named plaintiff must
suffer same injury as class members); *Hanon v. Dataproducts*, 976 F.2d 497, 508 (affirming
denial of class certification where plaintiffs' unique situation endangered ability to represent
27  class). *See also Cooper v. Southern Co.*, 390 F.3d 695, 714 (11th Cir. 2004) (Title VII)
(affirming denial of class certification where plaintiffs, collectively, "did not have claims that
28  would have been typical of the *entire* class"); *Hines v. Widnall*, 334 F.3d 1253, 1258 (11th Cir.

COSTCO'S OPPOSITION TO CLASS CERT
Case No. C04 3341 MHP

1 further, Costco has defenses unique to each Plaintiff:  Ellis twice put herself out of the running

2 for a GM job, first by moving to Colorado and then by terrorizing her staff; Sasaki ran up a string

3 of sub-standard performance reviews; Horstman rejected efforts to rotate her to FM and

4 expressly disclaimed promotional aspirations until her teenage daughters left high school.[62]

5 **VII.   PLAINTIFFS ARE NOT ADEQUATE REPRESENTATIVES**

6 Rule 23(a)(4) requires that plaintiffs "fairly and adequately protect the interests of the

7 class."  Ellis and Horstman raise a conflict as former employees who lack incentive to represent

8 class members still employed.  Former employees are mostly interested in money, while current

9 employees, by contrast, may primarily seek changed job conditions.[63]  Sasaki, already an AGM,

10 lacks incentive to represent the injunctive interests of women who seek AGM jobs.

11 Moreover, Ellis abused her subordinates, some of them putative class members.

12 Plaintiffs who have engaged in such misconduct cannot  be adequate class representatives.[64]

13 Ellis also has serious credibility problems, having lied to get her job with Costco.  All this, plus

14 weak claims (noted *supra* 11:22-12:17, 12:14-13:9, 13:17-14:6, 14:21-15:11), make Plaintiffs

15 inadequate.[65]

16

17 2003) (affirming denials of certification where plaintiffs raising class hiring and transfer claims did not experience failure to hire or transfer); *Donaldson v. Microsoft Corp.*, 205 F.R.D. 558, 568 (W.D. Wash. 2001) (plaintiffs atypical because they described both successes and failures, recounted positive and negative evaluations, good and poor managers, fair and unfair treatment); *Hively v. Northlake Foods,* 191 F.R.D. 661, 667-68 (M.D. Fla. 2000) (plaintiff grill operators could not represent putative class denied grill operator jobs).

18

19

20 [62] *See Bacon v. Honda of America Mfg.*, 370 F.3d 565, 572-73 (6th Cir. 2004) (plaintiffs atypical because personal choices, not employer practices, made them ineligible for promotion); *Hanon*, 976 F.2d at 508 (unique defenses can make plaintiff atypical); *Zacherty v. Texaco Expl. & Prod.*,185 F.R.D. 230, 240 (W.D. Tex. 1999) (plaintiffs seeking promotion class atypical as specific evidence explained why each plaintiff not promoted or trained).

21

22 [63] *Webb v. Barnes Group,* No. 02-2716 (N.D. Tex. July 6, 2004) (Kadue Decl., Ex. Z) (former employees "cannot benefit from any injunctive relief" and thus "have no incentive to adequately represent the interests of absent class members").

23

24 [64] *See, e.g., Hively v. Northlake Foods,* 191 F.R.D. at 668-69 (plaintiffs lacked credibility to adequately represent class because two plaintiffs were fired for "flipping off a customer" while others misrepresented employment history and falsified job application).

25

26 [65] *See Robinson v. Sheriff of Cook County*, 167 F.3d 1155, 1157 (7th Cir. 1999) ("extremely weak" claim is reason to doubt adequacy of representation:  "One whose claim is a loser from the start knows [she] has nothing to gain from the victory of the class, and so [she] has little incentive to assist or cooperate in the litigation; the case is then a pure class action lawyer's suit."); *Everitt v. City of Marshall*, 703 F.2d 207, 210 (5th Cir. 1983) (when "individual claim …

27

28

1    **VIII.   CERTIFICATION UNDER RULE 23(B)(2) IS INAPPROPRIATE**

2           Plaintiffs seek Rule 23(b)(2) certification without showing that Costco "has acted or

3    refused to act on grounds generally applicable to the class, thereby making appropriate final

4    injunctive relief or corresponding declaratory relief with respect to the class as a whole."

5    Because a (b)(2) class is not appropriate when the appropriate final relief "relates …

6    predominantly to money damages,"[66] Rule 23(b)(2) permits only those monetary damages that

7    are "merely incidental to the litigation."[67] "Incidental" damages "flow directly from liability to

8    the class *as a whole* on the claims forming the basis of the injunctive or declaratory relief."[68]

9           For a proper (b)(2) class, incidental damages will "not require additional hearings to

10   resolve the disparate merits of each individual's case; it should neither introduce new and

11   substantial legal or factual issues, nor entail complex individualized determinations."[69] Yet

12   Plaintiffs' claims here for both punitive **and** compensatory damages necessitate complex,

13   individualized determinations.[70] (The lack of AGM/GM posting data is an additional bar to

14   (b)(2) certification, as noted in Section X.A.2. below.)

15          **A.      Plaintiffs Lack Standing To Pursue Injunctive Relief**

16          No Plaintiff has standing to seek classwide injunctive relief.[71] Sasaki, long an AGM,

---

17   is dismissed," employee is "not a member of the class of the discriminated" and "has never
     suffered any legally cognizable injury … in common with the proposed class").

18   [66] FED. R. CIV. P. 23(b)(2) (advisory committee note).

19   [67] *Kanter v. Warner-Lambert Co.*, 265 F.3d 853, 860 (9th Cir. 2001).

20   [68] *Molski v. Gleich,* 318 F.3d 937, 949 (9th Cir. 2003) (quoting *Allison v. Citgo Petrol. Corp.*,
     151 F.3d 402, 415 (5th Cir. 1998) (emphasis in original)).

21   [69] *Allison*, 151 F.3d at 415. An example of damages "flow[ing] directly to the class as a whole"
     would be a university enjoined from charging too high a tuition. *Samuel v. University of*
22   *Pittsburgh*, 56 F.R.D. 435, 440 (W.D. Pa. 1972).

23   [70] The request to sever the intensely individualized Ellis retaliation claim (Motion 27 n.29) also
     highlights the predominance of monetary relief. *See Castano v. American Tobacco Co.*, 84 F.3d
24   734, 745-46 n.21 (5th Cir. 1996) (severing issues until "remaining common issue predominates
     over the remaining individual issues would eviscerate the predominance requirement,"resulting
25   in "automatic certification in every case where there is a common issue, a result that could not
     have been intended").

26   [71] Plaintiffs must establish standing. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561
     (1992). Standing to pursue an injunction requires proof of a realistic threat by the challenged
27   conduct; otherwise plaintiffs have no substantial stake in an injunction, and lack standing under
     Article III. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 101-02 (1983) (plaintiff needs
28   "personal stake" in outcome); *Wooden v. Board of Regents*, 247 F.3d 1262, 1283 & n.20 (11th

1   lacks a personal stake in any injunction to help women obtain that position, and also lacks

2   standing as to GM promotions, for no gender disparity exists in promotions to GM.[72]  The other

3   Plaintiffs, as former employees, have even weaker injunctive standing.[73]  Representatives who

4   lack standing to pursue classwide remedies fail the typicality test: "The standing requirement is

5   a function not only of Article III, but also the requirement … that the representative's individual

6   claim be typical of those belonging to the class members he seeks to represent."[74]

   **B.    Requests For Monetary Awards Predominate**

7

8       Moreover, where no Plaintiff has a personal stake in classwide injunctive relief, that

9   relief cannot predominate over expansive monetary claims.  The Supreme Court doubts whether

10  (b)(2) class actions seeking money damages can ever be certified.[75]  Circuit courts have refused

11  to certify (b)(2) cases seeking monetary damages requiring individualized proof and

12  determinations.[76]  The Ninth Circuit has adopted a flexible approach on this issue, preferring that

13  Cir. 2001) (class action plaintiffs seeking forward-looking relief must show "sufficient
    likelihood" of future harm).

14  [72]  Saad Decl. ¶ 60; Drogin Decl. ¶ 22; Drogin Dep. 62:12-63:19, Ex. X.  Thus Sasaki, as AGM,
    cannot show under *City of Los Angeles* and *Wooden* that she will be subjected to challenged
15  conduct.  *See Jane Does I-III v. District of Columbia*, 216 F.R.D. 5, 10 (D.D.C. 2003) (named
    plaintiffs seeking injunction must face "*real and immediate danger* of being personally injured")
16  (emphasis added) (quoting *Church v. City of Huntsville*, 30 F.3d 1332, 1340 (11th Cir. 1994)).
    And even if Sasaki had standing, her two co-Plaintiffs' lack of standing would still render her
17  interest in injunctive relief subordinate to their interest in pure monetary relief.  *See Ramirez v.
    DeCoster*, 194 F.R.D. 348, 352 (D. Me. 2000) (monetary damages predominated over injunctive
18  relief because only one named plaintiff was still employed by defendant, and former employees
    would not benefit from injunctive relief).

19  [73]  *See Jackson v. Motel 6 Multipurpose*, 130 F.3d 999, 1007 (11th Cir. 1997) (former employees
20  lacked standing to pursue injunctive relief); *Armstrong v. Powell*, 240 F.R.D. 661, 680 (W.D.
    Okla. 2005) (denying (b)(2) certification in promotion case where former employees may lack
21  standing); *Bacon v. Honda of Am. Mfg.*, 205 F.R.D. 466, 486 (S.D. Ohio 2001), *aff'd on other
    grounds*, 370 F.3d 565 (6th Cir. 2004) (plaintiffs' claims were primarily for monetary damages
22  where former employees would not benefit from injunctive relief sought) (citing *Zapata v. IBP*,
    167 F.R.D. 147, 162 (D. Kan. 1996) (denying (b)(2) certification for same reason)).

23  [74]  *Wooden*, 247 F.3d at 1287; *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 831 (1999) (Rule 23
24  "must be interpreted in keeping with Article III constraints"); *see also O'Shea v. Littleton*, 414
    U.S. 488, 494 (1974); *Howard v. City of Greenwood*, 783 F.2d 1311, 1314 n.2 (5th Cir. 1986)
25  ((b)(2) class inappropriate where plaintiffs lacked standing to seek injunctive relief); *Jane Does I
    Through III*, 216 F.R.D. at 12 ("To represent a class under 23(b)(2), plaintiffs must have standing
    to obtain injunctive relief.").

26  [75]  *Ticor Title Ins. Co. v. Brown*, 511 U.S. 117, 121 (1994).

27  [76]  *See Thorn v. Jefferson Pilot Life Ins. Co.*, 445 F.3d 311, 330-32 (4th Cir. 2006); *Reeb v. Ohio
    Dep't of Rehab. & Corr.*, 435 F.3d 639, 651 (6th Cir. 2006) (vacating class certification under
28  Rule 23(b)(2) in sex discrimination suit because of the highly individualized determinations

   COSTCO'S OPPOSITION TO CLASS CERT
   Case No. C04 3341 MHP

1    courts "examine[] the specific facts and circumstances of each case."[77]   An examination here

2    shows that (b)(2) treatment is improper.

3    **C.      Compensatory Awards Are Incompatible With Rule 23(b)(2)**

4          Requests for compensatory damages inevitably lead to intense individualized scrutiny. [78]

5    The very nature of these damages, compensating plaintiffs for emotional, intangible injuries,

6    implicates each plaintiff's subjective circumstances.  Pursuing compensatory damages precludes

7    (b)(2) certification because assessing such damages requires detailed, individualized inquiries.

8          In *Thorn*, the Fourth Circuit recently observed that claims for monetary relief generally

9    conflict with the (b)(2) concept of "a common injury properly addressed by classwide relief."[79]

10   That is surely the case here, where Plaintiffs seek damages for "emotional distress, humiliation,

11   embarrassment, and anguish."  2AC, at Prayer for Relief at ¶ 2.  These claims cannot be

12   "incidental" to injunctive relief as they do not "flow directly from liability to the class *as a*

13   *whole*."[80]  Class-member entitlement to damages would require the individualized hearings that

14   Rule 23 aims to avoid.[81]

15   **D.      Insisting on Punitive Damages Precludes A Rule 23(b)(2) Class**

16         Punitive damages require proof of harm to the "rights of an *aggrieved individual*,"[82] and

---

17   required to calculate monetary damages); *Allison*, 151 F.3d at 418 (denying certification for the
     same reasons).

18   [77]  *Molski*, 318 F.3d at 950.

19   [78]  *Allison*, 151 F.3d at 417.  *Accord Reeb v. Ohio Dep't of Rehab.*, 435 F.3d 639, 651 (6th Cir.
     2006) (compensatory damages predominated over injunctive relief because calculating damages

20   is individualized, and plaintiffs may file own actions; compensatory damages not recoverable
     through (b)(2) class; *Murray v. Auslander*, 244 F.3d 807, 812 (11th Cir. 2001) (vacating

21   certification where requested emotional distress damages would require individual inquiry and
     thus predominate over injunctive relief).

22   [79]  *Thorn v. Jefferson Pilot Life Ins. Co.*, 445 F.3d 311, 330 (4th Cir. 2006) (damage phase is to

23   compensate for *individual injuries*, requiring individual hearings to determine amounts due;
     injunctive relief, by contrast, is to enjoin *defendant's actions* affecting class as whole, without

24   individual hearings).

25   [80]  *Molski*, 318 F.3d at 949 (emphasis in original); *accord Thorn*, 445 F.3d at 330.

     [81]  *See Robertson v. Sikorsky Aircraft Corp.*, No. 397-CV-1216 (GLG), 2001 U.S. Dist. LEXIS
26   11662, at *24-25 (D. Conn. July 5, 2001) (each class member in discrimination case must show
     entitlement to promotion; discriminatory denial of same; date discrimination occurred; and

27   difference in salary).

28   [82]  42 U.S.C. §1981a(b)(1) (emphasis added).

COSTCO'S OPPOSITION TO CLASS CERT
Case No. C04 3341 MHP

1     an actual injury to the plaintiff, justifying compensatory damages.[83]   These aspects of a punitive

2     award require "a fact-specific inquiry into *that plaintiff's* circumstances."[84]   A suit for punitives

3     thus "jeopardizes [the] presumption of cohesion and homogeneity [underlying (b)(2)

4     certification] because individual claims for compensatory or punitive damages typically require

5     judicial inquiry into the particularized merits of each individual plaintiff's claim."[85]   Were the

6     proposed class to be certified, pursuit of punitive damages would require hearings on individual

7     circumstances, defeating the purpose of a (b)(2) class.

8         **E.**     **Self-Serving Declarations Do Not Control**

9         Plaintiffs, citing *Molski's* directive to consider their intent "in bringing the suit,"[86] assure

10     us that their "primary goal" is injunctive relief (Motion 25-26).  But *Molski* instructs courts to

11     examine "the specific facts and circumstances of each case"—which requires a look at *all* of the

12     evidence[87]—and by that standard how can Plaintiffs say their injunctive ambitions are primary?

13     First, they lack standing to pursue injunctive relief.  Second, they pursue Phase-I punitive and

14     compensatory damages, which require intense individualized scrutiny and thus do not "flow

---

15    [83]    *State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 423 (2003).  *Accord Allison*, 151

16    F.3d at 417-18; *Bacon*, 205 F.R.D. at 485-86; *Burrell v. Crown Petrol.*, 197 F.R.D. 284, 289-90
     (E.D. Tex. 2000) (refusing to award punitive damages on a classwide basis); *Colindres v.*

17    *Quitflex Mfg.*, 235 F.R.D. 347, 377-78 (S.D. Tex. 2006) ("Punitive damages have to be
     determined after proof of liability to individual plaintiffs at the second stage of a pattern or

18    practice case.").

19    [84]    *Lemon v. Operating Eng'rs*, 216 F.3d 577, 581 (7th Cir. 2000) (emphasis added).  Many
     courts find that punitive damages are individualized, and not appropriate for class treatment.  *See*

20    *Colindres*, 235 F.R.D. at 377-79 (certification inappropriate where individuals had different
     experiences to serve as basis for punitive damages claim); *Reid v. Lockheed Martin Aerovantics*

21    *Co.*, 205 F.R.D. 655, 681 (N.D. GA 2001) ("the [punitive damages] statute plainly requires a
     fact specific inquiry into the circumstances of the individual plaintiff"); *Miller v. Hygrade Food*

22    *Prods.*, 198 F.R.D. 638, 641-45 (E.D. Pa. 2001) (denying certification under (b)(2) and (b)(3), in
     part because calculation of punitive damages is individualized).

23    [85]    *Lemon v. Operating Eng'rs*, 216 F.3d 577, 580 (7th Cir. 2000).

     [86]    *Molski v. Gleich*, 318 F.3d 937, 950 (9th Cir. 2003).

24    [87]    *See id.* at 949-56; *Sepulveda v. Wal-Mart Stores,* No. CV04-1003 DSF (EX), 2006 U.S. Dist.

25    LEXIS 59056, at *52 (denying (b)(2) certification despite plaintiff's declaration he sought to
     change defendant's policies); *Hammett v. American Bankers Ins. Co.*, 203 F.R.D. 690, 696-97

26    (S.D. Fla. 2001) (rejecting similar declaration because it was belied by amount of potential
     damages); *Hall v. Burger King Corp.*, Civ. A. No. 89-0260-CIV-KEHOE, 1992 U.S. Dist.

27    LEXIS 18687, at *34 (S.D. Fla. Oct. 26, 1992) ("While plaintiffs attempt to downplay their
     request for money damages in an effort to fit under the more relaxed requirements of Rule 23(b)

28    (1) or (2)," it "is almost ludicrous to assert that damages do not predominate").

---

COSTCO'S OPPOSITION TO CLASS CERT
Case No. C04 3341 MHP

1   directly from liability to the class *as a whole*."[88]   If Plaintiffs satisfy (b)(2) merely by *saying* they

2   seek change above all else, then the predominance "requirement" is a sham, depending on

3   nothing more than the ethical self-restraint of money-seeking plaintiffs.[89]

4          Though Plaintiffs would mask their motivation by mouthing altruistic intentions, the

5   record demonstrates they care more about the fund than the impact:  they lack standing to pursue

6   injunctive relief; they seek punitive and compensatory damages in Phase I; and their proposed

7   class would conflict with Rule 23(b)(2).[90]

8   **IX.   "HYBRID" CERTIFICATION IS LIKEWISE INAPPROPRIATE**

9          Plaintiffs alternatively seek "hybrid" certification for all purposes other than damages,

10  and propose a parallel (b)(3) "damages" class.  But "hybrid" certification is not a "catch all" for

11  certifying classes that otherwise flunk (b)(2) or (b)(3) requirements.[91]   Indeed, by suggesting this

12  [88]  *Molski*, 318 F.3d at 949 (emphasis in original).

13  [89]  *See* Jeffrey H. Dasteel & Ronda McKaig, *What's Money Got To Do With It?:  How
    Subjective, Ad Hoc Standards For Permitting Money Damages in Rule 23(b)(2) Injunctive Relief
14  Classes Undermine Rule 23's Analytical Framework*, 80 Tul. L. Rev. 1881, 1894 (2006)
    (describing dangers of "'insignificant or sham requests for injunctive relief'" that "'provide
15  cover for (b)(2) certification of claims that are brought essentially for monetary recovery'")
    (quoting *Robinson v. Metro-N. Commuter R.R.*, 267 F.3d 147, 164 (2d Cir. 2001)).

16  [90]  Plaintiffs misplace reliance on *Molski* (Motion 25:26-26:4), because *Molski* looked at the
    entire record, including the amount of damages sought and released, and did not uncritically rely,
17  as Plaintiffs advocate, on a plaintiff's mere averments.  *Molski* thus, considering the entire
    record, *reversed* a (b)(2) certification.  *Id.* at 950, 953-54.

18  [91]  Plaintiffs have not separately moved for (b)(3) certification, presumably because (b)(3)
19  certification is more difficult to obtain.  A (b)(3) class requires proof that common questions
    predominate over individual questions, and that a class action is superior to individual
20  adjudications.  The (b)(3) predominance requirement "is far more demanding" than Rule
    23(a)(2)'s commonality requirement:  "[T]o satisfy the [(b)(3)] predominance requirement, a
21  plaintiff must establish that 'common issues of law and fact are central to all of [his or her]
    claims.'"  *Amchem Prods. v. Windsor*, 521 U.S. 591, 624 (1997).  Moreover, *Allison* establishes
22  that (b)(3) certification will rarely, if ever, be appropriate in Title VII cases where, as here,
    named plaintiffs seek damages:  "[t]he predominance of individual-specific issues relating to the
23  plaintiffs' claims for compensatory and punitive damages in turn detracts from the superiority of
    the class action device in resolving those claims."  *Allison*, 151 F.3d at 419; *see also Coleman v.
24  GMAC*, 296 F.3d 443, 448 (6th Cir. 2002) (under (b)(3), individualized determinations needed to
    calculate class-member damages would eliminate class efficiencies); *Robertson v. North Am.
25  Van Lines*, No. C-03-2397 SC, 2004 U.S. Dist. LEXIS 7788, at *13-14 (N.D. Cal. Apr. 13, 2004)
    (individual damages questions "will dominate trial of this action, both in terms of time and
26  significance," showing "proposed class is not sufficiently cohesive to warrant adjudication by
    representation").  Finally, the *Allison* court found that the statutory cap of $300,000 for
27  compensatory and punitive damages, along with the statutory attorney-fee provision, eliminated
    the danger that individual lawsuits would be precluded by financial concerns.  *See Allison*, 151
28  F.3d at 420.

COSTCO'S OPPOSITION TO CLASS CERT
Case No. C04 3341 MHP

1 alternative—to preserve their monetary claims—Plaintiffs only highlight their true motivation.

2 Certification of a "hybrid" class is controversial.[92] While Plaintiffs claim precedent in

3 the Seventh Circuit's *Jefferson* decision, saying it is "possible to certify … injunctive aspects …

4 under Rule 23(b)(2) and …damages aspects under Rule 23(b)(3),"[93] *Jefferson* said that such a

5 class "would be permissible *only when monetary relief is incidental to the equitable remedy.*"[94]

6 But monetary damages are not "incidental" if they "depend 'in any significant way on intangible,

7 subjective differences of each class member's circumstances,'" requiring individual hearings.[95]

8 Plaintiffs seek to "game the system," pleading a (b)(2) action that also seeks damages,

9 with a "failsafe option" of a combined (b)(2) and (b)(3) class to include remedies impermissible

10 under a rigorously analyzed (b)(2) class.[96] Plaintiffs are not entitled to (b)(2) certification, and

11 do not seek (b)(3) certification. The proposed hybrid theory—a mutation of an already defective

12 class theory—should fare no better.

## X. THE TRIAL PLAN SHOWS CERTIFICATION IS IMPROPER

14 Plaintiffs propose Phase-I jury findings on compensatory and punitive damages—before

---

15 [92] The Eleventh Circuit has rejected the suggestion. *Cooper*, 390 F.3d at 720-23 & n.14 (district court did not abuse discretion in declining to certify under "hybrid" theory). *Accord Miller v.*

16 *Hygrade Food Prods.*, 198 F.R.D. 638, 644-45 (E.D. Pa. 2001) (rejecting (b)(2) without certification; noting neither *Lemon* nor *Jefferson* ordered a hybrid class, but merely instructed

17 district court to *consider* one); *see Burrell v. Crown Petrol.*, 197 F.R.D. 284, 292 (E.D. Tex. 2000) (refusing to certify hybrid class, as it would likely violate Seventh Amendment); *Reid v.*

18 *Lockheed Martin Aeronautics*, 205 F.R.D. 655, 686 (N.D. Ga. 2001) (rejecting hybrid class because individual issues would still predominate, and class adjudication would not be superior);

19 *Adler v. Wallace Computer Servs.*, 202 F.R.D. 666, 673 (N.D. Ga. 2001) (even with hybrid class, each member would still have to show actual harm).

20 [93] *Jefferson v. Ingersoll Int'l*, 195 F.3d 894, 898 (7th Cir. 1999).

21 [94] *Id.* at 898 (emphasis added).

[95] *Lemon*, 216 F.3d at 581 (quoting *Allison*, 151 F.3d at 415); *accord Cooper v. Southern Co.*,

22 390 F.3d 695, 721 (11th Cir. 2004) ("complex, individualized determinations" should not be considered "incidental" to claims for injunctive relief).

23 [96] Linda S. Mullenix, *No Exit: Mandatory Class Actions In The New Millenium And The*

24 *Blurring Of Categorical Imperatives*, 2003 U. CHI. LEGAL F. 177, 215-16 (2003). The same article (*id.* at 216-17) identifies problems with *Jefferson* that undoubtedly apply here, too: it

25 sheds no light on how to effect notice or try the case; it raises Seventh Amendment problems; and it fails to consider preclusive effects of hybrid class actions. Similarly, in *Adler v. Wallace*

26 *Computer Servs.*, 202 F.R.D. 666, 673 (N.D. Ga. 2001), the court noted the Seventh Amendment problems that hybrid certification would create, by requiring a jury to determine individual

27 discrimination issues before the court could rule on equitable remedies. *Id.* at 673-74. "Pursuing this course would result in confusion and be overly burdensome to the resources of the court

28 system." *Id.*

---

any plaintiff establishes liability or injury.  Next, they propose to distribute damages through "a court approved formula"—a plan unprecedented in American law.  Plaintiffs' unmanageable proposal violates Rule 23(b)(2), Title VII, the Constitution,  and the Rules Enabling Act.

### A.   The Plan Inevitably Conflicts With Rule 23(b)(2)

#### 1.   The damages claims necessitate individual hearings

The plan to obtain classwide compensatory and punitive damages frustrates Rule 23(b) because those damages cannot be awarded in the aggregate; rather, they must be measured in light of each individual's specific injuries.  Courts do not award damages to "persons who have not been injured or … for [injuries] greater than that caused by the offending conduct."[97]

The point also applies to punitive damages, which must be set "*after* proof of liability to *individual plaintiffs* at the *second stage* of a pattern or practice case," because they "require proof of how discrimination was inflicted on *each plaintiff*, introducing new and substantial factual issues, and *not being capable of computation by objective standards*."[98]

Because use an individualized approach to avoid "granting a windfall to the class at the employer's expense" and unfairly reducing individual awards,[99] and do not abandon that approach unless other factors make it impractical or impossible.[100]  No such factor obtains here.

In *Krasweski*,[101] the district court denied the extraordinary remedy of classwide backpay relief because individualized determinations were more appropriate, even though (1) the issues were narrow (discriminatory hiring into a single entry-level position), (2) the court had  found

---

[97]  *Sikes v. Teleline,* 281 F.3d 1350, 1365 (11th Cir. 2000).  To prevent unwarranted damage awards for class members who suffered no harm, courts generally favor individualized hearings. *Segar v. Smith*, 738 F.2d 1249, 1290 (D.C. Cir. 1984) (citing *Teamsters*, 431 U.S. 324, 361 (1977)); *Bacon*, 205 F.R.D. at 485-86 (punitive damages require "proof of liability to individual plaintiffs"); *Burrell*, 197 F.R.D. at 292 (refusing to award punitive damages on classwide basis); *Faulk v. Home Oil Co.*, 186 F.R.D. 660, 664 (M.D. Ala. 1999) (entitlement to compensatory and punitive damages rests on "individualized proof of actual injury," not classwide liability).

[98]  *Colindres v. Quitflex Mfg.*, 235 F.R.D. 347, 377-78 (S.D. Tex 2006) (quoting *Allison*, 151 F.3d at 418) (emphasis added).

[99]  *United States v. City of Miami*, 195 F.3d 1292, 1300 (11th Cir. 1999).

[100]  *See Pettway v. American Cast Iron Pipe Co.*, 494 F.2d 211, 262 (5th Cir. 1974).

[101]  *See Kraszewski v. State Farm Gen. Ins. Co.*, No. C-70-1261-TEH, 1986 U.S. Dist. LEXIS 22604, at *2-5 (N.D. Cal. July 17, 1986) (Henderson, J.), *aff'd in part and rev'd in part on other grounds*, 912 F.2d 1182 (9th Cir. 1990).

COSTCO'S OPPOSITION TO CLASS CERT
Case No. C04 3341 MHP

1   classwide gender discrimination, and (3) stipulations on average earnings had simplified backpay

2   calculations.  If classwide relief was inappropriate in *Krasweski*—where only backpay was at

3   issue—it surely is inappropriate here, given the multitude of individual issues surrounding

4   compensatory and punitive damages.

5       Save for *Dukes*, each case Plaintiffs cite for their formula proposal is a pre-1991 Title VII

6   case, involving no punitive or compensatory damages,[102] and in *Dukes* itself there was no claim

7   for compensatory damages.

8                    **2.     Any damages class would be unmanageable**

9       The proposed plan invites the Court to enter a managerial nightmare of damages

10  allocations—which Plaintiffs propose to distribute via a "formula"—when logic and law dictate

11  otherwise.  *Dukes* itself would bar certifying a class for lost pay (or other monetary damages), for

12  no objective data reveal which class members actually sought a promotion.[103]

13       **B.     The Plan Would Violate Title VII**

        Plaintiffs' proposal conflicts with Title VII, as amended, because the putative class is

14  neither a "complaining party" nor an "aggrieved individual" under Title VII.[104]  As written, Title

15  VII simply does not accommodate a classwide compensatory and punitive damages remedy.

16       **C.     The Plan Would Violate Costco's Constitutional Rights**

17       Plaintiffs' plan to impose Phase-I compensatory and punitive damages would be

18  unconstitutional.  First, Plaintiffs envision recovery of damages for those who might opt out if

19  given the chance to do so and those who could not prove liability or damages in a hearing.  Such

20  ─────────────
    [102] *See* Motion 28, citing *Shipes v. Trinity Indus.*, 987 F.2d 311, 317 (5th Cir. 1993) (addressing
21  classwide backpay only); *Segar*, 738 F.2d at 1289-91 (addressing classwide front and backpay
    only); *Domingo v. New England Fish Co.*, 727 F.2d 1429, 1444-45 (9th Cir. 1984) (same);
22  *McKenzie v. Sawyer*, 684 F.2d 62, 76-77 (D.C. Cir. 1982) (same); *Stewart v. GMC*, 542 F.2d
    445, 452-53 (7th Cir. 1976) (same); *Dukes*, 222 F.R.D. at 177-79).

23  [103] *Dukes* rejected a formula distribution proposal based on "objective evidence such as tenure,"
    etc., as that evidence goes "only to the issue of *qualification*, not interest in a position." 222
24  F.R.D. at 180 (emphasis in original).  Wal-Mart's lack of posting data made it "difficult to
    discern how [to] identify which class members were interested in unposted promotions absent
25  some type of individualized proceedings."  Lost-pay remedies therefore could "not be reasonably
    managed on a class basis … for promotions that were not posted, such that no objective applicant
26  data exists."  *Id.* at 182.  The same reasoning applies here:  Costco lacks GM/AGM postings,
    leaving no objective means to find which class members actually *desired* promotion, and when.
27  [104] *See* 42 U.S.C. §1981a(b)(1) (limiting punitive damage to complaining party and aggrieved
28  individual).

─────────────
                            COSTCO'S OPPOSITION TO CLASS CERT
                            Case No. C04 3341 MHP

1    a procedure would award punitive damages to non-harmed parties, contrary to *BMW v. Gore* and

2    *State Farm v. Campbell*.[105]  The procedure would also result in multiple punishments for the

3    same alleged harm and damages for alleged harms that were never experienced by putative class

4    members.  *State Farm* rejected an aggregate approach to assessing punitive damages.[106]

5            Second, Plaintiffs' "fix" of allowing formulaic damages for a classwide award would

6    violate Costco's rights under *BMW v. Gore* and *State Farm v. Campbell*. *State Farm* held that a

7    punitive award violates due process rights when it bears no reasonable relationship to harm

8    suffered or compensatory damages awarded.[107]  No punitive award can satisfy this requirement

9    without first a finding of actual harm to given individuals.  Absent that finding, any punitive

10   award would lack proof and procedural safeguards.

11           After *State Farm*, individuals who cannot obtain monetary relief cannot obtain punitive

12   damages.[108]  A punitives-first approach would turn this principle on its head.[109]  The suggestion

13   to use a court-approved formula is not a solution.  The Second Circuit has recognized that

14   assessing Phase I punitive damages is wrong: "*State Farm* made clear that conduct relevant to

15   the reprehensibility analysis *must have a nexus to the specific harm suffered by the plaintiff*."[110]

16           Third, the proposed scheme would violate the seventh amendment's No-Re-examination

17   Clause.  This case so teems with individual issues that it cannot be tried to a single jury—it

18   would require many trials on issues of individual injury and damages.  The punitive claims alone

19   would require multiple trials,[111] having juries continually evaluate Costco's alleged conduct,

20   with inconsistent findings.[112]

21
     _____

22   [105]  517 U.S. 559 (1996) and 538 U.S. 408 (2003), respectively.

     [106]  538 U.S. at 423-25.

23   [107]  *Id.* at 417-20.

24   [108]  *See* 538 U.S. at 425.

25   [109]  *See In Re Simon II Litigation,* 407 F.3d 125, 138-39 (2d Cir. 2005) (vacating certification
     order that called for punitive-damages assessment before determining and awarding
     compensatory damages; noting inconsistency with *State Farm*); *Colindres*, 235 F.R.D. at 377-78.

26   [110]  *Simon II,* 407 F.3d at 138-39 (emphasis added).

27   [111]  *See State Farm*, 538 U.S. at 419.

28   [112]  *See Castano v. American Tobacco Co.*, 84 F.3d 734, 750-51 (5th Cir. 1996).

                                          COSTCO'S OPPOSITION TO CLASS CERT
                                          Case No. C04 3341 MHP
                                    - 34 -

**D.      The Plan Would Violate the Rules Enabling Act**

The proposed class would violate the Rules Enabling Act,[113] which forbids a rule of procedure to "abridge, enlarge or modify any substantive right."[114]   The REA covers class action procedures,[115] disallowing Rule 23 remedies that would abridge substantive rights.[116]   Adopting Plaintiffs' plan to award classwide compensatory or punitive damages would violate the REA by undermining Costco's right to defend individual claims under the 1991 Civil Rights Act.[117] Under *Teamsters v. United States*,[118] all class members benefit from a presumption that a discriminatory "standard operating procedure" explains their treatment, and employers can defend themselves by disproving that any particular plaintiff's plight resulted from the presumed discrimination.[119]   The Plaintiffs' proposed class plan abridges that right.

**CONCLUSION**

For many independent reasons, the Court should deny class certification.

DATED: September 29, 2006                    SEYFARTH SHAW LLP

By _____

David D. Kadue
Attorneys for Defendant
COSTCO WHOLESALE CORPORATION

---

[113]   28 U.S.C. §§ 2071-2077.

[114]   28 U.S.C. § 2072(b).

[115]   *See Amchem Products, v. Windsor*, 521 U.S. 591, 613 (1997).

[116]   *E.g., Ortiz v. Fireboard Corp.*, 527 U.S. 815, 845-47 (1999) (mandatory Rule 23 class actions aggregating damages claims implicate due process and Seventh Amendment rights); *Windham v. American Brands*, 565 F.2d 59, 66 & 70-72 (4th Cir. 1977) (disallowing classwide proof of damages—or use of "fluid recovery" to avoid proving individual damages—as violating mandate of REA); *Kline v. Coldwell Banker & Co.*, 508 F.2d 226, 236 & nn.8-9 (9th Cir. 1974) (Rule 23 does not authorize generalized proof of damages, given REA and Seventh Amendment right to jury trial); *cf. Schwab v. Philip Morris USA.*, No. CV 04-1945, 2005 WL 3032556 at *4 (E.D.N.Y. Nov. 14, 2005) (REA requires courts shaping Rule 23(b) remedies to stay within bounds of due process and avoid altering substantive rights).

[117]   See 42 U.S.C. § 2000e-5(g)(2)(A) & (B); *Thorn*, 445 F.3d 311 (defendants have right to assert defenses to claims even in class action context).

[118]   431 U.S. 324, 360 (1977).

[119]   *Id.* at 361-62.

---

COSTCO'S OPPOSITION TO CLASS CERT
Case No. C04 3341 MHP