SEYFARTH SHAW LLP
Kenwood C. Youmans (SBN 68258)
David D. Kadue (SBN 113578)
2029 Century Park East, Suite 3300
Los Angeles, California  90067-3063
Telephone: (310) 277-7200
Facsimile:  (310) 201-5219
kyoumans@seyfarth.com
dkadue@seyfarth.com

SEYFARTH SHAW LLP
David B. Ross (admitted *pro hac vice*)
1270 Avenue of the Americas
Suite 2500
New York, New York  10020
Telephone:   (212) 218-5500
Facsimile:   (212) 218-5526
dross@seyfarth.com

SEYFARTH SHAW LLP
Gerald L. Maatman, Jr. (admitted *pro hac vice*)
131 S. Dearborn Street, Suite 2400
Chicago, Illinois  60603-5803
Telephone: (312) 460-5000
Facsimile:  (312) 460-7000
gmaatman@seyfarth.com

SEYFARTH SHAW LLP
Thomas J. Wybenga (admitted *pro hac vice*)
999 Lake Drive
Issaquah, Washington 98027
Telephone:   (425) 313-6794
Facsimile:   (425) 313-7922
twybenga@seyfarth.com

Attorneys for Defendant
COSTCO WHOLESALE CORPORATION

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### (SAN FRANCISCO DIVISION)

| | |
|---|---|
| SHIRLEY "RAE" ELLIS, on behalf of herself and all others similarly situated,<br><br>   Plaintiffs,<br><br>  v.<br><br>COSTCO WHOLESALE CORPORATION<br><br>   Defendant. | Case No. C04 3341 MHP<br><br>**NOTICE OF MOTION TO STRIKE DECLARATION OF MARC BENDICK, J.R., Ph.D.; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date:  November 6, 2006<br>Time:  2:00 p.m.<br>Courtroom: 15<br>Judge:  Marilyn Hall Patel |

## TABLE OF CONTENTS

Page

NOTICE OF MOTION ................................................................................................ - 1 -

INTRODUCTION ...................................................................................................... - 1 -

RELEVANT BACKGROUND ...................................................................................... - 3 -

    **A.**    The GM and AGM Positions At Costco. ............................................................ - 3 -

    **B.**    The Bendick "Benchmarks." ........................................................................ - 4 -

ARGUMENT AND ANALYSIS ..................................................................................... - 6 -

**I.**    FLAWED EXPERT TESTIMONY IS PROPERLY STRICKEN FROM A CLASS CERTIFICATION PROCEEDING ................................................................. - 6 -

    **A.**    The Court Should Apply Daubert At Class Certification ..................................... - 6 -

    **B.**    Even Under A Modified Daubert Test, Expert Testimony Must Be Relevant And Reliable For Class Certification Purposes ......................................................... - 8 -

**II.**    DR. BENDICK'S DECLARATION IS INADMISSIBLE ......................................... - 10 -

    **A.**    Dr. Bendick's Testimony Lacks Probative Value For Plaintiffs' Challenge To Costco's PromoteFromWithin Policies............................................................ - 10 -

    **B.**    Dr. Bendick's Declaration Is So Deeply Flawed That It Is Inadmissible As A Matter Of Law................................................................................................ - 12 -

        1.    The Bendick "Benchmarks" Are Unreliable Because They Fail To Control For Job Earnings ................................................................................ - 12 -

        2.    Bendick's Benchmarks Are Unreliable Because They Compare Costco To "General Merchandise Stores" And "All Retailers"............................... - 15 -

        3.    Dr. Bendick's CensusBased Benchmarks Are Unreliable As They Use The Wrong Census Occupational Code ...................................................... - 18 -

        4.    Dr. Bendick Incorrectly Relies On The EEO1 Category of "Officials and Managers" as a Comparator for Costco's HighLevel Positions of GM and AGM ................................................................................................ - 19 -

        5.    Dr. Bendick Incorrectly Treats GenderDifferentiated Interest In Merchandise Manager As A Demand Factor......................................... - 20 -

CONCLUSION........................................................................................................ - 22 -

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Alexander v. Fulton County,*
    207 F.3d 1303 (11th Cir. 2000) ................................................................13, 16, 17, 19, 21

*Amchem Prods., Inc. v. Windsor,*
    521 U.S. 591 (1997).............................................................................................................8

*Bell v. Ascendant Solutions,*
    422 F.3d 307 (5th Cir. 2005) ..............................................................................................8

*Blades v. Monsanto Co.,*
    400 F.3d 562 (8th Cir. 2005) ............................................................................................11

*Bowe v. PolyMedica Corp.,*
    432 F.3d 1 (1st Cir. 2005)..................................................................................................10

*CNA Financial Corp. v. Donovan,*
    830 F.2d 1132 (D.C. Cir. 1997).........................................................................................20

*Carpenter v. Boeing Co.,*
    456 F.3d 1183 (10th Cir. 2006) ........................................................................................13

*Castano v. American Tobacco Co.,*
    84 F.3d 734 (5th Cir. 1996) ..............................................................................................11

*Daubert v. Merrell Dow Pharms., Inc.,*
    509 U.S. 579 (1993)..............................................................................................................7

*Dukes v. Wal-Mart, Inc.,*
    222 F.R.D. 189 (N.D. Cal. 2004)....................................................................9, 10, 17, 18

*Gariety v. Grant Thornton, LLP,*
    368 F.3d 356 (4th Cir. 2004) ............................................................................................10

*Johnston v. HBO Film Mgmt.,*
    265 F.3d 178 (3d Cir. 2001)...............................................................................................11

*Jones v. GPU,*
    234 F.R.D. 82 (E.D. Pa. 2005).........................................................................................10

*Kline v. Coldwell Banker & Co.,*
    508 F.2d 226 (9th Cir. 1974) ..............................................................................................8

*Kumho Tire Co. v. Carmichael,*
    526 U.S. 137 (1999)..............................................................................................................7

*Lust By & Through Lust v. Merrell Dow Pharms.,*
    89 F.3d 594 (9th Cir. 1996) ................................................................................................7

*McNamara v. Bre-X Minerals Ltd.,*
    2002 U.S. Dist. LEXIS 27473 (E.D. Tex. Sept. 30, 2002) ..................................................8

*Middleton v. City of Flint*,
  92 F.3d 396 (6th Cir. 1996) ....................................................................................4, 16

*Morgan v. UPS*,
  380 F.3d 459 (8th Cir. 2004) .................................................................................12, 13

*Paige v. California*,
  291 F.3d 1141 (9th Cir. 2002) ...............................................................................11, 12

*In re Polypropylene Carpet Antitrust Litigation*,
  996 F. Supp. 18 (N.D. Ga. 1997) ..................................................................................9

*Pottenger v. Potlatch Corp.*,
  329 F.3d 740 (9th Cir. 2003) .......................................................................................13

*Rhodes v. Cracker Barrel Old Country Store*,
  213 F.R.D. 619 (N.D. Ga. 2003) .................................................................................23

*Sanneman v. Chrysler Corp.*,
  191 F.R.D. 441 (E.D. Pa. 2000).....................................................................................8

*Smith v. Virginia Commonwealth University*,
  84 F.3d 672 (4th Cir. 1996) .....................................................................................13, 14

*Szabo v. Bridgeport Machines*,
  249 F.3d 672 (7th Cir. 2001) ........................................................................................11

*Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives & Composites, Inc.*,
  209 F.R.D. 159 (C.D. Cal. 2002) ...................................................................................9

*Unger v. Amedisys*,
  401 F.3d 316 (5th Cir. 2005) ..........................................................................................8

*United States v. City of Miami*,
  115 F.3d 870 (11th Cir. 1997) ...................................................................................4, 21

*Vickers v. General Motors Corp.*,
  204 F.R.D. 476 (D. Kan. 2001).......................................................................................9

*In re Visa Check/MasterMoney Antitrust Litig.*,
  280 F.3d 124 (2d Cir. 2001)......................................................................................9, 11

*Wagner v. Taylor*,
  836 F.2d 578 (D.C. Cir. 1987).......................................................................................11

*West v. Prudential Sec.*,
  282 F.3d 935 (7th Cir. 2002) .........................................................................................11

*Williams v. City of New Orleans*,
  729 F.2d 1554 (5th Cir. 1984) .........................................................................................4

*Windham v. American Brands*,
  565 F.2d 59 (4th Cir. 1977) .............................................................................................8

TABLE OF AUTHORITIES
Case No. C04 3341 MHP

**STATE CASES**

*Civ. 8099,*
    1998 WL. 812045 ..................................................................................................16

**FEDERAL STATUTES**

29 C.F.R. § 1602.7.........................................................................................................5

*Cruz v. Coach Stores, Inc.,*
    No. 96 Civ. 8099, 1998 WL 812045 (S.D.N.Y. Nov. 18, 1998) ...................................9, 16

*Schwab v. Philip Morris USA, Inc., No. CV 04-1945,*
2005 WL. 3032556 (E.D.N.Y. Nov. 14, 2005)............................................................8

Rules Enabling Act, 28 U.S.C. §§ 2071-2077 ................................................................8

**MISCELLANEOUS**

*L. Elizabeth Chamblee, Between "Merit Inquiry" And "Rigorous Analysis": Using
    Daubert to Navigate The Gray Areas Of Federal Class Action Certification* 31
    Fla. St. U. L. Rev. 1041, 1090 (2004)...............................................................8

**STATUTES**

Mary Kay Kane, Federal Practice & Procedure, Charles A. Wright, § 1798 at 223 (3d ed.
    2005) ...............................................................................................................10

1

2

**NOTICE OF MOTION**

3      Please take notice that, on November 6, 2006 at 2 p.m. before the Honorable Judge

4    Marilyn Hall Patel, United States District Court, Courtroom 15, 450 Golden Gate Ave., San

5    Francisco, California, Defendant will seek an order striking the Declaration of Marc Bendick, Jr.,

6    Ph.D. This motion is based on the attached memorandum of points and authorities, the

7    accompanying declarations and exhibits, the proposed order, and any further briefing and

8    arguments of counsel.

9

**INTRODUCTION**

10      Dr. Bendick submitted a declaration to support  Plaintiffs' motion for class certification

11    by arguing that five "benchmarks" to the external labor market show the expected numbers of

12    women in management positions at Costco.  These "benchmarks," however, are merely results-

13    oriented constructs unreliable on their face and devoid of probative value because they bear no

14    relation to Costco's managerial jobs or its business.

15      The high-level executive nature of the General Manager ("GM") and the Assistant

16    Manager ("AGM") positions at Costco make them non-comparable to the department store

17    managers, lower-level managers, first-line supervisors, small retail store managers, or the myriad

18    of other less responsible, less skilled, and less demanding management jobs in much smaller

19    facilities that Dr. Bendick includes in his analysis.  His "benchmarks" ignore market realities by

20    lumping together all levels of management jobs and all sizes of businesses, which he then

21    attempts to compare to an exceptional company such as Costco.  Moreover, his external labor

22    market comparison lacks probative value for the issues concerning Costco's promotion-from-

23    within practices, which require an analysis based on Costco's internal labor pools.  Accordingly,

24    his declaration should be disregarded as irrelevant and should be stricken by the Court.

25    Specifically:

26      •      Dr. Bendick fails to control for job earnings, in any of his five benchmarks, a

27            critical non-discriminatory factor that, when considered, entirely negates the

28

MOTION TO STRIKE BENDICK DECLARATION
Case No. C04 3341 MHP
- 1 -

supposed shortfall of women in management at Costco versus the labor market. Instead, he indiscriminately aggregates managers earning $25,000 annually with Costco-level managers earning well over $150,000.

- Dr. Bendick inappropriately relies on the over-inclusive industrial categories of "General Merchandise Stores" and "All Retail" as comparators for Costco, an error he took pains to avoid in his own prior work in *Dukes v. Wal-Mart* but ignored in this case. As a result, he aggregates small retail stores with Costco warehouses that generate annual revenues exceeding $100 million;

- Dr. Bendick uses the wrong census data code as a comparator for Senior Staff managers, which, again, results in an erroneous finding that there is a shortfall of female managers at Costco compared to his benchmarks;

- Dr. Bendick relies on the overbroad EEO-1 omnibus category of "Officials and Managers" as a comparator for Costco's high-level executive positions of GM and AGM; and

- Dr. Bendick wrongly treats gender-differentiated interest in the Merchandise Manager ("MM") position as a demand factor rather than a supply factor.

These errors render the Bendick "benchmarks" useless as purported scientific tools for his intended purpose: to measure the expected representation of women in management positions at Costco.

Dr. Bendick's own results prove the point. His five benchmarks produce measurements of availability and interest of female managers in the relevant labor market that range from 33.2% to 63.9%. Bendick Decl. ¶¶ 29-35 and Table 7.[1] These wildly inconsistent results of various "benchmarks," all of which purport to measure the same thing, demonstrate that the

---

[1] The declarations, depositions and exhibits cited herein have all been filed by Defendant in opposition to Plaintiffs' motion for class certification.

MOTION TO STRIKE BENDICK DECLARATION
Case No. C04 3341 MHP

- 2 -

1   Bendick benchmarks are unreliable, on their face.[2] Because Dr. Bendick's declaration lacks any

2   probative value on an issue bearing on class certification, the Court should strike his analysis—

3   as at least three Circuit Courts have done to similarly flawed Bendick "benchmarks."[3]

**RELEVANT BACKGROUND**

4

5   **A.      The GM and AGM Positions At Costco.**

6          It is undisputed that a Costco GM is an important executive. She has the final say on

7   day-to-day operations of a $100 million-plus business with over 200 employees. She evaluates

8   and promotes everyone in her warehouse. GMs earn an average salary of over $116,000 (and as

9   much as $176,000), plus an annual bonus of up to $40,000, and 2,000 stock units. Nelson Decl.

10  ¶ 5. A GM typically has more than a dozen years of prior Costco experience, much of it as an

11  AGM and Senior Staff manager.

12         Costco selects AGMs with the thought that, with sufficient experience and vacancies,

13  they will eventually become GMs (although relatively few can make it, as Costco has over 900

14  AGMs and selects only 35 or so GMs per year). The AGM fills in for the GM when she is

15  absent. AGMs earn an average salary of over $73,000, earn as much as $110,000, are eligible

16  for an annual bonus of up to $5,000, and receive 350 stock units.

17

18

19  [2]   Dr. Bendick concedes, as he must, that each "benchmark" provides different expected

20        percentages of representation, as each is under-inclusive in some sense. Bendick Dep. 215-
       17.

21  [3]   *E.g, United States v. City of Miami*, 115 F.3d 870, 872-74 (11th Cir. 1997) (Dr. Bendick's

22        testimony lacked probative value because in trying to show gender discrimination in
       promotion, he ignored legally relevant factors such as "interest of women in various ...

23        jobs," he improperly assumed that all employees would seek promotion upon eligibility at
       the same rate as their percentage in the general population, he assumed without evidence

24        that women were deterred from applying because of employer reputation for unfairness, and
       he relied on erroneous and incomplete general census data); *Middleton v. City of Flint,* 92

25        F.3d 396, 406 & n.8 (6th Cir. 1996) (district court erred as a matter of law in relying on Dr.
       Bendick's attempt to use "raw statistics concerning the city's general labor pool" to show

26        discrimination in promotion, and his "numbers also are quite misleading in other ways");
       *Williams v. City of New Orleans*, 729 F.2d 1554, 1562 (5th Cir. 1984) (rejecting Dr.

27        Bendick's analysis of relevant labor market as erroneous).

28
                                    MOTION TO STRIKE BENDICK DECLARATION
                                    Case No. C04 3341 MHP
                                              - 3 -

**B.     The Bendick "Benchmarks."**

Dr. Bendick attempted to create "benchmarks" to measure the expected representation of women in GM and AGM  positions at Costco based on external labor market data; but he failed, completely, to identify Costco–like management positions at Costco-like enterprises.  The "benchmarks" he created use two different sources of data:  the 2000 U.S. Census and EEO-1 data drawn from 1999 to 2003.  Dr. Bendick used these two data sources to create five different "benchmarks."  First, using the 2000 Census Code data, he created one "benchmark" (Benchmark 1) on the basis of data for "General Merchandise Stores" and another "benchmark" (Benchmark 2) on the basis of data for "All Retailers."  For both benchmarks, Dr. Bendick incorrectly used the occupational code for "Marketing and Sales Managers" as a comparator for Costco's Senior Staff managers.  Next, using EEO-1 data, which lumps all salaried supervisors and managers together as "Officials and Managers," Dr. Bendick created three more "benchmarks"—one based on 1999-2003 EEO-1 data for "General Merchandise Stores" (Benchmark 3), another based on 1999-2003 EEO-1 data for "All Retailers" (Benchmark 4), and yet another based on local 2000 EEO-1 data for larger establishments 50 or more employees among "Miscellaneous General Merchandise Stores" (Benchmark 5).  Bendick Decl. ¶¶ 21-35, Tables 4-7.

Dr. Bendick concedes that these "benchmarks" have numerous flaws even beyond those already noted above. The census-based "benchmarks" (Benchmark 1 and Benchmark 2) are flawed in that they:

•       include stores of all sizes, including "mom and pop" stores (Bendick Decl. ¶ 19),

•       are nationwide, not tailored to any local labor market in which Costco is located (*id.*), and

•       may be inaccurate to the extent other employers over-utilize or under-utilize women managers (*id.*).

The EEO-1-based "benchmarks" (Benchmarks 3-5) are flawed in that they:

•       lump together all supervisors and managers as "Officials and Managers," precluding any meaningful comparison at specific levels of warehouse management at Costco (Bendick Decl. ¶¶ 25, 28),

MOTION TO STRIKE BENDICK DECLARATION
Case No. C04 3341 MHP

- 4 -

1    •      include small retail establishments, and

2    •      even the "best" "benchmark," Benchmark 5, only partially mitigates this problem by
            reporting only establishments with 50 or more employees,[4] while Costco's warehouses
3           typically are at least four times that size (i.e., over 200 employees).

4           Dr. Bendick admits to still further analytical flaws.  He admits he has no idea how the

5    data he used for Benchmark 5, relying on 167 Costco establishments in 2000, would compare to

6    the over 300 Costco establishments in operation during 2004.  Bendick Dep. 21.  Yet he uses

7    information from those 167 Costco establishments in 2000 (two years before the liability period)

8    to perform Benchmark 5 comparisons instead of applying information he had regarding 300

9    Costco establishments in 2004.  *Id.* at 15-17.  Dr. Bendick also admits his Benchmark 5 would

10   compare Costco's high-level warehouse managers to an EEO-1 category—"Officials and

11   Managers"—that includes everything from "first-level supervisors all the way up through

12   chairman-of-the-board-type senior executives." *Id.* at 81.  Dr. Bendick also admits that the EEO-

13   1 statistics tell us nothing about the earnings or hours worked of the Officials and Managers

14   (Bendick Dep. 106), even though, as discussed below, both are critical variables to consider in

15   developing a meaningful benchmark for present purposes.

16          Finally, despite the significant differences in duties and work hours among various Senior

17   Staff manager positions, Dr. Bendick lumps them all together for purposes of his analysis.  He is

18   candidly ignorant about the nature of the differences among the Senior Staff positions, although

19   he knows that differences do exist.  Bendick Dep. 119-120.  Although he acknowledges that the

20   MM position is vitally important to consideration for promotion, Dr. Bendick treated each Senior

21   Staff manager position alike, and disdained any special benchmarking for the MM position

22

23

24   [4]    Dr. Bendick sought to mitigate his problem with reporting small establishments by claiming
            that the EEO-1 filing threshold for establishments is 100 employees.  Bendick Dep. 18:6-11.
25          In fact, the 100-employee threshold is for an entity overall.  29 CFR 1602.7.  For multi-
            establishment employers, an entity must file an individual establishment report for each
26          establishment with 50 employees.  *See* EEO Form 100 at
            http://www.eeoc.gov/stats/jobpat/eeo1. pdf; instructions for completion of EEO Form 100
27          form at http://www.eeoc.gov/stats/jobpat/e1instruct.html.

28
                                                              MOTION TO STRIKE BENDICK DECLARATION
                                                              Case No. C04 3341 MHP
                                           - 5 -

1  specifically, notwithstanding its key role in promotions and the unusual working hours this

2  position requires.  Bendick Dep. 120, 125, 142-43.

3      These admitted flaws notwithstanding, Dr. Bendick opines "with reasonable scientific

4  certainty" that his "benchmarks" reveal under-representation of women in various managerial

5  positions at Costco (Bendick Decl. ¶¶ 30-33), and that these shortfalls cannot be explained by

6  non-discriminatory supply factors (e.g., the preferences of women for certain hours of work) but

7  are solely the result of demand factors determined by Costco.  Bendick Decl. ¶¶ 34-35.[5]  Given

8  the inadequacies of his benchmarks, these "opinions" are groundless speculation.

9

## ARGUMENT AND ANALYSIS

10

### I.   FLAWED EXPERT TESTIMONY IS PROPERLY STRICKEN FROM A CLASS CERTIFICATION PROCEEDING

11

12      **A.   The Court Should Apply *Daubert* At Class Certification**

13      Where, as here, Plaintiffs critically rely on their experts, the Court must assess expert

14  reliability under the principles established in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S.

15  579 (1993) and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999).  Federal Rule of Evidence

16  702—the subject of both *Daubert* and *Kumho Tire*— allows expert witness testimony only if (1)

17  the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable

18  principles and methods, and (3) the witness has applied the principles and methods reliably to the

19  facts of the case.  *Kumho Tire*, 526 U.S. at 147; *Daubert*, 509 U.S. at 590.

20      "[T]he trial judge must ensure that any and all scientific testimony or evidence admitted

21  is not only relevant, but reliable," *Daubert*, 509 U.S. at 590, and must ensure that an expert

22  employs "the same level of intellectual rigor that characterizes the practice of an expert in the

23  relevant field." *Kumho*, 526 U.S. at 152.  Courts making this determination consider such factors

24  as (1) whether the method has gained general acceptance in the relevant scientific community,

25

26

27

---

[5]   In this respect, Dr. Bendick differs from Plaintiff's expert, Dr. Reskin, who conceded that women's preferences "play a role" in the numbers of men and women in management positions at Costco, and that these numbers are not "entirely the product of Costco's practices."  Reskin Dep. 238-39.

28

(2) whether the method has been peer-reviewed, (3) whether the method can be (and has been) tested, and (4) whether there is a known or potential rate of error. *See Lust By & Through Lust v. Merrell Dow Pharms.*, 89 F.3d 594, 597 (9th Cir. 1996) (citing *Daubert*'s four non-exclusive factors that assist in "the separation of inadmissible opinions based on junk science from admissible opinions developed by the scientific method").

Especially in light of the heavy stakes at the class certification stage, courts have correctly applied a full *Daubert* analysis to expert testimony offered in support of class certification. *See Bell v. Ascendant Solutions,* 422 F.3d 307 (5th Cir. 2005) (observing and not disapproving of district court's exclusion of plaintiff's expert under *Daubert* in class certification context). *Unger v. Amedisys,* 401 F.3d 316, 323-24 n.6 (5th Cir. 2005) (quoting with approval an unpublished district court case that applied *Daubert* at the class certification stage); *Sanneman v. Chrysler Corp.*, 191 F.R.D. 441 (E.D. Pa. 2000) (applying *Daubert* analysis at class certification stage); *McNamara v. Bre-X Minerals Ltd.,* 2002 U.S. Dist. LEXIS 27473 (E.D. Tex. Sept. 30, 2002) (same).

A law review commentator correctly concludes that a full *Daubert* analysis should apply to expert testimony at the class certification stage. L. Elizabeth Chamblee, *Between "Merit Inquiry" And "Rigorous Analysis": Using Daubert to Navigate The Gray Areas Of Federal Class Action Certification* 31 Fla. St. U.L. Rev. 1041, 1090 (2004). Anything less would deprive Costco, in derogation of the Rules Enabling Act, 28 U.S.C. §§ 2071-2077, of its due process rights to exclude inadmissible evidence. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613 (1997) ("Rule 23's requirements must be interpreted in keeping with Article III constraints, and with the Rules Enabling Act, which instructs that rules of procedure shall not abridge, enlarge, or modify any substantive right.") (internal citations omitted). Courts have applied the Rules Enabling Act in the class action context to disallow interpretations of Rule 23 that would abridge the substantive rights of the parties. *See Windham v. American Brands,* 565 F.2d 59, 72 & n.41 (4th Cir. 1977) (disallowing fluid recovery under Rule 23, as being in violation of the Rules Enabling Act); *Kline v. Coldwell Banker & Co.*, 508 F.2d 226, 233-34 (9th Cir. 1974) (same); *cf.*

MOTION TO STRIKE BENDICK DECLARATION
Case No. C04 3341 MHP

- 7 -

1  *Schwab v. Philip Morris USA, Inc.*, No. CV 04-1945, 2005 WL 3032556 at *4 (E.D.N.Y. Nov.

2  14, 2005) (courts must stay within the bounds of due process and avoid altering substantive law

3  in violation of the Rules Enabling Act when shaping the remedies in Rule 23(b) actions).

**B.     Even Under A Modified *Daubert* Test, Expert Testimony Must
Be Relevant And Reliable For Class Certification Purposes**

6          Some courts apply a modified *Daubert* standard at the class certification stage.  *E.g.*,

7  *Dukes v. Wal-Mart, Inc.*, 222 F.R.D. 189, 191-92 (N.D. Cal. 2004) (without mentioning the

8  Rules Enabling Act); *Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives & Composites,*

9  *Inc.*, 209 F.R.D. 159, 162 (C.D. Cal. 2002).  This controversy between a rigorous approach and a

10  more lenient approach, important as it is as a matter of principle, need not detain the Court here.

11  The Court need not engage in a "statistical dueling" because Dr. Bendick's analysis fails to meet

12  even a lenient test, as is apparent on the face of his declaration, given the undisputed facts and

13  the unrebutted conclusions of other experts.

14          Even under a modified *Daubert* standard, courts must not "uncritically accept all expert

15  evidence that is offered in support of, or against, class certification." *Dukes*, 222 F.R.D. at 191.

16  Even under a modified standard, "[a] district court must ensure that the basis of the expert

17  opinion is not so flawed that it would be inadmissible as a matter of law."  *In re Visa*

18  *Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 135 (2d Cir. 2001); *Dukes*, 222 F.R.D. at 191

19  (expert opinion must at least have probative value for purposes of class certification).  Under this

20  modified standard, the Court must determine whether the expert's testimony is so flawed as to be

21  inadmissible as a matter of law by examining whether the expert's methodology (1) comports

22  with basic principles, (2) has any probative value, and (3) primarily uses evidence that is

23  common to all members of the proposed class.  *See In re Polypropylene Carpet Antitrust*

24  *Litigation*, 996 F. Supp. 18, 26 (N.D. Ga. 1997); *Dukes*, 222 F.R.D. at 191.   Where an expert's

25  testimony is flawed as a matter of law, it should not be admitted even at the class certification

26  stage. *See, e.g., Vickers v. General Motors Corp.*, 204 F.R.D. 476, 479 (D. Kan. 2001) (court

27  cannot certify class action based on expert opinion so flawed as to be inadmissible as matter of

28

law); *Cruz v. Coach Stores, Inc.*, No. 96 Civ. 8099, 1998 WL 812045, at *4 n.3 (S.D.N.Y. Nov.

18, 1998) (disregarding expert report submitted in support of motion for class certification as

"fatally flawed"), *aff'd in part, vacated in part on other grounds*; *Cruz v. Coach Stores, Inc.*, 202

F.3d 560 (2d Cir. 2000).

In assessing an expert's reliability, a court may weigh evidence to decide class

certification issues. *E.g., Bowe v. PolyMedica Corp.*, 432 F.3d 1, 5-6 (1st Cir. 2005) (district

court has power to weigh evidence relating to class certification inquiry); *Gariety v. Grant

Thornton, LLP*, 368 F.3d 356, 365 (4th Cir. 2004) (district court erred in taking plaintiff's

assertions at face value in certifying class, because if court simply accepted complaint "at face

value in making class action findings, every complaint asserting the requirements of Rule 23(a)

and (b) would automatically lead to a certification order, frustrating the district court's

responsibilities for taking a 'close look' at relevant matters, for conducting a 'rigorous analysis'

of such matters, and for making 'findings' that the requirements of Rule 23 have been satisfied")

(internal citations omitted); *Jones v. GPU*, 234 F.R.D. 82, 93 (E.D. Pa. 2005) (denying motion

for class certification due to lack of commonality and typicality; while court "does not normally

look into the merits of the case at the certification stage, the validity of the plaintiffs' proffered

statistical analysis is a proper inquiry at this point"); 7B ARTHUR R. MILLER & MARY KAY KANE,

FEDERAL PRACTICE & PROCEDURE, CHARLES A. WRIGHT, § 1798 at 223 (3d ed. 2005) (weighing

evidence on class certification is appropriate if it is "directed toward examining the underlying

MOTION TO STRIKE BENDICK DECLARATION
Case No. C04 3341 MHP

- 9 -

1    facts to determine whether they are susceptible to common proof and is not to determine the

2    probability of success on the merits").[6]

3        **II.    DR. BENDICK'S DECLARATION IS INADMISSIBLE**

4        **A.    Dr. Bendick's Testimony Lacks Probative Value For Plaintiffs'
    Challenge To Costco's Promote-From-Within Policies.**

5        Before examining the numerous shortcomings of the Bendick "benchmarks," the Court

6    must determine whether external labor market benchmarks have any probative value for

7    Plaintiffs' challenge to Costco's promotions from within its *internal* labor pool.[7] As courts have

8    held, they do not.

9        In *Paige v. California*, 291 F.3d 1141 (9th Cir. 2002), African-American officers of the

10   California Highway Patrol ("CHP") alleged race discrimination in promotions and sought to

11   compare the percentage of African-American CHP officers to the percentage of African-

12   American law enforcement personnel in the California labor market. *Id.* at 1143. The Ninth

13   Circuit rejected this reliance on an external feeder pool instead of an internal feeder pool to show

14

15   _____
   [6]  *See also Blades v. Monsanto Co.*, 400 F.3d 562, 566-67 (8th Cir. 2005) (consideration of

16   class certification may require court to resolve disputes going to factual setting of case, and
such disputes may overlap with merits); *West v. Prudential Sec.*, 282 F.3d 935, 938 (7th Cir.

17   2002) ("Tough questions [at class-certification stage] must be faced and squarely decided, if
necessary by holding evidentiary hearings and choosing between competing perspectives.");

18   *Johnston v. HBO Film Mgmt.*, 265 F.3d 178, 189 (3d Cir. 2001); *Szabo v. Bridgeport
Machines*, 249 F.3d 672, 675-76 (7th Cir. 2001) ("judge should make whatever factual and

19   legal inquiries are necessary under Rule 23" even if "judge must make a preliminary inquiry
into the merits"); *Castano v. American Tobacco Co.*, 84 F.3d 734, 744 (5th Cir. 1996) ("A

20   district court certainly may look past the pleadings to determine whether the requirements of
Rule 23 have been met. Going beyond the pleadings is necessary, as a court must

21   understand the claims, defenses, relevant facts, and applicable substantive law in order to
make a meaningful determination of the certification issues"); *In re Visa Check/Master*

22   *Money Antitrust Litig., supra* ("the court must ensure that the basis of the expert opinion is
not so flawed that it would be inadmissible as a matter law."); *Wagner v. Taylor*, 836 F.2d

23   578, 587 (D.C. Cir. 1987) ("While, of course, a court does not possess 'any authority to
conduct a preliminary inquiry into the merits of a suit in order to determine whether it may

24   be maintained as a class action,' it is evident that some inspection of the circumstances of
the case is essential to determine whether the prerequisites of Federal Civil Rule 23 have

25   been met.").

26   [7]  Costco's structured promote-from-within policy, at the level of GM, AGM and Senior Staff,
may in fact be characterized as a "Firm Internal Labor Market," according to Plaintiffs'

27   expert, Dr. Reskin. Reskin Dep. 204-05.

28   _____
                        MOTION TO STRIKE BENDICK DECLARATION
                               Case No. C04 3341 MHP

1  discrimination in promotions, notwithstanding plaintiffs' argument that the internal pool was

2  inadequate because it was tainted by discrimination in hiring. *Id.* at 1145.  The court held that, as

3  a matter of law, plaintiffs could not rely on the proposed external pool (other African-American

4  law enforcement personnel in California), even if there was discrimination in hiring, because the

5  district court had held that the plaintiffs lacked standing to challenge any practice that implicated

6  hiring. *Id.* at 1146.  Thus, plaintiffs could compare themselves only against an internal pool of

7  employees who, by definition, were already hired. *Id.*

8         Similarly, the Eighth Circuit rejected an essentially identical labor market analysis that

9  was offered to support class certification in another failure-to-promote case, *Morgan v. UPS*, 380

10  F.3d 459 (8th Cir. 2004).  In *Morgan*, African-American plaintiffs brought a Title VII class

11  action for failure to promote, like the Plaintiffs here. 380 F.3d at 461.   The plaintiffs offered

12  expert testimony that the percentage of African-American division managers employed at UPS

13  was less than the percentage of their representation in the general populations of "all black

14  officials and managers," "operatives and laborers," and "blue collar workers." *Id.* at 464.  The

15  Eighth Circuit rejected outright this mode of analysis, holding that "plaintiff's reliance on a

16  bottom line racial imbalance in the workforce is insufficient to establish that blacks are less

17  likely to be promoted." *Id.* at 465.  The *Morgan* court also held that "[t]he relevant inquiry was

18  whether promotions from center to division manager were racially discriminatory, taking into

19  account the proper pool of *available qualified employees*.  The evidence presented of *overall*

20  *racial imbalances* and even general trends in upward mobility is insufficient." 380 F.3d at 465

21  (emphasis added).

22         Dr. Bendick uses the same kind of overbroad bottom-line statistics here.  He relies solely

23  on external pools from either Census or EEO-1 data.  By focusing exclusively on external labor

24  pools while ignoring the uniquely relevant internal labor pool of Costco employees available for

25  promotion, his analysis is remote from the issues in this case apart from its other inherent flaws –

26  and must be deemed inadequate as a matter of law.[8]

27  _____
   [8]    *Paige*, 291 F.3d 1146; *Morgan*, 380 F.3d at 465.

28  _____
                                        MOTION TO STRIKE BENDICK DECLARATION
                                        Case No. C04 3341 MHP
                          - 11 -

**B.** **Dr. Bendick's Declaration Is So Deeply Flawed That It Is Inadmissible As A Matter Of Law**

Dr. Bendick eschews a "finely tuned" analysis that would compare "the employer's relevant workforce with the qualified populations in the relevant labor market,"[9] in favor of a results-oriented, arbitrary model that is inherently unreliable and without probative value.[10]

**1.** **The Bendick "Benchmarks" Are Unreliable Because They Fail To Control For Job Earnings**

Since lower-level managerial positions are not at issue, Dr. Bendick's failure to control for the level of job earnings—even though data stratified by earnings level were available—renders his benchmark comparisons misleading and irrelevant.[11] Thus, Dr. Bendick admits that his benchmarks lack any controls for earnings, even though he agrees that Census data for earnings is available with respect to Benchmark 1 and Benchmark 2 and that the level of earnings can reflect a position's level of skills and responsibilities. Bendick Dep. 106, 163, 176. While admitting that one should consider skills and job responsibilities when comparing jobs, Dr. Bendick stated, "This isn't, of course, what I'm doing here, wasn't what I was asked to do, isn't what I attempted, isn't what I accomplished." *Id.* at 157-58.

---

[9]  *See Alexander v. Fulton County,* 207 F.3d 1303, 1327-28 (11th Cir. 2000) (requiring such analysis to be *"finely tuned* to compare the employer's relevant workforce with the qualified populations in the relevant labor market") (emphasis added).

[10]  *Carpenter v. Boeing Co.,* 456 F.3d 1183, 1197 (10th Cir. 2006) ("absent a close fit between the population used to measure disparate impact and the population of those qualified for a benefit, the statistical results cannot be persuasive"). Costco also moves to strike Dr. Drogin's declaration based on numerous flaws therein. To the extent that Dr. Bendick's analysis relies on Dr. Drogin, the Bendick Declaration falls with the Drogin Declaration.

[11]  *See, e.g., Carpenter,* 456 F.3d at 1198-99 (expert statistician's failure to control for major factors in Title VII case challenging overtime assignments renders his opinion unreliable); *Morgan,* 380 F.3d at 465 (statistician's regression analysis in pay discrimination case irrelevant for failing to control for past pay, which, when controlled for, demonstrated no statistically significant disparity between white and black pay); *Pottenger v. Potlatch Corp.,* 329 F.3d 740, 748 (9th Cir. 2003) (affirming summary judgment and noting that an expert statistical analysis flawed due to failure to control for relevant variables expert admittedly could have controlled for); *Smith v. Virginia Commonwealth University,* 84 F.3d 672, 676-77 (4th Cir. 1996) (affirming summary judgment and noting that an regression analysis used in employment discrimination context "must include all the major factors" that influenced the challenged action).

---

MOTION TO STRIKE BENDICK DECLARATION
Case No. C04 3341 MHP

- 12 -

1    Costco's managers earn considerably more than the purported comparators in Bendick's

2    "benchmarks": in 2000, the PUMS data show the median salary for general and operations

3    managers of general merchandise stores was $48,000. *Id.* at 160-61. Yet Dr. Bendick refuses to

4    say whether it is reasonable to compare people in the "General and Operations Managers"

5    category, including those earning $25,000 annually with Costco's general managers, whose

6    average salary (before bonus) is $116,000. *Id.* at 172-73.

7        Dr. Bendick ultimately defends his "benchmarks" with the assertion—unsupported by

8    any economic research he deigns to cite—that earnings is a "very very poor proxy to these sorts

9    of comparability characteristics." Bendick Dep. 172. He, nevertheless, provides no other

10   "proxy" of his own and concedes that the amount of skill and responsibility in a job is a

11   determinant of pay, acknowledging that there "is a huge literature talking about the extent to

12   which that is true." *Id.* at 176-77. Without any factual basis, except third-hand accounts, Dr.

13   Bendick argues that Costco has a higher level of efficiency and profitability than it competitors

14   (Bendick Second Report ¶ 6, Kadue Decl., Ex. O) and therefore concludes that Costco

15   systematically overpays its managers compared to the equally able managers hired by its

16   competitors, simply because it can afford to do so.[12] Bendick Second Report ¶¶ 4-6. Reasoning

17   backwards from his conclusion, and without any scientific basis that he cites, Dr. Bendick

18   concludes that Costco's managers are overpaid as result of Costco's comparative success, not

19   that Costco's success is the result of the comparative excellence of its managers.

20       As Dr. Saad notes, the relation between earnings level and such productivity factors as

21   skills and responsibility is well accepted in economic theory:

22           An earnings control is appropriate, since in a functioning labor market,
             productivity is rewarded via compensation. If compensation is higher, it must be
23           due to higher skills and/or greater responsibility. **To the extent that these**
             **characteristics may be correlated with gender in certain jobs, failing to**
24

_____

25   [12]  Notwithstanding that Costco is more efficient than competitors such as Wal-Mart or Target
26   in sales per square foot, its gross profit margins and operating margins are actually less than
     one-half of Wal-Mart's and approximately one-third of Target's. Nelson Decl. ¶ 3, at 2:24-
27   25. Dr. Bendick has based his conclusion here on a mistaken assumption of fact.

28
_____

                              MOTION TO STRIKE BENDICK DECLARATION
                              Case No. C04 3341 MHP
                                    - 13 -

1

**control for them will produce a biased and unreliable benchmark.**[13]  Saad
First Decl. ¶¶ 100-01 (emphasis added).

2

3   Dr. Bendick's unsupported and unsupportable explanation for not controlling for earnings is

4   wholly inconsistent with accepted economic principles.  Dr. Saad concludes, "In my years as a

5   labor economist, I have never seen a 'scientific opinion' so out of step with the findings of the

6   discipline.  Dr. Bendick either misunderstands the nature of economic forces, or has made

7   statements in his second report that he knows are unsupportable." *Id.*

8        By not controlling for earnings, as Dr. Saad reports,  Benchmarks 1 and 2 are over-

9   inclusive, by comparing Costco managers with retail managers who have very different levels of

10  skills and responsibilities.  "For example, a Costco manager may be responsible for managing

11  $150 million plus in inventory and hundreds of employees as compared to a retail manager that

12  is responsible for $1 million in inventory and ten employees.  The two retail management jobs

13  are different in terms of size and scope." Saad Second Decl. ¶ 13.[14]

14       When one controls for job earnings, the female representation of Costco actually exceeds

15  that in the external labor market. Saad First Decl. ¶ 105, Ex. 43.  Specifically, with job earnings

16  controlled for, female representation in Costco's Senior Staff, AGM, and GM positions (27.4%,

17

18

---

19  [13]    Saad Second Decl. ¶¶ 13-23:

20       "It is also important in an external benchmarking exercise to compare workers drawn from
approximately the same distribution of skills and responsibilities.  Dr. Bendick did not take

21  into account skills and responsibilities.  It is inappropriate to compare managers of low skill
and/or low scope of responsibility, earning $25,000 per year, to those with high skill and

22  high scope of responsibility, earning more than $50,000 per year.  In Dr. Bendick's analysis,
this is essentially what happens.  Dr. Bendick does not utilize a control for skills and other

23  human capital, which can be accomplished by utilizing an earnings control in the data one
uses to construct the external benchmark."

24  [14]   Dr. Bendick attempts to explain away the job-earnings differentiator by arguing that Costco

25  pays its managers more, not because the scope of their jobs is larger than that of Dr.
Bendick's comparators, but because Costco is extremely efficient and profitable.  Bendick

26  Second Report ¶¶ 4-6. But as Dr. Saad points out, "Dr. Bendick's 'scientific' opinion is
therefore that labor market earnings are not determined by market forces of the supply and

27  demand for labor." Saad Second Decl. ¶17.

28

MOTION TO STRIKE BENDICK DECLARATION
Case No. C04 3341 MHP

- 14 -

1   16.8%, 13.2%, respectively) exceeds that in the external labor market (22.3%, 14.2%, 10.2%,

2   respectively). *Id.*[15]

3         Dr. Bendick's own results reflect the shortcomings of creating benchmarks that fail to

4   capture the significance of the skills and duties reflected by job earnings.  His results variously

5   report the availability of  relevant female managers from a low of  33.2% to a high of 63.9%

6   (Bendick Decl. ¶¶ 29-35, Table 7), which cannot assist the Court in making any factual

7   determination. *See, e.g., Middleton*, 92 F.3d at 406 (reversing district court for adopting Dr.

8   Bendick's "incomplete and therefore irrelevant" analysis); *Cruz*, No. 96 Civ. 8099, 1998 WL

9   812045, at *4 n.3 (expert's opinion so flawed as to be inadmissible as a matter of law).

10                    **2.     Bendick's Benchmarks Are Unreliable Because They
                            Compare Costco To "General Merchandise Stores"
11                          And "All Retailers"**

12        Dr. Bendick's two Census-based "benchmarks" and his three EEO-1-based

13  "benchmarks" purport to compare the female representation among Costco warehouse managers

14  to the female representation among managers in industry segments using the categories "General

15  Merchandise Stores" and "All Retailers."  Both categories are too overbroad to be meaningful.

16  Neither category is "finely tuned to compare the employer's relevant workforce with the

17  qualified populations in the relevant labor market," and both miss the mark for different reasons.

18  *Alexander*, 207 F.3d at 1327-28:

19        Dr. Saad details the problems raised by Dr. Bendick's use of "General Merchandise

20  stores" data as a benchmark.  Saad Second Decl. ¶ 31.  In particular, Costco's product mix is

21  very different from the major department stores included the "General Merchandise" category,

22  which handle little sales of food and sundries that are Costco's largest product sales.  In this

23  respect, Costco is similar to a large chain of grocery stores or other warehouse stores, who have

24  experience merchandising food products in environments that feature shopping carts and check-

25  out lines.  By contrast, managers at Macy's, Bloomindales, or Nordstorms manage women's

---

26  [15]   Dr. Bendick concedes that, as a general matter, the higher the income of retail managers the
27        lower the female representation.  Bendick Dep. 214.

28

1   shoes and cosmetics departments. *Id.*[16] As Dr. Saad makes clear, "All Retailers" is a more

2   appropriate occupational code to use in any good-faith attempt to benchmark. *Id.* Even if

3   "General Merchandise" were the correct category, moreover, Dr. Bendick's failure to apply any

4   sort of limitation based on size of the employer or the establishment renders his analysis

5   inherently unreliable.

6       Dr. Bendick is very familiar with the inadequacy of the data he relies on here.  In the

7   *Dukes* matter, rather than using Census data, Dr. Bendick created a benchmark consisting of

8   about twenty large retail chain-store operations. 222 F.R.D. at 164-65.  Thus, instead of

9   comparing Wal-Mart to "General Merchandise Stores," Dr. Bendick limited his comparison to

10  "twenty other large general merchandisers." *Id.* at 164.  He included Costco in that group. *See*

11  *id.* at 164 n.39.  Dr. Bendick opted for this comparison because it "is consistent with the

12  reasonable approach of comparing Wal-Mart to 'other large chain[s] of large stores selling a

13  large range of goods." Dr. Bendick Rebuttal Decl. in *Dukes* ¶ 14, Kadue Decl. ¶ V. *See Dukes*,

---

18  [16]   A review of the product sales mix of the department stores in Dr. Bendick's general

19  merchandise benchmark demonstrates that although many are categorized as "general
    merchandise" stores, they sell very little "general merchandise." For example, the

20  Nordstrom, Inc. 10-K filing for fiscal year ending January 28, 2006 provides a breakdown
    of sales by product category. At Nordstrom the break-down of sales was as follows:

21  women's apparel 35%, shoes 21%, cosmetics and women's accessories 20%, men's apparel
    18%, children's apparel 3%, and "other" 3%. At Federated Department Stores, parent

22  company for Macy's and Bloomingdales, the breakdown was as follows: 34% feminine
    accessories/intimate apparel/Shoes and Cosmetics, 28% women's apparel, 21% men's and

23  children's apparel, and 17% home / miscellaneous.[16] In contrast, the Costco product sales
    mix breakdown for 2005 was as follows: 31% Food (including: dry and fresh foods and

24  institutionally packaged foods), 29% Sundries (including: candy, snack food, health and
    beauty aids, tobacco, alcoholic beverages, soft drinks, cleaning and institutional supplies),

25  16% Hardlines (including: major appliances, electronics, hardware, office supplies, garden
    and patio, sporting goods, furniture, cameras, automotive supplies), 12% Softlines

26  (including: apparel, domestics, jewelry, housewares, media, home furnishings, and small
    appliances), and 12% Other (including: gas stations, pharmacy, food court, optical, one-

27  hour photo, hearing aid, and print-shop).  Saad Second Decl. ¶ 31.

---

1  222 F.R.D. at 165 n.40.   Indeed, in *Dukes*, Dr. Bendick railed against the approach that he now

2  uses in this case.[17]

3        Given Dr. Bendick's firm grasp of the importance of finding proper comparators in

4  *Dukes*, one would expect Dr. Bendick to offer, at least as one possible benchmark, a similarly

5  limited group of "large chain[s] of large stores selling a large range of goods" in this case. *Id* at

6  165 n.40.  Instead, however, Dr. Bendick chose to compare Costco to all "General Merchandise

7  Stores" and "All Retailers."  He admits that his "ideal benchmark" would be to "go to the large

8  general merchandise stores, which is to go to the Wal-Mart data," but he inexplicably failed to do

9  so.  Bendick Dep. 197.

10        Finally, Dr. Bendick concedes that the same over-inclusiveness plagues his "All Retailer"

11  benchmarks, which would treat as comparable a Costco GM and a neighborhood gas station

12  manager, despite the fact that a Costco GM runs a business (including gas stations, by the way)

13  that is vastly larger, with more than $100 million dollars of annual revenue and with hundreds of

14  employees (Bendick Dep. 138-39).  His own work in *Dukes* attests that this is an improper

15  comparison, under either a "General Merchandise Stores" benchmark or an "All Retailers"

16  benchmark.  In fact, Dr. Bendick's purported comparisons are just the sort of comparisons that

17  the *Dukes* court refers to when it disparages "comparing apples to oranges." *Dukes*, 222 F.R.D.

18  at 165 n.40.

---

19  [17]  "[T]he vast majority of these 4.9 million persons are employed in positions very different

20  from Wal-Mart store managers.  About 2 million of the 4.9 million are owners-operators of
retail activities so small that they are run by the owner (and possibly other family members)

21  without any paid employees.  Firms in this category include, for example, neighborhood
candy shops run by family members (sometimes called 'mom and pop' stores) and street

22  corner news stands.  It also includes part-time businesses selling Tupperware through sales
'parties' in customers' homes.  The rest of the persons [defendant's expert] includes in her

23  96% computation are employed by retail firms large enough to have at least one paid
employee other than the owner(s), but the vast majority of these firms are still very small ….

24  In selecting firms against which to compare Wal-Mart's employment of store managers, it is
appropriate to focus on firms in which store manager positions are most like those in Wal-

25  Mart.  It is therefore *not* appropriate to include firms that consist of a single retail store
rather than a chain of stores, to include chains in which individual stores are very small (for

26  example, half a dozen employees), or to include stores that sell only a narrow range of
specialized products (such as bakeries)."  Dr. Bendick Rebuttal Declaration in *Dukes* ¶¶ 13-

27  14 (emphasis in original), Kadue Decl., ¶ V.

28

1

### 3.   Dr. Bendick's Census-Based Benchmarks Are Unreliable As They Use The Wrong Census Occupational Code

2

3   Dr. Bendick's two Census-based benchmarks are also unreliable because they use the

4   wrong Census Code for the jobs he compares, with materially flawed results. Here again, Dr.

5   Bendick's analysis flunks the test that "statistical evidence must be finely tuned to compare the

6   employer's relevant workforce with the qualified populations in the relevant labor market."

7   *Alexander*, 207 F.3d at 1327-28. Specifically, his analysis fails when, in Benchmark 1 and

8   Benchmark 2, he compares Costco's female representation in Staff Manager positions with the

9   female representation for Census Code 005 ("Marketing and Sales Managers"). Bendick Decl. at

10   7 n.14; Bendick Dep. 158-59.

11   The correct Census Code for comparison is Code 470 ("First Line Supervisors/Managers

12   of Retail Sales Workers"). Saad First Decl. ¶ 104. Dr. Bendick concedes that he lacks enough

13   knowledge to determine whether Census Code 005 or Census Code 470 is the appropriate census

14   code for comparison. Bendick Dep. 192-93. Census Code 005—Marketing and Sales

15   Managers—covers workers with office jobs in sales and marketing, as opposed to the on-the-

16   floor retail management jobs at issue here.[18]

17   Costco's Senior Staff managers are neither marketing managers nor sales managers as

18   defined by SOC Code 005. Saad First Decl. ¶ 103. The correct Census Code is again Code 470.

19   Saad First Decl. ¶ 104. SOC 470 has the following description: "Directly supervise sales

20   workers in a retail establishment or department. Duties may include management functions,

21   [18]   The following is the Standard Occupational Classification ("SOC") description for

22   Marketing Managers: "Determine the demand for products and services offered by a firm and its competitors and identify potential customers. Develop pricing strategies with the

23   goal of maximizing the firm's profits or share of the market while insuring the firm's customers are satisfied. Oversee product development or monitor trends that indicate the

24   need for new products and services." Saad First Decl. ¶ 103.

25   The SOC description for Sales Managers states: "Direct the actual distribution or movement of a product or service to the customer. Coordinate sales distribution by establishing sales

26   territories, quotas, and goals, and establish training programs for sales representatives. Analyze sales statistics gathered by staff to determine sales potential and inventory

27   requirements and monitor the preferences of customers." Saad First Decl. ¶ 103.

28

MOTION TO STRIKE BENDICK DECLARATION
Case No. C04 3341 MHP

such as purchasing, budgeting, accounting, and personnel work, in addition to supervisory duties." Saad First Decl. ¶¶ 103-104. As Dr. Saad explained (Saad First Decl. ¶¶ 103-04):

> Dr. Bendick utilized a category of workers who appear to have office jobs in sales and marketing, instead of the retail management jobs we are considering here. Specifically, Dr. Bendick utilizes "Marketing and Sales Managers" – code 005. … Costco's staff managers are neither marketing managers nor sales managers, as defined by SOC code 005. The correct code here is the one Dr. Bendick has applied to "Other salaried managers. . . . "

Dr. Bendick himself does not seriously dispute that his Census Code choice is incorrect. He only weakly explains that, "I cannot conclude that Dr. Saad's proposed choice [of appropriate census code for Staff Managers] is wrong, but neither can I conclude that my choice is wrong." Dr. Bendick Second Report ¶ 15.

As Dr. Saad explains, Dr. Bendick's inappropriate use of 005 Census Code is not only wrong but leads to a significant overstatement of female representation in Dr. Bendick's external labor market benchmark for staff managers. Saad First Decl. ¶ 103. This error fundamentally impacts the appropriate benchmarks for the staff manager positions from which the relevant labor pool is drawn for promotion at Costco. Dr. Bendick's rebuttal report failed to acknowledge the materiality of the difference, when the categories were considered with a jobs earning control; but he acknowledged at his deposition Dr. Saad's analysis showing precisely such a difference (Bendick Dep. 211-213).

### 4. Dr. Bendick Incorrectly Relies On The EEO-1 Category of "Officials and Managers" as a Comparator for Costco's High-Level Positions of GM and AGM

Similarly, in his EEO-1 based benchmarks, Dr. Bendick uses the grossly overbroad category of "Officials and Managers" to compare with Costco's high-level GM and AGM positions. Bendick Decl. ¶ 22-24. This is a false comparison upon which no reliable benchmark can or should be based.

Employers' EEO-1 Reports set forth the number of persons employed in nine broad occupational categories such as "Officials and Managers," "Operatives," and "Laborers." They also show the number of employees in five race/ethnic categories by sex. *CNA Financial Corp.*

1   *v. Donovan,* 830 F.2d 1132, 1134 n.10 (D.C. Cir. 1997).  Saad Second Decl. ¶ 28; Mulligan

2   Decl. ¶ 103.  A grouping this broad is hardly a valid comparison to the GM and AGM positions

3   at Costco.  Even a look within Costco proves this point.  In its own EEO-1 filings Costco reports

4   dozens of job titles within the "Officials and Managers" category, ranging from "Manager in

5   Training" to "Executive Vice President."  Bendick Decl. at 15 n.24.  It goes without saying that a

6   category so broad is not "finely tuned" to compare against the positions at issue in this matter,

7   GM and AGM.  *See Alexander,* 207 F.3d at 1327-28 (lack of appropriate labor market

8   comparison rendered results unreliable).

9               5.      **Dr. Bendick Incorrectly Treats Gender-Differentiated**
                        **Interest In Merchandise Manager As A Demand Factor**
10

11          Dr. Bendick's theory fails on its own terms because he admits in his deposition that

12   Costco's hours for Merchandise Managers discourages women from that position; but he calls

13   this a "demand" factor and not an "interest" or "supply" factor.  Bendick Dep. 121-22, 219, 230

14   Dr. Bendick refers to the hours as a "demand" factor even though he admits that it is the

15   selection of hours, and not the selection of employees, that affects the representation of women

16   in the merchandise manager position.[19]  Dr. Bendick's error is similar to the one he made in *City*

17   *of Miami,* 115 F.3d at 873-74, where "he concluded that the lower number of women in the

18   Department was attributable to the City's 'reputation for unfairness,' [but] acknowledged that he

19   had not done any research to determine what reputation for unfairness, if any, existed on the part

20   of the City."

21          There are differences in the Merchandise Manager position, and those differences are

22   significant.  The Merchandise Manager's primary responsibility is to get the store ready for

23

24   [19]   At deposition Dr. Bendick concedes that both supply and demand considerations enter into
        any outcome.  Bendick Dep. 46.  In examining this issue, Dr. Peggy Stockdale concludes
25      that "gender differences in job preferences for work hours ... persist even in modern
        samples of managerial women and men .... Such gender differences in ideal hours ... truly
26      appear to be a preference more so than a constraint."  Stockdale Second Decl. at 18.
        Plaintiff's expert, Dr. Reskin, also acknowledged that women's preferences may play a role.
27      *See* Note 5, *supra.*

28
                                                    MOTION TO STRIKE BENDICK DECLARATION
                                                    Case No. C04 3341 MHP
                                            - 20 -

1  'show time' – the opening of each day, bringing in and moving the day's merchandise and

2  optimizing the store for sales.  It can take between six and ten hours to get a store ready for

3  opening.  Merchandise managers often have begun their day extremely early in the morning.

4  They often need to be at the store no later than 4:00 a.m., and can need to be there as early [as]

5  12:00 a.m. depending on the type of merchandising tasks that are required for the day.[20]

6  Matthews Dep. ¶ 21.

7       This early morning requirement has an indisputable effect on the gender preferences for

8  the position.  Numerous studies have identified the gender differences in job attribute

9  preferences.  Dr. Stockdale concluded that, "Abundant, current research confirms that

10  managerial and professional women continue to have different job attribute preferences from

11  their male counterparts on various dimensions that may affect their desire for jobs like

12  Merchandise Manager that require difficult working hours and potential relocation" and that

13  "family structure variables affect some but not all of these preferences for women more than

14  men."  Stockdale Second Decl. at 22-23.[21]

15       As a result, Dr. Stockdale opined that, "To the extent that upper-level management

16  positions (e.g., assistant warehouse managers – AGMs and warehouse managers – GMs) as well

17  as key portal positions into upper level management positions (i.e., staff level manager,

18  especially merchandise manager) differ on job attributes that have been shown in the literature to

19  be affected by gender role ideology, especially with regard to non-work and family

20

21

---

22  [20]  In contrast, Dr. Stockdale noted that the front-end and administrative managers began their
23  work day at about the same time the store opened, and that receiving managers' work days
begin early, but are less erratic than the merchandising manager's work days.  Stockdale
First Decl. at 37.

24  [21]  Dr. Stockdale also concluded in her first report that, "The research reviewed … which relied
25  heavily on national, random household surveys and on meta-analyses, revealed that women
continue to have greater responsibility for family duties, and that their family role has a
26  stronger and almost exclusively negative influence on employment decisions, such as lack of
desire to relocate and the desire for work hours and flexibility arrangements that can
27  facilitate family responsibilities."  Stockdale First Decl. at 33.

28

MOTION TO STRIKE BENDICK DECLARATION
Case No. C04 3341 MHP

- 21 -

1    responsibilities, *gender differences in preferences for these positions are likely to exist.*"

2    Stockdale First Decl. at 35 (emphasis added).[22]

3         Finally, Dr. Bendick concedes that the PUMS data set, which he used in his second

4    report, contains information about job earnings and hours worked. Bendick Dep. 133-34; Dr.

5    Bendick Second Report ¶¶ 8, 10. Because Dr. Bendick chose to ignore these different

6    employment aspects and the gender preferences, however, he performed no comparison for the

7    hours worked by Costco managers versus any of the comparators, although he agreed that

8    working hours was a relevant aspect of the job in terms of assessing the gender differentials in

9    supply. Bendick Dep. 97, 114, 121. Dr. Bendick also admitted that he had no quarrel with the

10   statistical point that according to census data, women were less likely to work early morning

11   hours than men. Bendick Dep. 230. Armed with that information, Dr. Bendick nonetheless

12   refuses to consider this factor in creating his benchmarks. *Cf. Rhodes v. Cracker Barrel Old*

13   *Country Store*, 213 F.R.D. 619, 654 (N.D. Ga. 2003) (rejecting statistician's opinion in a

14   proposed Title VII class action because the statistician "fail[ed] to account for the many variables

15   that properly may affect job assignments, such as the job preference or experience of the

16   employee or applicant, available job openings, and labor-market availability"). Dr. Bendick's

17   failure to acknowledge the more difficult aspects of the Merchandising Manager position as a

18   "supply" factor affecting women's interest in filling that position renders his analysis fatally

19   flawed.[23]

20                              **CONCLUSION**

21         The Bendick "benchmarks" are poorly constructed, inaccurate measures of female

22   representation in jobs in the external labor market that are not comparable to Costco's GM and

23

24   [22] Similarly, Dr. Reskin conceded that she could not say "that child-rearing responsibilities that
     have traditionally been assigned to women have completely disappeared." Reskin Dep. 167.

25   [23] Dr. Saad, in fact, performed the analysis of PUMS data that Dr. Bendick failed to perform

26   and presented results that "[t]the PUMS data supports the hypothesis that different work
     schedules associated with the four Staff Manager positions influence the relative supply of

27   men and women for those jobs." Sadd Second Decl. ¶ 89, 53:10-13

28
                                        MOTION TO STRIKE BENDICK DECLARATION
                                        Case No. C04 3341 MHP
                                    - 22 -

1  AGM.   Dr. Bendick intentionally ignores fundamental variables that would correct his results-

2  oriented "benchmarks."  He fails to consider job earnings, he fails to control for the size of

3  comparator establishments, he relies on inappropriate occupational and industry codes, and he

4  refuses to consider how gender-related preferences with respect to working hours such as those

5  of the critical Merchandise Manager position would affect the supply of female management

6  labor.

7          The result of Dr. Bendick's selective mixing and matching and ignoring relevant

8  variables is a variety of "benchmarks" that share only one thing in common:  inflated figures that

9  only support a predetermined result.  Dr. Bendick thus engages in comparisons that he himself

10  criticized when the other side tried them in *Dukes v. Wal-Mart*.  His "benchmarks" include

11  "mom and pop" and single storefront configurations and other small-time operators that cannot

12  fairly be compared to Costco.  His "benchmarks" include general merchandise, non-grocery

13  department stores such as Macy's and Nordstrom that cannot fairly be compared to Costco.  His

14  "benchmarks" include many low-paid managers who cannot fairly be compared to the highly

15  experienced and well-compensated individuals who run Costco warehouses with annual revenues

16  often exceeding $100 million.  Each of these failures had a profound effect on Dr. Bendick's

17  analysis, because each of these errors over-represented women in management positions, and

18  resulted in comparisons of management positions that were not comparable to Costco

19  management positions.

20          Dr. Bendick's approach to benchmarking is inherently unreliable and should have no

21  weight whatsoever in this Court's consideration of Plaintiffs' motion for class certification.

22

23  DATED: September 29, 2006                              SEYFARTH SHAW LLP

24

25                                                        By _____

26                                                              David D. Kadue

27

28  _____

                                                        MOTION TO STRIKE BENDICK DECLARATION
                                                        Case No. C04 3341 MHP