# Women's Work, Men's Work

## Sex Segregation on the Job

Barbara F. Reskin and Heidi I. Hartmann, editors

Committee on Women's Employment and Related Social Issues
Commission on Behavioral and Social Sciences and Education
National Research Council

National Academy Press
Washington, D.C. 1986



EXHIBIT

1525

8/15/06

# 3   Explaining Sex Segregation in the Workplace

In the committee's judgment, the causes of job segregation are multiple, interlocking, and deep-seated—yet, as we show in Chapter 4, they are also amenable to policy intervention. In this chapter we discuss the factors we feel to be the most important in accounting for the extreme degree of sex segregation of work observed in the United States. Intertwined with the social processes that contribute to job segregation are widely shared cultural assumptions about the sexes and their appropriate activities. For example, the belief of many people, including many women, that women should place the care of their families first in their lives affects the way women are treated on the job when they do work. And such beliefs also interact with reality: many women today do indeed bear the greater share of the day-to-day work involved in family care. Similarly, it is often assumed that physical differences between the sexes make them suited or unsuited for certain types of work, and there are average sex differences in size and stature that may be significant in some occupations.

In this chapter we first examine the cultural beliefs that govern common attitudes about gender and work. We next examine barriers to employment, tracing how some beliefs became embodied in laws and judicial decisions that permitted or demanded that employers treat the sexes differently, and how they continue to provide rationalizations for both intentional and unintentional labor market discrimination against women (and, less frequently, men). Third, we investigate the roles that women's own choices and preferences play in their work careers and examine the effects of socialization and training. Assumptions about what kinds of work are appropriate for each gender, communicated through various socialization and training processes, contribute to the development of sex-typed occupational preferences in individuals. Evidence suggests, however, that such sex-typed preferences are neither fixed for life nor fully deterministic of the sex type of workers' jobs. Fourth, we examine the role that family responsibilities, actual or anticipated, play in shaping both women's choices and their opportunities. Finally, we examine the thesis that the occupational opportunity structure plays a major role in perpetuating the concentration of the sexes in different jobs. By the occupational opportunity structure we

Case3.04-cv-03341-EMC   Document437   Filed09/29/06   Page3 of 15

mean the distribution of occupations that are available to members of each sex (and often certain racial and ethnic groups within each sex), a distribution that is seen to be limited by institutionalized and informal barriers that restrict workers' opportunities.

Regarding the relative importance of these various factors, it is our judgment that women's free occupational choices made in an open market explain only very incompletely their concentration in a small number of female-dominated occupations. While workers' choices undoubtedly contribute to the observed occupational distributions of the sexes, their labor market outcomes depend heavily on the occupational opportunity structure, on various barriers, including employers' and coworkers' preferences, and on institutionalized personnel procedures. In this chapter we look at the evidence in more detail.

## CULTURAL BELIEFS ABOUT GENDER AND WORK

Beliefs about differences between the sexes, many of them taken as axiomatic, play an important role in the organization of social life. These assumptions are often so much a part of our world view that we do not consciously think about them. As one anthropologist put it, they are "referentially transparent" to us (Hutchins, 1980). It is their transparency that gives them their force: because they are invisible, the underlying assumptions go unquestioned, and the beliefs they entail seem natural to us. Even when we do question and revise certain of these beliefs—for instance, when we realize that they are prejudicial to women—the implicit assumptions that engendered them remain intact and can serve as the foundation for future, perhaps somewhat altered, sex stereotypes. The cultural axioms that have been used to exclude women from the workplace, to restrict them to certain occupations, or to condition their wage labor fall into three broad categories: those related to

women's role in the home, those related to male-female relationships, and those related to innate differences between the sexes.[1]

## Women's Role in the Home

The first category consists of those assumptions that hold that women's "natural" place is in the home. This group of assumptions underlies many specific attitudes about women and work held by employers, male workers, lawmakers, parents, husbands, and women themselves. It seeks to legitimate women's exclusion from the public sphere and hence the workplace and implies that a woman who is committed to her job is unwomanly. This axiom is neither universal nor timeless. It is an expression of cultural beliefs elaborated especially over the last two centuries and perhaps most fully developed and widely disseminated, through the popular media, in the contemporary United States. The assumption that women's place is in the home follows from the premise that men support women, so women do not need to do wage work to earn a living. By implication, if women are employed, it must be for extras or diversion from domestic life, so their concentration in low-paying, dead-end jobs is of little importance. The corollary to this set of assumptions, that men do not belong in the home during working hours, also accounts for the almost totally segregated occupation of housewife and may help to explain the resilience of the traditional sexual division of domestic work among couples in which both partners are employed full time.

Historically as well as today, the notion that women's place is in the home has not reflected the actual behavior of large sectors of the population; hence it has been in fundamental conflict with the reality of many women's lives. Women have worked to sup-

---

[1] This section on cultural beliefs relies heavily on di Leonardo (1982).

port themselves and their families; they have worked because their labor was needed. Women have replaced men gone to war. They have done heavy labor on family farms when necessary. They have sought wage work when there was no means of support for them on the farm. They have taken in boarders and devised other ways to earn money at home. Women who are urban and minority, recent immigrants, and poor in general have done menial work for low wages, without the primacy of women's domestic role being invoked. And highly educated women, earning better salaries, have also worked as nurses, teachers, social workers, office workers, and businesswomen since late in the last century. As women from all parts of the social and economic spectrum have increased their labor force participation, the contradiction between the underlying belief about women's place and reality has become more visible.

We can now see ways in which the belief system has been modified with changing circumstances and ways in which reality has been reconciled to the belief system (di Leonardo, 1982). For example, those who insist that women should not work claim the incompatibility of paid employment with women's domestic roles, in that paid work interferes with proper child care. Those who wish to justify women's employment outside the home, by contrast, try to show that it is compatible with, even complements, their home roles. The latter justification permits or even promotes jobs for women that minimize interference with child care through flexible scheduling (e.g., school teaching or part-time work), low demands on incumbents (e.g., retail sales), or work that can be done at home (e.g., data processing, typing, sewing). Certain occupations (e.g., teaching home economics) that are believed to enhance women's ability to carry out domestic duties later in their lives may be considered more acceptable than others. Other occupations (e.g., nursing, social work) have been acceptable because they have been defined

as an extension of women's domestic roles, a rationale that has been used to justify paying workers in these jobs low wages (Kessler-Harris, 1982).

Thus, despite the strong contradiction between the notion of women's place and reality, the former continues to provide the foundation for beliefs about the conditions under which women should and should not do wage work. Most important for the present endeavor are beliefs as to which occupations are appropriate for them.

## Male-Female Relationships

A second category of beliefs includes those about gender differences that are relevant in male-female relationships. For example, an ancient and pervasive belief in Western thought is that women lack reason and are governed by emotion (N. Davis, 1975; Jordanova, 1980). This line of thought offers a logical basis for assuming "natural" male dominance and underlies social values that men should not be subordinate to women. Whenever the two sexes interact outside the family, women are viewed as subordinate, and when they enter the workplace, they are expected to fill subordinate occupational roles. Caplow (1954) elaborates this point, arguing that attitudes governing interpersonal relationships in our culture sanction only a few working relationships between men and women and prohibit all others. He contends that according to these values, "intimate groups, except those based on family or sexual ties, should be composed of either sex but not both" (p. 238). Intimate work groups in which men and women have unequal roles are sometimes allowed. These norms of sexual segregation and male dominance have frequently guided employers' hiring decisions. Women are rarely hired in positions of authority (Wolf and Fligstein, 1979a, 1979b). Some employers explain that they defer to workers' preferences. Male managers surveyed one and two decades ago indicated that they felt both women and men

would be uncomfortable working under a woman supervisor (Grinder, 1961; Bass et al., 1971). They also thought that women in supervisory roles have difficulty dealing with men in subordinate positions.

In several recent studies, it is clear that attitudes about female supervisors have changed. Two-thirds of the respondents in a 1980 Roper survey said it made no difference to them whether they worked for a man or a woman, and only 28 percent preferred a male supervisor (Barron and Yankelovich, 1980:Table 5). A survey of 1,402 university employees revealed a preference for male bosses and professionals providing personal services (accountants, dentists, lawyers, physicians, realtors, and veterinarians), but it was weaker among women, the more educated, and those who had had positive experiences with female bosses or professionals (Ferber et al., 1979). A study of women in several traditionally male jobs in public utilities found that most subordinates of both sexes held positive attitudes toward women managers (U.S. Department of Labor, Employment and Training Administration, 1978). Of particular interest is the admission by several men that they had been initially concerned but that their apprehensions disappeared when they found that their supervisors performed effectively. More generally, this study revealed that attitudes changed quite rapidly with experience with female bosses, even when those bosses held jobs that traditional values label "very masculine" (p. 10). The effects of education and experience suggest that we may expect continued change in employee attitudes toward women supervisors. For women's occupational opportunities to increase, however, the behavior of those making employment decisions must also change.

Sexual relations, as well as power relations, are also relevant in the workplace, and fears of sexual relations particularly may contribute to occupational segregation. The folk theory that women unwittingly tempt men and that men, vulnerable to their provocation, may be prompted to seduction has been used to justify excluding women from certain occupations or work settings that are thought to heighten men's vulnerability to female sexuality. Examples include shipboard duty or jobs that involve travel with coworkers. Women have been denied certain jobs because their presence may suggest the appearance of impropriety. MacKinnon (1979) cites the example of the South Carolina Senate, which refused to hire women as pages in order to foster public confidence in the Senate by protecting its members from appearing in a possibly damaging way. Not only men but women themselves may be depicted as the victims of their unwitting sexual provocation. Reformers around the turn of the century argued that permitting the sexes to work side by side would lead women to stray, either because their presence tempts men or because corrupt men will exploit innocent and vulnerable women who have left the protection of their homes. This concern reflects the belief in women's sexuality as an autonomous force over which neither they nor the men with whom they work have control. And it also reveals, once again, the assumption that women's primary place is in the home: for the consequence of women's employment alongside men feared by reformers was that these women, once having strayed sexually, would be forever disqualified from their domestic roles as wife and mother. Kessler-Harris quotes Robert McClelland, Secretary of the Interior, in the middle of the last century: "There is such an obvious impropriety in the mixing of the sexes within the walls of a public office that I am determined to arrest the practice" (1982:100-101). Such reasoning ultimately led several states to pass laws making it illegal for women to hold a variety of occupations, including bartender, messenger, meter reader, and elevator operator, but it did not prevent women from entering offices in large numbers (J. Smith, 1974; Kessler-Harris, 1982).

More recently, the stereotype of woman as sexual temptress has been invoked to account for women's sexual harassment: sim-

ply by entering the workplace, women subject men to their sexuality and invite harassment. Sexual harassment is pervasive in male-dominated occupations that women have recently entered (Enarson, 1980; Martin, 1980; Walshok, 1981a; Westley, 1982). Gruber and Bjorn (1982) suggest that men may use it to gain the upper hand in situations in which men and women have similar jobs and earn equal wages, especially in unskilled jobs in which male coworkers cannot punish entering women by denying them work-related information. The important point here is that the unquestioned assumptions about the sexuality of both men and women underlie the limiting of women's occupational choices.

## Innate Differences Between the Sexes

A third category of beliefs that shape women's occupational outcomes are those that assume innate differences between the sexes. We have already seen that women are regarded as innately less rational and more emotional, a view that has been used to justify excluding them from positions of authority. In addition, women have variously been thought to lack aggressiveness, strength, endurance, and a capacity for abstract thought and to possess greater dexterity, tolerance for tedium, and natural morality than men. A body of research reviewed in Lueptow (1980) indicates that the public continues to hold many of these stereotypes about female and male "personalities." Some of these differences further justify women's greater responsibility for family care. For example, women's supposed natural sense of morality suits them for raising children and bringing a civilizing influence to family life.

Other stereotypes contribute directly to occupational segregation by asserting sex differences in what are alleged to be occupationally relevant traits. Women's dexterity is offered to explain their employment as clericals and sometimes as operatives; their supposed passivity and compliance have been seen as uniquely fitting them for clerical work (Grinder, 1961; Davies, 1975; Kessler-Harris, 1982) as well as other jobs involving boring, repetitive tasks. One employer's explanation, offered in the 1960s, for preferring women illustrates both points: "We feel that jobs requiring manual dexterity call for women. Also this work is particularly tedious and painstaking—definitely a women's job" (G. Smith, 1964:24). Construction firms cite women's alleged weakness and intolerance of harsh working conditions as reasons for denying them jobs (U.S. Department of Labor, Employment Standards Administration, 1981; Westley, 1982). The social expectations that women should uphold moral standards and care about the needy, perhaps because of their innate nurturance, limit their occupational opportunities. As Epstein (1981) noted, women have been encouraged to perform good works in service-oriented occupations such as social work and nursing, which, coincidentally, have often had poor career potential. And women have been believed to be "too good" for politics. They are also thought to be too sentimental and timid to enforce the law or serve in combat (Epstein, 1981). Women's alleged emotionality may disqualify them in many employers' minds for higher-level positions, especially those in law, medicine, or science that require rationality and tough-mindedness (for a brief review, see Miller and Garrison, 1982).

## Sex Stereotypes and Occupational Segregation

Many of these beliefs about women's innate traits and their natural social roles persist, despite women's increasing participation in a large number of formerly male occupations, even among students training for professions (Quadagno, 1976; Beattie and Diehl, 1979). A single woman worker who violates the stereotype can be explained as exceptional; when the behavior of many women clearly belies a particular stereotype, a different one may emerge to main-

tain the gender homogeneity with which members of an occupation have become comfortable. For example, women lawyers were dismissed in the 1960s as "too soft" for the courtroom. When they showed themselves to be competent in court, they were restereotyped by male lawyers as tough and unfeminine—and hence implicitly unsuited to their proper role as wife and mother (Epstein, 1981).

Stereotypes about appropriate and inappropriate occupations for women and men encourage sex-typical occupational choices by affecting workers' aspirations, self-image, identity, and commitment. The stereotyped views that masculine men would not pursue certain occupations, nor feminine women others, for instance, is deterrent enough for most people. Their misgivings are realistic: the femininity or masculinity of individuals who are not so deterred is questioned (Bourne and Wikler, 1978), and they may experience disapproval, especially from males (Nilson, 1976; Jacobs and Powell, 1983). The prospects of sexual harassment or of being prejudged as incompetent at one's work may also discourage those who might otherwise opt for sex-atypical occupations.

Another way that assumed sex differences affect the jobs women and men fill is that employers' beliefs that members of one sex do not want to do certain kinds of work influence their personnel decisions. For example, individuals who made hiring decisions for entry-level semiskilled jobs in several firms in one city commented to the researcher, "Women wouldn't like this," and "Men wouldn't like to see women (coworkers) this way." Another employer who hired primarily women said, "The work is clean and women like that" (Harkess, 1980).

### Statistical Discrimination

Economists (Arrow, 1972; Phelps, 1972) have termed one form of employers' reluctance to hire certain persons "statistical discrimination," a concept that refers to de-

cision making about an individual on the basis of characteristics believed to be typical of the group to which he or she belongs. The wide acceptance of assumptions of sex differences in characteristics related to productivity provides the basis for statistical discrimination by employers (e.g., Bass et al., 1971). According to this model, employers do not hire anyone who is a member of a group thought to have lower productivity; statistical discrimination serves for them as a cheap screening device. Statistical discrimination often rests on unquestioned assumptions about women's domestic roles. For example, employers may refuse to hire a woman in the childbearing years for certain jobs—especially those that require on-the-job training—because they assume that many young women will leave the labor force to have children, irrespective of any individual applicant's childbearing or labor market intentions. In a study of book publishing, Caplette (1981) discovered that women were automatically excluded from the primary route to upward mobility, the college traveler job, on the assumption that extensive traveling would conflict with their domestic responsibilities. According to this explanation of discrimination, employers practice statistical discrimination against women solely on economic grounds and presumably would ignore gender if they came to recognize that their cheap screening device was too costly in terms of misapplied human resources. Employers might, for example, become convinced that young men were equally likely to quit their jobs or take time off to share childbearing responsibilities or that many qualified women will not quit because of family responsibilities.

Statistical discrimination contributes to sex segregation in two ways. First, employers' beliefs that the sexes differ on work-related traits may bias them to favor one or the other sex for particular occupations. Second, if they expect that women are more likely than men to drop out of the labor force, they will hire women only for jobs that require little or no

on-the-job training (e.g., retail sales) or involve skills whose training costs workers themselves assume (e.g., typing, hairdressing). Using data for 290 California establishments, Bielby and Baron (1986) examined whether employers seemed to reserve some jobs for men and others for women in a manner consistent with their perceptions of sex differences in skills, turnover, costs, and work orientations. They found that employers assigned jobs involving nonrepetitive tasks, spatial skills, eye-hand-foot coordination, and physical strength to men and those requiring finger dexterity to women. The concept of statistical discrimination also encompasses employers' favoring members of a group whose performance they believe they can predict more reliably. Even if the sexes were equally productive and performed equally well on some valid employment test, if the test predicted women's performance less reliably, employers would make fewer errors by hiring men (Aigner and Cain, 1977; Osterman, 1978). For this type of statistical discrimination to help explain sex segregation, employers must believe that women's performance is less reliably predicted than that of men, and so exclude them from some occupations.[2]

### Sex Labeling and Sex Typing

In an influential 1968 study, Oppenheimer argued that the individual decisions of workers and employers are reinforced by a historical process through which most occupations have come to be labeled as women's work or men's work, and hence reserved for members of the appropriate sex. Oppenheimer contended that sex labeling reflected employers' beliefs that certain occupations required attributes that were characteristic of one sex or the other or, for women, represented an extension of domestic nonwage work. To job seekers, occupations take on the characteristics of current incumbents; custom then tends to make the sex labels stick.

The related concept of sex typing implies both that an occupation employs a disproportionate number of workers of one sex and the normative expectation that this is as it should be (Merton, in Epstein, 1970a:152). Manifest in language and the mass media, sex labels and the associated norms are learned through childhood and adult socialization by current and future workers and employers. An obvious example of sex typing in the mass media is classified advertisements stipulating a particular sex or segregated by sex, now not permissible under Title VII of the Civil Rights Act of 1964. Some sex-specific occupational titles (e.g., "lineman," "stewardess") are still common, although most were eliminated in the newest revision of the *Dictionary of Occupational Titles* (U.S. Department of Labor, 1977) and other government publications. Job descriptions often use sex-specific pronouns. Television, movies, magazines, and billboards consistently depict occupational incumbents in stereotyped ways (Marini and Brinton, 1984). As we show below, these labels influence the occupations to which people aspire, for which they prepare, and ultimately in which they seek employment. Influenced also are gatekeepers—parents, educators, employers, friends, and neighbors—who guide or control decisions regarding training and hiring. The widespread acceptance of these cultural labels may affect even those who reject them. Applicants who ignore the labels are likely to encounter prospective employers who accept them implicitly. Nondiscriminating employers may at least initially have trouble finding applicants for sex-atypical jobs. Even if labels

---

[2] One study offers evidence that this is the case. Although Osterman (1979) rejected less reliable predictions of women's absenteeism as a basis for wage differentials, Kahn (1981) showed that he used the wrong indicator of predictability. Using the appropriate one, Kahn found that female absenteeism was predicted less reliably, a finding that could support statistical discrimination in wages.

Case3:04-cv-03341-EMC   Document437   Filed09/29/06   Page9 of 15

deter neither employer nor prospective employee, their acceptance by other employees or by a prospective employee's family may deter her or him from taking and keeping a sex-atypical job (Walshok, 1981a).

### Contingent Stereotypes

Despite the prevalence and force of sex stereotyping of occupations, it is clear that these stereotypes do change over time, often in response to changing economic conditions. As noted above, secretaries were once typically male and women thought to be unsuitable, yet the preponderance of women in clerical jobs was later rationalized by their supposed feminine virtues. Economic and technological factors often vary over time and space, and stereotypes of the same jobs often differ according to how these factors vary. Studies of the age and sex characteristics of workers in the textile industries of Japan and the southern United States (Saxonhouse and Wright, 1982) and France (Tilly, 1979, 1982) in the first quarter of this century illustrate this point. In Japan, agriculture was a family enterprise in which girls and young women were the least valuable workers, so their families permitted them to work temporarily in the textile industry, as young women did in New England in an earlier period (Dublin, 1979). Single young women filled textile jobs, even in occupations that were held elsewhere by men. In contrast, in the American South entire families who lacked land tenure and access to well-developed labor markets worked in the textile industry, where jobs were assigned on the basis of sex and age. Only adult men had access to the most skilled jobs. The situation in France was similar: mills hired entire impoverished rural families, but only boys and men could move up the job ladder to better-paying, more skilled jobs. These varied employment practices, a product of structured economic opportunity interacting with male and parental power and household patterns of labor allocation, produced different patterns of sex segregation that persisted for some time.

The effects on sex segregation of economic factors, cultural beliefs, and the law are cumulative and reciprocal, but, as we have seen, this reciprocity can contribute positively to change. Bumpass (1982) found that the mothers of young children who worked between 1970 and 1975 were substantially less likely to agree that young children suffer if their mothers work than they had been in 1970. American cultural values about the sexes have changed since World War II (Mason et al., 1976; Cherlin and Walters, 1981; Thornton et al., 1983), at least partly in response to the women's movement. During this period women have entered occupations that were formerly closed to them. New laws and administrative regulations, such as the interpretation of Title VII of the 1964 Civil Rights Act to proscribe sexual harassment as discriminatory, help to weaken the link between traditional cultural stereotypes and employment practices. As these changes become apparent and are supported by changes in social values—especially those embodied in statutes outlawing discrimination—they transmit to future workers and employers the message that society gives women "permission" to pursue a broader range of jobs. Women's movement into occupations from which they once were excluded will also contribute to exposing the discrepancy between reality and many of our cultural assumptions about the sexes. With growing awareness that these beliefs are dubious and the traits to which they apply alterable, women's occupational aspirations and opportunities should expand accordingly.

## BARRIERS TO EMPLOYMENT

A variety of barriers make it difficult for women to hold certain jobs or exclude them altogether, thus contributing to their preponderance in traditionally female occupations. Evidence suggests that employers

sometimes deny women certain jobs because of their sex, by discriminating intentionally, by doing so unintentionally, or by deferring to the discriminatory preferences of employees or customers. Studies of employment practices before the passage of the Civil Rights Act reveal extensive sex segregation and the payment of lower wages to women; often these practices were explicitly codified in rules (Newman, 1976). Until recently, many state laws prohibited employers from hiring women for certain occupations or prescribed the conditions under which they could work. Some occupations (positions on combat ships in the U.S. Navy and on combat planes in the U.S. Air Force, for example) are still closed to women by law. Practices that have the effect of restricting women's access to some jobs, such as certain kinds of seniority systems or veterans' preference, are often institutionalized in formal personnel procedures. Others reside in informal aspects of the organization of work. Although it is impossible to assess the relative importance of these barriers in preventing women from entering and progressing in traditionally male-dominated jobs, it is essential to examine how they operate in order to propose and assess remedies.

## Legal Barriers

Legal barriers that limit women's free occupational choice are of two types: those imposed by law or public regulation and those instituted by employers that the law encourages, permits, or does not effectively prevent.[3] As Clauss (1982) points out, prior to the late 1800s tradition and prejudice were usually sufficient to keep women in the few occupations deemed appropriate for them, but when necessary the authority of the law was invoked to contain women's nontradi-

tional aspirations. For example, Justice Bradley's opinion in *Bradwell v. Illinois* (83 U.S., 16 Wall., 130, 141-42, 1872), in which the U.S. Supreme Court rejected a challenge to an Illinois law prohibiting women's admission to the bar, reflects the contemporary view of women:

The natural and proper timidity and delicacy which belongs to the female sex unfits it for many of the occupations of civil life. The constitution of the family organization, which is founded in the divine ordinance, as well as in the nature of things, indicates the domestic sphere as that which properly belongs to the domain and functions of womanhood.

The first protective labor law was enacted in 1874. Although a large literature debates the motivations of the working men and women, reformers (many of them feminists), and union leaders who supported protective labor legislation for women (Freeman, 1971; Hartmann, 1976; Steinberg, 1982), their long-run effect unquestionably was to restrict women's occupational opportunities (Baer, 1978). They prohibited women from doing tasks required by many occupations such as lifting more than a maximum weight, working more than a certain number of hours, or working at night. Some states specifically prohibited women from holding certain occupations, including some that supposedly could corrupt women morally (e.g., bartending) and others (mining, smelting, meter reading, pin setting in bowling alleys, crossing watchmen, jitney driving, freight handling or trucking) for which the rationale is less clear (Clauss, 1982). The legacy of such laws cannot be overemphasized. Railroads, for example, used the California hour and weight-lifting restrictions to justify not hiring women as telegraphers. An Illinois company used an 8-hour law for women to justify paying women operatives for only 8 hours when they were working 8½ hours. Not until the 1964 Civil Rights Act was passed and litigation occurred were these laws invalidated. Those that remain

---

[3] This section draws heavily on Clauss (1982) and Roos and Reskin (1984).

Case3:04-cv-03341-EMC   Document437   Filed09/29/06   Page11 of 15

on the books are unenforceable. But even in the 1960s and 1970s, manufacturers surveyed by the California State Employment Service often cited weight-lifting restrictions to justify not hiring women (Bielby and Baron, 1984).

In *Griggs* v. *Duke Power Company*, 401 U.S. 424 (1971) the Supreme Court interpreted Title VII of the 1964 Civil Rights Act to prohibit non-job-related requirements that disproportionately exclude members of protected groups. This ruling opened some occupations to women. For example, it invalidated requirements of height and physical agility that largely barred women from being officers in the San Francisco Police Department (Gates, 1976). Yet many police departments still maintain such requirements, preventing women from becoming police officers (Martin, 1980:47).

The prohibition against using sex as an employment criterion under Title VII is not absolute. Employers may refuse to hire applicants of one sex if they can show that sex is a bona fide occupational qualification (BFOQ) reasonably necessary to their normal operation (Section 703[e]). Although the occupations in which sex is a bona fide qualification typically cited are wet nurse and sperm donor, employers have succeeded in using the BFOQ provision to justify excluding women from such jobs as prison chaplains or guards (*Long* v. *California State Personnel Board*, 41 Cal. App. 3d 1000, 116 Cal. Rptr. 562, 1974; *Dothard* v. *Rawlinson*, 433 U.S. 321, 1977) because their sexuality might provoke the passions of violent male inmates and as international oil executives because that job involves dealing with allegedly sex-prejudiced Latin Americans (*Fernandez* v. *Wynn Oil*, 20 FEP 1162 [C.D. Cal.], 1979).

Laws and regulations stipulating that preference be given to veterans—legal under the Supreme Court's decision in *Personnel Administrators of Massachusetts* v. *Feeny*, 99 S.C. 2282 (1979)—reduce women's access to certain jobs. For example, 65 percent of all government agencies and 57 percent of municipal agencies preferred veterans when selecting police officers (Eisenberg et al., cited in Martin, 1980:47). Veterans' preference rules also apply to layoffs and contributed to the higher layoff rates that female federal government employees in grades above GS 12 (in which women are underrepresented) experienced in the federal personnel cuts of 1981 (Federal Government Service Task Force, 1981). The policy of giving veterans an advantage was formally incorporated into criteria for the Comprehensive Employment and Training Act (CETA) trainees in 1978, contributing to women's underrepresentation in certain programs relative to their proportion in the eligible population (Wolf, 1981).

The policy by some employers of excluding women in their childbearing years from jobs that might expose them to substances that are potentially toxic to fetuses has demonstrable segregative consequences. Federal officials have estimated that such policies close at least 100,000 jobs to women.[4] These jobs are concentrated in industries that have historically excluded women (Clauss, 1982), and some observers (Bell, 1979; Wright, 1979) have pointed out that employers use this policy to exclude women from better-paying male jobs, while ignoring hazards in predominantly female occupations.[5] In two Title VII challenges, the courts recently ruled that employers may not penalize women employees under the guise of protecting them from reproductive hazards (*Wright* v. *Olin Corporation*, 697 F.2d 1192 [4th Cir. 1982]; *Zuniga* v. *Klebert County Hospital*, 692 F.2d 986 [5th Cir. 1982]). Until 1978

----

[4] This estimate does not include the number of military jobs closed to women because of policies that do not permit women to occupy jobs that are related to combat (Roos and Reskin, 1984).

[5] Such hazards include the exposure of operating room nurses to waste anesthetic gases, of beauticians to hydrocarbon hair spray propellants, and of clerical workers to photoduplicating fluid.

employers could exclude pregnant women from certain jobs, even when it meant that they lost accumulated seniority. Then, in response to extensive lobbying by women's groups following the Supreme Court's decision in *General Electric* v. *Gilbert*, 429 U.S. 125 (1976), which held that discrimination against the condition of pregnancy in employment benefits such as disability insurance is not illegal sex discrimination, Congress amended Title VII to prohibit discrimination against pregnant women.

Title VII, provisions of Title IX of the Educational Amendment Act, and other laws provide recourse for women who are discriminated against in various conditions of employment. Yet, private litigation, which is expensive and lengthy, is seldom a viable option for many women, and enforcement agencies and legal rights organizations must limit the number of cases they pursue through the courts. Satisfactory redress of many of these cases, even of relatively overt discrimination, is not therefore easily attained.

### Discriminatory Acts and Behavior

Most economic theories of labor market discrimination were constructed to explain wage discrimination rather than restrictions on access to jobs. Nevertheless, we review them briefly, concentrating on their implications for segregation in labor markets (for more extensive discussions, see Treiman and Hartmann, 1981; Blau, 1984a, 1984b). Gary Becker's (1957) theory of race discrimination presumes a "taste" for distance from blacks, on the part of employers, employees, or customers. If employers discriminate, they pay for that taste by bidding up the wage for white workers above what would be necessary if they hired blacks. A discriminating employer would hire blacks only if they were willing to work at a wage low enough to compensate the employer for the "distaste." Economic considerations could motivate even unprejudiced employers to discrimi-

nate, however. If white employees have a taste for distance from blacks, they will work in an integrated workplace only if they are paid a premium for doing so. Employers will then lower the wage of blacks in order to compensate for the higher wage that they must pay whites when blacks are hired. Likewise, if customers have discriminatory tastes, prices will have to be lowered in order to prevent the loss of those customers to firms employing only whites. Again, the employer will hire blacks only at a lower wage in order to compensate for the loss in revenue from the lower sale price. Very few efforts have been made to test empirically any of Becker's hypotheses (Cain, 1984). However, customer discrimination has been suggested by Allison (1976) with respect to the higher wages earned by male than female beauticians, and Epstein (1981) found that many law firms attributed their reluctance to hire female attorneys to an anticipated loss of clients who they believed prefer males.[6]

Indulging discriminatory tastes could produce segregation across occupations or establishments (Blau, 1984b). Assuming that employers differ in their taste for discrimination or in their willingness to pay to indulge that taste, the victims of discrimination, blacks or women, would be totally absent from some establishments and concentrated in others—at lower wages (Bergmann, 1971, 1974). If employers were more adverse to hiring women for some jobs than others (or if male workers in different occupations expressed different amounts of opposition), then occupational segregation would result.

Understanding the reasons for discriminatory tastes might explain why employers' aversion to hiring women varies across occupations and why they prefer women for

---

[6] They also cited other reasons, ranging from problems in providing separate rest rooms to their own wives' opposition (Epstein, 1981).

some. Hiring decisions in prestigious professional and managerial occupations often involve subjective appraisals of whether an applicant will "fit in," since the potential consequences of an error are greater given the higher levels of uncertainty and individual control over the work process in those occupations (Kanter, 1977). For some occupations, employers prefer female workers. A 1961 survey by the National Office Management Association (Grinder, 1961) of 1,900 commercial and service organizations found that 28 percent indicated that sex appeal was a qualification for some office jobs. Since most men live intimately with women and men often work closely with women in lower-status jobs, clearly any taste for avoiding associating with women is situation-specific.

Theories that focus on patriarchy (Hartmann, 1976; Strober, 1984) contend that men's desire to keep women socially and economically dependent contributes to sex segregation and other limitations of equal employment opportunity for women. This would explain men balking at working with women as equals, while accepting female coworkers in subordinate jobs. Bergmann and Darity (1981) have argued that a few prejudiced workers can disrupt the workplace; they suggest that employers may defer to a few prejudiced employees in order to maintain harmony on the job. An alternative explanation for exclusionary behavior rests on the social perception of status. If the evaluation of some group as lower in social status is in general currency, then establishments or occupations that fail to honor it by including more than a token number of members of the lower-status group taint themselves (Touhey, 1974) and jeopardize the claim for deference they can make on others. Thus, a law firm with more than one or two blacks or women risks being labeled a "black" or "women's" firm and a concomitant loss of prestige.

Another explanation of the segregation of women and blacks into low-paying occupations rests on the potential profitability of

that arrangement. While many economists have argued that the inefficient use of labor resources on the part of discriminating employers will diminish employer profits (Arrow, 1972; Becker, 1957; Bergmann, 1971), others have pointed to the circumstances under which segregation actually increases profitability. In neoclassical economic theory, if an employer holds some monopsony power (either because the employer hires a large portion of the available workers in a particular area or because employees in a firm have low levels of mobility) *and* if the supply of labor is more elastic for women and blacks, then segregating those groups from white men and paying them a lower wage will increase profitability (Madden, 1975; Robinson, 1936). The extent to which these conditions persist in the labor market is a matter of some dispute, however (Cain, 1984), and one preliminary study that looks at the relationship between the propensity to hire women and profitability concludes that discrimination does impose a cost, though relatively small, on employers (Stolzenberg, 1982).

A class analysis of discrimination posits that employers segregate workers into groups that are then paid differentially in order to prevent the development of a cohesive working class. Since a unified work force is seen as holding more power to bargain over wages, segregation lowers the wage of all subgroups of labor (though some more than others), thus enhancing employer profitability. This hypothesis has been tested with respect to race but not to sex (Reich, 1981).

Until the late 1960s or early 1970s sex discrimination by unions contributed to occupational segregation in several ways. Some unions openly excluded women by policy or maintained sex-segregated bargaining units; others pursued practices that effectively kept women out (Simmons et al., 1975; Kessler-Harris, 1975; Hartmann, 1976).[7] Nepotism

---

[7] Union behavior has been seen as largely protectionist, but Hartmann (1976) argues that patriarchal

and sexism in the distribution of apprenticeships ensured women's virtual exclusion from the crafts; opportunities to learn a trade typically went to members' male relatives (Simmons et al., 1975). Collective bargaining agreements between unions and management were often openly discriminatory. For example, they frequently identified jobs as "male" or "female" and specified sex-segregated promotion and transfer ladders and separate lines of layoff and rehiring priorities for the sexes. On occasion women and men were even assigned to different locals, but this practice was ultimately found to be a violation of Title VII (Simmons et al., 1975).

Because Title VII of the 1964 Civil Rights Acts and other laws and regulations prohibit many forms of sex discrimination in employment, obtaining evidence of discrimination is now often difficult. Employers are unlikely to admit discriminatory hiring practices that they might have admitted in the past. Survey data, case studies, and experiments suggest, however, that discrimination has been an important factor in excluding women from a variety of occupations. Throughout most of this century women have faced open discrimination in employment or wages in many occupations. For example, one-third of the business and service organizations that responded to a 1961 survey by the National Office Management Association admitted a double standard of pay for female and male office employees, and two-thirds were admittedly reluctant to appoint women to supervisory jobs (Grinder, 1961).

Until quite recently, law firms openly discriminated in hiring and job assignment. Epstein (1981) recounts incidents of women lawyers being offered jobs as legal secretaries, and Rossiter (1982) tells of women scientists with advanced degrees employed as chemical librarians and scientific secretaries. Female physicians (Walsh, 1977) were commonly denied jobs for which they were qualified. Prior to 1964, employers were often candid regarding the preferred sex and race of their employees (see, for example, Grinder, 1961). A survey published by the *Harvard Law Record* in 1963 indicated that in evaluating applicants law firms rated being female more negatively than all other characteristics, including being at the bottom of one's class (Epstein, 1981). Nonprofessional occupations have been subject to less investigation, but the firing of women from craft jobs at the end of World War II to provide jobs for returning male veterans is well documented (Milkman, 1980). A comment by a female worker in a large industrial plant illustrates what is believed by many (Newman and Wilson, 1981) to be extensive discrimination in job assignments (O'Farrell, 1980:35):

I do the same work on the bench lathes as the men who do work on the big lathes. . . . We do the *same thing* to the pieces. . . . We have the *same equipment* and the *same training*. All the women welders went to welding school [run by the company] the same as the men. We passed the same tests to be certified as welders. . . . The only difference is that when we got through training, they sent all the women to be welders at a rate 14, while all the men went to a rate of 18. The women work on smaller pieces than the men, but we have to have the same skill and do the same welding work. . . . In fact, our work used to be part of the men's welding job, but the men didn't like it. . . . So [management] broke that part of the job off and put women on it, at a lower rate.

Employment practices in the Bell Telephone System prior to the 1973 consent decree illustrate the importance of occupational assignment: all formal recruiting was sex-

---

considerations have also been a factor. If the unions' only goal was simply to limit competition, sex need not have been the significant factor. Why were young men but not young women encouraged to enter trades? Why were male workers organized by unions, but not female workers? Hartmann argues that men had self-interest in maintaining women's subordinate position in the labor market so that women would continue to be economically dependent on men and perform household services. Many statements by union leaders during the nineteenth and early twentieth centuries indicate their strong support for keeping women at home.

specific, and it was impossible for applicants to pursue jobs that the company had decided were sex-inappropriate (Laws, 1976).

Cassell and Doctors (1972) used personnel records and interviews with managers and employees to examine the job grades for 2,300 workers in three manufacturing firms. They found that two of the firms discriminated in assigning job grades to women when they were hired and that this assignment tended to affect both grade and wage progression as long as the women remained with the firm.[8] They also found that firms were less likely to promote women to higher grades. Company representatives claimed that women did not want promotions because it would entail more responsibility and mean leaving their friends. Generally none of the workers, male or female, was well informed about promotion opportunities (in one of the companies, openings were posted for only two days), making it difficult for anyone to pursue them independently without official encouragement. A recent study of 3,500 employees at three large fiduciary institutions revealed similar results (Cabral et al., 1981). The researchers found that men tended to be placed in higher job categories than women with comparable education and were more likely to be promoted compared with women in similar entry positions, when seniority and previous experience were controlled. Malkiel and Malkiel (1973) found that female professionals in a large organization were assigned to lower-level jobs than similarly qualified men. Halaby (1979a) arrived at similar conclusions for managerial employees in a California public utility: while differences in experience and education translated into promotion to higher ranks for men, women remained concentrated in lower managerial ranks in which returns to increases in human capital were restricted.

A recent study of how several manufac-

turing firms in a southern city filled vacancies (Harkess, 1980) suggests that most of the employers explicitly considered gender in deciding whether to hire applicants for entry-level semiskilled positions, although they too explained that women would not want certain jobs. Recent field studies of the construction industry in which hiring quotas are in effect (U.S. Department of Labor, Employment Standards Administration, 1981; Westley, 1982) confirmed contractors' resistance to hiring women, even though they admitted that women were competent and indeed more dependable than men. Some cited objections by other employees as motivating their refusal to hire women.

A growing body of experimental research, some on employers or persons in training for managerial positions, also shows that employers favor men over equally or sometimes more qualified women (Fidell, 1970; Lewin and Duchan, 1971; Levinson, 1975; Dubeck, 1979). Although, taken singly, the generalizability of some of these studies is questionable, as a group they confirm the findings of surveys and statistical studies, case studies, and the accounts of women workers.

The unexpectedly large number of complaints of sex discrimination in hiring, job assignment, and promotion decisions that have been filed with federal antidiscrimination regulatory agencies since the passage of Title VII and other legislation provides evidence that women workers believe that they have been discriminated against. The number of charges filed with the Equal Employment Opportunity Commission (EEOC) increased from 2,053 in 1966 to almost 55,000 in 1983 (Equal Employment Opportunity Commission, 1984) or about one complaint for every 900 women in the labor force.

### Institutionalized Barriers in the Workplace

Some of the barriers that exclude women from certain male occupations are embed-

---

[8] The data for the third firm were not adequate to draw conclusions about discrimination.