Case3:04-cv-03341-EMC Document438 Filed09/29/06 Page1 of 13

ded in the formal structure of establishments: their personnel practices, job descriptions, mobility ladders, and the organization of tasks. These institutionalized barriers may have had their origin in prejudice or may be the by-products of administrative rules and procedures that were established for other reasons (such as seniority systems). However, once they are incorporated in an organization's structure they persist regardless of the lack of any discriminatory intent, unless they are altered.[9] Most individuals looking for work approach an employer within a broad and vaguely defined category (Blau and Jusenius, 1976). Employers play an active role in the labor market; they decide whether to hire applicants as well as for what job. The set of occupations to which any worker has access is generally quite small. Once workers get jobs, the job ladders that comprise their employers' internal labor markets (Doeringer and Piore, 1971) govern the occupations open to them. Of course, management decides who among alternative candidates should be promoted to fill vacancies and how quickly (see, for an example, Harlan and O'Farrell, 1982). As a result, sex differences in the allocation of workers to entry-level jobs greatly narrow the number of jobs available to women workers and perpetuate sex segregation throughout all jobs in an establishment (Blau and Jusenius, 1976).

Most large employers have internal labor markets with highly structured recruiting practices. Depending on the characteristics they seek in workers, employers use employment services, advertise directly to particular labor pools, or use employee referrals. The common practice of relying on informal referrals reflects employers' assumptions that a homogeneous work force will facilitate on-the-job training (Stevenson, 1977) and reduce the uncertainty inherent in hiring decisions (Kanter, 1977). For example, none of the employers Harkess (1980) surveyed used classified advertisements. Even if they did not actively discriminate in hiring, their reliance on employee referrals and walk-ins was likely to discourage applications from people unlike those already working there. The people to whom employees pass on job possibilities are part of their personal networks. Not only are such networks sex-segregated as a rule, but women are less likely than men to find their jobs through such informal methods (Leon and Rones, 1980; Granovetter, 1981; Roos and Reskin, 1984). Even if asked, workers might hesitate to recommend persons of the "wrong" sex or race, in the belief that they are less likely to satisfy their employer (Harkess, 1980).

Antinepotism rules provide one example of an employment policy that, while sex-neutral in theory, in practice works against women more often than men. By precluding spouses from working in the same department or company, they have tended to exclude wives who have similar background and training as their husbands but may be slightly behind in their careers. Although such rules are no longer the impediment they were for female academics prior to the 1970s (Simon et al., 1966; Dolan and Davis, 1960), many large companies continue to have policies against employing spouses.[10]

---

[9] This section draws heavily on Roos and Reskin (1984).

[10] Recent evidence regarding nepotism rules comes from the popular media and is unsystematic. It does indicate, however, that nepotism rules persist in some firms. A 1978 *New York Times* article (May 8) on nepotism referred to a policy that was only two years old at the University of New Orleans. A similar article that appeared in the *Louisville Courier Journal* (May 14, 1978) mentioned a recent unsuccessful suit challenging the nepotism rule at Libbey-Owens-Ford. In fall 1982 *Newsweek* (October 11, 1982:94) quoted a statement by Edward Hennessy, chairman of the board at Allied Corporation: "We have a policy at this company that we don't hire wives," which he later amended in a letter to the editor (November 29, 1982:6) to say that Allied's policy is not to hire the spouses of corporate officers

Most institutional barriers to promotion within firms reside in rules about seniority, job bidding, eligibility for promotion, and so forth that govern the operation of their internal labor markets. Because these practices are often codified (in collective bargaining agreements or civil service rules, for example), they are more visible than the barriers to being hired that women face. Best documented, perhaps, are the segregative effects of seniority systems that link workers' promotion prospects to their length of employment, particularly when they are not plantwide (Kelley, 1982; Roos and Reskin, 1984). In large firms, seniority to determine eligibility for promotion is often accrued only within a department or job group, and having substantial seniority in one group does not help one attain promotion opportunities in a new group. In effect, one loses seniority by transferring. Since many entry-level positions and their associated job ladders are sex-segregated, narrowly constituted seniority units hamper women's opportunity to transfer to jobs held by men that may have greater promotional opportunities. Even women with considerable experience are effectively limited in their access to male-dominated jobs in other units (Kelley, 1982). When legal action opens such jobs to women, many have been reluctant to sacrifice their seniority and risk future layoffs by transferring to male jobs (O'Farrell, 1982). Seniority is consequential even when jobs are secure, since it often determines shift, overtime, and vacation assignments (Steinberg and Cook, 1981).

Plantwide seniority systems that provide bumping rights in case of layoffs (in which more senior employees "bump" less senior ones, moving into their jobs, while the junior employees are laid off) may facilitate women's movement into sex-atypical employment. Some courts have addressed this problem (e.g., *Quarles v. Phillip Morris*, 279 F Supp. 505, 516, E.D. Va., 1968) by invalidating departmentwide seniority systems in firms in which departments were segregated (in this case, by race). However, a subsequent decision (*Teamsters v. United States et al.*, 45 LW 4514, 1977) denied remedies unless employees could show that the disparate impact of a bona fide seniority system was the result of intentional discrimination. In a recent decision (*Firefighters Local Union No. 1784 v. Stotts*, 104 S. Ct. 2576 [1984]) the Supreme Court held that the city of Memphis could apply its bona fide seniority system rather than lay off more senior white workers while retaining minority workers with less seniority to preserve the minority percentage of the work force. The Court, in striking down a lower court's injunction against the city's use of its seniority system, reasoned that the minorities who were protected from layoff were not the actual victims of previous discrimination by the city. Redressing problems of seniority can be difficult, since altering seniority systems, which generally have the force of tradition behind them, can generate opposition from those whose effective seniority is reduced by the remedy. For example, Northrup and Larson (1979) found that the seniority overrides required in the AT&T-EEOC consent decree engendered male hostility.

Practices of job posting (O'Farrell, 1980) have also impaired women's access to sex-atypical jobs in their plants. Job posting is seldom plantwide, so women do not learn of openings in other divisions (Shaeffer and Lynton, 1979; O'Farrell, 1980). A survey of corporations revealed that improved job posting facilitated women's movement into sex-atypical blue-collar jobs in nonunionized firms in which seniority was not binding (Shaeffer and Lynton, 1979). Information about openings is not sufficient, however. Many establishments have rules about who can apply for a transfer or a promotion, and in some firms bidding rights do not extend

---

nor to permit married couples to work in the same department or supervise each other.

across all units. In one such company that O'Farrell (1980) studied, regulations against cross-plant bidding served to keep women segregated in predominantly female jobs in the smaller of two plants.

A body of research on the New York State Civil Service system documents the segregative effect of formal promotion systems within structured job sequences (New York State Commission on Management and Productivity in the Public Sector, 1977; Peterson-Hardt and Perlman, 1979; C. Smith, 1979; Ratner, 1981; Haignere et al., 1981). Job ladders were typically sex-segregated with women concentrated in the lowest-level jobs within ladders. The "female" ladders were both shorter and more difficult to climb because of more stringent educational and experience requirements (Peterson-Hardt and Perlman, 1979). Given the stipulated limits on the number of candidates who could compete for a vacancy and women's under-representation in the eligible pools, women's chances for promotion were necessarily lower than those of men (Haignere et al., 1981; Ratner, 1981). Using supervisors' recommendations to identify candidates for promotion can also undermine the promotion opportunities of women in supportive roles. Although supervisors may be reluctant to recommend able assistants of either sex for promotion (Kanter, 1977; Shaeffer and Lynton, 1979), women suffer more because they are more apt to hold such jobs.

Design aspects of the work or the tools used can influence women's performance and hence their retention in historically male blue-collar jobs. Although women can learn to use unfamiliar tools, most machinery has been designed to accommodate men, so small women may not be able to operate existing machinery as efficiently or as safely as men (Walshok, 1981a). AT&T's experience is illustrative: women in outdoor jobs had higher accident rates than men until lighter-weight and more mobile equipment was introduced. Although it is unlikely that the intent to exclude women consciously influenced decisions about machine design or equipment, the decisions may nonetheless be exclusionary in effect. Women's lack of familiarity with tools and techniques may also restrict their interest in or access to a variety of blue-collar occupations, but remedial programs have also been effective in bringing women's skill level to a par with that of male job entrants (Walshok, 1981b).

### Informal Barriers in the Workplace

Exclusion also occurs subtly through a variety of processes that steer people away from work that has been culturally defined as inappropriate for their sex. Here we examine how informal processes in the workplace contribute to sex segregation either because an uncomfortable work climate leads women to withdraw from customarily male occupations or because it interferes with their ability to learn and perform their job.

Occupations that have been defined as male often provide an inhospitable context for women.[11] Women who enter them in violation of their sex labels are regarded as deviant and may face suspicion regarding their motives, hostility, or other sanctions (Aga, 1984). Men who are unaccustomed to working with women simply may be uncertain about how to behave. When work groups are integrated, gender becomes salient for the male occupants, who may subject the women to remarks calculated to put them in their place by emphasizing their deviant gender status (Kanter, 1977). These may take the form of profanity, off-color jokes, anecdotes about their own sexual prowess, gossip about the women's personal lives, and unwarranted intimacy toward them (Kanter, 1977; Martin, 1980). Kanter's analysis sug-

---

[11] Of course, the same has been true among men of different racial groups, and Kessler-Harris (1982) describes how prejudice by white female coworkers kept black women out of certain occupations and relegated them to others.

gests that male coworkers also assign women one of a small set of stereotyped nonprofessional personalities (mom, kid sister), which tend to prevent the women from participating in the group as full members. Women may respond to male hostility—whether direct or masked—with aloofness or defensiveness, which in turn makes interaction more difficult. Reskin (1978) has shown how role stereotyping limits the integration of women into the scientific community and impairs their performance.

These processes are especially likely in occupations that have a strong subculture, such as the police force (Martin, 1980) or occupations in which workers spend many hours together during slack periods. Firefighters represent such a group, as do crews that travel together (oil crews, merchant marines) or construction workers who may sit around the job site waiting out bad weather. To the extent that the work group resembles a social group, newcomers of a different sex (or race) may be viewed as intruders. Such occupations, too, may require a high degree of interdependence. The amount of interdependence in the work process can affect women's chance of success in sex-atypical jobs (Epstein, 1970a). When women are an unwelcome minority, whether they work autonomously or depend on others to accomplish their job makes a big difference in their performance. Several women pioneers in blue-collar occupations indicated that male coworkers' refusal to help them in the same way they would assist similar male workers hampered their ability to do their jobs (Walshok, 1981a; U.S. Department of Labor, Employment and Training Administration, 1978). Hostility sometimes takes the form of men sabotaging women's performance (Walshok, 1981a). In contrast, when work is organized so that women can work alone or with female partners, their retention in jobs dominated by men increases (Shaeffer and Lynton, 1979; Walshok, 1981a). It is probably not coincidental that several male-dominated occupations in which women's participation has increased do not involve working closely with others, e.g., bus drivers, real estate agents, dispatchers, mail carriers, office machine repairers (Remick, 1982).

At the extreme, women in male-dominated jobs face overt harassment (Nieva and Gutek, 1981; Walshok, 1981a). Sexual harassment is now recognized to be pervasive (Farley, 1978; MacKinnon, 1979; U.S. Systems Protection Board, 1981) and has been documented in construction (U.S. Department of Labor, Employment Standards Administration, 1981; Westley, 1982), craft jobs (Walshok 1981a), the automobile industry (Gruber and Bjorn, 1982), and forestry (Enarson, 1980). There is, however, no evidence that women entering occupations defined as male are more likely to be sexually harassed than those who work in traditionally female jobs.

Some women find superficial acceptance in predominantly male occupations but are excluded in subtle ways that impair their ability to do their jobs. Often their exclusion is not deliberate; men may be unaware of or indifferent to the process, and women reluctant to speak up (Epstein, 1970a). Since male domination of top positions is a structural phenomenon, however, the same processes that tend to strengthen the fraternity of men reinforce the exclusion of women. In the past many professional associations and unions barred women from membership (Epstein, 1970b; Simmons et al., 1975). Even today, some elite professional clubs in which important contacts are nurtured do not accept women as members, and women attending meetings there must literally use the back stairs (Schafran, 1981). More problematic because it is a daily affair is women's exclusion from informal networks. Kanter (1976:415) points out that "organizations . . . comprise a network of power relations outside of the authority vested in formal positions. . . ." Although some have observed that women lack access to these networks (Campbell, 1973; Welch and Lewis, 1980;

McPherson and Smith-Lovin, 1982), the actual processes through which access is limited are difficult to pinpoint, because of the subtle ways that discrimination occurs in network systems and the difficulty of quantifying the kinds of resources being distributed (Miller et al., 1981).

Women's exclusion from informal networks in which information is shared and alliances develop has implications for their learning and performing their jobs and their chances for advancement (for an example, see U.S. Department of Labor, Employment and Training Administration, 1978). Women are particularly apt to be excluded from activities that occur outside work hours (Kanter, 1977; Epstein, 1981), and, unsure of their reception, they may be reluctant to intrude (Martin, 1980). Martin (1978), for example, describes women police officers' exclusion from off-hours activities in which opportunities for desirable work assignments were discussed. In some occupations in which practitioners are self-employed (for example, physicians), collegial networks are indispensable for getting business. Yet women seem to be stuck in sex-segregated networks (Kaufman, 1977; Epstein, 1981) that put them at a professional disadvantage. Successful occupational performance is not always sufficient to gain admission to informal networks. In a case study of female school administrators, Ortiz and Covel (1978) found that even women who used formal networks effectively were barred from informal networks. Determining the consequences of women's exclusion from networks is difficult, but some findings are suggestive of deleterious effects. Kaufman's (1977) study of sex differences in faculty use of networks found that female faculty participated in less beneficial networks: they included fewer colleagues of higher rank and were judged to be less important than men judged their networks. Miller et al. (1981) found that belonging to a network enhanced the access of social service personnel to resources.

It is frequently argued that in order to advance, one must have active support from an individual who is established in one's field (Hochschild, 1975; Shapiro et al., 1978; Speizer, 1981). Sponsorship is common in the upper echelons of almost all professions (Epstein, 1970a; White, 1970; Zuckerman, 1977) as well as in some blue-collar occupations (Walshok, 1981a). Sponsors provide introductions through which an individual becomes established in the profession (Epstein, 1970a; Lorber, 1981), socialize their protégés to the values and behavior that are appropriate to the work culture (Caplow, 1954), and often provide vital instruction in the technical aspects of the job. As outsiders, women may need male endorsement to be taken seriously (Walsh, 1977) and thus may rely more than men on having a sponsor for advancement (Ortiz and Covel, 1978; Speizer, 1981). Because men hold a disproportionate number of positions of influence and few women in male-dominated fields hold high enough status to be effective as sponsors, most available potential sponsors are men. But men may hesitate to take on female protégés because they question their commitment, fear adverse reactions from wives and colleagues, or are unaware of their promise (Epstein, 1970a).

The evidence regarding the access of men and women to sponsors is scanty (Speizer, 1981), but what there is suggests that both professional and blue-collar women experience difficulty in finding sponsors (Roe, 1966; Epstein, 1970a; Walshok, 1981a). For example, most female truck drivers who said they had sponsors named their husbands or boyfriends (Lembright and Riemer, 1982). Only a few studies compared women and men. Women physicians were less likely than men to have had a sponsor in setting up practice (Lorber, 1981). Martin (1980) observed the expected sex difference in sponsorship among patrol officers, but her sample was small and unsystematic. Strober's (1982) survey of graduates of Stanford University's School of Business revealed that women were slightly more likely to have a mentor in their

current job, but the sexes did not differ according to type of mentoring. Research on sex differences in the effectiveness of sponsorship is also limited. For Strober's business graduates, having a mentor was not correlated with salary and was negatively related to job satisfaction for both sexes. A study of elementary school teachers concluded that sponsorship was necessary for advancement into male-dominated school administration but was more beneficial to men than women (Poll, 1978). Lorber (1981) compared the impact of sponsorship on the careers of female and male physicians in academic, institutional, and clinical settings. She found that women benefited from sponsorship in their postgraduate training but were less often sponsored for leadership positions. In contrast, 1,250 senior executives (of whom fewer than 1 percent were female) reportedly had mentors but denied that their mentors were important for their own success (Roche, 1979).

The journeyman-apprenticeship relationship can resemble the mentor-protégé relationship, except that apprentices may be assigned to journeymen who are indifferent or hostile (Walshok, 1981a). For this reason, women are particularly vulnerable in apprenticeship programs that lack classroom instruction, in which their training depends entirely on a single journeyman. One source of journeymen's hostility may be their perception that standards were reduced for female apprentices. Walshok (1981b) reports that a competency-based testing program at General Motors alleviated this problem by reassuring the journeymen while providing the apprentices with feedback on expectations and their performance.

Doing a good job does not necessarily mean getting credit, and what counts in a career is getting credit for doing good work (Hochschild, 1975). In some male-dominated work settings, women succeed only if their work is visible and can be assessed by an objective standard such as quantity of sales. Women's concentration in less visible positions (e.g., library work in law; Epstein, 1970b) or in jobs that deal with lower-status clients or customers may contribute to their invisibility and the underevaluation of their work. Women sell cheaper goods (or serve cheaper meals) than men do and their customers are often other women (Talbert and Bose, 1977). Ironically, when women hold male jobs, it is their gender and not their performance that is highly visible (Kanter, 1977). Kanter has outlined other ways in which women's minority status interferes with their performance and hence their evaluation, and evidence for female law students supports her thesis (Spangler et al., 1978). Any propensity to ignore or undervalue women's contributions not only reduces their personal chances for career advancement but also may justify not hiring additional women.

### Conclusion

In sum, women are excluded from many occupations because of the effects of past practices, remaining legal barriers, discrimination by employers and sometimes by unions and coworkers, institutionalized personnel practices, and informal barriers in the workplace that make many jobs uncomfortable for them or impair their performance. These barriers demonstrably contribute to the persistence of sex segregation in the workplace. Next we consider how and to what extent workers' occupational choices, socialization, education, and training also help to maintain a segregated work force.

## SOCIALIZATION AND EDUCATION

Many approach sex segregation in the workplace with the assumption that it results from women's and men's choices. If women choose to work with other women and men with other men, the consequences of segregation, even though often negative for women, might not be seen as an appropriate matter for policy intervention. In consid-

ering why women might choose different occupations than men choose, several reasons have been noted (Treiman and Hartmann, 1981). Sex-specific socialization can influence women's and men's occupational choices in a variety of ways. First, sex-specific socialization may lead women to prefer occupations that are generally viewed as appropriate for them. Second, women's premarket education and training may restrict the jobs for which they qualify. Third, women's beliefs that certain jobs are unavailable may deter them from trying to pursue them. Fourth, women's choices may reflect their ignorance of available options. A fifth significant factor, that women's anticipated family obligations may affect their choice of occupations, is discussed in the next section.

One view of occupational choice focuses on the differential socialization of the sexes to different personality characteristics, skills, and preferences. In brief, it holds that sex-role socialization contributes to sex segregation by creating in each sex preferences for occupations that have been defined as appropriate to that sex, at the same time leaving them disinclined, ignorant of, or pessimistic regarding their chances to pursue most other occupations. Some also point to the role of socialization in limiting the kinds of occupationally relevant training that women acquire. In recent years, sex-role socialization theory has become widely regarded as incomplete and is in the process of being reconceptualized. Socialization is now more commonly regarded as an ongoing process, rather than something that occurs in early childhood with results that remain fixed for life. Resocialization can and does occur, and adults also experience socialization in various contexts.

In the following discussion of how socialization shapes preferences, several caveats about occupational choice and sex-role socialization should be kept in mind. First, the notion of a chosen career may be misleading for many workers, at least early in their work histories. Young workers of both sexes display considerable movement within the labor force. For example, about 6 percent of the young men in the National Longitudinal Survey changed jobs every month (Hall and Kasten, 1976), and a considerable number changed occupations (Spilerman, 1977), even broadly defined occupational categories (Rosenfeld and Sorenson, 1979). Second, there are a large number of unlabeled occupations, and occasionally men and women perform the same occupation in different parts of the country, so that sex-role socialization could never provide a complete explanation of occupational choice. Third, the effect of workers' perceptions of available occupational options and the extent to which women may settle for sex-typical occupations only after being discouraged from pursuing sex-atypical occupations are often underestimated by those who regard choice as the major determining factor in one's work life. Finally, it should be kept in mind that sex-role socialization also contributes to sex segregation by influencing the preferences and behavior of people who make decisions about training or hiring workers or who occupy positions that can affect women's prospects for success in sex-atypical jobs. As we noted above, employers' and other gatekeepers' normative expectations regarding the sex-typing of jobs as well as attitudes about the sexes contribute to sex segregation.

### Sex-Role Socialization

Sex-role socialization refers to the lifelong process through which expectations about how each gender should behave are transmitted through the family, the educational system, and the mass media.[12] While strongly influenced by cultural standards, these expectations vary by race, ethnicity, and class. Sex-role socialization can generate sex-

---

[12] This discussion relies heavily on Marini and Brinton (1984).

typical occupational outcomes directly by creating sex-typed occupational aspirations or indirectly by developing in males and females tastes and characteristics that are compatible with occupations that have been labeled appropriate for their sex. Socialization occurs in two ways. Socialization agents can convey the impression that different attributes and behaviors are appropriate for females and males. They can also expose boys and girls to different experiences that produce different adult attributes. Both occur in most families. Children observe that adult men and women typically do different work inside and outside the home and that their interests and personal-social characteristics differ; they then infer what are expected behaviors for adult women and men. In addition, parents treat their male and female children differently in ways that may produce sex differences in certain characteristics (Huston, 1983). This has been demonstrated in recent research on activities and interests. Experimental studies that observe adults' reactions to the same behavior when only the adults' belief of the child's gender was varied have shown that the latter influenced their judgments about and behavior toward the child (e.g., Meyer and Sobiezek, 1972; Gurwitz and Dodge, 1975; Condry and Condry, 1976). In experimental studies adults made sex-typed toy choices for children and encouraged physical play for male children and interpersonal play activity and dependent, affectionate behavior for females. Because parents typically limit their daughters' freedom more than that of their sons, girls are exposed to fewer sources of socialization outside the family and may experience greater pressure to conform to parental values (Newson and Newson, 1976; Huston, 1983).

Regarding parental behavior that may be more closely linked to children's occupational attainment, parents harbor higher expectations for their sons' than their daughters' adult achievements (Maccoby and Jacklin, 1974; Hoffman, 1977; Marini, 1978).

This is especially true with respect to mathematics (Fennema and Sherman, 1977; Fox et al., 1979; Marini and Brinton, 1984, provide a detailed review). The sex-typicality of their parents' occupations influences the typicality of the occupation to which children aspire, with the same-sex parent exercising a stronger effect (Hofferth, 1980a). Children of employed mothers hold less traditional sex-role attitudes (Huston, 1983), and, among daughters, their mother's employment is important to their career choice (Beardslee and O'Dowd, 1962; Hartley, 1966; White, 1967; Almquist and Angrist, 1971; D. Bielby, 1978b). The research is inconclusive, however, on whether these daughters are more likely to enter typically male occupations (D. Bielby, 1978a; Brito and Jusenius, 1978; but see also Almquist and Angrist, 1970; Tangri, 1972; Klemmack and Edwards, 1973; Almquist, 1974).

Researchers have documented the existence of sex-typing in the occupational aspirations of children and young people. At relatively young ages, boys and girls are aware that adult sex roles differ and express interests in and prefer activities that the culture defines as appropriate to their sex (Blakemore et al., 1979; Carter and Patterson, 1979; Edelbrock and Sugawara, 1978; Faulkender, 1980; Schau et al., 1980). Preschool and elementary schoolchildren know the more obvious sex-typed adult occupations (Tibbetts, 1975; Garrett et al., 1977; Nemerowicz, 1979; see Ruble and Ruble, 1980, for a full review), and their knowledge of these stereotypes increases through adolescence (Stein, 1971).

In keeping with this knowledge, preschool children express sex-typed occupational preferences and expectations, although some (e.g., ballerina, cowboy) are not realistic possibilities. By mid- to late adolescence occupational aspirations are almost as sex-typed as the workplace itself. The index of segregation computed for the occupations that 14- to 22-year-olds wanted to hold at age 35 was 61, only 8 percent less

than the index measuring the actual level of segregation for the same occupational categories (Marini and Brinton, 1984). The young women aspired to fewer occupations, but the young men's aspirations were substantially more sex-typed. These patterns are quite stable from ages 14 to 22 (Gottfredson, 1978; Hofferth, 1980a; Marini and Brinton, 1984), although some evidence from the 1960s indicates that some women's occupational choices became more sex-stereotyped during college (J. Davis, 1965; Astin and Panos, 1969; Hind and Wirth, 1969).

Along with a general liberalization of sex-role attitudes and increasing support for women's equality of opportunity spurred on by the women's movement (Mason et al., 1976; Spitze and Huber, 1980; Cherlin and Walters, 1981; Thornton et al., 1983), the extent of sex-typing of young women's occupational aspirations has declined (Garrison, 1979; Herzog, 1982).[13] In 1968 only one in eight of the young women questioned in the National Longitudinal Survey expected to be employed in professional, technical, or managerial occupations when they were 35; by 1979 this proportion had increased to two in five (National Commission for Employment Policy, 1980:60). Lueptow (1981) also observed a marked drop in women's preferences for several traditionally female occupations, although males showed no commensurate increase in their preference for occupations defined as female. Among black female college students who expected to be employed at age 35, between 1968 and 1973 the proportion who thought they would work in sex-atypical occupations jumped from 14 to 21 percent; for whites the gain was only 2 percentage points, to 25 percent (Brito and Jusenius, 1978:70). For both races, one component of the change was the declining proportion who expected to be teachers. Douglas (1980) also reported that during approximately the same period the proportion of women entering college who expected to become elementary or secondary school teachers dropped from 35 to 10 percent. Interest among college women in professional careers in fields defined as male has increased sharply. For example, in 1968 only 3.3 percent of women surveyed by the American Council on Education planned to become businesswomen, compared with 20.4 percent in 1978 (Hornig, 1980). (During this period the proportion of men expecting to go into business increased from 17.5 to 23.3 percent.)

Sex-role socialization also may lead to sex differences in skills and knowledge that may affect occupational access. After the onset of adolescence, males tend to do better at mathematical reasoning and spatial skills, and women at verbal skills (Terman and Tyler, 1954; Dwyer, 1973; Maccoby and Jacklin, 1974; Sherman and Fennema, 1977; Brush, 1979; Richmond, 1980; Liben, 1978; Thomas and Jamison, 1975), but these differences are very small relative to within-gender differences (Huston, 1983).

Limited evidence shows sex differences in some personality characteristics that may be relevant for some occupations. There is some evidence that boys are more physically active, aggressive, competitive, and dominant in their peer groups than girls; and that girls are more anxious, timid, and compliant with adults (Maccoby and Jacklin, 1974; Block, 1976; and Frieze et al., 1978, present relevant reviews).

The evidence as to whether males and females differ in the value they place on dimensions of work is mixed. Boys are more likely to value financial rewards, status, and freedom from supervision; girls are more likely to value working with people, helping others, using their abilities, and being creative (Witty and Lehman, 1930; Singer and

---

[13] A concomitant change is the decline in the number of young women who aspire to be exclusively homemakers. In the 1979 National Longitudinal Survey of young women, only one-fourth expected to devote themselves exclusively to homemaking at age 35, compared with more than 60 percent of the respondents in 1968.

Stefflre, 1954; O'Hara, 1962; Lueptow, 1980; Herzog, 1982). These differences may not hold for black high school students (Brief and Aldag, 1975). Nieva and Gutek (1981) cite several studies that failed to find sex differences in orientation toward specific extrinsic and intrinsic rewards to working. They suggest that other investigators' failure to control for workers' occupation may account for some of the sex differences observed among employed persons. Miller and Garrison (1982) also found consensus among women and men on the importance of various working conditions, although they observed differences in some of the criteria women and men use for judging work. It is not clear whether these differences in attitudes and orientation have declined in keeping with changing occupational aspirations. Several recent studies (Brenner and Tomkiewicz, 1979; Lueptow, 1980; Peng et al., 1981; Tittle, 1981; Herzog, 1982) found no change, but national surveys of college freshmen show considerable convergence in several occupationally related attitudes (*Chronicle of Higher Education*, January 28, 1980; February 17, 1982).

The evidence taken together suggests that many young women and men enter the work force with attributes and aspirations consistent with the segregation of the sexes in different jobs. Recent changes, however, suggest a trend toward convergence in attitudes and aspirations. Moreover, the question of causation is complex. We can illuminate it by attempting to answer several questions. First, does socialization produce observed pre-employment sex differences in occupational aspirations, attitudes, and expectations? Second, to what extent do pre-employment sex differences contribute to occupational segregation? Third, can and should we try to reduce occupational segregation by intervening in socialization practices?

Although several researchers have observed a link between individuals' sex role orientations and women's employment aspirations (reviewed in Miller and Garrison, 1982), the extent to which sex-role socialization produces pre-employment sex differences is not established. We have seen that young women and men do differ on several attitudes and on a few abilities and personality traits (Marini and Brinton, 1984) and that young people's expressed occupational preferences are definitely sex-typed, although females' preferences have become less so over the past several years. The evidence reviewed indicates that parents treat children differently, depending on their gender, and below we review evidence that teachers also do so. It seems likely, then, that socialization contributes to the observed differences in abilities and values. With respect to occupational aspirations, however, our understanding of their formation is still quite limited (Laws, 1976; Miller and Garrison, 1982).

Considerable evidence suggests that visible occupational sex segregation contributes to the formation of sex-typed occupational preferences in young people. First, knowledge of the sex-segregated nature of the workplace may lead young people, from an early age, to prepare themselves for careers in which they believe they would be welcome. Second, sex segregation may affect preemployment aspirations and skills by restricting the ability of parents and other adults to serve as models for nontraditional occupations. Limited empirical evidence (reviewed in Marini and Brinton, 1984) suggests that same-sex role models may influence college students' educational and career choices (Fox, 1974; Goldstein, 1979). For example, Douvan (1976) offers anecdotal evidence of the value to successful women of having a prominent same-sex role model, and Basow and Howe (1979) report that college seniors' career choices were affected to a significantly greater degree by same-sex than by opposite-sex role models. Third, growing up in a world in which educational materials and the mass media show men and women performing different roles

may influence girls' and boys' expectations about the jobs they should fill. Television programs and commercials, projecting cultural ideals, depict women in fewer occupational roles than men (DeFleur, 1964; Women on Words and Images, 1975), and most of them are female occupations (Kaniuga et al., 1974; Tuchman et al., 1978; England and Gardner, 1983). The impact of television viewing on occupational aspirations has not been demonstrated, although elementary schoolchildren's identification with traditional sex roles is correlated with the amount of television they watch (Frueh and McGhee, 1975).

Both direct and indirect evidence points to the influence of young people's perceptions of occupational opportunities on their preemployment aspirations. Marini and Greenberger (1978) found that the sex composition of occupations influenced the degree to which white girls—but not boys—expected to realize their aspirations. Heilman (1979) found that high school students' occupational interests were a function of their perceptions of occupations as viable career choices, given their sex compositions. Research on the disparity between young people's aspirations and the occupations they expect to pursue is particularly instructive, because the latter are more likely to reflect the effect of constraints—including the sex labeling of the preferred occupations or market discrimination based on sex (Marini and Brinton, 1984). Girls, in particular, expect to be in more sex-typed occupations than the ones they prefer (Marini and Brinton, 1984). That young people's expectations are more sex-typed than their aspirations presumably reflects their perceptions of their actual options. Direct evidence for this presumption is provided by a study of the reasons for discrepancies between high school girls' expectations and aspirations. More than half of those whose expectations differed from their aspirations explained that the occupations to which they aspired were "inappropriate for females" (Burlin, 1976). In addition, almost one-third of the female high school students in a national sample (but only one-tenth of the males) thought that their gender would to some degree prevent them from getting the kind of work they would like (Bachman et al., 1980). Taken together these studies provide rather strong evidence that the existence of segregation contributes to the development of sex-typed occupational preferences.

Our second question is whether preemployment sex differences in aspirations, attitudes, and expectations lead to sex-typical occupational choices. Again we must distinguish values and traits from occupational preferences. Regarding the former, we quote from Marini and Brinton's (1984:208) review of sex typing in occupational socialization:

> Although it is possible that sex differences, particularly in physical characteristics, may form the basis for some occupational sorting by sex, the relevance of most stereotypically ascribed sex differences in personality and ability, including physical differences, to occupational performance remains unknown. . . . It seems likely that the extent to which one sex is better suited to perform sex-typed jobs has been greatly exaggerated. Because sex differences in personality traits and abilities are both smaller than they are stereotypically ascribed to be and of questionable relevance to the performance of most jobs, their role in . . . [producing] sex segregation . . . is likely to be minimal.

Additional research is clearly necessary to determine to what extent links exist between sex-typed characteristics and values and sex-typical occupational outcomes. We also need to know more about the actual skill requirements of jobs and their effect on sex segregation, since differences in aspirations may lead to differences in the skills men and women acquire.

The evidence regarding the association between people's preemployment occupational aspirations and the occupations in which they end up is mixed. Marini and Brinton (1984) identify five studies, all done before 1971, that examined the congruence

between high school aspirations and subsequent occupational attainment. The estimates ranged from 15 to 25 percent agreement for respondents reinterviewed 10 years after high school (Kohout and Rothney, 1964; Kuvlesky and Bealer, 1967) to between 50 and 80 percent among a group sampled six months after high school graduation (Porter, 1954; Schmidt and Rothney, 1955). Obviously these findings are sensitive to the number and fineness of the occupational categories the researchers used. We have uncovered no evidence linking the strength of children's sex-role socialization and the sex typicality of their occupational outcomes. One study (Spitze and Waite, 1980) found that although young women's career commitments were associated with the sex typicality of their first post-college jobs, their sex-role attitudes had no effect. Still, perhaps because of the general lack of longitudinal data, there is surprisingly little research on the connection between aspirations and outcomes. It is not impossible that appropriate studies would show a link between the sex-typing of one's aspirations and preferences (or traditional attitudes and values on sex-roles generally) and the sex-typing of one's occupational outcomes. It would be more to the point to discover whether having traditional attitudes or preferences tends to be correlated with being in female-dominated occupations in general, and not whether aspiring to a specific occupation leads to entering that specific occupation.

To conclude, the differential socialization of the sexes probably contributes to occupational segregation to some degree, both through the formation of sex-typed preferences in workers and the formation of preferences for workers of a particular gender among employers. Prospective studies of the same individuals over time are badly needed for a clearer understanding of the way in which socialization contributes to segregation through influencing preferences compared with its effect through influencing awareness of opportunities. At this time some preliminary conclusions can be stated. We have learned that the effects of preemployment socialization are far from immutable. Socialization is a lifelong process that continues after one enters the labor force. Accounts of the experiences of women who entered heavily male occupations subsequent to their first work experience (Walshok, 1981a) reveal the women's resocialization. It is not clear, however, whether interventions in childhood socialization would alter perceptions or attitudes, but some studies suggest that they can. Experimental research indicates that children who were exposed to media presentations showing men and women performing nontraditional work tended to express views that were less sex-typed about adult occupations than children who saw neutral or traditional sex-role portrayals (Atkin, 1975; Flerx et al., 1976; Davidson et al., 1979). Children who for a semester watched a television series ("Freestyle") designed to show men and women performing nontraditional activities and occupations displayed less stereotyped beliefs and attitudes about adults' occupational and domestic roles nine months later. Evaluations of programs designed to increase college women's participation in science (discussed in the following chapter) indicate that attempts to resocialize women to different career interests can be successful. It is important to recognize that high school curricula—including vocational education—constitute interventions that usually encourage occupational preparation consistent with sex-typed cultural values. In the next section, we trace the implications of education and training for sex-segregated occupational choices.

Education

People's labor market outcomes are affected by the amount and kind of education they acquire as well as through more subtle processes within the educational system. On average, black women and men attain about

the same amount of schooling, while Hispanic and white men have a slight edge over Hispanic and white women. However, men are overrepresented at the lower and higher levels of education. Level of education is linked to the kinds of jobs women and men obtain. For example, of women in the labor force in 1981, those who were high school dropouts were much more likely than graduates to work as operatives, laborers, private household workers, and other service workers. Of women in professional and technical occupations, 60 percent had completed four or more years of college (U.S. Department of Labor, Women's Bureau, 1983:116). Although historically men have been more likely to attend college and attain higher educational levels than women, recent data show that the enrollment rates of men and women have converged (Heyns and Bird, 1982).

Given the different historical experience of women and men with public education and the wide acceptance of beliefs about sex differences in both character traits and abilities, persistent sex differences in educational processes within the schools are not surprising. We discuss here two kinds of differences that are relevant for sex segregation: (1) sex-stereotyped educational materials and (2) teachers' and counselors' sex stereotypes and differential treatment of the sexes.

Sex bias in educational materials and those used for career counseling has been well documented. (See Marini and Brinton, 1984, for a detailed review.) As a rule, textbooks stereotype occupations as male or female (Vetter et al., cited in Evenson and O'Neill 1978). To illustrate, in 134 elementary school readers examined in one study, women were portrayed in only 26 occupations (all but one of which were stereotypically female), compared with almost 150 occupations for men (Women on Words and Images, 1975). Similar stereotyping has been found in foreign language and mathematics texts. The effects of sex-stereotyped educational materials on children's occupational aspirations have not been determined, although Kimmel (1970) and Wirtenberg (cited in National Commission on Employment Policy, 1980) found at least short-run effects of children's books on stereotyped attitudes toward minorities. An intriguing study (reported in Bem and Bem, 1973) revealed that females showed no interest in jobs labeled "draftsman" but expressed interest in jobs labeled "draftswoman." Similarly, males were not attracted to telephone operator jobs when the accompanying text used the female pronoun but were interested when male pronouns were employed. Nilsen (1977) observed a direct correlation between children's exposure to a sex-stereotyped reading program and their propensity to classify activities as belonging to male and female domains. However, we still know very little about the effects of books and other teaching materials on children's occupational choices.

Differential treatment of girls and boys by teachers seems to reinforce sex stereotypical attitudes and behaviors (see Brenner, 1981). Many teachers are aware of concerns regarding sex stereotyping, but they also perceive boys and girls as radically different and believe that they want to be treated differently (Guttentag and Bray, cited in Evenson and O'Neill, 1978). According to Guttentag and Bray's findings, teachers see their role as meeting rather than shaping their students needs. Teachers' education texts themselves continue to present stereotyped portrayals of females (Sadker and Sadker, cited in Brenner, 1981).

Marini and Brinton's (1984) review of the literature confirms sex bias in high school career counseling that is consistent with sex-typical occupational choices. High school counselors have tended to hold traditional attitudes about the appropriate occupations for female and male students, to discourage nontraditional aspirations, and to be ignorant of issues related to women's employment (Thomas and Stewart, 1971; Bingham and House, 1973; Medvene and Collins,