1976; Karpicke, 1980). In sum, the literature reveals considerable bias by counselors regarding the appropriateness of various occupational aspirations for women, and invariably recommends that school counselors be trained to provide women students with less biased counseling. Although the impact of counseling on students' aspirations has not been generally demonstrated (Marini and Brinton, 1984), a recent study by the American Institutes for Research (Harrison et al., 1979) revealed the effect of counselors on student curricular choices: 25 percent of the female students and 14 percent of the male students taking courses unusual for their sex had been advised against enrolling in them. Of those who entered traditional areas, 14 percent of the girls and 8 percent of the boys said that they had been dissuaded by counselors from enrolling in nontraditional areas. Others found that counselors were more likely to discourage than encourage women from enrolling in math and science courses (Levine, 1976; Casserly, 1979).

Because it is highly segregated by sex, the public school system offers students few role models for sex-atypical occupations. Elementary schoolchildren are three times more likely to be taught by women than by men (U.S. Department of Commerce, Bureau of the Census, 1983b), which may account in part for girls' preferences for teaching careers. In view of the lack of valid evidence regarding the stability of individuals' occupational preferences and the large numbers of factors that intervene between early school experiences and adult career choices, however, it is difficult to draw conclusions about any segregative effect. Secondary school teachers are somewhat more likely to be male, and men teach math, science, and social science courses disproportionately. They are even more likely to outnumber women in the various administrative roles visible to students—principal, assistant principal, and school superintendent (Howard, cited in Brenner, 1981). However, as is true for sex stereotyping in teaching materials and for teachers' and counselors' attitudes and behavior, the impact, if any, of same-sex role models has not been established.

The tracking of students into different curricula or specific subjects and away from others is common in many high schools, although it is often so subtle that students are unaware that it is occurring (Marini and Brinton, 1984). Teachers and counselors may recommend that female students avoid certain college preparatory courses, with the effect of restricting their subsequent occupational options (Marini and Brinton, 1984). This process has been documented most fully with respect to math and science. Girls have been underrepresented in mathematics and science classes in secondary school, although recently they have begun to enroll in these classes in greater proportions (National Commission for Employment Policy, 1980). Women undergraduate mathematics majors were more likely than men to report that their teachers had discouraged their pursuing math careers, although female mathematicians also often referred to a teacher's encouragement as important to their career decision (Luchins and Luchins, 1980). Researchers (Marini and Brinton, 1984; Fennema, 1983) have concluded that sex differences in mathematics and science training stem not from differences in ability or (for mathematics) in liking for the subject, but from the labeling of these subjects as male and perceptions of their utility (Wise et al., 1979; Armstrong, in National Commission for Employment Policy, 1980; for a contrasting view see Benbow and Stanley, 1983). For whatever reason, young women take fewer mathematics courses beyond algebra in high school and college. The implications for women's subsequent opportunities have been examined in several studies. In some schools math and science courses are prerequisites for some sex-atypical vocational courses (e.g., electronics—League of Women's Voters Education Fund, 1982). Moreover, students who fail to take

high school mathematics tend to avoid remedial mathematics courses later (Brenner, 1981). Lack of high school preparation also seriously restricts the majors for which college students qualify (Sells, 1973). For example, of a random sample of freshmen at the University of California at Berkeley, almost 60 percent of the men but only 8 percent of the women had enough high school math to take the course that was required to major in every field except the humanities, social sciences, librarianship, social welfare, and education (Sells, 1973). Failing to take college mathematics ultimately affected women's employment options. Sells (1979) found that only 16 percent of companies planning to recruit employees at the University of Maryland in 1978 would consider job candidates without a calculus background.[14]

Sex differences in college majors also contribute to job segregation, inasmuch as some college education is directly occupationally relevant. Until recently women were heavily concentrated in education, the humanities, arts, and behavioral sciences; and men in business, engineering, physical and certain social sciences, and preprofessional training (Polachek, 1978; National Center for Education Statistics, 1981). But recent data show decreasing sex differentiation across college majors (Heyns and Bird, 1982; Beller, 1984). Between 1971 and 1979 the index of segregation computed for college majors for a national sample of college students declined from 46 to 36 (National Center for Education Statistics, 1981), paralleling declines in sex segregation in professional occupations among members of young cohorts of workers (Beller, 1984). During the 1970s the proportion of women baccalaureates who took their degrees in education decreased by half, while those in business and health professions increased substantially. Women's enrollments in law, medicine, business administration, and engineering all increased sharply over the past decade (U.S. Department of Education, 1981). As a result, the proportion of law degrees awarded to women between 1970 and 1980 increased from 8 to over 40 percent; the comparable gains for medical degrees and masters of business administration are from 10 to 33 percent and from 3 to 21 percent, respectively. In the last decade women earned an increasing share of degrees in such quantitatively based disciplines as biological, physical, and computer sciences, at every degree level (Berryman, 1983). In engineering, over 13 percent of bachelor's degrees awarded in 1983 were to women, compared with less than 1 percent a decade earlier (Vetter and Babco, 1984; U.S. Department of Education, 1981). These changes probably reflect efforts to improve sex equity in education as well as women's responsiveness to improved opportunities in these male-dominated professional occupations.

### Vocational Education

Unlike most general education in the public schools, vocational education early received federal money and federal policy direction. Consequently it has been a particular target of change (see the following chapter for a full discussion of sex equity efforts). Vocational education programs have been sex-segregated since their inception in the late 1800s. In recent years, between 20 and 44 percent of high school senior women were enrolled in vocational courses (Grasso, 1980; Harnischfeger and Wiley, 1980; Hofferth, 1980b). Males and females have been differentially distributed across vocational courses, with females predominantly in health, home economics, and office and

---

[14] Math courses or a business major are not, however, always necessary to perform the jobs that require them. Some corporations have increased employment opportunities for women by eliminating educational requirements that did not prove to be necessary for job performance (Shaeffer and Lynton, 1979).

business programs, and males in technical preparation, the trades, and agriculture (Harnischfeger and Wiley, 1980). In fact, as recently as 1979, almost half the vocational programs in 10,584 public schools and colleges were still exclusively of one sex (Maeroff, 1982).[15]

Whether training should be available to women and what kinds have long been subject to debate (Kessler-Harris, 1982). Implicitly assuming that women's domestic role is paramount, advocates argued that training women would make them better homemakers. This rationale ultimately led to state laws requiring domestic science (home economics) courses for girls in publicly funded programs. The 1917 Smith-Hughes Act, which initiated federal funding for vocational education, made sex-segregated vocational education a matter of national policy by subsidizing training for female secondary students in domestic science but not in commercial office skills. World War I opened some publicly financed industrial training courses to female students, but by 1920 these had largely disappeared, and the sex-segregated nature of vocational education was firmly established (Kessler-Harris, 1982). Occupational training eventually became available to high school girls, but primarily for occupations already perceived as female. Hence, female students predominated in health and clerical programs, and males in the trades, agriculture, and technical programs (Harnischfeger and Wiley, 1980). Only retail sales has attracted students of both sexes in any numbers.

It is not clear to what extent sex differences across vocational education courses reflect tracking by the schools, students' choices, and parent and peer influences (Brenner, 1981). Kane and Frazee (1978) found that mothers are particularly influential in the type of vocational program women take, and young women in traditional vocational education training were more likely than those in nontraditional programs to cite their mother as a very important influence in program choice. Senior high school personnel reportedly influenced women's decisions to select their training less than half as often as parents. Young women may be especially loath to deviate from sex-role norms during adolescence when most vocational education takes place, and the same peer pressures that deter them from taking math and science may dissuade them from enrolling in shop or technical courses (Gaskell, 1985). The attitudes of male classmates deterred some adolescent girls from taking classes judged to be inappropriate for them, according to a study by Entwisle and Greenberger (1972). In their study of adult women who entered postsecondary vocational training, Kane and Frazee (1979) found that women who had already been in the labor force were more likely to consider mixed and nontraditional occupations,[16] apparently in response to their firsthand knowledge of the disadvantages of predominantly female jobs. In contrast, women who had been out of the labor force and who were insecure about reentering sought training for sex-typical occupations.

For whatever reason, vocational education programs are substantially sex-segre-

---

[15] A substantial proportion of all vocational education enrollments in secondary schools is in nonoccupationally specific programs; that is, programs that do not attempt to prepare students for specific jobs (Golladay and Wulfsberg, 1981). Home economics is a prime example: in 1978 only 11 percent of the enrollments in home economics and homemaking classes were classified as employment-related, according to the U.S. Office of Education. Of all secondary vocational enrollments in 1978, 43 percent were in these courses (Brenner, 1981:Table 5).

[16] The researchers classified programs in which 0-25 percent of the national enrollments are women as "nontraditional," those with 25-75 percent women as "mixed," and those with more than 75 percent women as "traditional."

gated, and the evidence, although somewhat weak, suggests that enrollment in such programs does affect one's subsequent employment.[17] Type of vocational curriculum is apparently linked to later occupation (Brenner, 1981; Golladay and Wulfsberg, 1981). A recent cross-sectional analysis of 1,539 workers ages 20-34 indicates that vocational courses are linked with being employed in related occupations (Mertens and Gardner, 1981). The evidence does not permit conclusions about causality, however. On one hand, students' occupational knowledge and preferences may dictate their choice of vocational courses; on the other hand, the vocational curricula open to them may in turn influence both their aspirations and their knowledge of available jobs (Mott and Moore, 1976; Kohen and Breinich, 1975), and hence affect the kinds of jobs they consider when they enter the labor market. Persons in postsecondary vocational training are considerably more likely than those in secondary school programs to enroll in employment-related programs (Brenner, 1981), so type of postsecondary vocational education is especially likely to be linked to subsequent occupation.

Assessment of the actual impact of vocational training on the sex typicality of students' subsequent jobs is hampered by data limitations. The federal Vocational Education Data System (VEDS), for example, includes job placement data only for students who either completed occupationally specific vocational programs and were available for placement or had terminated their training to take full-time jobs in the fields for which they were trained (Golladay and Wulfsberg, 1981). Thus, VEDS data exclude students who dropped out of the programs as well as those students enrolled in programs not considered vocationally specific, e.g., home economics and industrial arts.

The National Longitudinal Survey data are of higher quality but omit some variables necessary to assess the effects of vocational education on labor market outcomes (Brenner, 1981). These data show that young women who had enrolled in commercial programs were more likely than those in other vocational courses to hold sex-typical jobs four years later. In contrast, young women who had taken other than white-collar clerical vocational courses were less likely than female students in general, or those in college preparatory or other vocational courses, to hold sex-typed jobs (Grasso, 1980). Hofferth (1980b) observed the same pattern after 10 years.

Moreover, for both sexes, graduating from a trade or industrial program was associated with subsequent participation in and completion of an apprenticeship (Mertens and Gardner, 1981). Apprenticeship is the primary avenue into many skilled blue-collar occupations, and women have been almost totally excluded. In 1978 they constituted only 2.6 percent of the more than 250,000 registered apprentices and were thus underrepresented even relative to their presence (5.6 percent) in craft jobs (Ullman and Deaux, 1981). Several barriers contribute to women's underrepresentation in apprenticeship programs. They are less likely to learn about programs, to qualify, and to be selected (Waite and Hudis, 1981). An upper age limit of 24-27 years in many trades presents a significant obstacle to women who have children during their twenties. Moreover, many women who have spent several years in traditionally female jobs (Kane and Miller, 1981; Waite and Hudis, 1981;

---

[17] Three major longitudinal studies by Grasso and Shea (1979), Hofferth (1980b), and Harnischfeger and Wiley (1980) investigated whether vocational education improves the labor market outcomes of participants. These studies suggest that male participants fared no better than young men who had not been in vocational courses, net of other factors (see also Grasso, 1980). With respect to female students, Grasso and Shea found that those who were in vocational education courses were more likely to finish high school and earned higher wages than those in general education courses. The former were enrolled primarily in clerical programs that presumably led to clerical employment.

O'Farrell, 1982) do not consider skilled blue-collar work until divorce or other economic pressures prompt them to seek better-paying work. Large application and union induction fees may be beyond the budgets of the very women motivated by economic need to consider male occupations.

## Conclusion

In sum, women's labor market opportunities are affected by the vocational education, general education, and other socialization and training influences to which they are exposed. The link to employment is most plausible for vocational education, which teaches job-specific skills needed in the labor market, but some connection is undoubtedly present for the other types of experiences reviewed above as well. While we have focused on the effect of socialization processes on aspirations and learned personality traits, the differential treatment and exposure of boys and girls in general education, and the sex segregation of occupationally specific programs in vocational education, a general outcome of the socialization and education process is to restrict information about job options that are most typical of the opposite sex. For example, Gann Watson testified before the Committee on Education and Labor of the House of Representatives (U.S. Congress, House, 1982:343-344) that

> Most vocational students, particularly young women, opt for programs that are familiar to them. They do not know about . . . courses in areas consistent with their capabilities . . . which can lead to excellent employment opportunities. They choose to enroll in such courses as consumer and homemaking, industrial sewing and cosmetology because they conceive of them as women's programs and because they know what people in these jobs do. They do not know what machinists do, they do not know what industrial electricians do, so they go into cosmetology programs.

Interviews with female construction workers in a study of the industry sponsored by the Department of Labor illustrate this point. Before they had contact with a referral agency, the women were unaware of career opportunities in construction (U.S. Department of Labor, Employment Standards Administration, 1981).

It seems probable that occupational knowledge affects occupational outcomes. Parnes and Kohen (1975) have shown that this is the case for young black and white men, although knowledge of what workers in 10 occupations did was associated with only fairly small increases on the Duncan SEI score associated with their subsequent jobs. A similar study for young women (Mott and Moore, 1976) showed no effect of occupational knowledge on the prestige of their subsequent jobs. The 10 occupations on which the young women were questioned, however, were typically held by women, so we can draw no conclusions from this study about the effect of knowledge of a broad range of occupations on women's occupational choices or outcomes.

Providing students with information about sex-atypical occupations is probably not sufficient, however, to yield significant changes in their aspirations, in view of the importance of cultural norms and peer group and family pressures. For example, Verheyden-Hilliard (National Commission for Employment Policy, 1980) described a study in which a counselor provided a small group of girls with information regarding jobs not customarily held by women over an extended period. Although their awareness of the range of jobs open to women was enhanced, these subjects were not more likely to aspire to nontraditional occupations. Nevertheless, improved information is certainly a necessary, if not sufficient, step in ensuring equal opportunity in the labor market.

## FAMILY RESPONSIBILITIES

We noted at the outset of this chapter that deep-seated cultural beliefs about appropriate activities for men and women un-

doubtedly have a strong influence on both workers themselves and employers in their attitudes about appropriate work for men and women. One of the most long-standing of these beliefs is that women belong at home raising children and caring for their families. And we noted that, in fact, women more than men undertake the duties associated with child, family, and home care—both because they do so within marriage and because, if single, they are much more likely than men to have children living with them. These family care activities are done by women whether or not they also work for wages. Despite the increasing participation of mothers of even very young children in the labor force in recent years, a substantial proportion of mothers do withdraw from the labor market to care for young children. It is not unreasonable to suppose that women's family responsibilities do affect their labor market behavior, and several theorists have argued that women choose to enter and work in occupations that accommodate their actual or anticipated family responsibilities and that such choices, in the aggregate, contribute to job segregation by sex.

There are other ways, too, that women may be influenced by their families in their work lives. Husbands, and possibly fathers, may have definite ideas about the appropriate type, hours, and location of work for the women in their families. For example, Weil (1961) reports that 69.3 percent of the husbands of women who work part time object to full-time employment for women. While the pervasiveness of this attitude has probably undergone some change since 1961, 29.2 percent of married women who were employed in 1983 worked part time (U.S. Department of Labor, Women's Bureau, 1983); and women who work part time are between 3.8 and 4.4 times less likely to be employed in male occupations (Beller, 1982b). Since there is a correlation between part-time work and the likelihood of being employed in a sex-segregated occupation, to the degree that part-time work is more acceptable to the husbands of married women in the labor force, this attitude may contribute to occupational sex segregation. Women may be constrained by their husbands' attitudes, not only about the number of hours they work but also about how much money it is appropriate for them to earn. Thirty percent of magazine readers surveyed in 1978 responded that they thought they would turn down a job that paid more than their husbands earned (Bird, 1979). Axelson (1970) found that 25.7 percent of white men and 38.8 percent of black men agree or strongly agree that a husband should feel inadequate if his wife earns more than he does, and 10.9 percent of white men and 24.2 percent of black men agree or strongly agree that a wife should refuse a salary larger than that of her husband.[18] These findings suggest that husbands' attitudes may constrain wives' labor market choices.

Women may be constrained by additional aspects of familial responsibility. Many careers require a willingness to relocate as new opportunities arise. Bird (1979) found that corporate officers find relocating difficult because of family responsibilities and that the husband's career may take precedence. In a study of the careers of academic men and women, Marwell et al. (1979) cite evidence that 49 percent of married women, compared with 4 percent of married men, viewed their spouses' jobs as a major deterrent to considering positions in other geographic areas. It is likely, then, that the requirement of mobility in certain careers restricts women more so than it does men and contributes to occupational segregation by sex. Ironically, husband's careers may not only con-

---

[18] These findings raise the intriguing question of whether low wages contribute to job segregation (rather than the other way around), if wives seek low-paying jobs because they fear their husbands' objections. Recent data reveal, however, that in 12 percent of all couples wives earn more than their husbands (U.S. Department of Commerce, Bureau of the Census, 1983c).

strain wives' choices but may also directly benefit from their wives' contributions. Benham (1975) concludes that a woman's college education does more to raise the income of her husband than it does to increase the income she can earn herself. And given the household division of labor, it is likely that jobs that seem to require spouses to serve in a support role, such as those in the upper ranks of corporate, political, or academic life, are more easily filled by men than women (Bird, 1979; Kanter, 1977). In a survey of married male college graduates (Mortimer, 1976) only 14 percent replied that their wives had no involvement in their careers, and 19 percent said their wives had participated directly in job tasks. Fully 91 percent of ministers' wives said they were involved in church-related work, but only 18 percent thought they would be equally involved if their husbands were not ministers (Taylor and Hartley, 1975).

The significance of all aspects of families—including pregnancy, childbirth, caring for children, housework, and husbands' attitudes—is undoubtedly large for many aspects of womens' work lives, but, as we have seen, the theory and the evidence concerning their implications for job segregation by sex is much more limited. We want to caution, too, against the common tendency in social science research to assume that family responsibilities are important only to women's work lives and not to those of men. As Feldberg and Glenn (1979) have pointed out, all too often women at work are studied as though family was all that mattered for their behavior (overlooking the influence of such factors as working conditions, wages, and promotion opportunities) and men at home or in their communities are studied as though work was all that mattered (while connections of family and community concerns to work-related issues are ignored). While the available research focuses on the effects of women's family responsibilities on their workplace behavior, we want to stress the necessity for considering all the permutations of work-family interactions, for men as well as women.

Human Capital Theory

Mincer and Polachek (1974, 1978) and Polachek (1976, 1978, 1979, 1981a, 1981b) have argued that women's actual or expected family obligations dictate the choice of predominantly female occupations. This argument is derived from human capital theory and is based on the assumption that people make choices to invest in training or to pursue certain occupations with an eye toward maximizing their lifetime earnings. Women's expectations that they will interrupt their labor force participation to have children are thought to affect their decisions about education, training, and occupational choice in several ways. First, because women who do not plan continuous employment expect less return from any job-related investment in education or training, they might select female-dominated occupations, which are believed to require less investment in training. Second, women who anticipate a short period of employment might try to maximize their starting salaries by selecting female-dominated occupations, which hypothetically start at higher wage levels but yield lower long-run returns to experience than predominantly male occupations (which hypothetically pay less to start because they provide on-the-job training and advancement opportunity—Zellner, 1975). Third, women who anticipate intermittent employment might choose occupations requiring skills that do not depreciate rapidly with disuse or that do not penalize the depreciation.

Another possibility is that the household rather than the individual is the maximizing unit that allocates the time of its members according to their talents to realize the greatest economic benefit (Becker, 1974; Moore

and Sawhill, 1976).[19] Regardless of their socialization, women's poorer earning prospects relative to their husbands—either because they plan discontinuous employment, have less education or experience, or because of sex discrimination in the labor market—would lead them to specialize in domestic work while their husbands specialize in market work. Wives would retain responsibility for child care and domestic work even when employed full time, because their primary orientation would be toward the family. They might then prefer jobs that do not require overtime, unanticipated work effort, travel, or geographic mobility or that permit flexibility and time off in domestic emergencies, all hypothetically characteristics of some predominantly female occupations.[20]

Unfortunately, we have few data either about women's preferences or the degree to which female-dominated occupations might accommodate them, but, before turning to the available empirical literature that attempts to test several variants of the human capital thesis, let us note several theoretical objections. First, even if women do seek jobs that require less training, there is no reason to expect them to cluster particularly in female-dominated jobs, since many male-dominated jobs also require little skill or training (Blau and Jusenius, 1976). Second, it is difficult to establish the direction of causation between labor force intermittency and occupations with low wage growth (Welch, cited in Marini and Brinton, 1984)—have women in such occupations chosen them, or have they simply accepted what was offered? In general, is constraint a more accurate description of women's behavior than preference or choice? We now turn to the research results.

The human capital account of segregation has generated considerable research but conflicting findings. Mincer and Polachek (1974, 1978) attributed the observed relationship between women's work experience, home time, and wages to the depreciation of their skills while out of the labor force.[21] More recently, Polachek (1981b) cited the link between women's marital status and occupation as indirect evidence. He noted Andrea Beller's (1981) finding that being single increased women's probability of working in a male-dominated occupation and interpreted the different distributions of ever-married and never-married women in professional, technical, and administrative jobs in several industrialized nations in Roos's (1983) study as consistent with his thesis. Beller's own interpretation of these findings, however, is that single women had only a slightly greater probability (1 percent) of being employed in a nontraditional occupation (Beller, 1982b). Roos (1983) contends that the marital status differences are both

---

[19] The idea that the family is a utility maximizing unit has been criticized by feminist theorists (Folbre, 1982; McCrate, 1984). As Folbre points out, the potential for conflict of interest within the family is circumvented by the human capital approach. Much of feminist scholarship on the family has been devoted to reconceptualizing it from the separate vantage points of women and men rather than treating it as an undifferentiated unit (Hartmann, 1981; Rapp et al., 1979).

[20] The sexes do differ in the average distance they travel to work and their willingness to accept a job in another area (Niemi, 1974; Madden, 1978, 1981).

[21] The human capital approach has been criticized for failing to take into account the ways in which the attributes of jobs (rather than family responsibilities) affect women's behavior. Low wages (and discrimination) can affect the experience women (or men) choose to accumulate. And women, as well as men, may quit because of undesirable job features, such as lack of opportunities for promotion. On the effect of earnings on experience see Kahn (1980) and the exchange between Sandell and Shapiro (1978) and Mincer and Polachek (1978). For evidence of women's quitting, see Blau and Kahn (1981b) and Viscusi (1980); recent studies generally indicate that controlling for pay, occupation, industry, and personal productivity characteristics, men are as likely to quit as women.

minimal and inconsistent with the human capital explanation, and England (1982) found that single, childless white women were no more likely than other white women to be employed in sex-atypical occupations.

A more direct test examines the relationship between discontinuous participation and employment in a female-dominated occupation. Polachek (1981a) showed that years out of the labor force increased women's probability of working in female-dominated major occupational categories. In a simulation he also showed that if all women workers were employed continuously, their representation would increase in broad census categories for professional, managerial, and technical occupations and decrease in the operative and clerical categories. But Corcoran et al. (1984) pointed out that even under the assumption of continuous employment in Polachek's simulation, the index of segregation would decline by only two points.

Contrary to the human capital prediction, women's actual employment continuity does not appear to be related to holding a female-typed occupation. England's (1982) analysis of 3,754 mature women ages 30-44 in the National Longitudinal Survey found that the percentage of time they had been employed since completing school did not vary with the sex composition of their first or most recent occupation. Nor was the sex composition of their first occupation correlated with the proportion of (presurvey) years women eventually spent in the labor force (England, 1982). Moreover, the rates at which the earnings of women in predominantly female occupations appreciated with experience did not differ from those for women in less segregated occupations. England (1984) replicated these findings in a similar analysis of workers surveyed in the University of Michigan's Panel Study of Income Dynamics. If the human capital explanation is correct, the negative effect of time out of the labor force on earnings should have been greater in male-dominated occupations; but the sizes of the effect for more and less male occupations differed slightly or not at all. Polachek (1979) has demonstrated that time out of the labor force is positively correlated with wage loss, but not the crucial point that women's human capital depreciates less in predominantly female occupations. In sum, Polachek's thesis has little support. There is no clear evidence that female occupations penalize intermittence less than male occupations, nor is there much evidence that women who spend more time at home or expect to do so are apt to choose such occupations (England, 1984).

Mincer and Ofek (1982) have refined the human capital approach to women's labor market behavior to encompass the premise that workers recover skills that depreciated during a period out of the labor force more rapidly than they accumulate them from scratch. This implies that wage losses following a career interruption should be followed by a period of rapid wage growth. Corcoran et al. (1984) confirmed this for employed wives and female heads of households whose labor market behavior was observed over a 13-year period. These women displayed both the hypothesized wage loss after being out of the labor force and the hypothesized period of rapid recovery upon reentry, so that their net loss of wages was small. As Corcoran et al. point out, this rebound effect has important implications for the human capital explanation of segregation. If depreciation is quickly repaired, it is not economically rational for intermittent workers either to choose minimal investments or to postpone investing in job training until they have returned to the labor force on a permanent basis. And even if female-dominated occupations penalized women less than male-dominated occupations for dropping out, the long-run penalties are too small to support the inference that it is economically rational for women to choose such occupations, given their lower wages and lesser return to experience. In fact, England (1984) found that women in

male-dominated occupations have higher lifetime earnings than women in female-dominated ones, suggesting that it is not economically rational to choose predominantly female occupations to maximize lifetime earnings.

The ability of the human capital approach to explain sex segregation ultimately depends on determining what women believe is true and how they make labor market decisions. Unfortunately, we know very little about the beliefs women hold with respect to their own investments in human capital or the extent to which their occupational choices conform to the model of economic rationality. In general, when behavior is subject to such strong structural and cultural constraints as women's work is, there is less reason to expect a theory that assumes economic optimization to hold. While further research on women's own views of the trade-offs between investments in training, wage gains, and time spent with children might illuminate some of the assumptions of this approach, the lack of empirical confirmation suggests that if women choose female-dominated occupations, they probably do not do so because they think such occupations will maximize their lifetime earnings. Though the empirical evidence is limited, women may choose to limit their work commitment because of familial arrangements. It is even more likely that such a choice is subject to considerable constraint, as we examine below with regard to child care.

### Child Care and Occupational Segregation

The custom of assigning primary responsibility for child care to women has historically restricted their participation in the work force and in education and training programs. To a lesser degree it continues to do so. This can be seen in the differential labor force participation rates of women by the presence and age of their children. For example, in March 1982 half the women with children under age six were in the labor force compared with two-thirds of those with school-age children (U.S. Department of Labor, Women's Bureau, 1982b). The belief that young children whose mothers work suffer has contributed to the deterrent effect of having young children on women's employment, although the proportion of working mothers who believe that their employment will harm their children has declined markedly during the past decade (Bumpass, 1982). Recent reviews of research (Kamerman and Hayes, 1982; Hayes and Kamerman, 1983) indicate that the children of working mothers suffer no discernible ill effects from their mothers' employment (to the contrary, the added income demonstrably improves the lives of some children), that both wage-working and at-home mothers behave similarly toward their children (in such areas as school visits, for example), and that the children of both wage-working and at-home mothers also spend their time similarly (in play, homework, sports, television viewing, etc.).

Evidence also suggests, however, that the lack of adequate, affordable, and convenient child care prevents some women from participating in the labor force and limits others to jobs that they believe will accommodate their child care responsibilities. Estimates indicate that one in every five to six nonemployed women is not in the labor force because she cannot find satisfactory child care (Shortlidge, 1977; Presser and Baldwin, 1980). National Longitudinal Survey data from 1971 for mothers with children under age six suggest that these figures may be even higher for black women: 26 percent of black mothers surveyed reportedly were constrained from employment by the lack of adequate day care compared with only 5 percent of the white mothers, and 47 percent of the nonemployed black and 13 percent of white mothers said that they would look for jobs immediately if free day care were available (U.S. Department of Labor, Manpower Administration, 1975).

The absence of flexible child care alternatives may also restrict some women to jobs with certain hours, those that do not require overtime or weekend work, and those that permit time off for children's illnesses. The U.S. Commission on Civil Rights (1981b) reviews several studies indicating that the unavailability of adequate child care prevents women from increasing their hours of employment. The 1977 Current Population Survey on child care indicated that 16 percent of employed women would work more hours if they could locate suitable child care (Presser and Baldwin, 1980). Limiting their work hours can in turn reduce women's prospects for promotion, restrict them to jobs for which they are overqualified, or make it impossible for them to take courses that would improve their job options. Survey data confirm the problem child care presents for many employed women (Astin, 1969; National Commission on Working Women, 1979). One in 12 of the employed women surveyed in the 1977 special Current Population Survey on child care cared for their children while they were at work (U.S. Department of Commerce, Bureau of the Census, 1982:6). One in eight women in blue-collar and service occupations did so, many of whom managed by working in their own homes (U.S. Department of Commerce, Bureau of the Census, 1982:26). It seems likely that most of these women were restricted to low-paying, predominantly female occupations like direct mail or telephone sales.

The U.S. Commission on Civil Rights (1981b) details the ways in which the lack of child care restricts women's ability and, in the case of the Work Incentive Program (WIN), their legal right to take advantage of important federal job training programs. Although they discovered no estimates as to the number of women who are denied access to programs because they lack child care, the commission reports that since 1972 federal regulations have required that child care be available before a women is referred for employment or training and describes a 1977 study that identified the lack of adequate child care as one of two primary reasons why women WIN registrants were less likely than men to be assigned to either training or a job.

Employed women vary widely in the type of child care they both use (U.S. Department of Commerce, Bureau of the Census, 1982) and prefer (Presser and Baldwin, 1980). Many women prefer family-based care to group care (U.S. Department of Labor, Manpower Administration, 1975), although working women surveyed by Paskoff preferred day care at the workplace (cited in U.S. Department of Labor, Women's Bureau, 1982b). Moreover, as Presser and Baldwin (1980) have shown, it is often the most disadvantaged women—young, unmarried, minority, and low-income mothers—who are least likely to locate satisfactory arrangements that they can afford. Full-time blue-collar and service workers are less than half as likely as mothers in white-collar occupations to use group child care and more likely to depend on their children's fathers (U.S. Department of Commerce, Bureau of the Census, 1982), probably through arranging for parents to work different shifts (Presser, 1980). And finally, some parents do not find any arrangements. Sandra Hofferth (1979) estimated that 32,000 preschoolers were caring for themselves in 1975. The 1977 Current Population Survey (U.S. Department of Commerce, Bureau of the Census, 1982:42) revealed self-care for .3 percent of the children under five whose mothers worked full-time and .5 percent of the children of mothers employed part-time.

Unfortunately, none of the available studies tells us how many employed women might be able to work in less sex-typed occupations if they were not constrained by their need for child care, but the constraints on employment opportunities that inadequate child care presents for some women are indisputable. It is also important not to lose sight of the fact that some employers may make hiring decisions based on their

beliefs about individual women's need for child care and the probable reliability of that care. Employers may sometimes be reluctant to hire or promote mothers, even those who have secured adequate child care, for certain jobs because they question whether their child care is adequate. We also noted above that male workers may attempt to reinforce women's sense of responsibility for housework and child care through their own behavior on the job and at home. Such behavior would also contribute to job segregation.

### Conclusion

In sum, although the research evidence does not enable us to say that women's greater responsibility for child care, housework, and family care necessarily contributes to sex segregation in the workplace, it almost certainly plays an important role in limiting their employment opportunities in general. Some women (and men) may of course freely choose to place family responsibilities first in their lives and employment and work careers second or lower. Whenever women's choices and opportunities are constrained, however, as they most certainly are by familial responsibilities and the lack of alternative social arrangements for family care, we must be concerned. For some women, familial responsibilities are clearly not chosen but are a burden thrust on them. For others, especially those for whom economic need is greatest, family responsibilities contribute all the more to their need for equal opportunity and equitable pay in the workplace. Yet others may feel compelled to bear the greater share of home and family care because their own earning ability is limited compared with their husbands or other male providers. Finally, for most if not all women, the powerful cultural beliefs regarding women's "natural" responsibility for children, men, and homes enter the workplace unbidden, conditioning many aspects of their employment.

### THE OPPORTUNITY STRUCTURE AND SEX SEGREGATION

We have reviewed evidence indicating that many factors on both the demand and the supply sides affect labor market outcomes for men and women. We have separately examined the influence of deeply ingrained cultural beliefs, of barriers to employment, of education and socialization, and of family responsibilities on the extent and persistence of the sex segregation of jobs. Such an approach runs the risk of losing sight of the interrelationship between opportunities and decisions that occurs within the labor market. Workers' occupational decisions are often influenced by what they find in the labor market. The labor market presents workers with an occupational opportunity structure that is affected not so much by the actions of any one employer but is rather the cumulated effect of the actions of many. Over time, of course, opportunity structures change, at least partly as employers respond to changes in workers' behavior. In this section we examine evidence regarding the role of the occupational opportunity structure in shaping workers' preferences, knowledge, and occupational outcomes, and thereby contributing to the perpetuation of sex segregation.

Lloyd Reynolds (1951), in a major contribution to the analysis of labor markets, noted that the vacancies to which people have access when they enter the labor market strongly affect the occupations in which they end up. Reynolds characterized the job mobility process as involving a job search (often based on tips from friends and relatives) that typically culminates in a worker taking the first acceptable job offered.[22] Because jobs are filled rapidly, workers are seldom in the position to choose among al-

---

[22] See Kahn (1978), Sandell (1980), and Gera and Hasan (1982) for further discussion of the job search process.

ternatives. Reynolds concluded that changes in demand induce the adaptation of the labor supply: opportunity must precede movement. Sociologists, too (White, 1970; Sorensen, 1975, 1977; Spilerman, 1977; Konda and Stewman, 1980), have stressed the importance of opportunities in determining workers' occupational outcomes. In this scheme, workers' personal characteristics are important primarily as a basis for rationing vacancies in better jobs among the supply of potential applicants, an idea further developed by Thurow (1975). When gender is used systematically by employers as the basis for selecting workers for certain occupations, sex segregation results.

This emphasis on opportunities is consistent with research on labor market behavior. Workers frequently do not make career plans until they have left school and entered the labor market. For example, more than half the workers that Lipset and his colleagues (Bendix et al., 1954) surveyed had no specific job plans while in school, and members of a national sample of college students who did have career plans changed them often (Davis, 1965). Once in the labor market, many young workers move from job to job seeking work that suits them through trial and error (Folk, 1968; Hall and Kasten, 1976; Sorensen, 1977; Rosenfeld, 1979), before settling into semipermanent positions.[23] Examining mobility data from the 1970 census, Rosenfeld and Sorensen (1979) found that young (ages 20-31) and, to a smaller degree, older (ages 32-41) workers of both sexes frequently changed occupations. During the previous five years, 35 percent of young men and 29 percent of young women moved from one to another of the 11 broad occupational categories, and 22 percent of older workers did so. More than one in nine people over age 18 who were employed in January 1977 worked in a different detailed occupational category a year later (Rosenfeld, 1979). Jacobs (1983) found that 55 percent of women ages 30-44 in 1967 worked in a different three-digit occupation 10 years later. Spilerman (1977) revealed similar results for male construction workers, truck drivers, and mail carriers: between 33 and 43 percent of workers in their twenties changed occupations during a five-year period, as did between 13 and 27 percent of those in their thirties. Such mobility suggests that career decisions made prior to entering the labor force are important for only a minority of workers. It is rather that their labor market careers are likely to be shaped by the opportunities they find.

Unfortunately, most systematic research on the effect of job openings on occupational attainment has been limited to men (Rosenfeld, 1982), so evidence of the effect of opportunities on women's labor market behavior is largely indirect. The evidence is of three types. The first shows women's responsiveness to labor market conditions and the actual availability of jobs—regardless of prior sex labeling. The second shows that the opportunity structure is highly differentiated by sex. The third demonstrates flexibility in workers' preferences and aspirations.

Substantial evidence suggests that women's response to labor market conditions and job availability is strong. Cain (1966), Mincer (1962a), and others have demonstrated that the unprecedented influx of women into the labor force since World War II was a response to increases in wage rates offered. Oppenheimer (1970) has argued that because many of the new jobs created since the mid-1940s were in occupations considered to be "women's work," the rise in female labor force participation can be understood as a response to job opportunities that had not previously existed for women. Moreover, once in the labor force, the decisions of women to move from one job to another are as strongly influenced as those of men by the wage rate in the current job

---

[23] Rosenfeld (1984) reviews these and other theories of labor market mobility for young male workers.

and by the long-run earning prospects offered by a job change (Blau and Kahn, 1981b).

Furthermore, women are responsive to particular occupational openings. When occupations have become open, women have responded by moving into them—regardless of their prior sex label. For example, within a 20-year period, the proportion of clerical workers who were women increased from less than 5 percent in 1880 to over 30 percent in 1900; 20 years later, women made up half of all clerical workers (Rotella, 1981). During World War II, when employers welcomed applications from women, their numbers in such jobs as welding that were formerly almost exclusively male increased tremendously.[24] Black women's rapid movement out of domestic service and into clerical occupations (Malveaux, 1982b) that opened to them during the 1960s and 1970s provides another example of women's responsiveness to the availability of occupations. During the 1970s, sharp increases occurred in the proportions of women obtaining professional degrees in fields such as law and medicine, which have been dominated by men. The rapid increase in the number of women mining coal (Hall, 1981; Clauss, 1982) indicates that nonprofessional and physically arduous occupations also attract women when they believe they have a chance at jobs. In 1972, no women applied for mining jobs at Peabody Coal Company in Kentucky, the nation's largest coal producer; by 1978, after it had become known that women were being hired, 1,131 women applied for mining jobs (Working Women, 1981). A similar growth occurred in applications by women for jobs in shipbuilding yards, when the Maritime Administration began requiring the shipbuilding contractors to establish goals and timetables for the increased employment of women. The shipbuilding contractors found that as more women were hired, more women applied. Unquestionably, the key reason for the increase of women in this case was goals and timetables (*Federal Register* 42, No. 158:41379-80), but while equal employment opportunity policies played a role in many of these examples, their effect is hard to document. A more systematic effort is left for the next chapter.[25]

This is not to say that large pools of women are available for all male-dominated occupations. Employers sometimes claim that they cannot comply with federally mandated affirmative action requirements because the pool of eligible women is too small (U.S. Department of Labor, Employment Standards Administration, 1981). But shortages are probably most common in occupations that require preemployment training. Of course, women may lack enthusiasm for occupations in which they believe they will encounter hostility or other difficulties or those in which their femininity might be questioned (Strober, 1984). As Wolf (1981)

---

[24] Milkman (1980:103) quotes a 1943 billboard:

"What Job is mine on the Victory Line?"
If you've sewed on buttons, or made buttonholes, on a machine,
   you can learn to do spot welding on airplane parts.
If you've used an electric mixer in your kitchen,
   you can learn to run a drill press.
If you've followed recipes exactly in making cakes,
   you can learn to load shell.

[25] Several researchers have attempted to assess the impact of equal employment opportunity laws on the labor market outcomes of minorities or women (Ashenfelter and Heckman, 1976; Goldstein and Smith, 1976; Heckman and Wolpin, 1976; Beller, 1978, 1979, 1980, 1982a, 1982b; Flanagan, 1976; Butler and Heckman, 1977; Brown, 1982; Osterman, 1982; Leonard, 1984a,b,c). We discuss their conclusions in the next chapter. Here it is sufficient to mention the difficulty involved in demonstrating the impact of the passage of equal employment laws and regulations on the actual availability of opportunities. The dramatic effect of the passage and enforcement of the 1965 Voting Rights Act on voting by blacks (U.S. Commission on Civil Rights, 1981a) provides some evidence of the impact on people's behavior of legal changes that open up opportunities.

notes, young women, for whom norms about appropriate female behavior are salient, may be especially reluctant to take jobs labeled male. After their middle twenties, however, women are less likely to be deterred by the possibility that they may appear unfeminine and more likely to be influenced by the fact that predominantly male jobs are better paid.

That women have generally responded to opportunities as they became available does not mean that they are not also constrained in their behavior and does not belie the basic sex-differentiated structure of opportunities. For example, as noted above, family obligations may constrain women's responses to particular types of openings. Moreover, despite the opening of new occupations to women, some areas are still explicitly closed to women and many others are implicitly so, as the evidence of barriers in the workplace reviewed above demonstrates. In particular, opportunities at the establishment level are apparently extremely sex-segregated. As Bielby and Baron (1984) found for a sample of California firms, nearly 60 percent were totally segregated, i.e., were either all male or all female or had a job structure in which each job category was occupied by a single sex. Within establishments, particularly large establishments, rules govern workers' opportunities. Rules governing seniority, job bidding rights, transfer, leaves, and so on have often contributed to restricting women's career advancement and concentrating them in female-dominated jobs. Throughout the economy, the index of segregation remains over 60—women often work with women and men with men, and women's occupations are lower paid. An individual could not fail to notice the sex-typing of jobs and the differential opportunities apparently available to women and men. And he or she might conclude, rightly or wrongly, that their choices are severely constrained.

Finally, flexibility in workers' preferences and behavior (and in the labor market as well) is demonstrated by both a fair amount of mobility by men and women between sex-typical and sex-atypical occupations, as measured at the level of detailed census occupations, and the continuing influence of structural factors on their preferences and aspirations. In one recent study of women ages 30-44 in the National Longitudinal Survey who changed jobs between 1967 and 1977, Jacobs (1983) found the sex type of their jobs at these two points uncorrelated (sex type was trichotomized into less than 30 percent female, 30-69.9 percent female, and over 70 percent female). When he replicated his analysis with 1980 and 1981 Current Population Survey data for job changers of both sexes and across the full range of adult ages, Jacobs observed only small correlations between the sex type of jobs at the two points ($r = .10$ for the women, .15 for the men). Rosenfeld's (1984) analyses of a sample of workers who changed jobs during 1972 revealed that about 15 percent of women who worked in jobs that were over half female moved to jobs that were dominated by men, and about 40 percent of women in jobs in which men were the majority moved to similar jobs, with the remaining 40 percent moving to jobs that were at least 50 percent female. It is important to note, however, that the sex type of these job shifts is generally measured for the occupational aggregates in which the jobs fall. For example, a shift from food server in a cafeteria to crossing guard might be measured as a shift from female-typed work to sex-neutral work, because food servers are in an occupational category that is predominantly female while crossing guards are in an integrated occupational category (made up of female crossing guards and male traffic enforcement officers). Nevertheless the actual move is from one female-typed job to another. Because sex segregation is pervasive at the level of jobs within firms, many of the moves noted in these studies may be more sex-typical than is apparent. Despite these data problems, however, these recent studies, confirmed by other researchers (e.g., Corcoran

et al., 1984), suggest that a moderate amount of mobility occurs across sex-typed occupations.

Evidence also shows that structural factors continue to influence workers' behavior and attitudes after they enter the labor market. Theorists of labor market segmentation argue that workers' motivation and behavior are governed both by their position in labor market segments and, within organizations, on job ladders (Stevenson, 1978; Harrison and Sum, 1979). For example, the turnover rates of both sexes are affected by the type of job they hold, so controlling for the latter accounts almost completely for sex differences in turnover (U.S. Department of Labor, Women's Bureau, 1975; Lloyd and Niemi, 1979; Haber et al., 1983). Recent evidence indicates similar effects of job characteristics on the psychological functioning of both women and men (Miller et al., 1979; Krause et al., 1982; Kohn et al., 1983). People's jobs socialize them to certain attitudes toward work. It follows that exposure to various work opportunities and experiences affects workers' occupational preferences. For example, longitudinal analysis of mature employed women revealed that their attitudes toward work became more favorable in response to their employment experiences (Ferree, 1980). The opportunity structure can also be expected to have an effect on workers' occupational aspirations. To illustrate, about half the women in traditionally male skilled craft jobs whom Walshok (1981a) studied had some childhood access to nontraditional work skills, but, according to Walshok, because they also realized that these fields offered no opportunities for women, they did not seek craft jobs until opportunities opened up. For example, a plumber described her experience: "I've always liked tools . . . (but) it never occurred to me that I would ever be a plumber until somebody handed me a wrench and said 'Hop to it.' I just happened to run into that particular opportunity . . ." (p. 169). It seems likely, then, that women's aspirations and preferences change as their perception of opportunities changes and that the occupational opportunity structure is an important determinant of their preferences.

These findings suggest a fluidity in the labor market, in workers, and in their occupational preferences. Apparently, workers can and do circulate in and out of sex-atypical occupations. Our discussion of informal barriers above suggested some reasons why workers might leave sex-atypical occupations, but further systematic longitudinal research is clearly needed to understand the circulation of workers across sex-typed occupations. These frequent job changes belie the claim that segregation reflects the relatively stable choices of women and men stemming from their childhood sex-role socialization but support the thesis that workers' job outcomes reflect the available opportunities. The amount of movement between sex-typical and sex-atypical occupations and the responsiveness of women workers to new opportunities makes the continued high degree of sex segregation in the economy even more remarkable. Clearly, theories of occupational sex segregation and of discrimination will have to take into account the movement of workers of both sexes in and out of sex-atypical occupations. Further research will be needed to ascertain to what extent these occupational changes actually involve movement across sex-typed jobs. In any case, however, the mobility is a significant aspect of the labor market for women and men.

Two additional aspects of the occupational opportunity structure merit discussion. First, the occupational opportunity structure affects workers' decisions by affecting their knowledge of job opportunities as well as their preferences. As we noted above in discussing institutionalized barriers in the workplace, many employers use referrals from other workers as an important recruitment technique. Thus potential applicants hear about available jobs from friends and other informal networks that tend to be sex-

segregated. Women are more likely to hear about available jobs from other women, and, because of the sex-segregated occupational structure, these women are likely to be in women's jobs. Second, it is important to remember that while the occupational opportunity structure results in part from employers' actions, taken together, workers also participate in its development. Employers determine whom to hire and in what position, but workers sometimes play an active role, for example when whites or men object to minorities or women (Bergmann and Darrity, 1981), or when applicants accept or refuse jobs that are offered. As Strober (1984) notes, if white men refuse a job at the wage offered, employers may try to hire women or minority men. If some women or minority men accept it, their acceptance will signal to yet others that this job is now available to them.

## CONCLUSION

From our examination of the evidence for several alternative and interrelated explanations of sex segregation, our primary conclusion is that women's occupational choices and preferences play a limited role in explaining occupational segregation by sex.

Both explanations for occupational segregation that focus on women's own choices—sex-role socialization and human capital theory—recognize that cultural values about men and women condition their socialization and their subsequent educational choices. Sex-role socialization is thought to contribute to labor market segregation by encouraging girls to be primarily responsible for domestic work and boys for breadwinning and by identifying sex-appropriate occupations. Each gender is not only socialized to perform sex-specific primary adult roles, but each is also taught the skills, values, and occupational aspirations compatible with them. The socialization process also encourages the development of different sex-linked personality traits that may ultimately affect the occupations to which women and men feel suited. The occupational aspirations of boys and girls continue to differ as do some occupationally related skills and values, although these differences have declined in the recent past. These differences are consistent with what we know of the content of sex-role socialization: parents, teachers, and counselors treat girls and boys differently and hold different goals for them. Tracking still occurs within the public school system, as does sex stereotyping in children's books, including textbooks, and the mass media. Although the link is not established unequivocally, it seems likely that socialization contributes to sex differences in aspirations, preferences, skills, and values and therefore probably contributes to occupational segregation, but we are unsure about the size of any contribution and the value of focusing on sex-role socialization as a locus of change. Our literature review suggests that the impact of preemployment sex differences in abilities and values on occupational outcomes is probably small, except in those occupations that require skills that are usually acquired prior to employment. Further research to clarify the role of occupational aspirations in producing sex-typed occupational outcomes is clearly indicated.

The sizable amount of mobility that occurs across occupations, and more specifically across sex-typical and sex-atypical occupations, is inconsistent with the view that outcomes reflect fixed occupational preferences. Rather we have seen that preferences are likely to change over a lifetime, particularly in response to new opportunities. The shifts that have been observed in women's occupational aspirations in recent years are consistent with expanding job opportunities for women in a broader range of occupations. That young women often expect to pursue more traditional occupations than those to which they aspire reinforces our argument that the perceived opportunity structure is of central importance in determining both preferences and outcomes. The educational

Case3:04-cv-03341-EMC   Document439   Filed09/29/06   Page 18 of 19

system also contributes to segregation by tracking students in sex-typical vocational courses. The failure of schools to present a wide range of occupational possibilities to students regardless of their sex necessarily narrows the job possibilities that they are likely to pursue later.

Advocates of the human capital theory of sex segregation, a second major explanation that attributes sex segregation to women's choices, have constructed an internally plausible account of how segregation could result from the economically rational decisions by women who plan to raise families to limit their investments in training and pursue certain occupations. Women do fail to acquire the training necessary for many jobs, but it is not clear how much this reflects their own choices, lack of encouragement, or the existence of obstacles to their doing so. Attempts to assess the theory by examining patterns of sex segregation by marital status have yielded conflicting results. The results of studies based on panel data that provide the most direct tests have been inconsistent with the theory's predictions. Women who spend more time out of the labor force are no more apt to choose female-dominated occupations than those who plan continuous employment, and female occupations do not penalize intermittent labor force participation less than male-dominated ones. Furthermore, any depreciation in women's occupational skills that does occur when they leave the labor force seems to be quickly repaired, so that long-run income losses are too small to motivate women to postpone investing in training or to select low-paying occupations that require little training. The connections between familial responsibilities and work deserve additional research attention, however, because it seems likely that family care obligations do influence people's labor market behavior.

The limited effect of socialization and related factors that can be demonstrated directs our attention to the role of forces within the labor market that limit the set of occupations from which women workers can choose. This approach recognizes the active role employers play in the labor market as well as the existence of other barriers that reduce women's options. A variety of barriers prevent women from exercising free occupational choice. Some barriers were codified into laws, and others were permitted by the courts. Most such laws are now invalid, but their legacy lingers in both employment practices and the current segregated occupational structure. It is important to recall that cultural beliefs about women's proper roles influence decisions by employers and male coworkers. Their behavior as well as institutionalized personnel practices also create barriers in the labor market. On these grounds we conclude that sex segregation cannot be ascribed primarily to women's choice of female-dominated occupations.

As we have shown, women's exclusion from many occupations has unquestionably contributed to segregation. An examination of the operation of labor markets and of the importance of the occupational structure reviewed indicates that the labor market outcomes of both men and women commonly depend on the opportunities that are known and open to them. These opportunities have been largely determined by employers and other decision makers in influential positions. Employers have in many instances structured their workplace and personnel policies in ways that have established and reinforced job segregation, but employers also respond to changes in women's and men's attitudes as well as to government initiatives. Consequently the opportunities available to women expand at the same time that public and private awareness of changing attitudes grows. As opportunities have expanded in the past, women have rapidly responded. This seems to be the best explanation for some rather dramatic changes over the past decade in women's representation in a variety of occupations, which we examined in Chapter 2.

These conclusions have implications for different types of intervention. If it were possible and desirable to do so, reducing sex differences in personal traits produced by socialization without changing the labor market would probably reduce segregation only slightly. Moreover, early sex-role socialization is probably less amenable to policy intervention than are some factors that come into play later, such as tracking in schools and barriers women encounter in the labor market. Eliminating the latter factors should contribute to changes in women's occupational aspirations, as well as an increase in their opportunities, and thus both directly and indirectly modify women's distribution across occupations. In the next chapter our examination of the effectiveness of a variety of interventions further demonstrates the close relationship between opportunities and workers' behavior and illustrates important sources of further change.