Brad Seligman (State Bar No. 083838)
Jocelyn D. Larkin (State Bar No. (State Bar No. 110817)
THE IMPACT FUND
125 University Avenue
Berkeley, CA  94710
Telephone:  (510) 845-3473
Facsimile:  (510) 845-3654

Bill Lann Lee (State Bar No. 108452)
James M. Finberg (State Bar No. 114850)
Daniel M. Hutchinson (State Bar No. 239458)
LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA  94111-3339
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008

Steve Stemerman (State Bar No. 067690)
Elizabeth A. Lawrence (State Bar No. 111781)
Sarah Varela (State Bar No. 234640)
DAVIS, COWELL & BOWE, LLP
595 Market Street, #1400
San Francisco, CA  94105
Telephone:  (415) 597-7200
Facsimile:  (415) 597-7201

Attorneys for Plaintiffs and the Proposed Class

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHIRLEY "RAE" ELLIS, LEAH HORSTMAN, and ELAINE SASAKI on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>COSTCO WHOLESALE CORPORATION,<br><br>Defendant. | Case No.  C-04-3341 MHP<br><br>**PLAINTIFFS' OPPOSITION TO COSTCO'S MOTIONS TO STRIKE DECLARATIONS OF PLAINTIFFS' EXPERTS**<br><br>Date:   November 7, 2006<br>Time:  9:00 a.m. |

1

**TABLE OF CONTENTS**

2

**Page**

3 I.     INTRODUCTION ................................................................................................. 1

4
II.    ARGUMENT ....................................................................................................... 2
5

6 A.    No Court Has Held That a District Court Must Conduct a *Daubert*
Inquiry at the Class Certification Stage ...................................................... 2
7

8 B.    None of Costco's Challenges Justifies Exclusion of Plaintiffs'
Expert Testimony ........................................................................................ 4
9
1.    Dr. Richard Drogin ......................................................................... 4
10
2.    Dr. Marc Bendick .......................................................................... 10
11
3.    Dr. Barbara Reskin ........................................................................ 14
12
III.   CONCLUSION .................................................................................................. 21

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

Page

## CASES

Arnold v. Cargill, Inc.,
   2006 WL 1716221 (D. Minn. 2006) ........................................................................ 15, 21

Bacon v. Honda of Am. Mfg, Inc.,
   205 F.R.D. 466 (S.D. Ohio 2001) ................................................................................. 3

Bazemore v. Friday,
   478 U.S. 385 (1986) ................................................................................................... 5, 8

Bell v. Ascendant Solutions, Inc.,
   422 F.3d 307 (5th Cir. 2005) .......................................................................................... 4

Butler v. Home Depot, Inc.,
   No. C 94-4435, 1997 WL 605754 (N.D. Cal. Aug 29, 1997) ................................. 4, 5, 21

Capaci v. Katz & Besthoff, Inc.,
   711 F.2d 647 (5th Cir. 1983) ........................................................................................ 10

Cherosky v. Henderson,
   330 F.3d 1243 (9th Cir. 2003) ........................................................................................ 7

Coates v. Johnson & Johnson,
   756 F.2d 524 (7th Cir. 1985) ...................................................................................... 5, 8

Daubert v. Merrell Dow Pharm., Inc.,
   509 U.S. 579 (1993) ............................................................................................. passim

Drayton v. W. Auto Supply Co.,
   No. 01-10415, 2002 WL 32508918 (11th Cir. March 11, 2002) ................................... 3

Dukes v. Wal-Mart Stores, Inc.,
   222 F.R.D. 137 (N.D. Cal. 2004) .......................................................................... passim

Dukes v. Wal-Mart, Inc.,
   222 F.R.D. 189 (N.D. Cal. 2002) .......................................................................... passim

EEOC v. Morgan Stanley & Co.,
   324 F. Supp. 2d 451 (S.D.N.Y. 2004) ......................................................................... 15

Eisen v. Carlisle & Jacquelin,
   417 U.S. 156 (1974) ........................................................................................................ 2

Eldredge v. Carpenters 46 N. Cal. Counties JATC,
   833 F.2d 1334 (9th Cir 1987) ...................................................................................... 10

Gay v. Waiters' & Dairy Lunchmen's Union, Local No. 30,
   694 F.2d 531 (9th Cir 1982) .......................................................................................... 7

Hazelwood Sch. Dist. v. United States,
   433 U.S. 299 (1977) ........................................................................................................ 8

Hnot v. Willis Group Holdings Ltd.,
   228 F.R.D. 476 (S.D.N.Y. 2005) ................................................................................... 3

In re: VISA Check/MasterMoney Antitrust Litig.,
   280 F.3d 124 (2d Cir. 2001) ................................................................................. 1, 2, 3

**TABLE OF AUTHORITIES**
(continued)

Page

*James v. Stockham Valves & Fittings Co.,*
   559 F.2d 310 (5th Cir. 1977)........................................................................................ 5

*Kumho Tire Co. Ltd. v. Carmichael,*
   526 U.S. 137 (1999) ................................................................................................... 2

*Lamumba Corp. v. City of Oakland,*
   No. C 05-2712-MHP, 2006 U.S. Dist. LEXIS 45022 (N.D. Cal. Jun. 30, 2006) .................... 8

*Lilly v. Harris-Teeter Supermarket,*
   720 F.2d 326 (4th Cir. 1983)..................................................................................... 10

*Lyons v. England,*
   307 F.3d 1092 (9th Cir. 2002)................................................................................. 7, 8

*McReynolds v. Sodexho Marriott Services, Inc.,*
   349 F. Supp. 2d 1 (D.D.C. 2004) ............................................................................. 9

*Midwestern Machinery v. Northwest Airlines, Inc.,*
   211 F.R.D. 562 (D. Minn. 2001).............................................................................. 3

*Morgan v. United Postal Serv. of Am., Inc.,*
   380 F.3d 459 (8th Cir. 2004)................................................................................... 6

*Nat'l R.R. Passenger Corp. v. Morgan,*
   536 U.S. 101 (2002) .............................................................................................. 7, 8

*Nevada Dept. of Human Resources v. Hibbs,*
   538 U.S. 721 (2003) .............................................................................................. 20

*Obrey v. Johnson,*
   400 F.3d 691 (9th Cir. 2005)................................................................................... 5

*Paige v. State of California,*
   291 F.3d 1141 (9th Cir. 2002)........................................................................ 8, 9, 12

*Palmer v. Shultz,*
   815 F.2d 84 (D.C. Cir. 1987) ................................................................................. 7

*Price Waterhouse v. Hopkins,*
   490 U.S. 228 (1989) ............................................................................................. 15

*Stender v. Lucky Stores, Inc.,*
   803 F. Supp. 259 (N.D. Ca. 1992) .............................................................. 4, 7, 15

*Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives & Composites, Inc.,*
   209 F.R.D. 159 (C.D. Cal. 2002) ........................................................................... 3

*Trout v. Lehman,*
   702 F.2d 1094 (D.C. Cir. 1983) ............................................................................. 8

*Unger v. Amedisys Inc.,*
   401 F.3d 316 (5th Cir. 2005)................................................................................. 4

*Williams v. City of New Orleans,*
   729 F.2d 1554 (5th Cir. 1984)............................................................................... 11

*Williams v. Owens-Illinois, Inc.,*
   665 F.2d 918 (9th Cir. 1982)................................................................................. 7

*Wright v. Stern,*

**TABLE OF AUTHORITIES**
(continued)

Page

2006 WL 2669082 (S.D.N.Y. 2006) ................................................................ 15

**RULES**

Federal Rule of Civil Procedure
23 ..................................................................................................................... 1, 4
23(a)(2) ................................................................................................................. 1
23(f) ..................................................................................................................... 4

Rules Enabling Act ...................................................................................................... 4

**TREATISES**

J. Cleveland, M. Stockdale, K. Murphy,
*Women and Men in Organizations: Sex and Gender Issues at Work* (2000) ................... 18, 19

I.      **INTRODUCTION**

Costco's three motions to strike are nothing more than thinly-disguised attacks on the merits of the evidence in this case, patently improper at class certification. The motions—more than 73 pages of additional briefing—are also a blatant evasion of the 35-page limit set by this Court for Costco's class certification response.

To justify the motions, Costco invokes the U.S. Supreme Court's decision in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), a fig leaf that cannot conceal the obvious nature of these motions. In fact, no published decision has held that a district court must conduct a *Daubert* inquiry at the class certification stage and, indeed, most have found it would be premature to do so. The best that Costco can muster in support of its claim that this Court must apply *Daubert* is a couple of unpublished district court opinions from Texas and a law student note from the Florida State University Law Review.

Even if *Daubert* were fully applied at this early stage, plaintiffs' experts would easily satisfy the threshold standards that *Daubert* sets for the admissibility of expert testimony. Plaintiffs' experts are highly qualified and employ methodologies that are well-established in both their professional fields and within Title VII class action jurisprudence. There is nothing novel or cutting-edge in their opinions or approach. The issues that defendant raises in these motions to strike, such as the omission of a disputed variable or the external validity of laboratory studies, may be fodder for cross-examination at trial but do not come close to justifying exclusion of this evidence at this preliminary stage.

This Court is charged with conducting a rigorous analysis of the requirements of Rule 23. In evaluating the expert testimony, the Court must ensure that the testimony demonstrates the existence of common questions under Rule 23(a)(2) but is not "so flawed that it would be inadmissible as a matter of law." *In re: VISA Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 135 (2d Cir. 2001); *accord Dukes v. Wal-Mart, Inc.*, 222 F.R.D. 189, 191-92 (N.D. Cal. 2004) (*Dukes II*). Defendant's motions, rather than aiding this inquiry, unnecessarily burden the Court and should be denied.

## II.    ARGUMENT

### A.    No Court Has Held That A District Court Must Conduct A *Daubert* Inquiry At The Class Certification Stage

The United State Supreme Court's decision in *Daubert* addressed the role of the district court in making threshold admissibility determinations for expert testimony offered at trial.  The high court charged the trial courts with the responsibility to act as a "gatekeeper" to ensure that juries were not presented with "science that is junky."  *Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 159 (1999) (Scalia, J., concurring).  The trial court must "determine whether the testimony has a 'reliable basis in the knowledge and experience of [the relevant] discipline.'"  *Id.* at 149 (quoting *Daubert*, 509 U.S. at 592) (alteration in original).  *Daubert* did not erect a high hurdle for expert testimony; "the rejection of expert testimony is the exception rather than the rule."  Fed. R. Evid. 702 advisory committee's note (2000 Amendments).

In *In re: VISA Check/MasterMoney Antitrust Litigation*, the Second Circuit addressed whether *Daubert* applies at class certification.  In reaching the conclusion that it does not, the panel noted that the *Daubert* inquiry is analytically distinct from that required for class certification:

> We note that a motion to strike expert evidence pursuant to [*Daubert*], involves an inquiry distinct from that for evaluating expert evidence in support of a motion for class certification, although the parties' substantive arguments in both instances may be similar, as is true in this case.  A *Daubert* motion is typically not made until later stages in litigation, such as in association with a motion for summary judgment, motion *in limine*, or at trial. . . .

280 F.3d at 132 n.4 (internal citations omitted).  The panel rejected defendant's argument that the district court failed to adequately scrutinize plaintiffs' expert report, because such scrutiny would have been an impermissible inquiry into the merits, citing *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974).  *Visa Check*, 280 F.3d at 133.  "A district court may not weigh conflicting expert evidence or engage in 'statistical dueling' of experts" at class certification.  *Id.* at 135 (*quoting Caridad v. Metro-North Commuter RR*, 191 F.3d 283, 292-93 (2d Cir. 1999)).[1]

---

[1] In an unpublished *per curiam* decision, the Eleventh Circuit affirmed the grant of class certification in a race discrimination class action and rejected the argument that the district court failed to apply *Daubert* to the statistical evidence.  "Appellants have presented no authority

1    "This does not mean . . . that courts must uncritically accept all expert testimony

2    that is offered in support of, or against class certification." *Dukes II*, 222 F.R.D. at 191.  Rather,

3    at class certification, the task of the district court is to "ensure that the basis of the expert

4    [statistical] opinion is not so flawed that it would be inadmissible as a matter of law." *VISA*

5    *Check*, 280 F.3d at 135.  The question for the district court at the class certification stage is

6    whether plaintiffs' expert evidence is sufficient to demonstrate common questions of fact

7    warranting certification of the proposed class, not whether the evidence will ultimately be

8    persuasive. *Id.*

9    Since *VISA Check*, numerous district courts have concluded that a full *Daubert*

10   inquiry is not appropriate at the class certification stage.  *See, e.g., Hnot v. Willis Group Holdings*

11   *Ltd.*, 228 F.R.D. 476, 484 (S.D.N.Y. 2005) ("Reasonable statisticians can disagree about what

12   tests and what controls should be utilized, but at the class certification stage, only a plausible

13   position needs to be set forth."); *Dukes II*, 222 F.R.D. at 191; *Thomas & Thomas Rodmakers,*

14   *Inc. v. Newport Adhesives & Composites, Inc.*, 209 F.R.D. 159, 162 (C.D. Cal. 2002) ("[A] lower

15   *Daubert* standard should be employed at [the class certification] stage of the proceedings.");

16   *Midwestern Machinery v. Northwest Airlines, Inc.*, 211 F.R.D. 562, 566 (D. Minn. 2001) ("A

17   party and its experts should not be expected to have fully evaluated all data at the preliminary

18   stage of class certification."); *Bacon v. Honda of Am. Mfg, Inc.*, 205 F.R.D. 466, 470 (S.D. Ohio

19   2001) ("[A] *Daubert* inquiry is not warranted at this stage of the proceedings.").

20   Costco makes no effort to distinguish this large body of legal authority.  Instead, it

21   cites two Fifth Circuit opinions to support its argument that this Court must apply *Daubert* at

22   class certification.  Neither remotely stands for that proposition.  In *Bell v. Ascendant Solutions,*

23   *Inc.*, 422 F.3d 307, 314 (5th Cir. 2005), the Fifth Circuit reviewed the district court's unpublished

24   opinion denying class certification in a securities fraud action.  The court below had granted a

25   motion to exclude plaintiffs' expert report under *Daubert*.  The appeals panel found that it *could*

26

27   establishing a court must perform a *Daubert* inquiry of scientific evidence at this early stage of a
     class action proceeding."  *Drayton v. W. Auto Supply Co.*, No. 01-10415, 2002 WL 32508918, at
28   *6 n.13 (11th Cir. March 11, 2002).

*not review* that evidentiary decision because Fifth Circuit precedent limits the scope of a Rule 23(f) appeal solely to the issue of class certification. In other words, the appeals court concluded it had no jurisdiction to approve or disapprove the application of *Daubert* below, which hardly constitutes support for Costco's view. The decision in *Unger v. Amedisys Inc.*, 401 F.3d 316, 323 (5th Cir. 2005), merely refers in a footnote to the same unpublished lower court decision in *Bell*. Neither mandates, nor even addresses, the application of *Daubert* at class certification.[2] Similarly unpersuasive is Costco's citation to two district court opinions applying *Daubert* at class certification and to a law student note.

## B. None Of Costco's Challenges Justifies Exclusion Of Plaintiffs' Expert Testimony

None of the criticisms raised by Costco warrants exclusion of plaintiffs' experts testimony, under either the *Visa Check* standard that an expert opinion is not "so flawed that it would be inadmissible as a matter of law" or the full-blown *Daubert* standard.

### 1. Dr. Richard Drogin

Defendant does not dispute the qualifications of plaintiffs' expert, Dr. Richard Drogin. He is a highly qualified statistician whose testimony offering similar promotion pool analyses has been accepted by many federal courts, including this one. *See, e.g., Dukes v. Wal-Mart Stores, Inc.*, 222 F.R.D. 137, 164 (N.D. Cal. 2004) (*Dukes I*); *Butler v. Home Depot, Inc.*, No. C 94-4435, 1997 WL 605754, at *5-11 (N.D. Cal. Aug 29, 1997); *Stender v. Lucky Stores, Inc.*, 803 F. Supp. 259, 294 (N.D. Ca. 1992); *see also* Declaration of Dr. Richard Drogin in Support of Class Certification, App. 1 ("Drogin Decl."). Nor does Costco challenge his basic methodology for promotion analysis, which is well-accepted in his field and likewise used by Costco's expert, Dr. Ali Saad, in this case. Instead, Costco seeks to exclude Dr. Drogin's testimony based upon classic statistical disputes over appropriate explanatory variables, time

---

[2] Costco cobbles together the notion that failure to apply *Daubert* in the Rule 23 context would violate the Rules Enabling Act by depriving it of its due process right to exclude inadmissible evidence. Not surprisingly, Costco cites no authority to support this theory, which misconstrues the Rules Enabling Act, Rule 23, and due process.

1   period and aggregation of data.  These questions go to the weight, not the admissibility, of the

2   testimony.

3              *Selection of Variables* - Costco argues that Dr. Drogin has failed to include a

4   variable for prior experience as Merchandise Manager.  The U.S. Supreme Court has said that

5   "[n]ormally, failure to include variables will affect the analysis' probativeness, not its

6   admissibility." *Bazemore v. Friday*, 478 U.S. 385, 400 (1986).[3]  The Ninth Circuit has held that a

7   study "may be relevant, and therefore admissible, even if it is not sufficient to establish

8   [plaintiffs'] *prima facie* case . . . .  Thus, objections to a study's completeness generally go to 'the

9   weight, not the admissibility of the statistical evidence,' and should be addressed by rebuttal, not

10  exclusion." *Obrey v. Johnson*, 400 F.3d 691, 695 (9th Cir. 2005) (internal citation omitted)

11  (*quoting Mangold v. Cal. Pub. Utils. Comm'n*, 67 F.3d 1470, 1476 (9th Cir. 1995)).

12             Moreover, case law fully supports excluding variables that "potentially" may

13  themselves be tainted by discrimination.  *Coates v. Johnson & Johnson*, 756 F.2d 524, 544

14  (7th Cir. 1985); *James v. Stockham Valves & Fittings Co.*, 559 F.2d 310, 332 (5th Cir. 1977)

15  (rejecting pay rate regression analysis that incorporated race-biased differences in job

16  classification and in subjective performance evaluations); *see also Butler*, 1997 WL 605754, at

17  *10 n.21 ("A 'tainted variable' is one whose value is affected by discrimination and has the effect

18  of concealing disparities due to discrimination.").

19             Dr. Drogin persuasively explains his decision to exclude prior Merchandise

20  Manager experience as a variable: the variable is tainted since women have been

21  disproportionately excluded from that position.  *See* Drogin Decl. ¶ 18; *see also* Supplemental

22  Declaration of Richard Drogin in Support of Class Certification and in Opposition to Costco's

23  Motion to Strike Drogin Declaration ("Drogin Supp. Decl.") ¶¶ 2-4.  Contrary to Costco's

24  assertion that "plaintiffs have produced no . . . evidence" to show that the variable of

25  merchandising experience is "tainted," Drogin Motion at 10, Dr. Drogin supports his conclusion

26  by a statistical analysis of lateral moves into Merchandise Manager, which showed substantial

27

28

---

[3]  The *Bazemore* standard is, moreover, the applicable rule at trial; presumably an even more permissive approach applies at the early class certification stage.

gender disparities, a result that would occur less than one time in $10^{14}$ by random fluctuation. Drogin Decl. ¶ 17. Dr. Drogin's conclusion is supported by Costco's own internal focus group reports that women have been blocked from rotating into Merchandising positions. See Plaintiff's Motion for Class Certification ("Opening Brief") at 17; Declaration of Jocelyn D. Larkin in Support of Class Certification, Exh. 34 (CRE 0142527), Exh. 37 (CRE0142691).

Costco parries that its expert has constructed a so-called job posting database, which it claims demonstrates that "differential gender preferences affect the number of females in the MM position." Drogin Motion at 12. Dr. Drogin has studied this database and concluded that it is grossly incomplete and cannot be deemed a random or representative sample. Drogin Decl. ¶ 8; Drogin Supp. Decl. ¶ ¶ 5-15. More to the point, however, the database includes virtually no postings for Staff Manager openings filled by rotation, which comprise more than 71% of the placements into Merchandise Manager. Drogin Decl. ¶ 8. Dr. Saad conceded that his database accordingly "does not relate to the job interests of sitting senior staff once they are senior staff." Saad Second Decl. ¶ 53. In short, the database does not relate to the question of whether Merchandise Manager experience is a tainted variable for purposes of an AGM promotion analysis.

*Time Period of Statistical Analysis* - Defendant complains that Dr. Drogin should not have included data from before the limitations period. This argument is not a *Daubert* argument at all, but a thinly disguised summary judgment motion based on the Title VII filing period.[4] Even if so treated, it would fail because plaintiffs do not rely solely on the challenged statistical evidence. Rather, as outlined in the class certification motion, they rely upon a variety of evidence, including evidence of subjective criteria and stereotyping that continued far into the liability period, confirmed by Costco's internal focus group deliberations in 2005-2006. *See* Opening Brief at 3-22. At the liability stage, all such evidence is assessed on a cumulative basis.

---

[4] None of the cases Costco relies upon excluded statistics based on *Daubert*. In fact, the only cited case that discusses *Daubert*, *Morgan v. United Postal Serv. of Am., Inc.*, 380 F.3d 459, 467-68 (8th Cir. 2004), concluded that the regressions in question *were admissible* but that they failed to establish a pattern and practice to rebut a summary judgment motion.

1   *Gay v. Waiters' & Dairy Lunchmen's Union*, Local No. 30, 694 F.2d 531, 550 (9th Cir 1982)

2   (*citing EEOC v. Am. Nat'l Bank*, 652 F.2d 1176, 1188 (4th Cir 1981)).[5]

3          In any event, Costco has both the law and the facts wrong.  Plaintiffs' promotion

4   claims arise from a class-wide pattern or practice of widespread, systemic discrimination.  Case

5   law has traditionally permitted the application of the continuing violation theory to such claims.

6   *See Williams v. Owens-Illinois, Inc.*, 665 F.2d 918, 924 (9th Cir. 1982) ("[A] systematic policy of

7   discrimination is actionable even if some or all of the events evidencing its inception occurred

8   prior to the limitations period.").  Neither the Supreme Court nor the Ninth Circuit has changed

9   this rule.  *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 n.9 (2002) (declining to

10  pass on the applicability of the continuing violations principle to pattern-or-practice cases);

11  *Lyons v. England*, 307 F.3d 1092, 1107 n.8 (9th Cir. 2002) (same).  Plaintiffs alleging discrete

12  discriminatory acts must file a charge within a specified time of those acts.  *See Morgan*, 536 U.S.

13  at 113.  In a pattern or practice case, however, the discrimination complained of is not the discrete

14  acts—those are only the results of the challenged conduct—but rather the pattern or practice of

15  discrimination itself. [6]

16         In addition, both the Supreme Court and the Ninth Circuit have held that time-

17  barred discriminatory acts may serve as relevant background evidence for timely discrimination

18  claims.  *Morgan*, 536 U.S. at 113; *Lyons*, 307 F.3d at 1108-11.  Costco's argument to the contrary

19

20  [5] Were Dr. Drogin's analysis limited to the post-2002 period, it would still be admissible even if
    the disparities were not statistically significant.  *See, e.g., Palmer v. Shultz*, 815 F.2d 84, 97 n.10

21  (D.C. Cir. 1987) (statistics showing less than two standard deviations should be considered along
    with other evidence); *cf. Stender*, 803 F. Supp. at 333 (liability found for some positions where

22  statistical data are not significant, based on cumulative evidence).  Even for the post-2001 period,
    however, Dr. Drogin's approach would show statistical significance for the period prior to the

23  filing of this action, and for the year 2003.  Saad Second Decl., ¶ 78 & Exh. R39.

24  [6] The Supreme Court drew a distinction between causes of action for discrete acts and causes of
    action for "a series of separate acts that collectively constitute one 'unlawful employment

25  practice.'"  *Morgan*, 536 U.S. at 117 (*quoting* 42 U.S.C. § 2000e-5(e)(1)).  In *Morgan*, the series
    of separate acts were those that formed a hostile work environment.  *See also Cherosky v.*

26  *Henderson*, 330 F.3d 1243, 1247 (9th Cir. 2003) (noting in reference to the timely filing question
    that pattern or practice claims are distinct from discrete acts because they are "based on

27  discriminatory conduct that is widespread throughout a company or that is a routine and regular
    part of the workplace," and that such claims "typically use statistical evidence to demonstrate the

28  employer's . . . treatment of the protected group").

relies on the unsupported assumption that there is no limitations-period discrimination.[7]  This pre-liability period evidence is also relevant to proving that an employer acted with discriminatory intent during the liability period, even if the prior acts were taken against a different victim.  *Lyons*, 307 F. 3d at 1111 n.12.  For these reasons, Costco's argument that only statistics from 2002 and later are relevant is unavailing, and plaintiffs' inclusion of earlier years in their statistical analysis, demonstrating statistically significant disparities, is warranted.[8]

Costco acknowledges that case law permits use of data from prior to the charge filing period.  Drogin Motion at 16 (*citing Paige v. California*, 291 F.3d 1141 (9th Cir 2002)).  In fact, numerous cases authorize the use of such data.  *See Coates*, 756 F.2d at 540; *Trout v. Lehman*, 702 F.2d 1094, 1104 (D.C. Cir. 1983), *vacated and remanded on other grounds*, 465 U.S. 1056 (1984).  Indeed, the Supreme Court has repeatedly held that "proof that an employer engaged in racial discrimination prior to the effective date of Title VII might in some circumstances support the inference that such discrimination continued, particularly where *relevant aspects of the decisionmaking process had undergone little change*."  *Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 309-10 n.15 (1977) (emphasis added) (*cited with approval in Bazemore*, 478 U.S. at 402).

Costco asserts that reliance on earlier data is improper because its promotional practices "underwent a major overhaul in 2001."  Drogin Motion at 16.  The extent and significance of the changes in 2001 are hotly disputed—and form additional common questions.  For purposes of Dr. Drogin's analysis, however, it is undisputed that Costco did not change any of the promotion procedures for the positions at issue in this case.  Both before and after 2001, there was no job posting or written promotion procedures for Assistant Manager and General

---

[7] Costco cites *Lamumba Corp. v. City of Oakland*, No. C 05-2712-MHP, 2006 U.S. Dist. LEXIS 45022 (N.D. Cal. Jun. 30, 2006), as support for its argument that plaintiffs cannot use pre-limitations statistics as background information.  *Lamumba* does not support Costco's argument.  *Lamumba* was not a pattern or practice case and the plaintiffs did not allege *any* discrimination during the limitations period.  *Id.* at *22.

[8] Costco's attempt to distinguish *Paige v. State of California*, 291 F.3d 1141 (9th Cir. 2002), is unavailing.  First, *Paige* does not conflict with *Morgan*, which explicitly did *not* address pattern or practice claims.  *Morgan*, 536 U.S. at 115 n.9.  Second, the question of whether Costco's promotion practices have changed over time is a factual matter very much in dispute.

1    Manager selections.  Opening Brief at 15-16.  There was also no significant change in promotion

2    rates until after this suit was filed in August 2004.  *See* Drogin Decl. ¶ 20.[9]

3              *Leaves of Absence* – Costco claims Dr. Drogin's failure to account for leaves of

4    absence has "a demonstrable effect on the analysis of disparity in promotions," another merits

5    argument.  Drogin Motion at 19; *see, e.g., Dukes I*, 222 F.R.D. at 160.   In fact, Costco's expert

6    did not demonstrate that differential leaves of absence significantly affected *promotion*

7    disparities.  *See* Saad Dep. 141:8-143:23.  Accounting for leaves of absence has no significant

8    effect in the promotion analysis: Dr. Saad's promotion pool with and without leaves is nearly

9    identical.  *Compare* Saad First Decl. Exh. 8 *with* Saad First Decl. Exh. 9 (combined weighted

10   female availability pool is 19.1% not counting leaves and 18.9% counting leaves); Saad Dep. at

11   137:16-22, attached as Exhibit 1 to Declaration of  Jocelyn D. Larkin in Opposition to Motions to

12   Strike ("Larkin Decl. re Motions to Strike").  Moreover, although he found there were gender

13   disparities in the amount of leave taken, these disparities amounted to less than five days a year,

14   on average.  Saad Dep. 139:24-14:5, Larkin Decl. re Motions to Strike, Exh. 1.

15             *Regional vs. National Aggregation* - Costco challenges Dr. Drogin's company-

16   wide analyses, claiming that he should instead report his results by region.  Both experts offered

17   company-wide analyses, and in fact performed region by region analyses.  *See* Drogin Decl. ¶ 21

18   & n.21, Saad Second Decl.  ¶¶ 37-40.  None of these analyses is subject to a *Daubert* challenge

19   and Costco cites no case on the issue.  Rather, Costco seeks to argue the merits of which analyses

20   are more probative.  The statistical battle between aggregation and disaggregation is a classic

21   merits issue.  *See Paige*, 291 F.3d at 1148 (aggregated statistical data may be used "where it is

22   more probative than subdivided data"); *McReynolds v. Sodexho Marriott Servs., Inc.*,

23   349 F. Supp. 2d 1, 16 (D.D.C. 2004) (declining "defendant's invitation to rule as a matter of law

24   that plaintiffs cannot aggregate statistics on a company-wide basis"); *Dukes I*, 222 F.R.D. at 157-

25   _____

     [9] Costco complains that one of Dr. Drogin's time to promotion analyses only goes to the start of
26   2004, as opposed to the date that the lawsuit was filed.  Drogin Motion at 17.  The argument goes
     to the weight of the evidence, not its admissibility.  Moreover, because Costco began to focus on
27   this case in early 2004—when Costco provided class counsel with promotion data during
     unsuccessful settlement discussions—Dr. Drogin's exclusion of post-2003 data was not
28   unreasonable.  *See* Seligman Decl. in Support of Class Certification ¶ 12.

59.[10]   Courts have expressed a preference for aggregated data when disaggregated data could obscure overall patterns.  *See, e.g., Eldredge v. Carpenters 46 N. Cal. Counties JATC*, 833 F.2d 1334, 1339 n.7 (9th Cir 1987); *Lilly v. Harris-Teeter Supermarket*, 720 F.2d 326, 336 n.17 (4th Cir. 1983); *Capaci v. Katz & Besthoff, Inc.*, 711 F.2d 647, 654-56 (5th Cir. 1983).

Dr. Drogin's choice to aggregate results has, moreover, a sound scientific basis, as explained in his class certification declaration.  Drogin Decl. ¶ 21 & n.21 (citing relatively small number of promotions in each region, involvement of Senior Managers in promotion decisions, and patterns in each region).  Dr. Drogin nevertheless used region as a control in his promotion model and found it made no difference to his conclusion.  Drogin Decl. ¶ 21.  Costco's expert agrees that there is no reason to believe the promotion and posting policies are different in each region.  Saad Dep. 208:4-13; 211:7-212:9, Larkin Decl. re Motions to Strike, Exh. 1.  Dr. Saad's data confirm Dr. Drogin's finding that, in every region except Texas, there is a negative disparity in female promotion rates for the period 1999 through the filing of this case.  *See* Saad Second Decl, Exhs. R2-R8 (showing female shortfall for 1999-7/31/2004).[11]  The question of which statistical methodology more accurately explains the promotion patterns at Costco is a common question of law and fact supporting certification.

## 2.   **Dr. Marc Bendick**

Costco's attack on Dr. Bendick is also a merits-based challenge.  Judge Jenkins rejected a similar challenge in *Dukes II*, 222 F.R.D. at 194 ("Defendant's criticism of Dr. Bendick's benchmarking analysis is of the type that clearly goes to the weight, rather than the admissibility, of the evidence.").[12]  *See also Dukes I*, 222 F.R.D. at 164 ("Defendant's

---

[10] In *Dukes*, Dr. Drogin relied on data aggregated at the national level, but also summarized regional analyses of promotion rates.  *Dukes I*, 222 F.R.D. at 160-61.  The regional summary in Wal-Mart made sense given that more than 45,000 promotions were involved and most promotion decisions were made at the store, or district level and are reported to a higher level of management.  In contrast, there are only 651 AGM promotions at issue in this case.  Drogin Supp. Decl. ¶ 16.

[11] Dr. Saad conceded that the number of promotions in the Texas region is too small to be analyzed.  Saad Second Decl. ¶ 40.

[12] Although Dr. Bendick has appeared as an expert in 137 cases, Bendick Decl. ¶ 2, Costco asserts that three courts have rejected "similarly flawed Bendick 'benchmarks'."  Bendick Motion at 3 & n.3.  None of those cases involved a *Daubert* analysis or a class certification motion; rather, in each case, on the merits, a court rejected Dr. Bendick's conclusions.  In none of these

1    arguments . . . merely highlight the presence of a significant issue affecting all class members

2    which supports, rather than defeats, granting class certification.").  Moreover, Costco, in attacking

3    each benchmark separately, ignores Dr. Bendick's method—he looks at a range of potential

4    benchmarks to reach his conclusion that the low representation of women in Costco management

5    compared to comparator companies likely results from Costco's culture or management practices.

6    Supplemental Declaration of Dr. Marc Bendick in Support of Class Certification and in

7    Opposition to Motion to Strike Bendick Declaration ("Bendick Supp. Decl.") ¶ 47.  He does not

8    rely on any single benchmark alone but, acknowledging the advantages and limitations of each,

9    looks at all the benchmarks to reach a conclusion.  Declaration of Dr. Marc Bendick in Support of

10   Class Certification ("Bendick Decl.") ¶¶ 7-8, 29-35.[13]

11           *External Benchmarking* - Costco argues Dr. Bendick's analysis should be rejected

12   because it does not rely on an internal labor pool.  Costco misconstrues the purpose of

13   Dr. Bendick's analysis.  Dr. Bendick does not offer a full-blown statistical analysis, purporting to

14   measure shortfalls at Costco.  Rather, as he explains in his declaration, Dr. Bendick develops

15   benchmarks for the representation of women based on comparable positions at comparable firms

16   other than Costco.  Such benchmarks indicate the availability and interest of qualified women in

17   the same industry as Costco.  Thus, his analysis "complement[s]" and supports the plausibility of

18   Dr. Drogin's internal availability analyses.  Bendick Decl. ¶ 7 & n.2.  This was precisely what

19   Dr. Bendick did in *Dukes*.  As Judge Jenkins explains, "[t]he type of benchmarking applied here

20   addresses the issue of labor supply, i.e. the availability of female employees who are qualified

21   and interested in management positions." *Dukes I*, 222 F.R.D. at 164.  In contrast, in *Paige*,

22   cases did Dr. Bendick offer an analysis similar to this case or for the same limited purpose; each
     involved different types of statistical analysis offered to prove statistical discrimination.  In this
23   case, Dr. Bendick offers his benchmark analysis solely to demonstrate that women at comparable
     companies are available, qualified and interested in management positions.  Judge Jenkins
24   rejected Wal-Mart's attempt to rely on two of these cases.  *Dukes II*, 222 F.R.D. at 195 n.5.  In the
     third case, *Williams v. City of New Orleans*, 729 F.2d 1554, 1562 (5th Cir. 1984), the court of
25   appeals upheld, under an abuse of discretion standard, a district court's rejection of the
     geographic labor market Dr. Bendick utilized, a far different issue than that presented in this case.

26   [13] Costco decries the fact that the benchmarks have different ranges.  The important point,
     however, is that under each of the benchmarks, as well as the median of all the benchmarks, the
27   availability of women for management positions is higher at other firms than at Costco.  Bendick
     Supp. Decl. ¶¶ 36-38.
28

291 F.3d at 1146-47, plaintiffs relied solely on an outside labor pool for their calculation of

shortfalls.  Significantly, that case involved a challenged examination and there was no claim that

the class members were less available or interested in promotion than their comparators.

Dr. Bendick's benchmarks "provide a way to analyze the relative importance of

general societal factors and company specific behavior in determining why the level of

representation of women among managers at Costco is what it is today."  Bendick Supp. Decl.

¶ 53.  If the representation of women at Costco is much lower than at its comparators, then "the

likely cause of this low representation at Costco is probably Costco's behavior, not the attitudes

and behavior of Costco's female workers."  *Id.*[14]

*Failure to Control for Earnings* - Costco's expert limits his analysis to those

companies that pay in the same range as Costco and criticizes Dr. Bendick for not doing the same.

*See* Saad Dep, 171:10-174:13, Larkin Decl. re Motions to Strike, Exh. 1.  The practical

consequence of Dr. Saad's approach is to reduce the female pool, since his model over-represents

high level retail managers, where there is lower female representation than store level managers.

Bendick Supp. Decl. ¶ 9.  To justify this approach, Costco's expert offers a treatise for his

"Chicago School" of economics, in which he assumes earnings is the only appropriate proxy for

skill and responsibility.  Saad First Decl. ¶ 101; Saad Second Decl. ¶ 14.  Dr. Bendick explains

that the adherents to the Chicago School have views that "respected, mainstream economists

would consider . . . at best partial truth and do not accurately describe the workings of real firms

in the American labor market today."  Bendick Supp. Decl. ¶ 21.

Both Dr. Bendick and Dr. Saad understand that Costco managers are significantly

better paid than managers at its competitors.  Bendick Supp. Decl. ¶¶ 5-6; Saad Dep. 174:26-

175:6 ("I am told, that they pay very well, that they may pay higher"); *id.* 180:6-9 ("I know that

---

[14] Costco argues that Dr. Bendick improperly treats "gender differentiated interest" as a demand factor.  Bendick Motion at 20-22.  The argument is simply a variation of Costco's theory that differential interest of men and women explains disparities at Costco.  Dr. Bendick's benchmarks take supply factors into account, and do not ignore potential differential interest of men and women at Costco and its comparators.  Bendick Supp. Decl. ¶ 41.  There is no reason to believe that Costco has fundamentally different work attributes, such as hours of work, than its comparators.  *Id.* ¶¶ 42-46.

1   the pay for Wal-Mart for assistant manager is 20 per cent lower, 25 percent lower, than it is for

2   equivalent people, maybe even more at Costco."), Larkin Decl. re Motions to Strike, Exh. 1.

3   Dr. Saad, however, does not let this fact interfere with his theory—he simply concludes that

4   employers who pay their managers less than Costco, such as Wal-Mart and Sam's Club, are not

5   Costco's competitors. Saad Dep. 179:20-23.[15] Thus, his model simply excludes "a lot" of such

6   employees. *Id.* 181:2-9.

7           Costco also argues that Dr. Bendick uses "the wrong census code" for one of his

8   benchmarks. Dr. Bendick cogently explains why he used that particular code. Bendick Supp.

9   Decl. ¶¶ 29-31. He also shows that, even when he used the code that Costco's expert proposes,

10   his conclusions are unchanged. Bendick Decl. at n.14; Bendick Supp. Decl. ¶¶ 31-32 & tbl. C.

11   Costco's expert further disputes the code choice, but admits the choice of codes only makes a

12   difference if his earnings control is used. Saad Second Decl. ¶ 29.

13           *General Merchandise Stores and Retailers* - Costco challenges Dr. Bendick's use

14   of "General Merchandise Stores" and "All Retailers" as benchmarks. Dr. Bendick explains his

15   choice of these benchmarks, citing Costco's own executives and EEO-1 reports. Bendick Decl.

16   ¶¶ 10-11; Bendick Supp. Decl. ¶ 10 n.9. Moreover, he did not rely solely on either of these

17   benchmarks, but looked at several other benchmarks to support his conclusion. Bendick Supp.

18   Decl. ¶ 37.

19           Costco's real argument is an attempt at impeachment rather than a *Daubert* claim:

20   that Dr. Bendick failed to use the same benchmarks he used in Wal-Mart, where he focused on

21   Wal-Mart's twenty largest competitors. Bendick Motion at 16-17. This argument was not raised

22   by Costco's expert, who likewise did not conduct an analysis limited to major competitors. In

23   any event, Dr. Bendick explains why he did not use the same benchmarks in this case, which

24   involves a much smaller company than Wal-Mart. Bendick Supp. Decl. ¶ 24.

25

26   [15] Dr. Saad's view of Costco's competitors is not shared by Costco executives, who consider Wal-Mart and Sam's Club to be their competition. Bendick Decl. ¶ 11 & n.12. In fact, Costco at

27   times has expressly targeted Wal-Mart and Sam's Club managers for Costco management positions, as the experience of plaintiff Rae Ellis establishes. Ellis Decl. in Support of Class Cert

28   ¶ 3.

More to the point, when Dr. Bendick, in response to this new argument, computed the female availability at the top competitors, the result was a female availability of 49.2%, a figure *higher* than the composite benchmark that Dr. Bendick computed in his first report. Bendick Supp. Decl. ¶¶ 25-27 & tbl. B.  In short, the analysis Costco claims Dr. Bendick should have made provides strong additional support to his conclusion that "the explanation for the lower representation of women at Costco than at its comparators is to be found in the company, its corporate culture, and its human resource management practices.  It cannot be explained away as a shortage of available, qualified and interested women."  Bendick Supp. Decl. ¶ 41.

*EEO-1 Category* - Dr. Bendick's declaration describes five individual benchmarks and a sixth benchmark, which is a composite of the five.  Each benchmark offers advantages and limitations, as Dr. Bendick candidly explains.  Bendick Decl. ¶¶ 29-31.[16]  Two of his benchmarks use EEO-1 "Officials and Managers" data.  He explains that this EEO-1 category incorporates data that are broader than the jobs in question, but has the advantage of excluding smaller employers and being geographically focused.  Bendick Decl. ¶¶ 25, 28.  In *Dukes*, Dr. Bendick relied solely on EEO-1 data.  *See Dukes I*, 222 F.R.D. at 164.  Here, in contrast, he offers a range of benchmarks, from different data sources, to support his overall conclusion.  The limitations of one or more benchmarks, taken out of context, come nowhere close to raising the kind of fundamental methodological defects that would justify exclusion of his testimony at this early stage.

### 3.   Dr. Barbara Reskin

Dr. Barbara Reskin is a highly regarded organizational sociologist, known for her research on sex and gender.  Costco's psychological expert acknowledged he had "no reservations about her credentials or experience in areas related to the sociology of work."  Landy Decl. at 13.  Dr. Reskin is currently the S. Frank Miyamoto Professor of Sociology at the University of Washington and previously taught at Harvard, the University of Michigan, and Ohio State.  She is a past president of the American Sociological Association and a Fellow of the

---

[16] His supplemental declaration considers three additional benchmarks.  See Bendick Supp. Decl. ¶¶ 9-10 (PUMS data); *id.* ¶¶ 24-26 (top competitor model based on EEO-1 data); *id.* ¶ 30 (alternative occupational code).

1   National Academy of Sciences and the American Academy of Arts and Sciences.  Declaration of

2   Dr. Barbara Reskin in Support of Class Certification ("Reskin Decl.")  ¶¶ 2-6.

3        In her declaration, Dr. Reskin explains the mechanisms of stereotyped decision-

4   making and opines that Costco's culture and promotion practices may increase the likelihood that

5   unconscious biases will affect promotion decisions.  Dr. Reskin uses a well-accepted social

6   science methodology, known as social framework analysis.  Numerous federal courts have

7   accepted the methodology.  *See Arnold v. Cargill, Inc.*, 2006 WL 1716221, at *6-7 (D. Minn.

8   2006) (social framework methodology is "reliable"); *EEOC v. Morgan Stanley & Co.*, 324 F.

9   Supp. 2d 451, 461-62 (S.D.N.Y. 2004); *Dukes II*, 222 F.R.D. at 191-92 (social framework

10  analysis is "an acceptable social science methodology").  Moreover, the U.S. Supreme Court

11  specifically endorsed the use of expert testimony on stereotyping in *Price Waterhouse v. Hopkins*,

12  490 U.S. 228, 235-36 (1989).  Other courts have admitted such testimony as well.  *See, e.g.*,

13  *Wright v. Stern*, 2006 WL 2669082, at *17-18 (S.D.N.Y. 2006) (at summary judgment stage,

14  expert stereotype evidence admitted over *Daubert* challenge); *Butler*, 984 F. Supp. at 1262-66

15  (class certification); *Stender*, 803 F. Supp. at 301-03, 327.

16        *Reliance on Laboratory Studies* - Costco has not challenged Dr. Reskin's

17  methodology, presumably because it is so well-accepted in her field and in federal courts.

18  Instead, Costco seeks to exclude Dr. Reskin's opinions on the grounds that cognitive bias theories

19  rest on "research conducted on college student subjects in laboratories."[17]  Reskin Motion at 7.

20  Costco argues this research is, by definition, irrelevant since these settings do not replicate the

21  working conditions at Costco.  *Id.* at 8-9.  Even assuming that this criticism is cognizable under

22  *Daubert*, it fails for several reasons.

23

---

24  [17] In a footnote, Costco cites its expert, Frank Landy, for the proposition that automatic cognitive
    processing is "little more than 'pop' psychology."  Reskin Motion at 8 n.12.  These sentiments
25  can be given little credence, however, because Dr. Landy admitted in his deposition that his views
    on gender stereotyping in the workplace were in the minority and *not in the mainstream* of basic
26  psychologists and other social scientists. Landy Dep. 160:7-18 (emphasis added), Larkin Decl. re
    Motions to Strike, Exh 2.  Dr. Landy was not offered as an expert on stereotyping; Costco offered
27  Dr. Margaret Stockdale as its expert for that issue.  As Dr. Reskin points out, Dr. Stockdale in
    large part agrees with Dr. Reskin on the existence of stereotyping in the workplace.  Reskin Supp.
28  Decl. ¶¶ 8-13.

When researchers are studying the fundamental mechanisms of the brain, such as cognitive processing, the setting is not dispositive. Supplemental Declaration of Dr. Barbara Reskin in Support of Class Certification and in Opposition to Motion to Strike Reskin Declaration ("Reskin Supp. Decl.") ¶ 3. Not surprisingly, Costco's experts—Dr. Stockdale and Dr. Landy—both rely on laboratory studies in their own declarations, as is well-accepted in social science. *See* Reskin Supp. Decl. ¶ 1. Were there any doubt, researchers conducting meta-analyses have found that gender stereotyping effects are consistent across samples of students and employees; those differences that exist tend to show more evidence of bias among workers than college students. Moreover, meta-analyses have found that implicit bias measures predict behavior better than survey measures of explicit bias and that such measures predicted discrimination in employment decisions. *See* Reskin Supp. Decl., ¶¶ 2-3.

Additionally, Dr. Reskin's opinion does not rely solely on theories of implicit cognitive bias. She relies on the findings of a large body of interdisciplinary, peer-reviewed social science research on factors that create and sustain bias, in-group favoritism and paternalism and those personnel practices that minimize exclusion. Reskin Decl. ¶¶ 35-60 ("Categorization, Ingroup Favoritism, Stereotyping and Sex Bias in Promotions"), ¶¶ 61-89 ("Barriers to Women's Representation Among Warehouse AGMs and GMs and the Use of Personnel Practices That Can Reduce Their Exclusionary Effects"). This research is based on both empirical and experimental research. *Id.*

*Effect of Individuating Information* - Building on its misguided claim about laboratory studies, Costco challenges Dr. Reskin's views because it claims that its decision-makers have plenty of individuating information about candidates and that this will be sufficient to mitigate the effects of stereotyped thinking. Reskin Motion at 9-11. This argument, too, must fail.

The extent to which Costco decision-makers systematically collect and rely on individuating information is a highly disputed fact in this case. Costco claims that its managers evaluate and select candidates based on warehouse walks, despite the fact that decisionmakers

1   maintain no notes of these walks and have no selection criteria they apply.  Reskin Decl. ¶ 29.

2   This factual issue cannot be resolved until trial.

3                    Moreover, research suggests that the mere presence of some individuating

4   information may not fully mitigate the effects of stereotyping.  Reskin Supp. Decl. ¶¶ 4-7.

5              For individuating information to reduce bias, a decision maker must
               have time, motivation, and the information must be job related.
6              When Costco's managers recount having known promotion
               candidates for years and having already ranked them on a
7              promotable list, they are unlikely to be motivated to acquire
               individuating information that would offset any automatic
8              stereotypes which they are unaware they hold.  One- to two-hour
               warehouse walks every month or two by the district and regional
9              executives who ultimately must decide whom to promote to AGM
               or GM are unlikely to provide *current, accurate, job-related*
10             individuating information for the hundreds of workers they
               encounter in each warehouse they supervise.  In sum, Costco's
11             procedures for selecting AGMs and GMs do not meet the
               conditions for individuating information to nullify the effects of sex
12             stereotypes.

13  Reskin Supp. Decl. ¶ 7.  The extent of individuating information and its impact on promotion

14  decisionmaking at Costco will plainly be a point of conflict between experts at trial, but are not a

15  basis for exclusion at this stage.

16                   *GMs as Decisionmakers for AGM Selections* – Costco faults Dr. Reskin for what it

17  claims is her mistaken premise about who makes AGM promotion decisions.[18]  Costco claims

18  that "the GMs are unquestionably the principal decisionmakers," although it concedes that the

19  Regional Managers must approve the selections.  Reskin Motion at 12.  In fact, there is ample

20  evidence that the Regional Managers make these decisions but, in any event, it is a disputed

21  factual issue.[19]  Even if Costco were correct, however, its criticism turns on the premise that so

---

22  [18] On a *Daubert* motion, it is not the responsibility of the trial court to determine whether an
23  expert's opinion is factually correct.  "The focus, of course, must be solely on principles and
    methodology, not on the conclusions that they generate."  *Daubert*, 509 U.S. at 595.  Once
24  admitted, "[v]igorous cross-examination, presentation of contrary evidence, and careful
    instruction on the burden of proof are the traditional and appropriate means of attacking shaky but
25  admissible testimony."  *Id.* at 596.

26  [19] Costco SVP Gaherty testified that he gives final approval to AGM selections based on
    recommendations from his Regional Operations Managers.  Gaherty Dep. 39:10-12, 56:6-21,
27  Larkin Decl. re Motions to Strike, Exh. 3.  His testimony is confirmed by Costco's internal
    documents.  Many of the promotable lists, which are created and maintained at the regional level,
28  and sent up to the divisional level, include the names of senior staff managers who have the
    potential to advance to Assistant General Manager.  *See* Sample Promotable Lists, Larkin Decl. re

1   long as GMs have some individuating information, then stereotyping will not occur.  As noted

2   above, the research on individuating information does not support this premise.

3                   *The Absence of Disparities in Performance Evaluations* – Costco claims that

4   Dr. Reskin cannot be correct that stereotyping is infecting decision-making since women, on

5   average, receive higher performance evaluations than do men.[20]  In fact, these results support her

6   opinions.  Unlike the unwritten subjective system for making GM and AGM promotions,

7   Costco's performance evaluation system has written criteria and rating scales, managers must

8   collect current performance information about an individual to complete the form, and they are

9   accountable.  When such procedures are in place, stereotyping is minimized.  *See* Reskin Supp.

10  Decl. ¶ 26.  Indeed, these results also suggest that women as a group are *more qualified* for

11  promotion than are men and that Dr. Drogin's statistics—which assume equally qualified pools

12  by gender—actually underestimate the discrimination against women.

13                  Costco's own expert, Dr. Margaret Stockdale, has written about the phenomenon

14  of women as a group receiving higher performance ratings but not their fair share of promotions.

15              In general, women are perceived as less competent and
16              subsequently are less likely to be promoted or are promoted at a
              slower rate than men with the same qualifications.  In fact, *even*
17              *when women receive higher performance ratings than men, men*
              *receive more promotions*.

18  J. Cleveland, M. Stockdale, K. Murphy, *Women and Men in Organizations: Sex and Gender*

19  *Issues at Work*  57 (2000) (internal citations omitted) (emphasis added), Larkin Decl. re Motions

20  to Strike, Exh. 5.[21]  Thus, there is nothing inconsistent in Dr. Reskin's findings.

---

21  Motions to Strike, Exh. 4.  As these promotable lists are not made available to General Managers,
   they plainly facilitate this selection process by regional officials.  The declarations from GMs
22  offered in opposition to class certification do not support the conclusion that they are the primary
   decision-makers either.  Instead, they describe their role as giving "input," Loveland Decl. ¶ 20,
23  "suggestions," Greek Decl. ¶ 17, and "recommendations," D'Agostino Decl. ¶ 30.  *See* Letter
   from David Kadue to Brad Seligman, (November 1, 2004) at 5, Larkin Decl., Exh. 25 ("For AM
24  promotions, the persons personally informed before final decision would be District VP, Senior
   VP, Executive VP.").  *See* Webb Decl. ¶ 6 (the "primary decision-maker" for AGM selection).

25  [20] Costco bootstraps its criticisms of Dr. Drogin's statistics to argue that Dr. Reskin's theory must
26  also be wrong.  Reskin Motion at 14-15.  Those arguments are addressed in the discussion of the
   Motion to Strike Dr. Drogin's testimony.

27  [21] Costco also argues that the lower rates of turnover among women "belie [Dr. Reskin's]
   assumption that women would give up or leave Costco because promotion opportunities are being
28  denied to them."  Reskin Motion at 16.  Dr. Reskin has never made this argument and, not

1    *Observations about CEO Jim Sinegal's Remarks* – Costco mischaracterizes

2    Dr. Reskin's testimony concerning remarks made by CEO Jim Sinegal about female employees at

3    Costco.  It argues that Dr. Reskin was quoting him for the purpose of concluding that

4    discrimination in promotions had occurred.  Reskin Motion at 16-17.  It misreads her opinions.

5             In her declaration, Dr. Reskin explained that research has shown that Americans

6    hold certain commonly shared stereotypes about women in the workplace.  Among those

7    stereotypes is the view that women's family responsibilities are more likely to interfere with work

8    responsibilities than are men's family responsibilities.  Costco's own expert, Dr. Margaret

9    Stockdale, describes it as follows:

10             Stereotypes of working mothers often stress the conflicts between
11             work and family, focusing either on the ways that family will
         detract from work (e.g. working mothers are often assumed to be
12             less involved in their work, less reliable, etc.) or on the ways that
         work will detract from family (e.g. working mothers are sometimes
13             assumed to have less interest in or dedication to their children).

14    Cleveland, Stockdale, Murphy, *supra*, at 56, Larkin Decl. re Motions to Strike, Exh. 5.[22]

15    A second stereotype has to do with the appropriateness of women for jobs that have historically

16    been held predominantly by men, *i.e.* forklift driver or stocker.  Reskin Decl. ¶ 58.[23]

17    In her report, Dr. Reskin observed that Mr. Sinegal's comments conformed with these broadly

18    held stereotypes.  Indeed, Mr. Sinegal testified that more female than male managers were leaving

19    for family reasons, although Costco's own data showed that its female employees' turnover is

20    lower than that of male employees.  *See* Saad First Decl. ¶ 93.  This strongly suggests that Mr.

21    Sinegal's views are influenced by these pervasive stereotypes.  Reskin Decl. ¶¶ 53-54.  As Chief

22    Justice Rehnquist recognized:

23    ─────────────────────────────────────────────────
surprisingly, Costco cites no portion of either her declaration or her deposition that made this
24    contention.

[22]  In fact, 48 percent of women Costco staff managers have no children under age 18 and, in any
25    event, there are hundreds of thousands of women with young children working as supervisors and
managers in the retail industry in America today.  Reskin Supp. Decl. ¶¶ 34-35.
26
[23]  As Costco's expert has written, "[T]he lack of fit between their gender and the stereotypes of
27    the job may increase people's reliance on gender stereotypes when observing and evaluating
women."  Cleveland, Stockdale, Murphy, *supra*, at 166, Larkin Decl. re Motions to Strike,
28    Exh. 5.

1
2
3
4

> Stereotypes about women's domestic roles are reinforced by parallel stereotypes presuming a lack of domestic responsibilities for men. . . . These mutually reinforcing stereotypes created a self-fulfilling cycle of discrimination that forced women to continue to assume the role of primary family caregiver, and fostered employers' stereotypical views about women's commitment to work and their value as employees.

5   *Nev. Dept. of Human Res. v. Hibbs,* 538 U.S. 721, 736 (2003) (explaining purposes underlying

6   FMLA).

7              As the CEO, Mr. Sinegal's attitudes can affect both the culture and the practices

8   within the company.  Mr. Sinegal, for instance, must approve the promotion of every General

9   Manager.  Sinegal Dep. 23:17- 24:4, Larkin Decl., Exh. 1.   As Dr. Reskin observed, Mr. Sinegal

10  was convinced that the job assignments that men and women received reflected "workers'

11  preferences rather than managerial decisions."  Reskin Decl. ¶ 75.  But, as she explains, "[a]

12  robust research finding is that commitment at the top is necessary for the elimination of subtle

13  barriers to advancement faced by women and minorities."  *Id.*  Far from testifying about the

14  ultimate issue of discrimination, Dr. Reskin carefully linked Mr. Sinegal's remarks to

15  consequences for the organization and for advancement opportunities for women.

16              *Lack of Expertise as Industrial Psychologist* – Costco claims that Dr. Reskin lacks

17  the necessary expertise to comment on its performance evaluations, promotability lists or job

18  descriptions.  Reskin Motion at 21-22.  On these points, Dr. Reskin comments refer to the

19  absence of written criteria and to the use and impact of subjective criteria.  *See* Reskin Decl.

20  ¶¶ 82, 85, 89; Reskin Supp. Decl. ¶¶ 18-26.  These issues are plainly within her expertise as a

21  sociologist of work and the social framework methodology.  Also within her expertise is the

22  application of research on paternalistic and in-group practices to the policies and practices at

23  Costco.

24              *Opinions on Costco Culture and Uniformity* – Costco criticizes Dr. Reskin for

25  failing to conduct empirical studies of Costco culture, something neither Dr. Stockdale,

26  Dr. Landy, nor any other expert conducted.  Landy First Decl. at 10-11 (explaining preparation

27  for report); Landy Second Decl. ¶ 1 (noting the lack of empirical studies); Stockdale First Decl. at

28  43-46 (listing references and materials reviewed for report); Stockdale Second Decl. at 1

(explaining review for report). Costco does not suggest how, in the context of litigation, such an empirical study would be possible. Numerous courts have allowed sociologists to provide opinions about corporate culture. Whether "[the defendant] has a strong, common culture is relevant because it may make it more likely that common questions exist at the class certification stage." *Arnold,* 2006 WL 1716221 at *8; *see also Dukes I,* 222 F.R.D. at 151; *Butler,* 1997 WL 605754, at *14 (accepting evidence of corporate culture to demonstrate causality).

## III.   CONCLUSION

Costco has improperly used the Supreme Court's decision in *Daubert* to argue prematurely a broad range of expert issues that are not relevant to admissibility. Instead, they are the classic cross-examination questions appropriate at trial, where the merits are fully aired and decided. Accordingly, Costco's motions to strike should be denied.

Dated: October __, 2006

THE IMPACT FUND

By: _____
        Jocelyn D. Larkin

Brad Seligman (State Bar No. 083838)
Jocelyn D. Larkin (State Bar No. 110817)
125 University Avenue
Berkeley, CA 94710
Telephone: (510) 845-3473
Facsimile: (510) 845-3654

Bill Lann Lee (State Bar No. 108452)
James M. Finberg (State Bar No. 114850)
Daniel M. Hutchinson (State Bar No. 239458)
LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

Steve Stemerman (State Bar No. 083838)
Elizabeth A. Lawrence (State Bar No. 111781)
DAVIS, COWELL & BOWE, LLP
595 Market Street, #1400
San Francisco, CA 94105
Telephone: (415) 597-7200
Facsimile: (415) 597-7201

*Attorneys for Plaintiffs and the Proposed Class*