Brad Seligman (State Bar No. 083838)
Jocelyn D. Larkin (State Bar No. 110817)
THE IMPACT FUND
125 University Avenue
Berkeley, CA  94710
Telephone:  (510) 845-3473
Facsimile:  (510) 845-3654

Bill Lann Lee (State Bar No. 108452)
James M. Finberg (State Bar No. 114850)
Daniel M. Hutchinson (State Bar No. 239458)
LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
Embarcadero Center West
275 Battery Street, 30th Floor
San Francisco, CA  94111-3339
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008

Steve Stemerman (State Bar No. 067690)
Elizabeth A. Lawrence (State Bar No. 111781)
Sarah Varela (State Bar No. 234640)
DAVIS, COWELL & BOWE, LLP
595 Market Street, #1400
San Francisco, CA  94105
Telephone:  (415) 597-7200
Facsimile:  (415) 597-7201

Attorneys for Plaintiffs and the Proposed Class

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHIRLEY "RAE" ELLIS, LEAH HORSTMAN and ELAINE SASAKI, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>COSTCO WHOLESALE CORPORATION,<br><br>Defendant. | Case No.  C-04-3341 MHP<br><br>**SUPPLEMENTAL DECLARATION OF DR. RICHARD S. DROGIN IN SUPPORT OF CLASS CERTIFICATION AND IN OPPOSITION TO COSTCO'S MOTION TO STRIKE**<br><br>**Date: November 7, 2006**<br><br>**Time: 9:00 a.m.** |

I, Dr. Richard S. Drogin declare:

1. I make this declaration of my own personal knowledge and could testify thereto if called as a witness. This declaration responds to issues and claims raised in Dr. Saad's First and Second Declarations in Opposition to Class Certification.

**Dr. Saad's Promotion Model is Based on A Tainted Variable, not Costco Policy**

2. Dr. Saad constructs two alternative analyses of promotions into AGM. One analysis separates all Senior Staff into sixteen subgroups, depending on the combination of the four Senior Staff jobs they have held. A second analysis separates Senior Staff into two groups, those with Merchandising Manager experience and those without Merchandising Manager experience.[1] Dr. Saad's statistical models are defective, because he introduces a tainted variable to explain the shortfall of women promoted, that is, prior Merchandise Manager experience. A tainted variable is one for which the values of the variable itself may be influenced by discrimination. Thus using a tainted variable will mask the discrimination being studied.

3. As I explained in my initial Declaration, most Senior Staff positions are filled by rotation, not by promotion. Among those Senior Staff positions filled by promotion, Front End Manager is the most common initial position entered.[2] For rotation assignments, Costco makes the decision as to where to rotate an employee.[3] Women are less likely to be rotated into Merchandise Manager jobs from other Senior Staff jobs than is expected from their representation in these jobs.[4] Since women in Senior Staff jobs are less likely to be rotated into Merchandising Manager positions, and "staff managers with merchandising experience have a better chance of getting promoted than those without such experience"[5], women are less likely to be promoted to

---

[1] Saad Decl. at ¶ 43.

[2] Drogin Decl. at ¶ 8-9. [May 15 report, pp. 4-5.]

[3] Drogin Decl. at ¶ 18. [May 15 report, p. 9.]

[4] I presented a discussion and analysis of this pattern in my Declaration at ¶ 17. [May 15 report (p. 8, ¶ 17).]

[5] Saad Decl. at ¶ 47. [report, p. 33:25-27].

1  AGM. Company policy is to treat all Senior Staff jobs as a group, and to rotate employees among the four Senior Staff positions in order that each employee gain experience in each of these jobs.[6]

3. 4. However, there is empirical evidence that shows that Costco does not follow this policy, and women in Senior Staff are not always rotated through the same jobs as men.[7] By controlling for 'Senior Staff experience,' Dr. Saad is factoring in Costco's failure to follow its policy as justification for their failure to promote Senior Staff women into AGM positions. In other words, Dr. Saad is constructing his statistical model based on Costco practices rather than Costco policy. Moreover, these practices themselves have adverse impact on women, thus limiting promotional opportunities.

**Dr. Saad's Study of Job Posting Data is Defective**

5. Costco has no job posting system for filling vacancies in GM or AGM. Moreover, employees rotated between Senior Staff positions are moved at the discretion of the GM, and there is no formal process for Senior Staff employees to indicate interest in a particular rotation. Nevertheless, Dr. Saad relies on a study of existing job posting data for vacancies in Senior Staff positions and lower level management jobs to draw inferences about the differences in job preferences between men and women.[8] His study is defective, and his inferences drawn from the study are not reliable, because

 (a) the data he used is grossly incomplete and unrepresentative;
 (b) he does not know whether most of the vacancies for which he has no data were posted or not;
 (c) his methodology for coding and compiling his database is haphazard, misleading and arbitrary;
 (d) he uses his study of job posting applicants for promotion to Senior Staff jobs to draw inferences about differences in job interest among men and

---

[6] The elements of this policy are outlined in detail in my declaration at ¶ 18.
[7] Drogin Decl. at ¶ 13, 17. [May 15 report, p. 7, ¶ 13 and p.8, ¶ 17.]
[8] Saad Decl. at ¶ 63. [ report, pp. 40:27-41:2.]

|     |                                                                                           |
| --- | ----------------------------------------------------------------------------------------- |
| 1   | women holding Senior Staff jobs for promotion into AGM positions and                      |
| 2   | for rotation among Senior Staff jobs.                                                     |

3   Each of these defects in Dr. Saad's analysis is discussed in the following paragraphs.

4         6.     Under questioning at his deposition, Dr. Saad admitted that he did study the

5   completeness of the job posting data, and that his study includes information for "…between 15

6   and 20 percent of the moves that are similar to those jobs that were posted."[9]  This means

7   information for 80-85% of all vacancies in management and non-management jobs where posting

8   might occur are not included in his study.  There were about 125 warehouses that could not

9   provide any posting data.  Moreover, he also admitted that the data he did study cannot be

10  considered as a random sample[10], and thus he has no way of knowing whether the data he studied

11  is representative of all vacancies.

12        7.     Dr. Saad could not explain whether the large number of positions for which there

13  was no posting data was a result of the fact that the data was not retained, or whether the jobs

14  were never actually posted.[11]  This is an important threshold question that should be answered

15  before any meaningful analysis of posting data can be undertaken.  If most, or possibly nearly all,

16  openings in Senior Staff positions are not even posted, then the existing posting data for the

17  remaining openings cannot be considered as an unbiased measure of interest in promotion.

18  Dr. Saad never discusses in his report why there are such a large number of openings for which

19  there is no posting data.

20        8.     The paper files provided to Dr. Saad for his job posting study were of very low

21  quality.  "These records were in a variety of formats, and in a variety of states of organization and

22  completeness."[12]  The files had to be collected directly from the warehouses.  In the process of

---

[9] Saad Dep. 28:10-12 . Subsequently, in his second declaration re class certification, he says there is posting data for 29% of staff promotions found in the human resources data, for 2002-2005. Saad Second Decl. at ¶ 57(p26:20-22). It appears posting has been much more common since 2004.  See note 27 infra.

[10] Saad Dep. 28: 1-22. deposition, p. 28.

[11] Saad Dep. 31:1-9.  deposition, p. 31:1-9.

[12] Saad Decl. at ¶ 64. [report, p. 41:12-14].

1   converting the paper files into an electronic database, Dr. Saad set up various rules and
2   procedures for handling anomalous and ambiguous cases.  For example,
3       (a)   Dr. Saad failed to distinguish postings for a generic[13] Senior Staff openings
4   compared to an opening for a specific Senior Staff position. He coded the
5   generic Senior Staff postings according to the specific job the successful
6   applicant entered.[14]  By coding the postings for generic Senior Staff
7   openings as the specific job that was filled, Dr. Saad distorts his measure of
8   interest in all Senior Staff jobs.  For example, suppose a woman applies for
9   a generic posting, and was then selected and assigned to Front End
10  Manager.  Dr. Saad's methodology would count this women's application,
11  as well as those of all other applicants for this posting, as showing interest
12  in Front End, and not Merchandise or any other Senior Staff job.  A study
13  of the paper record documents Dr. Saad relied upon in compiling his
14  database of posting data shows that there were at least 50 examples where
15  the posting indicated a generic opening in Senior Staff.  Thus, Dr. Saad's
16  measure of interest in various Senior Staff jobs does not accurately reflect
17  the actual interest shown in the limited application data he studied.
18      (b)   some of the paper files were simply unusable and had to be excluded;[15]
19      (c)   in some cases Dr. Saad created an "implied posting" from paper resumes;[16]
20      (d)   some of the paper files were excluded if there were applicants who were
21  not in the human resource electronic files;[17]
22      (e)   postings showing only one applicant were excluded;[18]

---

[13] Generic openings are those postings that do not designate a specific Senior Staff job opening among the four Senior Staff jobs

[14] Saad Dep. 72:24-73:16. deposition, pp. 72:24-73:16.

[15] Saad Dep. 64:17-25. deposition, p. 64:17-25.

[16] Saad Dep. 57:5-20, 59:12-24. deposition, p. 57:5-20 and p. 59:12-24.

[17] Saad Decl. at ¶ 64.  [report, p. 41:25-28].

[18] Saad Decl. at ¶ 64.  [report, p. 41:24-25].

1      (f)     in some cases the posting corresponded to a promotion found in the electronic personnel data, but the person promoted was not an applicant, so Dr. Saad added this person to the set of applicants;

    (g)     Dr. Saad counted a promotion found in the electronic data as having matching posting data even if the actual promotion occurred up to two months prior to the job posting date.[19]

9.     Dr. Saad's inferences about "differential job interest by gender" based on his job posting study are flawed, because the population he studied, primarily employees below Senior Staff, is different from the population for whom he is making his inference, Senior Staff employees. Dr. Saad uses his study of applicants for posted openings into Senior Staff jobs and below to make inferences about Senior Staff employees who want to be AGMs or who may seek to be rotated into Merchandise Manager positions.[20] He fails to recognize that the set of people he is studying in his posting data are not the same group as the set of people he is making inferences about.

10.     Rotation of Senior Staff employees is at the discretion of the GM, and because there is no posting or application process involved, there is no formal mechanism in place for taking job interest into account. Indeed, Costco Management assumes all Senior Staff employees are interested in AGM and GM positions.[21] Employees who have achieved Senior Staff level positions may well have different interest in advancement than lower level employees. Moreover, rotation of Senior Staff employees among the four Senior Staff jobs is part of company policy. Accordingly, it is reasonable to assume that Senior Staff employees expect to be rotated among the four Senior Staff jobs.

11.     In his Surrebuttal Report, and his Second Declaration, Dr. Saad attempts to defend his posting database by comparing its characteristics to those in unposted (or unretained posted) warehouses. This type of post hoc analysis cannot redeem a sample that was not

---

[19] Saad Dep. 66:13-25. deposition, p. 66:13-25.
[20] *See* Saad Decl. at ¶ 63[report, pp. 40-41, ¶ 63.]
[21] Zook Dep. 129:1-130:23.

randomly selected. A fundamental principle in statistics is that when a random sample is drawn from a population, then there is a measurable degree of reliability in making predictions from that sample to the population as a whole. The formulas for computing reliability and margin of error depend on the details of the how the random sample was drawn. Employing a random mechanism in selection of the sample insures that the mathematical laws of probability will apply in reaching conclusions about the population, based on the sample results. If the sample is not drawn according to some specifiable random mechanism, then there is no mathematics to justify projecting the results of the sample to the population. "In short, a good survey defines an appropriate population, uses an unbiased method for selecting the sample, has a high response rate, and gathers accurate information on the sample units. When these goals are met, the sample tends to be representative of the population: the measurements within the sample describe fairly the characteristics in the population."[22] Dr. Saad's posting data is not a random sample.

12. The property of whether a sample is random or not is determined solely by how the sample was initially selected. It makes no sense in statistics to collect available data, and then try to determine whether it can be considered like a random sample. The problem is that you have no information about the variable of interest in the population (i.e. differential interest between men women Senior Staff employees in becoming AGMs), so you cannot tell whether a (non-random) sample has similar characteristics with regard to this variable.

13. Dr. Saad tries to justify the generalization of his measure of differential interest he found in the partial posting database to the population of Senior Staff employees. To do this, he examines whether certain known characteristics of his posting data are consistent with the same known characteristics in the population of employees. For example, he shows that the "gender balance among promotees is the same as that among promotees analyzed in the posting materials."[23] Showing this similarity gives no information about interest differential between male and female Senior Staff employees.

---

[22] "Reference Manual on Scientific Evidence", 2nd Edition, page 102.
[23] Saad Second Decl. at ¶ 60.

1    14.    Such misguided after the fact studies are incapable of establishing that the limited posting data gives a 'representative' measure of Senior Staff interest in promotion to AGM. The theory of statistical inference "… assumes throughout that some kind of probability sampling is used and that observations $y_i$, on the i-th unit is the correct value for that unit. The error of estimate arises solely from the random sampling variation that is present when n of the units are measured instead of the complete population of N units."[24] Moreover, "In complex surveys, particularly when difficult problems of measurement are involved, the assumptions may be far from true."[25] Dr. Saad has obtained data from a non-randomly selected set of postings. "Statistical inference can be justified only in terms of an explicit chance model for the data. No box, no inference."[26]

15.    At best, performing the comparisons that Dr. Saad makes between characteristics of promotions in his posting data and the corresponding characteristics of promotions not in available posting data could show that posting data is significantly different in terms of these characteristics than what would be expected in a random sample. In fact, Dr. Saad's own studies indicate several instances where his posting data is significantly different than what would be expected from a random sample. For example, in Exhibit R20 of his declaration Dr. Saad reports a statistically significant difference in the distribution of number of promotions by year between promotions with and without available posting data.[27] In Exhibit R21, Dr. Saad reports that the distribution of regions among promotions in available posting data and among promotions with no available posting data has statistically significant difference. In Exhibit R24, Dr. Saad finds four situations where there is a statistically significant difference in the age of those promoted who are in available posting data, and those promoted who are not in posting data.

**Company Wide Analysis**

---

[24] "Sampling Techniques", Third Edition, Cochran, page 359.
[25] "Sampling Techniques", Third Edition, Cochran, page 359.
[26] "Statistics", by Freedman, Pisani, Purves, page 407.
[27] In fact it appears the number of postings increased significantly in 2004. Saad Second Decl at ¶ 62.

16. I explained in my opening declaration why I performed a company-wide analysis, and why a region-by-region analysis would not undermine my conclusions. Costco cites my testimony in *Dukes v. Wal-Mart Stores, Inc*, where, in addition to a national analysis, I offered a summary of regional analyses of promotion data. The regional summary was appropriate in Wal-Mart, unlike in this case, for several reasons. First, the number of promotions in issue at Wal-Mart: 22,388 support manager, 15,043 management trainee, 4124 co-manager and 3567 manager promotions in the Wal-Mart case, was much greater than the 651 AGM promotions at Costco. In Wal-Mart, regional analyses would include substantial numbers of promotions. Second, the vast majority of the promotion decisions at issue in Wal-Mart involved entry level management where promotions were made at the store (support manager) or at best involved the district level (management trainee). In this case, by contrast, entry level management decisions are not in issue, and promotion decisions must be reported to, and in many cases approved, above the District level.

I declare under penalty of perjury under the law of the State of California that the foregoing is true and correct. Executed this 13th day of October 2006 at Berkeley, California.

*Richard Drogin*

———————————————
Richard Drogin, Ph. D.