1  Brad Seligman (State Bar No. 083838)
   Jocelyn D. Larkin (State Bar No. (State Bar No. 110817)
2  THE IMPACT FUND
   125 University Avenue
3  Berkeley, CA  94710
   Telephone:  (510) 845-3473
4  Facsimile:  (510) 845-3654

5  Bill Lann Lee (State Bar No. 108452)
   James M. Finberg (State Bar No. 114850)
6  Daniel M. Hutchinson (State Bar No. 239458)
   LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
7  Embarcadero Center West
   275 Battery Street, 30th Floor
8  San Francisco, CA  94111-3339
   Telephone:  (415) 956-1000
9  Facsimile:  (415) 956-1008

10 Steve Stemerman (State Bar No. 067690)
   Elizabeth A. Lawrence (State Bar No. 111781)
11 Sarah Varela (State Bar No. 234640)
   DAVIS, COWELL & BOWE, LLP
12 595 Market Street, #1400
   San Francisco, CA  94105
13 Telephone:  (415) 597-7200
   Facsimile:  (415) 597-7201
14
   Attorneys for Plaintiffs and the Proposed Class
15

16                UNITED STATES DISTRICT COURT

17               NORTHERN DISTRICT OF CALIFORNIA

18

19
   SHIRLEY "RAE" ELLIS, LEAH            Case No.  C-04-3341 MHP
20 HORSTMAN, and ELAINE SASAKI on
   behalf of themselves and all others
21 similarly situated,

22              Plaintiffs,            **SUPPLEMENTAL DECLARATION OF**

23        v.                          **MARC BENDICK, JR., PH.D. IN SUPPORT**
                                      **OF CLASS CERTIFICATION AND IN**
24 COSTCO WHOLESALE                   **OPPOSITION TO COSTCO'S MOTION**
   CORPORATION,                       **TO STRIKE BENDICK DECLARATION**
25
                Defendant.            Date:       November 7, 2006
26                                    Time:       9:00 a.m.

27

28

## TABLE OF CONTENTS

I.      Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1
II.     Should I Control for Earnings in Employment Benchmarks? . . . . . . .   2
III     Broader Issues Underlying the Discussion of Controlling for Earnings . .   8
IV.     Differences Between My Analyses of Costco and Wal-Mart . . . . . . . .   12
V.      My Choice of Occupational Codes . . . . . . . . . . . . . . . . . . .   15
VI.     Combining Benchmarks to Increase Accuracy . . . . . . . . . . . . . .   19
VII.    Does My Analysis Control for Labor Supply? . . . . . . . . . . . . . .   22
VIII.   The Role of Benchmarking Analysis . . . . . . . . . . . . . . . . . .   27
Attachment A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   30

I, Marc Bendick, Jr., Ph. D., declare:

## I.  INTRODUCTION

1.      I am a labor economist who, on August 18, 2006, provided an expert declaration on behalf of plaintiffs ("*Bendick Declaration of August 2006*").  Since that time, I have read six documents from the defendant addressing various points in that *Declaration*:[1]

- *Declaration of Ali Saad re First Report Submitted in Opposition to Plaintiffs' Motion for Class Certification ("Saad First Declaration")*, signed September 25, 2006;

- *Declaration of Ali Saad re Second Report Submitted in Opposition to Plaintiffs' Motion for Class Certification ("Saad Second Declaration")*, also signed September 25, 2006;

- *Declaration of Casey B. Mulligan, Ph.D., Submitted in Opposition to Plaintiffs' Motion for Class Certification ("Mulligan Declaration")*, signed September 22, 2006;

- *Declaration of Margaret Stockdale, Ph.D., re First Report Submitted in Opposition to Plaintiffs' Motion for Class Certification ("Stockdale First Declaration")*, signed September 22, 2006;

---

[1] These documents and other sources consulted by me or available to me while completing the present declaration are listed in Attachment A.

SUPPL. DECL OF MARC BENDICK IN SUPPORT OF
CLASS CERT AND IN OPP TO MOTION TO STRIKE

- *Declaration of Margaret Stockdale, Ph.D., re Second Report Submitted in Opposition to Plaintiffs' Motion for Class Certification ("Stockdale Second Declaration"), also signed September 22, 2006;  and*

- *Notice of Motion to Strike Declaration of Marc Bendick, Jr., Ph.D.,; Memorandum of Points and Authorities in Support Thereof ("Notice of Motion to Strike"),* signed September 29, 2006.

In the present declaration, I respond to selected criticisms of my analyses in these six documents.

## II.  SHOULD I CONTROL FOR EARNINGS IN EMPLOYMENT BENCHMARKS?

2.      In the *Bendick Declaration of August 2006,* I developed five benchmarks for the expected representation of women among Costco managers, based on the EEOC's EEO-1 data or the 2000 Census's "EEO Special File." My final, conservative benchmark, computed as the median of these five benchmarks, was:   34.1% for Store Managers, 34.1% for Assistant Managers, 42.5% for Staff Managers, and 41.2% for Other Assistant Managers.[2]

3.      In Section 12 of the *First Saad Declaration*, Dr. Saad describes these benchmarks as "flawed" because they "…failed to do one critical thing" – control for the level of skills and responsibilities of Costco managerial employees compared to those of the average retail manager in EEO-1 or Census data.[3]   To develop a benchmark he believed appropriately controls for this effect, Dr. Saad used "PUMS" data[4] from the 2000 Census for retail managers who earn as much

---

[2] *Bendick Declaration of August 2006*, p. 17, Table 7, Column (g).

[3] *First Saad Declaration*, p. 57, paragraph 100.

[4] The Public Use Microdata Sample (PUMS) data set is an extract from the 2000 Census released to the general public by the U.S. Census Bureau. Dr. Saad used it in his analysis of the 2000 Census because it includes earnings information. As I discuss in paragraph 4 below, I believe that it is not appropriate to control for earnings, and therefore I had no need to use the PUMS data set. Instead, I used the "EEO Special File" which is a different extract from the 2000 Census released to the general public by the U.S. Census Bureau.  I selected that data set because, as I stated in

SUPPL. DECL OF MARC BENDICK IN SUPPORT OF
CLASS CERT AND IN OPP TO MOTION TO STRIKE

as Costco managers earned in that year. Under this approach, his benchmarks are: 10.2% for Store Managers, 14.9% for Assistant Managers, and 22.3% for Staff Managers.[5]

4. I strongly disagree with Dr. Saad's reasoning. In controlling for earnings, Dr. Saad is assuming that, both at Costco and at the other retailers to which I am comparing Costco, differences in earnings among managers reflect *only* differences in managers' personal skills and responsibilities.[6] For example, he might be assuming that the average Costco manager is better educated, smarter, stronger, more energetic, more creative, better organized, or more experienced than the average retail manager in the Census. He provides no empirical support for such an assumption. Concurrently, he ignores a much simpler, more plausible explanation for some or all of the differences in compensation – that the earnings of Costco managers are higher than the earnings of managers at other retail firms who have the *same* level of skills and responsibilities but who work at a company which is less efficient and profitable than Costco.

5. Dr. Saad's assumption is particularly implausible because Costco's unusually high efficiency and profitability is widely discussed in the business press. For example, articles in *Business Week*, *Fortune*, the *New York Times,* and similar sources have reported:[7]

---

paragraph 13 of the *Bendick Declaration of August 2000,* the EEO Special File is specifically designed by the Census Bureau for use in establishing employment benchmarks.

In the present report (see paragraph 11, below), I develop an additional benchmark, and this time I use the PUMS data set. I do so because I wanted to follow Dr. Saad's procedures to facilitate comparing my benchmark to his. However, since both the PUMS data set and the EEO Special File are extracted from the same underlying 2000 Census data, it should matter little which of the two I used. And that is in fact what I found (see paragraphs 13 and 14 below).

[5] *Saad First Declaration,* Exhibit 43 and p. 60, paragraph 105. Dr. Saad did not provide a benchmark for the expected female representation among "Other Salaried Managers."

[6] As Dr. Saad explicitly states, "...if compensation is higher, it *must* be due to higher skills or greater responsibility." *Saad First Declaration*, paragraph 101 (emphasis added).

[7] See "The Costco Way," *Business Week Online*, April 12, 2004; "How Costco Became the Anti-Wal-Mart," *New York Times,* www.nytimes.com, July 17, 2005; "The Only Company Wal-Mart Fears," *Fortune*, November 24, 2003 (reprinted in *CNNMoney.com*); and "Costco's Competitive Secret," *Motley Fool,* June 14, 2006.

- In 2003, Costco earned $13,647 in operating profit per hourly employee, compared to $11,039 at its most direct competitor, Sam's Clubs.

- Costco generated $795 in annual sales per square foot of retail space, compared to $516 at Sam's Clubs and $411 at another warehouse style retailer, BJ's Wholesale Club.

- Costco's selling, general and administrative costs totaled 9.8% of sales revenues, compared to 17% at Wal-Mart and 24% at Target.

- Costco outperforms competitors such as Sam's Clubs and BJ's in terms of catering to affluent customers, catering to small business customers, and offering innovative packaging and merchandising.

- Costco has employee turnover one-third that of the retail industry average, and inventory shrinkage (losses from shoplifting and employee thefts) only 13% that of the retail industry average.

6.     Apparently reflecting this higher level of efficiency and profitability, Costco is reported to pay its employees an average of 38% more than comparable employees at other retailers.[8]

7.     In these circumstances, Dr. Saad's comparison of managers at Costco to managers earning Costco-like wages at other retailers is *not* a comparison of managers with equal skills and responsibilities, as Dr. Saad claims.   Instead, it is a comparison of Costco managers to managers with a *higher* level of skills and responsibilities, because they have achieved Costco-level wages while working for less efficient, less profitable employers.

---

[8] Paul Lightfoot, "Adequate Minimum Wage Helps Business, Workers, Economy" *Press Release, Brennan Center, New York University School of Law*, June 16, 2004.

SUPPL. DECL OF MARC BENDICK IN SUPPORT OF CLASS CERT AND IN OPP TO MOTION TO STRIKE

8.    Dr. Saad's comparison is further unappealing in that it is based on a *limited number* of *very untypical* retail managers.  For example, in developing his benchmark for Costco General Managers, Dr. Saad includes only retail general managers who earn between $75,000 and $150,000 per year.  This group encompasses only 18% of all retail general managers in the PUMS data set, all of whom earned more than 80% of their fellow retail general managers.

9.    The practical effect of Dr. Saad's inappropriate limitation of his data to high earners is to substantially under-estimate the expected representation of women among Costco managers.  This under-estimation arises because his sample over-represents managers in retail firms' senior executive positions, such as vice presidents and above -- the positions most likely to command salaries as high as $150,000 per year at most retail firms -- and under-represents managers *actually working in stores*.  As the widely-discussed concept of the "glass ceiling" reminds us, *very* few women have achieved senior executive positions.  However, their absence at the senior executive level should not be allowed to dominate a benchmark for *store level* managers -- Costco GMs and below -- which is the issue in the present case.

10.    If Dr. Saad wishes to use 2000 Census PUMS data to compare Costco managers to retail managers matched to Costco managers in terms of skills and responsibilities, he should have constructed a different benchmark.   That benchmark would not limit its comparison to managers who earned Costco-level wages.  However, it would limit it to managers employed in general merchandise stores — the same type of retail store as Costco.[9]

---

[9] In paragraph 31 and footnote 16 of the *Saad Second Declaration,* Dr. Saad takes the position that it is inappropriate to compare Costco to other "general merchandise" stores because some of them sell little "general merchandise."  This position misinterprets the definition of a general merchandise store, which is a store which sells a sufficient range of goods that it is not a specialty retailer, but not necessarily all possible types of goods.  His position also ignores the fact that, in their EEO-1 reports to the EEOC, both Costco and these comparator chains selected the "general merchandise store" category as most accurately describing their operations. Finally, his position is inconsistent with the defendant's assertion, discussed in Section IV below, that I erred in not comparing Costco to the 20 largest retail chains in the nation, since one of the characteristics I used to define this set of 20 retail chains was that they are all "general merchandise stores."

SUPPL. DECL OF MARC BENDICK IN SUPPORT OF
CLASS CERT AND IN OPP TO MOTION TO STRIKE

11.   I have computed that benchmark.  Using PUMS data from the 2000 Census, I calculated the proportion female among managers employed at least 35 hours per week in general merchandise stores (Standard Industrial Codes 578 and 579) nationwide.[10]   The resulting expected representation of females among Costco managers is reported in column (d) of Table A, below.  It ranges from 34.3% female at the highest level of manager in these stores (General and Operations Managers) to 62.7% at the lowest level (First Line Supervisors of Sales Workers).

**TABLE A**
**THE  REPRESENTATION OF WOMEN AMONG**
**MANAGERS AT GENERAL MERCHANDISE STORES**
**NATIONWIDE, ACCORDING TO 2000 CENSUS PUMS DATA**

| (a) | (b) | (c) | (d) | (e) |
|---|---|---|---|---|
| Costco Job Level | Female Representation at Costco, 1999-2004 | Closest Corresponding Census Job Title | Female Representation in General Merchandise Stores, 2000 Census PUMS | Ratio of Costco Female % to Census Female % |
| **Store Managers** | 12.9% | General and Operations Managers | 34.3% | 37.6% |
| **Assistant Managers** | 16.6% | General and Operations Managers | 34.3% | 48.4% |
| **Staff Managers** | 27.9% | Marketing and Sales Managers | 61.9% | 45.1% |
| **Other Salaried Managers** | 30.0% | First Line Supervisors of Sales Workers | 62.7% | 47.8% |

---

[10] I have limited these calculations to the 50 states and the District of Columbia.  Dr. Saad's calculations apparently also include Puerto Rico.

12.     Column (b) of Table A provides figures, previously presented in Table 1 of the *Bendick Declaration of August 2006*, on the actual representation of women in Costco in-store management jobs, so that they can be compared against the benchmark figures in Column (d).   At all four managerial levels examined, Costco's actual female representation is substantially lower than this new benchmark.   As Column (e) of Table A reports, among Store Managers, the Costco figure (12.9% female) is about one-third – 37.6% -- as large as the Census figure (34.3% female). At the remaining three levels of management, according to Column (e), the Costco figure is slightly less than half the Census figure – 48.4%, 45.1%, and 47.8%, respectively.

13.    The new benchmarks in Column (d) of Table A are very similar to those presented in Table 2 of the *Bendick Declaration of August 2006*:

- for Store Managers, 34.3% in the former, 34.1% in the latter;

- for Assistant Managers, 34.3% in the former, 34.1% in the latter;

- for Staff Managers, 61.9% in the former, 63.2% in the latter; and

- for Other Salaried managers, 62.7% in the former, 63.9% in the latter.

14.     This similarity is not surprising, since both benchmarks are based on managers in general merchandise stores reported in the 2000 Census.  The remaining small differences appear to be due to technical differences between how the Census Bureau prepared the EEO Special File from underlying Census data and how it prepared the PUMS data from the same underlying source.  Therefore, Table A essentially repeats Table 2 in the *Bendick Declaration of August 2006* and requires no changes to the conclusions stated in my previous report.

### III. BROADER ISSUES UNDERLYING
### THE DISCUSSION OF CONTROLLING
### FOR EARNINGS

15.     In the course of contending that my employment benchmarks should control for earnings, Dr. Saad asserts that my failure to do so signals professional ignorance or incompetence on my part:[11]

> Dr. Bendick's report fails to apply well known and undisputed principles of labor economics, and consists of untested and unsupported assertions.    More specifically, Dr. Bendick does not appear to believe that labor markets will tend to reach equilibrium wage rates…[His] opinion is contradicted by thousands of scholarly articles"

And[12]

> Dr. Bendick's "scientific" opinion is therefore that labor market earnings are not determined by market forces of the supply and demand for labor.  In my years as a labor economist, I have never seen a "scientific opinion" so out of step with the findings of the discipline.   Dr. Bendick either misunderstands the nature of economic forces, or has made statements that he knows are unsupportable.

Dr. Saad further asserts that my approach is obviously incorrect because, in his opinion, it violates the so-called "law of one price" which he implies is sacred to all economists because it was enunciated in 1776 by the founding father of economics, Adam Smith.[13]

16.     Arcane debates about economic theory are neither necessary nor appropriate within the context of this case.   Nevertheless, I feel compelled briefly to record my strong

---

[11] *Saad Second Declaration,* paragraph 2, page 1.

[12] *Saad Second Declaration,* paragraph 17 on page 7.

[13] *Saad Second Declaration*, page 8, line 3.

SUPPL. DECL OF MARC BENDICK IN SUPPORT OF
CLASS CERT AND IN OPP TO MOTION TO STRIKE

disagreement with Dr. Saad's statements.  Economic theory does not say that all workers with the same job title will earn the same wage, as Dr. Saad states.  Instead, it says that, on average and in the long run, they will all be paid in proportion to their productivity.  Therefore, they will all be paid the same wage *only if they are all equally productive*.  Dr. Saad ignores the possibility that employees of some firms may be more productive than their equally-qualified peers employed by other firms because some firms are better-managed and more efficient than others.  Although he does not make the assumptions underlying this position explicit, he is implicitly assuming that it is impossible for one firm to be more efficient and productive than another because the more efficient firm will drive all less-efficient competitors out of business.[14]

17.     In taking this position, Dr. Saad is closer than I am to being "out of step" with "well known and undisputed principles of labor economics" and "thousands of scholarly articles." The conclusions Dr. Saad states are dependent on assumptions about the competitiveness and efficiency of markets which many mainstream economists find so artificial and unrealistic that they are of limited relevance when analyzing "real world" firms and industries.  While many mainstream economists use these assumptions for research in economic *theory*, only economists at the edge of "mainstream" thinking typically claim that these assumptions, by themselves, accurately describe the actual daily workings of real companies such as Costco and its fellow retailers.

18.     The unstated but crucial role of these unrealistic, unstated assumptions is equally evident in a report prepared on behalf of the defendant by a second economic expert, Dr. Casey Mulligan.  Paragraph 113 of the *Mulligan Declaration* contains the following statements:

---

[14] Defendant  further misstates economic theory by asserting, in its *Notice of Motion to Strike*, p.13, lines 17-19, that "Dr. Bendick concludes that Costco's managers are overpaid..." I concluded no such thing.   Both Dr. Saad and I assume that Costco managers are correctly paid  -- that is, paid in proportion to their productivity.   Dr. Saad and I differ only about whether those differences in productivity arise solely because these managers are smarter, better educated, etc. (Dr. Saad's position), or whether some or all of that difference arise because Costco is a more efficient, more profitable employer (my position).

SUPPL. DECL OF MARC BENDICK IN SUPPORT OF
CLASS CERT AND IN OPP TO MOTION TO STRIKE

Costco operates with small margins in a highly competitive market.  It can ill afford a diminution of its productivity relative to its competitors, whether the diminution derives from gender attitudes or something else…Plaintiffs' experts…fail to present a complete economic analysis that reconciles Costco's success in the marketplace with their allegation that Costco discriminates against women….

This statement expresses a presumption by Dr. Mulligan that competition among firms in a market economy eliminates employment discrimination by forcing discriminating firms out of business.

19.     Both Dr. Saad's conclusion and Dr. Mulligan's reflect a position commonly championed by a subset of economists, often referred to as the "Chicago school" because much of their underlying research has been done by economists affiliated with the University of Chicago.[15]   Dr. Saad received his Ph.D. from that university, and Dr. Mulligan received his Ph.D. from that university and is now on its faculty.

20.     This "Chicago" way of thinking about how markets operate is considered *one part* of mainstream economic analysis. As such, it is commonly discussed in standard textbooks on economics and labor economics.  However, much of this discussion focuses on the limitations of the approach, especially its reliance on assumptions about the contemporary American economy which many respected, mainstream economists consider unrealistic.  These assumptions include:

- that vigorous competition among firms is universal among firms in the contemporary American economy;

---

[15] Some research studies in this tradition are cited in footnote 1 of the *Saad First Declaration* and Appendix 2 (bibliography) to the *Mulligan Declaration*.  One "classic" statement of this line of reasoning is Gary Becker, *The Economics of Discrimination* (Chicago: University of Chicago Press, 1957).

- that firms, including multi-billion dollar global corporations, come into existence or cease to operate rapidly;

- that firms even slightly less efficient than their competitors will be driven out of business by more efficient competitors;

- that all parties to employment transactions have complete, unambiguous information about all aspects of those transactions;

- that firms can adjust their employment practices instantly and without cost; and

- that historical, sociological, political, legal and institutional considerations have little or no lasting influence on employment practices.

In addition to finding such assumptions not descriptive of "real world" businesses, many "non-Chicago" economists also recognize that, contrary to the predictions of the Chicago approach, extensive empirical research concludes that employment discrimination continues to be found in the American economy today.[16]

21.   Obviously, it is not possible within this declaration to resolve this broad-ranging, long-standing controversy within the field of economics.  However, it is appropriate to note that statements such as those quoted from Dr. Saad and Dr. Mulligan would not command universal agreement among respected, mainstream scholars in economics.  The subset of mainstream economists strongly identifying with the "Chicago school" might find such statements correct and relevant.  Many other respected, mainstream economists would consider that they convey at best

---

[16] Each side of this disagreement is supported by hundreds of theoretical or empirical studies conducted by economists or other scholars.  Overviews of some aspects of this discussion may be found in Ronald G. Ehrenberg and Robert S. Smith, *Modern Labor Economics, Theory and Public Policy.* Reading, MA: Addison Wesley Longman, 9th edition, 2005, chapter 12; Glen Cain, "The Economic Analysis of Labor Market Discrimination." In Orley Aschenfelter and David Card (eds), *Handbook of Labor Economics, Vol. 3.*  Amsterdam: North Holland, 1999; and Marc Bendick, Jr., "Adding Testing to the Nation's Portfolio of Information on Employment Discrimination." In Michael Fix and Margery Austin Turner (eds), *A National Report Card on Discrimination: The Role of Testing.* Washington: Urban Institute Press, 1999.

- 11 -

partial truth and do not accurately describe the workings of real firms in the American labor market today.

22.      In this circumstance, it is not appropriate for Dr. Saad to equate my presenting analysis with which he or other "Chicago" economists disagree with my being professionally ignorant, incompetent, or outside "mainstream" thinking generally accepted among my professional peers.

## IV.  DIFFERENCES BETWEEN MY ANALYSES OF COSTCO AND WAL-MART

23.      In their *Notice of Motion to Strike*, defendant's counsel argue that I am inconsistent between my analysis in this case and a similar analysis I presented in another case, *Dukes et al. v. Wal-Mart*.[17]  In both cases, the defendant is a large retail chain, and I developed benchmarks based on EEO-1 data for the representation of women in management.  However, in the Wal-Mart case, I compared the defendant against the 20 largest chains of general merchandise stores, whereas in the present case, I compare Costco to all general merchandise stores and all retailers, but not the 20 largest retail chains.  Defendant's counsel characterize this difference as an "inexplicable failure" on my part.[18]

24.      This difference is not "inexplicable," as I explained to defendant's counsel in my deposition.[19]  The key circumstance differentiating the Wal-Mart case and the present one is the

---

[17] The *Notice of Motion to Strike*, page 2, lines 4-7, states:

> Dr. Bendick inappropriately relies on the over-inclusive industrial categories of "General Merchandise Stores" and "All Retailers" as comparators to Costco, an error he took pains to avoid in his own prior work in *Dukes v. Wal-Mart* but ignored in this case.

[18] *Notice of Motion to Strike*, page 17, line 8.

[19] *Deposition of Marc Bendick, Jr,, taken August 12, 2006*, especially page 62, line 3 through p.70, line 12, and page 80, lines 16-23.

- 12 -

size of the company being analyzed.   Wal-Mart is the world's largest private employer, with 1.8 million employees in 2006.[20]   In the EEO-1 data I used in my analysis, it was *triple* the size of the largest of the 20 comparator chains and *84 times* the size of the smallest of the 20.   In that unique circumstance, my priority in selecting comparators was to select firms as similar in size to Wal-Mart as possible, even if that meant ignoring data from many other general merchandisers.   In contrast, while Costco is a large firm, its 118,000 employees in 2006 makes it only 6.6% the size of Wal-Mart and places it more within the same size range as multiple other general merchandise store chains.   In that circumstance, my priority in selecting comparators was to take advantage of all data available on general merchandise retailers, rather than to restrict the comparator sample to the largest chains among them.[21]   This consideration led me to adopt a different set of comparators for Costco than for Wal-Mart.

25.      However, since defendant's counsel have raised the issue, I have no objection to comparing Costco to the 20 largest retail chains in the United States, thereby generating a sixth comparator analysis parallel to the five set forth in the *Bendick Declaration of August 2006*.   To be consistent with my work in the Wal-Mart case, I base the comparison on the 20 chains used as comparators to Wal-Mart plus Wal-Mart itself -- a "21 chain" comparison group.   My report in the Wal-Mart case provides data from which I compute, for the most recent year for which I have data, that the representation of women among retail managers at these 21 large retail chains is

---

[20] 2006 employment figures for Wal-Mart and Costco in this paragraph are from the financial data website www.hoovers.com, downloaded October 10, 2006.

[21] This consideration of using all available data is particularly crucial with respect to Benchmark Five, where available data permit analyzing only *167 Costco establishments* even when all general merchandise stores are included in the comparison.   In sharp contract, even after restricting data to the 20 largest retail chains, data still permitted analyzing more than 2,900 Wal-Mart establishments—more than *40 times* the number of Costco establishments which could be analyzed.

- 13 -

49.2%.[22] That makes it consistently *higher* than the final, conservative benchmark set forth in Table 7 of the *Bendick Declaration of August 2006* for all four groups of manager examined, which range from 24.1% to 42.5%.

26.   In Table B below, I insert the 49.2% figure in Column (d).  Column (b) of the table provides figures, previously presented in Table 1 of the *Bendick Declaration of August 2006*, on the actual representation of women in Costco in-store management jobs, so that they can be compared against the benchmark figures in Column (d).   At all four managerial levels examined, Costco's actual female representation is substantially lower than this new benchmark. As Column (e) of Table B reports, among Store Managers, the Costco figure (12.9% female) is 26.2% as large as the "21 large chain" benchmark of 49.2%. At the remaining three levels of management, according to Column (e), the Costco figure ranges from 33.7% to 61.0% of the 49.2% benchmark.

27.   In short, when I adopt defense counsel's suggestion that I apply the same benchmark to Costco that I applied to Wal-Mart, the conclusions set forth in the *Bendick Declaration of August 2006* remain unchanged.   As Paragraph 30 of that *Declaration* stated, "Costco's actual representation of women among its in-store managers fell substantially short of *every one of the five benchmarks* for *all four Costco in-store managerial jobs examined*."  I only need to change "five benchmarks" to "six benchmarks" for that statement to remain true.

---

[22] According to the same source cited in the footnote immediately preceding this one, in 1999 (the central year in my analysis of Wal-Mart), Wal-Mart had about 900,000 employees, and women constituted 34.5% of its retail managers.  In that same year, the 20 large retail chains to which Wal-Mart was compared together had about 1.8 million employees, and women constituted 56.5% of their retail managers.  (34.5% * 900,000+ 56.5% * 1,800,000) / (900,000 +1,800,000) = 49.2%.

Since this analysis is based on EEO-1 reports, which do not provide separate data for different levels of managers, that same expected representation figure must be applied to all four levels of retail managers at Costco.

SUPPL. DECL OF MARC BENDICK IN SUPPORT OF
CLASS CERT AND IN OPP TO MOTION TO STRIKE

**TABLE B**
**THE REPRESENTATION OF WOMEN AMONG**
**MANAGERS AT THE 21 LARGEST RETAIL CHAINS**
**NATIONWIDE, ACCORDING TO 1999 EEO-1 DATA**

| (a) | (b) | (c) | (d) | (e) |
|---|---|---|---|---|
| Costco Job Level | Female Representation at Costco, 1999-2004 | Closest Corresponding Census Job Title | Female Representation in the 21 Largest Retail Chains, 1999 | Ratio of Costco Female % to Census Female % |
| **Store Managers** | 12.9% | General and Operations Managers | 49.2% | 26.2% |
| **Assistant Managers** | 16.6% | General and Operations Managers | 49.2% | 33.7% |
| **Staff Managers** | 27.9% | Marketing and Sales Managers | 49.2% | 56.7% |
| **Other Salaried Managers** | 30.0% | First Line Supervisors of Sales Workers | 49.2% | 61.0% |

## V.  MY CHOICE OF OCCUPATIONAL CODES

28.       In the *Saad First Declaration,* Dr. Saad argues that "Dr. Bendick has utilized the wrong census code for comparison to Costco's Staff Managers.  Dr. Bendick utilized a category of workers who appear to have office jobs in sales and marketing, instead of the retail management jobs we are considering here."[23]   In my comparisons, I used Census Occupational Code 005, "Marketing and Sales Managers," whereas Dr. Saad believes that I should have used Census Occupational Code 470, "First Line Supervisors of Sales Workers."

---

[23] *Saad First Declaration*, paragraph 103.

29.     To resolve this disagreement requires comparing the duties and responsibilities of each of the four job titles in the Staff Manager category to the description of each Standard Occupational Code into which it might be placed.  I have reviewed Costco documents entitled "job analysis" for these four positions,[24] but they provide incomplete guidance.  Dr. Saad argues that I incorrectly utilized a category of office jobs in sales and marketing, *instead of* retail management jobs.  Yet when I review the "essential functions and tasks" listed in the "job analysis" for the four positions at issue, I find some which appear to be part of an "office job in sales and marketing" and others which appear more typical of a "retail management job."  For example:

| Staff Manager Position | Tasks and Function Related to an "Office Job" in Sales and Marketing | Tasks and Functions Related to a "Retail Management" Job |
|---|---|---|
| Merchandising Manager | Develops and implements sales and merchandising plan for the warehouse. | Observes employee performance to ensure best merchandising practices. |
| Administrative Manager | Tracks warehouse budget. | Schedules, develops, counsels, and directs departmental personnel. |
| Front End Manager | Develops and implements plans for special promotions. | Provides and ensures prompt and courteous member services. |
| Receiving Manager | Oversee supply requisitions. | Implements and upholds safety procedures. |

Without more information – specifically, some weighting to signal which of the "essential tasks and functions" are most important – I cannot conclude with certainty whether Dr. Saad's proposed choice or my choice is correct.

30.     However, to the best of my knowledge, Dr. Saad has no better information on this subject than I do.  In this circumstance, it is misleading for the *Notice of Motion to Strike* to say, "Dr. Bendick concedes that he lacks enough knowledge to determine whether Census Code 005

---

[24] These documents are part of Exhibit 183 to the deposition of Dr. Margaret Stockdale taken on July 12, 2006.

SUPPL. DECL OF MARC BENDICK IN SUPPORT OF
CLASS CERT AND IN OPP TO MOTION TO STRIKE

or Census Code 470 is the appropriate census code for comparison"[25]   A more accurate statement would be, "Both Dr. Saad and Dr. Bendick lack enough knowledge to determine whether Census Code 005 or Census Code 470 is the appropriate census code for comparison, but Dr. Bendick provides information empowering the Court to assess their respective positions."

31.     In the absence of sufficient information to resolve this issue, I have produced Table C, below, to explore whether Dr. Saad's suggestion actually makes a difference in empirical results.  Column (c) of the table repeats the six estimates of expected representation of females among Costco Staff Managers presented in the *Bendick Declaration of August 2006*. Column (d) presents the comparable figure estimated using Dr. Saad's recommended Census code. Column (e) then reports the difference.  As I briefly reported earlier in my *Bendick Declaration of August 2006*,[26] according to Column (e), adopting Dr. Saad's approach causes one of the six benchmark figures to increase slightly (by 0.7%), and two to decrease slightly (by 1.2%).[27]  Such differences do not support Dr. Saad's conclusion (in paragraph 104 of the *First Saad Declaration*, emphasis added) that, "Dr. Bendick's use of the wrong … code leads to a *significant overstatement* of female representation in his external labor market benchmark…" The difference so small that it does not deserve the adjective "significant."  Moreover, the difference does not consistently overstate; switching to Dr. Saad's recommended approach leads to lower benchmarks in two cases but a higher benchmark in a third case.

---

[25] *Notice of Motion to Strike*, page 18, lines 12-13.

[26] *Bendick Declaration of August 2006*, footnote 14.

[27] The other three benchmark figures remain unchanged, since they are not based on Census data and therefore do not involve selection of a Census job code.

SUPPL. DECL OF MARC BENDICK IN SUPPORT OF
CLASS CERT AND IN OPP TO MOTION TO STRIKE

**TABLE C**
**THE EXPECTED REPRESENTATION OF WOMEN**
**AMONG COSTCO STAFF MANAGERS**
**UNDER TWO ALTERNATIVE CENSUS**
**OCCUPATIONAL CODES**

| (a) | (b) | (c) | (d) | (e) |
|---|---|---|---|---|
| **Data Used in Estimating Expected Female Representation** | **Table in Bendick May 2006 Report** | **Expected Female Representation Under Standard of Availability Used in Bendick May 2006 Report (Job Code 005, Sales and Marketing Manager)** | **Expected Female Representation under Dr. Saad's Preferred Job Code (Job Code 470, First Line Supervisors of Retail Sales Workers)** | **Effect of Switching to Dr. Saad's Preferred Job Code** |
| **2000 Census General Merchandise Stores** | 2 | 63.2% | 63.9% | **0.7% increase** |
| **2000 Census All Retailers** | 3 | 42.5% | 41.2% | **1.3% decrease** |
| **EEO-1 Reports, General Merchandise Stores** | 4 | 49.5% | 49.5% | **No change** |
| **EEO-1 Reports, All Retailers** | 5 | 37.2% | 37.2% | **No change** |
| **Localized EEO-1 Reports** | 6 | 33.2% | 33.2% | **No change** |
| **Median of the Above 5 Figures** | 7 | 42.5% | 41.2% | **1.3% decrease** |

32.     Between 1999 and 2004, Costco's actual representation of females among Staff Managers averaged 30.0%.[28]  As I stated in the *Bendick Declaration of August 2006,* this figure is substantially lower than either of the two Census-based figures in that *Declaration* –

---

[28]*Bendick Declaration of August 2006*, Table 1.

63.2% and 42.5%.   The figure is also substantially below the two Census-based figures which emerge under Dr. Saad's recommended job code – 63.9% and 41.2%.   Therefore, *whether or not I adopt Dr. Saad's recommendation*, the conclusions set forth in the *Bendick Declaration of August 2006* remain unchanged.   As Paragraph 30 of that *Declaration* states, "Costco's actual representation of women among its in-store managers fell substantially short of *every one of the five benchmarks* for *all four Costco in-store managerial jobs examined*."

## VI.  COMBINING BENCHMARKS TO INCREASE ACCURACY

33.     In criticizing my benchmarking analysis, the *Notice of Motion to Strike* (page 2, line 20 – page 3, line 1, emphasis added) states:

> Dr. Bendick's ... five benchmarks produce measurements of availability and interest of female managers in the relevant labor market that range from 33.2% to 63.9% ... these *wildly inconsistent* results of various "benchmarks," all of which purport to measure the same thing, demonstrates that the Bendick benchmarks are unreliable, on their face.

34.     In the present case, as in most complex employment litigation involving statistical analysis no single data set is perfectly structured to provide a single benchmark which is ideal in all respects.   Data sets often do not exactly match the employment situation to which they are being applied in terms of geographical coverage or time period in which data were gathered. Data sets are commonly either too inclusive or under-inclusive, compared to the specific set of employees being analyzed.   And data sets frequently do not contain all the variables by which we would like to describe workers.   In those circumstances, a standard practice among my professional peers is to: (1) Identify multiple data sets which have different advantages and

disadvantages; (2) explicitly state the strengths and weaknesses of each; and then (3) combine the multiple estimates to capture the consensus among them.   This last step minimizes the influence of individual benchmarks' weaknesses and maximizes the influence of their strengths.

35.   This three-step procedure precisely describes my analysis in this case.  In step (1), I identified the 2000 Census and the EEOC's EEO-1 data as the most appropriate data sets on which to base benchmarks.  I then defined five different benchmarks which could be derived from one or the other of these data sets.  In step (2), I noted that each of these benchmarks had both advantages and limitations, which I discussed in paragraphs 18, 19, 20, 25, and 28 of the *Bendick Declaration of August 2006.*

36.   As I stated in paragraph 30 of that *Declaration*, it is noteworthy that Costco's actual representation of women in management fell substantially short of all five of these benchmarks for all four Costco management jobs examined.  However, that observation did not represent my final conclusion about the appropriate benchmark because I had not yet performed step (3) -- combining the candidate benchmarks to capture the consensus among them.   To do so, I followed a standard practice in statistical analysis by selecting the *median* among the five estimates -- the figure which fell exactly in the middle of the range of figures being examined. Here, that meant that I rejected the two highest benchmarks and the two lowest benchmarks and selected the one which remained as my final, conservative benchmark figure.[29]  I thus obtained a single figure and eliminated the variation which the *Notice to Strike* objected to as "wild inconsistency."

37.   The "three step procedure" also provides the proper context in which to consider objections defendant raises against the five benchmarks individually.  For example, the *Notice of Motion to Strike,* page 17, line 10-12, states:

---

[29] *Bendick Declaration of August 2006*, paragraph 31.

…over-inclusiveness plagues his [Bendick's] "All Retailer" benchmarks, which treat as comparable a Costco GM and a neighborhood gas station manager.

This statement is correct[30] for one of my "All Retailer" benchmarks — Benchmark 2, based on all retailers in the 2000 Census.  It is not true of my other "All Retailer" benchmark -- Benchmark 4, based on all retailers in EEO-1 reports -- because EEO-1 reports are filed only for firms with more than 100 employees.  It is also not true of the remaining three benchmarks, because they are based either on EEO-1 data (and thus on firms with more than 100 employees) or on general merchandise stores (a category which does not include gas stations).

38.    Because my final, conservative benchmark is based on the consensus (the median) among all five benchmarks, this disadvantage of one of the five benchmarks -- which I had already pointed out in the *Bendick Declaration of August 2006*, paragraph 19 -- is not fatal to my overall benchmarking conclusions.  Nor is it sufficient reason for excluding Benchmark 2 from the analysis, because that benchmark has offsetting advantages which some or all of the four other benchmarks do not -- primarily, coverage of the entire spectrum of retailers which Costco executives describe as its competitors.[31]    The general point here is that it is not appropriate to assess any of the five benchmarks without considering its strengths as well as its weaknesses, and without consider its role in the overall system of benchmarks and the consensus among them.  In that broader context, defendant's statement about Benchmark 2, quoted in the previous paragraph, is of limited importance.

---

[30]   That is, the statement is technically correct.  However, it is also potentially misleading. Benchmark 2 encompasses managers of a broad range of retail establishments, small, medium, and large.  The manager of a neighborhood gas station manager is not necessarily *typical* of the persons included in this benchmark.

[31] See *Bendick Declaration of August 2006*, paragraphs 11 – 12.

SUPPL. DECL OF MARC BENDICK IN SUPPORT OF
CLASS CERT AND IN OPP TO MOTION TO STRIKE

1

2

## VII. DOES MY ANALYSIS CONTROL
## FOR LABOR SUPPLY?

3

4

39.      In paragraph 26 on page 27 of the *Mulligan Declaration*, defendant's expert

5

Dr. Casey Mulligan concludes, "The gender composition of promotions to Costco's AGM

6

[Assistant General Manager] and GM [General Manager] positions are likely determined by

7

supply factors related to external forces.  Plaintiffs' experts have provided no statistical support

8

for Plaintiffs' claim that employer gender discrimination is a factor.  They fail to account for

9

supply factors…"

10

40.      By "supply factors" here, Dr. Mulligan means the personal circumstances and

11

attitudes of women, which he believes make them more reluctant than equivalent men to "supply

12

labor" -- that is, to be available for, interested in, and qualified for Costco managerial jobs.  In

13

particular, Dr. Mulligan argues that, because women have more family responsibilities than men,

14

they are less willing to move geographically to advance their careers; accept positions requiring

15

early morning work hours; and accept positions requiring irregular work hours.  In doing so,

16

17

according to Dr. Mulligan, the women may be influenced by having "…learned from their parents

18

that women 'ought to' limit their work hours in order to have time to care for children and

19

housework," as well as by "gender attitudes of family members."[32]

20

41.      I was amazed that Dr. Mulligan believes I failed to consider such "supply

21

factors,"  since the central purpose of the *Bendick Declaration of August 2006* was to consider

22

and control them.   To do so, I applied very simple logic:  If women are available for, interested

23

in, and qualified for managerial jobs at retail firms comparable to Costco at a certain rate, then

24

25

they ought to be available for, interested in, and qualified for managerial jobs at Costco at the

26

same rate.  To the extent that they are employed as managers at Costco at a lower rate than at

27

28

[32] *Mulligan Declaration*, paragraphs 13, 14, 43, 45, and 51-65.

comparable retail firms, then that difference in rates *cannot be explained by supply factors* because the *same* supply factors affect women's availability for, interest in, and qualification for managerial jobs at both Costco and the comparable firms.

42. I was equally amazed to read an assertion paralleling Dr. Mulligan's -- that I fail to control for supply effects -- by Dr. Saad. Page 5, paragraph 4 of the *Saad First Declaration* states, "…on the supply side, all three [defense experts, including Bendick] assume that 'job interest' is essentially equal between men and women." This statement is patently incorrect. My analysis allows men and women to differ in their interest in jobs in management. All I assume is that, whatever male-female differences exist apply *both at Costco and at other, comparable retail firms*. In that circumstance, male-female differences in "labor supply" are controlled for by comparing Costco's representation of women in management to those at comparator firms.

43. Work requirements at Costco which might affect women's interest in Costco management jobs tend to have direct counterparts at other retail firms. For example, the U. S Department of Labor's official guide to careers describes the occupation of "Sales Worker Supervisors" as follows:[33]

> …Work schedules usually depend on customers' needs….Long, irregular hours are common, particularly during sales, holiday, and busy shopping hours and at times when inventory is taken. Supervisors are expected to work evenings and weekends….Hours can change weekly, and managers must sometimes report to work on short notice….

44. These are the sorts of work requirements Dr. Mulligan cites to explain why he expects women to be represented among managers at Costco at a lower rate than at comparable other retailers. But U.S. Department of Labor wrote the passage quoted above not to describe

[33] U.S. Department of Labor, *Occupational Outlook Handbook* (www.bls.gov/oco/ocos25.htm).

SUPPL. DECL OF MARC BENDICK IN SUPPORT OF
CLASS CERT AND IN OPP TO MOTION TO STRIKE

Costco but rather retailers in general.   Therefore, it cannot possibly explain *differences* between Costco and other retail firms.

45.     Such work requirements common to retail management positions do not mean that women generally avoid employment in retailing.  In 2004, when women accounted for 46.5% of the U.S. Civilian Labor Force, they accounted for 50.8% of retail salespersons and 43.0% of first-line supervisors of retail salespersons.[34]

46.     More generally, women do not universally shun occupations where they may be required to put in long hours; work in the middle of the night or during very early morning hours; or face an irregular, changing work schedule.   The following are examples of occupations in which such circumstances often arise and yet women constitute more than half of all workers in the occupation:

- registered nurses (92.2% female)

- hosts and hostesses in restaurants, lounges, and coffee shops (90.9% female)

- home health care aides (89.3% female)

- hotel and motel clerks (75.3% female)

- airline flight attendants (71.4% female)

- bartenders (58.2% female)

- dispatchers (55.6% female)

- news reporters (53.7% female)

- gaming services workers (52.8% female).

47.     As I stated in Paragraph 30 of the *Bendick Declaration of August 2006*, "Costco's actual representation of women among its in-store managers fell substantially short of *every one*

---

[34] The figures in paragraphs 38 and 39 are from: U.S. Department of Labor, *Women in the Labor Force: A Databook*.  Washington: Bureau of Labor Statistics of the U.S. Department of Labor, May 2005, pp. 28-34, Table 11.

*of the five benchmarks* for *all four Costco in-store managerial jobs examined*." The five benchmarks control for "supply factors" -- the work requirements of Costco managerial jobs and women's reactions to these requirements.   Since the lower representation of women among managers at Costco cannot be due to differences in the behavior of women (Dr. Mulligan's "supply factors"), they appear instead to be due to what Dr. Mulligan refers to as "demand factors" -- Costco's behavior, including gender discrimination.[35]

48.     The *Bendick Declaration of August 2006* closed with the following two conclusions:[36]

- The substantial representation of women among managers in firms comparable to Costco clearly suggests that women are available for, qualified for, and interested in Costco-like retail management jobs in substantial numbers.

- This fact, in turn, suggests that, when women are not employed by Costco in managerial positions at benchmark rates, the explanation for this shortfall is to be found in the company, its corporate culture, and its human resource management practices. It cannot be explained away as a shortage of available, qualified, and interested women.

Nothing in Dr. Mulligan's declaration causes me to change those conclusions.

49.     An analysis by Dr. Drogin further strengthens my belief that Costco's under-representation of women among it managers is explained by Costco's behavior and attitudes rather than by women's behavior and attitudes.   Both Dr. Saad and Dr. Mulligan imply that women's attitudes toward jobs tend to change slowly, over decades or generations.   For example, Dr. Mulligan argues that the women's attitudes toward jobs reflect having "…learned from their parents that women 'ought to' limit their work hours in order to have time to care for children and

---

[35]   Dr. Mulligan uses the term "discrimination" (e.g., in paragraph 12 of the *Mulligan Declaration)*. I do not use the term in my analysis.

[36]   *Bendick May 2006 Report*, p. 17, paragraphs 34 and 35.

SUPPL. DECL OF MARC BENDICK IN SUPPORT OF
CLASS CERT AND IN OPP TO MOTION TO STRIKE

housework" -- lessons which presumably continue to influence them throughout their working lives.[37]   In a similar vein, when Dr. Saad was asked if "constraints" on women's availability for management jobs change over time, he replied in terms of gradual evolution as one "cohort" (that is, age group) of women is replaced by younger women from a later generation.[38]   The *Saad First Declaration* also offers an "investment" model to explain why women would be less interested in management jobs than men, specifically emphasizing that "…investments take time…"[39]

50.      A third defense expert, Dr. Margaret Stockdale, appears to share Dr. Saad's and Dr. Mulligan's opinion that women's availability for, interest in, and qualification for managerial jobs at Costco are likely to change only slowly, over many years.  Pages 17-35 of the *Stockdale First Declaration* lays out a "social glass ceiling" perspective which emphasizes, in addition to impediments which may be created by employers, the role of "…pervasive social and cultural influences that serve to *maintain* traditional gender ideologies, despite increasing acceptance of egalitarianism in social and economic roles for men and women."[40]

51.      If women's circumstances, attitudes and behavior evolve slowly over decades or generations, then such changes cannot explain why the representation of women among managers at a firm would change dramatically, in a matter of weeks or months.  Such a change at Costco

---

[37] *Mulligan Declaration*, page 10, paragraph 43.

[38] Q. …Do you have any reason to believe that the difference in male and female interests at Costco for merchandising type jobs and above differed over time?

A. …There may be an evolution in constraints on a systematic basis.  It could be a cohort effect in this data.  That's possible.…

(Saad deposition, p. 201, lines 1-18).

[39] *Saad First Declaration*, pp. 5-9; the quotation is from page 7, paragraph 6.

[40] *Stockdale First Declaration*, p. 35 (emphasis added).

SUPPL. DECL OF MARC BENDICK IN SUPPORT OF
CLASS CERT AND IN OPP TO MOTION TO STRIKE

occurred around the time this litigation was filed, on August 17, 2004. Plaintiffs' expert Dr. Drogin has compared the representation of women among Costco promotions to Assistant General Manager from 1999 through August 2004 to that rate from August 2004 through 2005. He reports that the former averaged 18.4% female, whereas the latter *more than doubled* that rate, to 34.7%.[41]

52.   When Dr. Saad was asked to explain this sudden change, he could not:[42]

Q. You are aware that post-litigation the promotion rate of women increased?

A. I am aware of that.

Q. And do you have an explanation of that?

A. No, I don't.

This lack of explanation is not surprising so long as Dr. Saad considered only the "supply" factors both he and Dr. Mulligan have focused on in this case. But Dr. Saad ignored an obvious "demand" explanation -- an abrupt change in Costco's behavior, perhaps reflecting a decision to promote more women in response to the litigation. This is why Dr. Drogin's finding strengthens my belief that Costco's under-representation of women among its managers is best explained by Costco's behavior and attitudes rather than women's behavior and attitudes.

## VIII. <u>THE ROLE OF BENCHMARKING ANALYSIS</u>

53.   The *Notice of Motion to Strike* (page 1, lines 21-23) argues that my benchmarking analysis is inappropriate because it focuses on the labor market external to Costco, rather than Costco's internal promotions:

---

[41] *Drogin Report*, May 15, 2006, Table 8. This change is statistically significant at the level of 4.94 standard deviations (*Drogin Report*, May 15, 2006, paragraph 20).

[42] *Saad deposition*, p. 201, lines 19-23.

SUPPL. DECL OF MARC BENDICK IN SUPPORT OF
CLASS CERT AND IN OPP TO MOTION TO STRIKE

> His [Bendick's] external labor market comparisons lack probative value for the issues concerning Costco's promote-from-within policies, which requires an analysis based on Costco's internal labor pools.

This assertion reflects a fundamental misunderstanding of benchmarking analysis. The benchmarks I present do not represent the proportion of women expected to hired at Costco if management positions were being filled by external hiring rather than internal promotions. Instead, the benchmarks offer a standard of comparison for the representation of women among incumbent Costco managerial employees, whether they arrived at their positions by external hiring, internal promotion, or any other process. The benchmarks thereby provide a way to analyze the relative importance of general societal factors and company-specific behavior in determining why the level of representation of women among managers at Costco is what it is today. Simply put, if representation of women among managers is low at *both* Costco and its comparator firms, then the cause of this low representation of women is probably employee preferences and behavior which is largely beyond the control of an employer such as Costco. But if comparator firms achieve a level of women in management much higher than at Costco, then the cause of the low representation at Costco is probably Costco's behavior, not the attitudes and behavior of female workers.

54.    The role of benchmarking in eliminating erroneous thinking on this point is best illustrated by Dr. Stockdale's analysis.[43] The *Second Stockdale Declaration*, p. 23, lines 12-16, states:

> Gender differences in preferences for job attributes relevant to senior staff positions at Costco persist in the 21st Century among career-oriented managerial and professional men and women. The research connects such preferences to gender-role socialization, if not

---

[43] In paragraphs 39-44 above, I have already provided a different example of the same confusion, in that instance perpetrated by Drs. Mulligan and Saad.

- 28 -

specifically to family constraints, neither of which can be attributed to structural constraints imposed by Costco.

55.        Here, Dr. Stockdale is not writing about gender differences in preferences unique to women and men employed by Costco.  Instead, she intends her statement to apply to managerial and professional women and men throughout the contemporary American labor market.  But if that were true, then gender preferences for job attributes would reduce the representation of women among managers in *both* Costco and the comparator firms in my benchmarks.  It is logically impossible for these gender preferences to explain a *difference* between Costco and its comparators -- the sort of difference my benchmarking analysis clearly demonstrates.  Therefore, in direct contradiction of Dr. Stockdale's statement quoted in the previous paragraph, the explanation of these differences must be "structural constraints imposed by Costco."  Benchmarking analysis is perhaps the best way to keep people from making the logical error Dr. Stockdale has made here.


* * * * * * * *


I declare under penalty of perjury of the laws of the United States and of the District of Columbia that the foregoing is true and correct.  This declaration was signed by me on ____ October 2006, in Mikkeli, Finland.


_____

Marc Bendick, Jr., Ph.D.

SUPPL. DECL OF MARC BENDICK IN SUPPORT OF
CLASS CERT AND IN OPP TO MOTION TO STRIKE

**ATTACHMENT A**

**DOCUMENTS AND OTHER DATA SOURCES
CONSULTED BY ME OR AVAILABLE TO ME
IN PREPARING THIS DECLARATION[44]**

Ali Saad, *Shirley "Rae" Ellis, et al., v. Costco Wholesale Corp., Expert Report of Ali Saad, Ph.D.* Resolution Economics LLC, no date.  Later presented as *Declaration of Ali Saad re First Report Submitted in Opposition to Plaintiffs' Motion for Class Certification,* signed September 25, 2006.

Ali Saad, *Rebuttal Report of Dr. Ali Saad, Ph.D., in the Matter of Ellis, et al., v. Costco Wholesale Corp.* Resolution Economics LLC, August 18, 2006.  Later presented as *Declaration of Ali Saad re Second Report Submitted in Opposition to Plaintiffs' Motion for Class Certification,* signed September 25, 2006.

*Deposition of Al Saad, Ph.D.* June 29, 2006.

Casey B. Mulligan, Ph.D., *Expert Report of Casey B. Mulligan, Ph.D., in the Matter of Shirley "Rae" Ellis et al. v. Costco Wholesale Corp.* June 22, 2006. Later presented as *Declaration of Casey B. Mulligan, Ph.D., Submitted in Opposition to Plaintiffs' Motion for Class Certification* signed September 22, 2006.

*Gender Differences in Job Attribute Preferences: Expert Report by Margaret S. Stockdale.* June 20, 2006.  Later presented as *Declaration of Margaret Stockdale, Ph.D., re First Report Submitted in Opposition to Plaintiffs' Motion for Class Certification* signed September 22, 2006.

*Declaration of Margaret Stockdale, Ph.D., re Second Report Submitted in Opposition to Plaintiffs' Motion for Class Certification*, signed September 22, 2006.

*Deposition of Dr. Margaret Stockdale,* July 12, 2006.

Frank Landy, Ph.D., *Expert Report, Shirley 'Rae" Ellis et al v. Costco Wholesale Corporation.* Landy Litigation Support Group, June 22, 2006.

Richard Drogin, Ph.D., *Statistical Analysis of Job Movement in Management at Costco.*  Drogin, Kakigi, and Associates, May 15, 2006.

Barbara F. Reskin, Ph.D., *Expert Report of Barbara F. Reskin, Ph.D.* May 16, 2006.

"The Costco Way," *Business Week Online*, April 12, 2004.

"How Costco Became the Anti-Wal-Mart," *New York Times, nytimes.com*, July 17, 2005.

"The Only Company Wal-Mart Fears," *Fortune*, November 24, 2003 (reprinted at www. *CNNMoney.com*).

---

[44] In addition to sources listed in *Bendick May 2006 Report*, Attachment C.

SUPPL. DECL OF MARC BENDICK IN SUPPORT OF
CLASS CERT AND IN OPP TO MOTION TO STRIKE

"Costco's Competitive Secret," *Motley Fool,* June 14, 2006.

Paul Lightfoot, "Adequate Minimum Wage Helps Business, Workers, Economy" *Press Release, Brennan Center, New York University School of Law*, June 16, 2004.

U.S. Bureau of the Census. *Public Use Microdata Sample 2000, Technical Documentation.* PUMS/15-US (RV). Washington: U.S. Department of Commerce.

U.S. Department of Labor, "Sales Worker Supervisor," *Occupational Outlook Handbook.* www.bls.gov/oco/ocos025.htm.

U.S. Department of Labor, *Women in the Labor Force: A Databook.* Washington: Bureau of Labor Statistics of the U.S. Department of Labor, May 2005, Table 11, pp. 28-34.

Ronald G. Ehrenberg and Robert S. Smith, *Modern Labor Economics, Theory and Public Policy* (Reading, MA; Addison Wesley Longman, 7th edition, 2000, chapter 12.

Marc Bendick, Jr., "Adding Testing to the Nation's Portfolio of Information on Employment Discrimination." In Michael Fix and Margery Austin Turner (eds), *A National Report Card on Discrimination: The Role of Testing.* Washington, DC: Urban Institute Press, 1999.

Wayne F. Cascio, "Decency Means More than 'Always Low Prices': A Comparison of Costco to Wal-Mart's Sam's Clubs." *Academy of Management Perspectives* (August 2006), pp. 26-37.

*Notice of Motion to Strike Declaration of Marc Bendick, Jr., Ph.D.,; Memorandum of Points and Authorities in Support Thereof,* signed September 29, 2006.

www.hoovers.com (website)

Marc Bendick, Jr., The *Representation of Women in Store Management at Wal-Mart Stores, Inc.* (January 2003).

*Deposition of Marc Bendick, Jr., Ph.D.*, taken August 12, 2006.