1  Brad Seligman (State Bar No. 083838)
2  Jocelyn D. Larkin (State Bar No. (State Bar No. 110817)
   THE IMPACT FUND
3  125 University Avenue
   Berkeley, CA  94710
4  Telephone:  (510) 845-3473
   Facsimile:  (510) 845-3654
5
6  Bill Lann Lee (State Bar No. 108452)
   James M. Finberg (State Bar No. 114850)
7  Daniel M. Hutchinson (State Bar No. 239458)
   LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
8  Embarcadero Center West
   275 Battery Street, 30th Floor
9  San Francisco, CA  94111-3339
   Telephone:  (415) 956-1000
10 Facsimile:  (415) 956-1008

11
   Steve Stemerman (State Bar No. 067690)
12 Elizabeth A. Lawrence (State Bar No. 111781)
   DAVIS, COWELL & BOWE, LLP
13 595 Market Street, #1400
   San Francisco, CA  94105
14 Telephone:  (415) 597-7200
   Facsimile:  (415) 597-7201
15

16 Attorneys for Plaintiffs and the Proposed Class

17                  UNITED STATES DISTRICT COURT

18                NORTHERN DISTRICT OF CALIFORNIA

19

20 SHIRLEY "RAE" ELLIS, LEAH
   HORSTMAN and ELAINE SASAKI, on          Case No.  C-04-3341 MHP
21 behalf of themselves and all others
   similarly situated,                     **SUPPLEMENTAL DECLARATION OF**
22                                          **BARBARA F. RESKIN, PH.D.**
                   Plaintiffs,
23
             v.
24
   COSTCO WHOLESALE
25 CORPORATION,

26                 Defendant.

27

28

1    I, Barbara F. Reskin, declare:

2    I make this supplemental declaration in response to the several reports of Drs.

3    Landy, Saad, Stockdale, and Mulligan of my own personal knowledge and could testify if called

4    as a witness.

### Summary of Opinions

6    I.    Drs. Landy and Stockdale challenge the applicability to this case of
          research based on laboratory experiments on stereotyping and ingroup
7          favoritism because it lacks the individuating information that may reduce
          stereotyping's biasing effects.  However, generalizing from the results of
8          laboratory experiments about basic cognitive processes is appropriate.
          Moreover, the research Drs. Landy and Stockdale cite supporting
9          individuating information is based entirely on laboratory experiments.

10   II.   Drs. Stockdale and Landy exaggerate the capacity of individuating
          information to check the biasing effects of stereotyping.
11

12   III.  Drs. Stockdale and Landy ignore strong evidence of the pervasive and
          biasing effects of sex stereotyping and ingroup favoritism and their effect
13         on women's access to predominantly male jobs.

14   IV.   Drs. Stockdale and Landy ignore evidence that employers' personnel
          practices affect whether sex stereotyping and ingroup favoritism bias on
          promotions decisions.
15

16   V.    Defendant's experts overstate the importance of family roles for women's
          career preferences, relying on the results of dated and poorly designed
17         research. They ignore the fact that workers' preferences are a function in
          part of opportunities that become open to them.

18   VI.   Dr. Landy incorrectly claims that my report does not meet the standards of
          social framework analysis.
19

20   **I.   Drs. Landy And Stockdale Challenge The Applicability To This Case Of Research
      Based On Laboratory Experiments On Stereotyping And Ingroup Favoritism
21    Because It Lacks The Individuating Information That May Reduce Stereotyping's
      Biasing Effects.  However, Generalizing From The Results Of Laboratory
22    Experiments About Basic Cognitive Processes Is Appropriate.  Moreover, The
      Research They Cite Supporting Individuating Information Is Based Entirely On
23    Laboratory Experiments.**

24         1.    Although they reject my use of laboratory research to help understand

25   women's underrepresentation among AGMs and GMs at Costco, Drs. Landy and Stockdale

26   themselves rely on laboratory research to argue that Costco's promotion decisions were not

27   tainted by managers and executives' sex stereotypes because it lacks individuating information

28   that may inhibit the effects of stereotypes.

1          2.        Dr. Landy singles out the Implicit Association Test (IAT) for particular

2    criticism, characterizing "the notion of automatic cognitive processing as an explanation for

3    gender discrimination [as] little more than 'pop' psychology" (first report, ¶14).  Although

4    implicit stereotypes are just one of the forms of cognitive bias that affects promotion decisions,

5    most social psychologists and other social scientists accept this technique for measuring implicit

6    (or automatic) stereotypes (Hunt, Borgida, Kelley and Burgess *et al.* 2002:585).[1]  Indeed, a meta-

7    analysis shows that the IAT predicts behavior better than survey measures of explicit bias

8    (Poehlman *et al.* 2006), and an IAT measure of implicit gender bias predicted discrimination in

9    employment decisions (Rudman and Glick 2001).  Contrary to Dr. Landy's claim, researchers

10   have used the IAT to study gender stereotyping, including Lemm and Banaji (1999), Carpenter

11   (2001), and Rudman and Glick (2001).

12         3.        More generally, the propriety of generalizing the results of laboratory

13   experiments on automatic stereotyping and ingroup favoritism to work settings depends on (1)

14   whether the experimental manipulation falls in the range of what workers encounter at work, (2)

15   whether the research subjects' basic cognitive functioning differs from those in the population,

16   and (3) the degree which subjects are able to consciously control their responses to the

17   experimental manipulation.  To publish in peer-reviewed journals researchers must establish the

18   validity of the experimental manipulation.  Basic cognitive functioning operates the same way in

19   research subjects (usually students) and workers.  Indeed, most undergraduates are workers, either

20   holding or having held jobs.  And almost 40 percent of undergraduates in 2004 were over age 25.[2]

21   Meta-analyses indicate that gender stereotyping effects are consistent across samples of students

22   and of employees; those differences that exist tend to show more evidence of bias among workers

23   than among college students (Hunt *et al.* 2002:587-88).  Finally, much stereotyping research

24   focuses on basic cognitive processes that are normally outside subjects' conscious control.  Just as

25   scientists generalize underlying mechanisms from a small number of subjects in clinical

26   ───────────────

27   [1] *Human Resource Magazine,* published by the Society of Human Relations Managers, recently
     featured the IAT in a cover story (February 2006).

28   [2] National Center for Educational Statistics.  2004.  *Digest of Educational Statistics.* Chapter 3,
     Post-Secondary Education, Table 173.

1    experiments (*e.g.*, on the physiological consequences of exposure to tobacco smoke), research on

2    automatic cognitive processes does not require a large number of subjects from all walks of life to

3    be generalizable.

4    **II.    Drs. Stockdale And Landy Exaggerate The Capacity Of Individuating Information**

5    **To Check The Biasing Effects Of Stereotyping.**

6              4.       Individuating information can curtail the effect of sex stereotyping under

7    specific conditions (Hunt *et al.* 2002:603; Cleveland, Stockdale and Murphy 2000 [hereafter,

8    "Cleveland *et al.*"]:59). Because perceivers automatically prefer information that supports their

9    stereotypes while rejecting inconsistent information, only *unambiguous* individuating information

10   can override stereotypes.  Unambiguous diagnostic individuating information can eliminate the

11   effect of stereotypes on ratings of "targets", but it is *not* effective in curtailing the effect

12   stereotypes have on *predicting the target's behavior*—an outcome especially relevant in

13   promotion decisions (Kunda and Thagard 1996:294).  Glick *et al.* (1988:184) whom Stockdale

14   and her colleagues cite reported the same pattern in the responses by "business professionals" to

15   resumes:  Individuating information curtailed subjects' stereotypes about the applicants'

16   personalities, but they nonetheless preferred male applicants for customarily male jobs and female

17   applicants for customarily female jobs.

18             5.       If perceivers lack the incentive or the cognitive resources to form an

19   individualized impression of the person, they may ignore individuating information. "The mere

20   process of trying to suppress a stereotype consumes cognitive resources, making it harder to

21   process individuating information" (Hunt *et al.* 2002:603).  Individuating information is most

22   effective in suppressing stereotyping when it is relevant to the decision being made. Sometimes,

23   however, decision makers consider gender relevant for some decisions, such as filling a

24   customarily-male job.  Also, irrelevant individuating information can *increase* the impact of sex

25   stereotypes if it makes the target seem more like a "typical man" or "typical woman" (Hunt *et al.*

26   2002:604).

27             6.       Observers encountering several unfamiliar people who differ on several

28   characteristics tend to organize the information about them in terms of a major distinction such as

568517.2                                  - 3 -                              CASE NO. C-04-3341 MHP

1  sex.  As a result, observers often confuse individuals from the same general category.  In addition,

2  when dealing with multiple members of a stereotyped group (*e.g.*, women), observers are likely to

3  recall information that is stereotype-consistent over inconsistent information and to confuse

4  which women the individuating information that they recall applies to (Kunda and Thagard

5  1996:303).  Individuating information that reveals high sex-atypical skills among female

6  candidates for customarily male jobs can reduce observers' assessment of their sex-typical skills

7  (Rudman and Glick 2001).

8          7.      For individuating information to reduce bias, a decision maker must have

9  time, motivation, and the information must be job related.  When Costco's managers recount

10  having known promotion candidates for years and having already ranked them on a promotable

11  list, they are unlikely to be motivated to acquire individuating information that would offset any

12  automatic stereotypes which they are unaware they hold.  One- to two-hour warehouse walks

13  every month or two by the district and regional executives who ultimately must decide whom to

14  promote to AGM or GM are unlikely to provide *current, accurate, job-related* individuating

15  information for the hundreds of workers these decision makers encounter in each warehouse they

16  supervise.  In sum, Costco's procedures for selecting AGMs and GMs do not meet the conditions

17  for individuating information to nullify the effects of explicit or implicit sex stereotypes or

18  ingroup favoritism.

19  **III.    Dr. Stockdale And Landy Ignore Strong Evidence Of The Pervasive And Biasing**
        **Effects Of Sex Stereotyping And Ingroup Favoritism And Their Effect On Women's**
20      **Access To Predominantly Male Jobs**

21          8.      Sex stereotypes operate as "implicit knowledge" that decision-makers draw

22  on and that "influence [people's] perceptions of individual men and women" (Cleveland *et al.*:42-

23  43).  Dr. Stockdale (Costco's expert on stereotyping) and Dr. Landy ignore or substantially

24  misstate well-established scholarship about sex stereotyping and the impact of stereotyping on

25  women's underrepresentation in high-level jobs.  Dr. Stockdale's coauthored book on sex

26  stereotyping and women's and men's careers *contradicts* most of her and Dr. Landy's opinions

27  about sex stereotyping and *supports* my opinions on sex stereotyping and its adverse effects on

28  women's careers (Cleveland *et al.* :54-65).

568517.2                                    - 4 -                          CASE NO.  C-04-3341 MHP

9.      When decision makers are busy or under time pressure, or their cognitive resources are otherwise taxed, they are less able to attend to many details and hence are more likely to base decisions on stereotypes (Bodenhausen *et al.* 1998:319; Fiske 1998:389; Hunt *et al.* 2002:613).  According to Hunt and her colleagues, sex stereotypes are activated when participants have high cognitive demands and little incentive not to stereotype, they are less likely to be activated when participants have high cognitive demands but are motivated not to stereotype, and they are eliminated when participants are motivated to avoid stereotyping and have light cognitive loads (Hunt et al. 2002:612-13; Goodwin *et al.* 1998:694).  As Dr. Stockdale's book states, sex stereotypes play an important role in sex discrimination (Cleveland *et al.* :56-57), in part by operating as implicit knowledge that decision-makers draw on and that "influence [people's] perceptions of individual men and women" (Cleveland *et al.* :43).

10.      Researchers substantially agree that these gender stereotypes have small but consistent effects on decision makers' evaluations, attributions, and employment decisions, especially regarding women who act in stereotype-inconsistent ways (Hunt *et al.* 2002:616-17).  These small effects accumulate, leading over time to nontrivial long-run consequences.  For this reason, Stockdale and others recognize that sex stereotypes play an important role in sex discrimination (Heilman 1995; Cleveland *et al.* :56-57).

11.      Sex stereotyping influences job assignments, concentrating women in predominately female jobs and men in predominately male jobs (Reskin 1993).  Both sex stereotypes and the sexes' segregation into different jobs lead jobs to be defined (or "labeled") as "male" or "female".  This labeling perpetuates job segregation, as Dr. Stockdale's book indicates (Cleveland *et al.* :313).  Costco's disproportionate assignment of female applicants for senior staff jobs illustrates how job segregation is maintained (*see* ¶28 for details).

12.      Sex stereotypes influence gatekeepers' perceptions of workers who hold jobs atypical for their sex.  Drawing on Kanter's (1977) case study of a major organization, Stockdale's book explains that majority-sex workers tend to have distorted impressions of co-workers from the minority sex, exaggerating their differences from the majority sex while ignoring their similarities (Cleveland *et al.* :165).

13.     Managerial jobs have been stereotyped as male and have become associated with stereotypically male attributes and, as a result, male attributes became associated with succeeding in those jobs (Kanter 1977; Cleveland *et al.* :303; Hunt *et al.* 2002:598).  As Stockdale and her coauthors acknowledge, although women and men do not differ in managerial ability or motivation, women are perceived to have fewer of the attributes associated with managerial effectiveness than men.  The fact that the male sex stereotype is consistent with the occupational stereotype of a manager, while the stereotype of a woman is not, "spells trouble for women attempting to enter and succeed in the managerial ranks" (Cleveland *et al.* :163).

14.     Dr. Landy (second decl., ¶ 3) contends that my claim that jobs' sex composition and their "labels" as "women's work" or "men's work" affect women's access to sex-atypical jobs is moot because I do not specify cutting points that define a job as predominately female or male (Cohen *et al.* 1998:722).  In fact, because job segregation is high in many firms, many jobs can be accurately characterized as disproportionately male or disproportionately female (Tomaskovic-Devey *et al.* 2006:585).  On a related point, Dr. Landy is wrong in claiming in paragraph 3 of his second report that there is "no gender typing of staff managers' jobs."  Costco's own data show women disproportionately work as front end and administrative managers, and merchandising and receiving managers are disproportionately male.  Importantly, the proportion of women employed in a job is positively associated with the likelihood that a woman will be hired or promoted into that job (Cohen *et al.* 1998; Reskin *et al.* 1999).  As Stockdale's book asserts, "Jobs that are mainly held by men tend to have male stereotypes, whereas jobs that are mainly held by women tend to have female stereotypes, almost independent of the content of the job" (p. 164; *see also* Hunt *et al.* 2002:598).

15.     As Dr. Landy admitted in his deposition, he is in the minority in his view of automatic cognitive processing.  Research on conscious and implicit stereotyping is generally accepted in the social scientific community, routinely appears in the top journals, and has been the subject of special issues of several major journals (Fazio and Olson 2003:307-10; Kunda and Thagard 1996).  In addition, Dr. Landy misquotes me as saying "human information processing is universally flawed with respect to the influence of gender on personnel decisions" (first decl., 48).

1  I made no such assertion. I cite a body of research that establishes that people's automatic

2  cognitive need to simplify the multitude of stimuli barraging them necessitates taking "cognitive

3  shortcuts" such as categorization, ingroup favoritism, and stereotyping (Reskin Decl., ¶¶ 13-18).

4  However, as I show below, employers can prevent these cognitive shortcuts from harming either

5  sex.

6        16.    Stereotypes about woman are not necessarily negative, as Dr. Landy

7  implies (first decl., 93-98). In fact, *both* sexes often associate positive images with women more

8  readily than with men (Hunt *et al.* 2002:509).[3] I did not claim that Costco's male decision makers

9  harbor negative stereotypes about women. In my opinion, the sex stereotype at Costco that harms

10  women is that women are primarily oriented to their families and hence eschew jobs as AGMs or

11  GMs. This stereotype limits women's access to such jobs.

12        17.    Because Dr. Landy mistakenly equates "ingroup membership" with

13  membership in an organization's elite, his critique of my discussion of categorization and ingroup

14  favoritism is irrelevant (first decl., 98-99). An extensive body of research has shown that people

15  automatically categorize others into ingroups and outgroups based on the similarity of personal

16  characteristics, such as sex and age. Importantly, we automatically favor and trust members of

17  our ingroup over outgroup members (Brewer and Brown 1998; Hunt *et al.* 2002:606). Even

18  groups created on the basis of inconsequential attributes practice ingroup favoritism (Fazio and

19  Olson 2003:307; Kunda and Thagard 1996). Ingroup favoritism is particularly likely when

20  corporate managers are filling positions that involve uncertainty (Kanter 1977:48, 63). In

21  organizations like Costco in which most decision makers are male, automatic ingroup favoritism

22  tends to exclude women from top jobs unless companies implement personnel structures that

23  check its biasing effects (discussed below).

24

25

26

27

---

28  [3] I did not say that Greenwald and his colleagues said that *only* "men carry implicit negative
associations about women," contrary to Dr. Landy's misstatement in his first report (¶5).

**IV.   Drs. Stockdale And Landy Ignore Substantial Evidence That Employers' Personnel Practices Affect Whether Sex Stereotyping And Ingroup Favoritism Bias Promotions Decisions**

18.   Sociological, psychological, and organizational research has shown that personnel structures can mitigate the biasing effects of ingroup favoritism and stereotyping. Because sex stereotypes replace missing information and sex stereotyping and ingroup favoritism distort decision makers' recollections, processes that ensure that decision-makers have relevant information on all decision criteria for every promotion candidate reduce the *incidence* of stereotyping and the *impact* of cognitive distortions. Employers minimize bias in promotion decisions by using objective, reliable, and timely information that is directly relevant to job performance (Heilman 1995). For objective measures to minimize cognitive bias, organizations must provide a detailed specification of all performance criteria along with precise information for each candidate on each criterion. In addition, they must maintain written records with standard information for all candidates, and examine that information for each candidate with respect to the written, detailed job requirements when filling openings. The more formalized (or standardized) an employers' personnel practices, the higher its proportion of female managers, according to an analysis of a representative sample of U.S. firms (Reskin and McBrier 2000). In using standardized data and standardized procedures, firms reduce decision makers' discretion that permits biases of which those decision makers may be unaware. A simple illustration clarifies how structures can reduce explicit or automatic biases. Women's inclusion in major symphony orchestras increased as a direct result of orchestras implementing blind auditions in which auditioners performed behind screens, so that judges' explicit or implicit sex stereotypes or ingroup favoritism could not distort their assessments of the auditioners (Goldin and Rouse 2000). In contrast, Costco has not implemented any standardized procedures to promote top warehouse managers, opting instead for a system based entirely on district and regional executives' discretion.

19.   The discretionary process occurs to a considerable degree through the warehouse walk which Dr. Landy characterized as a "best practice" (first report, Table 10). These walks provide the primary opportunity for regional and district managers to acquire

SECOND DECLARATION OF BARBARA F. RESKIN, PH.D.

1   individuating information about possible promotees. Regional and district executives typically

2   choose whom to accompany them on walks, choices vulnerable to cognitive bias. This and

3   Costco's other procedures for identifying candidates for promotion do not meet the standards for

4   individuating information to nullify the effects of sex stereotyping. These periodic and short

5   exposures to some senior staff during a walk whose primary purpose is to assess the performance

6   of the warehouse make it all but impossible for regional and district managers to acquire and

7   retain current, job-relevant individuating information for *all* staff qualified for promotion.

8         20.    Standardizing performance evaluations is necessary for eliminating the

9   effects of cognitive biases that operate systematically against women, but it will not increase

10   women's access to top managerial positions unless decision-makers systematically consult those

11   evaluations for all promotion candidates *before* making promotion decisions (Edelman 1992).

12         21.    Dr. Landy disagrees that bureaucratized promotion systems are less subject

13   to bias (first decl., 58-60). Indeed, he claimed in his firstdeclaration that the bureaucratic model

14   is outdated and that standardization would "[s]trangle" human resources (59). In his second

15   declaration he claimed that I deny that Costco is a bureaucracy (¶18).[4] Neither of these claims is

16   true. Costco has bureaucratized almost all facets of its business through its centralized structure

17   and reliance on planning, record keeping and monitoring performance. It does this, presumably,

18   to reduce the likelihood of capricious decisions or costly mistakes that result from unchecked

19   discretion. Costco's failure to standardize the methods through which it promotes employees to

20   AGM and GM stands out in contrast to its otherwise bureaucratized practices.

21         22.    Employers' personnel policies and practices can reduce the biasing effects

22   of stereotyping and ingroup favoritism in part by holding decision makers *accountable* for their

23

---

24   [4] Bureaucracies are organizational systems that rely on written rules and records, standardized

25   practices, hierarchical authority (including accountability), and the separation of a position from
its incumbent. Written procedures and records and emphasis on standardized practices are
necessary to reduce the likelihood of capricious or unequal treatment. According to the National

26   Organizations Survey, 70 percent of a representative survey of almost 600 U.S. work
organizations had a bureaucratic structure (Kalleberg *et al.* 1996:109). A strong majority of the

27   organizations in the survey had formalized personnel structures (Kalleberg *et al.* :chapter 4). The
researchers concluded that "modern organizations are dominated by the use of bureaucratic

28   systems of control" (p. 217).

1    decisions.  When decision makers know that they will be held accountable for making fair

2    decisions, their stereotypes are less likely to affect their decisions (Hunt *et al.* 2002:609; Tetlock

3    1985, 1992).  Costco has not implemented any accountability structures with respect to decisions

4    regarding whom to promote to GM and AGM.  Decision makers are not accountable for how they

5    reached their decision, what that decision is, whether they have goals, or whether they achieve

6    those goals.  According to the depositions of district and regional vice presidents, their bonuses

7    do not depend on their performance in increasing diversity among GMs and AGMs.  In the

8    absence of a system of accountability, promotions into predominantly-male jobs based entirely on

9    the discretion of a predominantly male executive staff will tend to maintain those jobs' sex

10    makeup.

11    　　　　　23.　　　Contrary to Dr. Landy's contention, Costco's practice of identifying

12    prospective AGMs and GMs well in advance of a promotion decision is exclusionary and

13    vulnerable to bias stemming from cognitive distortions (Landy first decl., 69-73).  Costco's

14    practice of providing special opportunities to "superstars" whom executives see as prospective

15    GMs creates a self-fulfilling prophecy of success for a few, while limiting the opportunities of

16    others.  In contrast, posting all jobs ensures that all interested candidates have an opportunity to

17    apply.

18    　　　　　24.　　　Personnel structures reduce bias only to the extent that organizations

19    actually use them in making personnel decisions. Standardizing performance evaluations, for

20    example, will not increase women's access to top managerial positions unless decision-makers

21    systematically consult those evaluations for all promotion candidates before making promotion

22    decisions.  Edelman's research on organizations that have adopted EEO or diversity initiatives do

23    so either symbolic gestures or as part of substantive change (Edelman 1992).  Edelman would

24    characterize Costco's attention to diversity at the level of warehouse management as a symbolic

25    rather than a substantive response to the BOLD Initiative because it entailed no procedural

26    changes in promotion practices for GMs and AGMs.  Without substantive changes, symbolic

27    gestures do not alter the gender composition of high level jobs (Edelman 2005).

28

25.     A recent study of women's representation in management jobs across several hundred firms demonstrate the importance of substantive structures. Women's share of managerial jobs was positively associated with organizations' implementing procedures to ensure gender equality—affirmative action plans (*i.e.*, goals and timetables), full-time diversity staff, diversity task forces, and diversity evaluation. In contrast, diversity training which tends to be a one-shot event, often provided by outside consultants, did not increase white women's access to managerial jobs, and it reduced the access of black women (Kalev *et al.* 2006:600, 602-04 ).

26.     Costco's own data demonstrate the value of standardized personnel procedures for eliminating inadvertent sex biases. Their experts cited the fact that female staff managers had higher average evaluations than men as evidence that Costco does not discriminate against women.[5]  Other data show no gender-based pay disparities (net of position).  These patterns are consistent with the fact that Costco's evaluation and compensation systems are standardized, minimize decision makers' discretion, and give employees clear feedback.[6]  In contrast, Costco's practice of promoting workers to warehouse management lacks any standardization or check on the decision makers' discretion, and Costco does not regularly provide feedback to aspiring AGMs and GMs as to their promotion prospects, and women are underrepresented among AGMs and GMs. The lesson is clear:  when Costco standardized evaluation and reward structures, it checked sex bias.  When it relied on the discretion of district and regional vice presidents, it allowed cognitive distortions associated with their conscious and implicit stereotypes to exclude qualified women.

---

[5] Female managers' significantly higher evaluations led Costco's experts to infer that Costco did not discriminate against women (Landy first decl., 79-80; Saad dep. :53-54). Women's higher scores could reflect real performance differences, and the simple fact that women's average scores exceed men's does not rule out the possibility that women received lower scores than they merited.

[6] Because neither system is behaviorally based and Costco does not include on the evaluation form how evaluators are supposed to decide what score a subordinate deserves or how to weight each of the dimensions in arriving at a total score (*e.g.*, CRE0125217), these are not ideal systems.

568517.2                                  - 11 -                          CASE NO. C-04-3341 MHP

**V.** **Defendant's Experts Overstate The Importance Of Family Roles For Women's Career Preferences, Relying On The Results Of Dated And Poorly Designed Research. They Ignore The Fact That Workers' Preferences Are A Function In Part Of Opportunities That Become Open To Them.**

27.    Costco's experts attribute the gender disparity in warehouse management to women's lack of interest in these jobs and contend that women lack interest in these jobs because of their commitment to their families. Their evidentiary basis for these assumptions is weak. They also disregard factors over which Costco does have control that affect workers' aspirations, particularly meaningful assurances that advancement opportunities exist for women.

28.    In keeping with their "supply-side" approach, neither Dr. Saad nor Dr. Mulligan acknowledged that Costco's decision-makers play *any* role in the sexes' segregation into different warehouse management jobs. However, Dr. Saad's second declaration shows that Costco substantially overselected female applicants for predominantly-female jobs. Although women comprised just 42 percent of the applicants, they were 72 percent of those promoted to membership and marketing managers. Decision-makers also overselected female applicants to be assistant front-end managers: women were 34 percent of the applicants, but 45 percent of those hired (Saad Decl. 2, Exh. 28), although there was no shortage of male applicants—over 1000 men applied to postings for these jobs. In disproportionately assigning women to feeder jobs for front-end and administrative manager, Costco perpetuated sex segregation, while simultaneously signaling to its workers that women belong in some jobs.

29.    Dr. Stockdale exaggerates the importance of family roles for the career preferences of women employed at Costco by using dated evidence and poorly designed studies. For example, among the evidence she cites with dubious generalizability to Costco employees are a 1977 survey sample of adults who work as little as 20 hours a week, a study using 1988 data limited to white women, a 1988 study of dual-earner couples, a convenience sample of 336 parents of children at daycare centers, and 252 working parents employed in a Canadian firm (Decl.1: 14-23). Although these studies conclude that women do more domestic work and childcare than men do, none show that a woman's share of childcare is related to her willingness to accept a managerial job.

30.     Based on two studies, Dr. Stockdale concluded in her first declaration that women are less likely than men to accept management positions requiring relocation ( 40). One source is a 1977 survey of 359 members of dual-career families that asked respondents if they would move if—*hypothetically*—their spouse received a higher-paying job in another city (30-32). The relative earnings of husbands and wives in 1977 cast doubt on the hypothetical. More generally, women's labor market status compared to their husband's has changed so dramatically that we cannot extrapolate the findings from 1977 to the early twenty-first century. (The other study Stockdale cited used a "convenience sample" whose study design does not meet scientific standards and whose results cannot be generalized to any known population.)

31.     Dr. Saad's first declaration shows that men who were staff managers in 1999 transferred more frequently than women, although the transfer rate for both sexes was low (Exh. 41). However, when he took into account whether sample members had been promoted to AGM, the sex difference becomes statistically insignificant (Saad dep. :162). Importantly, both women and men who had been promoted to AGM were about twice as likely to have moved as those who had not been promoted (Saad report, Exh. 42). One interpretation of these results which Dr. Saad does not acknowledge is that a promotion to AGM is an incentive for both sexes to move, so that the sex difference in moving may result in part from a sex difference in promotion offers. Other research raises the same possibility. Female managers employed at twenty Fortune 500 firms had relocated slightly less often than their male counterparts, but the researchers acknowledge that one cannot tell how much of this sex difference is due to being offered an advancement opportunity that involves moving and how much is due to whether the sexes differ in how often they accept such offers. However, the women studied were as willing to accept an international assignment as the men (Brett and Stroh 1999:396). As noted above, a large body of sociological research supports the assumption that people's "preferences" change in response to opportunities open to them.

32.     In her first declaration, Dr. Stockdale attributes her presumption that women and men differ in their preference for warehouse management to gender role socialization (23), as does Dr. Mulligan when he suggests in his report that "a woman may have learned from

1   her parents that women 'ought to' limit their work hours in order to have time to care for children

2   and housework" (¶43). These speculations ignore the fact that socialization is a life-long process

3   in which *on-going* social rewards and punishments from a variety of sources shape or reinforce

4   workers' preferences and behavior (Epstein 1988; Reskin and Hartmann 1986:81; Reskin *et al.*

5   1999). Dr. Stockdale does acknowledges the importance of opportunities and the lack thereof in

6   writing that "[b]arriers to women's employment opportunities . . . are the sources of differences in

7   job attribute preferences . . . if they cause women to re-evaluate (*i.e.*, lower) their career

8   aspirations" (pp. 24, 27). She wrote that people's occupational preferences depend to a

9   considerable degree on the opportunities and constraints that they encounter. Just as barriers can

10  lead workers to lower their preferences, awareness of opportunities can cause them to raise their

11  sights (Kanter 1977:129-65; Cassirer and Reskin 2000). For example, surveys have shown that

12  workers' preferences as well as whether they hold disproportionately-male, sex-integrated, or

13  disproportionately-female jobs fluctuate over time and in response to opportunities. As

14  predominately-male jobs have become open to women, women have flocked to them (Jacobs

15  1989; Reskin and Roos 1989; Rosenfeld 1992; Padavic and Reskin 2002).

16          33.     Based on economic theory, Drs. Saad and Mulligan claim that women are

17  underrepresented among AGMs and GMs because women choose not to pursue these jobs (for a

18  discussion of the theoretical argument, *see* Bendick's Decl., Section III).[7] Drs. Saad and

19  Mulligan make two erroneous assumptions about women's preferences and the female labor

20  supply. The first is that raising children deters women from accepting high-level managerial jobs;

21  the second is that this preference substantially reduces the supply of promotable female

22  employees at Costco. My analyses of two data sets—the IPUMS data for the over 4 million

23  women employed full-time in retail sales and Dr. Saad's sample of the performance evaluations

24  of 281 Costco managers—cast doubt on both assumptions (Saad Report 1:52, Exh. 37).

25          34.     Over sixty percent of women employed in retail sales in the IPUMS data

26  from the 2000 census had no children under age 18. Among these women, I selected the two

---

[7] For the sake of accuracy, I should mention that Dr. Saad also relied on the experience of a single
female Costco employee whom he testified chose to defer promotion for family reasons (p. 13).

occupational groups that Dr. Saad identified as corresponding in responsibilities to Costco's general managers and senior staff managers.[8] Of the almost quarter million women employed full time in retail sales as general managers, 63 percent had no children under age 18. Among the almost one million women employed full time as first-line supervisors of sales workers in the retail sales industry, 60 percent had no children under age 18. According to Dr. Saad's second report using Costco's "dependent" data, 48 percent of comparable female Costco employees have no children under age 18. Thus, the supply of women without child-based scheduling constraints at Costco cannot account for women's underrepresentation in top warehouse management.

35.     In addition, the presence of children—even pre-school children—does not deter American women from pursuing careers as managers. According to my analyses of the IPUMS data, more than 83,000 mothers of children under 18 worked full time as general managers in retail sales, as did more than 33,000 mothers of children under six. Among women employed full time as first-line supervisors of sales workers, almost 362,000 had children under 18, and more than 134,000 had children under six.

36.     My results from analyzing the performance evaluations of 281 Costco managers in Dr. Saad's sample are consistent with these national data. As part of the performance-evaluation process, Costco employees have an opportunity to discuss their career goals and any constraints.[9] Dr. Saad claimed that these data included many examples of women indicating that they wanted to postpone promotion because of family considerations (Saad dep. :186). In fact, the performance evaluations of only nine male and nine female managers mentioned family constraints. Similarly, all of Costco's experts assume that women prioritize family over advancement at work and identified early starting or erratic schedules as deterrents

---

[8] I restricted the sample to women between the ages of 22 and 64. Like Dr. Saad, I selected women who worked more than 35 hours a week and who had some earnings, but I did not further restrict the sample by earnings for the reasons Dr. Bendick outlined in his second declaration.

[9] Although many sample members had multiple performance evaluations over the four years for which Dr. Saad had data, I used only the most recent evaluation for any sample member.

1 for mothers with children at home. According to my tabulations, just four men and one woman

2 mentioned time or scheduling constraints in this sample of performance evaluations.[10]

3         37.    The performance evaluation data sometimes included workers' career

4 aspirations. According to my tabulation, virtually identical proportions of male and female

5 AGMs aspired to be GMs, as did very similar proportions of merchandise managers and

6 administrative managers. A higher proportion of male than female front-end managers aspired to

7 become GMs, but the reverse is true for receiving managers.

8 **VI.   Social Framework Analysis**

9         38.    Dr. Landy asserts that my report does not meet the standards of social

10 framework analysis as described by Monahan and Walker (1991; Landy Decl.1:27). He is

11 wrong. Social framework analysis uses general scientific knowledge to construct a frame of

12 reference or background context for the factual issues crucial to the resolution of a specific case

13 (Walker and Monahan 1987:559). I reviewed testimony, documents, and other quantitative and

14 qualitative information about the case in order to draw conclusions about how *extant* social

15 science theory and research applies to the specific circumstances of the organizational setting in

16 which discrimination is alleged to have occurred. I evaluated these data in the context of social

17 science scholarship on factors that produce, maintain, and minimize bias. I relied on the findings

18 of a large body of interdisciplinary, peer-reviewed social science research on factors that create

19 and sustain bias and those that minimize it, and compared them with Costco's policies and

20 practices and the stated beliefs of the executives who decided whom to promote to AGM and

21 GM. Dr. Landy tried to cast doubt on the findings by misclassifying the scientific literature that I

22 cited as essays or theories rather than empirical research (first report :Table 2).[11]

23

---

24 [10] Men's comments included "I must stay on the morning shift so that I am able to pick up [my children] from school" (center manager); "I can't work many hours over 45. I play a great part in my children's lives" (hardlines manager); "I would like someone to . . . say that I have been a
25 successful merchant so that I may move on to more normalized hours" (merchandise manager); and "regular days off like Fri., Sat.—Sat., Sun.—Sun, Mon.—so I can see my family"
26 (merchandise manager). The woman who mentioned schedules (an administrative manager) sought "earlier shifts, weekend day(s)" (tabulated from Dr. Landy's first report, Appendix G and
27 Dr. Saad's sample data).

28 [11] For example, Dr. Landy did not classify as "empirical" monographs such as Kanter's, or articles or books that critically review a body of empirical research (*e.g.*, Baron and Pfeffer 1994; Reskin

39.     Dr. Landy comments in his second report that I could not offer any examples of scholarship that uses social framework analysis with respect to gender discrimination during my deposition. After the deposition I recalled one example with which Dr. Landy is surely familiar: a chapter by Barbara Gutek and Margaret Stockdale in his book *Employment Discrimination Litigation* which Dr. Landy edited.[12]

## CONCLUSIONS

40.     Costco's experts disregard a large body of peer-reviewed research conducted with a variety of recognized methods by members of multiple scholarly disciplines that establishes that cognitive distortions—automatic ingroup favoritism and conscious and implicit as well as explicit sex stereotypes—contribute to women's underrepresentation in management jobs. They completely ignore the fact that employers can implement personnel practice that check these biases. Costco's experts emphasize women's preferences. I do not argue that workers' preferences play no role in the jobs they hold. But Costco's experts ignore both the evidence of explicit and implicit bias and the fact that employers' personnel practices can minimize the effects of these biases. It is my opinion that decision makers' cognitive distortions and Costco's failure to implement structures that have been shown to mitigate those distortions contribute to a considerable degree to women's low representation among Costco's AGMs and GMs. Women's increased representation in warehouse management in the short period since this lawsuit was filed could not result from these female employees suddenly shedding their family responsibilities or sex-role socialization. Rather this increase provides a preview of what happens when employers prioritize achieving a more balanced managerial workforce (Sturm 2000).

Signed this 15th day of October at Seattle, Washington.

_Barbara Reskin_
Barbara F. Reskin

---

and Hartmann 1985, Reskin 1998; Reskin *et al.* 1999; Padavic and Reskin 2002—all highly cited publications published by selective peer-reviewed journals or presses).

[12] For another example, see Fiske and Borgida 1999.

1 | **REFERENCES**

2 | Baron, J.N. and J. Pfeffer. 1994. "The Social Psychology of Organizations and Inequality." *Social Psychology Quarterly* 57:190-209.

3

4 | Bodenhausen, G.V., C.N. Macrae, and J. Garst. 1998. "Stereotypes in Thought and Deed: Social Cognitive Origins of Intergroup Discrimination." Pp. 311-36 in C. Sedikides, J. Schopler, and C. A. Insko (eds.), *Intergroup Cognition and Intergroup Behaviors*. Mahway, N.J.: Erlbaum.

5

6 | Brett, J.M. and L.K. Stroh. 1999. "Women in Management: How Far Have We Come and What Needs to Be Done." *Journal of Management Inquiry* 8:392-98.

7 | Brewer, M.B. and R.J. Brown. 1998. "Interpersonal Relations. Pp. 554-94 in D.T. Gilbert, S.T. Fiske, and G. Lindzey (eds.), *Handbook of Social Psychology*. NY: McGraw-Hill.

8

9 | Cassirer, N.R. and B.F. 2000. High Hopes: Organizational Location, Employment Experiences, and Women's and Men's Promotion Aspirations. *Work and Occupation* 27:438-63.

10 | Carpenter, S.J. 2001. "Implicit Gender Attitudes." Unpublished doctoral dissertation, Yale University.

11

12 | Cleveland, J.N., M. Stockdale, and K.R. Murphy. 2000. *Women and Men in Organizations*. Mahwah, NJ: Erlbaum.

13 | Cohen, L.E., J.P. Broschak, and H.A. Haveman. 1998. "And Then There Were More: The Effects of Organizational Sex Composition on Hiring and Promotion. *American Sociological Review* 63:711-27.

14

15 | Edelman, L.B. 1992. "Legal Ambiguity and Symbolic Structures: Organizational Mediation of Civil Rights Law." *American Journal of Sociology* 97:1531-76.

16

17 | Edelman, L.B. 2005. "Law at Work: The Endogenous Construction of Civil Rights." Pp. 357-72 in Nielsen and Nelson (eds.). *Handbook of Discrimination Research*. Springer.

18 | Epstein, C.F. 1988. *Deceptive Distinctions*. New Haven: Yale.

19 | Fazio, R.H. and M.A. Olson. 2003. "Implicit Measures in Social Cognition Research." *Annual Review of Psychology* 54:297-327.

20

21 | Fiske, S.T. 1998. "Stereotyping, Prejudice and Discrimination." In D.T. Gilbert, S.T. Fiske, and G. Lindzey (eds.), *Handbook of Social Psychology*. NY: McGraw-Hill.

22 | Fiske, S.T. and E. Borgida. 1999. "Social Framework Analysis as Expert Testimony in Sexual Harassment Suits." Pp. 575-83 in S. Estreicher (ed.), *Sexual Harassment in the Workplace*. Boston: Kluwer Law International.

23

24 | Fiske, S.T. and S.E. Taylor. 1991. *Social Cognition*. NY: McGraw-Hill.

25 | Glick, P., C. Zion, and C. Nelson. 1988. "What Mediates Sex Discrimination in Hiring Decisions?" *Journal of Personality and Social Psychology* 98:131-51.

26

27 | Goldin, C. and C. Rouse. 2000 "Orchestrating Impartiality: The Impact of "Blind" Auditions on Female Musicians." *American Economic Review* 90:715-41.

28

Goodwin, S.A., D. Operario, and S.T. Fiske. 1998. "Situational Power and Interpersonal Dominance Facilitate Bias and Inequality." *Journal of Social Issues* 54:677-98.

Heilman, M. E. 1995. "Sex Stereotypes and Their Effects in the Workplace: What We Know and What We Don't Know." *Journal of Social Behavior and Personality* 10:3-26.

Jacobs, J.A. 1989. *Revolving Doors.* Stanford: Stanford University Press.

Hunt, J.S., E. Borgida, K. M. Kelley, and D. Burgess. 2002. "Gender Stereotyping: Scientific Status," pp. 580-620 in *Modern Scientific Evidence: The Law and Science of Expert Testimony, Vol. 2,* edited by D. Faigman, D. H. Kaye, M. J. Sacks, and J. Sanders. West: St. Paul.

Kalev, A., F. Dobbin, and E. Kelly. 2006. "Best Practices of Best Guesses? Assessing the Efficacy of Corporate Affirmative Action and Diversity Policies." *American Sociological Review* 71:589-617.

Kalleberg, A.L., D. Knoke, P.V. Marsden, and J.L. Spaeth. 1996. *Organizations in America.* Sage.

Kanter, R. 1977. *Men and Women of the Corporation.* NY: Basic.

Kunda, Z. and P. Thagard. 1996. "Forming Impressions from Stereotypes: Traits and Behaviors." *Psychological Review 103*:284-308.

Lemm, K. and M.R. Banaji. 1999. "Unconscious Attitudes and Beliefs about Men and Women." Pp. 15-35 in *Perceiving and Performing Gender,* edited by U. Paseor and F. Brown. Opladen Germany: Westdutscher Verlag.

Monahan, J. and L. Walker. 1991. "Judicial Use of Social Science Research. *Law and Human Behavior* 15:571-84.

Padavic, I. and B.F. Reskin. 2002. *Women and Men at Work.* Thousand Oaks, CA: Sage.

Poehlman, T.A., E. Uhlmann, A.G. Greenwald, and M.R. Banaji. 2006. "Understanding and Using the Implicit Association Test: III. Meta-analysis of predictive Validity." Under review.

Reskin, B.F. 1993. "Sex Segregation in the Workplace." *Annual Review of Sociology* 19:241-70.

Reskin, B.F. 1998. *The Realities of Affirmative Action.* Washington, D.C.: American Sociological Association.

Reskin, B.F. and H.I. Hartmann. 1986. *Women's Work, Men's Work: Sex Segregation on the Job.* Washington, D.C.: National Academy Press.

Reskin, B.F. and D.B. McBrier. 2000. "Why Not Ascription? Organizations' Employment of Male and Female Managers. *American Sociological Review* 65: 210-33.

Reskin, B.F., D.B. McBrier, and J. Kmec. 1999. "The Determinants and Consequences of Workplace Sex and Race Composition." *Annual Review of Sociology* 25:335-61.

Reskin, B.F. and P.A. Roos. 1999. *Job Queues, Gender Queues: Explaining Women's Inroads into Customarily Male Occupations.* Philadelphia: Temple.

Rosenfeld, R.A. 1992. "Job Mobility and Career Processes." *Annual Review of Sociology* 18:39-61.

Rudman, L.A. and P. Glick. 2001. "Prescriptive Gender Stereotypes and Backlash toward Agentic Women. *Journal of Social Issues* 57, 743-762.

Stockdale, M.S. 2006. Expert report in Browning v. Southwest Institute.

Sturm, S. 2001. "Second Generation Employment Discrimination: A Structural Approach." *Columbia Law Review* 101:458-568.

Tetlock, P.E. 1985. "Accountability: The Neglected Social Context of Judgment and Choice." *Research in Organizational Behavior* 7:297-332.

Tetlock, P.E. 1992. "The Impact of Accountability on Judgment and Choice: Toward a Social Contingency Model." *Advances in Experimental Social Psychology* 25:331-76.

Tomaskovic-Devey, D. C. Zimmer, K. Stainback, C. Robinson, T. Taylor, and T. McTague. 2006. "Documenting Desegregation: Segregation in American Workplaces by Race, Ethnicity and Sex." *American Sociological Review* 71:565-88.

Walker, L. and J. Monahan. 1987. "Social Frameworks: A New Use of Social Science in Law." *Virginia Law Review* 76:877-96.