IMPACT FUND
Brad Seligman (SBN: 83838)
Jocelyn D. Larkin (SBN: 110817)
Michael Caesar (SBN: 280548)
125 University Ave., Suite 102
Berkeley, CA  94710
Telephone: (510) 845-3473
Facsimile:  (510) 845-3654
jlarkin@impactfund.org

LIEFF CABRASER HEIMANN &
BERNSTEIN
Kelly M. Dermody (SBN: 171716)
Daniel M. Hutchinson (SBN: 239458)
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008
kdermody@lchb.com

LEWIS, FEINBERG, LEE, RENAKER &
JACKSON, P.C.
Bill Lann Lee (SBN: 108452)
Julia Campins (SBN: 238023)
476 9th Street
Oakland, CA  94607
Telephone: (510) 839-6824
Facsimile: (510) 839-7839
blee@lewisfeinberg.com

DAVIS, COWELL & BOWE, LLP
Steve Stemerman (SBN: 067690)
Elizabeth A. Lawrence (SBN: 111781)
595 Market Street, #1400
San Francisco, CA 94105
Telephone: (415) 597-7200
Facsimile: (415) 597-7201
eal@dcbsf.com

[Additional Counsel Listed on Signature Page]

Attorneys for Plaintiffs and the Proposed
Classes

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHIRLEY "RAE" ELLIS, LEAH HORSTMAN, and ELAINE SASAKI on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>COSTCO WHOLESALE CORPORATION,<br><br>Defendant. | Case No.: C-04-3341 EMC<br><br>**NOTICE OF CROSS-MOTION AND CROSS-MOTION FOR CLASS CERTIFICATION AND OPPOSITION TO MOTION FOR ORDER ELIMINATING CLASS CLAIMS**<br><br>Date:       July 31, 2012<br>Time:      1:30 p.m.<br>Judge:     Hon. Edward M. Chen<br>Courtroom: 5 |

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

RELIEF SOUGHT ....................................................................................................... 1

I.     INTRODUCTION AND SUMMARY OF ARGUMENT ..................................... 1

II.    PROCEDURAL HISTORY AND EFFECT OF PRIOR DECISIONS .................. 2

III.   FACTUAL BACKGROUND AND FINDINGS ................................................... 4

     A.   Costco Has Uniform Warehouse Management Structure and Personnel ..................................................................................................... 5

     B.   Costco Has a Uniform Promotion System ................................................... 5

     C.   Costco's Decision-Makers Share a Common Understanding of How to Make Promotion Decisions ..................................................................... 8

     D.   Senior Costco Management Has Long Known of Barriers to the Promotion of Women But Expressly Rejected Internal Recommendations to Eliminate Such Barriers ........................................... 9

          1.   The BOLD Initiative and the Decision Not to Post AGM and GM Positions ..................................................................... 9

          2.   Focus Groups and Recommendations in 2005-06 ....................... 11

     E.   Costco's Female Employees Have Been Systematically Denied AGM and GM Positions ............................................................................ 13

          1.   Internal Statistical Analysis ......................................................... 13

          2.   Benchmarking Analysis ................................................................ 14

          3.   The Experiences of the Named Plaintiffs and Class Members Illustrate the Consequences of Costco's Promotion System ........................................................................ 14

IV.   ARGUMENT ................................................................................................... 17

     A.   Plaintiffs Have Satisfied Rule 23(a)(2) ..................................................... 17

          1.   Employment Policies That Incorporate Elements of Discretion May Still Meet the Commonality Standard After *Dukes* ........................................................................................... 17

          2.   The Ninth Circuit's Ruling on Commonality ............................... 19

          3.   Plaintiffs Have Challenged Specific Employment Practices Which Raise Common Questions ................................................. 20

          4.   Costco's Statistical Arguments Do Not Defeat Commonality ...... 22

              (a)   Pattern of Disparity Across Regions ................................. 22

               (b)   Other Statistical Arguments .............................................. 24

          5.   Dr. Reskin's Report Further Supports Commonality ................... 26

     B.   Plaintiffs' Claims Are Typical of the Class ............................................. 27

     C.   The Case Can Properly Be Certified Using a Hybrid Approach Under Rule 23(b) and Plaintiffs Have Proposed a Manageable Trial Plan ........................................................................................................... 28

1

**TABLE OF CONTENTS**
(continued)

2

Page

3      1.   Injunctive and Liability Claims Are Properly Certified
            Under Rule 23(b)(2)....................................................... 29

4      2.   Plaintiffs' Back Pay and Compensatory Damages Claims
            Are Properly Certified Under Rule 23(b)(3)................................. 29

5

6      3.   The Court Should Certify Punitive Damages Under Rule
            23(b)(3) .................................................................. 32

7      4.   The Court Can Alternatively Certify Particular Issues Under
            Rule 23(c)(4) ............................................................. 33

8          D.   Trial Plan....................................................................... 33

9      V.   CONCLUSION ............................................................... 34

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## TABLE OF AUTHORITIES

2

**Page**

3

4

### CASES

5

*Albemarle Paper Co. v. Moody*,
  422 U.S. 405 (1975) ................................................................................................ 32

6

*Bains LLC v. Arco Products Co.*,
  405 F.3d 764 (9th Cir. 2005) .................................................................................. 34

7

*Barefield v. Chevron*,
  1988 WL 188433 (N.D. Cal. Dec. 6, 1988) ...................................................... 32, 34

8

*Bolden v. Walsh Group*,
  No. 06 C 4104, 2012 WL 1079893
  (N.D. Ill. Mar. 30, 2012) ........................................................................................ 19

9

10

*Butler v. Home Depot, Inc.*,
  1997 WL 605754 (N.D. Cal. 1997) ..................................................................... 24, 26

11

*Butler v. Home Depot, Inc.*,
  984 F. Supp. 1257 (N.D. Cal. 1997) ...................................................................... 26

12

*Califano v. Yamasaki*,
  442 U.S. 682 (1979) ................................................................................................ 33

13

*Capaci v. Katz & Besthoff, Inc.*,
  711 F.2d 647 (5th Cir. 1983) .................................................................................. 23

14

15

*Chen-Oster v. Goldman Sachs & Co.*,
  No. 10 Civ. 6950, 2012 WL 205875 (S.D.N.Y. Jan. 19, 2012) ......................... 19, 29

16

*Cherosky v. Henderson*,
  330 F.3d 1243 (9th Cir. 1986) ................................................................................ 25

17

*Coates v. Johnson & Johnson*,
  756 F.2d 524 (7th Cir. 1985) .................................................................................. 24

18

19

*Delagarza v. Tesoro Ref. & Mktg. Co.*,
  C-09-5803 EMC, 2011 WL 4017967 (N.D. Cal. Sept. 8, 2011) ........................ 31, 32

20

*Dukes v. Wal-Mart Stores, Inc.*,
  222 F.R.D. 137 (N.D. Cal. 2004) ........................................................................... 32

21

*Easterling v. Connecticut Dept. of Correction*,
  278 F.R.D. 41 (D. Conn. 2011) ....................................................................... 29, 31, 33

22

*EEOC v. Gen. Tel. Co. of Nw., Inc.*,
  885 F.2d 575 (9th Cir. 1989) .................................................................................. 24

23

*EEOC v. Joe's Stone Crab, Inc.*,
  220 F.3d 1263 (11th Cir. 2000) .............................................................................. 25

24

25

*Eldridge v. Carpenters 46 N. Cal. Counties JATC*,
  833 F.2d 1334 (9th Cir 1987) ................................................................................. 23

26

*Ellis v. Costco Wholesale Corp.*,
  240 F.R.D. 627 (N.D. Cal. 2007) ..................................................................... passim

27

28

1

## TABLE OF AUTHORITIES
### (continued)

2

Page

3

*Ellis v. Costco Wholesale Corp.*,
   657 F.3d 970 (9th Cir. 2011)..............................................................................passim

4

*Gay v. Waiters' and Dairy Lunchmen's Union*, Local 30,
   694 F.2d 531 (9th Cir. 1982)........................................................................................ 26

5

*Handi Inv. Co. v. Mobil Oil Corp.*,
   653 F.2d 391 (9th Cir. 1981).......................................................................................... 4

6

*Hanon v. Dataproducts Corp.*,
   976 F.2d 498 (9th Cir. 1992)........................................................................................ 27

7

*In re Whirlpool Corp. Front-Loading Washer Products Liability Litigation*,
   No. 10-4188, — F.3d —, 2012 WL 1537914, at *10 (6th Cir. May 3, 2012) ...................... 29

8

*International Brotherhood of Teamsters vs. United States*,
   431 U.S. 324 (1977)..................................................................................................... 28

9

*James v. Stockham Valves and Fitting Co.*,
   559 F.2d 310 (5th Cir. 1977).................................................................................. 24, 25

10

*Jenson v. Eveleth Taconite Co.*,
   139 F.R.D. 657 (D. Minn. 1991)................................................................................... 30

11

*Jermyn v. Best Buy Stores, L.P.*,
   276 F.R.D. 167 (S.D.N.Y. 2011) .................................................................................. 29

12

*Kolstad v. Am. Dental Ass'n*,
   527 U.S. 526 (1999)..................................................................................................... 32

13

*Lyons v. England*,
   307 F.3d 1092 (9th Cir. 2002)...................................................................................... 25

14

*McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
   672 F.3d 482 (7th Cir. 2012).................................................................................passim

15

*McReynolds v. Sodexho Marriot Services, Inc.*,
   349 F. Supp. 2d 1 (D.D.C. 2004) ........................................................................... 23, 24

16

*Messner v. Northshore Univ. HealthSystem*,
   669 F.3d 802 (7th Cir. 2012)........................................................................................ 31

17

*Morgan v. UPS*,
   380 F.3d 459 (8th Cir. 2004)................................................................................... 23, 24

18

*Myers v. Hertz Corp.*,
   624 F.3d 537 (2d Cir. 2010).......................................................................................... 30

19

*Nat'l R.R. Passenger Corp. v. Morgan*,
   536 U.S. 101 (2002)..................................................................................................... 25

20

*Neal v. Dir. D.C. Dept of Corr.*,
   No. 93-2420, 1995 WL 517246 (D.D.C. Aug. 9, 1995) ................................................. 30

21

*Paige v. California*,
   291 F.3d 1141 (9th Cir. 2002)................................................................................. 23, 25

22

*Price Waterhouse v. Hopkins*,
   480 U.S. 228 (1989) .................................................................................................... 26

23

24

25

26

27

28

# TABLE OF AUTHORITIES
### (continued)

Page

*Robinson v. Metro-North Commuter R.R. Co.*,
   267 F.3d 147 (2d Cir. 2001)................................................................... 29, 33

*Segar v. Smith*,
   738 F.2d 1249 (D.C. Cir. 1984) ................................................................. 26

*State Farm Mut. Auto. Ins. v. Campbell*,
   538 U.S. 408 (2003) ............................................................................. 32, 33

*Stender v. Lucky Stores, Inc.*,
   803 F. Supp. 259 (N.D. Cal. 1992) ............................................................ 26

*United States v. Alexander*,
   106 F.3d 874 (9th Cir. 1997)..................................................................... 3, 4

*United States v. City of New York*,
   258 F.R.D. 47 (E.D.N.Y. 2009) .................................................................. 30

*United States v. City of New York*,
   276 F.R.D. 22 (E.D.N.Y. 2011) ............................................................ passim

*United States v. Cote*,
   51 F.3d 178 (9th Cir. 1996)......................................................................... 4

*United States v. Cuddy*,
   147 F.3d 1111 (9th Cir. 1998)...................................................................... 4

*Wal-Mart Stores, Inc. v. Dukes*,
   131 S. Ct. 2541 (2011) ........................................................................ passim

*Watson v. Fort Worth Bank & Trust*,
   487 U.S. 977 (1988)................................................................................. 17

*Zinser v. Accufix Research Inst., Inc.*,
   253 F.3d 1180 (9th Cir.), *amended by*
   273 F.3d 1266 (9th Cir. 2001).................................................................... 29

**STATUTES**

42 U.S.C. § 1981a(b)(3)................................................................................ 34

42 U.S.C. § 2000e-5(g)(2)(A) ...................................................................... 33

42 U.S.C. § 2000e-5(g)(2)(B) ...................................................................... 33

42 U.S.C. 2000e-2(k)(1)(B)(i) ...................................................................... 20

**RULES**

Federal Rules of Civil Procedure
   Rule 23 .......................................................................................... 1, 3, 19

Federal Rules of Civil Procedure
   Rule 23(a)..................................................................................... 2, 17, 19

Federal Rules of Civil Procedure
   Rule 23(a)(2) ................................................................................ 17, 22

Federal Rules of Civil Procedure
   Rule 23(b) ............................................................................................. 2

1041977.2                                    - v -

# TABLE OF AUTHORITIES
### (continued)

**Page**

Federal Rules of Civil Procedure
Rule 23(b)(2) ........................................................................................... 2, 28, 29, 32

Federal Rules of Civil Procedure
Rule 23(b)(3) ............................................................................................... passim

Federal Rules of Civil Procedure
Rule 23(c)(4) ..................................................................................................... 33

Federal Rules of Civil Procedure
Rule 23(g) ......................................................................................................... 17

## OTHER AUTHORITIES

David L. Faigman, Nilanjana Dasgupta, Cecilia L. Ridgeway,
*A Matter of Fit: The Law of Discrimination and the Science of Implicit Bias,*
59 HASTINGS L.J. 1389 (June 2008) ...................................................................... 26

Title VII, 42 U.S.C. § 2000e et seq. ......................................................................... 3

1

2

**NOTICE OF CROSS-MOTION AND CROSS-MOTION FOR CLASS CERTIFICATION AND OPPOSITION TO MOTION FOR ORDER ELIMINATING CLASS CLAIMS**

3

4

5

6

7

Please take notice that, on July 31, 2012, at 1:30 p.m. before the Honorable Judge Edward Chen, United States District Court, 450 Golden Gate Ave., San Francisco, Plaintiffs will seek an order recertifying this case as a class action and appointing class counsel.  Fed. R. Civ. P. 23.  By agreement of the parties, this motion is based on the record submitted in 2006 for class certification, and the decisions of the district court and Ninth Circuit.

8

9

10

**RELIEF SOUGHT**

Plaintiffs request that the Court certify two classes and appoint Plaintiffs' counsel to represent the classes.  *See* Proposed Order (filed herewith):

11

12

**1. Injunctive Relief Class:**  All women who are currently employed or who will be employed at any Costco warehouse in the U.S. who have been or will be subject to Costco's system for promotion to Assistant General Manager and/or General Manager positions.

13

14

**2. Monetary Relief Class**:  All women who have been employed at any Costco warehouse store in the U.S.  since January 3, 2002 who have been subject to Costco's system for promotion to Assistant General Manager and/or General Manager positions.

15

16

**I.      INTRODUCTION AND SUMMARY OF ARGUMENT**

17

18

19

20

21

22

23

24

25

26

Plaintiffs Rae Ellis, Elaine Sasaki, and Leah Horstman seek an order resolving the few remaining issues necessary to permit the certification of this gender discrimination class action.  For this task, the Court has the benefit of Judge Patel's very thorough evaluation of the large evidentiary record in support of her order certifying the class, 240 F.R.D. 627 (N.D. Cal. 2007), and the Ninth Circuit's order clarifying applicable legal standards and narrowing the matters remaining in dispute. 657 F.3d 970 (9th Cir. 2011).  Importantly, the Ninth Circuit limited the remand to clarification or reevaluation of those few factual questions that were both *necessary* to the commonality determination and not *clearly resolved* by the district court previously.  *Id.* at 979-88.  Numerous legal and factual issues are thus settled and, under the law of the case doctrine, need not be relitigated.

27

28

While Costco mounts a scattershot attack, the primary thrust of its opposition is that *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011), forecloses certification. This argument, raised without success to the Ninth Circuit, fails because this case is significantly smaller and simpler than *Dukes*. It involves a challenge to specific companywide employment practices, not local decision-making. The promotion system for the two jobs at issue is centralized and managed by a small cadre of executives. Decisions since *Dukes* have affirmed that such challenges, even if the employment practice challenged incorporates elements of discretionary decision-making, may properly be certified on a nationwide basis. *See, e.g.*, *McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482, 488 (7th Cir. 2012). Moreover, unlike *Dukes*, the record here includes a host of compelling admissions from Costco's senior managers about undisputed stereotyped decision-making arising from a flawed promotion system.

Costco's Rule 23(a) arguments fare no better the second time around. As to the only issue identified for reconsideration by the Ninth Circuit, the evidence demonstrates that the pattern of disparity in promotions adverse to women is consistent across the company, not a problem isolated to certain regions. Even under the disaggregated method of analysis favored by Costco's expert, the outcome is consistently adverse to women in all regions large enough for analysis. Similarly unavailing is Costco's last remaining bid to defeat typicality – its defenses against the named plaintiffs are precisely the same as those that will be raised against all class members and are, thus, not "unique."

Finally, to address the holding in *Dukes* that individual monetary remedies can no longer be certified under Rule 23(b)(2), Plaintiffs propose two classes (one for injunctive relief and a second for monetary relief) and a hybrid certification model that has been used by other courts both before and after *Dukes*. As Plaintiffs propose to have individual remedies hearings, the bulk of Costco's objections to Rule 23(b) certification are inapposite.

## II.   PROCEDURAL HISTORY AND EFFECT OF PRIOR DECISIONS

Plaintiffs filed this case on August 17, 2004, alleging that Costco discriminated against female employees with respect to promotion into Assistant General Manager and General

1   Manager in violation of Title VII, 42 U.S.C. § 2000e et seq.  Costco's challenged practices

2   constitute a pattern or practice of *disparate treatment* and have an illegal *disparate impact*.  Dkt.

3   No. 1  at ¶¶ 37 - 50.

4        Plaintiffs filed their class certification motion on August 28, 2006.  Dkt. No. 127.

5   Plaintiffs submitted deposition testimony from Costco's senior management and corporate

6   designees; Costco documents; statistical and social science expert analysis; and declarations from

7   Plaintiffs and class members.[1]

8        On January 11, 2007, the Court granted the class certification motion.  240 F.R.D. 627;

9   Dkt. No. 511 (amending class definition by stipulation and order).  The Court denied in part and

10  granted in part Costco's motions to strike the expert testimony.  Dkt. No. 494.

11       Costco appealed.  On September 16, 2011, the Ninth Circuit affirmed in part, vacated in

12  part and remanded the certification order for reconsideration in light of *Dukes*.  657 F.3d 970.[2]

13       The prior decisions of this Court and the Ninth Circuit have significant ramifications for

14  the adjudication of these Rule 23 motions.  Specifically, the parties and this Court are bound by

15  these determinations under the law of the case doctrine.  *United States v. Alexander*, 106 F.3d

16  874, 876 (9th Cir. 1997) ("[A] court is generally precluded from reconsidering an issue that has

17

---

18  [1] Costco's opposition to class certification included declarations from female employees whom
    Costco interviewed without notice to class counsel after the close of discovery.  *See* Dkt. No. 461.
19  Costco had not disclosed the majority of these declarants either.  *See* Dkt. No. 460.  Plaintiffs
    moved to strike the declarations and requested additional discovery.  *Id.*  The district court
20  entered two orders that required Costco to present the declarants for cross-examination at the
    class certification hearing.  *See* Dkt. Nos. 462, 482 (Order Clarifying that Which Need Not Be
21  Clarified).  The parties reached a stipulation that Costco must withdraw significant portions of the
    declarations (i.e. blanket disclaimer of gender discrimination and interest in the litigation) and
22  that the remaining portions may be considered "for Rule 23 purposes only."  Dkt. No. 484.  The
    Court accepted the parties' stipulation, but ordered that:  (1) "the Court may require testimony
23  [from Costco's declarants] if it finds it necessary"; and (2) testimony from a Rule 30(b)(6)
    witness regarding the preparation of Costco's declarations "may be ordered by the Court."  Dkt.
24  No. 486.  Costco did not appeal the order

25       In support of its recent motion, Costco resubmitted 80 declarations without informing the
    Court of the prior Stipulation and Order and its very significant limitations.  Plaintiffs request that
26  the Court strike those portions of each declaration that Costco was ordered to withdraw.

27  [2] In March 2012, Plaintiffs filed a Third Amended Complaint with detailed factual allegations
    conforming the pleadings with the factual record developed through discovery and consistent
28  with the clarified Rule 23 standards articulated in *Dukes*.  Dkt. No. 537.

1   already been decided by the same court, or a higher court in the identical case.") (internal

2   quotation marks omitted).  Factual determinations underlying class certification that were not

3   upset by the Ninth Circuit and legal conclusions not addressed by *Dukes* are not to be

4   reconsidered.  *United States v. Cuddy*, 147 F.3d 1111, 1113-14 (9th Cir. 1998) (law of the case

5   doctrine would prevent the district court from upsetting the Ninth Circuit's earlier factual

6   determination if not clearly erroneous); *Alexander*, 106 F.3d at 877 (previous factual findings are

7   the law of the case, reversible only if clearly erroneous); *Handi Inv. Co. v. Mobil Oil Corp.*, 653

8   F.2d 391 (9th Cir. 1981); *see also United States v. Cote*, 51 F.3d 178, 181 (9th Cir. 1996) (on

9   remand, rule of mandate, which is a "broader" version of the law of the case doctrine, requires

10  that holdings of the appellate court are binding).

11      Significantly, the Ninth Circuit left largely undisturbed the district court's findings of fact.

12  Its focus was on a few disputes about which it could not determine if the lower court had actually

13  made findings.  657 F.3d at 981-83.

14  **III.   FACTUAL BACKGROUND AND FINDINGS**

15

16      Plaintiffs provide a summary of the relevant factual background, much of which is no

17  longer in dispute.

18      From 1983 to 2012, Costco's co-founder, James Sinegal, was the President and CEO.

19  First Amended Answer to Third Amended Complaint ¶ 23, Dkt. No. 541 ("Answer").  Costco's

20  U.S. operations are divided into three geographic divisions, each led by an Executive Vice

21  President (EVP).  240 F.R.D. at 634.  Each division is divided into regions managed by a Senior

22  Vice President (SVP).  *Id.* There are currently eight regions.  Each region is ordinarily comprised

23  of two districts, headed by a District Manager/Vice President.  Warehouse Ops Flow Chart, Ex.

24  25.[3]

25

26  _____

27  [3] All references to exhibit numbers throughout the brief refer to exhibits to the Declaration of
    Jocelyn Larkin, except where noted.  References to deposition testimony are abbreviated as

28  "[Witness' Last Name] Dep." and to declarations as "[Declarant's Last Name] Decl."

1    All operations management above the district level meet every four weeks at the corporate

2    office for the Operations meeting.  Zook Dep. 21:11 – 19, Ex. 11.

3    Costco's Executive Committee is comprised of the top 15 company officers, including its

4    divisional operations executive vice presidents and was, until 2006, two years after the filing of

5    this case, all male.  Sinegal Dep. 81:6-83:3, Ex. 8; Executive Comm. List, Ex. 17.  Within U.S.

6    warehouse operations, every Executive Vice President, Senior Vice President, Vice President and

7    Assistant Vice President position was held by a man as of 2006.  Sinegal Dep. 189:25-190:7, Ex.

8    8.

9    ### A.    Costco Has Uniform Warehouse Management Structure and Personnel

10   Every warehouse has a General Manager (GM), two to three Assistant General Managers

11   (AGM), and three or four Senior Staff Managers.  657 F.3d at 975.  Senior Staff Managers are the

12   pool from which AGM promotions are drawn.  Defendant Costco Wholesale Corporation's

13   Motion for an Order Eliminating Class Claims, Dkt. No. 543 ("Costco Br.") at 5.  The four Senior

14   Staff positions are Administrative Manager, Front-End Manager, Receiving Manager, and

15   Merchandise Manager.  *Id.*  Men are disproportionately assigned to the Merchandise Manager

16   positions.  Drogin Decl. ¶ 7.  Costco assumes that all Senior Staff are interested in advancement

17   to AGM.  DiCerchio Dep. 83:25-84:2, Ex. 1; Sinegal Dep. 44:23-45:4, Ex. 8;  Zook Dep. 129:12-

18   130:23, Ex. 11.

19   ### B.    Costco Has a Uniform Promotion System

20   The record establishes that Costco has uniform personnel and promotion policies.

21   Importantly, the district court made a specific finding, undisturbed by the Ninth Circuit, that the

22   evidence did *not* support Costco's assertions that that promotion decisions were local or varied by

23   region:

24   Defendants argue that promotion decisions to AGM and GM vary
     by region and that promotion decisions to AGM are made at the
25   store level.  However, these assertions are unsupported and do not
     undermine commonality.  Rather, the evidence before the court
26   indicates that officers at the regional and corporate levels are
     involved in promotion decisions.

27

28

240 F.R.D. at 639.  Thus, promotion policies, salary ranges for management jobs, and personnel policies are set by the corporate office, are uniform across the U.S. and do not vary by region or division.  Employee Agreement, Ex. 15; Sinegal Dep. 30:15-22, 45:11-15, Ex.8; Portera Dep. 110:12-111:4, Ex. 6; Reskin Decl. ¶ 17-19.  Costco's Employee Agreement, which contains its personnel policies, applies to all its employees.  Answer ¶ 29.

Costco has a uniform system of pre-selection and grooming of AGM and GM  candidates, which is orchestrated by the most senior corporate officials.  At the direction of CEO Sinegal, District and Regional Managers prepare lists of their preferred candidates for promotion to AGM and GM; these senior executives then forward the lists of "promotables" to Divisional Vice Presidents.  Sinegal Dep. 38:7-39:3; 67:17-69:13, Ex. 8;  Portera Dep. 86:3-87:14, Ex. 6; Sample Promotable Lists, Ex. 24.  The lists are the primary source for promotion selections.  Sinegal Dep. 65:3-66:2, Ex. 8; Vachris Dep. 71:7-22, Ex. 9; Gaherty Dep. 58:15-59:9, Ex. 2.  The executive vice presidents and senior vice presidents "work closely together as a group and a team. . . in developing individuals" who will be selected for warehouse management.  Portera Dep. 110:12 – 111:4, Ex. 6.

Costco invites those placed on the top of the promotable list to the company's annual managers meeting.  Answer ¶ 40; Zook Dep. at 17:17-18:13; 18:24-19:13, Ex. 11; Hoover Dep. 55:25-56:3, Ex. 4.  These opportunities to create personal relationships with higher level executives further reinforce the advantages of the pre-selected favorites.  Reskin Decl. ¶¶ 9, 30.

Costco displays the photographs and biographies of future promotables in the confidential "Green Room" in the Corporate Headquarters, to which only top executives have access.  Answer ¶ 39.  These senior executives use the Green Room displays to assess the promotable "talent pool."  Sinegal Dep. 65:3-66:2, Ex. 8, Sample Promotable Lists, Ex. 24.

Costco fills most AGM and GM positions from within.  Answer ¶ 35.  Costco does not post openings for promotion into either position nor does it have any procedure to apply for either position.  657 F.3d at 975; Answer ¶¶ 46, 57.  Costco provides nothing in writing to its employees that explains the qualifications or the process for promotion to GM or AGM.  657 F.3d at 975.

1   Costco does not require decision-makers to identify or interview candidates for

2   promotions or to consider more than one candidate.  *Id.*  Costco does not require decision-makers

3   to maintain any records concerning these promotions, such as the candidates considered, the

4   criteria used, or the reasons for selecting a particular candidate.  *Id.*

5   Costco does not have any minimum qualifications for promotion into General Manager,

6   other than experience as an Assistant General Manager or for promotion into AGM other than

7   experience as a Senior Staff manager and has no written criteria for these promotions.[4]

8   240 F.R.D. at 639; Zook Dep. 78:5-79:14, Ex. 11; Schutt Dep. 102:12-15, 118:10-13, Ex. 7;

9   DiCerchio Dep. 54:17-55:8, Ex. 1; Sinegal Dep. 43:15-21, 46:5-7, Ex. 8.  Costco has never

10  validated the criteria it uses, such as the promotables lists described above, to select General

11  Managers and Assistant General Managers.  Sinegal Dep. 65:3-66:2, Ex. 8; Vachris Dep. 71:7-22,

12  Ex. 9; Gaherty Dep. 58:15-59:9, Ex. 2.

13  For the selections of GMs, the Regional Senior Vice President ("SVP") recommends a

14  candidate.  The recommendation must be approved by the Executive Vice President, the Chief

15  Operating Officer, and the CEO.  Schutt Dep. 74:20-75:19, Ex. 7; DiCerchio Dep. 47:20-48:8,

16  49:24-50:6, Ex. 1; Sinegal Dep. 23:17-24:4, Ex. 8.  Costco's CEO personally approves every

17  General Manager selection.  Schutt Dep. 74:20-75:19, Ex. 7; Sinegal Dep. 23:17-24:4, Ex. 8.

18  The District Vice President, in consultation with General Managers, recommends who

19  will be promoted into an Assistant General Manager position; Senior Vice Presidents are

20  informed of these decisions before the promotion takes effect.  Webb Dep. 82:17-23, Ex. 10;

21  Letter from Kadue to Seligman, (November 1, 2004) at 5, Ex. 20.

22

23

24

25

26  [4] Costco asserts that "MM and FM experience are crucial for promotion to AGM."  Costco Br. at
5.  The evidence does not support that this experience is required.  Dr. Drogin found that, for the

27  period 2000–2005, more than half of candidates promoted to AGM had not served as a Front End
Manager and approximately 15% had not served as Merchandising Manager. Drogin Decl. ¶ 12.

28

1

**C.**      **Costco's Decision-Makers Share a Common Understanding of How to Make Promotion Decisions**

2

3          A small group of senior decision-makers is responsible for implementing the promotion

4    system challenged in this case.  These regional and divisional operations managers meet

5    frequently and receive instructions from Costco's CEO Sinegal regarding the criteria he expects

6    them to apply in making selection decisions.  Zook Dep. 21:11–19, Ex. 11; Sinegal Dep. 42:4–

7    44:5, Ex. 8.

8          Sinegal testified that the criteria used to select General Managers and Assistant General

9    Managers are the same throughout Costco's U.S. Operations.  Sinegal Dep. 43:18-21; 45:11-15,

10   Ex. 8; *see also id.* at 29:13-20; Reskin Decl. ¶ 25.  In addition to prior service at the position

11   immediately below, they are "people skills," "merchandising skills," and "adroit with the

12   numbers . . . and the whole financial aspect of their business."  Sinegal Dep. 43:17-21, Ex. 8.

13   Costco has no written guidelines or instructions about how to assess, apply or weigh these

14   criteria.  *Id.* at 45:11-46-7.

15         The record shows that the CEO holds stereotyped perceptions about the roles for women

16   and men.  In Sinegal's view, the shortfall of women in higher level warehouse management

17   positions is not attributable to any failing of Costco's decision-making process but instead results

18   from women's preference for jobs that allow them to accommodate their families: "Our

19   experience is that the women have a tendency to be the caretakers and have the responsibility for

20   the children and for the family."  Sinegal Dep. 141:16-18, Ex. 8.

21         CEO Sinegal believes that women prefer front end and administrative positions rather

22   than merchandising positions (stocking) and that women turn down opportunities for such

23   positions more than their male counterparts.

24              I think *since the beginning of time* women have had a tendency to
              come in to our business in positions that were more associated with
25            the administrative aspect of the company, the front end, the
              marketing end, that was the way they entered our business.  So
26            many of our positions out on the sales floor in merchandising are
              jobs like forklift drivers, and so that's been traditionally a male
27            dominated field,  something that has changed and is changing over
              a period of time, but that has historically been a male oriented
28            job ….  It's been true at Costco ….

1   Sinegal Dep. 146:23-147: 11 (emphasis added), Ex. 8.

2       Plaintiffs' expert Barbara Reskin put these statements into context, noting that the

3   stereotypes asserted by Costco's CEO systematically reduce promotions opportunities for women

4   when the decision-makers are predominantly male, as they are at Costco.  Reskin Decl. ¶¶ 46-60.

5       **D.      Senior Costco Management Has Long Known of Barriers to the Promotion of
            Women But Expressly Rejected Internal Recommendations to Eliminate Such
6           Barriers**

7       Based on the evidence, the district court identified a common question of fact: whether

8   Costco treats the representation of women in the warehouse management ranks as a "company-

9   wide issue," not a local or regional matter.  240 F.R.D. at 640.  This district court finding, not

10  questioned on appeal by Costco or the Ninth Circuit, is settled.

11      **1.      The BOLD Initiative and the Decision Not to Post AGM and GM
            Positions**
12

13      Between 1999 and 2001, Costco experienced an across-the board decline in the percentage

14  of women in virtually every top warehouse management position.  Chart of Warehouse Salaried

15  Position Diversity Trend Percentages, Ex. 26. In 2000, Costco launched a company-wide

16  program, known as the BOLD Initiative, to assess what  barriers might exist to the advancement

17  of its female and minority employees.  The corporate office convened interviews and focus group

18  discussions among its managers.  Matthews Dep. 111:20-112:21, 113:2–24; 129:12–16, Ex. 5.

19      The notes from these discussions reveal that Costco's own managers themselves identified

20  many of the barriers created by Costco's policies and practices, and recommended changes in

21  personnel policies.  In the "White Male Group Meeting," participants identified the "'good old

22  boy' network," "type casting people (stereotypes)" and "[p]rejudices" as potential barriers.  2001

23  BOLD Initiative Focus Group Notes, Ex. 12 at CRE 0142017 - 18.  Another focus group reported

24  that barriers included "[l]ack of consistent application of systems dealing with promotions,

25  training, reviews, etc.,"  "[r]elying on the use of 'word of mouth' to evaluate talent" and

26  "[s]tereotyping." *Id.* at CRE 0142025.  Promotions were "[d]one as special favors at times or

27  based on relationships," *id.* at CRE 142026, and "[i]t depend[ed] on who you know as to whether

28  you get the training needed to be promoted," *id.* at CRE 0142045.  The BOLD initiative

accordingly recommended that Costco "[p]ost salaried positions," including GM and AGM positions, *id.* at CRE 0142026, and "[d]evelop standards for promotion," *id.* at CRE 0142040; *see* Matthews Dep. 145:18-151:5, Ex. 5.

As a next step, Costco established working groups, including a Recruitment and Promotion Project Team. In its May 2001 report, the team summarized the "barriers that have prevented the company from benefiting from a diverse management team" as follows:

> Employees currently find out about job opportunities by informal word of mouth, occasional posting, mentoring relationships and sometimes rumor.

> There is no formal diversity program. As well as there is no accountability for diversity promotions, no diversity management goals, no tracking system to monitor diversity progress.

> There is no system to identify and mentor people of color or women that have shown high potential.

> There has been no formal diversity training on a regular basis to address various diversity issues.

The team concluded:

> Inconsistencies in the promotion practices allow for favoritism and individual biases to enter into the process

> Corporate wide diversity has not been seen as a top priority issue or key to success of the company. A dedicated department and staff to carry out company goals related to diversity would increase the company's chances of success.

Fact Finding and Preliminary Conclusions Memo, Ex. 18 at 0142113.  The Report concluded that "[a]lthough the recruiting efforts at Costco are somewhat fragmented, it appears that our efforts are resulting in a diversified workforce at the entry level. However, diversity appears to breakdown at the more senior positions." *Id.* at 142112.

In late 2001 or 2002, the Executive Committee, through the Rothman Workplan, adopted some changes to lower level promotion and personnel practices "in response to criticisms that Costco's inconsistent promotion practices allowed for favoritism and individual biases."  657 F.3d at 979, n.5.  The Rothman Workplan included a job posting system for promotions to

NOTICE OF CROSS-MO. & CROSS-MO. FOR CLASS CERT & OPPO. TO MO. FOR ORDER ELIMINATING CLASS CLAIMS

1  management positions up to the four senior staff jobs.  Workplan 2002 Salaried Employee

2  Posting Policy, Ex. 27.[5]

3      Significantly though, CEO Sinegal blocked implementation of recommendations to post

4  vacancies for warehouse AGM and GM positions.  Matthews Dep. 150:23-151:5, Ex. 5.  CEO

5  Sinegal "felt very strongly and very adamantly, that those were not the types of jobs that should

6  be up for posting" and "made [his] feelings known."  Sinegal Dep. 123:22-124:2, 124:9-16, Ex. 8.

7  Sinegal felt so strongly that, at a company meeting, he publicly dismissed job posting as "bull

8  shit."  Sinegal Dep. 128:6-13, Ex 8; Answer ¶ 80.

9      Top management's rejection of the BOLD recommendation did not quiet the concerns

10  about the fairness of the promotion process.  The named Plaintiffs and other women continued to

11  complain and the representation of women in AGM and GM positions did not improve.  Despite

12  the concerns raised, Costco made no changes to its AGM and GM promotion policies and

13  practices.

14                    **2.    Focus Groups and Recommendations in 2005-06**

15      In August 2005, after this action was filed, Costco launched another series of focus groups

16  on potential barriers to the advancement of women.  At the company's annual management

17  meeting, attendees participated in group sessions to identify potential barriers.  Their comments

18  were collected and recorded.  Rothman Workplan 2005 Session Comments, Ex. 23.  These

19  comments were grouped into ten "potential barriers," which included "[c]larify criteria for

20  promotion," "[r]otation," "[u]nconscious exclusion," "[r]elocation," and "[p]reconceived

21  notions."  Individual Focus Group Reports on Potential Barriers, Ex. 19.  Costco assigned each

22  topic to a senior manager for further focus groups at the regional level and a follow-up

23  presentation at the monthly operations committee.  Rothman Workplan – The Next Steps, Ex. 22.

24  The barriers identified by Costco's managers in 2005 mirrored the earlier comments made by the

25  2001 management focus groups.

26

27  _____

28  [5] The Ninth Circuit expressly accepted the district court's determination that the Rothman
    Workplan did not change the practices for AGM or GM promotions.  657 F.3d at 979 n.5.

1    Managers again cited the lack of written guidelines and the lack of clarity in promotion

2    criteria as barriers to the promotion of women.  They noted the need for "[c]onsistent criteria for

3    promotion," and for "[i]dentifying what skills and behaviors are necessary and communicating

4    the expectations consistently."  Ex. 23 at CRE 0142512-513.  "Employees when questioned do

5    not know the path to promotion . . . ."  Regional Focus Group Notes, Ex. 21 at CRE 0142701.

6    Others observed that "[w]e need to do a better job at laying out career paths for our employees,"

7    *id.* at CRE 0142688, that getting promoted depended partly on "[w]ho you know," *id.* at 0142695,

8    the "[t]endency to promote people like us" and "[s]tereotypes," Ex. 19 at CRE 0142502.

9    Participants also reported that barriers included employees "not knowing of job opportunities

10   across the country (job postings)," Ex. 23 at CRE 0142516, and "[l]ack of knowledge about

11   upcoming opportunities," *id.* at CRE 0142539.

12   The focus groups identified specific barriers to women obtaining merchandise experience,

13   including the "[p]erception of stockers as 'big strong men,'" and the "[u]nconscious stereotype

14   that women can't be Merchandise Managers or forklift drivers."  *Id.* at CRE 0142527, CRE

15   0142538.  They recognized that women were blocked by lack of rotation into merchandising

16   positions.  "[A]s rotation has slowed this has affected our female managers.  Many of them have

17   started in areas such as Marketing, Admin, and Front End.  In many cases, they have occupied

18   these roles and have not been rotated on to the floor, which is a requisite for advancement."  Ex.

19   21 at CRE 0142691.

20   The findings of these study teams were presented at monthly operations meetings.  In

21   January 2006, one study team highlighted the "[l]ack of express guidelines and specific path for

22   promotion."  Diversity in the Workplace, Ex. 14 at CRE 0142590.  This created a potential

23   barrier because "[e]mployees are not always aware of the best path to growth" and "how

24   merchandising plays a key role in the promotion process."  *Id.*  A month later, in February 2006,

25   another study team reiterated to senior executives that potential barriers were created by

26   "[u]nclear criteria for promotion to warehouse manager" and "[u]nclear way to communicate

27   criteria."  Excerpts from Monthly Operations Meeting, February 21, 2006, Ex. 16 at CRE

28   0130149.  They proposed that written promotion criteria be created and communicated to

1    managers, and used for selection decisions. *Id*. at CRE 0130150.  Yet another team briefed the

2    operators on the risks of "[p]reconceived [n]otions" that create barriers. *Id.* at CRE 0130126.

3           In April 2006, Costco's Board of Directors was briefed on the history of the company's

4    diversity efforts and the results of the focus groups.  The written presentation to the Board

5    included no action plan.  Indeed, the Board presentation asserted that "[w]e sometimes tend to

6    promote people like us" but noted that no ideas had yet been presented to deal with this barrier of

7    "[u]nconscious [e]xclusion." Diversity at Costco, Board of Directors Meeting Presentation, April

8    25, 2005, Ex. 13 at CRE 0135100.

9           While Costco has generic anti-discrimination language in its Employee Agreement, the

10   history of the BOLD Initiative and 2006 Focus Groups, as well as the experiences of the Class

11   and named Plaintiffs, highlight ongoing bias in promotion decision-making.

12   **E.     Costco's Female Employees Have Been Systematically Denied AGM and GM
             Positions**

13   **1.     Internal Statistical Analysis**

14

15          Costco's promotion system has led to predictable consequences for its female managers.

16   Although women hold about 28% of the Senior Staff positions, their representation dropped to

17   roughly 16 - 18% at AGM and 13% at GM levels.  Drogin Decl. ¶ 6, Table 1a.  Plaintiffs'

18   statistician analyzed Costco's internal workforce data to determine whether this distribution was

19   the result of statistically significant shortfalls in the rate of promotion of women into AGM.  In

20   order to obtain an unbiased measure of the pool of men and women available and qualified for

21   promotion, he looked to the representation of men and women in Senior Staff manager positions.[6]

22   He compared the pool of women and men available and qualified for promotion to the AGM

23   position for the period 1999 to August 2004, the date the action was filed,[7] to the selection rates

24

25   [6] Based upon his analysis of Costco's personnel policies, Dr. Drogin combined Senior Staff
     positions into one pool.  Because Costco disproportionately assigns men to the Merchandising

26   Manager positions, treating each senior staff manager job as a separate pool would introduce a
     "tainted variable" into the analysis. Drogin Decl. ¶ 18; Drogin Supp. Decl. ¶¶ 2-4; *see infra* n.15.

27   [7] Dr. Drogin found that the percentage of women promoted into AGM promotions following the

28   initiation of this action shot up dramatically.  Drogin Decl. ¶ 20 (from 18.4% to 34.7%).

1    and determined that there were statistically significant shortfalls in the selection of women.  For

2    the entire period for which data were available, 1999-2005, there was likewise a statistically

3    significant disparity.  *Id.*

4         Dr. Drogin then conducted an alternative analysis, which controlled for the amount of

5    Senior Staff experience held.  He used a pool limited to those in Senior Staff positions who had at

6    least as much experience as those actually promoted out of the Senior Staff ranks.  The results for

7    this alternative model were virtually identical to his initial analysis.  *Id.* at ¶ 20.

8              ## 2.    <u>**Benchmarking Analysis**</u>

9         Plaintiffs' labor economist developed benchmarks for the representation of women in

10   retail management positions at Costco's competitors.  Using *external* workforce data,

11   benchmarking determines what the available, qualified and interested pool of women is for these

12   jobs.  Based on EEO-1 and census data, Dr. Bendick created five different benchmarks and a

13   sixth composite benchmark from which he concluded that the representation of women at Costco

14   "fell substantially short" of every one of the benchmarks.  Bendick Decl. ¶ 30.  Dr. Bendick

15   concluded that the shortfall in female managers at Costco "cannot be explained away as a

16   shortage of available, qualified and interested women."  *Id.* at ¶ 35.  Instead, the explanation "is to

17   be found in the company, its corporate culture, and its human resource management practices."

18   *Id.*  The district court concluded that Dr. Bendick's analysis "presents a sufficient foundation for

19   his conclusion that women are underrepresented at these positions relative to women at

20   comparable companies."  240 F.R.D. at 638.  The Ninth Circuit did not upset this finding.

21          ## 3.    <u>**The Experiences of the Named Plaintiffs and Class Members**</u>
             <u>**Illustrate the Consequences of Costco's Promotion System**</u>
22

23        **Shirley "Rae" Ellis –** Ellis was hired by Costco in 1998 as an AGM.  240 F.R.D. at 633.

24   Prior to Costco, she worked nearly 20 years in retail management, including five years as a

25   General Manager for Sam's Club, a Costco competitor.  Ellis Decl. ¶ 2, 240 F.R.D. at 633.  She

26   was heavily recruited by Costco management and was promised promotion to General Manager

27   within one year.  Ellis Decl. ¶ 4.  Despite these promises, excellent reviews, and strong interest,

28   Ellis was frustrated in her attempts to obtain a promotion.  Ellis Decl. ¶¶ 7-8 & Exs. 1-6.  Without

1  access to postings or written policies or procedures for promotion, Ellis had no way to apply for

2  open GM positions.  Ellis Decl. ¶ 8; 240 F.R.D. at 633.  Ellis sent a letter to her superiors on

3  August 29, 2002, in which she "expressed her 'burning desire to help the company be successful'

4  and to advance within the company, stating that she wanted to learn how selection to General

5  Manager worked, where she stood as a candidate for promotion, and what she might need to do to

6  become a General Manager."  240 F.R.D. at 633; Ellis Decl. ¶ 14, Ex. 6.  After waiting four years

7  and being passed over repeatedly, Ellis filed a class charge of gender discrimination with the

8  EEOC in October 2002.  Ellis Decl. ¶ 13 & Ex. 4; 240 F.R.D. at 633.

9        In January 2004, CEO Sinegal came to Ellis's warehouse to speak with her about her

10  charge of discrimination, backed by a phalanx of senior managers.  Ellis Decl. ¶ 18.  Sinegal

11  directed her to sit with him in the food court area, while other managers stood behind her within

12  earshot, a situation both intimidating and humiliating for her.  *Id.*  While he promised she would

13  shortly receive a call about a GM promotion in Texas, that phone call never came.  Instead,

14  within weeks, Ellis was—for the first time in her Costco career—criticized for her work

15  performance and subjected to "disciplinary action."  Ellis Decl. ¶¶ 19-20.  She filed a retaliation

16  charge with the EEOC in April 2004 and this lawsuit in August.  240 F.R.D. at 633.  She left

17  Costco a few months later.  Ellis Decl. ¶ 23.

18        **Elaine Sasaki –** Sasaki, a current Costco employee, has worked for Costco since 1985.

19  Sasaki Decl. ¶ 2; 240 F.R.D. at 633.  She started as a cashier and worked her way up to Senior

20  Staff management in four years.  Sasaki Decl. ¶ 6.  Sasaki received excellent reviews and

21  repeatedly told management of her interest in being promoted to Assistant General Manager.

22  Sasaki Decl. ¶¶ 6-12 &. Exs. 1-4.  Despite being rated as ready to be promoted to AGM in 1993,

23  Sasaki was not promoted to AGM until 1996.  Sasaki Decl. ¶¶ 11-16.  As an AGM, she continued

24  her quest to become a GM.  She moved her family four times to improve her chances of

25  promotion to GM.  Sasaki Decl. ¶¶ 26-27.  In 2000, she was told she was on the promotable list

26  for GM.  Sasaki Decl. ¶ 19.  By 2006, Sasaki nevertheless remained an AGM.  Between 2000 and

27  2006, Sasaki had been passed over for at least eight GM positions, none of which were posted and

28  all of which she heard about only after they were filled.  Sasaki Decl. ¶ 34-35.

1    In September 2003, Sasaki wrote to Costco's Director of Human Resources, expressing

2   her concern about the promotion process and that she had not been promoted because of her

3   gender.  240 F.R.D. at 634.  "I want to be evaluated on facts.  I want to be held to the same

4   standards as my peers, but it does not help that these standards seem to shift after each meeting."

5   Sasaki Decl. ¶ 36 & Ex. 9.  She filed a charge of discrimination with the EEOC on March 1,

6   2005.  240 F.R.D. at 634.

7    **Leah Horstman –** Horstman was hired in 1981 and worked for Costco for more than 23

8   years.  Horstman Decl. ¶¶ 2-3; 240 F.R.D. at 633.  From the beginning of her career at Costco,

9   Horstman told her managers that she was interested in becoming a General Manager.  Horstman

10   Decl. ¶¶ 4-6.  After 15 years with the company, Horstman received her first promotion to a Senior

11   Staff manager position.  Horstman Decl. ¶ 13.  By 2000, Horstman had significant experience in

12   all four areas of the warehouse.  Horstman Decl. ¶¶ 14-16, 24-25.  However, without written

13   promotion policies or posting, she was unable to determine the requirements or opportunities for

14   promotion.  Horstman Decl. ¶ 21.  Despite excellent evaluations and two decades of experience,

15   Horstman was never promoted beyond the staff level.  She resigned in June 2004 and filed a

16   charge of discrimination in October 2004.  Horstman Decl. ¶¶ 40-41.

17    Like the named Plaintiffs, class members describe their frustrating attempts to be

18   promoted in a system without posting or selection criteria.  Harrell Decl. ¶ 14; Olson Decl. ¶¶ 8-9;

19   Wales Decl. ¶ 9; *see* Glenn Dep. 22:10-15, Ex. 3.  They describe changing, unwritten

20   requirements for promotions.  Harrell Decl. ¶ 14; Wales Decl. ¶ 14; Horstman Decl. ¶¶ 24, 28;

21   Glenn Dep. 100:20 – 103:8, Ex. 3.  Others were denied opportunities to interact with senior

22   managers, who were critical to their ability to advance.  *See* Olson Decl. ¶ 10.  In the absence of a

23   formal promotion process, these women understood that, to be promoted, they had to be in the

24   good graces of Costco's all-male decision-makers.  Wales Decl. ¶ 14; Horstman Decl. ¶ 20.  This

25   made these women uniquely vulnerable to sexual harassment, which several of them silently

26   endured.  *See* Harrell Decl. ¶¶ 24-25; Horstman Decl. ¶ 36.

27    Notwithstanding the questionable manner in which Costco collected the declarations of

28   class members and that it is prohibited from presenting them except for Rule 23 purposes, *see*

1   fn.1, the declarations confirm the presence of significant common issues, such as the common

2   practice of selecting employees for promotion by the "tap on the shoulder" system with

3   significant involvement of senior executives.  For example, Kristen D'Agostino reports, that as a

4   GM, she makes recommendations to "Senior Level managers" of employees ready for promotion

5   to AGM, but adds that "all final decisions, however, are made at the Vice-President level."

6   D'Agostino Decl. ¶ 30, Dkt. No. 565.  Melanie Petty confirms that there was no interview process

7   before her promotion to AGM, but that her GM told her the Regional Vice President was

8   considering her for the position.  Petty Decl.  ¶¶37-38, Dkt. No.  615. Similarly, Sonia Ward

9   states that a Senior Vice President and a District Vice President were involved in the decision to

10  promote her to GM. Ward Decl. ¶¶ 35-36, Dkt. No. 631.

11  **IV.**   **ARGUMENT**

12          **A.**   **Plaintiffs Have Satisfied Rule 23(a)(2)**

13          Plaintiffs are required to demonstrate that there are questions of law or fact common to the

14  class.  Fed. R. Civ. P. 23(a)(2).[8]  Judge Patel concluded that plaintiffs met this burden.  240

15  F.R.D. at 640.  While the intervening cases have clarified the law, they do not alter the conclusion

16  that the record here fully satisfies the commonality requisite.

                   **1.**   **Employment Policies That Incorporate Elements of Discretion May**
17                          **Still Meet the Commonality Standard After _Dukes_**
18

19          The Supreme Court's _Dukes_ decision affirmed its earlier decision in _Watson v. Fort Worth_

20  _Bank & Trust_, 487 U.S. 977 (1988) that a system of subjective decision-making may give rise to

21  liability under Title VII "in appropriate cases." _Dukes,_ 131 S. Ct. at 2554 (quoting _Watson_, 487

22  U.S. at 990-91).  "'[A]n employer's undisciplined system of subjective decisionmaking [can

23  have] precisely the same effects as a system pervaded by impermissible intentional

24  discrimination.'" _Id._ (quoting _Watson_).

25

26  _____

27  [8]  Costco does not dispute that plaintiffs have satisfied the numerosity and adequacy of
    representation requirements of Rule 23(a).  Costco also does not contest that counsel for plaintiffs
28  meet the requirements of Rule 23(g) for appointment as class counsel.

To certify a class challenging such a subjective system, the Supreme Court held that plaintiffs must identify a "common mode of exercising discretion." *Dukes*, 131 S. Ct. at 2554. While "'a single [common] question' will meet Rule 23(a)(2)," *id.* at 2556, the Supreme Court explained that the common question must "produce a common answer to the crucial question *why was I disfavored.*" *Id.* at 2552.   For a disparate treatment claim, plaintiffs must demonstrate "significant proof that [defendant] operated under a general policy of discrimination." *Id.* at 2554 (internal quotation marks omitted).  For disparate impact analysis (where proof of intent is not required), plaintiffs must identify a "specific employment practice. . . that ties all their . . . claims together." *Id.* at 2555-56 (internal quotation marks omitted).  *Dukes* found commonality lacking because decisions were left to local manager discretion and the only company-wide policy challenged was one forbidding sex discrimination.  *Id.* at 2554.

Decisions interpreting *Dukes* have affirmed that commonality may be satisfied where, as here, managerial discretion is exercised "within a framework established by the company." *McReynolds*, 672 F.3d at 488.  In *McReynolds,* a race discrimination action on behalf of 700 African American brokers, plaintiffs challenged a company-wide "teaming policy," which authorized brokers in its 600 branch officers to form teams, and an "account distribution policy" which awarded accounts based on past revenue generation.  *Id.*  Judge Posner, writing for the panel, reversed the denial of class certification, concluding that nationwide certification was appropriate and consistent with *Dukes* because "the exercise of . . . discretion is influenced by the two company-wide policies." *Id.* at 489.[9]

In *Chen-Oster v. Goldman Sachs & Co.*, No. 10 Civ. 6950, 2012 WL 205875 (S.D.N.Y. Jan. 19, 2012), the defendant in a nationwide gender discrimination class action moved to strike plaintiffs' class allegations, arguing that a challenge to the delegation of managerial discretion could not, *as a matter of law*, be certified after *Dukes.*  The magistrate judge rejected that

---

[9] Describing the risk of discrimination associated with the teaming policy, Judge Posner explained that "there is bound to be uncertainty about who will be effective in bringing and keeping shared clients; and when there is uncertainty people tend to base decisions on emotions and preconceptions, for want of objective criteria." *Id.* at  489.

1    contention, concluding that plaintiffs had identified specific employment practices, "the 360-

2    degree review process, forced quartile rankings, and the tap on the shoulder" promotion system,

3    and properly pled that these policies "in combination with managerial discretion, result in

4    systemic discrimination." *Id.* (internal quotation marks omitted); *see Bolden v. Walsh Group*, No.

5    06 C 4104, 2012 WL 1079893 (N.D. Ill. Mar. 30, 2012) (in race discrimination case,

6    commonality satisfied for disparate impact challenge to policy allowing construction foremen to

7    assign work hours and overtime without reference to any objective criteria).

8         The Ninth Circuit's decision here further supports that *Dukes* does not foreclose a finding

9    of commonality.  Costco argued there – as it does here – that Plaintiffs' theory and evidence were

10   indistinguishable from that presented in *Dukes*, and that Rule 23 commonality could never be

11   established.  It asked the Ninth Circuit to *reverse* the class certification order and "instruct the

12   court below to deny certification to *any* nationwide class."  Costco's Supplemental Brief on

13   Significance of *Wal-Mart Stores, Inc. v. Dukes*, at 7 (Ninth Cir. Dkt. No. 15, July 25, 2011).  The

14   Ninth Circuit rejected Costco's invitation to hold that Plaintiffs could not establish commonality

15   after *Dukes*. To the contrary, it carefully assessed the district court's commonality analysis and

16   ultimately vacated and remanded on the *far narrower grounds,* discussed below.  657 F.3d at 984.

17   It expressed no hesitation that a challenge to policies that include the exercise of discretion

18   remains viable after *Dukes*.

19              **2.    The Ninth Circuit's Ruling on Commonality**

20        The Ninth Circuit articulated the remaining commonality questions for this Court to

21   address.  First, it observed that, in evaluating commonality, "a district court *must* consider the

22   merits" to the extent that they overlap with the Rule 23(a) requirements.  657 F.3d at 981.  While

23   it appeared that the district court had in fact done just that, the appellate court noted some

24   language in the order that made it "unclear" what standard had been applied.  *Id.*  It rejected,

25   however, Costco's effort "to equate a 'rigorous analysis' with an in-depth examination of the

26   underlying merits – i.e. whether Costco was in fact discriminating against women."  657 F.3d at

27   983 n.8.  Thus, it characterized as "incorrect" Costco's assertion that commonality requires

28

1  "statistical proof of under-promotion of women *and . . .* a plausible link between the practice and

2  the impact." *Id.*

3        Second, the Ninth Circuit clarified which factual issues should -- and should not -- be

4  resolved in connection with the commonality inquiry in this case.  Thus, the district court is *not*

5  required to resolve factual disputes regarding "whether women were in fact discriminated against

6  in relevant managerial positions as Costco" or "whether Costco does in fact have a culture of

7  gender stereotyping and paternalism." 657 F.3d at 983.   Instead, it must:

8
> resolve any factual disputes necessary to determine **whether there**
9  > **was a common pattern or practice that would affect the class *as***
> ***a whole*. . . .** In other words, the district court must determine
10 > whether there was 'significant proof that [Costco] operated under a
> general policy of discrimination. . . .'

11 *Id.* (bold added and internal citation omitted).  It identified just one factual issue for which

12 reconsideration was required on remand - "the national versus regional nature of the alleged

13 discrimination."  *Id.*at 984; *see infra* discussion at pages 22-23, below.

14      **3.**    **Plaintiffs Have Challenged Specific Employment Practices Which**
**Raise Common Questions**
15

16       Plaintiffs challenge a uniform company-wide system for making promotions to GM and

17 AGM, the components of which are largely undisputed.[10]  These components include:

18     •    Pre-selection and grooming of candidates for promotion into AGM and GM

19        through  promotable lists and the Green Room, based upon unvalidated criteria;

20     •    Reliance upon unvalidated criteria for making promotion decisions into AGM and

21        GM; and

22     •    Failure to provide females with accurate and timely notice of promotional

23        opportunities into AGM and GM.

24       The specific employment practices challenged here present common questions capable of

25 "generat[ing] common *answers* apt to drive the resolution of the litigation." *Dukes,* 131 S. Ct. at

26 _____

27 [10] Costco's promotion process for AGM and GM includes multiple uniform components that
collectively disadvantage women.  Under Title VII, Plaintiffs need not separate out the elements
28 if they are not capable of individual analysis.  42 U.S.C. 2000e-2(k)(1)(B)(i).

2551.  These questions include: whether Costco has engaged in a pattern or practice of disparate treatment adverse to its female employees with its use of this pre-selection and selection system for promotion into AGM and GM; whether Costco's pre-selection and selection system for promotion into AGM and GM has a disparate impact on female employees and, if so, is that justified by business necessity; whether injunctive and other equitable remedies are warranted for the Injunctive Relief class; whether other equitable remedies, back and front pay, punitive and compensatory damages are warranted for both Classes.  Third Amended Complaint (Dkt. No. 537) at ¶ 14.

The practices challenged here and those challenged in *Dukes* are starkly different.  While *Dukes* involved a multitude of job categories, both hourly and management employees, and both pay and promotion claims, Plaintiffs here challenge only promotion into two managerial job positions.  The practices affect a class of approximately 700 women, not 1.5 million.  The CEO is closely involved and directs key components of the process here.  All of the challenged decisions are made by a small group of high-level decision-makers working in concert, not thousands of individual store managers acting alone.  *See* Ex. 25.  While Plaintiffs' experts provide the scientific framework for understanding how this system disadvantages women, Costco's own managers identified the problems of bias and stereotyping that infect its promotion process.  *See, e.g.*, Reskin Decl. ¶¶ 35-45 (first explaining scientific framework and then discussing how the BOLD initiative fits into the framework).

Costco mischaracterizes Plaintiffs' claims, suggesting that they are treating CEO Sinegal as "one supervisor" responsible for making the challenged decisions.  Costco Br. at 13-14. Plaintiffs need not identify one common supervisor nor do they treat Sinegal as such.  Instead, the evidence demonstrates that, through his indisputably strong leadership, Sinegal has crafted the specific features of the promotion system (i.e. promotable lists, Green Room, no posting), directed his senior managers about the kind of individuals to select, and exercised influence and approval over selections to General Manager.  This evidence strongly supports that Costco managers have a "common mode of exercising discretion."  *Dukes,* 131 S. Ct. at 2554.

1

### 4.    Costco's Statistical Arguments Do Not Defeat Commonality

2
3
4
5
6
7
8

The district court previously concluded that "plaintiffs have presented compelling evidence of gender disparities . . . sufficient to demonstrate class-wide impact" and "provided sufficient evidence of gender disparities in the promotion of women to GM and AGM to raise a common issue of triable fact."  240 F.R.D. at 638-39.  In addition, the Court denied Costco's *Daubert* challenges to the admissibility of Plaintiffs' statistical experts, which the Ninth Circuit affirmed.[11]  657 F.3d at 981 n.6.   The statistical evidence presented here strongly supports the finding that Rule 23(a)(2) commonality is satisfied.

9
10
11
12

As noted above, the Ninth Circuit rejected Costco's claim that Plaintiffs must provide "statistical proof of under-promotion of women" to satisfy commonality, an approach that would "turn class certification into a mini-trial."  *Id.*  Despite this admonition, Costco re-argues a host of statistical issues that are, with one exception, merits-based issues.

13

### (a)    Pattern of Disparity Across Regions

14
15
16
17
18

The Ninth Circuit identified only one statistical issue that had implications for the question of whether there are common questions that would unify a *nationwide* class.  The parties' experts reached differing conclusions about the extent to which the statistical disparities presented a company-wide pattern versus one limited to only two out of eight regions.  The panel directed that, on remand, the district court should resolve this dispute.  657 F.3d at 983-84.

19
20
21
22
23
24

The differing conclusions of Plaintiffs' and Defendant's experts are explained by their respective decisions about whether and how to aggregate (or disaggregate) data for analysis.  Costco's expert analyzed the data at the regional level and his results consequently were not surprising given the relatively small number of promotions in each region.  For this reason, Dr. Drogin aggregated the results but included a control for region.  Drogin Decl. at ¶ 21.   Using this method, he found a consistent statistical pattern across the company.  *Id.*

25
26

------

27
28

[11] Judge Patel granted Defendant's motion on one point, striking an analysis of the average number of years it took to reach AGM positions.  240 F.R.D. at 648.

Importantly, <u>both experts found a negative disparity in female promotion rates for the period 1999 to the filing of the case in *every region*</u> (except Texas, which both agreed had too few promotions to analyze).  Drogin Decl. at ¶ 21; Saad Second Decl. at Exs. R2-R8, Ex. 28 (showing female shortfall for 1999-7.31.2004).  In other words, the experts agreed that the pattern in every region was adverse to women, although it was statistically significant in only some where the disaggregated mode of analysis was used.  This pattern of regional disparities is fully consistent with Dr. Drogin's finding of an overall pattern of disparities adverse to women at Costco.  Drogin Decl. at ¶ 21, n.21.

There is no legal requirement that plaintiffs demonstrate statistically significant shortfalls in every region at the liability stage of a Title VII class action, much less to demonstrate the Rule 23 commonality.  Indeed, the Ninth Circuit expressly rejected Costco's contention that "statistical proof of under-promotion of women" was required. Were that the law, a defendant could defeat commonality simply by breaking a statistical analysis down into ever-smaller subunits until a common pattern would be obscured.  Such a ploy becomes "an unfair and obvious attempt to disaggregate that data to the point where it was difficult to demonstrate statistical significance." *Capaci v. Katz & Besthoff, Inc.*, 711 F.2d 647, 654-56 (5th Cir. 1983); *see also McReynolds v. Sodexho Marriot Services, Inc.*, 349 F. Supp. 2d 1, 15 (D.D.C. 2004).  Aggregated data, especially here where regional data consistently shows disparities, "presents a more complete and reliable picture."  *Eldridge v. Carpenters 46 N. Cal. Counties JATC*, 833 F.2d 1334, 1339 n. 7 (9th Cir 1987); *Paige v. California*, 291 F.3d 1141, 1148 (9th Cir. 2002) (aggregation "is particularly appropriate where small sample size may distort the statistical analysis and may render any findings not statistically probative.").[12]

---

[12]  The cases cited by Costco are thus distinguishable.  In *Morgan v. UPS*, 380 F.3d 459 (8th Cir. 2004), which affirmed a summary judgment order *on the merits*, the district court found that "the number of districts in which no blacks were promoted was actually lower than would be expected."  Thus the evidence showed "discrimination in some districts and not in others…." 380 F.3d at 464.  In *Dukes*, the Supreme Court rejected aggregate statistics, in the absence of local data, because the aggregate disparity "may be attributable to only a small set of …stores."  *Dukes,* 131 S. Ct. 2555.  Here, both experts' analyses confirm that the disparities are not limited to a few regions but are observed in all measurable regions.

NOTICE OF CROSS-MO. & CROSS-MO. FOR CLASS CERT & OPPO. TO MO. FOR ORDER ELIMINATING CLASS CLAIMS

1    The evidence demonstrates that "there was a common pattern or practice that would affect

2    the class *as a whole*."  657 F.3d at 983.

3                        **(b)      Other Statistical Arguments**

4    *Failure to Account for Merchandise Manager Experience* - Dr. Drogin's promotion pool

5    for AGM included employees in all Senior Staff positions.  Unlike Costco's expert, Dr. Drogin

6    did not separate out one of these four positions, Merchandise Manager, as a variable because the

7    statistical evidence showed women were disproportionately denied this position.[13]  Drogin Decl.

8    ¶¶ 17-18.  This variable was therefore 'tainted'—use of this variable would skew the analysis and

9    obscure the discriminatory pattern.  Drogin Supp. Decl. ¶¶ 2-4.  Costco argues that Dr. Drogin's

10   analysis necessarily had to account for whether candidates had Merchandise Manager experience.

11   The district court disagreed, finding: "[p]laintiffs have presented substantial evidence,

12   beyond mere allegations, that raises the inference that MM [Merchandise Manager] is tainted by

13   Costco's preference for hiring men for that position."  240 F.R.D. at 648.[14]  Having found the

14   evidence "strong enough to establish commonality," the court concluded that "plaintiffs are not

15   required at this stage to prove that MM is a tainted variable."  *Id.*

16   The Court's analysis was correct.  The selection of variables included in a statistical

17   analysis is frequently the focus of expert debate in Title VII pattern and practices cases.  *See, e.g.*,

18   *EEOC v. Gen. Tel. Co. of Nw., Inc.*, 885 F.2d 575, 579-82 (9th Cir. 1989); *Morgan v. UPS*, 380

19   F.3d 459, 466-67 (8th Cir. 2004); *McReynolds v. Sodexho*, 349 F. Supp. 2d at 16.

20   More significantly, Costco fails to explain how this argument has anything to do with

21   commonality.  There is no evidence that this experience, tainted or not, is required or present in a

---

[13] The evidence included Dr. Drogin's analysis of lateral moves into Merchandise Manager, which showed substantial gender disparities.  Drogin Decl. ¶17.  His conclusion was supported by Costco's own internal focus group reports that women have been blocked from rotating into Merchandising positions.   Ex. 23 at CRE 0142527, 142538; Ex. 21 at CRE 142691.

[14] Case law supports excluding variables that "potentially" may themselves be tainted by discrimination.  *See Coates v. Johnson & Johnson*, 756 F.2d 524, 544 (7th Cir. 1985) (Cudahy, J., concurring) (collecting cases); *James*, 559 F.2d at 332; *see also Butler*, 1997 WL 605754, at *10 n.21 ("A 'tainted variable' is one whose value is affected by discrimination and has the effect of concealing disparities due to discrimination.").

1    regionally differentiated manner.  In short, whether such experience should be a variable is a

2    "common contention . . . that . . . is capable of classwide resolution."  *Dukes*, 131 S. Ct. at 2551.

3        *Inclusion of Pre-Limitations Data* – Raising another merits issue, Costco objects to Dr.

4    Drogin's statistical analysis, which included data from 1999 and 2000, claiming that it was wrong

5    to include these earlier years and that, without them, there is no evidence of statistically

6    significant disparities in the liability period.  Judge Patel made an explicit finding that there was

7    "no legal bar to the use of pre-liability period evidence in this case, and finds Dr. Drogin's

8    analysis relevant to plaintiffs' claims." 240 F.R.D. at 647.   There is no basis for upsetting that

9    finding, which is well supported by the case law and was not questioned by the Ninth Circuit.[15]

10       Moreover, the evidence in fact demonstrated statistically significant disparities *during* the

11   liability period.  Costco's expert confirmed that, even if the pre-limitations data were excluded,

12   Dr. Drogin's analysis would show statistical significance for the liability period up to the filing of

13   the action, and for year 2003 standing alone.  Saad Second Decl. ¶¶ 78–79, and R39, Ex. 28.

14       *Absence of Statistical Disparities for GM Promotions*  - Finally, Costco argues that the

15   absence of a disparity in promotions to GM undermines commonality, an argument that also got

16   no traction with the Ninth Circuit.   The lack of a disparity, as Dr. Drogin explained, is because

17   women's representation within the available pool (AGM) is "artificially low" as a result of their

18   under-promotion out of the Senior Staff job.  Drogin Decl. ¶23.  The absence of a disparity is no

19   bar to a finding of liability in a class case, where the lack of disparity is itself the product of

20   discrimination at lower levels.  *See Stender v. Lucky Stores, Inc.*, 803 F. Supp. 259, 333 (N.D.

21   Cal. 1992); *Butler v. Home Depot, Inc.*, 1997 WL 605754, at *8-10 (N.D. Cal. 1997); *see also*

22   *Segar v. Smith*, 738 F.2d 1249, 1283-84 (D.C. Cir. 1984).

23

24

25   [15] *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002); *Lyons v. England*, 307
26   F.3d 1092, 1108-11 (9th Cir. 2002); *Paige*, 291 F.3d at 1149 *Cherosky v. Henderson*, 330 F.3d
     1243, 1247 (9th Cir. 1986).  Moreover, courts often regard post-litigation conduct as suspect and
27   exclude it from analyses.  *EEOC v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1277 n.14 (11th Cir.
     2000); *James v. Stockham Valves and Fitting Co.*, 559 F.2d 310, 325 n.18 (5th Cir. 1977) (post
28   litigation changes entitled to little weight).

Costco's contention also ignores that the determination of commonality is based upon the totality of the evidence. Even at the merits stage, a claim may be established where statistical evidence alone does not raise an inference of discrimination. *See, e.g.*, *Gay v. Waiters' and Dairy Lunchmen's Union, Local 30*, 694 F.2d 531, 553 (9th Cir. 1982).

### 5.     <u>Dr. Reskin's Report Further Supports Commonality</u>

The expert testimony of sociologist Dr. Barbara Reskin explains the mechanism of stereotyped decision-making and how Costco's promotion practices might increase the likelihood that unconscious biases and stereotypes would affect promotion decisions, to the detriment of women.

In *Price Waterhouse v. Hopkins*, the U.S. Supreme Court recognized the value of expert testimony on stereotyping. 480 U.S. 228, 255-56 (1989). Courts have regularly admitted such expert testimony to assist triers of fact to understand the phenomenon of implicit bias and stereotypes, so that they can determine whether particular employment decisions resulted from unconscious bias. *See, e.g.*, *Butler v. Home Depot, Inc.*, 984 F. Supp. 1257, 1263-66 (N.D. Cal. 1997) (rejecting *Daubert* challenges to testimony of social psychologist, statistician and sociologist); *Butler*, 1997 WL 605754, at *7 (denying motion for summary judgment and for decertification of class, after consideration of, among other evidence, a report from a sociologist). *See generally* David L. Faigman, Nilanjana Dasgupta, Cecilia L. Ridgeway, *A Matter of Fit: The Law of Discrimination and the Science of Implicit Bias*, 59 HASTINGS L.J. 1389 (June 2008).

Nothing in *Dukes* has altered the usefulness or admissibility of expert testimony about stereotypes for appropriate purposes. In *Dukes*, the Supreme Court expressly confirmed that class certification is appropriate where the plaintiffs challenge a practice that incorporates a "common mode of exercising discretion." *Dukes*, 131 S. Ct. at 2554. Professor Reskin's report explicates the processes by which the small group of decisionmakers here are influenced by the CEO's views and the company culture.

1

### B.    Plaintiffs' Claims Are Typical of the Class

2        Only one typicality issue remains for this Court to address:  Does Costco have unique

3    defenses against the named Plaintiffs' claims that do not apply to other class members?  657 F.3d

4    at 985.  The answer is no.

5        The district court previously found that the named Plaintiffs were typical of the class they

6    seek to represent.  240 F.R.D. at 641.  On appeal, Costco raised a host of typicality arguments; the

7    Ninth Circuit found error as to only one.  It concluded that the district court improperly dismissed

8    Costco's asserted "unique defenses" as a matter of law, rather than considering their potential

9    impact on the litigation.  657 F.3d at 984 (citing 240 F.R.D. at 641).  It held that the Court must

10   consider whether "there is a danger that absent class members will suffer if their representative is

11   preoccupied with defenses unique to it."  *Id.* (citing *Hanon v. Dataproducts Corp.*, 976 F.2d 498,

12   508 (9th Cir. 1992)).  The proper analysis is whether the Plaintiffs need "to meet defenses . . . not

13   typical of the defenses which may be raised" against other class members.  *Id.*  The panel

14   declined to express an opinion about whether Costco had such defenses.  *Id.*

15       Costco has not met that standard.  Instead, it has proffered garden-variety defenses that are

16   routinely raised in promotion discrimination cases.   For each, it argues either that: 1) the Plaintiff

17   was not interested, available or qualified; or 2) there was no opening into which the Plaintiff

18   could have been promoted.[16]

19       So, for Rae Ellis, Costco argues she was a lateral hire, lied in the hiring process and was

20   disciplined for misconduct (not qualified) and transferred to a market with limited opportunities

21   (no openings).[17]  For Leah Horstman, Costco claims she deferred promotion to accommodate

22

23

---

24   [16] These very standard defenses are entirely different from the "unique defense" that made the
     named plaintiff in *Hanon* atypical.  There, the named plaintiff in a securities class action had
25   served as a named plaintiff in prior securities class actions, had a relationship with his lawyers,
     and had only purchased a small and uneconomical number of shares.  *Hanon*, 976 F.2d at 508.

26   [17] Costco's defenses also have no merit. Ellis was assured that her move to Colorado would not
     affect her chances at promotion. Ellis Decl. ¶ 9.  She was willing and able to relocate anywhere.
27   *Id.* ¶¶ 10, 15.  Ellis was disciplined for the first time *after* she filed her discrimination charge.  *Id.*
     ¶¶ 19-21.
28

1   raising children (not available).[18]  For Elaine Sasaki, Costco brands her a "bad performer" (not

2   qualified), and claims no adverse impact in her region (a class not individual defense).[19]  These

3   defenses are no different from the merits arguments that it will be raising against the rest of the

4   class, and may properly be considered in Phase II remedial proceedings.

5       **C.    The Case Can Properly Be Certified Using a Hybrid Approach Under
            Rule 23(b) and Plaintiffs Have Proposed a Manageable Trial Plan**

6

7           The Ninth Circuit vacated the Rule 23(b)(2) certification here after *Dukes* held that claims

8   for back pay and other individualized remedies could no longer be certified under that subsection.

9   The appeals court also concluded that former employees lacked standing under Rule 23(b)(2) as

10  they do not have an interest in injunctive relief.  The panel remanded for this Court to determine

11  whether the class can be recertified under Rule 23(b)(2) and (b)(3).  As a result, Plaintiffs meet

12  Rule 23(b) through two proposed classes:  (1) an injunctive relief class (current employees only);

13  and (2) a monetary relief class (current and former employees).  Plaintiffs ask the Court to certify

14  liability and injunctive relief under Rule 23(b)(2) and all remedies under Rule 23(b)(3).  Plaintiffs

15  further propose current employee Sasaki as the representative for the Rule 23(b)(2) class and all

16  three named Plaintiffs as representatives for the Rule 23(b)(3) class.  Plaintiffs request notice and

17  opt-out rights for all class members.

18          Plaintiffs' proposal is consistent with the traditional model for Title VII class actions

19  established under *International Brotherhood of Teamsters vs. United States*, 431 U.S. 324, 361

20  (1977), and reaffirmed by the Supreme Court in *Dukes.*  This hybrid (b)(2) and (b)(3) approach

21  has been approved in numerous pre- and post-*Dukes* class cases, including most recently *United*

22  *States v. City of New York*, 276 F.R.D. 22, 34 (E.D.N.Y. 2011), and *Easterling v. Connecticut*

23

24  ────────────────────

    [18] Horstman turned down a Front End Manager position, the hours of which were not compatible

25  with her family responsibilities, because she had been assured that her prior service as an
    Assistant Front End Manager was sufficient for promotion.  Horstman Decl. ¶¶ 24-35.  She

26  remained in her current position because she believed her GM would not promote her unless she
    served as Front End Manager.  *Id.* ¶ 30.

27  [19] The record establishes that Costco considered Sasaki promotable until she complained about
    the unfairness of the promotion system.  *See* Sasaki Decl. ¶¶ 18, 27-28 & Ex. 9.

28

*Dept. of Correction*, 278 F.R.D. 41 (D. Conn. 2011).[20]  *See also Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 167-68 (2d Cir. 2001).  As explained in Plaintiffs' proposed trial plan, the parties would first litigate liability and injunctive claims.  Then, damages would be subject to individualized damages hearings.  These hearings would operate under the procedure set forth in *Teamsters*, which establishes a presumption, after a finding of liability, that a female employee's non-promotion was the result of discrimination.

**1.  Injunctive and Liability Claims Are Properly Certified Under Rule 23(b)(2)**

The Court should recertify the liability phase and claims for injunctive relief under Rule 23(b)(2).  While the Ninth Circuit vacated the prior (b)(2) ruling, it focused only on whether Plaintiffs' "*compensatory damages and backpay claims*" were properly certified under Rule 23(b)(2).  657 F.3d at 987 (emphasis added).  As Rule 23(b)(2) is appropriate where the "primary relief sought is declaratory or injunctive," *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1195 (9th Cir.), *amended by* 273 F.3d 1266 (9th Cir. 2001), Plaintiffs' claims for injunctive relief fit squarely under Rule 23(b)(2).  Costco does not dispute this point.

**2.  Plaintiffs' Back Pay and Compensatory Damages Claims Are Properly Certified Under Rule 23(b)(3)**

Plaintiffs propose that back pay and compensatory damages be certified under Rule 23(b)(3).  Under Rule 23(b)(3), the district court must determine whether common issues predominate over individual issues, and whether class treatment will be manageable and the superior method of resolution of the class members' claims.

*Common Issues Predominate* - As described above, this case challenges Costco's uniform promotions practice.  Curing this discriminatory practice will require a common remedy.  *See City of New York*, 276 F.R.D. at 47-49.  The individualized issues to be resolved will only arise if

---

[20] The Sixth Circuit recently approved a similar approach in *In re Whirlpool Corp. Front-Loading Washer Products Liability Litigation*, a consumer class action. No. 10-4188,  — F.3d —, 2012 WL 1537914, at *10 (6th Cir. May 3, 2012); *see also, e.g., Chen-Oster*, 2012 WL 205875, at *7-8; *Jermyn v. Best Buy Stores, L.P.*, 276 F.R.D. 167, 173-74 (S.D.N.Y. 2011).

Plaintiffs first prove at a Phase I liability trial that Costco has maintained a discriminatory promotions system, making Costco liable for damages.  Then, at Phase II, the focus will turn to damages allocable to each individual, with Costco having the burden to prove, through admissible evidence, that any employee's specific non-promotion was *not* the result of discrimination.  *Id.* at 48.  Moreover, because no damages hearings would be necessary unless Plaintiffs prove Costco's *liability* for damages, it is preferable to resolve the liability issue first on a classwide basis, resolve issues common to all claims for damages, and then move to any necessary damages calculations.

Courts, including those with certified classes much larger than this one, have approved this process.  *See, e.g.*, *United States v. City of New York*, 258 F.R.D. 47, 67 (E.D.N.Y. 2009) (certifying liability phase under Rule 23(b)(2) and deferring decision regarding certification of claims for monetary relief until after determination of liability); *City of New York*, 276 F.R.D. at 47-50 (class of over 7,100, over 2000 of whom were eligible for compensatory damages; after determination of liability, certifying certain issues relating to monetary relief under Rule 23(b)(3)); *see also Jenson v. Eveleth Taconite Co.*, 130 F.3d 1287 (8th Cir. 1997) (reviewing damages phase of case; certification order at 139 F.R.D. 657 (D. Minn. 1991)); *Neal v. Dir. D.C. Dept of Corr.*, No. 93-2420, 1995 WL 517246, at *4-5 (D.D.C. Aug. 9, 1995); *cf. McReynolds*, 672 F.3d at 490-91 (noting efficiencies in determining liability on classwide basis rather than in 700 individual lawsuits).  Moreover, Costco's attempt to portray the individual hearings of 700 class members as "doom[ing] certification" confuses the predominance inquiry.  As one court has explained, "The [predominance] question is not one of scale; instead it is whether certification 'would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.' . . .  The number of potential claimants says nothing about the relationship between common and individual issues." *City of New York*, 276 F.R.D. at 48 (quoting *Myers v. Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010)).

*A Class Action Is the Superior Approach* - A class action remains the superior method of litigating these issues, because the court can resolve the myriad common issues in one proceeding

1   and leave only the individualized issues for additional *Teamsters* proceedings.  *City of New York*,

2   276 F.R.D. at 49.  As this Court has held, "[G]iven the classwide nature of the claims and the

3   predominance of common issues over individual issues, it would make little sense to force the

4   parties and the courts to duplicate efforts all with respect to the same workplace." *Delagarza v.*

5   *Tesoro Ref. & Mktg. Co.*, C-09-5803 EMC, 2011 WL 4017967, at *16 (N.D. Cal. Sept. 8, 2011).

6   Under *Teamsters*, every class member shares the same presumption.  If the court declines to

7   certify the class, that significant efficiency will be lost.  *Cf. McReynolds*, 672 F.3d at 492 ("[T]he

8   lawsuits will be more complex if, until issue or claim preclusion sets in, the question whether

9   Merrill Lynch has violated the antidiscrimination statutes must be determined anew in each

10  case.").[21]

11      Costco asserts that the mere presence of "individual hearings to identify who was best

12  suited for and actually interested in specific promotions" defeats predominance.  To the contrary,

13  as other courts have analyzed, this exact analysis is *consistent* with class certification.  *See, e.g.*,

14  *Easterling*, 278 F.R.D. at 50 ("[T]o share in any forward-looking relief, such as priority hiring or

15  front pay, each claimant would need to establish that she is currently qualified [for the relevant

16  position] . . . . [and] mitigation issues . . . these individual questions are less substantial than the

17  issues that will be subject to generalized proof."); *City of New York*, 276 F.R.D. at 47-50

18  (determining that class satisfied Rule 23(b)(3) even though individual proceedings would be

19  required).

20      The predominance requirement does not "constitute a uniformity requirement, such that a

21  single exception would defeat class certification." *Delagarza*, 2011 WL 4017967, at *12; *see*

22  *also Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 819 (7th Cir. 2012) (rejecting that

23  Rule 23(b)(3) requires "common proof of damages for class members").  Even where certain

24  class members' circumstances vary, certification under Rule 23(b)(3) may be appropriate.

25

26  [21] The relevant comparison for purposes of the 23(b)(3) analysis is not, as Costco argues, between the trial plan proposed by Plaintiffs and no individual lawsuits but rather between the trial plan

27  and 700 individual lawsuits. *City of New York*, 276 F.R.D. at 49; *see also McReynolds*, 672 F.3d at 490-91.

28

1    *Delagarza*, 2011 WL 4017967, at *12. Given the many common issues and the efficiencies to be

2    gained by class treatment, such certification is appropriate here.[22]

3              **3.      The Court Should Certify Punitive Damages Under Rule 23(b)(3)**

4              The Ninth Circuit directed that, on remand, this Court should consider whether Plaintiffs'

5    claim for punitive damages should be certified under either Rule 23(b)(2) or (b)(3). 657 F.3d at

6    987 & n.10. Plaintiffs propose that this Court certify the claim under Rule 23(b)(3).[23]

7              Plaintiffs' punitive damages claim may properly be certified under Rule 23(b)(3).

8    Resolving punitive damages in a single class proceeding ensures that the amount of punitive

9    damages awarded among the class is consistent and properly measures the reprehensibility of

10   Costco's conduct. No individual issues are implicated because, as the Ninth Circuit held, they

11   "do not require an individual determination." 657 F.3d at 987. The panel expressly endorsed

12   Judge Patel's holding that "a claim [for punitive damages] focuses on the conduct of the

13   defendant and not the individual characteristics of the plaintiffs." 240 F.R.D. at 643 (citing

14   *Barefield v. Chevron*, 1988 WL 188433, at *3 (N.D. Cal. Dec. 6, 1988)); *see also State Farm*

15   *Mut. Auto. Ins. v. Campbell*, 538 U.S. 408, 416 (2003) ("[P]unitive damages . . . are aimed at

16   deterrence and retribution"); *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 535 (1999) (holding that

17   "§ 1981a provides for punitive awards based solely on an employer's state of mind").

18

19

20   [22] Costco asserts that, absent *objective* evidence of interest in promotions which it did not retain,

21   the class cannot be certified. Its reliance on the district court decision in *Dukes* is misplaced,
     however, because the district court assumed there would be *no* individualized proceedings at
     Stage II; in contrast, Plaintiffs propose to conduct such hearings. *Cf. Dukes v. Wal-Mart Stores,*

22   *Inc.*, 222 F.R.D. 137, 180 (N.D. Cal. 2004). This Court has also rejected similar arguments that
     defendant's own missing data can preclude a finding that Rule 23(b)(3) certification is

23   appropriate. *Delagarza*, 2011 WL 4017967, at *17. To allow Costco to benefit from its own

24   failure to retain records would be at odds with Title VII's mandate to ensure that proven victims
     of discrimination receive "make whole" relief. *Albemarle Paper Co. v. Moody*, 422 U.S. 405,

25   418-20 (1975).

26   [23] Based on Plaintiffs' research, no district court has yet determined that punitive damages are "an
     allowable 'form[] of 'incidental' monetary relief'" under Rule 23(b)(2) after *Dukes*. Because

27   Plaintiffs are already requesting that the class receive notice and opt out rights and the claim
     otherwise satisfies Rule 23(b)(3), there is no need for this Court to address this issue of first

28   impression.

NOTICE OF CROSS-MO. & CROSS-MO. FOR CLASS CERT & OPPO. TO MO. FOR ORDER ELIMINATING CLASS CLAIMS

Costco ignores these holdings and challenges any certification of punitive damages, because it claims a right to raise defenses to each individual's punitive damage claim.[24] As just noted, the Ninth Circuit has rejected this contention in finding that no "individual determination" is required.   Moreover, Costco does not explain what individual defenses to punitive damage liability it could raise, which would be relevant to "the degree of reprehensibility of the defendant's conduct." *State Farm*, 538 U.S. at 419. The statutory provision upon which Costco rests its contention that it can defend each Title VII claim individually, 42 U.S.C. § 2000e-5(g)(2)(A) & (B), does not address punitive damages at all.[25]

### 4.   The Court Can Alternatively Certify Particular Issues Under Rule 23(c)(4)

If the Court does not certify the back pay and damages claims under Rule 23(b)(3), Plaintiffs request that the Court certify "particular issues" under Rule 23(c)(4).  *See McReynolds*, 672 F.3d at 490-92  (certifying injunctive and classwide liability claims under Rule 23(c)(4)); *see also Easterling*, 278 F.R.D. at 45-46 (citing *Robinson*, 267 F.3d at 167-68  and noting that it was not overruled by *Dukes* as to this point); *City of New York*, 276 F.R.D. at 33-35 (same).  For the reasons outlined above, Plaintiffs' injunctive and classwide liability claims are appropriately certified under Rule 23(c)(4).

### D.   Trial Plan

Plaintiffs propose the following trial plan:[26]

**STAGE 1 (Part One):**  The jury decides:

---

[24] *State Farm* and *Philip Morris* mandated a showing of harm to the individual because, in those state tort cases, punitive damages were awarded as punishment for harm inflicted on individuals *other* than the plaintiffs.  Here, the only harm at issue is harm to the class, and upon a finding of liability, the necessary predicate to punitive damages would have been established.  Nor does Costco's reference to Title VII's language regarding the "rights of an aggrieved individual" preclude class relief.  *See Califano v. Yamasaki*, 442 U.S. 682, 698-99 (1979) (language in Social Security Act authorizing suit by "individual" did not preclude class relief).

[25] If Costco has no right to defend punitive damages claims with individual defenses, its Rules Enabling Act argument necessarily fails.

[26] Ellis's retaliation claims should be severed and tried separately from the class trial.

- Whether Costco has engaged in a pattern or practice of discrimination (liability for class-wide disparate treatment);

- Whether Costco's conduct meets the standard for an award of punitive damages;

- If liable for punitive damages, the aggregate amount of punitive damages owed to the class; [27]  and

- Whether Costco is liable to the named Plaintiffs for gender discrimination  and, if so, in what amount;

The Court decides:

- Whether Costco's employment practices have had an adverse impact on the class (prima facie case of disparate impact).

**STAGE 1 (Part Two):**  The Court would decide:

- Whether Costco's employment practices were justified by business necessity (defense to the disparate impact claim), and if so, whether there was a less discriminatory alternative;

- In the event of a liability finding for disparate impact, appropriate injunctive relief;

**STAGE 2:**

- Individual hearings to determine back pay and compensatory damages and adjudicate individual defenses. [28]

## V.     <u>CONCLUSION</u>

This case is a straightforward challenge to a promotion system that is uniform companywide and mandated at the highest level.  It presents common questions of liability and relief under Title VII and is well-suited for class treatment.  Accordingly, Plaintiffs request that

---

[27] *See Barefield,* 1988 WL 18843 at *3-4 (determination of liability for, and amount of, punitive damages to class in Stage 1).  There are adequate protections to ensure that, if punitive damages are awarded, they would satisfy constitutional due process.  Punitive damage awards can be measured against verdicts for back pay and compensatory damages.  *Bains LLC v. Arco Products Co.,* 405 F.3d 764, 775-77 (9th Cir. 2005).  The trial court retains authority to modify punitive damages award after Stage II proceedings if it concludes it is disproportionate to actual damages. There is little risk of an excessive award since Title VII imposes a cap on compensatory and punitive damages.  42 U.S.C. § 1981a(b)(3).  Finally, any class member can opt out and choose instead to litigate on her own.

[28] The Court can ensure that the punitive damage award is not disproportionate to the actual damages finally awarded to ensure due process.

1    this Court certify the proposed classes, appoint class counsel as set forth in Larkin Declaration,

2    and deny Costco's motion.

3    Dated: June 8, 2012                        By:    /s/ Jocelyn D. Larkin
                                                      Jocelyn D. Larkin
4
                                               THE IMPACT FUND
5                                              Brad Seligman (SBN: 83838)
                                               Jocelyn D. Larkin (SBN: 110817)
6                                              Michael Caesar (SBN 280548)
                                               125 University Avenue, Suite 102
7                                              Berkeley, CA 94 710
                                               Telephone: (510) 845-3473
8                                              Facsimile:  (510) 845-3654
                                               jlarkin@impactfund.org
9
                                               LEWIS, FEINBERG, LEE, RENAKER &
10                                             JACKSON, P.C.
                                               Bill Lann Lee (SBN: 108452)
11                                             Julia Campins (SBN: 238023)
                                               476 9th Street
12                                             Oakland, CA  94607
                                               Telephone: (510) 839-6824
13                                             Facsimile:  (510) 839-7839

14                                             LIEFF CABRASER HEIMANN &
                                               BERNSTEIN, LLP
15                                             Kelly Dermody (SBN: 171716)
                                               Daniel Hutchinson (SBN: 239458)
16                                             275 Battery Street, 29th Floor
                                               San Francisco, CA  94111-3339
17                                             Telephone: (415) 956-1000
                                               Facsimile:  (415) 956-1008
18
                                               DAVIS, COWELL & BOWE LLP
19                                             Steve Stemerman (SBN:067690)
                                               Elizabeth A. Lawrence (SBN:111781)
20                                             595 Market Street, #1400
                                               San Francisco, CA  94105
21                                             Telephone: (415) 597-7200
                                               Facsimile:  (415) 597-7201
22
                                               ALTSHULER BERZON LLP
23                                             James M. Finberg (SBN: 114850)
                                               Eve H. Cervantez (SBN: 164709)
24                                             177 Post Street, Suite 300
                                               San Francisco, CA 94108
25                                             Telephone: (415) 421-7151
                                               Facsimile: (415) 362-8064
26
                                               *Attorneys for Plaintiffs and the*
27                                             *Proposed Classes*

28
     1041977.2                       - 35 -                   Case No. C-04-3341 EMC

NOTICE OF CROSS-MO. & CROSS-MO. FOR CLASS CERT & OPPO. TO MO. FOR ORDER ELIMINATING CLASS CLAIMS